## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**OUR ALCHEMY, LLC, *et al.*,**<br><br>　　　　　**Debtors.** | **CHAPTER 7**<br>**Case No. 16-11596-KG**<br>**Jointly Administered** |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,**<br><br>　　　　　**Plaintiff,**<br><br>　　　**v.**<br><br>**ANCONNECT, LLC; ANDERSON MERCHANDISERS, LLC; ANDERSON MERCHANDISERS CANADA, INC.; OA INVESTMENT PARTNERS LLC; OA INVESTMENT HOLDINGS LLC; VIRGO INVESTMENT GROUP, LLC; VIRGO SOCIETAS PARTNERS, LLC; VIRGO SOCIETAS PARTNERSHIP III (ONSHORE), L.P.; VIRGO SOCIETAS PARTNERSHIP III (OFFSHORE), L.P.; VIRGO SERVICE COMPANY LLC; ARC ENTERTAINMENT, LLC; ARDON MOORE; MARK PEREZ; JESSE WATSON; TODD DORFMAN; BILL LEE; STEPHEN LYONS; and FREYR THOR,**<br><br>　　　　　**Defendants.** | **Adv. No. _____**<br><br><br><br>__**JURY TRIAL DEMANDED**__ |

## COMPLAINT

### I.    INTRODUCTION

　　　　1.　　　Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly

administered Chapter 7 bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson

Digital, LLC ("Anderson Digital" and collectively with Alchemy the "Debtors"), by and through

his counsel, brings this action, *inter alia*: (a) to avoid as fraudulent transfers various transactions associated with and including the acquisition of ANConnect, LLC's physical and digital distribution business for a value far in excess of the fair market value of that interest (the "ANConnect Transaction"); (b) to avoid certain other fraudulent and/or preferential transfers that were made to the detriment of creditors, including excessive cash payments and fees paid to Alchemy insiders and others, improperly exercised setoffs, and satisfaction of other parties' obligations using the Debtors' funds; (c) to recover over $6 million of Alchemy's accounts receivable that are being wrongfully withheld by ANConnect; and (d) to recover for the Defendants' breaches of fiduciary duty, including but not limited to entering into the ARC Transaction (defined later herein) and permitting and directing the Debtors to assume and/or pay obligations of certain of the Defendants, the combination of which caused the Debtors to collapse into bankruptcy promptly following the closing of the ANConnect Transaction and ARC Transaction in July 2015.

2.     This case arises from an investment firm's purchase of the Debtors, upon which it rendered the Debtors insolvent, squandered their working capital in a series of ill-conceived transactions, and forced the Debtors to shoulder their affiliates' obligations at every turn.  In 2014, Virgo Investment Group added Alchemy, a distributor of film and television content, to its portfolio.  Within weeks of purchasing Alchemy, however, Virgo rendered the company insolvent by taking a $14.5 million dividend for itself.  Although Virgo injected capital into Alchemy over the course of the following months (in a failed attempt to keep the company afloat), emails between the Debtors' insiders make clear that Alchemy was suffering from crippling liquidity and cash flow problems that persisted throughout Virgo's short-lived management of the Debtors.  Alchemy nonetheless paid nearly $40 million for ANConnect's

physical and digital distribution business in June 2015, despite knowing that ANConnect's

physical distribution business was suffering from its own serious financial problems and that the

lion's share of the business (consisting of physical DVD sales) was a rapidly dying industry with

sales significantly declining in the years prior to Alchemy's acquisition.  A series of disputes

between the Debtors, ANConnect, and various ANConnect affiliates ensued, in which the

Debtors transferred away millions of dollars in fees and were not appropriately compensated by

ANConnect.  Alchemy has also been denied over $7 million of its accounts receivable, which

ANConnect refuses to remit to Alchemy, as required by the governing agreements.  At the same

time, Virgo agreed to bail out a failing and hopelessly insolvent entity named ARC, which was

on the brink of collapse, in hopes of improving their relationship with the heirs to a Texas oil

fortune.  Even though the Debtors were not parties to the agreement governing the ARC

Transaction, Virgo forced the Debtors to pay off other entities' debts as a result of the

transaction, assume over $2 million in ARC debt, and take responsibility for managing ARC

without receiving any benefit for doing so.  Alchemy never recovered from the stress inflicted

upon it by its insiders and, less than a year after acquiring ANConnect, filed for bankruptcy.

## II.    JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the

"Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

4.     The Trustee demands a jury trial before an Article III judge in connection with all

claims asserted herein, and the Trustee does not consent to the entry of final judgment or

adjudication by a bankruptcy judge.

5.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

3

## III.   PARTIES

### A.   The Plaintiff

6.     Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Debtors' bankruptcy estates.  Plaintiff maintains an office at Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.

7.     On July 1, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases are being jointly administered under the caption *In re Our Alchemy, LLC, et al.*, U.S.B.C. D. Del., Case No. 16-11596-KG.

8.     Alchemy, previously known as Millennium Entertainment, was an independent distributor of film and television content across all platforms in North America, including DVD, digital, and video-on-demand platforms.  In July 2015, Alchemy agreed to purchase certain physical home video and digital distribution capabilities from ANConnect, LLC, including, *inter alia*, the purchase of Debtor Anderson Digital, LLC.

### B.   The Defendants

#### 1.   The Anderson Defendants

9.     Defendant ANConnect, LLC ("ANConnect") is a Texas limited liability company with its principal place of business at 421 SE 34th Street, Amarillo, TX 79103.  ANConnect is the physical distribution arm of, and is wholly-owned by, Anderson Media Corporation.  Prior to the ANConnect Transaction, ANConnect owned a 51% membership interest in Anderson Digital.

10.     Defendant Anderson Merchandisers, LLC ("Anderson Merchandisers") is a Delaware limited liability company with its principal place of business at 5601 Granite Parkway,

4

Suite 1400, Plano, TX 75024.  Anderson Merchandisers provides in-store merchandising services, and is a wholly-owned subsidiary of Anderson Media Corporation.

11.      Defendant Anderson Merchandisers Canada, Inc. ("AM Canada") is a Delaware corporation with a place of business at 60 Leek Crescent, Unit B, Richmond Hill, Ontario L4B 1H1.  AM Canada is a wholly-owned subsidiary of Anderson Media Corporation.

12.      Defendant Stephen Lyons is an individual with an address at 1524 Anita Lane, Newport Beach, CA 92660.  Lyons was co-founder, Managing Partner, and Executive Vice President of Sales, Marketing, and Business Development of Anderson Digital.  Lyons owned a 24.5% membership interest in Anderson Digital.  In connection with Alchemy's purchase of Anderson Digital, Lyons resigned from his positions, effective July 9, 2015.

13.      Defendant Freyr Thor is an individual with an address at 115 Peterson Avenue, South Pasadena, CA  90630.  Thor was co-founder and Managing Partner of Anderson Digital. Thor owned a 24.5% membership interest in Anderson Digital.  In connection with Alchemy's purchase of Anderson Digital, Thor was hired by Alchemy as Senior Vice President of Product Management.

### 2.      The Virgo Defendants

14.      Defendant Virgo Investment Group, LLC ("Virgo Investment Group") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.

15.      Defendant Virgo Societas Partners, LLC ("Virgo Societas") is a Delaware limited liability company for which Jesse Watson serves as managing member, with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.

5

16.     Defendant Virgo Societas Partnership III (Onshore), L.P. ("Virgo Onshore") is a Delaware limited partnership with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.  Virgo Onshore's general partner is Defendant Virgo Societas Partners, LLC, of which Jesse Watson is the Managing Member.  Virgo Onshore is a limited partner of Calrissian, LP.

17.     Defendant Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore") is a Cayman Islands limited partnership with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.  Virgo Offshore's general partner is Defendant Virgo Societas Partners, LLC, of which Jesse Watson is the Managing Member. Virgo Offshore is a limited partner of Calrissian, LP.

18.     Defendant Virgo Service Company LLC ("Virgo Service Company") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.  Virgo Service Company is an affiliate of Defendants Virgo Investment Group, Virgo Onshore, and Virgo Offshore.[1]  Virgo Service Company is the general partner of Calrissian LP ("Calrissian"), which is the 100% equity owner and sole member of Alchemy.[2]

19.     Defendant Jesse Watson is an individual with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010.  Watson is Founding Partner, Chief Investment

---

[1]     Virgo Investment Group, Virgo Societas, Virgo Onshore, Virgo Offshore, and Virgo Service Company are referred to, collectively, herein as the "Virgo Entities" or "Virgo."

[2]     Calrissian filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which is being administered under the caption *In re Calrissian LP*, No. 17-10356-KG.  Contemporaneously with the filing of the instant Complaint, Plaintiff has also filed an adversary proceeding against Calrissian within Calrissian's bankruptcy case, seeking avoidance and recovery of certain fraudulent and preferential transfers described herein.

6

Officer, and Manager of Virgo Investment Group, and has lead responsibility for the day-to-day operations of the company and its affiliates. Watson is also a Manager of Virgo Service Company. Watson also served on Alchemy's Board of Managers.

20.    Defendant Todd Dorfman is an individual with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010. Dorfman is a Founding Partner of Virgo Investment Group, and served on Alchemy's Board of Managers.

21.    Defendant Mark Perez is an individual with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010. Perez is a Founding Partner of Virgo Investment Group. Perez also served on Alchemy's Board of Managers, and played an active role in Alchemy's day-to-day operations.[3]

22.    At all times relevant hereto, the Virgo Entities and the Virgo Individuals were and are the agents of one another and, in doing the acts alleged herein, acted within the course and scope of such agency and each ratified and/or authorized the wrongful acts of each other.

23.    Defendant Bill Lee is an individual residing at 701 Ocean Avenue, #103; Santa Monica, CA 90402. Lee served as Alchemy's Chief Executive Officer until he was fired by the Alchemy Board of Managers in December 2015. Lee also served on Alchemy's Board of Managers during his time with the company.

24.    Defendant OA Investment Partners LLC ("OA Partners") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010. OA Partners' members include Virgo Onshore (24.48%), Virgo

---

[3]    Jesse Watson, Mark Perez, and Todd Dorfman are referred to, collectively, herein as the "Virgo Individuals."

7

Societas Intermediate III, LLC (25.52%), and ALC Mezz Partners, L.P. (50%). Virgo Service Company is the designated Manager of OA Partners.

25.     Defendant OA Investment Holdings LLC ("OA Holdings") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010. Calrissian is the 100% equity owner and sole member of OA Holdings. Virgo Service Company is the designated Manager of OA Holdings.

### 3.     The ARC Defendants

26.     Defendant ARC Entertainment, LLC ("ARC") is a Delaware limited liability company with a place of business at 201 Main Street, Suite 3200, Fort Worth, TX 76102. At all times material hereto, ARC was controlled by Defendant Ardon Moore.

27.     Defendant Ardon Moore is an individual with a place of business at 201 Main Street, Suite 3200, Fort Worth, TX 76102. Moore is the President of ALC Genpar, LLC, the general partner of ALC Partners, L.P. which is a limited partner of Calrissian. Moore is also the President of ALC Mexx Genpar, LLC, the general partner of ALC Mezz Partners, L.P. which is a member of Defendant OA Partners.

## IV.     FACTS

28.     In 2010, Millennium Entertainment, LLC, now known as Alchemy, was formed as a film distribution and catalog company.

### A.    Virgo, Acting Through Calrissian, Purchases Millennium

29.    Calrissian was formed as a Delaware limited partnership on August 4, 2014, with Virgo Service Company as its general partner, and Virgo Onshore, Virgo Offshore, and Santa Rita Entertainment, LLC (run by Bill Lee) as its limited partners.

30.    Calrissian was formed for the purpose of purchasing 100% of the membership interests in Millennium Entertainment, LLC.  On August 18, 2014, Calrissian and the Virgo Entities entered into a Purchase Agreement with Nu Image Holdings, Nu Image, Inc., and certain other equity holders to purchase all outstanding equity interests in Millennium Entertainment, LLC, for a purchase price of $41 million, $36 million of which was the initial closing payment with the remaining $5 million paid out over future years.

31.    Calrissian is merely an investment vehicle for Virgo Entities.  Calrissian has no operations or employees, has no real assets other than its equity interest in Alchemy and OA Holdings, and is entirely controlled by the Virgo Entities.

32.    After the sale, Calrissian changed the name of Millennium Entertainment, LLC to Our Alchemy, LLC.  Per a January 8, 2015 press release, "[t]he rebrand comes five months after a management team led by Lee and private investment firm Virgo Investment Group LLC partnered to acquire the Millennium Entertainment catalog assets and distribution platform from a consortium of investors."

### 1.    Alchemy Makes a $14.5 Million Equity Distribution to Calrissian

33.    On August 18, 2014, Calrissian entered into a Promissory Note in favor of Virgo Onshore and Virgo Offshore in the amount of $14,340,000 to partially fund Calrissian's acquisition of Millennium Entertainment from Nu Image, Inc. and other equity holders.  Section

9

4.7 of the Promissory Note states, "Borrower hereby covenants that all proceeds of this Note shall be used solely to make an equity investment in Millennium LLC."

34.     On September 4, 2014, less than a month after Calrissian's acquisition of Alchemy had been completed, Alchemy entered into a $40 million credit facility with SunTrust Bank, N.A., which consisted of a $20 million revolver and a $20 million term loan (the "September 2014 SunTrust Facility").

35.     Upon the closing of the September 2014 SunTrust Facility, Calrissian – acting through Mark Perez – caused Alchemy to draw $14,539,123.65 out of the SunTrust loan proceeds and transfer that $14,539,123.65 to Calrissian (Alchemy's sole member) as an equity distribution (the "Calrissian Distribution").[4]

36.     On September 4, 2014, Mark Perez sent an email confirming receipt of the funds on behalf of "Calrissian / Virgo."

37.     This transfer to Calrissian is recorded as a member distribution in Alchemy's books and records.

38.     The Calrissian Distribution had the effect of doubling Alchemy's bank debt, from approximately $15 million, to over $31 million.

39.     Subsequently, on September 17, 2014, Calrissian made (i) a $7,110,756.29 transfer to Virgo Onshore, and (ii) a $7,411,931.38 transfer to Virgo Offshore, totaling $14,522,687.67.  The remaining $16,435.98 (i.e., the remainder of the Calrissian Distribution, after the September 17, 2014 transfers to Virgo Onshore and Virgo Offshore) remained in Calrissian's bank account.

---

[4]     The Trustee filed a Proof of Claim for this transfer in the Calrissian bankruptcy. *See In re Calrissian LP*, U.S.B.C. D. Del., Case No. 17-10356 (KG), Claim 2-1, filed March 22, 2018.

40.     Alchemy received no consideration for making the Calrissian Distribution, which rendered Alchemy insolvent and unable to pay its debts as they came due, and left Alchemy with unreasonably small capital for the business in which it was engaged.

41.     Indeed, as a result of the Calrissian Distribution, Alchemy became inundated with past due notices from creditors, threats of termination of material content supply agreements for non-payment, and threats of legal action, and was forced to micromanage which creditors to pay (if at all), and soon defaulted on, *inter alia*, a number of film licensing agreements with Nu Image, Inc. for failing to make participation payments thereunder.

### 2.     Calrissian and the Virgo Entities Are Forced to Inject Capital to Fund Alchemy Operations

42.     The Calrissian Distribution left Alchemy insolvent and with unreasonably small capital for the business in which it was engaged, and in a position where the Virgo Entities were forced to advance funds to keep its operations afloat.

43.     In an October 9, 2014 email, Virgo principal Mark Perez expressed concern about Alchemy's "tightened liquidity position" and stressed the "[n]eed to continue to show timely payments," fearing that Virgo would need to "inject interim capital . . . if absolutely necessary to get us through."

44.     Perez's fears concerning insufficient capital were well-founded, as Virgo found it "absolutely necessary" to inject capital into Alchemy on multiple occasions throughout the subsequent months.

45.     On January 12, 2015, Calrissian, acting at the behest of Virgo and Perez, advanced $3,000,000 to Alchemy (then still known as Millennium Entertainment, LLC) to fund a Promissory Note executed by Millennium in favor of Calrissian.  The maturity date was March 28, 2015, seventy-five (75) days from the date of the Note.

11

46.     On March 31, 2015, Our Alchemy transferred $3,051,945.21, which included accrued interest, to Calrissian to payoff the January 21, 2015 Note.

47.     Subsequently, on March 31, 2015, Calrissian made (i) a $1,494,326.60 transfer to Virgo Onshore, and (ii) a $1,557,618.60 transfer to Virgo Offshore, totaling $3,051,945.20.

48.     A couple months later, on May 21, 2015, Calrissian, acting at the behest of Virgo and Perez, advanced another $3,000,000 to Alchemy, to fund another Promissory Note executed in favor of Calrissian.  The maturity date for this Note was again seventy-five (75) days from the date of the Note, on August 4, 2015.

49.     On July 10, 2015, one day after Closing on the ANConnect Transaction, Alchemy transferred $3,033,534.25 (which included accrued interest) to Calrissian to payoff the May 21, 2015 Note.  The funds used to repay the Note were sourced from the increased borrowings under the SunTrust Amended and Restated Loan Agreement funded on July 9, 2015 in connection with the ANConnect and ARC Transactions.

50.     On July 10, 2015, Calrissian made (i) a $1,485,312.03 transfer to Virgo Onshore, and (ii) a $1,548,222.22 transfer to Virgo Offshore, totaling $3,033,534.25.

51.     Although dressed up as purported loans, the January 12, 2015 and May 21, 2015 advances to Alchemy – which came from an insider that dominated and controlled Alchemy's management decisions, were described by that insider as a capital contribution, were not made at arm's length, and were made at a time when Alchemy was insolvent and not adequately capitalized.  In short, the advances are properly characterized as equity, not debt.

52.     With the January 12, 2015 and May 21, 2015 payments from Calrissian to Alchemy properly characterized as equity, the March 31, 2015 and July 10, 2015 payments from Alchemy to Calrissian were made in exchange for less than reasonably equivalent value at a time

when Alchemy was insolvent or became insolvent as a result of the payments, and left Alchemy with unreasonably small capital.

53.     The July 10, 2015 payment from Alchemy to Calrissian of $3,033,534.25 was made within one year of the Petition Date, to an insider that dominated and controlled Alchemy's management decisions and is the 100% equity owner and sole member of Alchemy.

54.     The March 31, 2015 and July 10, 2015 payments from Alchemy to Calrissian were subsequently transferred to Virgo Onshore and Virgo Offshore.  These subsequent transferees did not take for value; were aware of Alchemy's tenuous financial position and were the main impetus for the transfers described herein to Calrissian, and as such did not take in good faith; and knew or should have known that the transfers would be subject to avoidance powers in bankruptcy.

### B.     The ANConnect Transaction

#### 1.     Alchemy Overpays For Distressed ANConnect Business Units

55.     During January 2015, Alchemy was considering a potential acquisition of ANConnect's video and digital distribution business.  The negotiations were spearheaded by Defendant Lee (then-CEO of Alchemy) and Defendant Perez (one of Alchemy's Managers and a Founding Partner of Virgo Investment Group) on Alchemy's side, and by Charlie Anderson, Chairman of Anderson Media Corporation, for ANConnect.

56.     Alchemy, Lee, the Virgo Entities, and the Virgo Individuals pursued the ANConnect transaction despite the fact that Alchemy's core business was struggling from the stress of the Calrissian Distribution.  As demonstrated by an Alchemy presentation dated April 2015, the rationale for the transaction was half baked, with the Defendants naively focused on making Alchemy an "[u]nstoppable force with thick competitive barrier to entry, dominating

independent film distribution worldwide," without regard to responsibly operating the existing Alchemy business – which was suffering due to the Calrissian Distribution – and oblivious to the fact that distribution of physical media was a rapidly dying industry.

57. In a Term Sheet dated February 11, 2015, Millennium Entertainment, LLC (now known as Alchemy) expressed the intent to purchase ANConnect's "US video and digital distribution business" and to assume "certain specified liabilities and obligations" of ANConnect, in exchange for "a multiple of 4 times estimated Proforma EBITDA of the Physical Business and 6 times estimated Proforma EBITDA of the Digital Business." The Term Sheet was signed by Bill Lee on behalf of Millennium and Bill Lardie on behalf of ANConnect.

58. The Term Sheet also provides that "[t]he Parties will agree to a mutually agreeable transition plan for the transfer of the Business and the Transferred Assets."

59. ANConnect, LLC and Our Alchemy, LLC executed an Asset Purchase Agreement dated May 7, 2015 (the "APA"), a true and correct copy of which is available upon the Court's or the Defendants' request.[5] The parties subsequently executed two amendments to the APA, respectively dated May 29, 2015 and June 9, 2015.

60. The APA defines the "Business" purchased by Alchemy as ANConnect's "home video and digital distribution for motion pictures and other audiovisual media in and throughout the United States of America and its territories and protectorates, excluding, for clarity, music, including music videos, and any in-store merchandising services performed by Anderson Merchandisers, LLC."

---

[5] The Defendants may claim confidentiality issues with respect to the information contained in certain of the documents referenced herein. While the Trustee believes that this information is not confidential, out of an abundance of caution, the Trustee is not attaching the referenced documents but instead shall make such documents available upon the Court's or the Defendants' request.

61.    Section 2.01 of the APA more specifically identifies the "Purchased Assets," which include, *inter alia*, ANConnect's 51% membership interest in Anderson Digital.[6]

62.    The aggregate purchase price for the Purchased Assets was $37,637,347 (the "Anderson Purchase Price"), consisting of (a) $35,893,147 allocated to the physical segment of the Business, and (b) $1,744,200 for ANConnect's 51% membership interest in Anderson Digital.  The purchase price was subject to certain post-closing adjustments, as set forth in Sections 2.05 and 2.06 of the APA.

63.    Alchemy also agreed to assume certain liabilities of ANConnect, which are set forth in Section 2.03 of the APA (the "Assumed Liabilities").  The Assumed Liabilities include, *inter alia*: (i) liabilities related to content suppliers' contracts, inventory sales, and personnel (as set forth in Sections 2.03(a), 2.03(b), 2.03(c), and 2.03(i) of the Disclosure Schedules attached to the APA); (ii) amounts due to content owners, as set forth in Exhibit A to the APA; and (iii) accounts payable to wholesale suppliers, as set forth in Exhibit B to the APA.

64.    Closing on the ANConnect Transaction occurred on July 9, 2015 (the "Closing").

65.    Payment of the Anderson Purchase Price and assumption of the Assumed Liabilities constituted a transfer of property, or an interest in property, of Debtor Alchemy to and/or for the benefit of ANConnect made at a time when Alchemy was insolvent, inadequately capitalized for the business in which it was engaged, and unable to pay its debts as they came due.

66.    Alchemy received less than reasonably equivalent value in exchange for payment of the Anderson Purchase Price and assumption of the Assumed Liabilities, and was either

---

[6]    Alchemy purchased the remaining membership interests in Anderson Digital from the company's founders Stephen Lyons and Freyr Thor, who each owned a 24.5% interest.

rendered insolvent as a result of the closing of the APA, or insolvent before the closing of the APA.

67.     The following documents and facts make clear that liquidity and cash flow were ongoing concerns at Alchemy in the months leading up to the July 2015 closing on the ANConnect Transaction:

a.     A January 19, 2015 email from Bill Lee including "liquidity" among a list of concerns about the business;

b.     Alchemy's failure to pay Nu Image, Inc. licensing fees as they came due, starting as early as February 27, 2015 and continuing thereafter;

c.     An April 27, 2015 email from Bill Lee describing the SunTrust situation – i.e., the ability to put Alchemy in further debt to keep it afloat – as "Life or death!";

d.     A May 12, 2015 email from Mark Perez to Bill Lee and Jesse Watson describing Alchemy's "cumulative liquidity need" and noting that Alchemy's continued viability was dependent on Virgo's ability to continue injecting cash into the business;

e.     A May 15, 2015 email from Jim Jenkins stating that Alchemy was desperately maneuvering towards "keeping out of debtor's prison";

f.     A May 15, 2015 document emailed by Bill Lee to Judd Taylor listing "working capital" as one of the key issues impacting the contemplated ARC Transaction (defined below);

g.     A May 25, 2015 email from Mark Perez stating that "liquidity is an important area to get right and probably easiest to discuss in person";

h.     A May 27, 2015 email from Jesse Watson to Bill Lee, Mark Perez, and Todd Dorfman acknowledging the need to resort to "back up plans" for liquidity and questioning

whether they were "cutting it too close," a reference to Virgo's operation of Alchemy on a shoestring following the Calrissian Distribution;

        i.     A June 5, 2015 email from SVP for Business and Legal Affairs Olivia Lerner stating that, due to ongoing issues with paying its vendors on time, Alchemy was "trying to urgently get positive trade references to a company called D&B," and that to do so certain favored vendors would have to be "called and buttered up";

        j.     On June 22, 2015, Alchemy defaulted on a $1,000,000 payment due to Toiion, Inc. in connection with the release of an animated picture known as "Dino Time";

        k.     A June 24, 2015 email from the co-President of PBSS Distribution to Bill Lee describing "continued problems with getting paid" by Alchemy dating back to March 2015;

        l.     A June 25, 2015 email from Freyr Thor to Bill Lee stating that "the Alchemy world is spinning at high velocity, we are all working hard to keep it under control"; and

        m.     Alchemy's failure to pay nearly $4.4 million owed to FUNimation Productions, Ltd. for DVDs ordered during the first half of 2015.

      68.     Disputes between Alchemy and a number of its creditors over unpaid debts had also arisen in the months leading up to the ANConnect Transaction, including a dispute with Nu Image, Inc. (Alchemy's former majority owner) over amounts owed under various licensing agreements.

      69.     Alchemy, bent on "world domination" at any price, vastly overpaid for the package of rights and liabilities it received from ANConnect.  Alchemy ignored numerous red flags indicating that the Anderson Purchase Price was vastly overinflated and much greater than

the actual value of that which it acquired.  Indeed, before closing the deal, Alchemy was aware that:

a.       ANConnect and Anderson Digital had collection issues which, in the words of Alchemy VP of business development and mergers and acquisitions Jim Jenkins, were "very concerning";

b.       ANConnect had defaulted on various payment obligations owed to Alchemy;

c.       sales of physical media (such as DVDs), a major component of the Anderson Transaction, had sharply declined over the last decade, and continue to do so industry-wide;

d.       a May 29, 2015, presentation made on Alchemy's behalf to SunTrust by Bill Lee and Mark Perez stated that acquisition of ANConnect's physical business would "generat[e] significant free cash flow and enable[e] favorable working capital with 100% 'services' model."  This presentation acknowledged, however, that the physical business (which was based largely on DVD sales) was in rapid decline, with total industry revenues declining from $20.6 billion in 2006 to only $9.6 billion in 2015, with declines expected to accelerate rapidly through 2021; and

e.       Alchemy's April 2016 Confidential Information Memorandum similarly noted the "10% annual market decline on physical product consistent with research estimates."

70.       In a May 7, 2015 email, Akin Gump (counsel to SunTrust, Alchemy's lender) raised concerns that "there are no provisions addressing ANConnect's solvency following the closing. . . . To add extra protection, we could take this one step further and request a solvency opinion at closing."

71.     Despite Akin Gump's recommendation, the Debtors did not obtain a solvency or fairness opinion in connection with the acquisition.

72.     Further, before closing the deal, both Alchemy and ANConnect knew that ANConnect's relationship with Group 1200 Media – ANConnect's third largest supplier of physical product to Walmart in 2014 – would terminate in August 2015.  A June 23, 2015 Alchemy bank presentation to SunTrust estimated that the annual EBITD impact of losing this relationship was approximately negative $1.4 million, which should have equated to a $5.6 million reduction ($1.4 million multiplied by 4) of the Anderson Purchase Price.  Instead of renegotiating the price with ANConnect to account for this significant loss of business, Alchemy – at the direction of Virgo – simply plowed ahead with the transaction.  To make matters worse, Alchemy assumed in excess of $3 million in obligations due from ANConnect to Group 1200 Media, as part of the ANConnect Transaction for a relationship that was about to terminate.

73.     Moreover, Anderson Digital's members had stripped Anderson Digital of its working capital in the days leading up to the Closing. On July 2, 2015, Anderson Digital wired $1,001,864 to an escrow account at Bank of America, ultimately for the benefit of the Anderson Digital members (i.e., ANConnect (51%), Lyons (24.5%), and Thor (24.5%)).  Upon information and belief, given ANConnect's 51% membership interest in Anderson Digital, it received approximately $510,000 of this amount.

74.     The July 2, 2015 transfer of Anderson's Digital capital was made within the one year period immediately preceding the Petition Date, to the company's insiders.

75.     The July 2, 2015 transfer of Anderson Digital's capital to its members was made without consideration, had the effect of reducing Anderson Digital's working capital to $0, and

contributed to the severe liquidity issues experienced by the Debtors in the weeks following the

ANConnect Transaction.

76.    Alchemy's already insufficient cash flow significantly worsened once the deal

closed, due in large part to the Assumed Liabilities.  Almost immediately after the Closing,

creditors were contacting Alchemy demanding payment, and within a matter of weeks, Alchemy

was in the midst of a crippling liquidity crisis and was unable to meet its obligations as they

became due.

77.    Indeed, just one day after Closing of the APA, on July 10, 2015, Bill Lee emailed

a list of "Alchemy priorities," which listed "liquidity/cash management" as one of Mark Perez's

main concerns about Alchemy, and listed "[m]anage[ment] [of] negative $5M working capital

requirement through September" as Lee's top priority.

78.    Contemporaneous communications further establish the point, including a July

13, 2015 email in which Alchemy's CFO considers paying Steve Lyon's severance (discussed

further below) "over a period of time" because Alchemy is "looking for short term liquidity

improvement options" and an August 17, 2015 email in which an Alchemy consultant and

Alchemy's HR Director discuss a conversation regarding the consultant's past due invoices and

states that SVP for Business and Legal Affairs Olivia Lerner told her as a personal favor that,

unless she received pre-payment for services rendered to Alchemy, then she should refuse to

perform them.

79.     In the words of Anderson Digital co-founder Stephen Lyons, it was immediately

apparent that "Alchemy's acquisition of Anderson Digital's parent company has been an

operational and financial disaster," which left Alchemy "experiencing serious trouble meeting its

financial obligations as they come due, [including obligations] to vendors and suppliers which

are critical to the company's continued existence."  The transaction left the already distressed

Alchemy in a state of "financial triage, picking and choosing which of its creditors it will pay,"

and having difficulty making timely lease and license payments.  Lyons was also informed on at

least two occasions – including in November 2015 by then-CEO Bill Lee and in February 2016

by Mark Perez – about the Debtors' cash flow problems.

80.    In an email dated February 12, 2016 from Mark Perez to Alchemy Co-Presidents

Scott Guthrie and Kelly Summers,[7] Perez conveyed a familiar story resulting from the

ANConnect Transaction (*i.e.*, Alchemy assuming obligating and paying money in exchange for

no value), stating:

> Team -- have been coordinating with the new CFO at Group 1200 to solve the rather large payable ($3mm+) that came over with the Red Cloud [code name for ANConnect] transaction.  Group 1200 is no longer a supplier for us so this is really just a legacy liability.

> The goal here is to stretch out the payment timeline, so I proposed monthly payments of $150k for the first six months with an agreement to have a discussion thereafter to the potential of accelerating remaining payments due.  The CFO didn't shut down the proposal but suggested a larger initial payment.

81.    Kelly Summers responded that same day:

> Thank you Mark.  Until today I had no idea we'd acquired a $3M liability in that transaction.  Hits keep coming.

> Payment plans is all we can offer so I'm with you there.  But until I see what our cash flow looks like it's hard to say whether that's something we can honor.  Buys us time, keeps us out of court so it's the right thing to do.  But at what cost?

> We have many other payables affecting our current ability to produce near-term revenue.

> As you know we are losing product flow from existing suppliers, we have effectively shut down all business development & acquisition activity, and planned

---

[7]    After Lee's departure from the company in December 2015, Scott Guthrie and Kelly Summers served as co-Presidents of Alchemy.

titles are in trouble of meeting street date due to unpaid vendors and work stoppage. Our pipeline is dying.

82. Per a Confidential Information Memorandum prepared in connection with Alchemy's unsuccessful attempt to obtain a $70 million debt recapitalization, in April 2016 Alchemy was "burdened with an estimated $22.4 million of legacy liabilities related to the ANConnect transaction and transition plus payables 'overhang' from the historical acquisitions business." Those "legacy liabilities" (*i.e.*, the Assumed Liabilities) accounted for approximately 50% of Alchemy's total liabilities at that time.

83. Alchemy did not receive reasonably equivalent value for its transfer of the Anderson Purchase Price consisting of cash payments totaling $29,888,124.40 and the assumption of obligations in excess of $16 million, payment of which was made at a time when Alchemy was insolvent or rendered insolvent as a result of the payment. Moreover, at the time the Anderson Purchase Price was paid, Alchemy was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with Alchemy was unreasonably small capital.

84. ANConnect knew or should have known of the deficiencies in its business, knew or should have known that Alchemy was insolvent and with inadequate capital, and knew or should have known that Alchemy was paying a vastly overinflated price therefor, and as such did not take the Anderson Purchase Price in good faith.

**2.    Alchemy Overpays for Lyons' and Thor's Interests in Anderson Digital**

85. In addition to purchasing ANConnect's 51% interest in Anderson Digital as part of the APA, Alchemy also purchased each of Lyons' and Thor's 24.5% interest.

86.     On June 30, 2015, Alchemy, Anderson Digital, and Lyons entered into a Membership Interest Purchase Agreement (the "Lyons Agreement"), which provided for payments totaling $1,800,000 for Lyons' 24.5% minority interest in Anderson Digital.

87.     The purchase price of ANConnect's 51% majority membership was $1,744,200, which was derived from calculating six times the company's estimated 2014 EBITDA of $570,000 (totaling $3,420,000, of which 51% is $1,744,200).  Applying this formula to Lyons' 24.5% interest, the purchase price would have been $837,900.  Yet, the Lyons Agreement inexplicably inflates the cost of Lyons' interest to more than double that already overinflated amount, well in excess of reasonably equivalent value.

88.     Alchemy made the first payment, in the amount of $1,400,000, to Lyons on July 9, 2015, in connection with the Closing on the ANConnect Transaction.

89.     Because Alchemy was insolvent at the time of the ANConnect Transaction (or was rendered insolvent as a result thereof), it was unable to make the second contemplated payment (for $400,000) for Lyons' interest by November 15, 2015, the date provided in the Lyons Agreement.  Alchemy nonetheless made a payment to Lyons on December 11, 2015, in the amount of $150,000, and a further payment to Lyons on February 19, 2016 in the amount of $250,000.

90.     Section 2.b of the Lyons Agreement also burdened Alchemy with the severance obligations which Lyons and Anderson Digital had agreed to in Lyons' 2012 employment agreement.  Alchemy made a $61,000 severance payment to Lyons on July 17, 2015, another $331,000 severance payment to Lyons on February 19, 2016, and another $1,487.42 severance payment to Lyons on March 4, 2016.

LEGAL\37018257\1

91.     Pursuant to the Lyons Agreement, Alchemy also paid an additional $15,000.00 to the Bryan Cave law firm for the benefit of Lyons.

92.     Alchemy had no involvement in Lyons' pre-acquisition employment arrangement with Anderson Digital, and received no consideration for the hundreds of thousands of dollars of severance it paid to Lyons in connection with that employment arrangement.

93.     Even Mark Perez was baffled regarding this obligation.  In an email dated November 13, 2015 from Mark Perez to Bill Lee among others regarding Alchemy's obligation to pay Lyons' severance:

> So we are paying Steve [Lyons] $460k over two years in severance?!  This is the first I have heard that we are paying him severance.  Not sure why we would buy his business and then have to pay him severance.

94.     Alchemy and Anderson Digital also entered into a Membership Interest Purchase Agreement with Thor, dated July 2, 2015 (the "Thor Agreement"), which provided that Thor would receive payments totaling $1,370,114 for his 24.5% minority interest in Anderson Digital, $900,000 of which would be paid at Closing on the ANConnect Transaction, followed by four individual payments of $117,528.50.

95.     Alchemy paid the first payment of $900,000 to Thor on July 9, 2015, and then paid $235,057 (equaling two of the $117,528.50 payments) to Thor on February 26, 2016, and an additional $117,875 to Thor on April 5, 2016.

96.     As with the purchase price for Lyons' interest, the purchase price for Thor's interest was improperly inflated.  Applying the formula used to calculate the purchase price for ANConnect's 51% interest, Thor's 24.5% interest would have been approximately $837,900, yet the Thor Agreement increased that already overinflated cost to $1,370,114, well in excess of reasonably equivalent value.

24

97.     These transfers to Thor were made within the one-year period immediately preceding the Petition Date.  Thor was an insider, due to his ownership and executive leadership roles with the Debtors.

98.     On top of the inflated purchase price Lyons and Thor each received, they also received approximately $245,000 in additional cash in the days leading up to the Closing. On July 2, 2015, a few days before Closing, Anderson Digital wired $1,001,864 to an escrow account at Bank of America, ultimately for the benefit of the Anderson Digital members in the form of equity distributions.  Upon information and belief, given Lyons' and Thor's respective 24.5% membership interests in Anderson Digital, they each received approximately $245,000 of this amount.

99.     This transfer was made without consideration, had the effect of wiping out Anderson Digital's working capital days before Alchemy purchased Anderson Digital, and contributed to the severe liquidity issues experienced by the Debtors in the weeks following the ANConnect Transaction and ARC Transaction.

100.    The July 2, 2015 transfer of Anderson Digital's capital to Lyons and Thor – insiders of the company, by virtue of their ownership and management roles – was made within the one year period immediately preceding the Petition Date.

101.    Lyons and Thor knew or should have known that the Debtors were insolvent and with inadequate capital, knew or should have known that Alchemy was paying a vastly overinflated price for their interests in Anderson Digital, had stripped Anderson Digital of vital working capital, and knew or should have known that Alchemy had no obligation to pay Lyons' severance obligations, and as such did not take the funds they received in good faith.

25

### 3.       Claims Concerning Ancillary Agreements

#### a.       Disputes Regarding Post-Closing Adjustments

102.     Because the APA was partially predicated upon financial figures for commercial

flows, such as third-party balances and product returns, that would remain fluid through the

Closing, ANConnect and Alchemy agreed that the ultimate purchase price would be subject to

adjustments based upon final calculations of these figures.  Sections 2.05 and 2.06 of the APA

set forth the manner in which adjustments relating to, *inter alia*, balances due from content

owners, wholesale supplier working capital balances, and product returns would be calculated.

The APA contemplated a cooperative exchange of information between the parties from which

the adjustments would be calculated and agreed upon.

103.     Subsequent to the Closing, however, a number of disputes arose between the

parties regarding post-closing adjustments to the purchase price.  These disputes were still

ongoing when the Debtors filed for bankruptcy.

104.     ANConnect failed to furnish timely and completed Closing Balance Sheets for the

3PL and wholesale businesses, as required by Section 2.05(a) of the APA, instead belatedly

providing incomplete, flawed, and piecemeal data on a rolling basis.  The integrity of this data

was further undermined by a protracted (nearly six week) "black out period" in which

ANConnect was unable to deliver *any* reliable data due to a faulty SAP conversion, which

ANConnect allowed to run for months despite knowing it was faulty.  As a result, Alchemy

lacked the most basic of information, including, for example, point-of-sale data, opening

balances, inventory counts, shipment information, invoicing and billing reports, and the status of

returns.  All of this information had to be recreated for the blackout period.

105.    ANConnect also failed to grant Alchemy accessed to the relevant books and records, as required by Section 2.06(b)(i) of the APA, with Alchemy's repeated requests for the required access and disclosure being met with a variety of inadequate responses, including incomplete or inaccurate data, claims of compliance, partially satisfied promises, and inability to reconcile data with third-party sources.

106.    ANConnect's failure to provide this data made it impossible for the parties to finalize or agree upon the post-closing adjustment calculations contemplated in Section 2.06 of the APA.

### b.    Transition Services Agreement

107.    In order to facilitate the transfer of ANConnect's business to Alchemy following closing on the APA, Alchemy and ANConnect entered into a Transition Services Agreement dated July 9, 2015 (the "Transition Services Agreement"), a true and correct copy of which is available upon the Courts' or the Defendants' request.

108.    The Transition Services Agreement was intended to ensure continuity in the management of major accounts and to minimize customer attrition and other disruptions to the business.  ANConnect was to provide Alchemy with services such as warehousing, order fulfillment, freight management, price stickering, return transition services and processing, and specific distribution and administrative services, as described in Exhibits A and B of the Transition Services Agreement.

109.    These services included the collection and remittance of accounts receivable owed to Alchemy on a weekly basis.  Exhibit B of the Transition Services Agreement required ANConnect to "maint[ain] … accurate records of Accounts Receivable created post closing for the benefit of Buyer [i.e., Alchemy] (including gross amounts from new invoices added to new

A/R balance, payments made by customers against new invoices, any deductions taken by

customer against new invoices),"[8] and to "remit[] … any cash collected on behalf of Buyer … by

wire transfer every Monday for any cash collected in the prior week."

110.    Although ANConnect has collected millions of dollars' worth of Alchemy

Accounts Receivable, it has violated the Transition Services Agreement by failing to remit those

receivables to Alchemy.

111.    ANConnect's affiliate AM Canada, with which Alchemy entered into a

Wholesale Service Agreement dated July 9, 2015 for the performance of certain wholesale

services in Canada, also collected Alchemy Accounts Receivable on behalf of Alchemy, but has

similarly failed to remit those amounts to Alchemy.

112.    On February 17, 2016, ANConnect and Anderson Merchandisers filed a

complaint against Alchemy in the Superior Court of the State of Delaware (the "Delaware State

Court Action"), alleging they are owed post-closing adjustments and certain other payments

under the APA, as well as compensation for various transition and merchandising services.[9]

113.    ANConnect's Complaint in the Delaware State Court Action states that "[u]nder

the Transition Services Agreement, ANConnect has collected receivables from Walmart/Sam's

Club, Best Buy, and Ingram on behalf of Alchemy," but "has withheld $6,047,325 [of those

---

[8]     Accounts Receivable collected by ANConnect or its affiliates pursuant to the
Transition Services Agreement are referred to herein as the "Alchemy Accounts Receivable."

[9]     On April 11, 2016, Alchemy filed its Answer with Affirmative Defenses and
Counterclaims in response to ANConnect and Anderson Merchandisers' allegations.  The
Delaware State Court Action – captioned as *ANConnect, LLC, et al. v. Our Alchemy, LLC*, C.A.
Co. N16C-02-152 WCC [CCLD] – has been stayed pursuant to 11 U.S.C. § 362 since Alchemy's
bankruptcy filing.  Plaintiff denies all liability on behalf of Alchemy in the Delaware State Court
Action.

receivables] as an equitable setoff" for amounts allegedly owed to ANConnect under the APA and other ancillary agreements.

114.    The Proof of Claim[10] filed by ANConnect in Alchemy's bankruptcy further admits that, in addition to the $6,047,325 ANConnect is withholding, AM Canada is in possession of and withholding $126,094.69 CAD (equivalent to $97,305, using the exchange rate as of the Petition Date) of additional receivables collected on behalf of and rightfully belonging to Alchemy.  These sums are purportedly being withheld as "recoupment … because of amounts due and owing ANConnect by Alchemy," even though AM Canada is not a party to the Transition Services Agreement or to the APA.

115.    Moreover, Alchemy's books and records indicate that the Alchemy Accounts Receivable collected on behalf of Alchemy total $7,027,687 – even more than the amount ANConnect and AM Canada admit withholding.

116.    Neither ANConnect nor AM Canada is not entitled to withhold the Alchemy Accounts Receivable for "setoff," "recoupment," or any other reason.

117.    ANConnect's claims against Alchemy in the Delaware State Court Action (upon which ANConnect bases its and AM Canada's improper withholding of Alchemy Accounts Receivable) relate largely to the parties' disputes regarding post-closing adjustments under the APA.

118.    Section 2.06(b)(iv) of the APA, relating to purchase price adjustments, states:

"Except as specifically provided herein, **neither party may offset amounts owed from the other**; provided however, that Buyer may offset any amounts owed to it by Seller hereunder that have been agreed by Seller to be owed, determined to be owed by the Independent Accountant in accordance with Section 2.06(b), or determined to be owed pursuant to the dispute resolution mechanisms set forth in

---

[10]    *See In re Our Alchemy, LLC*, U.S.B.C. D. Del., Case No. 16-11596 (KG), Claim 158-1, filed October 13, 2016.

Section 10.10 against any amounts that Buyer may owed to Seller, Anderson Merchandisers, LLC, or their respective Affiliates pursuant to the Merchandising Agreement." (emphasis added).

Thus, Section 2.06(b)(iv) expressly provides that neither party may offset amounts owed (or perceived to be owed) from the other, with the sole exception that *Alchemy* is authorized to offset amounts owed to it by ANConnect.

119.    Despite this prohibition, ANConnect has, in connection with the performance of its contractual duties under the Transition Services Agreement, collected and retained receivables from Walmart/Sam's Club, Best Buy, and Ingram which were intended for, and legally belong, to Alchemy. Specifically, ANConnect has improperly withheld and retained in excess of $6 million in Alchemy Accounts Receivable to improperly set off amounts that it has unilaterally deemed to be owed to it by Alchemy pursuant to the APA and other agreements.

120.    ANConnect has also caused its affiliate AM Canada to wrongfully withhold receivables intended for and rightfully belonging to Alchemy.

121.    ANConnect elected to withhold these amounts despite Alchemy's express, written notification that it was unwilling to agree to ANConnect's proposed offsets.

122.    ANConnect's unauthorized quarantine of Alchemy's cash-hampered operations at a critical juncture resulted in a decrease in working capital, a disruption of service with key vendors, a decay in relations with content partners, and resulting delivery issues with Alchemy's key retail partners.

### c.    The Merchandising Agreement

123.    Alchemy and Anderson Merchandisers entered into a Merchandising Agreement (the "Merchandising Agreement") dated July 9, 2015, which provides that Alchemy would engage Anderson Merchandisers as a contractor to perform certain merchandising services (such

as stocking, inventory management, and setting up product displays) in Walmart stores.  A true and correct copy of the Merchandising Agreement is available upon the Court's or the Defendants' request.

124.    Section 2 of the Merchandising Agreement sets forth the manner in which Alchemy would compensate Anderson Merchandisers for its services.

125.    Section 2.1 of the Merchandising Agreement states that "Company [Alchemy] may offset amounts owed by ANConnect, LLC to it under that certain Asset Purchase Agreement (the "APA") dated as of May 7, 2015 by and between Company and ANConnect, LLC, but only to the extent that such offset is specifically permitted by the APA."  The Merchandising Agreement does not give Anderson Merchandisers the right to offset.

126.    Section 2.06(b)(iv) of the APA permits Alchemy to offset amounts owed from another party in certain circumstances, including "any amounts owed to it by [ANConnect] … that have been agreed by [ANConnect] to be owed," against "any amounts that [Alchemy] may owe to [ANConnect], Anderson Merchandisers, LLC, or their respective Affiliates pursuant to the Merchandising Agreement."  The APA does not give ANConnect the right to offset.

127.    In April 2016, ANConnect owed Alchemy $3,208,314 for post-closing adjustments pursuant to Section 2.06(a)(iv) the APA.  ANConnect admitted that it owed this amount to Alchemy in the Complaint it filed in the Delaware State Court Action on February 17, 2016.

128.    On April 12, 2016, Alchemy agreed that, instead of properly paying the $3,208,314 to Alchemy, ANConnect could instead use the money to satisfy an antecedent debt owed by Alchemy to Anderson Merchandisers for services rendered under the Merchandising Agreement.

LEGAL\37018257\1

129.     This transfer occurred within the 90-day period immediately preceding the

Petition Date, at a time when Alchemy was insolvent.

### d.     Reimbursement Fees

130.     In connection with the APA, ANConnect and Alchemy negotiated with certain

third-party content suppliers to obtain their consent to the assignment of ANConnect's contracts

to Alchemy.  Section 2.09 of the APA, entitled "Third Party Consents," provides:

> To the extent that Seller's rights under any Contract or Permit constituting a
> Purchase Asset, or any other Purchased Asset, may not be assigned to Buyer
> without the consent of another Person which has not been obtained … Seller shall
> use its best efforts to obtain any such required consent (s) from the Material Content
> Suppliers as promptly as possible and **Seller and Buyer shall share equally in any
> costs or fees imposed by any such Material Content Supplier as a condition to
> consenting to such assignment**; provided that such costs and fees … shall be
> subject to Buyer's approval.  (emphasis added).

131.     The Merchandising Agreement provides that Alchemy will pay certain

"Reimbursement Fees" to Anderson Merchandisers, as described in Exhibit A to the

Merchandising Agreement.

132.     The Reimbursement Fees are composed as follows:

| | |
|---|---|
| DreamWorks | $500,000 |
| Xlrator | $150,000 |
| ARC | $2,000,000 |
| Ketchup Entertainment | $250,000 |
| Bagdasarian | $25,000 |
| Anderson Excess Tag-A-Long | $1,426,000 |
| TOTAL | $4,351,000 |

133.     Upon information and belief, the Reimbursement Fees contracted for in the

Merchandising Agreement represent Alchemy's reimbursement of its half of the amounts paid

(or other consideration given) by ANConnect to obtain consents from Material Content Suppliers, per Section 2.09 of the APA.

134.    Upon information and belief, Alchemy paid $2,089,775.45 of the Reimbursement Fees to Anderson Merchandisers, as reimbursement to ANConnect in connection with the consents obtained between July 7, 2015 and July 1, 2016.[11]

### C.    The ARC Transaction

135.    In the months leading up to the ANConnect Transaction, Virgo Investment Group was attempting to raise capital to fund the APA purchase price, in order to reduce its own exposure and risk.

136.    To this end, Virgo Investment Group agreed to bail out ARC Entertainment, LLC ("ARC"), a failing entity controlled and owned by Ardon Moore and on the brink of collapse, in exchange for a $10 million equity contribution to Calrissian, which ultimately was used to fund a portion of the ANConnect Transaction purchase price.

137.    On July 9, 2015, Calrissian and OA Holdings entered into a Contribution Agreement with ARC, which purported to assign, convey, and transfer substantially all of ARC's assets, as well as certain liabilities, to Calrissian, which in turn contributed those assets and liabilities to OA Holdings, an entity wholly owned by Calrissian and formed for the purposes of completing this transaction (the "ARC Transaction").

138.    Virgo Service Company authorized the ARC Transaction on behalf of OA Holdings, as its designated Manager.  Virgo Service Company also authorized the ARC Transaction on behalf of Calrissian, as its general partner.

---

[11]    Anderson Merchandisers has filed a claim against the Alchemy estate for the remaining $2,261,224.55 of Reimbursement Fees.  *See In re Our Alchemy, LLC*, Bankruptcy No. 16-11596, Claim 157-1, filed October 13, 2016.

139.    At the time of the Contribution Agreement, ARC was in deep financial trouble and was insolvent.  ARC was unable to finalize its 2014 financial audit because of liquidity and "going concern" issues raised by its outside auditor.  Indeed, Schedule 3 attached to the Contribution Agreement reveals that, as of May 31, 2015, ARC had $13.28 million in current total liabilities, versus $9.1 million in current total assets.  Schedule 3 further indicates pro forma total (current, plus long term) liabilities totaling $25.97 million, versus pro forma total assets of $15.03 million – a difference of $10.94 million – and adjusted working capital of negative $6.41 million.  Schedule 3 also states that Bentonville Film Festival's "June 2015 Cash Flow is negative $1.4m, based on supplied cash flow schedules."

140.    All involved parties were fully aware of ARC's disastrous financial position, yet proceeded regardless because of the Virgo Individuals' personal desire to consummate the deal. Indeed, in response to June 7, 2015 emails from Alchemy CFO John Avagliano emphasizing "how much more we need to negotiate" given that ARC was "in denial" regarding its financial status and was "functionally insolvent," Alchemy CEO Bill Lee stated that those concerns should be ignored because "Ardon [WHO] and Mark [Perez]'s conversation was positive and there is a way forward on the transaction."

141.    Upon information and belief, the Virgo Individuals wanted to consummate the ARC transaction as a sweetheart deal for the benefit of Ardon Moore, to access what Bill Lee described as his "manage[ment] of the primary Bass Family fund…Billions!!!," a reference to Moore's role in managing the Bass Family oil fortune.

142.    Although ARC owned a handful of valuable assets (including those specifically identified on Schedule 2.02(f) of the Contribution Agreement), these assets were, notably, excluded from the ARC Transaction.

34

143.    The Contribution Agreement assigned all of ARC's liabilities to OA Holdings, including $2.9 million in accounts payable, $2.87 million due to licensors, and $13,793,000 in accrued participation expenses.

144.    In exchange for the transfer to Calrissian, ARC received a 10% interest in Calrissian (the 100% owner of Alchemy).

145.    Calrissian amended its limited partnership agreement on July 9, 2015, providing for additional partnership contributions into Calrissian for purposes of raising the necessary funds to close the ANConnect and ARC Transactions.  As of that date, Calrissian's general partner was Virgo Service Company, and its limited partners were: Virgo Onshore; Virgo Offshore; Santa Rita Entertainment, LLC (run by Bill Lee); SR Holdings IV – Millennium LLC (managed by Daniel Rowe); ALC Partners, L.P. (run by Ardon Moore); Charlie Anderson (Chairman of Anderson Media Corporation); and ARC.

146.    Although Alchemy was not a party to the Contribution Agreement and received no benefit therefrom, the Virgo Defendants were able to exploit their status as Alchemy insiders to impose ARC-related liabilities on Alchemy without any corresponding benefit to Alchemy.

147.    Those liabilities were imposed on Alchemy both informally and via various ancillary agreements entered into in connection with the Contribution Agreement – i.e., the Business Development Agreement, Drinkwater Employment Agreement, Management Agreement, Management Services Agreement, ALC Mezz Agreement.[12]

---

[12]    The Business Development Agreement, Drinkwater Employment Agreement, and Management Agreement are attached as exhibits to the Contribution Agreement, which is available upon the Court's or the Defendants' request.  True and correct copies of the Management Services Agreement and the ALC Mezz Agreement are also available upon the Courts' or the Defendants' request.

148.     Accordingly, even though Alchemy was not a party to the Contribution Agreement (nor was obligated to provide loans, guaranties, pledges, or other credit support in connection therewith), these ancillary agreements made Alchemy contractually liable for significant financial obligations connected to the transaction, in exchange for which it received no benefit.

149.     Ardon Moore became a board advisor to Alchemy as of July 9, 2015, which allowed him to participate in all formal board meetings and obtain confidential materials related to the financial position and operations of Alchemy.

### 1.     The Mezzanine Loan Agreement

150.     OA Partners was formed specifically for the purpose of carrying out the ANConnect Transaction, in connection with which OA Partners (as Lender) and Alchemy (as Borrower) entered into a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") dated July 9, 2015, a true and correct copy of which is available upon the Court's or the Defendants' request.

151.     The Mezzanine Loan Agreement establishes a $20,175,893 unsecured credit facility in favor of Alchemy, with advances on the loan split into "Tranche A" in the amount of $10,000,000, portions of which would be advanced "from time to time" until June 30, 2016, and "Tranche B" in the amount of $10,175,893, to be advanced on the Closing Date of the ANConnect Transaction (i.e., July 9, 2015).  The maturity date of the loan was March 4, 2019.

152.     On July 9, 2015, OA Partners made the Tranche B advance in the amount of $10,175,893 to Alchemy.

153.     Alchemy prepaid the entire Tranche B advance, plus interest – amounting to $10,181,733.54 – four days later on July 13, 2015.

154.    This payment was made within the one year period immediately preceding the Petition Date, to Alchemy's affiliate OA Partners, which, by virtue of its common ownership, is an insider of Alchemy.

155.    Section 3(c)(i) of the Mezzanine Loan Agreement provides that Alchemy was permitted to "repay a portion of the principal amount of Tranche B equal to the Permitted Tranche B Payment Amount, if any," and that "[f]or the avoidance of doubt, such portion repaid shall be the entirety of the principal amount of Tranche B if the Permitted Tranche B Payment Amount is equal to or greater than such principal amount."

156.    The Permitted Tranche B Payment Amount is a defined term in Section 5.21(d)(2) of the related Amended and Restated Revolving Credit and Term Loan Agreement (the "July 2015 SunTrust Facility") dated July 9, 2015, between Alchemy as Borrower, several banks and financial institutions as Lenders, and SunTrust Bank as Administrative Agent for the Lenders, which provides:

> [W]ith respect to Tranche B, the Borrower may repay up to $10,175,893 of the Mezzanine Debt of Tranche B with the proceeds of Term Loans made with respect to the Incremental Term Commitments hereunder only on and after such date that there is an Incremental Term Commitment in the amount of $14,500,000 pursuant to Section 2.21B hereof (and if the amount of such Incremental Term Commitment is less than $14,500,000, then the Borrower may repay Mezzanine Debt with respect to Tranche B in an amount of up to the aggregate of: (x) the pro rata amount of the Additional Lender's Incremental Term Commitment that has been allocated to the Term Loan Commitments plus (y) the pro rata amount of the Revolving Lenders Revolving Commitments that has been reallocated to the Term Loan Commitments after the date that the Incremental Term Commitment is finalized) (the "Permitted Tranche B Payment Amount"). Any portion of the Tranche B outstanding after the Permitted Tranche B Payment Amount is made may not be repaid until after the Obligations hereunder are repaid in full in cash.

157.    The provisions of Section 5.21(d)(2) relating to the $14.5 million loan had been met in connection with Closing on the ANConnect Transaction, such that Alchemy was

37

contractually permitted, under the Mezzanine Loan Agreement, to prepay the Tranche B advance.

158.   However, Alchemy made this payment at a time when it was insolvent.

159.   With respect to the Tranche A advances, OA Partners advanced a total of $16,498,000 as a loan to Alchemy between August 17, 2015 and November 21, 2015.

160.   On October 28, 2015, OA Partners inexplicably transferred $548,000 of the advanced Tranche A funds to ARC.

161.   The wire confirmation for the transfer indicates that the wire was approved by two Virgo Investment Group executives – Founding Partner Robert Racusin and Vice President of Finance Ben Painter.

162.   On February 1, 2016, Virgo Investment Group sent a request to Alchemy seeking confirmation of the outstanding balance under the Mezzanine Loan Agreement as of December 31, 2015.  The principal amount indicated in the request included the $548,000 transfer that had been made to ARC – in other words, the funds which had been transferred to ARC (from which Alchemy received no benefit) were being treated as an obligation owed by Alchemy to OA Partners under the Mezzanine Loan Agreement.

163.   Alchemy had no contractual relationship with ARC that required such a payment, and received no value for the $548,000 transfer to ARC.  Upon information and belief, there was no agreement in place providing that Alchemy would be repaid by ARC.

164.   On December 23, 2015 – at a time when Alchemy was insolvent – Alchemy transferred $2,000,000 to OA Partners to pay down the balance of advances that had been made on Tranche A.

165.    Alchemy was not contractually permitted to make the $2,000,000 Tranche A prepayment, because Section 3 of the Mezzanine Loan Agreement does not permit any prepayments on Tranche A until June 30, 2016 at the earliest.

166.    This payment was made within the one year period immediately preceding the Petition Date, to Alchemy's affiliate OA Partners, which, like Alchemy, is managed and controlled by the Virgo Entities, is an insider of Alchemy.

167.    Alchemy's Tranche A prepayment – made more than six months before any payment was even permitted, much less due – was not in the ordinary course of Alchemy's business.

168.    Alchemy received no value for making the early Tranche A prepayment.

### 2.    The ALC Mezz Agreement

169.    On July 9, 2015, OA Holdings, ANConnect, and ALC Mezz Partners, L.P. (another entity controlled by Ardon Moore) entered into a Loan and Security Agreement (the "ALC Mezz Agreement"), as well as related Promissory Notes, pursuant to which ANConnect and ALC Mezz Partners each advanced $2,000,000 (for a total of $4,000,000) to OA Holdings, for general use following the ARC Transaction.

170.    Section 2 of the ALC Mezz Agreement provides for mandatory payments of $250,000 in principal, as well as all accrued interest, on the last day of each calendar quarter commencing September 30, 2015.  Therefore, the first payment was due on September 30, 2015.

171.    According to an October 18, 2015 letter from ANConnect to both Alchemy and OA Holdings, Alchemy agreed to allow for $250,000 owed to Alchemy by ANConnect in connection with the Transition Services Agreement to instead be retained by ANConnect in satisfaction of the first loan payment owed by OA Holdings.

172.     The $250,000 wrongfully used to satisfy OA Holdings' obligation consisted of accounts receivable belonging to Alchemy, which ANConnect had collected pursuant to the Transition Services Agreement and was required to remit to Alchemy.

173.     Alchemy was not a party to the ALC Mezz Agreement, had no obligation to ANConnect or ALC Mezz Partners in connection with the $4 million loan, and received no benefit from agreeing to pay OA Holdings' debt.

174.     At the time Alchemy made the $250,000 payment, it was insolvent, undercapitalized, and unable to pay its debts as they came due.

### 3.     The Sony DADC Obligation

175.     In connection with the Contribution Agreement, ARC also transferred and conveyed various contracts to OA Holdings, including a Replication Services Agreement dated December 20, 2013 between ARC and Sony DADC US Inc. d/b/a Sony DADC Americas ("Sony DADC").

176.     As of July 9, 2015, ARC owed Sony DADC more than $2 million in connection with the Replication Services Agreement (the "Sony DADC Obligation").

177.     Upon information and belief, Sony DADC demanded that Alchemy assume the Sony DADC Obligation because it knew that OA Holdings was essentially just a shell company for the faltering ARC.  Accordingly, Sony DADC and Alchemy executed an agreement entitled Third Amendment to Replication Services Agreement (the "Third Amendment"), dated July 8, 2015, which amends a previous agreement between Sony DADC and Alchemy to provide that Alchemy will assume the liabilities owed by ARC under the Replication Services Agreement (i.e., the Sony DADC Obligation).

40

178.    Although the Third Amendment references "right[s] to license and distribute titles" supposedly provided to Alchemy, these are the *same* rights which Alchemy purchased as part of the ANConnect Transaction.  Thus, Alchemy received nothing of value in exchange for the assumption of the Sony DADC Obligation.

179.    Alchemy made at least two payments which were applied towards OA Holdings' outstanding obligation to Sony DADC, and for which it received no benefit.

180.    The first of these payments occurred on September 23, 2015, in the amount of $257,000, paid by Alchemy to OA Holdings, which then immediately transferred those funds to Sony DADC.

181.    A week later, on September 30, 2015, Alchemy made a second payment (this time directly to Sony DADC and for the benefit of OA Holdings), in the amount of $250,000.

182.    Alchemy received no consideration in exchange for assuming and paying down the Sony DADC Obligation.

### 4.    The Business Development Agreement and Management Services Agreement

183.    A Business Development Agreement dated July 9, 2015 between Alchemy and ARC proposes that Trevor Drinkwater (CEO of ARC and OA Holdings) will provide business development services for Alchemy, in exchange for payment by Alchemy to ARC of a portion of the revenue generated by such services.  The Business Development Agreement further provides that ARC will accept the payments from Alchemy as a reduction in the Earn-Out owed to it by OA Holdings under the terms of the Contribution Agreement.

184.    In other words, the Business Development Agreement provides that Alchemy will satisfy OA Holdings' Earn-Out obligation to ARC, which Alchemy had no obligation to do.

185.     Moreover, the "business development" services which would supposedly be provided by Drinkwater never benefited Alchemy, and were instead developed for the benefit of ARC, even though Alchemy paid Drinkwater's salary (pursuant to the Employment Agreement referenced below).

186.     This fact is acknowledged in a June 8, 2015 email from Mark Perez to Bill Lee and Jesse Watson, in which Perez states that Ardon Moore demanded as part of the ARC Transaction that Drinkwater be paid "out of Alchemy (not ARC)" despite providing services for the sole benefit of ARC.

187.     At the same time, Alchemy and OA Holdings entered into a Management Services Agreement providing that Alchemy would manage OA Holdings and specifically perform all responsibilities delegated to OA Holdings' officers under its LLC Agreement.  These services included management of Bentonville Film Festival, LLC, a wholly-owned subsidiary of OA Holdings.

188.     In order to fulfill its obligations under the Management Services Agreement, Alchemy also entered into an Employment Agreement dated July 9, 2015 with Trevor Drinkwater, providing that Drinkwater would initially serve as the President of OA Holdings and Bentonville Film Festival, LLC, in exchange for compensation and benefits including but not limited to an annual base salary of $350,000, various fringe benefits, and the potential for other bonus and incentive payments.  Drinkwater also agreed to certain restrictive covenants, including noncompetition and non-solicitation clauses.

189.     In exchange for providing management services, Alchemy was entitled to a Management Fee of $250,000 annually plus reimbursement of certain costs incurred by

"Approved Personnel," which included Drinkwater and ARC/Bentonville Film Festival employees Scott Moesta, Gina Allgaier, and Isabelle De Laperouse.

190.    Alchemy dedicated significant resources and incurred substantial costs in performing its duties as manager of OA Holdings.  Alchemy never received any compensation or reimbursement in performing those services.

191.    Drinkwater's employment similarly did not benefit Alchemy.  Any business opportunities he developed benefited ARC, not Alchemy.

192.    Since closing of the ARC Transaction until the Debtors' bankruptcy filings, OA Holdings experienced similar liquidity issues as the Debtors and ARC.

193.    To the Debtors' detriment and with the full knowledge and approval of the Virgo Individuals, Bill Lee, and Ardon Moore, the Debtors paid obligations of OA Holdings to which the Debtors have no responsibility and received no benefit.

194.    To provide just a few examples:

a.    The Debtors' routinely funded payroll and other employment obligations of OA Holdings and Bentonville Film Festival LLC in excess of $1 million from July 9, 2015 through July 1, 2016;

b.    On December 1, 2015 Alchemy transferred $125,000 to pay an Advance due under a Distribution Agreement dated as of February 21, 2012 between ARC and Jock Animation (Pty) Ltd.; and

c.    On March 7, 2016 Alchemy paid Double Dutch International $22,500 to pay an Advance (Invoice #453) due under an Acquisition Agreement dated October 15, 2015 between OA Holdings and Double Dutch International.

LEGAL\37018257\1

195.     Additionally, OA Holdings and ARC, with the knowledge of Virgo Individuals and Ardon Moore diverted revenue sources that should have been collected by Alchemy under the OA Distribution Agreement to which Alchemy earns a Distribution Fee.  Because these monies were diverted and not accounted for under the OA Distribution Agreement, Alchemy incurred damages in the form of lost distribution fees and recoupment of advanced costs.

196.     An email dated January 29, 2016 from Rex Bowring (the Debtors' Controller) to Mark Perez describes one example of such a diversion: "Are we going to swap cash proceeds with ARC.  They looking to get Showtime money for their titles directly rather than recoup from their participation statement."

197.     Perez responds in an email dated February 7, 2016: "Rex – please get this deposited and wired to OA.  Thanks."

198.     The amount of the Showtime check was $85,000.  Given that Alchemy was in an unrecouped position with respect to the OA Distribution Agreement in February 2016, Alchemy would have been entitled to retain the entire $85,000, at a time when it was insolvent and experiencing a significant liquidity crisis.

### 5.     The Management Agreement

199.     In yet another ancillary agreement to the Contribution Agreement, on July 9, 2015, ARC and OA Holdings also entered into a Management Agreement stating that OA Holdings will not make any "Major Decisions" that "affect[], directly or indirectly, the Company, the Company's assets, any subsidiary of the Company, or any such subsidiary's assets" without first obtaining "prior consent from ARC" to do so.  The "Major Decisions" encompassed by the Agreement are listed in Section 1, and include any transaction outside the

"ordinary course of business," expenditures over certain thresholds, and capital expenditures, salary decisions, and film festival investments of any amount.

200.    Thus, although ARC conveyed title of substantially all of its assets to OA Holdings, this Management Agreement allowed ARC to maintain control over virtually all OA Holdings' significant operations and management decisions, to the detriment of Alchemy.

201.    The Management Agreement, as well as Drinkwater's employment relationship with but not for the benefit of Alchemy, allowed ARC to maintain significant control of OA Holdings, to the detriment of Calrissian and Alchemy.

**6.      The ARC/OA Holdings Distribution Agreement**

202.    On November 11, 2010, ARC and Alchemy's assignor, ANConnect (at that time known as Anderson Merchandisers, L.P.), entered into a Distribution Agreement ("OA Distribution Agreement"), a true and correct copy of which is available upon the Courts' or the Defendants' request.

203.    Pursuant to the OA Distribution Agreement, Alchemy was granted the exclusive right to distribute ARC's home video products.  The term of the OA Distribution Agreement, as amended, expired on December 31, 2020.

204.    On November 9, 2016, OA Holdings as assignee of ARC, filed a motion for relief from the automatic stay to terminate the OA Distribution Agreement [D.I. 312].  An Order was entered on November 30, 2016 granting OA Holdings requested relief [D.I. 332] and OA Holdings subsequently provided notice to the Trustee terminating the OA Distribution Agreement.

205.    Section 8(g) of the OA Distribution Agreement provides:

> At the end of the Term and at any time after the end of the Term, if
> Anderson [i.e., Our Alchemy] is in an unrecouped position and/or in

a debit balance, as reflected in the corresponding accounting statement, Anderson may submit an invoice to Vendor [OA Investment Holdings LLC] for payment of the unrecouped balance and Vendor shall remit payment thereof in full to Anderson no later than ten (10) days from the date of the invoice.

206.     On February 17, 2017, the Trustee issued a letter to OA Holdings President, Trevor Drinkwater, demanding payment of the unrecouped balance due Alchemy in the amount of $2,854,749.80 as a result of OA Holdings notice of termination to end the Term.  To date, OA Holdings has breached the OA Distribution Agreement by failing to remit the unrecouped balance due Alchemy to the Trustee.

## V.     THE CLAIMS

### FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550
### (Against the Virgo Entities, ANConnect, Lyons, Thor, Anderson Merchandisers, OA Holdings, and ARC)

207.     Paragraphs 1 through 206, above, are incorporated herein by reference, as if restated in their entirety.

208.     As set forth in detail above, the Trustee seeks to avoid the following fraudulent transfers and recover the value of each from any initial, immediate, and/or mediate transferees (collectively, the "Fraudulent Transfers"):

a.     $14,539,123.65 transfer from Alchemy to Calrissian on September 4, 2014, portions of which were subsequently transferred to Virgo Onshore and Virgo Offshore;

b.     Approximately $510,000 transferred from Anderson Digital to ANConnect on or around July 2, 2015 as a member distribution;

c.     The Anderson Purchase Price, paid by Alchemy to ANConnect on July 9, 2015 consisting of cash payments of $29,888,124.40 and the assumption of obligations in excess of $16 million;

46

d.      $2,453,487.82 in fraudulent transfers from the Debtors to Lyons between July 2015 and August 2016 (the "Lyons Transfers"), including:

i.      Transfer of approximately $245,000 from Anderson Digital to Lyons on or around July 2, 2015;

ii.     Transfer of $1,400,000 from Alchemy to Lyons on July 9, 2015;

iii.    Transfer of $61,000 from Alchemy to Lyons on July 17, 2015;

iv.     Transfer of $150,000 from Alchemy to Lyons on December 11, 2015;

v.      Transfer of $581,000 from Alchemy to Lyons on February 19, 2016;

vi.     Transfer of $1,487.42 from Alchemy to Lyons on March 4, 2016; and

vii.    Transfer of $15,000 from Alchemy to Bryan Cave on behalf of Lyons in February 2016;

e.      $1,497,932 in fraudulent transfers from the Debtors to Thor between July 2015 and April 2016 (the "Thor Transfers"), including:

i.      Transfer of approximately $245,000 from Anderson Digital to Thor on or around July 2, 2015;

ii.     Transfer of $900,000 from Alchemy to Thor on July 9, 2015;

iii.    Transfer of $235,057 from Alchemy to Thor on February 26, 2016; and

iv.     Transfer of $117,875 from Alchemy to Thor on April 5, 2016;

47

f.      $2,089,775.45 in Reimbursement Fees transferred from Alchemy to Anderson Merchandisers between July 2015 and July 2016;

g.      $250,000 transfer made from Alchemy to ANConnect, for the benefit of OA Holdings, on or around October 18, 2015;

h.      Alchemy's assumption of the Sony DADC Obligation, and payment of $507,000 in connection therewith, for the benefit of OA Holdings;

i.      $548,000 transfer from Alchemy to ARC on October 28, 2015;

j.      $3,051,945.21 transfer from Alchemy to Calrissian on March 31, 2015, which was subsequently transferred to Virgo Onshore and Virgo Offshore; and

k.      $3,033,534.25 transfer to Calrissian on July 10, 2015, which was subsequently transferred to Virgo Onshore and Virgo Offshore.

209.    Each Fraudulent Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

210.    The Fraudulent Transfers occurred within two (2) years of the Petition Date.

211.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

212.    The Debtors made the Fraudulent Transfers with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

213.    Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

48

## SECOND CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550
### (Against the Virgo Entities, ANConnect, Lyons, Thor, Anderson Merchandisers, OA Holdings, and ARC)

214.    Paragraphs 1 through 213, above, are incorporated herein by reference, as if restated in their entirety.

215.    As set forth in detail above, the Debtors seek to avoid the Fraudulent Transfers and recover the value of each from any initial, immediate, and/or mediate transferees.

216.    Each Fraudulent Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

217.    The Fraudulent Transfers occurred within two (2) years of the Petition Date.

218.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

219.    As more particularly set forth above, the Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

220.    As more particularly set forth above, the Fraudulent Transfers were made at a time when the Debtors were insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

221.    Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

222.    As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

223.     Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## THIRD CLAIM – UNJUST ENRICHMENT
**(Against the Virgo Entities, ANConnect, Lyons, Thor, Anderson Merchandisers, OA Holdings, and ARC)**

224.     Paragraphs 1 through 223, above, are incorporated herein by reference, as if restated in their entirety.

225.     Each of the Fraudulent Transfers described above conferred a benefit on the Defendant which received it, and the Defendants unjustly retained that benefit at the expense of the Debtors' estates.

## FOURTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
**Pursuant to 11 U.S.C. §§ 547(b) and 550**
**(Against Anderson Merchandisers, OA Partners, the Virgo Entities, Lyons, and Thor)**

226.     Paragraphs 1 through 225, above, are incorporated herein by reference, as if restated in their entirety.

227.     The Trustee seeks to avoid the following preferential transfers (collectively, the "Preferential Transfers"):

  a.     $3,208,314 preferential transfer from Alchemy to Anderson Merchandisers on April 12, 2016;

  b.     $10,181,733.54 preferential transfer from Alchemy to OA Partners on July 23, 2015;

  c.     $2,000,000 preferential transfer from Alchemy to OA Partners on December 23, 2015;

  d.     $3,033,534.25 preferential transfer from Alchemy to Calrissian on July 10, 2015, which was subsequently transferred to Virgo Onshore and Virgo Offshore;

e.      Reimbursement Fees paid by Alchemy to Anderson Merchandisers between April 1, 2016 and the Petition Date;

f.      the Lyons Transfers; and

g.      the Thor Transfers.

228.    Each Preferential Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

229.    As more particularly set forth above, the Preferential Transfers were made during the ninety (90) day period immediately preceding the Petition Date, or were made to an insider within the one (1) year period immediately preceding the Petition Date.

230.    As more particularly set forth above, each of the Preferential Transfers was made for or on account of an antecedent debt owed before such transfer was made.

231.    Each of the Preferential Transfers was made at a time when the Debtors were insolvent.

232.    Each of the Preferential Transfers was made to or for the benefit of a creditor, and enabled that creditor to receive more than it would have received if the Preferential Transfer had not been made.

233.    Accordingly, the Trustee is entitled to avoid the Preferential Transfers pursuant to Section 547 of the Bankruptcy Code.

234.    As more particularly set forth above, the Defendants were the initial transferees of the Preferential Transfers, or the entity for whose benefit the Preferential Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

235.    Accordingly, the Trustee is entitled to recover the Preferential Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## FIFTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 6 Del. C. §§ 1304(a) & 1305(a), and 11 U.S.C. §§ 544 and 550
### (Against the Virgo Entities, ANConnect, Lyons, Thor, Anderson Merchandisers, OA Holdings, and ARC)

236.     Paragraphs 1 through 235, above, are incorporated herein by reference, as if restated in their entirety.

237.     At all times material hereto, the Debtors had at least one creditor prior to making the above described Fraudulent Transfers.

238.     At all times material hereto, the Debtors were insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

239.     The Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

240.     The Debtors made the Fraudulent Transfer with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

241.     Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a) and 1305(a), and Section 544 of the Bankruptcy Code.

242.     As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

243.     Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## SIXTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 6 Del. C. § 1305(b), and 11 U.S.C. §§ 544 and 550
### (Against the Virgo Entities, OA Partners, Lyons, and Thor)

244.    Paragraphs 1 through 243, above, are incorporated herein by reference, as if restated in their entirety.

245.    The Trustee seeks to avoid the following transfers:

a.    $10,181,733.54 transfer from Alchemy to OA Partners on July 23, 2015;

b.    $2,000,000 transfer from Alchemy to OA Partners on December 23, 2015;

c.    $3,033,534.25 transfer from Alchemy to Calrissian on July 10, 2015, which was subsequently transferred to Virgo Onshore and Virgo Offshore;

d.    the Lyons Transfers; and

e.    the Thor Transfers.

246.    Each of these transfers was made within one year of the Petition Date.

247.    As more particularly set forth above, each of these transfers was made to an insider that, by virtue of its insider status, had reasonable cause to believe that Alchemy was insolvent.

248.    Each of these transfers was made for an antecedent debt.

249.    Each of these transfers was made at a time when Alchemy was insolvent.

250.    At all times material hereto, Alchemy had at least one creditor prior to making these transfers.

251.    Accordingly, the transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. § 1305(b), and Section 544 of the Bankruptcy Code.

252.     As more particularly set forth above, the Defendants were the initial transferees of the transfers, or the entity for whose benefit the transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

253.     Accordingly the Trustee is entitled to recover the transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## SEVENTH CLAIM – BREACH OF FIDUCIARY DUTY
### (Against the Virgo Individuals, Lee, and Ardon Moore)

254.     Paragraphs 1 through 253, above, are incorporated herein by reference, as if restated in their entirety.

255.     Defendants Perez, Watson, and Dorfman (as Managers), Defendant Lee (as Manager and CEO), and Ardon Moore (who, as a board advisor with significant influence over the board's decisions was a de facto Manager) owed fiduciary duties to the Debtors and to the creditors of those entities as well.

256.     The fiduciary duties included duties of: loyalty, due care, and good faith.

257.     The duty of loyalty obligated the fiduciaries to commit themselves to the business of the Debtors with the attitude of promoting the interests of the Debtors and not themselves.

258.     The duty of loyalty is breached, inter alia: (a) when directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when directors "abdicate" their directorial responsibilities; and/or (c) when directors act in bad faith.

259.     The duty of due care is breached, inter alia: (a) when directors engage in an irrational decision-making process; and (b) when the conduct of directors rises to the level of "gross negligence."

260.    The Virgo Individuals and Lee breached their fiduciary duties in connection with the Debtors by, *inter alia*:

a.    allowing the Debtors to enter into the Fraudulent Transfers described above;

b.    allowing the Debtors to enter into the Anderson Transaction;

c.    allowing the Debtors to enter into the ARC Transaction;

d.    allowing ARC to assign obligations directly to Alchemy (e.g. the Sony DADC Obligation), even though Alchemy was not a party to the Contribution Agreement;

e.    directing Alchemy to pay obligations that OA Holdings had assumed in the Contribution Agreement, including but not limited to allowing $250,000 due to Alchemy by ANConnect to instead be used as partial repayment of OA Holdings' loan obligation;

f.    allowing the benefits of assets (including but not limited to Bentonville Film Festival, LLC) to flow to ARC, even though those assets had been contributed to OA Holdings; and

g.    continuing to employ key ARC personnel without any benefit to Alchemy or OA Holdings, while directing Alchemy to foot the bill for paying those individuals' salaries.

261.    The conduct of the Virgo Individuals, Lee, and Ardon Moore, as alleged above, was intentional, reckless, or grossly negligent.

262.    The Virgo Individuals, Lee, and Ardon Moore prioritized the interests of the Virgo Entities and themselves over those of the Debtors.

263.    While the Virgo Entities may have benefitted from the ARC Transaction (including the Contribution Agreement, and the agreements related thereto) by, *inter alia*, raising

money they otherwise would have to pay out of their own pockets for the ANConnect

Transaction, Alchemy was damaged by the obligations imposed upon it.

264.     As a result of the various breaches of fiduciary duty described above, the Debtors

have suffered damages in an amount to be determined at trial.

### EIGHTH CLAIM – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Virgo Individuals, Lee, and Ardon Moore)**

265.     Paragraphs 1 through 264, above, are incorporated herein by reference, as if

restated in their entirety.

266.     To the extent that any of the Virgo Individuals, Lee or Ardon Moore might be

found not to have had a fiduciary duty to the Debtors at the time of the transactions complained

of herein, each such Defendant is nevertheless liable for having aided and abetted the breach of

fiduciary duties by one or more of the other defendants possessing such duties at the relevant

times.

267.     As described in the paragraphs above, each non-fiduciary defendant substantially

assisted, knowingly participated in, benefitted from, and aided and abetted the breaches of

fiduciary duties engaged in by the other defendants.

268.     As a result of this improper conduct, the Debtors have suffered damages in an

amount to be determined at trial.

### NINTH CLAIM – BREACH OF CONTRACT
**(Against ANConnect)**

269.     Paragraphs 1 through 268, above, are incorporated herein by reference, as if

restated in their entirety.

270.     As more particularly set forth above, Alchemy and ANConnect were parties to the

Transition Services Agreement.

271.     The Transition Services Agreement is valid and enforceable.

272.     The Transition Services Agreement provides, *inter alia*, that ANConnect would collect Alchemy Accounts Receivable on behalf of Alchemy, and remit those collections to Alchemy by wire transfer on a weekly basis.

273.     As more particularly set forth above, ANConnect collected millions of dollars of Alchemy Accounts Receivable which it has not remitted to Alchemy.

274.     ANConnect admits that it is in possession of and withholding $6,047,325 of Alchemy Accounts Receivable that rightfully belong to Alchemy.

275.     ANConnect further admits that its affiliate AM Canada is in possession of and withholding approximately $97,305 of additional Alchemy Accounts Receivable that rightfully belong to Alchemy, purportedly as "recoupment [for] amounts due and owing ANConnect by Alchemy."

276.     As more particularly set forth above, Alchemy's books and records indicate additional Alchemy Accounts Receivable (above and beyond the $6,144,630 ANConnect admits to withholding) that have been collected but not remitted to Alchemy.

277.     As more particularly set forth above, ANConnect is not entitled under the Transition Services Agreement or the APA to withhold (or direct its affiliate to withhold) the Alchemy Accounts Receivable as "setoff," "recoupment," or for any other reason.

278.     By failing to remit the Alchemy Accounts Receivable to Alchemy, ANConnect breached its duties and obligations under the Transition Services Agreement.

279.     As a result of ANConnect's breaches of its duties and obligations under the Transition Services Agreement, Alchemy has incurred substantial damages, including but not limited to, at least $6,144,630 of Alchemy Accounts Receivable, as well as any additional

57

Alchemy Accounts Receivable which ANConnect, AM Canada, and/or any of their affiliates have collected but failed to remit to Alchemy.

280.    ANConnect is liable to Alchemy for these damages.

## TENTH CLAIM – TURNOVER
### Pursuant to 11 U.S.C. § 542
### (Against ANConnect and AM Canada)

281.    Paragraphs 1 through 280, above, are incorporated herein by reference, as if restated in their entirety.

282.    The Alchemy Accounts Receivable being withheld by ANConnect and/or AM Canada are property of the Alchemy estate.

283.    The Alchemy Accounts Receivable being withheld by ANConnect and/or AM Canada constitute property of the Alchemy estate which the Trustee may use in his administration of this bankruptcy case, and have significant value to the estate.

284.    In the Delaware State Court Action, ANConnect admitted to withholding a minimum of $6,047,325 of Alchemy Accounts Receivable which it had collected on behalf of Alchemy and which belong to Alchemy.

285.    In its Proof of Claim, ANConnect once again admitted to withholding the Alchemy Accounts Receivable which it had collected on behalf of Alchemy and which belong to Alchemy.

286.    In its Proof of Claim, ANConnect also admitted that its affiliate AM Canada is withholding $126,094.69 CAD ($97,305.00, using the exchange rate as of the Petition Date) which had been collected on behalf of Alchemy and which belong to Alchemy.

287.     There is no legitimate dispute that the Alchemy Accounts Receivable consist of receivables which were: 1) due and owing to Alchemy, and 2) collected by ANConnect and/or AM Canada on behalf of Alchemy.

288.     There is no legitimate dispute that the Alchemy Accounts Receivable constitute property of the Alchemy estate which ANConnect and AM Canada have failed to turn over to Alchemy.

289.     Pursuant to 11 U.S.C. § 542(a), the Alchemy Accounts Receivable should be immediately turned over to the estate.

## ELEVENTH CLAIM - ACCOUNTING
### (Against ANConnect)

290.     Paragraphs 1 through 289, above, are incorporated herein by reference, as if restated in their entirety.

291.     Alchemy and ANConnect are parties to the Transition Services Agreement.

292.     The Transition Services Agreement required ANConnect to collect accounts receivable on behalf of Alchemy, and remit them to Alchemy on a weekly basis.

293.     As set forth in detail above, ANConnect has failed to remit all Alchemy Accounts Receivable to Alchemy as required by the Transition Services Agreement.

294.     A dispute exists regarding the specific amount of Alchemy Accounts Receivable that have been collected and withheld by ANConnect and its affiliates.  ANConnect admits that it and its affiliate AM Canada are withholding a total of $6,144,630 in Alchemy Accounts Receivable, but Alchemy's records indicate that the true amount of Alchemy Accounts Receivable that have been collected and withheld is over $7 million.

295.     The true amount of Alchemy Accounts Receivable due to Alchemy can only be ascertained through an accounting.

296.     Plaintiff accordingly seeks an immediate accounting from ANConnect of any and all Alchemy Accounts Receivable that have been collected and are currently being withheld by ANConnect, AM Canada, and/or any other affiliate of ANConnect.

## TWELFTH CLAIM – DECLARATORY JUDGMENT

297.     Paragraphs 1 through 296, above, are incorporated herein by reference, as if restated in their entirety.

298.     An actual controversy exists between the Trustee and the Virgo Defendants concerning payments made by Alchemy on March 31, 2015 and July 10, 2015 to Calrissian, which related to purported "loans" made by Calrissian to Alchemy on January 12, 2015 and May 21, 2015.

299.     A transaction should be characterized according to its true nature rather than the name given to the transaction by the parties.  The January 12, 2015 and May 21, 2015 "loans" were made by Calrissian, an insider that, through the Virgo Defendants, dominated and controlled Alchemy's management decisions, at a time when Alchemy was insolvent and had unreasonably small capital – a situation caused by the Calrissian Distribution several months earlier.  The Virgo Defendants further demonstrated, through their actions, that the January 12, 2015 and May 21, 2015 "loans" represented equity investments and that the Virgo Defendants looked to Alchemy's future earning as the source of repayment of their advances, including by characterizing the advances as injections of interim capital needed to "get [Alchemy] through" its "tightened liquidity position," by dominating and controlling Alchemy's management decisions, and by continuing to advance funds while Alchemy was thinly capitalized or undercapitalized.

300.     Based on the facts previously set forth, the Trustee is entitled to declaratory relief, including a declaratory judgment (the "Declaratory Judgment") to the effect that the funds advanced by Calrissian (acting through the Virgo Defendants) to Alchemy on January 12, 2015 and May 21, 2015 constituted, and should be characterized as, equity investments by Alchemy's controlling member rather than debt.

### THIRTEENTH CLAIM – BREACH OF CONTRACT
**(Against OA Holdings)**

301.     Paragraphs 1 through 300, above, are incorporated herein by reference, as if restated in their entirety.

302.     As more particularly set forth above, Alchemy and OA Investment Holdings, LLC – as successor in interest to ARC – were parties to the OA Distribution Agreement.

303.     The OA Distribution Agreement provides, *inter alia*, that – at the end of the contractual term – OA Holdings shall remit payment of any unrecouped balance to the Debtor within ten days from receiving a demand for the same.

304.     The Debtor demanded payment from OA Holdings of an unrecouped balance due Alchemy in the amount of $2,854,749.80 on February 17, 2017.

305.     OA Holdings has not remitted the unrecouped balance to Alchemy.

306.     By failing to remit the unrecouped balance to Alchemy, OA Holdings breached its duties and obligations under the OA Distribution Agreement.

307.     As a result of ANConnect's breaches of its duties and obligations under the Transition Services Agreement, Alchemy has incurred damages in the amount of $2,854,749.80.

308.     OA Holdings is liable to Alchemy for these damages.

## VI.  <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of Our Alchemy, LLC and Anderson Digital, LLC, demands judgment in his favor and against the Defendants:

(a)  For avoidance and recovery of the Fraudulent and Preferential Transfers, or the value thereof in the amounts set forth above;

(b)  Directing the Transferee Defendants (as identified in Claims One, Two, Four, Five, and Six, above) to immediately pay the Trustee the amount of the Fraudulent and Preferential Transfers, plus interest thereon and costs, and in connection therewith, enter judgment in favor of the Trustee and against the Transferee Defendants;

(c)  Against the Virgo Individuals, Lee, and Ardon Moore, jointly and severally, for damages in an amount to be determined at trial;

(d)  Turnover of all Alchemy Accounts Receivable, the proper amount of which to be determined by a true and accurate accounting;

(e)  Payment by OA Holdings of the unrecouped balance due under the OA Distribution Agreement;

(f)  Entry of the Declaratory Judgment;

(g)  The entry of judgment in favor of the Trustee and against the Defendants, jointly and severally, for punitive damages;

(h)  Pre-Judgment and Post-Judgment Interest, reasonable attorneys' fees, and costs; and

(i)  Such additional relief as this Court deems just.

## VII.    <u>JURY DEMAND</u>

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

Dated: June 29, 2018

*/s/ John T. Carroll, III*

_____

John T. Carroll, III (DE No. 4060)
COZEN O'CONNOR
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013
jcarroll@cozen.com

and

Steven M. Coren (*pro hac vice* to be sought)
Benjamin M. Mather (*pro hac vice* to be sought)
Andrew J. Belli (*pro hac vice* to be sought)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
abelli@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Ch. 7 Trustee*

63