## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OUR ALCHEMY, LLC, *et al.*, | ) | Case No. 16-11596 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| _____Debtors._____ | ) | |
| GEORGE L. MILLER, in his capacity as | ) | |
| Chapter 7 Trustee for the jointly administered | ) | |
| Bankruptcy estates of Our Alchemy, LLC and | ) | |
| Anderson Digital, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 18-50633 (KG) |
| | ) | |
| ANCONNECT, LLC; ANDERSON | ) | |
| MERCHANDISERS, LLC; ANDERSON | ) | |
| MERCHANDISERS CANADA, INC; OA | ) | |
| INVESTMENT PARTNERS LLC; OA | ) | |
| INVESTMENT HOLDINGS LLC; VIRGO | ) | |
| INVESTMENT GROUP, LLC; VIRGO | ) | |
| SOCIETAS PARTNERS, LLC; VIRGO | ) | |
| SOCIETAS PARTNERSHIP III (ONSHORE), | ) | |
| L.P.; VIRGO SOCIETAS PARTNERSHIP III | ) | |
| (OFFSHORE), L.P.; VIRGO SERVICE | ) | |
| COMPANY LLC; ARDON MOORE; MARK | ) | |
| PEREZ; JESSE WATSON; TODD DORFMAN; | ) | |
| BILL LEE; STEPHEN LYONS; and FREYR | ) | |
| THOR, | ) | |
| | ) | |
| _____Defendants._____ | ) | Re: D.I. 12 |

## MEMORANDUM OPINION
## RE ARDON MOORE'S MOTION TO DISMISS

**INTRODUCTION**

George L. Miller, in his capacity as Chapter 7 trustee ("Trustee") of the jointly administered bankrupt estates of Our Alchemy, LLC ("Alchemy" or "Debtor") and Anderson Digital, LLC ("Anderson"), brings this adversary proceeding against ANConnect LLC, Virgo Investment Group, LLC and its affiliates (collectively "Virgo"), ARC Entertainment, LLC ("ARC"), and numerous other entities and individuals associated with the bankrupt entities, including Ardon Moore ("Moore"). The Trustee alleges in the Complaint that Moore is liable for breaches of fiduciary duty with respect to duties owed to the bankrupt entities or, in the alternative, is liable for aiding and abetting breaches of fiduciary duty. On September 11, 2018, Moore filed a motion to dismiss the adversary case pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"), applicable to this Court through Federal Rule of Bankruptcy Procedure 7012(b), arguing the Complaint fails to state a claim upon which relief can be granted.

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334. This opinion addresses state law claims that are related to the bankruptcy case and are noncore. As such this Court may hear the proceeding and issue proposed findings of facts and conclusions of law for the district court to review *de novo*. 28 U.S.C. §157(c)(1). Venue is proper in this district pursuant to 28 U.S.C. 1408.

## STATEMENT OF FACTS

The events leading to Moore's involvement with the Debtor and in this subsequent litigation began in 2014. Virgo, a Delaware limited liability company, purchased one hundred percent of the equity interest in Alchemy. (Compl. at ¶ ¶29-30). Alchemy was a distributor of DVDs, digital media, and video-on-demand content of both movies and television shows. (Compl. at ¶8). Virgo accomplished its acquisition of Alchemy through forming Calrissian L.P., ("Calrissian") a Delaware limited partnership which held Alchemy's entire equity interest following the purchase. (Compl. at ¶ ¶30-31). Prior to acquiring Alchemy, Calrissian executed a promissory note with two of the Virgo entities, Virgo Onshore and Virgo Offshore, for $14,340,000 to be used in acquiring Alchemy. (Compl. at ¶ 33). Shortly after acquiring Alchemy, Calrissian, acting in conjunction with certain Virgo individuals who then held positions in Alchemy's management, caused Alchemy to enter into a $40 million credit facility with SunTrust Bank, N.A. and directed Alchemy to draw $14,539,123.65 from the credit facility. (Compl. at 34-35). Alchemy transferred the money it drew from the credit facility to Calrissian referring to it as a member distribution. (Compl. at ¶¶35, 37). The Trustee alleges that the distribution to Calrissian caused Alchemy's bank debt to double reaching just over $31 million and putting financial strain on Alchemy. (Compl. at ¶¶38, 40). The Trustee avers that following the distribution to Calrissian, which was then funneled upward to the Virgo entities, Alchemy was left "insolvent and unable to pay its debts as they came due." (Compl. at ¶40). The distribution left Alchemy with

"unreasonably small capital for the business in which it was engaged." (Compl. at ¶¶40-41).

Recognizing the financial state of Alchemy following the distribution, Virgo began considering various actions to keep Alchemy afloat which included the Virgo entities injecting capital into Alchemy on several occasions to enable Alchemy's operations to continue. (Compl. ¶¶42-44). The Trustee alleges that in a continued effort to make Alchemy profitable, Virgo directed Alchemy to acquire ANConnect, LLC, another supplier of digital media. (Compl. at ¶¶55-56). The Trustee avers that Alchemy overpaid for ANConnect and assumed various liabilities of ANConnect following the execution of an asset purchase agreement between Alchemy and ANConnect. (Compl. at ¶¶62-66). The sale closed on July 9, 2015 with Alchemy paying a total purchase price of $37,673,347. (Compl. at ¶¶62, 64).

While pursuing the ANConnect transaction, Virgo made attempts to secure funding for the deal. (Compl. at ¶135). Virgo acquired $10 million of funding from Moore for to be used in purchasing ANConnect through the asset purchase agreement. (Compl. at ¶136). In return for contributing the funds, Virgo agreed to bail out ARC, a failing business which Moore owned. (Compl. at ¶136). On July 9, 2015, the same day as the ANConnect transaction closed, Virgo, acting through Calrissian, entered into a contribution agreement with ARC. (Compl. at ¶137). Pursuant to the contribution agreement, Virgo agreed to assume certain ARC liabilities and created an entity formed and wholly owned by Calrissian, OA Holdings, to accomplish the transfer. (Compl. at ¶¶137-138).

The Trustee alleges that ARC was in "deep financial trouble and was insolvent" at the time Virgo approved the ARC transaction. (Compl. at ¶139). Specifically, the Trustee alleges that ARC was unable to finalize its 2014 financials following issues raised by its external auditor. (Compl. at ¶ 139). The Complaint contains allegations that ARC's liabilities greatly outweighed its assets by as much as $10.94 million dollars. (Compl. at ¶139). The Trustee alleges that despite Virgo's recognition that ARC was in alarming financial condition, Virgo pushed forward with the transaction because key members of Virgo's management had personal motives. (Compl. at ¶140). Specifically, the Trustee maintains that Virgo agreed to the acquisition of ARC as a "sweetheart deal for the benefit of Ardon Moore" in order to win Moore's favor given his role as a manager of the Bass family's large oil fortune and corresponding investment fund. (Compl. at ¶141). Further, the Trustee alleges that ARC withheld its most valuable assets from the ARC transaction. (Compl. at ¶142). The Trustee claims that ARC received a 10% equity interest in Calrissian, the one hundred percent owner of Alchemy. (Compl. at ¶144).

On July 9, 2015, the date of the ARC and ANConnect transactions, Calrissian amended its limited partnership agreement to add ARC as a limited partner. (Compl. at ¶145). Calrissian also added ALC Partners, L.P. as a limited partner, another entity that Moore controlled. (Compl. at ¶145). The Trustee alleges that Virgo exploited its power over Alchemy through the use of Virgo's insiders in Alchemy to "impose ARC-related liabilities on Alchemy" even though Alchemy was not a party to the ARC transaction and gained no benefit from the transaction. (Compl. at ¶146). The Trustee points to

several ancillary agreements to the ANConnect and ARC transactions that imposed

ARC related liabilities onto Alchemy. (Compl. at ¶147). The Trustee also contends that

Virgo informally imposed ARC related liabilities on Alchemy. (Compl. at ¶147). As part

of the ARC transaction, entered into on July 9, 2015, Moore became a "board advisor" to

Alchemy and received the right to "participate in all formal board meetings and obtain

confidential materials related to the financial position and operations of Alchemy."

(Compl. at ¶149).

To execute the ARC transaction, the purpose of which was to fund the

ANConnect deal, Calrissian formed OA Investment Partners LLC ("OA Partners"), a

Delaware limited liability company. (Compl. at ¶150). The Complaint alleges that ARC

transferred the $10 million dollars that Moore pledged to fund the ANConnect

transaction to OA Partners. (Compl. at ¶150). OA Partners and Alchemy executed a

Mezzanine Loan Agreement on July 9, 2015 whereby OA Partners acted as lender and

Alchemy acted as borrower. (Compl. at ¶150). The Mezzanine Loan Agreement

provided for $20,175,893 of unsecured credit with advances split into two tranches,

"Tranche A" and "Tranche B." (Compl. at ¶151). Tranche B provided for an advance of

$10,175,893 on the closing date of the ANConnect transaction while Tranche A provided

for $10,000,000 in advances to be made intermittently until June 30, 2016. (Compl. at

¶151).

On July 9, 2015, OA Partners made the Tranche B advance to Alchemy who then

prepaid the entire amount of the Tranche B advance, including interest, four days later,

on July 13, 2015. (Compl. at ¶153). The Trustee alleges that the terms of the Mezzanine

Loan Agreement permitted, but did not require, Alchemy to repay the loan on Tranche B after satisfying certain conditions. (Compl. at ¶156). The Trustee contends that Alchemy satisfied the terms of the loan agreement thereby permitting it to make the July 13 payment. (Compl. at ¶157). The complication that the Trustee raises in the Complaint is that, although contractually permitted to make the payment, Alchemy made the payment at a time when it was insolvent. (Compl. at ¶¶157-158).

Following the Tranche B payment on July 13, OA Partners advanced $16,498,000 from Tranche A as a loan to Alchemy between August 17, 2015 and November 21, 2015. (Compl. at ¶159). The Trustee further alleges that on October 28, 2015, OA Partners transferred $548,000 of the advanced Tranche A funds to ARC and that the wire confirmation for the transfer received approval from Virgo executives. (Compl. at ¶¶160-161). The Trustee contends that these subsequent transactions left Alchemy with a $548,000 liability while ARC received the money without transferring any value to Alchemy. (Compl. at ¶162). The Trustee avers that no contractual agreement existed between Alchemy and ARC requiring the $548,000 payment. (Compl. at ¶163).

The Trustee alleges that Alchemy remained insolvent following November 21, 2015 and that on December 23, 2015, Alchemy transferred $2,000,000 to OA Partners to pay down the balance of advances made on Tranche A. (Compl. at ¶164). However, the Trustee points to the Mezzanine Loan Agreement alleging that it did not allow Alchemy to make any payments on Tranche A until June 30, 2016. (Compl. at ¶165). The Trustee avers that Alchemy received no value for engaging in these transactions. (Compl. at ¶168).

The Trustee alleges that, in addition to the ARC transaction and its implications on the ANConnect deal, OA Holdings, ANConnect, and an entity controlled by Moore, ALC Mezz Partners, L.P., ("Mezz"), entered into a "Loan and Security Agreement" with "related Promissory Notes" on July 9, 2015, whereby ANConnect and Mezz each advanced $2,000,000 to OA Holdings "for general use following the ARC Transaction." (Compl. at ¶169). The Mezz agreement mandated quarterly payments of $250,000 in principal plus accrued interest beginning on September 30, 2015. (Compl. at ¶170). Alchemy, in turn, agreed to allow ANConnect to retain $250,000 that ANConnect owed Alchemy in satisfaction of a transition service agreement between the two parties. (Compl. at ¶171). The Trustee contends that ANConnect wrongfully withheld the $250,000 from Alchemy where it consisted of Alchemy's accounts receivable that the transition service agreement required ANConnect to remit. (Compl. at ¶172). The Trustee avers that Alchemy was not a party to the Mezz agreement and that it had no obligation to ANConnect or Mezz with respect to the money loaned to OA Holdings. (Compl. at ¶173). The Trustee alleges that the $250,000 payment to OA Holdings occurred while Alchemy "was insolvent, undercapitalized, and unable to pay its debts as they came due." (Compl. at ¶174).

Prior to the ARC transaction, ARC owed Sony DADC ('Sony") more than $2 million dollars pursuant to a service contract. (Compl. at ¶¶175-176). The Trustee alleges that Sony demanded that Alchemy assume ARC's service contract obligation because Sony was aware that OA Holdings was merely a shell for the distressed ARC. (Compl. at ¶177). The Trustee further alleges that in response, Alchemy acquiesced to

Sony and ARC's demands and agreed to assume ARC's $2,000,000 liability owed to Sony on July 8, 2015. (Compl. at ¶177). The Trustee maintains that although Sony transferred various licensing and distribution rights to Alchemy, those were rights that Alchemy already owned by virtue of the ANConnect transaction meaning Alchemy received no value for assuming the Sony liability. (Compl. at ¶178). Following the July 9 deal, Alchemy made payments to Sony occurring on September 23, 2015 and September 30, 2015 totaling $507,000. (Compl. at ¶¶179-181).

The Trustee alleges further that Moore demanded certain concessions along with the ARC transaction relating to other business development matters and services. (Compl. at ¶¶183, 186). Specifically, the Trustee directs the Court's attention to Moore demanding that Trevor Drinkwater, the CEO of ARC and OA Holdings, receive compensation from Alchemy even though he did not eventually provide services that benefitted Alchemy. (Compl. at ¶¶183, 185). Further, the Trustee asserts that the July 9 deal required Alchemy to make payments to ARC to reduce the earn-out OA Holdings owed to ARC under the contribution agreement. (Compl. at ¶¶183-184). The Trustee alleges that Alchemy assumed responsibility for managing OA Holdings and certain services related to its wholly owned subsidiaries which caused Alchemy to enter into an employment agreement with Mr. Drinkwater to serve as president of OA Holdings in return for paying him a base salary of $350,000 with the potential for bonuses. (Compl. at ¶¶187-188). In exchange for managing OA Holdings, Alchemy would receive $250,000 annually plus reimbursements of certain expenses. (Compl. at 189). The Trustee alleges that Alchemy never received any compensation or reimbursement for its

management of OA Holdings and that Mr. Drinkwater acted only to benefit ARC developing business opportunities for ARC's benefit not Alchemy's. (Compl. at ¶¶190-191).

The Trustee asserts that Virgo executives and Moore approved and executed these transactions with full knowledge of the detrimental effects to Alchemy. (Compl. at ¶193). The Trustee alleges several instances in the remainder of the Complaint where Alchemy made payments to OA Holdings while it was insolvent and alleges that Virgo's executives acting in concert with Moore diverted revenues away from Alchemy toward OA Holdings and ARC. (Compl. at ¶¶194-195, 198). The Trustee also alleges that, although the July 9 deals conveyed substantially all of ARC's assets to OA Holdings, the ancillary management agreements, along with Mr. Drinkwater's employment, enabled ARC to essentially maintain control over OA Holdings to the detriment of Alchemy. (Compl. at ¶¶200-201).

Lastly, the Trustee points to a November 11, 2010[1] agreement between ANConnect acting as assignor of Alchemy and ARC in which Alchemy received the exclusive right to distribute ARC's home video products. (Compl. at ¶¶202-203). According to the Trustee, the distribution agreement will not expire until December 31, 2020. (Compl. at ¶203). Nevertheless, on November 9, 2016, OA Holdings filed a motion for relief from the automatic stay which this Court granted on November 30, 2016,

---

[1] The Complaint states this transaction occurred in 2010. However, this appears to be a typo as none of the events previously mentioned in the Complaint predate Virgo's 2014 acquisition of Alchemy.

allowing OA Holdings to terminate the distribution agreement. (Compl. at ¶204); D.I. 312-32. The Trustee alleges that the termination of the distribution agreement caused harm to Alchemy and that OA Holdings has not remitted payments and balances owed to Alchemy. (Compl. at ¶206).

Before the Court is the Motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Pursuant to the events described above, the Trustee alleges in Count Seven of the Complaint that Moore breached his fiduciary duties that the Trustee contends Moore owed to Alchemy, the other debtors, and the creditors of all the debtor entities through his role as a board advisor "with significant influence over the board's decisions as a de facto Manager." (Compl. at ¶255). The Trustee charges that the events described in the Complaint amount to breaches of the duties of care, loyalty, and good faith. (Compl. at ¶¶256, 261-264). In the alternative, the Trustee alleges in Count Eight that if it is determined that Moore did not owe fiduciary duties to Alchemy, the other bankrupt entities, or the creditors of those entities then Moore is liable for aiding and abetting the Virgo executives for breaching their fiduciary duties. (Compl. at ¶266).

## DISCUSSION

The questions relevant to the Motion are whether the Trustee adequately alleged facts that, if true, could support a claim that Moore owed fiduciary duties and that he breached those duties, or that Moore aided and abetted the Virgo entities and Virgo executives in their alleged breaches of fiduciary duty. The Court finds that the Trustee

did not state a claim that Moore breached any fiduciary duties. The Court will dismiss

Count Seven of the Complaint as it applies to Moore. The Court finds that the Trustee

failed to state a claim for aiding and abetting against Moore and will dismiss Count

Eight of the Complaint as it applies to Moore.

## A. Standard of Review Under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a plaintiff's

allegations. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In order to survive a

motion to dismiss the plaintiff is required to put forth "a short and plain statement of

the claim that the pleader is entitled to relief in order to give the defendant fair notice of

what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); Fed. R. Civ. Proc. 8. A

plaintiff need not provide detailed factual allegations but must provide more than mere

labels, conclusions, and formulaic recitations of elements to a cause of action. *Id.* at

1964-65. Courts may disregard legal conclusions presented as factual allegations. *Id.* at

1965. In deciding a motion to dismiss, a court assumes that all the facts in the complaint

are true. *Id.* However, the pleader must allege facts that raise the right to relief above

the level of mere speculation. *Id.*

"Determining whether a complaint states a plausible claim for relief will… be a

context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed.2d

868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* at 678, 1949. "[T]he Court may grant…a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief" *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 506 (D. Del. 2012)(internal citation omitted). The law only requires a court to draw reasonable inferences from allegations and does not require a court to accept every strained inference a plaintiff may aver in a complaint. *See Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013). Put simply, the fundamental question the court must answer is whether, if everything the plaintiff alleges is true, the plaintiff can recover. *Kost*, 1 F.3d at 183.

## B. Breach of Fiduciary Duty Claim Against Moore

### 1. Relevant Law Concerning Fiduciary Duties.

"A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012)(applying fiduciary principles in LLC context). "The managing member of an LLC is vested with discretionary power to manage the business of the LLC and easily fits the definition of a fiduciary." *Id.* (internal quotation marks omitted). However, a "straightforward commercial relationship arising from contract" that "is in all of its aspects an arms-length relationship" will not give rise to fiduciary duties. *McMahon v. New Castle Assoc.*, 532 A.2d 601, 605 (Del. Ch. 1987)(Chancellor Allen). A commercial relationship involves a bargained for contractual undertaking where the parties define their relationship and include protections for their particular interests. *See*

*Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995). Evidence of special knowledge, confidentiality, or mutual dependence beyond the fulfillment of the contractual terms will tend to support a finding of a fiduciary relationship. *Id*. Fiduciary duties are creatures of equity and a court will not impose fiduciary duties unless there is no adequate remedy at law and a special relationship of trust exists between the parties. *McMahon*, 532 A.2d at 605.

Under Delaware law, the LLC agreement contains the rights and obligations governing a limited liability company. *Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 849 (Del. Ch. 2012)(stating "it is typically the case that the evaluation of fiduciary duty claims cannot occur without a close examination of the LLC agreement itself"). A court, unless constrained by an applicable statute or law, will give effect to the terms of the LLC agreement. *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 802-03 (Del. Ch. 2011). If the LLC agreement is silent as to the applicability of fiduciary duties, a court will apply the traditional "rules of law and equity, including the rules of law and equity relating to fiduciary duties." *Auriga*, 40 A.3d at 850; *See also Feeley*, 62 A.3d at 660-61; 6 Del. C. § 18–1104. Thus, absent modification by an LLC agreement, the fiduciary duties applicable to an LLC context are essentially identical to those applied in the corporate context. *See Auriga*, 40 A.3d at 849-851; *In re Atlas Energy Resources, LLC*, 2010 WL 4273122, at *6 (Del. Ch. October 28, 2010).[2]

---

[2] The parties have not presented the Court with a copy of the LLC agreement and both argue as if the traditional fiduciary duties applicable in other contexts apply equally here.

Generally, only managers and officers of an LLC will have fiduciary duties to the LLC and those that hold a controlling interest in the entity. *See Triple H Family Limited Partnership v. Neal*, 2018 WL 3650242, at *14 (Del. Ch. July 31, 2018). "Delaware case law has recognized that a person who is not named or designated a manager in the LLC's governing documents may nonetheless be deemed a *de facto* manager and fiduciary of the LLC." *Id.* An individual who has "unfettered access" to the LLC's confidential information, helps to plan the LLC's business dealings with various outside parties on important issues, and assists in updating the LLC's lenders in conjunction with management can be a *de facto* manager owing fiduciary duties to the LLC. *Id.* A plaintiff must demonstrate that a defendant had access to the LLC's confidential information and engaged in acts on behalf of the LLC to establish the defendant's status as a *de facto* manager. *Id.* Delaware courts consistently look "to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers." *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *17 (Del.Ch. Feb. 11, 2015). A third party exerts actual control over an entity through the existence of a relationship where the third party dominates the company's business affairs. *Kahn v. Lynch Comm. Sys., Inc.*, 638 A.2d 1110, 1114-15 (Del. 1994).

In *Triple H*, the Court of Chancery found that an individual acted as a *de facto* manager where he signed the LLC's certificate of formation, had his personal attorney draft the operating agreement, directed the CFO of a different entity he controlled to handle the LLC's accounts, loaned working capital to the firm, approved hiring decisions and employee compensation, and staffed the LLC with his own associates.

*Triple H*, 2018 WL 3650242, at *14. In the corporate context, *Kahn v. Lynch* dealt with a 43.3% shareholder who exerted actual control over the board's decision-making process to approve a strategic acquisition where the directors deferred to the demands of its controlling shareholder rather than follow their own business judgment. *Id.* at 1114-115. In *Kahn v. Lynch*, the controller was so brazen as to tell the board "you must listen to us" and threatened to take full control of the company if the board did not meet their demands. *Id.* at 1114.

In *McMahon*, Chancellor Allen held that a business arrangement between two parties did not involve fiduciary duties where the contract bore the hallmarks of a commercial relationship rather than a fiduciary one. *See McMahon*, 532 A.2d at 605. Specifically, Chancellor Allen noted that the transaction, which involved a dispute between a landlord and lessee, involved no element of confidentiality or joint undertaking and merely amounted to a typical contractual undertaking. *Id.* The parties did not share a mutual dependence beyond the fulfillment of their contractual obligations. *Id.* As such, imposing fiduciary duties and an equitable remedy for their breach was improper where the parties did not place a special trust in each other. *Id.*

In *Metro Ambulance*, the Court of Chancery held that two service contracts created a commercial rather than fiduciary relationship between two companies providing healthcare related services. *Metro Ambulance*, 1995 WL 409015, at *1. Specifically, Metro Ambulance provided transportation for patients to receive medical treatment at various facilities while it contracted with another company to manage its billing to the patients' health insurance companies. *Id.* The court explained that the

agreements were a straightforward commercial transaction with clearly defined terms where both parties would fulfill their contractual obligations. *Id.* at *3.

### 2.  The Complaint Does Not State Facts Suggesting Moore Owed Fiduciary Duties to Alchemy or Virgo Either Before or On July 9, 2015.

Here, considering the Complaint's allegations as true, Moore negotiated and entered into numerous agreements with the Virgo entities and Alchemy through ARC and his other entities. Pursuant to the contribution agreement, Moore agreed to pay $10 million dollars to assist Virgo in purchasing ANConnect through their wholly owned subsidiary, Alchemy. In return, Moore negotiated and secured favorable business terms for himself which the Trustee attempts to use as examples of Moore breaching fiduciary duties he allegedly owed to Alchemy. Although the transactions and relationships involved here are more complex than those at issue in *Metro Ambulance* and *McMahon,* Moore's conduct is markedly different than the defendants' conduct in *Triple H* and *Kahn v. Lynch.*

The Complaint makes no allegations that Moore had any rights under Alchemy's LLC agreement either before or after the July 9 agreements.[3] In fact, the allegations in the Complaint support the inference that Moore stood on the opposite side of the July 9 transactions and bargained hard for a deal that was favorable to his interests at arm's

---

[3] The Trustee alleges that Moore had the right to attend Alchemy board meetings and access confidential information but does not allege these rights were bestowed upon him through amendments to the LLC agreement and the Trustee did not provide the Court with a copy of the LLC agreement.

length. The Complaint even references a conversation between two of the Alchemy

executives alleging:

> Indeed, in response to June 7, 2015 emails from Alchemy CFO John Avagliano
> emphasizing "how much more we need to negotiate" given that ARC was "in
> denial" regarding its financial status and was "functionally insolvent," Alchemy
> CEO Bill Lee stated that those concerns should be ignored because "[Moore] and
> Mark [Perez]'s conversation was positive and there is a way forward on the
> transaction. (Compl. at ¶140).

The allegations do not support any inference that in negotiating the July 9

transaction Moore owed fiduciary duties to Alchemy as a *de facto* manager or

someone possessing any semblance of control over Alchemy. To the contrary, the

Complaint suggests Moore was an outsider who Alchemy negotiated with at arm's

length prior to the closing of the July 9 agreements. The Complaint raises the

inference that Alchemy had to exert some degree of effort in negotiating with Moore

as highlighted in the excerpt from the Complaint cited above where the CFO

remarked "how much more we need to negotiate" with Moore. *Id*. The allegations

suggest Moore bargained at arm's length and received numerous concessions in

return for contributing $10 million to fund the ANConnect transaction.

There is no contention that Moore exerted influence beyond what is customary in

an arm's length negotiation such that Alchemy and Virgo did not follow their own

business judgment in dealing with Moore. Insofar as the Trustee points to Moore's

conduct occurring either on or before July 9, 2015 to support a claim for breach of

fiduciary duty, those contentions merit no relief. The allegations establish that

Moore did not owe any fiduciary duties prior to the closing of the July 9 agreements.

### 3.  The Complaint Does Not Support an Inference That Moore Owed Fiduciary Duties After the July 9, 2015 transactions.

The Trustee alleges that Moore became a board advisor to Alchemy following the July 9 agreements and argues that his position as board advisor created a fiduciary relationship between Moore and Alchemy. To support this claim, the Trustee alleges that Virgo and Alchemy granted Moore the right to participate in Alchemy's board meetings and granted access to all of Alchemy's confidential information. The Trustee avers that Moore's position as a board advisor, knowledge of Alchemy's nonpublic information, and the use of his influence with the Bass family to obtain concessions from the Virgo entities made Moore a *de facto* manager of Alchemy with fiduciary duties which Moore breached.

The Trustee's allegations fall short. Despite the Trustee's reliance on Moore's connection to the Bass family, nowhere in the Complaint is it alleged that Moore knew Virgo was interested in his company because of the Bass family connection or that Moore used that influence in his dealings with Alchemy. Many of the transactions that occurred after the July 9 agreements were largely set in motion by the July 9 deals that Moore bargained for at arm's length prior to having any board advisor status with Alchemy. For example, Alchemy assumed the Sony obligation from ARC on July 8, 2015 meaning it became obligated to pay Sony irrespective of any actions Moore could have taken after becoming a board advisor and learning of Alchemy's financial condition. (Compl. at ¶177). Alchemy entered the Mezzanine Loan agreement on July 9, 2015 while Moore stood on the opposite side of the transaction, contractually obligating

Alchemy to repay the loan to OA Partners. (Compl. at ¶156). Similarly, the loan and security agreement entered on July 9 between ALC Mezz, ANConnect, and OA Holdings, contractually obligated OA Holdings to pay the $4 million dollar loan. (Compl. at ¶¶169-170). The Mezz agreement bound OA Holdings, which was an entity that Virgo controlled, to repay the loan. Moreover, Alchemy became the manager of OA Holdings and Virgo continued to control Alchemy. *See* (Compl. at ¶187). Moore negotiated these and most of the other transactions in the Complaint at arm's length and fixed his rights through contract meaning subsequent payments on these transactions do not implicate Moore.

The Trustee makes no specific allegations of how Moore exerted influence on the Alchemy board following his appointment as a board advisor or used that position improperly. The Complaint makes no allegations that Moore even utilized his right and actually attended board meetings. Although the Complaint alleges that Moore had the right to access Alchemy's confidential information, the Complaint fails to establish that Moore took any actions on behalf of Alchemy, used the confidential information improperly, or exercised his right to access confidential information. The Trustee does not allege that Moore had the power to prevent the challenged transactions occurring after July 9, 2015 from taking place.

Under the relevant Delaware decisional law, the Trustee needed to allege that Moore not only had access to confidential information but that he also took action on behalf of the entity. Absent additional allegations of how Moore specifically used his position as a board advisor to act as a *de facto* manager, the claim in Count Seven fails as

to Moore. While the Complaint suggests the relationship between Alchemy and Moore following the July 9 deals was more than a straightforward commercial relationship, the allegations fall short of providing a reasonable inference there was such mutual dependence between Alchemy and Moore, accompanied by Moore's control of Alchemy, to reach the level of a special position of trust implicating fiduciary duties.

Specifically, aside from the Trustee's theory that Virgo wanted to curry favor with Moore to access the Bass family fortune, a primary motivator for bringing Moore into Alchemy's business circle was to reduce Virgo's exposure in funding the purchase of Anderson Digital from ANConnect. Moore provided $10 million dollars to assist Virgo in the transaction with ANConnect. In return, Moore received an equity interest in Calrissian and the benefit of having OA Holdings, which Alchemy managed, assume many of ARC's liabilities. In this way, the relationship between the parties is commercial in nature as it shows a mutual dependence limited to the fulfillment of the contractual terms of several agreements and the value exchanged. While the allegations of Moore's subsequent position as a board advisor, access to Alchemy's information, equity interest in Calrissian, and the Bass family theory push the circumstances of this case away from a "straightforward commercial relationship," the allegations as a whole point to the conclusion that the relationship between Moore and Alchemy remained primarily a commercial one rooted in the dependence of each side fulfilling contractual obligations. The Court finds that Moore did not owe any fiduciary duties to Alchemy

either before or after the July 9 deals.[4] Owing no fiduciary duties to Alchemy or its creditors and stakeholders, it is not necessary to examine whether Moore's conduct breached any such duty.

## C. Aiding and Abetting a Breach of Fiduciary Duty Claim Against Moore

### 1. The Relevant Delaware Jurisprudence.

There are four elements necessary to establish a claim for aiding and abetting a breach of fiduciary duty which include "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)(internal quotation marks omitted). "Knowing participation in a board's fiduciary breach requires that the [nonfiduciary] act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Id.* at 1097. "[A] bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting." *Id.; See also Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984)(holding fact that party pursued best price attainable in arm's length negotiation precludes aiding and abetting liability). A court will only address a claim for aiding and abetting if the plaintiff first establishes that an underlying breach of fiduciary duty occurred. *See Crescent/Mach I Partners, L.P. v.*

---

[4] In addition to requiring a position of trust or confidence, Delaware law requires the absence of any adequate remedy at law before the imposition of fiduciary duties which are creatures of equity. *See McMahon*, 532 A.2d at 605. The Complaint does not allege that the Trustee is without other legal remedies to recover for the harms allegedly done to Alchemy. In fact, the Trustee brings claims of fraudulent and preferential transfers under the bankruptcy code, breach of contract, and might have other claims available.

*Turner*, 846 A.2d 963, 990 (Del. Ch. 2000)(holding plaintiffs established existence of fiduciary duty and requisite breach making it necessary to evaluate whether defendants knowingly participated).

However, if a nonfiduciary attempts to create or exploit already existing conflicts of interest in a company's board then the individual may be liable for aiding and abetting. *Malpiede*, 780 A.2d at 1098. This is especially true where an individual conspires with a company's fiduciaries to breach their duties. *Id.* "A court may infer a non-fiduciary's knowing participation only if ...the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach." *Crescent/Mach I Partners*, 846 A.2d at 990 (brackets and internal citation omitted). "To establish scienter, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper.'" *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2016)(citing *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862–63 (Del. 2015). "The aider and abettor must act 'knowingly, intentionally, or with reckless indifference' that is, with an 'illicit state of mind.'" *RBC Capital*, 129 A.3d at 862.

Creditors do not ordinarily have standing to assert claims for breach of fiduciary duty. *Production Resources Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 787 (Del. Ch. 2004). Generally, creditors must resort to contract law, fraudulent conveyance law, or the bankruptcy code to obtain relief from corporate actions. *Id.* Creditors gain standing to assert derivative fiduciary duty claims when a company is insolvent because creditors step into the shoes of equity holders as residual claimants. *Id.* at 790-91.

Creditors do not gain a special set of fiduciary duties when a company becomes

insolvent, rather, they merely gain standing to assert the same fiduciary duties owed to

equity holders and the entity in the first place. *Id.* at 792; *See also Trenwick Am. Litig.*

*Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 203, n.96 (Del. Ch. 2006)(approving of *In re*

*Scott Acquisition Corp.*, 344 B.R. 283 (Bankr. D. Del. 2006).

   "A wholly-owned subsidiary is to be operated for the benefit of its parent."

*Trenwick*, 906 A.2d at 174. As such, when a wholly owned subsidiary is solvent, the

directors and officers of the subsidiary owe duties only to the parent and have no duties

to the subsidiary or its creditors. *Quadrant Structured Products Co., Ltd. v. Vertin*, 102

A.3d 155, 184 (Del. Ch. 2014). "A subsidiary board is entitled to support a parent's

business strategy unless it believes pursuit of that strategy will cause the subsidiary to

violate its legal obligations." *Trenwick*, 906 A.2d at 174.  "Under settled principles of

Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned

subsidiaries or their creditors." *Trenwick*, 906 A.2d at 191. Delaware allows such

preferential dealing in a wholly owned subsidiary context because the absence of

minority shareholders or other constituencies eliminates divisions of interest

traditionally associated with managers of companies as fiduciaries. *See Quadrant*, 102

A.3d at 184; *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1177

(Del. 1988).

   In contrast, when a wholly owned subsidiary is insolvent or directors approve

actions that render the subsidiary insolvent, the subsidiary's managers must consider

the interests of creditors who become residual claimants rather than exclusively support

the parent company's interests. *See Quadrant*, 102 A.3d at 184-85; *See also In re Direct Response Media, Inc.*, 466 B.R. 626, 649-50 (Bankr. D. Del. 2012)(holding directors of insolvent wholly owned subsidiary owed duties to creditors); *In re Scott Acquisition*, 344 B.R. at 287 (holding wholly owned subsidiary directors may be liable for breaches of fiduciary duty to creditors when subsidiary is insolvent); *Trenwick*, 906 A.2d at 203, n.96 (approving of *In re Scott Acquisition* and bankruptcy court's analysis).

In the often cited and leading case of aiding and abetting in Delaware law, *Malpiede v. Townson*, Frederick's of Hollywood became the subject of a bidding contest following the board's decision to sell the company. *Malpiede*, 780 A.2d at 1079. Two trusts held 41% of the voting common stock. *Id.* Knightsbridge Capital Corp. presented the board with an offer to purchase all of Frederick's voting common stock at $6.00 to $6.25 per share. *Id.* at 1080. The board approved Knightsbridge's offer and signed a merger agreement prohibiting the board from soliciting any other bids from third parties while permitting the board to negotiate with third parties, if necessary, to fulfill their fiduciary duties. *Id.*

Subsequently, other parties made higher offers. Knightsbridge then matched the highest offer and demanded a highly restrictive definition of what constituted a superior proposal under the merger agreement. *Id.* The Frederick's board decided to capitulate to the Knightsbridge demand and approved the deal with Knightsbridge effectively ending the bidding process. *Id.* Knightsbridge followed up by purchasing additional Frederick's shares on the open market at an average price of $8.21 per share and acquired a majority. *Id.*

When a third party later made a cash offer of $9.00 per share, the board relied on its amended, more restrictive, merger agreement with Knightsbridge and refused to consider the higher cash bid. *Id.* The Frederick's shareholders sued and alleged, *inter alia*, that Knightsbridge was liable for aiding and abetting the board's breach of fiduciary duty. *Id.* at 1081-82.

On appeal, the Delaware Supreme Court held that allegations in the shareholder complaint did not support a reasonable inference that Knightsbridge's conduct, although "somewhat suspect," amounted to a knowing participation in the Frederick's board's breach of fiduciary duty. *Id.* at 1098. The court reasoned that Knightsbridge's conduct was consistent with an arm's length negotiation and no allegations suggested that Knightsbridge conspired with board members, participated in the board's decision-making process, or attempted to create and/or exploit conflicts of interest on the board. *Id.* at 1097-98. The court also focused on the fact that only one of the board members had a conflict of interest and that the lone conflicted director did not dominate or control the others on the board. *Id.* at 1098.

2. **The Complaint Does Not State A Claim for Aiding and Abetting with Respect to Moore's Conduct Prior to the July 9 transactions.**

In the instant case, the Court will grant Moore's motion to dismiss the aiding and abetting claim. For the reasons articulated in the Court's opinion concerning the claims for breach of fiduciary duty against Alchemy's board and Virgo, the Court finds there is not an underlying breach of fiduciary duty under the facts alleged in the Complaint. Therefore, the Trustee's claim against Moore for aiding and abetting merits no relief.

The Court further notes that even if the Trustee plead facts to support an underlying fiduciary breach, the aiding and abetting claim would still fail as the Complaint fails to create a reasonable inference that Moore knowingly participated in any alleged breach.

The Complaint makes numerous allegations suggesting Moore secured extremely favorable terms from Virgo regarding the July 9 deals; none these come close to the degree of aggressive maneuvering engaged in by Knightsbridge in *Malpiede* where aiding and abetting liability did not exist. The Trustee alleges that Moore succeeded in securing what the Trustee calls a "sweetheart deal" from Virgo to bail out his failing business, ARC, and relies on the fact that ARC transferred liabilities to a shell company and then demanded payment from Alchemy. The Trustee contends that Moore demanded that Alchemy pay Mr. Drinkwater's salary who then performed his job only to benefit ARC. The Complaint also alleges that Virgo acquiesced to Moore's demands because Virgo was more interested in winning Moore's favor and influence over managing the Bass family oil fortune rather than fulfilling their fiduciary duties owed to Alchemy and its creditors while Alchemy was insolvent.

While the Trustee's Complaint serves as an indictment of the whole overarching business deal at issue in this case, the deal itself was not so egregious as to persuade the Court that Moore knowingly participated in a breach of fiduciary duty. The crucial inquiry lies in whether Moore was aware that Alchemy was insolvent when he negotiated for a transaction favoring his interests. The Complaint does not contain any allegations to suggest that Moore knew his influence with the Bass family was the factor that enabled him to secure the favorable terms in the ARC transaction and related

dealings with Virgo and Alchemy. Nor does the Complaint contain any allegations that Moore even used his influence in the negotiations with respect to Alchemy. Even if Moore knew he possessed leverage to secure his demands because of his alleged influence over the Bass family, using that influence to his advantage was not improper *per se*.

While in other contexts the Virgo individuals serving on Alchemy's board would be conflicted and Moore liable for exploiting their conflicts of interest, Alchemy was Virgo's wholly owned subsidiary through Calrissian. Under Delaware law, a wholly owned subsidiary exists for the sole benefit of the parent company, in this case Calrissian which Virgo controlled. Therefore, Virgo's decision to prioritize winning Moore's favor in order to pursue potential business arrangements managing the Bass family oil fortune over effectively managing Alchemy would normally be consistent with their fiduciary duties in a wholly owned subsidiary context and protected by the business judgment rule.

The exception to this well-established rule is that managers of a wholly owned subsidiary owe fiduciary duties to creditors when the subsidiary is insolvent. This is the case because the creditors step into the shoes of residual claimants where the equity holders' interests in the firm are "underwater" and lack the incentive to pursue their interests. Again, the Trustee does not make factual allegations that Moore was aware his influence with the Bass family provided him leverage over Virgo and Alchemy nor does the Trustee allege facts suggesting Moore used such leverage in his negotiations with Virgo and Alchemy. Assuming Moore used his Bass family influence as a

bargaining chip, if he was unaware that Alchemy was insolvent at the time of the negotiations and closing of the July 9 transactions, using his influence with the Bass family to exploit the conflicts of interest on the Alchemy board and amongst the Virgo entities was not improper. Moore may have believed he was dealing with a *solvent* as opposed to *insolvent* wholly owned subsidiary. Even if Moore used his Bass family influence in the negotiations, it only provides a basis for aiding and abetting liability if he did so while knowing that Alchemy was insolvent where the Alchemy board would have owed duties to creditors rather than owing duties solely to their parent company.

The Complaint alleges that Alchemy and Virgo understood Moore's business, ARC, was "functionally insolvent" and failing. The Trustee also makes well pled allegations that Alchemy was insolvent during the relevant time period. However, the Trustee fails to allege that Moore was aware of Alchemy's state of insolvency. Absent allegations that Moore knew he was dealing with an insolvent entity, his demands made pursuant to the July 9 deals that Alchemy assume ARC's liabilities, pay Mr. Drinkwater's salary, manage OA Holdings, and make payments to satisfy transferred ARC liabilities cannot support an aiding and abetting claim. Delaware law is clear that arm's length negotiations cannot be a basis for aiding and abetting liability. The allegations suggest that Moore stood on the opposite side of the July 9 transactions from Virgo and Alchemy and do not state whether Moore knew Alchemy was insolvent when negotiating favorable terms for himself. As such, the Complaint fails to state a claim for aiding and abetting with respect to Moore's conduct prior to the closing of the July 9 transactions and beginning his role as a board advisor to Alchemy.

3. **The Complaint Fails to State an Aiding and Abetting Claim as to Transactions Occurring After the July 9 Agreements.**

The events that followed the July 9 deals do not support a claim for aiding and abetting liability. Pursuant to the July 9 deals, Moore became a board advisor to Alchemy and had the right to participate in board meetings as well as access Alchemy's confidential information. Therefore, the Complaint supports a reasonable inference that Moore had knowledge that Alchemy was insolvent after July 9, 2015. As explained earlier in this opinion, many of the subsequent transactions and payments Alchemy made were subject to the requirements of the July 9 deals where Moore negotiated at arm's length and obtained fixed contractual rights. Even if Alchemy and Virgo breached their fiduciary duties by entering the July transactions with Moore, the allegations suggest that it was not until after the consummation of the challenged July 9 agreements that Moore could have learned of Virgo and Alchemy's purportedly improper conduct. The allegations fail to show that Moore knowingly participated in any underlying breach and, instead, only learned of Virgo and Alchemy's conduct in hindsight. Nevertheless, the Court finds that the underlying conduct itself did not amount to a breach of fiduciary duty based on the allegations in the Complaint. Therefore, the Court will grant Moore's motion to dismiss Count Eight of the Complaint.

## **CONCLUSION**

The Court directs Moore to prepare and circulate an order of dismissal consistent with this opinion.  The Court also denies the Trustee's request for leave to amend.  The request improperly appeared in a footnote and did not indicate the grounds for the amendment.

Dated:  September 16, 2019

KEVIN GROSS, U.S.B.J.