## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OUR ALCHEMY, LLC, *et al.*, | ) | Case No. 16-11596 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| _____Debtors. _____ | ) | |
| GEORGE L. MILLER, in his capacity as | ) | |
| Chapter 7 Trustee for the jointly administered | ) | |
| Bankruptcy estates of Our Alchemy, LLC and | ) | |
| Anderson Digital, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 18-50633 (KG) |
| | ) | |
| ANCONNECT, LLC; ANDERSON | ) | |
| MERCHANDISERS, LLC; ANDERSON | ) | |
| MERCHANDISERS CANADA, INC; OA | ) | |
| INVESTMENT PARTNERS LLC; OA | ) | |
| INVESTMENT HOLDINGS LLC; VIRGO | ) | |
| INVESTMENT GROUP, LLC; VIRGO | ) | |
| SOCIETAS PARTNERS, LLC; VIRGO | ) | |
| SOCIETAS PARTNERSHIP III (ONSHORE), | ) | |
| L.P.; VIRGO SOCIETAS PARTNERSHIP III | ) | |
| (OFFSHORE), L.P.; VIRGO SERVICE | ) | |
| COMPANY LLC; ARDON MOORE; MARK | ) | |
| PEREZ; JESSE WATSON; TODD DORFMAN; | ) | |
| BILL LEE; STEPHEN LYONS; and FREYR | ) | |
| THOR, | ) | |
| | ) | |
| _____Defendants. _____ | ) | **Re: D.I. 24 & 25** |

## MEMORANDUM OPINION

## RE: VIRGO ENTITIES' MOTION TO DISMISS

## INTRODUCTION

George L. Miller, in his capacity as Chapter 7 trustee (the "Plaintiff" or "Trustee") for the jointly administered bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital") (collectively, the "Debtors"), brought this adversary proceeding against certain affiliates of the Debtors and associated individuals. In this Memorandum Opinion the Court will address the motion of the following: Virgo Investment Group, LLC ("Virgo Investment Group"), Virgo Societas Partners, LLC ("Virgo Societas"), Virgo Societas Partnership III (Onshore), L.P. ("Virgo Onshore"), Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore"), and Virgo Service Company LLC ("Virgo Service Company") (collectively, the "Virgo Defendants" or "Virgo Entities").

The Virgo Defendants move to dismiss partially the First, Second, Third and Fifth Claims and wholly dismiss the Fourth, Sixth and Twelfth Claims against them in the thirteen-claim complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), made applicable here by Federal Rule of Bankruptcy Procedure 7012 ("Bankruptcy Rule 7012") (the "Motion"). The Trustee alleges that (1) Alchemy's transfer of the Calrissian Distribution to Calrissian, which was subsequently transferred to Virgo Onshore and Virgo Offshore and (2) Alchemy's transfers of the Bridge Loan repayments to Calrissian, which were subsequently transferred to Virgo Onshore and Virgo Offshore, are fraudulent and/or preferential or constitute unjust enrichment. The Trustee also seeks to recharacterize the two Bridge Loans made pursuant to the Calrissian

2

Notes as equity contributions. The Virgo Defendants only seek to dismiss the claims related to the two Bridge Loans and not the Calrissian Distribution.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to enter a final order pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1).[1] Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409. The recharacterization and avoidance claims are core matters under 28 U.S.C. § 157(b)(2)(B), (F) and (H). *See U.S. v. State Street Bank & Trust Co.*, 520 B.R. 29, 38 (Bankr. D. Del. 2014) (recharacterization claims are core). Although the unjust enrichment claim is a non-core matter, the Court nevertheless "has the power to enter an order on a motion to dismiss even if the matter is not core." *In re Axiant, LLC*, 2012 WL 5614588, at *1 (Bankr. D. Del. Nov. 15, 2012).

## BACKGROUND

This adversary proceeding has several claims against numerous defendants who also filed motions to dismiss. In this Memorandum Opinion, the Court will only recite the facts relevant to the Trustee's claims against the Virgo Defendants.

### A. Virgo Defendants, Acting Through Calrissian, Purchase Millenium/Alchemy

In 2010, Millennium Entertainment, LLC ("Millennium") was founded as a film distribution and catalog company. Compl. ¶ 28. On August 4, 2014, Calrissian was formed as a Delaware limited partnership for the sole purpose of acquiring all of

---

[1] However, the Trustee has demanded a trial by jury and does not consent to the Court's entry of a final judgment. Compl. ¶ 4. In deciding a motion to dismiss, the Court is not required to state findings of fact or conclusions of law. *See* Fed. R. Bankr. P. 7052 & Fed. R. Civ. P. 52(a)(3).

Millennium's membership interest. Compl. ¶¶ 28-29. Calrissian's general partner was Virgo Service Company and its limited partners were Virgo Onshore, Virgo Offshore and Santa Rita Entertainment, LLC. Compl. ¶ 29. On August 18, 2014, the Virgo Defendants and Calrissian entered into an asset purchase agreement with Nu Image Holdings, Nu Image, Inc. and other equity holders to acquire Millennium for $41 million. Compl. ¶ 30. Thereafter, Calrissian renamed Millennium as "Our Alchemy, LLC." Compl. ¶¶ 30-32.

### B. Alchemy Makes a $14.5 Million Equity Distribution to Calrissian

On September 4, 2014, less than a month after the acquisition, Alchemy entered into a $40 million credit facility with SunTrust Bank, N.A., consisting of a $20 million revolver and a $20 million term loan (the "SunTrust Facility"). Compl. ¶ 34. Upon closing, Mark Perez,[2] at the behest of Alchemy, transferred $14,539,123.65 out of the SunTrust Facility to Calrissian as an equity distribution (the "Calrissian Distribution"). Compl. ¶¶ 34-37. The equity distribution doubled Alchemy's bank debt from approximately $15 million to over $31 million. Compl. ¶ 38. Subsequently, Calrissian transferred $7,110,756.29 to Virgo Onshore and $7,411,931.38 to Virgo Offshore. Compl. ¶ 39. While the Trustee alleges the Calrissian Distribution is a fraudulent transfer or constitutes unjust enrichment under the First, Second, Third and Fifth Claims, the Virgo Defendants are not seeking to dismiss these claims. However, the Calrissian Distribution serves as the backdrop to the disputed transactions which follow.

---

[2] Mark Perez is a founding partner of Virgo Investment Group. He served on Alchemy's Board of Managers, and played an active role in Alchemy's day-to-day operations. Compl. ¶ 21.

**C. The Two Disputed Promissory Notes Payments**

The Calrissian Distribution caused Alchemy to become illiquid forcing the Virgo Defendants to inject capital to maintain operations. Compl. ¶ 42. In an October 9, 2014 email, Perez acknowledged the "'[n]eed to continue to show timely payments,' fearing that the Virgo Defendants would need to 'inject interim capital . . . if absolutely necessary to get us through.'" Compl. ¶ 43. On January 12, 2015, Virgo Onshore and Virgo Offshore loaned $3,000,000 to Calrissian for the latter to provide Alchemy with capital pursuant to a promissory note (the "Virgo January 2015 Note"). *See* Br. in Supp. of the Virgo Defs.' Mot. to Dismiss for Failure to State a Claim, ¶¶ 13-14 (D.I. 25) (the "Defs.' Br.").[3]

On the same day, Calrissian, acting at the behest of the Virgo Defendants and Perez, transferred $3,000,000 to Alchemy (the "First Bridge Loan") to fund a Promissory Note (the "Calrissian January 2015 Note") executed by Alchemy in favor of Calrissian. Compl. ¶ 45. The maturity date was seventy-five days later, on March 28, 2015. Compl. ¶ 45. On March 31, 2015, Alchemy transferred $3,051,945.21 to Calrissian to pay off the Calrissian January 2015 Note's principal and accrued interest. Compl. ¶ 46. Then, Calrissian transferred $1,494,326.60 to Virgo Onshore and $1,557,618.60 to Virgo offshore. Compl. ¶¶ 46-47.

Between April and May 2015, Alchemy's Board of Managers had several email communications regarding Alchemy's liquidity problems. Compl. ¶ 67. In an April 27,

---

[3] This fact is absent from the Complaint. The Court notes this transaction here because it is necessary to later discuss the Defendants' Exhibits which they wish the Court to consider in deciding the recharacterization and avoidance claims.

2015 email, defendant Bill Lee[4] described Alchemy's ability to obtain additional financing

from SunTrust as "Life or death!" Compl. ¶ 67. c. In a May 12 email, Perez told Lee and

Jesse Watson[5] that due to Alchemy's "cumulative liquidity need[,]" . . . "Alchemy's

continued viability was dependent on Virgo's ability to continue injecting cash into the

business." Compl. ¶ 67. d. In a May 15, 2015 email, Lee described "'working capital' [as]

one of the key issues impacting the contemplated ARC Transaction."[6] Compl. ¶ 67. f.

On May 21, 2015, Virgo Onshore and Virgo Offshore loaned $3,000,000 to

Calrissian for the latter to provide Alchemy with capital pursuant to a promissory note

(the "Virgo May 2015 Note" and along with the Virgo January 2015 Note, collectively, the

"Virgo Notes"). *See* Defs.' Br. ¶¶ 20-21.[7] On the same day, Calrissian, acting at the behest

of the Virgo Defendants and Perez, advanced $3,000,000 to Alchemy (the "Second Bridge

Loan" and along with the First Bridge Loan, collectively, the "Bridge Loans") to fund a

Promissory Note executed in favor of Calrissian (the "Calrissian May 2015 Note" and

along with the Calrissian January 2015 Note, collectively, the "Calrissian Notes"). Compl.

¶ 48. The maturity date was seventy-five days later, on August 4, 2015. Compl. ¶ 48. On

July 10, 2015, Alchemy transferred $3,033,534.25 to Calrissian to pay off the May 2015

---

[4] Bill Lee served as Alchemy's CEO until December 2015. He also served on Alchemy's Board of Managers during his time at Alchemy. Compl. ¶ 23.

[5] Jesse Watson served as a Manager of Virgo Service Company and on Alchemy's Board of Managers. Compl. ¶ 19.

[6] The ARC Transaction is beyond the scope of this Memorandum Opinion. The Court quotes this sentence from the Complaint to further illustrate Alchemy's insolvency during its incurrence of the two notes at issue.

[7] This fact is absent from the Complaint. The Court notes this transaction here because it is necessary to later discuss the Defendants' Exhibits which they wish the Court to consider in deciding the recharacterization avoidance claims.

Note's principal and accrued interest. Compl. ¶ 49. Then, Calrissian transferred $1,485,312.03 to Virgo Onshore and $1,548,222.22 to Virgo Offshore. Compl. ¶¶ 49-50. Alchemy's repayment of the May 2015 Note was funded from the increased borrowings under the SunTrust Amended and Restated Loan Agreement signed on July 9, 2015. Compl. ¶ 49.

On July 1, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. Compl. ¶ 7.

## LEGAL STANDARD

Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) is inextricably linked to Rule 8(a)(2), which provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." In its seminal *Twombly* decision, the Supreme Court ushered in the modern era of notice pleading under Rule 8(a)(2). The Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The *Twombly* standard is one of "plausibility" and not "probability" - "it simply requires that the complaint state enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556.

The Supreme Court again addressed the Rule 8(a)(2) notice pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). The *Iqbal* decision clarifies that the *Twombly* plausibility standard applies to all civil suits filed in federal courts and identifies two "working principles" underlying the *Twombly* decision. *Id.* at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

The United States Court of Appeals for the Third Circuit synthesized the preceding authorities in its *Fowler* decision:

> [A]fter *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts. As the Supreme Court instructed in *Iqbal,* '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."' This 'plausibility' determination will be 'a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense.'

*Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted). The Court now proceeds with its analysis of the Virgo Defendants' Motion.

## DISCUSSION

### I.    The Virgo Defendants' Exhibits

#### A.    Background

The Virgo Defendants offered seven exhibits to support their arguments. Four are attached to the Defs.' Br. Three are filed separately in support of their Reply Brief in Support of the Virgo Defendants' Motion to Dismiss for Failure to State a Claim (the "Defs.' Reply") (D.I. 55). *See* Exhibit(s) E-G of the Reply Br. in Supp. of the Virgo Defs.' Mot. to Dismiss for Failure to State a Claim (hereinafter "Defs.' Reply Exs.") (D.I. 56).

The Virgo Defendants attached the Calrissian January 2015 Note and the Calrissian May 2015 Note as Exhibits A and C, respectively. *See* Defs.' Br. ¶¶ 8, 14. They also attached the Virgo January 2015 Note and the Virgo May 2015 Note as Exhibits B and D, respectively. *See* Defs.'Br. ¶¶ 13, 20.

Further, the Virgo Defendants attached Calrissian's Financial Statement dated December 31, 2015 to show the payments and repayments for all four of the Calrissian and Virgo Notes (the "Calrissian Financial Statement"). *See* Defs.' Reply Br. Ex. E. The Virgo Defendants also attached Perez's emails dated October 9, 2014 (the "Perez October 2014 Email") and May 12, 2015 (the "Perez May 2015 Email" and along with the Perez October 2014 Email, collectively the "Perez Emails") highlighting Alchemy's liquidity

issues and the possibility of the Virgo Defendants' need to inject capital to maintain operations. *See* Defs.' Reply Br. Exs. F, G.

### B. Legal Standard

In deciding a motion to dismiss, courts generally only consider the allegations contained in the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). An exception exists for a "'document integral to or explicitly relied upon in the complaint' . . . 'without converting the motion to dismiss into one for summary judgment.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). "'The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* The critical analysis lies in "whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* In *Schmidt*, the Third Circuit explained that "the justification for the integral documents exception is that it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Id.* at 250.

### C. Analysis

First, the Calrissian and Virgo Notes were not attached to the Complaint as exhibits nor are they public record. The Complaint cited the Calrissian January 2015 Note

at paragraphs 45 and 46. The Complaint also cited the Calrissian May 2015 Note at paragraphs 48 and 49. However, the Complaint did not cite the Virgo Notes.

The Calrissian Notes are integral to the Complaint. The Trustee seeks to avoid Alchemy's transfers of $3,051,945.21 and $3,033,534.25 to Calrissian in satisfaction of the Calrissian Notes, which Calrissian subsequently transferred to Virgo Onshore and Virgo Offshore in satisfaction of the Virgo Notes. Moreover, the Trustee seeks to recharacterize the two Bridge Loans pursuant to the Calrissian Notes as equity. The Calrissian Notes include relevant terms such as maturity dates, interest rates, default provisions and relationship between the parties. In fact, the documents themselves are essential in showing the parties' intent and reasons for transferring the sums at issue.

The Virgo Notes are integral to the Trustee's avoidance claims. Their existence show why Calrissian transferred Alchemy's repayments to Virgo Onshore and Virgo Offshore. The Trustee alleged that "Calrissian is merely an investment vehicle for [the] Virgo Entities. Calrissian has . . . no real assets[.]" Compl. ¶ 31. Calrissian advanced $3,000,000 to Alchemy on two occasions. It could not have done so without assets. In fact, on the same day prior to each of the transfers, Virgo Onshore and Virgo Offshore loaned Calrissian $3,000,000 pursuant to the Virgo Notes. The Complaint omits this information.

However, the Trustee argues that its avoidance allegations were not "based on these particular [Virgo] loan documents; they were derived from the books, records, and other materials in his possession as the Trustee." Pl.'s Mem. of Law in Opp'n to the Virgo Entities' Mot. to Dismiss for Failure to State a Claim, p. 22 ("Pl.'s Opp'n") (D.I. 55). The Calrissian and Virgo Notes are inextricably linked. Although they form different

11

transactions with different entities, the Virgo loans are a necessary precursor to Calrissian's Bridge Loans. The Virgo Notes form the basis and provide context for the Calrissian Notes, which the Trustee seeks to recharacterize. Moreover, the Virgo loans form the basis and provide context for why Calrissian transferred Alchemy's repayments to Virgo Onshore and Virgo Offshore, two transactions the Trustee is seeking to avoid. At this stage, the Court can consider the Calrissian and Virgo Notes.

Second, the Calrissian Financial Statement[8] and Perez Emails[9] were not attached to the Complaint as exhibits nor are they public record. However, the Calrissian Financial Statement is integral for the same reasons the Calrissian and Virgo Notes are integral. The Calrissian Financial Statement also forms the basis for the Trustee's specific allegations concerning the transfers pursuant to the Calrissian and Virgo Notes. *See* Compl. ¶¶ 45-49. At this stage, the Court can consider the Calrissian Financial Statement.

In his complaint, the Trustee cherry-picks certain quotes from and cites to the Perez Emails, but does not attach the entire emails as exhibits. *See* Compl. ¶¶ 43, 67d. The crux of the Trustee's claims is that Alchemy's strained liquidity necessitates Calrissian to inject capital. Calrissian consequently provided the Bridge Loans, which the Trustee argues were equity contributions subject to avoidance. In fact, The Trustee explicitly cited and quoted from both of the Perez Emails to form his claims. Thus, at this stage, the Court can consider the Perez Emails in their entirety.

---

[8] The Defendants did not attach the Calrissian Financial Statement as an exhibit in Defs.' Br., but only in Defs.' Reply and thus the Trustee did not have an opportunity to respond.

[9] The Defendants did not attach the Perez Emails as an exhibit in Defs.' Br., but only in Defs.' Reply and thus the Trustee did not have an opportunity to respond.

## II.    Twelfth Claim – Declaratory Judgment for Recharacterization

### A.    Background

The recharacterization claim is the point of departure because its outcome affects the analysis of the other claims. The Trustee seeks declaratory judgment to recharacterize the First and Second Bridge Loans pursuant to the Calrissian Notes as equity contributions. The Trustee alleges that the Virgo Defendants dominated and controlled Calrissian, an insider of Alchemy, and caused Calrissian to advance $6,000,000 to an insolvent Alchemy. Compl. ¶¶ 42, 51, 299.

### B.    Legal Standard

In the Third Circuit, "the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006)). To infer intent, the Court looks to the parties' contract, their actions, and the "economic reality" of the case. *Id.* (citing *SubMicron*, 432 F.3d at 456).

The Court adopts Chief Judge Sontchi's approach in looking to the Sixth Circuit's eleven-factor test in *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d

726, 747-48 (6th Cir. 2001)[10] and the Third Circuit's seven-factor test in *SubMicron*[11] to

derive the relevant recharacterization factors as:

> (a) names given to the instruments, if any, evidencing the indebtedness;
> (b) presence or absence of a fixed maturity date and a schedule of payments;
> (c) no fixed rate of interest and interest payments;
> (d) whether repayment depended on success of the business;
> (e) inadequacy of capitalization;
> (f) identity of interests between creditor and stockholder;
> (g) security, if any, for the advances;
> (h) ability to obtain financing from outside lending institutions;
> (i) extent to which the advances were subordinated to the claim of outside creditors;
> (j) the extent to which the advances were used to acquire capital assets;
> (k) presence or absence of a sinking fund;
> (l) presence or absence of voting rights; and
> (m) other considerations.

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, 2017 WL

1508606, at *14 (Bankr. D. Del. Apr. 27, 2017). None of the factors are dispositive, *per se.*

---

[10] The Sixth Circuit's eleven factors are: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments."*AutoStyle Plastics*, 269 F.3d at 749–50 (quoting *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986)).

[11] The Third Circuit's seven factors are: "(1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation." *SubMicron*, 432 F.3d at 455 n.8 (citing *In re SubMicron Sys.*, 291 B.R. 314, 323 (D. Del. 2003) (citation omitted)).

The Third Circuit made clear that the recharacterization inquiry depends not on a mechanistic but on a totality-of-the-facts-in-each-case approach. *LMI Legacy Holdings,* 2017 WL 1508606, at *14. (citing *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.),* 473 B.R. 525, 572 (Bankr. D. Del. 2012) (citation omitted)).

### C. Analysis

#### (a) Names Given to the Instruments, if any, Evidencing the Indebtedness

If there are not any notes or debt instruments, then it "is a strong indication that the advances were capital contributions and not loans." *AutoStyle Plastics,* 269 F.3d at 750 (quoting *Roth Steel,* 800 F.2d at 631). Here, we have two substantively similar promissory notes: the Calrissian January 2015 Note and the Calrissian May 2015 Note. *See* Defs.' Br. Exs. A and C. The notes include the principal amounts, interest rates, payment terms, events of default and remedies. The notes also identified the borrower on the signature page and the principal amounts. Thus, the first factor weighs against recharacterization.

#### (b) Presence or Absence of a Fixed Maturity Date and a Schedule of Payments

The lack of a fixed maturity date or a fixed obligation to repay suggests the advances were not loans but equity contributions. *AutoStyle Plastics,* 269 F.3d at 750 (citing *Roth Steel,* 800 F.2d at 631). Here, the notes identify a "maturity date" that was seventy-five days from the execution of the note. *See* Defs.' Br. Exs. A and C. Given the short-term nature of these Bridge Loans, it is reasonable to infer that the "schedule of payments" would just be one lump sum payment due on the maturity date. For both of the Calrissian Notes, Alchemy repaid the principal and interest before the due date. Compl. ¶¶ 46, 49. Thus, this factor weighs against recharacterization.

(c) <u>No Fixed Rate of Interest and Interest Payments</u>

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *AutoStyle Plastics*, 269 F.3d at 750 (citing *Roth Steel*, 800 F.2d at 631). Here, the Calrissian Notes indicate that the "Note Rate" was 8% per annum. *See* Defs.' Br. Exs. A and C. For both Calrissian Notes, Alchemy repaid the principal and accrued interest at the same time. Compl. ¶¶ 46, 49. Thus, this factor weighs against recharacterization.

(d) <u>Whether Repayment Depended on Success of the Business</u>

If repayments are *solely dependent* upon the borrower's future profits or earnings, then the advances are likely capital contributions. *AutoStyle Plastics*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 631) (emphasis added). The thrust of the Trustee's allegation is that Alchemy's need for interim capital as indicated in the Perez Emails suggests Alchemy's source of repaying the Bridge Loans had to be from its future earnings. Compl. ¶¶ 42-54, 67. d. and 299; *see also* Pl.'s Opp'n, p. 11.

The Calrissian Notes do not limit repayments to Alchemy's future profits. *See* Defs.' Reply Br. Exs. F, G. The Trustee does not plead sufficient facts showing that Alchemy's repayment of the Calrissian January 2015 Note was from Alchemy's future profits. While the Perez Emails indicate Alchemy's liquidity issues, they are not dispositive of the fact that Alchemy's repayment of the Calrissian Notes *must depend solely* on the success of Alchemy's business. Compl. ¶ 43; *see also* Defs.' Reply Br. Ex. F. Moreover, the Calrissian May 2015 Note was repaid from the "increased borrowings

under the SunTrust Amended and Restated Loan Agreement funded on July 9, 2015."

Compl. ¶ 49. Thus, this factor weighs against recharacterization.

(e) Inadequacy of Capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital contributions." *AutoStyle Plastics*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630). Undercapitalization "'is particularly relevant when a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation.'" *Id.* (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 917 (Bankr. E.D. Va. 1997)). Before each of the Bridge Loans were advanced, the Trustee adequately pleaded that Alchemy's illiquidity required interim capitalization. Thus, this factor weighs in favor of recharacterization.

Undercapitalization, *per se*, does not establish a recharacterization claim at the pleading stage. Undercapitalization is one factor and has the same weight as the others. *See Walnut Creek Mining Co. v. Cascade Investment, LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 174 (D. Del. 2015)) ("[The fact that a party lends to an inadequately capitalized company does not necessarily imply that it intends to infuse the company with capital; instead, it may have a pre-existing interest in the borrower that it is trying to protect.").

(f) Identity of Interest Between Creditor and Stockholder

If the stockholders' advances are a proportionate ratio to their stock ownership, then the advance is likely an equity infusion. *AutoStyle Plastics*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630). If the ratio is disproportionate, the advances are likely debt. *Id.* Here, Calrissian, a Delaware limited partnership, was formed as an investment vehicle

to acquire all of Alchemy's (then Millennium) membership interests (Millennium was formed as an LLC). Compl. ¶¶ 29-31. Virgo Service Company is the general partner. Virgo Onshore, Virgo Offshore and Santa Rita Entertainment, LLC are the limited partners. Compl. ¶ 29. The Virgo Defendants, through Calrissian, acquired Alchemy. Compl. ¶ 30. Thus, the Virgo Defendants, through Calrissian, have equity interests in Alchemy.

However, the Complaint's pleading of this element is deficient. The Complaint does not allege the Virgo Defendants' ownership interest for each respective Virgo entity. Further, the Complaint fails to allege any correlation between the Virgo Defendants' equity interests and their advancing of $3,000,000 pursuant to each of the two Bridge Loans. Thus, this factor weighs against recharacterization.

(g) Security, if any, for the Advances

If an advance is made on an unsecured basis, it is likely a capital contribution as opposed to a loan. *AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631). The Complaint does not allege that Calrissian received any security when advancing the First or Second Bridge Loan to Alchemy. *See* Compl. ¶¶ 42-54. Moreover, the parties do not dispute the Bridge Loans were made on an unsecured basis. *See* Pl.'s Opp'n, p. 11; Defs.' Reply, p. 12. Thus, this factor weighs in favor of recharacterization.

(h) Ability to Obtain Financing from Outside Lending Institutions

The lack of alternative outside lending means no reasonable creditor is willing to lend and is thus a strong indication that an advance is a capital contribution, not a loan. *AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631). Alchemy entered into the SunTrust Facility in September 2014. Compl. ¶ 34. The Complaint alleges that

Alchemy repaid the Second Bridge Loan pursuant to the Calrissian May 2015 Note from "the increased borrowings under the SunTrust Amended and Restated Loan Agreement funded on July 9, 2015 in connection with the ANConnect and Arc Transactions." Compl. ¶ 49. The Court is cognizant that the SunTrust Facility was amended and extended for several unrelated reasons. Here, the SunTrust amend-and-extend transaction highlights Alchemy's ability to receive outside financing. Thus, this factor weighs against recharacterization.

(i) Extent to which Advances were Subordinated to Claims of Outside Creditors

If the advance were subordinated to the claims of all other creditors, then the advance is likely a capital contribution. *AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631-32). However, here, the Complaint does not allege any subordination with regard to the First or Second Bridge Loans and the parties do not dispute this fact. Thus, this factor weighs against recharacterization.

(j) Extent to which the Advances were Used to Acquire Capital Assets

If the advance is used to satisfy day-to-day operations rather than acquiring capital assets, then the advance is "indicative of bona fide indebtedness." *AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 632). The Complaint references the Perez October 2014 Email to highlight Alchemy's "tightened liquidity position" and the need to "inject interim capital . . . if absolutely necessary to get [Alchemy] through" the period of paying outstanding accounts payable. Compl. ¶ 43; Defs.' Reply Br. Ex. F. This email led to the First Bridge Loan pursuant to the Calrissian January 2015 Note. Thereafter, the Complaint references the Perez May 2015 Email to further highlight Alchemy's "cumulative

liquidity need." Compl.  ¶ 67. d; Defs.' Reply Br. Ex. G. In that same email, Perez noted

that the Virgo Defendants have "the ability to provide additional short-term (3 month)

'swing' capacity (similar to the 1Q15 promissory note)." Defs.' Reply Br. Ex. G. This email

led to the Second Bridge Loan pursuant to the Calrissian May 2015 Note.

The Complaint and Perez Emails indicate the First and Second Bridge Loans were

advanced to pay outstanding accounts payable in the ordinary course and fund other

day-to-day operations. The Bridge Loans were not used to acquire capital assets. Thus,

this factor weighs against recharacterization.

(k) Presence or Absence of a Sinking Fund

"The failure to establish a sinking fund for repayment is evidence that the

advances were capital contributions[.]" *AutoStyle Plastics*, 269 F.3d at 752 (citing *Roth*

*Steel*, 800 F.2d at 632). The Complaint does not allege the presence of a sinking fund. The

parties also do not dispute this fact. Thus, this factor weighs in favor of recharacterization.

(l) Presence or Absence of Voting Rights

In *SubMicron*, the Third Circuit identified the presence or absence of voting rights

as a factor. *SubMicron*, 432 F.3d at 455 n.8 (citing *In re SubMicron Sys.*, 291 B.R. 314, 323 (D.

Del. 2003) (citation omitted)). Where the Complaint does not allege nor do the primary

notes grant any voting rights, the advance is likely a loan. *See Friedman's Liquidating Trust*

*v. Goldman Sachs Credit Partners, L.P., (In re Friedman's Inc.)*, 452 B.R. 512, 523-24 (Bankr.

D. Del. 2011). Here, the Complaint does not allege that either of the Calrissian Notes

provide for any voting rights. Thus, this factor weighs against recharacterization.

(m)    <u>Other Considerations</u>

    (i)    **Certainty of Payment in the Event of the Corporation's Insolvency or Liquidation**

In *SubMicron*, the Third Circuit identified the certainty of payment in the event of the corporation's insolvency or liquidation as a relevant factor for recharacterization claims. *SubMicron*, 432 F.3d at 455 n.8 (citing *In re SubMicron Sys.*, 291 B.R. 314, 323 (D. Del. 2003) (citation omitted)). This factor "cuts straight to what a lender cares about when making a loan, especially in a distressed situation." *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC et al. (In re HH Liquidation, LLC)*, 590 B.R. 211, 296 (Bankr. D. 17 Del. 2018). In the [*SubMicron*] seven-factor test, this "'certainty of payment' factor effectively replaces the more amorphous *AutoStyle* factors[.]" *Id.* Here, given Alchemy's need for liquidity and the consequent short-term maturity (seventy-five days) of both Calrissian Notes, the "certainty of payment" factor weighs heavily in treating the advances as debt. Thus, this factor weighs against recharacterization.

    (ii)    **Insider Status**

The Complaint alleges that the Virgo Defendants' insider status is a significant factor in recharacterization. Specifically, although the two Bridge Loans were "dressed up as purported loans . . . [they] came from an insider that dominated and controlled Alchemy's management decisions, were described by that insider as a capital contribution, were not made at arm's length, and were made at a time when Alchemy was insolvent and not adequately capitalized." Compl. ¶ 51; *see also* ¶ 299. The Trustee also makes this argument in his opposition. *See* Pl.'s Opp'n, pp. 6, 9, 10.

In analyzing the bankruptcy court's recharacterization analysis, the Fourth Circuit noted that "a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim." *Fairchild Dornier GMBH v. The Official Comm'n of Unsecured Creditors (In re: Dornier Aviation (North America), Incorporated)*, 453 F.3d 225 (4th Cir. 2006). For struggling businesses, an insider is often the only party willing to lend and so "recharacterization should not be used to discourage good-faith loans." *Id.*

The Court agrees that Calrissian's insider status and Alchemy's liquidity constraints are relevant factors for recharacterization. However, the Court refuses to make these factors dispositive or afford them more weight than the aforementioned factors. Thus, Calrissian's insider status and Alchemy's undercapitalization merely weigh in favor of recharacterization.

### D. Conclusion

The Court analyzed fourteen factors. Only four weigh in favor of recharacterization: (e) inadequacy of capitalization; (g) security, if any, for the advances; (k) presence or absence of a sinking fund; and (m) other considerations—insider status. The Trustee fails to plead a claim to recharacterize Calrissian's Bridge Loans pursuant to the Calrissian Notes as equity. The Court will dismiss the Trustee's Twelfth Claim.

### III.  First Claim – Avoidance and Recovery of Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550

The Trustee alleges an actual fraudulent transfer claim against the Virgo Defendants. The Trustee seeks to avoid and recover: (1) the Calrissian Distribution of

$14,539,123.65; (2) the First Bridge Loan repayment of $3,051,945.21 made on March 31, 2015, pursuant to the Calrissian January 2015 Note; and (3) the Second Bridge Loan repayment of $3,033,534.25 made on July 10, 2015 pursuant to the Calrissian May 2015 Note. The Virgo Defendants only seek dismissal of the First and Second Bridge Loan repayments. The Trustee argues that these transfers were made within two years of the Petition Date with the actual intent to hinder, delay, and/or defraud the Debtors' creditors. Compl. ¶¶ 207-213.

To avoid a transfer under section 548(a)(1)(A) of the Bankruptcy Code, the plaintiff must show that the transfer was made within two years of the petition date and the transaction was made with the intent to hinder, delay, or defraud. 11 U.S.C. § 548(a)(1)(A); *Fedders*, 405 B.R. at 545. Courts often rely on circumstantial evidence to infer fraudulent intent because direct evidence is typically unavailable. *Id.* To do so, courts refer to the "badges of fraud," which include the: (i) relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency of the debtors; (iv) amount of the estate transferred; (v) reservation of control of the assets transferred; and (vi) concealment of the transfer. *Id.* One badge is not conclusive of either liability or exculpation. *Id.* The Supreme Court is clear that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678.

Under section 550 of the Bankruptcy Code, the Court can only grant the Trustee relief to the extent the transfers are avoidable under sections 544, 547, or 548 of the Bankruptcy Code. Moreover, the Trustee is only entitled to "recover, for the benefit of the estate, the property transferred . . . from— (1) the initial transferee of such transfer or the

entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).

The Trustee failed to plead actual fraud sufficiently. The Trustee seemingly argues that the two Bridge Loans were non-arm's length capital contributions that came from an insider who dominated and controlled Alchemy's management decisions at a time when Alchemy was insolvent. Thus, Alchemy committed an actual fraudulent transfer when it repaid the two Bridge Loans to Calrissian, and Calrissian subsequently transferred the sums to the Virgo Defendants. This is insufficient for the Court to reasonably infer actual fraud. In fact, as the Court found above, the two Bridge Loans were debt and so Alchemy merely repaid the two Bridge Loans pursuant to the Calrissian Notes. As the Trustee fails to plead actual fraud, he cannot prevail under section 550.

The Court will grant the Virgo Defendants partial dismissal of the First Claim as it relates to the First and Second Bridge Loan repayments.

## IV. Second Claim – Avoidance and Recovery of Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550

The Trustee alleges a constructive fraudulent transfer claim against the Virgo Defendants. The Trustee seeks to avoid and recover: (1) the Calrissian Distribution of $14,539,123.65; (2) the First Bridge Loan repayment of $3,051,945.21 made on March 31, 2015 pursuant to the Calrissian January 2015 Note; and (3) the Second Bridge Loan repayment of $3,033,534.25 made on July 10, 2015 pursuant to the Calrissian May 2015 Note. The Virgo Defendants only seek dismissal of the First and Second Bridge Loan repayments. The Trustee alleges that these transfers were made at a time when the

24

Debtors were insolvent, had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured. Compl. ¶¶ 214-223. The Trustee also alleges that the Virgo Defendants were either the initial transferees of the transfers, the entity for whose benefit the transfers were made, or the immediate or mediate transferee of such initial transferee. Compl. ¶ 222.

To avoid a transfer under section 548(a)(1)(B) of the Bankruptcy Code, the plaintiff must show that the transfer was made within two years prepetition; the debtor "received less than a reasonably equivalent value in exchange for such transfer;" and the debtor:

(I)     was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . .;

(II)    was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; [or]

(III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debt matured.

11 U.S.C. § 548(a)(1)(B). Moreover, the Court adopts the law on section 550 of the Bankruptcy Code set forth in Section III above.

The second claim relies on the resolution of the recharacterization claim. The Court will grant the Virgo Defendants dismissal of the Trustee's recharacterization claim finding that Calrissian's advancement of the two Bridge Loans to Alchemy was debt and not equity. Thus, when Alchemy repaid the two Bridge Loans to Calrissian, Alchemy did not receive less than reasonably equivalent value. Alchemy already received reasonably equivalent value of two liquidity lifelines totaling $6,000,000 pursuant to the Calrissian Notes. As the Trustee fails to plead constructive fraud, his claim under section 550 fails.

The Court will grant the Virgo Defendants partial dismissal of the Second Claim as it relates to the First and Second Bridge Loan repayments.

## V.  Third Claim – Unjust Enrichment

The Trustee alleges an unjust enrichment claim against the Virgo Defendants. The Trustee alleges the following transfers constitute unjust enrichment: (1) the Calrissian Distribution of $14,539,123.65; (2) the First Bridge Loan repayment of $3,051,945.21 made on March 31, 2015 pursuant to the Calrissian January 2015 Note; and (3) the Second Bridge Loan repayment of $3,033,534.25 made on July 10, 2015 pursuant to the Calrissian May 2015 Note. The Virgo Defendants only seek dismissal of the First and Second Bridge Loan repayments. The Trustee alleges that these transfers conferred a benefit on the Virgo Defendants who unjustly retained that benefit at the expense of the Debtors' estates. Compl. ¶¶ 224-225.

To establish an unjust enrichment claim, the plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Emerald Capital Advisors Corp. v. Bayerische Moteren Weke Aktiengesellschaft (In re FAH Liquidating Corp.)*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

This claim also depends on the recharacterization claim. The Court will not recharacterize the First and Second Bridge loans as equity. As a result, the Trustee does not sufficiently plead facts showing an impoverishment or absence of justification when Alchemy repaid the two Bridge Loans pursuant to the Calrissian Notes.

The Court will grant the Virgo Defendants partial dismissal of the Third Claim as it relates to the First and Second Bridge Loan repayments.

## VI.    Fourth Claim – Avoidance and Recovery of Transfers Under 11 U.S.C. §§ 547(b) and 550

The Trustee alleges a preference claim against the Virgo Defendants. The Trustee alleges the Second Bridge Loan repayment of $3,033,534.25 made on July 10, 2015, pursuant to the Calrissian May 2015 Note is preferential. The Virgo Defendants seek dismissal of this claim. The Trustee specifically alleges that this transfer was made to and/or for the benefit of insiders, the Virgo Defendants, within one year of the petition date on account of an antecedent debt, while the Debtors were insolvent and the payment amounted to a sum more than the Virgo Defendants would realize if the Debtors filed for relief under Chapter 7 of the Bankruptcy Code.

To avoid a transfer under section 547(b) of the Bankruptcy Code, the plaintiff must show that the transfer: (1) was made to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or within 90 days of the petition date or one year if the creditor was an insider; and (5) enables such creditor to receive more than he would have if the case was a Chapter 7 liquidation. 11 U.S.C. § 547(b). Moreover, the Court adopts the law on section 550 of the Bankruptcy Code from Section III above.

Here, the Trustee has sufficiently pleaded a preference claim. According to the Complaint, the Second Bridge Loan repayment of $3,033,534.25 pursuant to the Calrissian May 2015 Note was made for the benefit of a creditor, Calrissian. It was on account of an

antecedent debt, the $3,000,000 Second Bridge Loan advance including interest. The debtors were insolvent at the time. The repayment was made within one year of the Petition Date to an insider as Alchemy was controlled by Calrissian who in turn was controlled by Virgo Onshore and Virgo Offshore as general partners. The Trustee also pleads that Calrissian received more than it would have in a Chapter 7 liquidation because the Calrissian May 2015 Note was executed on an unsecured basis. The Trustee sufficiently pleaded a preferential claim.

Here, the Virgo Defendants assert that the Second Bridge Loan repayment was made in the ordinary course of business. *See* Defs.' Br. ¶¶ 40-48. Section 547(c)(2) of the Bankruptcy Code provides an ordinary course of business exception to a preference claim. The Trustee may not avoid a transfer as preferential:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). Courts have considered several factors in determining whether an ordinary course of business exception exists, including:

> (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating financial condition.

*In re Conex Holdings, LLC,* 518 B.R. 269, 280 (Bankr. D. Del. 2014). "No one factor is determinative." *Id.*

The ordinary course of business defense is an affirmative defense to a preference claim. *See In re Sierra Concrete Design, Inc.,* 463 B.R. 302, 305 (Bankr. D. Del. 2012). The Federal Rules of Civil Procedure require a defendant to plead an affirmative defense in the answer. *Schmidt,* 770 F.3d at 249. However, a defendant may assert an affirmative defense in responding to a motion to dismiss if the facts giving rise to the defense are apparent from the face of the complaint. *Id.; Brody v. Hankin,* 145 Fed.App'x 768, 771 (3d Cir. 2005).

First, there was a short length of time of only seven months that the parties engaged in dealings. The First Bridge Loan was advanced on January 12, 2015 and the Second Bridge Loan was repaid on July 10, 2015. Second, the Bridge Loans were similar amounts. Third, the payments were tendered in the same manner. Fourth, there is no allegation that either side engaged in an unusual action to collect on or pay the debt. Fifth, there are no facts showing that Calrissian did anything to gain an advantage in light of a deteriorating financial condition. The second, third, fourth and fifth factors are helpful to the Virgo Defendants. However, the factors beneficial to the Virgo Defendants rely on only two transactions. The facts giving rise to the ordinary course of business defense is not apparent from the face of the Complaint. As the Trustee adequately pleaded a preference claim, his claim for recovery under section 550 also survives.

The Court will deny the Virgo Defendants dismissal of the Fourth Claim.

## VII.    Fifth Claim – Avoidance and Recovery of Transfers Under 6 Del. C. §§ 1304(a) and 1305(a) and 11 U.S.C. §§ 544 and 550

The Trustee alleges fraudulent transfer claims under state law against the Virgo Defendants. The Trustee seeks to avoid and recover: (1) the Calrissian Distribution of $14,539,123.65; (2) the First Bridge Loan repayment of $3,051,945.21 made on March 31, 2015 pursuant to the Calrissian January 2015 Note; and (3) the Second Bridge Loan repayment of $3,033,534.25 made on July 10, 2015 pursuant to the Calrissian May 2015 Note. The Virgo Defendants only seek dismissal of the First and Second Bridge Loan repayments. The Trustee alleges that these transfers were not made for reasonably equivalent value, at a time when the Debtors were insolvent, had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured. Compl. ¶¶ 238-239. Moreover, the Trustee alleges the Debtors made the transfers with the actual intent to hinder, delay, and/or defraud the Debtors' creditors. Compl. ¶ 240. The Trustee also alleges that the Virgo Defendants were either the initial transferees of the transfers, the entity for whose benefit the transfers were made, or the immediate or mediate transferee of such initial transferee. Compl. ¶ 242.

Claims under sections 1304(a) and 1305(a) of the Delaware Code are applicable to this adversary proceeding pursuant to Section 544(b)(1) of the Bankruptcy Code. The section allows the Trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b)(1). Section 1304(a) of the Delaware Code states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was

made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>> b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. § C. 1304(a); Section 1305(a) of the Delaware Code states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del. C. § 1305(a). The claw-back period for sections 1304(a)(1), (a)(2) and 1305(a) is "within 4 years after the transfer was made or the obligation was incurred . . . ." 6 Del. C. §§ 1309(1), (2). "It is undisputed that the Delaware . . . Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa)." *Autobacs Strauss*, 473 B.R. at 567. The Court also adopts the law on section 550 of the Bankruptcy Code from Section III above.

As sections 1304(a) and 1305(a) of the Delaware Code track sections 548(a)(1)(A) and (B) of the Bankruptcy Code, respectively, the Court adopts its analysis from Sections III (First Claim) and IV (Second Claim) above, respectively. As the Trustee fails to plead a claim under sections 1304(a) and 1305(a), he cannot prevail under section 550. The Court

will grant the Virgo Defendants partial dismissal of the Fifth Claim as it relates to the
First and Second Bridge Loan repayments.

## VIII.    Sixth Claim – Avoidance and Recovery of Transfers Under 6 Del. C. §§ 1305(b) and 11 U.S.C. §§ 544 and 550

The Trustee alleges a fraudulent transfer claim under state law against the Virgo
Defendants. The Trustee alleges the Second Bridge Loan repayment of $3,033,534.25
made on July 10, 2015, pursuant to the Calrissian May 2015 Note is a fraudulent transfer
under Delaware law. The Virgo Defendants seek dismissal of this claim. The Trustee
specifically alleges that this transfer was made to an insider, Calrissian, on account of an
antecedent debt when Alchemy was insolvent and Calrissian, through the Virgo
Defendants, had reasonable cause to believe Alchemy was insolvent.

A claim under section 1305(b) of the Delaware Code is applicable to this adversary
proceeding pursuant to Section 544(b)(1) of the Bankruptcy Code. 11 U.S.C. § 544(b)(1).
Section 1305(b) of the Delaware Code states:

> (b)  A transfer made by a debtor is fraudulent as to a creditor whose claim
> arose before the transfer was made if the transfer was made to an insider
> for an antecedent debt, the debtor was insolvent at that time and the insider
> had reasonable cause to believe that the debtor was insolvent.

6 Del. C. § 1305(b). As mentioned in Section VII above, the Delaware fraudulent transfer
laws track the Bankruptcy Code.

As section 1305(b) of the Delaware Code closely tracks section 547(b) of the
Bankruptcy Code, the Court adopts its analysis from Section VI (Fourth Claim) above.
*See Halperin v. Moreno (In re Green Field Energy Servs.),* 2015 WL 5146161 at *17 (Bankr. D.
Del. Aug. 31, 2015) ("[T]he requirements of Section 1305(b) largely overlap with those of

32

Section 547(b)."). As the Trustee adequately pleaded a claim under section 1305(b) of the Delaware Code, his claim for recovery under section 550 of the Bankruptcy Code survives. The Court will deny the Virgo Defendants dismissal of the Sixth Claim.

## IX.    Leave to Amend

Rule 15(a), made applicable here by Bankruptcy Rule 7015, provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Granting such leave is within the court's discretion and courts liberally allow amendments. *See, e.g., Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192-93 (Bankr. D. Del. 2003); *In re Crucible Materials Corp.*, 2011 WL 2669113, at *4-5 (Bankr. D. Del. Jul. 6, 2011). However, "denial of leave to amend is justified if there is undue delay, bad faith, a dilatory motive, prejudice or futility." *In re Valley Media, Inc.*, 288 B.R. at 193 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434).

In a footnote, the Trustee seeks leave to amend in the event the Court dismisses any of his claims. *See* Pl.'s Opp'n, 23 n.18.  Courts previously observed that where a plaintiff only requested leave to amend in a footnote in a response in opposing a motion to dismiss, doing so was not the proper method to seek leave to amend. *Malivuk v. Ameripark, LLC*, 694 Fed. Appx. 705, 710-11 (11th Cir. 2017) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1222 (11th Cir. 1999) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.")). Moreover, a plaintiff's request for leave to amend a complaint is improper without indicating the particular grounds on which amendment is sought.

*Mackereth v. Kooma, Inc.*, 2015 WL 2337273, at *12 (E.D. Pa. May 14, 2015) (quoting *U.S. ex rel Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) (denying plaintiff's footnote request for leave to amend the response in opposition to defendants' motion to dismiss).

The Trustee had the opportunity to amend his Complaint within 21 days when he received service of the Defendants' Rule 12(b) Motions. Fed. R. Civ. P. 15(a)(1)(B). The Trustee was on notice of the possibly deficient Complaint but opted to oppose the Motions instead of amend. The Court will deny the Trustee's request for leave to amend based on procedural infirmities. The Court is not making a finding of undue delay, bad faith, a dilatory motive, prejudice or futility. Rather, the Court finds that a request for leave to amend a complaint that is merely embedded in a footnote of an opposition memorandum to a motion to dismiss is improper.

## CONCLUSION

For the foregoing reasons, the Court grants the Virgo Defendants dismissal of the Twelfth Claim, grants dismissal in part of the First, Second, Third and Fifth claims, and denies dismissal of the Fourth and Sixth claims without prejudice. The Court also denies the Trustee's request to amend the complaint, without prejudice. The Court directs the Virgo Defendants to prepare and circulate a form of order which reflects the Court's rulings and thereafter to submit the proposed order to the Court.

Dated: September 16, 2019

_____
KEVIN GROSS, U.S.B.J.