## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>OUR ALCHEMY, LLC, *et al.*,<br><br>　　　　　　　　　　　Debtors. | )　Case No. 16-11596 (KG)<br>)　(Jointly Administered)<br>)<br>)<br>) |
| GEORGE L. MILLER as Chapter 7 Trustee<br>for the Estates of Debtors Our Alchemy, LLC,<br>and Anderson Digital, LLC,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>ANCONNECT, LLC; ANDERSON<br>MERCHANDISERS, LLC; ANDERSON<br>MERCHANDISERS CANADA, INC.; OA<br>INVESTMENT PARTNERS LLC; OA<br>INVESTMENT HOLDINGS LLC; VIRGO<br>INVESTMENT GROUP, LLC; VIRGO<br>SOCIETAS PARTNERS, LLC; VIRGO<br>SOCIETAS PARTNERSHIP III<br>(ONSHORE), L.P.; VIRGO　SOCIETAS<br>PARTNERSHIP III (OFFSHORE),　L.P.;<br>VIRGO SERVICE COMPANY LLC; ARDON<br>MOORE; MARK PEREZ; JESSE WATSON;<br>TODD DORFMAN; BILL LEE; STEPHEN<br>LYONS; and FREYR THOR,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　Adv. No. 18-50633 (KG)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Re: Adv. Dkt. No. 26 |

## MEMORANDUM OPINION

## Re: THE VIRGO INDIVIDUAL DEFENDANTS'
## MOTION TO DISMISS

## <u>INTRODUCTION</u>

George L. Miller, in his capacity as Chapter 7 trustee (the "Plaintiff" or "Trustee") for the

jointly administered estates of Our Alchemy LLC ("Alchemy") and Anderson Digital, LLC

("Anderson Digital") (collectively, the "Debtors")[1], brought this adversary proceeding against certain affiliates of the Debtors and several individuals. Further, the Trustee brought this adversary proceeding against Alchemy's Board of Managers: Todd Dorfman ("Dofrman"), Mark Perez ("Perez"), Jesse Watson ("Watson") (Dorfman, Perez, and Watson are collectively, the "Virgo Individuals"), and Bill Lee (served as Alchemy's former CEO as well). Bill Lee has not responded to the Complaint. Additional defendants include Anderson Digital's managing partners including Stephen Lyons (resigned in 2015) and Ardon Moore ("Moore"). Freyer Thor is also a named defendant. He answered the Complaint rather than move to dismiss.

This Memorandum Opinion addresses the Virgo Individuals motion to dismiss the Seventh and Eighth Claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7012 (the "Motion to Dismiss"). The Trustee alleges that (1) the Virgo Individuals, Bill Lee and Moore breached their fiduciary duties to the Debtors and alternatively, (2) aided and abetted the breach of fiduciary duties to the Debtors. The Virgo Individuals seek to dismiss the breach of fiduciary duty claim and aiding and abetting breach of fiduciary duty claim directed toward them.

## <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The breach of fiduciary and aiding and abetting the breach of fiduciary duty claims are non-core proceedings that do not fall under 28 U.S.C. § 157(b)(2). The Court nevertheless "has

---

[1] George L. Miller is the Chapter 7 Trustee for the jointly administered estates of the Debtors. The Trustee has demanded a trial by jury and does not consent to the Court's entry of a final judgment. However, in deciding a motion to dismiss, the Court is not required to state findings of fact or conclusions of law. Bankr. R. 52(a)(3).

the power to enter an order on a motion to dismiss even if the matter is not core." *In re Axiant, LLC*, 2012 WL 5614588, at \*1 (Bankr. D. Del. Nov. 15, 2012).

## BACKGROUND[2]

This adversary proceeding has several claims against numerous defendants who also filed motions to dismiss. In this Memorandum Opinion, the Court will only address the facts relevant to the claims of the Trustee to breaches of fiduciary duty and aiding and abetting the breaches of fiduciary duty claims against the Virgo Individuals.

### A. Virgo Entities, Acting Through Calrissian, Purchase Millenium/Alchemy

In 2010, Millennium Entertainment, LLC ("Millennium") was founded as a film distribution and catalog company. Compl. ¶ 28. On August 4, 2014, Calrissian L.P. ("Calrissian") was formed as a Delaware limited partnership for the sole purpose of acquiring all of Millennium's membership interest. Compl. ¶¶ 28-29. Calrissian's general partner was Virgo Service Company LLC ("Virgo Service Company") and its limited partners were Virgo Onshore, Virgo Offshore[3] and Santa Rita Entertainment, LLC. Compl. ¶ 29. On August 18, 2014, the Virgo Defendants and Calrissian entered into an asset purchase agreement with Nu Image Holdings, Nu Image, Inc. and other equity holders to acquire Millennium for $41 million. Compl. ¶ 30. Thereafter, Calrissian renamed Millennium as "Our Alchemy, LLC." ("Alchemy"). Compl. ¶¶ 30-32.

### B. Virgo Individuals Served as Board Members

Watson, Dorfman, and Perez are founding partners of Virgo Investment Group, LLC ("Virgo Investment") Compl. ¶¶ 19-21. Watson served as Virgo Investment's Chief Investment Officer

---

[2] Ruling on the Motion to Dismiss, the Court "must accept all of the complaint's well-plead facts as true, but may disregard any legal conclusions." *Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[3] " Virgo Onshore" is an abbreviation for Virgo Societas Partnership III L.P. (Onshore); and "Virgo Offshore" is an abbreviation for Virgo Societas Partnership III L.P. (Offshore)

and was responsible for its day-to-day operations. Compl. ¶ 19. After Alchemy was founded, Dorfman, Watson, Perez, and Bill Lee served as Alchemy's Board of Managers. Bill Lee served as the CEO of Alchemy until the end of 2015. Compl. ¶ 21.

### C. The August 2014 Calrissian Note

On August 8, 2014, Calrissian entered into a promissory note in favor of Virgo Onshore and Virgo Offshore in the amount of $14,340,000 to fund Calrissian's acquisition of Millennium ("August 2014 Calrissian Note"). Compl. ¶ 33. Section 4.7 of the August 2014 Calrissian Note states "all proceeds of this Note shall be used solely to make an equity investment in Millennium LLC." *Id.*

### D. Alchemy Made a $14.5 Million Disputed Equity Distribution to Calrissian

On September 4, 2014, less than a month after the acquisition, Alchemy entered into a $40 million credit facility with SunTrust Bank, N.A., which constitutes a $20 million revolver and a $20 million term loan (the "SunTrust Facility"). Compl. ¶ 34. Upon the closing of the SunTrust Facility, Perez, at the behest of Alchemy, transferred $14,539,123.65 out of the SunTrust Facility to Calrissian as an equity distribution (the "Calrissian Distribution"). Compl. ¶¶ 34-37. The Calrissian Distribution doubled Alchemy's bank debt from approximately $15 million to over $31 million. Compl. ¶ 38. Subsequently, Calrissian transferred $7,110,756.29 to Virgo Onshore and $7,411,931.38 to Virgo Offshore. Compl. ¶ 39. The remaining $16,435.98 stayed in Calrissian's bank account. *Id.*

### E. The Two Disputed Promissory Notes Payments

The Calrissian Distribution caused Alchemy to become illiquid forcing the Virgo Defendants to inject capital to maintain operations. Compl. ¶ 42. On January 12, 2015, Virgo Onshore and Virgo Offshore loaned $3,000,000 to Calrissian for the latter to provide Alchemy

with capital pursuant to a promissory note (the "Virgo January 2015 Note"). *See* Br. in Supp. of the Virgo Defs.' Mot. to Dismiss the Seventh and Eighth Claim, p. 7 (D.I. 27) (the "Defs.' Br.").

On the same day, Calrissian, acting at the behest of the Virgo Defendants and Perez, transferred $3,000,000 to Alchemy (the "First Bridge Loan") to fund a Promissory Note (the "Calrissian January 2015 Note") executed by Alchemy in favor of Calrissian. Compl. ¶ 45. The maturity date was seventy-five days later, on March 28, 2015. Compl. ¶ 45. On March 31, 2015, Alchemy transferred $3,051,945.21 to Calrissian to pay off the Calrissian January 2015 Note's principal and accrued interest. Compl. ¶ 46. Then, Calrissian transferred $1,494,326.60 to Virgo Onshore and $1,557,618.60 to Virgo offshore. Compl. ¶¶ 46-47.

On May 21, 2015, Virgo Onshore and Virgo Offshore loaned $3,000,000 to Calrissian for the latter to provide Alchemy with capital pursuant to a promissory note (the "Virgo May 2015 Note" and along with the Virgo January 2015 Note, collectively, the "Virgo Notes"). *See* Defs.' Br. pp. 7-8.[4] On the same day, Calrissian, acting at the behest of the Virgo Defendants and Perez, advanced $3,000,000 to Alchemy (the "Second Bridge Loan" and along with the First Bridge Loan, collectively, the "Bridge Loans") to fund a Promissory Note executed in favor of Calrissian (the "Calrissian May 2015 Note" and along with the Calrissian January 2015 Note, collectively, the "Calrissian Notes"). Compl. ¶ 48. The maturity date was seventy-five days later, on August 4, 2015. *Id.* On July 10, 2015, Alchemy transferred $3,033,534.25 to Calrissian to pay off the May 2015 Note's principal and accrued interest. *Id.* at ¶ 49. Then, Calrissian transferred $1,485,312.03 to Virgo Onshore and $1,548,222.22 to Virgo Offshore. *Id.* at ¶¶ 49-50. Alchemy's repayment of

---

[4] This fact is absent from the Complaint. The Court notes this transaction in *Virgo Entities* Opinion in considering the recharacterization and the avoidance claim. The recharacterization claim for this transaction is closely related to the breach of fiduciary duty claim here.

the May 2015 Note was funded from the increased borrowings under the SunTrust Amended and Restated Loan Agreement signed on July 9, 2015. *Id.* at ¶ 49.

**F. Negotiations and Events Leading Up to the ANConnect Transaction**

In January 2015, Perez and Bill Lee, on behalf of Alchemy, started to negotiate with Anderson Media Corporation for the potential acquisition of the wholly-owned subsidiary, ANConnect LLC's ("ANCONNECT"), video and digital distribution business (the "ANConnect Transaction"). *Id.* at ¶¶ 9, 13. The negotiations were conducted by Bill Lee, Perez, and Charlie Anderson, the Chairman of Anderson Media Corporation.

On February 11, 2015, Bill Lee signed Millennium Entertainment's term sheet that expressed Alchemy's intent to purchase ANConnect's US video and digital distribution business and to assume certain liabilities of ANConnect, in exchange for "a multiple of 4 times estimated Proforma EBITDA of the Physical Business and 6 times estimated Proforma EBITDA of the Digital Business." *Id.* at ¶ 57.

Alchemy had cash flow issues and disputes with a number of its creditors over unpaid debts leading up to the closing date of the ANConnect Transaction. *Id.* at ¶¶ 67-68. Bill Lee and the Virgo Individuals had multiple email communications between April 2015 and June 2015 about Alchemy's liquidity problems. *Id.* at ¶ 67.

Prior to the ANConnect Transaction, ANConnect's total industry revenues in physical business declined from $ 20.6 billion in 2006 to $9.6 billion in 2015, and it defaulted on various payment obligations owed to Alchemy prior to the ANConnect Transaction. *Id.* at ¶ 69, b-d.

On May 7, 2015, lender SunTrust's Counsel, Akin Gump, suggested Alchemy receive a solvency opinion on ANConnect prior to closing. However, Alchemy failed to obtain a solvency opinion in connection with the acquisition. *Id.* at ¶¶ 70-71.

### G. Alchemy Entered into the ANConnect Transaction

On May 7, 2015, Alchemy and ANConnect executed an Asset Purchase Agreement ("APA"), which provided that Alchemy would purchase ANConnect's home video and digital distribution for motion pictures throughout the United States and its 51% membership interest in Anderson Digital with certain exclusions. *Id.* at ¶¶ 14, 59-60; Defs.' Br. Ex. 1.[5] The purchase price was $ 35,893,147 for ANConnect's physical business, and $1,744,200 for its 51% interest in Anderson Digital. *Id.* at ¶ 62. Alchemy additionally assumed certain liabilities of ANConnect, including a $3 million obligation due by ANConnect to Group 1200 Media, ANConnet's third largest supplier of physical product. *Id.* at ¶¶ 63, 72. The ANConnect Transaction closed on July 9, 2015. *Id.* at ¶ 64. ANConnect's contractual relationship with Group 1200 Media was terminated in August 2015. *Id.* at ¶ 72.

On the same day that the ANConnect Transaction closed, Alchemy and Anderson Merchandising[6] entered into a Merchandising Agreement, which provides that Alchemy would engage Anderson Merchandisers as a contractor to perform services in Walmart stores. *Id.* at ¶ 123. The Merchandising Agreement additionally provided that Alchemy would pay certain "Reimbursement Fees" to Anderson Merchandisers to reimburse half of the amounts paid by ANConnect to obtain the third-party suppliers' consent to the assignment of ANConnect's contracts to Alchemy pursuant to the APA. *Id.* at ¶¶130-31. Alchemy paid a total of $2,089,775.45

---

[5] Prior to the ANConnect Transaction, Anderson Digital was owned by ANConnect, Stephen Lyons ("Lyons"), and Freyr Thor ("Thor"). ANConnect had a 51% membership interest, Lyons had a 24.5% membership interest, and Thor had a 24.5% membership interest. In addition to purchasing ANConnect's membership interest in Anderson Digital, Alchemy later purchased all of Lyons' and Thor's membership interests in 2015. Compl. ¶ 86.

[6] Anderson Merchandisers is a wholly-owned subsidiary of Anderson Media Corporation and provides in-store merchandising services. Compl. ¶ 10.

in Reimbursement Fees to Anderson Merchandisers for the consents received between July 7, 2015 and July 1, 2016. *Id.* at ¶¶ 130-34.

### H. Alchemy Purchased Lyons' and Thor's Interests in Anderson Digital

Alchemy purchased ANConnect's 51% membership interest in Anderson Digital as part of the ANConnect Transaction. On June 30, 2015, Alchemy, Anderson Digital, and Lyons entered into a membership Interest Purchase Agreement ("Lyons Agreement") for Alchemy to purchase Lyons' 24.5% interest for the price of $1,800,000. *Id.* at ¶ 86. On July 2, 2015, Alchemy, Anderson Digital, and Thor entered into a Membership Interest Purchase Agreement ("Thor Agreement") for Alchemy to purchase Thor's 24.5% interest for $1,370,114. *Id.* ¶ 94.

### I. The ARC Transaction

ARC Entertainment, LLC ("ARC") is a company registered in Delaware and controlled by Moore. *Id.* at ¶ 26. In 2015, ARC was in deep financial trouble and became insolvent. *Id.* at ¶ 139. ARC was unable to finalize its 2014 financial audit because of its liquidity issue. As of May 31, 2015, it had in total $13.28 million of current liabilities, and $9.1 million of assets. *Id.*

The Virgo Entities agreed to acquire ARC in exchange for ARC's $10 million equity contribution to Calrissian LP, which would ultimately be used to fund the purchase of ANConnect ("ARC Transaction"). *Id.* at ¶ 136.

Prior to the transaction, Alchemy's CFO, John Avagliano, indicated that ARC was "functionally insolvent." Bill Lee responded that the concern should be ignored because the conversion was positive *Id.* at ¶ 140. Upon the Trustee's information and belief, the Virgo Individuals desired this transaction as "a sweetheart deal" for Moore, in exchange for an access to what Bill Lee described as Moore's "manage[ment] of the primary Bass Family fund . . . Billions!!!" *Id.* at ¶ 141.

Calrissian formed a wholly-owned subsidiary, OA Investment Holdings LLC ("OA Holdings"), as a vehicle to complete the ARC Transaction. On July 9, 2015, OA Holdings, Calrissian, and ARC entered into a Contribution Agreement, which provided that ARC would convey substantially all of its assets and certain liabilities to Calrissian, and would further convey those assets and liabilities[7] to OA Holdings. In exchange, ARC would receive a 10% interest in Calrissian, and Moore would become a board advisor for Alchemy. *Id.* at ¶¶137, 144, 149.

## J. Payments Alchemy made Following the ARC Transaction

### a. Funds from Mezzanine Loan Agreement Transferred to ARC

OA Investment Partners LLC ("OA Partners") was formed by Virgo Entities to carry out the ANConnect Transaction. Compl. ¶ 150. OA Partners' members included Virgo Onshore, Virgo Societas Intermediate III, LLC, and ALC Mezz Partners, L.P.[8] *Id.* at ¶ 24. On July 9, 2015, OA Partners and Alchemy entered into a Mezzanine Loan Agreement for OA Partners to provide Alchemy a $20,175,893 unsecured credit facility. *Id.* at ¶ 151. The loan was split into two advances, "Tranche A" ($10,000,000) and "Tranche B" ($10,175,893). *Id.*

On October 28, 2015, OA Partners advanced $548,000 of Tranche A funds directly to ARC, and treated this fund as an obligation owed by Alchemy to OA Partners. *Id.* at ¶ 160-162. Alchemy had no contractual relationship with ARC that required such payment from Alchemy to ARC. *Id.* at ¶ 163.

### b. Deduction by ANConnect to Satisfy OA Holdings' Obligation

On July 9, 2015, OA Holdings, ANConnect, and ALC Mezz Partners, L.P. entered into a Loan and Security Agreement (the "ALC Mezz Agreement"), which provides that ANConnect and

---

[7] The Contribution Agreement assigned liabilities which include $2.9 million in accounts payable, $2.87 million due to licensors, and $13,793,000 in accrued participation expenses to Calrissian. Compl. ¶ 143.

[8] ALC Mezz Partners, L.P. is another entity controlled by Moore. Compl. ¶ 27.

ALC Mezz Partners would each advance $2,000,000 to OA Holdings for general use following the ARC Transaction. *Id.* at ¶ 169. The ALC Mezz Agreement specified mandatory repayments of $250,000 principal with accrued interest on the last day of each calendar quarter starting from September 30, 2015. *Id.* at ¶ 170. According to a letter dated October 18, 2015 from ANConnect to both Alchemy and OA Holdings, ANConnect retained $250,000 that it owed to Alchemy to satisfy OA Holdings' obligation to repay ANConnect under the ALC Mezz Agreement. *Id.* at ¶ 171. Alchemy was not a party to the ALC Mezz Agreement, and received no benefit for paying OA Holdings' debt. *Id.* at ¶¶ 172-73.

### c. Alchemy's Assumption of Sony DADC Obligation

Pursuant to the Contribution Agreement, ARC transferred several contracts to OA Holdings, which included a Replication Services Agreement signed between ARC and Sony DADC US Inc. d/b/a Sony DADC Americas ("Sony DADC") on December 30, 2013. *Id.* at ¶ 175. As of July 9, 2015, ARC owed Sony DADC more than $2 million under the Replication Services Agreement ("Sony DADC Obligation"). *Id.* at ¶ 176. On July 8, 2015, Alchemy and Sony DADC entered into a Third Amendment to Replication Services Agreement ("Third Amendment"), which provided that Alchemy would assume the Sony DADC Obligation. *Id.* at ¶ 177. Alchemy made at least two payments under the Third Amendment, each time $250,000, on September 23 and September 30 of 2015. *Id.* at ¶¶ 180-81. Alchemy received no benefit for assuming and paying for OA Holdings' Sony DADC Obligation. *Id.* at ¶ 182.

### d. Alchemy Employed Drinkwater

As part of the ARC Transaction, Alchemy agreed to employ Trevor Drinkwater ("Drinkwater") and pay for his salary and benefits. *Id.* at ¶ 185. On July 9, 2015, Alchemy entered into an Employment Agreement with Drinkwater, which provided that Alchemy would pay

Drinkwater an annual base salary of $350,000 with benefits for him to serve as the President and CEO of OA Holdings, Bentonville Film Festival LLC and ARC. *Id.* at ¶ 188. Defs.' Br. Ex. 9.

Meanwhile, Alchemy and ARC signed a Business Development Agreement, which provided that Drinkwater would perform business development services for Alchemy, and a portion of the revenue generated by his services would be paid by Alchemy to ARC to satisfy OA Holdings' earn-out obligation under the Contribution Agreement. *Id.* at ¶ 183.

### c. Alchemy Paid for OA Holdings' Obligations

On July 9, 2015, Alchemy and OA Holdings entered into a Management Services Agreement, which provided that Alchemy would manage OA Holdings and perform all of its officers' responsibilities, including the duty to manage Bentonville Film Festival, LLC, a wholly-owned subsidiary of OA Holdings. *Id.* at ¶ 187.

Following the signing of the Management Services Agreement, Alchemy paid several obligations of OA Holdings without receiving benefit, including (1) routine funding of OA Holdings' payrolls and paying Bentonville Film Festival's employment obligations in excess of $1 million; (2) on December 1, 2015, a transfer of $125,000 to pay an advance due under a Distribution Agreement between ARC and Jock Animation (Pty) Ltd., ("Jock Animation Advance"); and (3) on March 7, 2015, a payment of $22,500 advance due under an Acquisition Agreement between OA Holdings and Double Dutch International ("Double Dutch International Advance"). *Id.* at ¶¶ 193-94.

## LEGAL STANDARD

Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) is inextricably linked to Rule 8(a)(2), which provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that

the pleader is entitled to relief." In its seminal *Twombly* decision, the Supreme Court ushered in the modern era of notice pleading under Rule 8(a)(2). The Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The *Twombly* standard is one of "plausibility" and not "probability" - "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556.

The Supreme Court again addressed the Rule 8(a)(2) notice pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). The *Iqbal* decision clarifies that the *Twombly* plausibility standard applies to all civil suits filed in federal courts and identifies two "working principles" underlying the *Twombly* decision. *Id.* at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

The United States Court of Appeals for the Third Circuit synthesized the preceding authorities in its *Fowler* decision:

> [A]fter *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the

> complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts. As the Supreme Court instructed in *Iqbal*, '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."' This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'

*Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted). The Court

now proceeds with its analysis of the Virgo Defendants' Motion.

## DISCUSSION

### A.  Admission of the Documents

#### 1.  Legal Standard

The Virgo Individuals provide ten exhibits ("Exhibit___") in their Brief in Support of the Virgo

Individuals' and Virgo Entities' Motion to Dismiss the Seventh and Eight Claim of the Trustee's

Complaint, (D.I. 27) ("Defs.' Br."), Exs. 1-10. The Trustee does not object to the submission of

Exhibits 1, 2, and 9. Plaintiff's Memorandum of Law in Opposition to the Virgo Individuals'

Motion to Dismiss for Failure to State A Claim, p. 17 (D.I. 45) ("Pl.' Br."). The Court discussed

the legal standard in admitting extrinsic documents at the pleading stage in the *Virgo Entities*

Opinion.

In deciding a motion to dismiss, courts generally only consider the allegations contained

in the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770

F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,

998 F.2d 1192, 1196 (3d Cir. 1993)). An exception exists for a "'document integral to or explicitly

relied upon in the complaint' . . . 'without converting the motion to dismiss into one for summary

judgment.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.

1997)). "'The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* The critical analysis lies in "whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* In *Schmidt*, the Third Circuit explained that "the justification for the integral documents exception is that it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Id.* at 250.

    2.   Exhibits

       **a. Exhibit 1**

Exhibit 1 is the APA signed between ANConnect and Alchemy. The Trustee does not object to the submission of this agreement. Pl.' Br. p. 17. The Complaint explicitly relies on the content of the APA to form its breach of fiduciary duty claim. The Complaint states that ANConnect and Alchemy executed an APA, described the "Purchased Assets," "sale price", "Assumed liabilities," and claims that the Virgo Individuals breached their fiduciary duties for overpaying under the APA. Compl. ¶¶ 59-66. The Court will consider the APA at the pleading stage.

       **b. Exhibit 2**

Exhibit 2 is the Contribution Agreement signed by OA Holdings, Calrissian, and ARC in the ARC Transaction. The Trustee does not object to the submission of this agreement. Pl.' Br. p. 17. The Complaint cited portions of the Contribution Agreement in support of the allegation that the Virgo Individuals breached their fiduciary duties in allowing the ARC Transaction. Compl.

¶¶ 139-143. Exhibit 2 is integral to the Complaint and the Court will consider the Contribution Agreement at the pleading stage.

### c. Exhibit 3-6

Exhibit 3-6 are the Virgo January 2015 Note, the Calrissian January 2015 Note, the Virgo May 2015 Note, and the Calrissian May 2015 Note. The Court discussed the admission of these four Notes and decided to consider these documents in the *Virgo Entities* Opinion for the recharacterization and avoidance claim.

### d. Exhibit 7

Exhibit 7 is a letter, dated October 18, 2015, addressed by Bill Lardie, on behalf of ANConnect, to Bill Lee, confirming certain deductions of cash due by ANConnect to Alchemy, including the deduction of $250,000 to satisfy OA Holdings' debt to ANConnect. The Trustee argues that Exhibit 7 is a factual defense provided by the Virgo Individuals and should not be considered at the pleading stage. Pl.' Br. p. 24. The Virgo Individuals state that the letter is explicitly referenced by the Complaint to form its breach of fiduciary duty claim. Defs.' Br. p. 27.

This letter is integral to the breach of fiduciary duty claim. The Complaint alleges that based on the October 18, 2015 letter, the Virgo Individuals breached their fiduciary duty in "directing Alchemy" to allow a $250,000 deduction by ANConnect. *Id.* at ¶¶ 171, 260. e. The content of this letter forms the basis of the Trustee's claim. The Court will consider this letter at the pleading stage.

### e. Exhibit 8

Exhibit 8 includes two email communications. One email was from Perez to Moore in relation to the ARC transaction, dated June 5, 2015. Defs.' Br. Ex. 8. This email is not mentioned in either Virgo Individuals' Motion to Dismiss, or the Trustee's Brief. The Virgo Individual do not

elaborate on how this email forms the basis of the Complaint. Thus, the Court will not consider this email.

The second email is from Perez to Bill Lee, Jim Jenkins, and Watson, dated June 8, 2015. This email addresses Perez's negotiation with Moore for the ARC Transaction, which includes the proposal of Alchemy hiring Drinkwater. *Id.* The Trustee alleges that Drinkwater's employment by Alchemy was to solely benefit ARC at Alchemy's expense and states that "this fact is acknowledged in a June 8, 2015 email . . . ." Compl. ¶¶ 185-86. The Complaint explicitly relies on this email to form its breach of fiduciary duty claim. The Court will consider this email at the pleading stage.

### f. Exhibit 9

Exhibit 9 is the Employment Agreement signed between Drinkwater and Alchemy. The Trustee does not object to the submission of this agreement. Pl.' Br. p. 17. The Trustee explains Drinkwater's employment contract, his compensation, and his responsibilities to establish the breach of fiduciary duty claim, and therefore explicitly relies on the Employment Agreement. Compl. ¶ 188. The Court will consider this document at the pleading stage.

### g. Exhibit 10

Exhibit 10 is a portion of the SunTrust Loan Facility signed by Millennium and SunTrust Bank on September 4, 2014. Defs.' Br. Ex. 10. The Complaint alleges that after the closing of the SunTrust Loan Facility, Perez caused a transfer of $14,539,123.65 from the SunTrust Loan proceeds through Alchemy to Calrissian and recorded it as "member distribution." Compl. ¶¶ 34-37. The Virgo Individuals offer an excerpt of the SunTrust Loan facility to show that the transfer was permitted use of the fund, to reimburse Calrissian for its previous equity contribution. Defs.' Br. p. 31. This is a factual dispute raised by the Virgo Individuals regarding the purpose of the

transfer. The Trustee bases his claim on the transfers before and after receiving the SunTrust Loan Facility, rather than the content of the SunTrust Loan Facility agreement. The Court will not weigh evidence at this stage and determine the meaning of the SunTrust Loan Facility agreement. Further, the Exhibit does not include the full document. The Court will not consider Exhibit 10 at the pleading stage.

### B. Trustee's Claim is Not A Deepening Insolvency Claim

The Virgo Individuals argue that all of the Trustee's allegations boil down to a claim that the Virgo Individuals allowed various transactions that drove Alchemy into deeper insolvency. Defs.' Br. p. 10. The Trustee argues that the allegations are that the Virgo Individuals knowingly allowed Alchemy to overpay for the ANConnect Transaction, stripped off Alchemy's working capital for the affiliates' benefits, and tried to rehabilitate ARC's failing business at Alchemy's expense. Pl.' Br. pp. 21-22.

### 1. Delaware Does not Recognize "Deepening Insolvency" Theory

It is well settled that Delaware does not recognize the theory of "deepening insolvency," and does not support a claim that alleges that a debtor should have filed for bankruptcy rather than continuing to operate the insolvent business and incur additional debt. *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) (holding that "directors . . . do not have a duty to shut down the insolent firm and marshal its assets for distribution to creditors. . . . Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors."); *see also Trenwick Am. Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del.Ch.2006), *aff'd*, 931 A.2d 438 (Del. 2007).

The business judgment rule protects good faith, disinterested business decisions when the directors institute a business strategy that involves taking on additional debts.    *In re Midway Games Inc.*, 428 B.R. 303, 315 (Bankr. D. Del. 2010), *on reconsideration in part* (Mar. 19, 2010) (internal citation omitted). Directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of the creditors' interests. *Id.* at 316. If the business strategy results in deeper insolvency and ultimately fails to increase the company's value, it does not mean that a plaintiff can state claims against the directors based on the result. This is simple business failure that does not give rise to breach of fiduciary duty claims. *Id.*

### 2.    Trustee's Allegations are Beyond Deepening Insolvency Claim

In the present case, the Court will dismiss the allegations that are based on 1 "deepening insolvency" theory. The Trustee alleges that Alchemy had liquidity issues prior to the ANConnect Transaction, and the ANConnect Transaction placed Alchemy in deeper insolvency and unable to pay its liabilities. Compl. ¶ 66. This is disguised deepening insolvency theory that may not form the basis for breach of fiduciary duty claims. However, the Complaint also alleges that Alchemy received less than reasonably equivalent value in the ANConnect transaction and overpaid for the transaction. *Id.* Therefore, the Court does not read this claim as a solely deepening insolvency claim. The Court will consider the allegation that the Virgo Individuals breached their fiduciary duties by overpaying ANConnect.

Additionally, the Complaint alleges that the Virgo Individuals caused Alchemy to enter into the ARC Transaction for the benefit of Moore, and overpaid for the transaction. *Id.* at ¶¶ 137, 141, 260. The Complaint further contends that the Virgo Individuals caused Alchemy to assume a number of Alchemy affiliates' obligations without receiving benefit. *Id.* at ¶¶ 148, 175-179, 260.

Moreover, the Trustee alleges that the Virgo Individuals caused Alchemy to enter into a variety of "Fraudulent Transfers" pursuant to an actual fraudulent transfer theory. *Id.* at ¶¶ 208, 260.

These allegations go beyond a simple deepening insolvency claim. The center of these claims is that Alchemy incurred additional obligations without receiving benefit or reasonably equivalent value. Therefore, the Court will consider the allegations that do not implicate deepening insolvency theory and determine whether the claims meet the Rule 12(b)(6) legal standard.

## C. The Breach of Fiduciary Duty and Aiding and Abetting Claims Identified Certain Transfers

### 1. Legal Standard

The Virgo Individuals argue that the breach of fiduciary duty and aiding and abetting claims incorporate sixty-three pages of the Complaint without any specific factual allegation. Defs.' Br. pp. 16-17. The Trustee argues that it alleges each Virgo Individual's Board membership, their knowledge in each transaction, and a series of challenged transactions under the claim. Pl.' Br. pp. 24-25.

The Court will dismiss a claim which is impermissibly vague when the plaintiff solely incorporates a lengthy complaint without identifying any challenged transaction or party. *In re DBSI, Inc.*, 445 B.R. 351, 358 (Bankr. D. Del. 2011) (dismissing a breach of fiduciary duty claim for simply referring to "above-described actions and omissions" in a lengthy complaint without identifying any specific facts under the breach of fiduciary duty count).

### 2. The Trustee's Claims Identified Certain Transactions

In the present case, the Complaint narrates a variety of transactions from Paragraph 1 to 206. Under the "Seventh Claim," the breach of fiduciary duty count, the Trustee lists seven challenged transactions. Compl. ¶ 260, a-g.

The challenged transaction under "¶260 a" allowed the Debtors to enter into the Fraudulent Transfers which incorporates the Fraudulent Transfers listed under the First Claim, ¶208 a-k. The challenged transactions under ¶260 b-g involved b. Alchemy entering into the Anderson Transaction, c. Alchemy entering into the ARC Transaction, d. ARC assigning obligations to Alchemy, including the Sony DADC Obligation, e. Alchemy paying OA Holdings' obligations, including a $250,000 deduction by ANConnect, f. Alchemy transferring benefits of assets to ARC, including the Bentonville Film Festival, and g. Alchemy continuing to employ key ARC personnel. *Id.* at ¶ 260.b-g.

The Trustee identifies specific challenged transactions under ¶260 "a," "b," and "c." However, he fails to identify the transactions under "d," "e," "f," and "g." Under the transactions lettered "d, e, f," the Trustee uses the phrase "e.g." and "including but not limited to" in reference to challenged transactions without explaining the specific occurrence. Under the transaction numbered "g," the Trustee merely states "key ARC personnel" without identifying the specific individuals at issue.

The Complaint constitutes 308 paragraphs and numerous transactions that involve different parties. The Trustee must allege specific facts about the challenged events, and may not merely use broad incorporation language to refer vaguely to transactions. Therefore, the Court will only consider the events that are specifically listed under the breach of fiduciary count.

The aiding and abetting claim specifies that the challenged transactions are the events listed in the breach of fiduciary claim, and the scope of the claim is to the extent that "any of the Virgo Individuals . . . might be found not to have had a fiduciary duty to the Debtors at the time of the transactions . . . ." *Id.* at ¶ 266. The language is sufficient.

**D. Breach of Fiduciary of Duties**

**1. Pleading Standard**

The Trustee alleges that Perez, Watson, and Dorfman owed fiduciary duties to Alchemy, and they breached their duties of loyalty, due care, and good faith in the operation of Alchemy's business. *Id.* at ¶¶ 254-64. The Virgo Individuals argue that the Complaint fails to plead sufficient facts to support the breach of fiduciary claim, and fails to identify any conduct of Watson, Dorfman, or Perez that resulted in the breach. Defs.' Br. pp. 16-18.

The Trustee must plead sufficient facts showing both the existence of a fiduciary duty and that the fiduciary breached that duty. *Beskrone v. OpenGate Capital Grp. (In re PennySaver USA Publ'g, LLC)*, 587 B.R. 445, 463-64 (Bankr. D. Del. 2018). Delaware law is clear that officers, directors, and managers owe the corporation the traditional "triad" of duties: due care, loyalty and good faith. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ).

> A complaint fails to state a claim against an alleged officer for breach of fiduciary duty when it fails to allege facts demonstrating that (1) he took part in the challenged conduct and (2) failed to demonstrate the due care attendant to his particular office in doing so . . . . *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 573 (Bankr. D. Del. 2008).

To state a plausible claim for a breach of fiduciary duty, the plaintiff should allege specific conduct by each individual officer or director in authorizing the challenged transaction. *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 465–66 (Bankr. D. Del. 2018) (holding that the facts a trustee must show to establish a fraudulent transfer include (1) the "specific facts as to which transactions a particular defendant authorized . . . (2) what authority a particular defendant had to approve such transactions" and (3) the Trustee must not lump defendants together (without

supplying specific facts as to each defendant's wrongdoings).”; *In re Conex Holdings, LLC*, 514 B.R. 405, 413 (Bankr. D. Del. 2014) (dismissing a breach of fiduciary claim for failing to plead with specificity about which individual defendant authorized the challenged transaction); *In re Troll Commc'ns, LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008) (dismissing a breach of fiduciary claim because the complaint was vague and lacked adequate detail about each defendant's conduct).

In the Complaint the Trustee alleges that Watson, Perez, and Dorfman all served as Alchemy's Board members. Therefore, the Trustee sufficiently pleads that they owed fiduciary duties to Alchemy. Compl. ¶¶ 19-21. The Court will discuss whether the Trustee met his burden to show that they breached their fiduciary duties in the alleged transactions.

### 2. Duty of Care

The duty of care is the duty to act on an informed basis. *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ). The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) “use that amount of care which ordinarily careful and prudent men would use in similar circumstances;” and (2) “consider all material information reasonably available.” *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A. 2d 959, 967 (Del Ch. 1996)).

A breach of the duty of care requires proving gross negligence. *In re Fedders N. Am., Inc.*, 405 B.R. at 527; *see also Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) (“[A] corporate director is only considered to have breached his duty of care in instances of gross negligence.”) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (1994)). Gross negligence “generally requires that officers, directors, and managers fail to inform

themselves fully and in a deliberate manner." *In re Fedders N. Am., Inc.*, 405 B.R. at 527 (citing *Cede & Co.,* 634 A.2d at 368). If gross negligence is established, the directors will lose the business judgment protection, and the court will consider the challenged transaction under an "entire fairness standard of review." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (internal citation is omitted).

The Court will discuss each challenged transaction in deciding whether the Complaint pleads a plausible breach of due care claim.

### E.  The Fraudulent Transfers

The Trustee alleges that the Virgo Individuals breached their fiduciary duties in approving the "Fraudulent Transfers" listed under the First Claim. Compl. ¶ 260. The Virgo Individuals argue that only three of these transactions were approved by the Virgo Individuals, including a $14.5 million Calrissian Distribution and two Bridge Loan repayments. Defs.' Br. p. 30.

The "First Claim" lists the "Fraudulent Transfers" numbered "a-k." *Id.* at ¶ 208. The transfer under item "b" was a payment made by Anderson Digital to ANConnect. The Trustee fails to show its relevance to the Virgo Individuals' fiduciary duties toward Alchemy. The transfers under items "c," "g," "h," and "i" fall under the ANConnect Transaction and the ARC Transaction. The Court will address the transfers under the discussion of the ANC Transaction and the ARC. The Court will discuss all other transactions below.

### 1.  The $14 Million Calrissian Distribution

The Trustee contends that Perez breached his fiduciary duty by making the $14 million Calrissian Distribution. Compl. ¶ 208. a. The Virgo Individuals argue that this transfer was a repayment of the August 2014 Calrissian Note. 2014. Defs.' Br. pp. 30-31.

The Complaint alleges that Perez caused Alchemy to transfer $14,539,123.65 of the SunTrust loan proceeds to Calrissian and recorded it as "member distribution" in Alchemy's books and records, and subsequently transferred the funds to the Virgo Entities. Compl. ¶¶ 35, 37, 208. Alchemy received no consideration for the Calrissian Distribution. The Complaint states a plausible claim that Perez breached his duty of due care in making the transaction.

The Virgo Individuals argue that the Calrissian Distribution is a loan repayment, rather than an equity investment. However, the Virgo Entities do not make that claim in their motion to dismiss the recharacterization claim. (D.I. 25). From the face of the Complaint, the August 2014 Calrissian Note is not a loan, but rather an equity contribution. The Complaint states that the August 2014`` Calrissian Note addresses the proceeds to be used as "equity investment."

In reviewing a motion to dismiss for failure to state a claim, the Court will take all allegations as true and will read all factual disputes in plaintiff's favor. *In re Pursuit Capital Mgmt.*, LLC, 595 B.R. 631, 646 (Bankr. D. Del. 2018). The Court will not weigh the evidence and turn a motion to dismiss into a motion for summary judgment at the pleading stage. Here, the Trustee establishes a prima facie case of Perez's breach of his fiduciary duty. The Court will deny dismissal of the claim.

### 2. The Payments Made to Lyons and Thor to Acquire their Membership Interests in Anderson Digital

In the Complaint the Trustee contends that the Virgo Individuals breached their fiduciary duties by overpaying Lyons and Thor between July 2015 and August 2016 in relation to the acquisition of their combined 49% membership interests in Anderson Digital. Compl. ¶ 260. d. e. However, the Trustee does not provide any fact regarding who authorized these payments, which director was involved, and how much Alchemy overpaid for their membership interests. The

Trustee fails to state a plausible claim, and the Court will grant the Motion to Dismiss the breach of fiduciary claim.

### 3. Reimbursement Fees paid to Anderson Merchandisers

The Trustee contends that the Virgo Individuals breached their fiduciary duties by paying the reimbursement fees to Anderson Merchandisers between July 2016 and July 2016 in the total sum of $ 2,089,775.45. Compl. ¶¶ 130-134, 208, f. Similarly, here the Complaint fails to identify the individuals who were involved in these reimbursement payments. The Court will grant the Motion to Dismiss this transaction.

### 4. The Two $3 Million Bridge Loan Repayments

The Trustee alleges that the Virgo Individuals breached their fiduciary duties in authorizing the transfers of $3,051,945.21 and $3,033,534.25 from Alchemy through Calrissian to the Virgo Entities (two "Bridge Loan Repayments"). Compl. ¶ 208. j, k. The Virgo Individuals admit that the Board approved these two payments. Defs.' Br. p. 30. The Court in the *Virgo Entities Recharacterization* Opinion determined that these were repayments of two short-term loans provided by the Virgo Entities to Alchemy. The Complaint fails to show how the Board was grossly negligent in authorizing the repayments of these loans. The Court will grant the Motion to Dismiss regarding these transactions.

### 5    The ANConnect Transaction

The Trustee contends that the Virgo Individuals breached their fiduciary duties by paying the purchase price of $29,888,124.40 and assuming obligations in excess of $16 million in the ANConnect Transaction. Compl. ¶¶ 208. c, 260. The Trustee alleges that at the time of the ANConnect Transaction, Alchemy was struggling in its core business, ANConnect's business was

in rapid decline, and the Virgo Individuals signed the deal knowing that ANConnect would terminate the contractual relationship with its third largest supplier in 2015. *Id.* at ¶¶ 64-72.

The Virgo Individuals argue that the Trustee fails to show any of the Board member's gross negligence in entering into the ANConnect Transaction, but instead, shows that the Virgo Individuals were informed prior to the ANConnect Transaction. Defs.' Br. p. 22.

The Court reviews the ANConnect transaction under the business judgment rule. In Delaware, the "directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). The complaint must show that the Board was grossly negligent in making the acquisition decision. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 539–40 (Bankr. D. Del. 2009); *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del.Ch.2006) (holding that the complaint sufficiently alleged gross negligence by claiming "that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation.").

The Complaint fails to plead around the business judgment rule. It fails to show any deficient decision-making process by the Board or any specific Board member's gross negligence in approving the transaction. The Trustee must plead with specificity that among Perez, Watson, and Dorfman, who was involved in the transaction.

Additionally, the Trustee does not show the Board members' failure to inform themselves prior to the ANConnect Transaction. According to the Complaint, Alchemy was aware of ANConnect's financial difficulties, business decline, defaults in payments, and the incoming termination of relationship with Group 1300 Media prior to entering into the transaction. *Id.* at

¶¶ 69, 72. The Trustee may not claim that the Board breached their fiduciary duties by simply approving a transaction with an entity that is in financial trouble.

Further, the focus of the Virgo Individuals' breach of fiduciary duty is the price Alchemy paid. However, the Trustee fails to demonstrate any specific fact to show the overpayment. Rather, the Trustee merely makes conclusive statement alleging that Alchemy "overpaid." Delaware does not recognize a breach of fiduciary claim solely based on alleged "overpayment" on a transaction without specification. *Chester Cty. Employees' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *12 (Del. Ch. Oct. 7, 2016), *aff'd*, 186 A.3d 798 (Del. 2018) (dismissing the breach of fiduciary claim and holding that the "[p]laintiff should allege the amount by which New Residential allegedly overpaid, and [p]laintiff's allegations should deal with the overpayment incentives. . . .").

The Court will dismiss the breach of due care claim against the Virgo Individuals for entering into the ANConnect Transaction.

### 6.  Entering into the ARC Transaction

The Trustee alleges that the Virgo Individuals breached their duties of due care by allowing Alchemy to enter into the ARC Transaction. Compl. ¶ 260. c. The Trustee contends that the Virgo Individuals consummated the transaction to provide Ardon Moore a "sweetheart deal" in exchange for Ardon Moore's management in the Bass Family fund. *Id.* at ¶ 141. The Virgo Individuals argue that Alchemy was not a party to the ARC Transaction and was not involved in the transaction. Defs.' Br. pp. 23-24.

The Contribution Agreement was entered into by ARC, Calrissian, and OA Holdings. The transaction was for OA Holdings, Calrissian's wholly-owned subsidiary, to acquire ARC in exchange for a $10 million equity contribution to be used toward the ANConnect acquisition.

Compl. ¶ 136. This transaction was not signed by Alchemy and did not impose any obligation on Alchemy (although it may have affected Alchemy ultimately). Defs.' Br. Ex. 2. The Trustee does not explain how the Virgo Individuals injured Alchemy by entering into the ARC Transaction, and thus fails to rebut the business judgment rule presumption. The Court will dismiss the breach of fiduciary claim against the Virgo Individuals for entering into the ARC Transaction.

### 7.  Alchemy's Assumption of ARC's and OA Holdings' Obligations

The Trustee alleges that the Virgo Individuals breached their fiduciary duties by assigning certain of ARC's obligations to Alchemy, allowing Alchemy to assume OA Holdings' obligations in the Contribution Agreement, and allowing the benefits of assets to flow to ARC. As the Court discussed above, it will only address the transactions that are clearly stated in the Complaint. The Trustee asserts the following specific transactions under the breach of fiduciary claim:

(1)  Alchemy transferred $548,000 of Tranche A funds to ARC without contractual relationship with ARC; Compl. ¶¶ 162-68, 208. i.

(2)  Alchemy allowed ANConnect to offset $250,000 to satisfy ARC's obligation to ANConnect pursuant to the ALC Mezz Agreement; *Id.* at ¶¶ 171, 208. g.

(3) Alchemy assumed the Sony DADC Obligation and made two payments to Sony DADC in 2015; *Id.* at ¶¶ 176-81, 208. h.

(4) Alchemy paid various of OA Holdings' obligations, including the funding of OA Holdings' payroll and Bentonville Film Festival, LLC; a payment of $1250,000 advance for the Distribution Agreement between ARC and Jock Animation (Pty) Ltd, and a payment of $22,500 advance due for a contract between OA Holdings and Double Dutch International. *Id.* at ¶¶ 195-98; Pl.' Br. p. 29.

The Virgo Individuals argue that the Complaint fails to state plausible breach of fiduciary duties claim in each transaction under the Complaint. The Court will address these transactions individually below.

### F.  Sony DADC Obligation Assignment

According to the Complaint, Sony DADC demanded that Alchemy assume the obligation by signing the Third Amendment with Alchemy. Compl. ¶ 177. The Complaint further alleges that Alchemy made two payments, $257,000 and $250,000 to Sony DADC consequently. However, the Complaint fails to state which Virgo Individuals authorized or signed the Third Amendment, and does not provide any facts about who authorized the two payments. The Trustee does not allege adequate facts to state a plausible claim, and the Court will grant the Motion to Dismiss for this claim.

### G.  Transfer of $548,000 Tranche A Fund to ARC

The Complaint alleges that the Virgo Individuals breached their fiduciary duty by allowing OA Partners to transfer $548,000 of the advanced Tranche A funds to ARC. Compl. ¶ 260. a. However, the Complaint states that the wire was approved by two Virgo Investment Group executives--Robert Racusin and Ben Painter. *Id.* at ¶ 161. The Complaint fails to elaborate on the Virgo Individuals' participation in this transfer. The Court will grant the Motion to Dismiss of this transfer.

### H.  The $250,000 payment under the ALC Mezz Agreement

Similarly, the Complaint merely states that "Alchemy agreed to allow" ANConnect to retain $250,000 it owed to Alchemy in satisfaction of OA Holdings' obligation to ANConnect. *Id.* at ¶ 171. The Trustee does not provide the name of any individual defendant who authorized the payment. In fact, the October 18, 2015 letter shows that the email communication was from

ANConnect to Bill Lee and Jim Jenkins. *Id.*; Br. p. 27. Ex. 7. The Trustee does not provide any facts showing any Virgo Individuals' participation. The Court will grant the Motion to Dismiss this claim.

### I.  Benefits of Assets flowed to ARC and Payments of OA Holdings' Obligations

The Complaint alleges that the Virgo Individuals allowed the "benefits of assets (including but not limited to Bentonville Film Festival, LLC) to flow to ARC, even though those assets had been contributed to OA Holdings. . . ." *Id.* at ¶ 260, f. The Virgo Individuals argue that they cannot divine the meaning of Trustee's allegation, and the claim should be dismissed. Defs.' Br. p. 27.

It seems that this paragraph refers to Paragraph 194 of the Complaint, which indicates that the Virgo Individuals, Bill Lee and Ardon Moore, collectively approved Alchemy's funding of OA Holdings' payroll and payments for Bentonville Film Festival LLC's [9] employment obligations. *Id.* at ¶ 194, a. The Complaint additionally alleges that the Virgo Individuals collectively approved Alchemy to make the Jock Animation Advance payment and Double Dutch International Advance payment without receiving any benefit. *Id.* at ¶ 194, b. c. The Trustee's brief clarifies that this subsection indicates the Virgo Individuals' authorization of the above payments. Pl.' Br. p. 29.

Here, the Complaint sufficiently alleges that the Board authorized these transfers to strip assets from Alchemy to benefit OA Holdings. It states plausible breaches of fiduciary duties claim. The Court will deny the Motion to Dismiss this transaction.

### J.  Employment of Drinkwater

The Trustee alleges that the employment of Drinkwater was at Alchemy's expense solely for the benefit of ARC. Compl. ¶¶ 188, 191.  According to the email communication among Perez,

---

[9] The Complaint alleges that Bentonville Film Festival LLC is a wholly-owned subsidiary of OA Holdings. Compl. ¶ 187.

Bill Lee, Watson, and Jim Jenkins dated June 8, 2015, the employment of Drinkwater was part of the ARC Transaction proposal raised by Moore. Defs.' Br. Ex. 8. The employment of Drinkwater by Alchemy to serve as the CEO for ARC and OA Holding is the result of the parties' negotiation in the ARC Transaction. From this transaction, Alchemy was to receive a $10 million equity contribution, which the email described as "Alchemy Investment." *Id.*; Compl. ¶ 136.

The Trustee is required to rebut the business judgment rule to survive a motion to dismiss for the directors' breach of fiduciary duties in negotiating and entering into the ARC Transaction. As the Court discussed above, the Trustee fails to plead around the business judgment rule to show anyone's gross negligence in entering the ARC Transaction. Therefore, the Court will grant the Motion to Dismiss of this claim.

### K. Breach of Duty of Loyalty and Good Faith

"The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Troll Commc'ns, LLC*, 385 B.R. 110, 119 (Bankr. D. Del. 2008). A sufficiently pled claim for a breach of the duty of loyalty requires the plaintiff to "allege facts showing that a self-interested transaction occurred and that the transaction was unfair to the plaintiffs." *Id.* (citing *Joyce v. Cuccia*, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997)); *In re Nat'l Serv. Indus., Inc.*, No. AP 14-50377 (MFW), 2015 WL 3827003, at *6 (Bankr. D. Del. June 19, 2015); *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 162–63 (Bankr. D. Del. 2019).

"To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders." *In re Troll Commc'ns, LLC*, 385 B.R. 110, 119 (Bankr. D. Del. 2008)

The Trustee contends that the Virgo Individuals breached their fiduciary duties of loyalty and good faith in operating Alchemy. Compl. ¶¶ 258, 260. However, the Trustee does not allege that any of the Virgo Individuals was self-interested, was on both sides of any transaction, or received any benefit out of the transaction.

It seems that the Trustee alleges "bad faith" when he contends that the ARC transaction was a "sweetheart deal for the benefit of Ardon Moore," in order for the Virgo Individuals to get access to Ardon Moore's management of the Bass Family funds. However, the Trustee fails to elaborate on any Virgo Individuals' conduct, any of their personal reasons for entering into the transaction, or any unfair benefit to the Virgo Individuals because of self-dealing. This vague allegation lacks specificity to survive a motion to dismiss. The Court will grant the Motion to Dismiss at the pleading stage.

### L. Aiding and Abetting the Breach of Fiduciary Duty

The Trustee alleges that to the extent that the Virgo Individuals are found not to have a fiduciary duty to Alchemy, they should be liable for having aided and abetted the breach of fiduciary duties by other defendants. Compl. ¶ 266. The Virgo Individuals argue that the Trustee fails to plead all elements required to state a plausible aiding and abetting claim. Defs.' Br. p. 35.

To prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008); *In re Troll Commc'ns, LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008).

At the pleading stage, the Trustee is entitled to plead in the alternative and to assert claims of aiding and abetting to the extent that some defendants did not themselves have any fiduciary duties or were shielded from breach of fiduciary duty claims by exculpatory provisions of debtor's operating agreement. *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150 (Bankr. D. Del. 2019).

The Trustee sufficiently alleges Perez breached his fiduciary duty in the Calrissian Distribution. However, the Trustee fails to plead with specificity that any other director "knowingly participated" in the Calrissian Distribution.

The Trustee sufficiently pleads the Virgo Individuals' breach of fiduciary duty in funding OA Holdings' payrolls, paying Bentonville Film Festival's employee obligations, making Jock Animation Advance payment, and making Double Dutch International Advance payment. Although the Trustee does not mention the defendants by name, the Trustee alleges that all the Virgo Individuals were aware and participated in the transfers. Therefore, the Trustee states a claim for aiding and abetting a breach of fiduciary duty against all the Virgo Individuals.

For ANConnect's deduction of $250,000 to satisfy OA Holdings' obligation to ANConnect, the email communication between Bill Lee and ANConnect on August 18, 2015 shows that Bill Lee participated in this transaction. He might have breached his fiduciary duty in the assumption of OA Holdings' liability. However, the Trustee must plead with sufficient facts how Bill Lee breached his fiduciary duty in Alchemy's assumption of liability, and how any Virgo Individuals knowingly participated in this deduction.[10] The Trustee did not.

---

[10] According to the email communication, the ANConnect's deduction of OA Holdings' $250,000 responsibility was based on the collection provisions of the Transition Services Agreement signed between Alchemy and ANConnect. Defs.' Br. Ex.7. It is uncertain whether Bill Lee breached his fiduciary duty, and it is the Trustee's burden to plead with specificity if there is any wrongdoer or wrongdoing in this transaction.

The Court will grant the Motion to Dismiss the aiding and abetting a breach of fiduciary claim to all other challenged transactions.

### M. The Breach of Fiduciary Duty and Aiding and Abetting the Breach of Fiduciary Duty Claims are Against the Individuals

The Trustee alleges the Virgo Individuals, Bill Lee, and Moore breached their fiduciary duties to Alchemy in the Seventh and Eighth Claims. Compl. ¶ 260, 265. The Seventh and the Eighth Claims do not allege claims against the Virgo Entities.   Paragraph 22 of the Complaint states that the "Virgo Entities and the Virgo Individuals were and are the agents of one another." *Id.* at ¶ 22. However, this is not sufficient to extend the breach of fiduciary claim against Alchemy or its affiliates. A breach of fiduciary duty claim must be pled by specifically pointing out the entity that was involved in the challenged transaction. The Court only considers the breach of fiduciary claim and aiding and abetting the breach of fiduciary duty claim against the Virgo Individuals in this Opinion.

### N. Leave to Amend

Rule 15(a), made applicable here by Bankruptcy Rule 7015, provides that "a party may amend its pleading only with the opposing party's written consdent or the court's leave.   The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Granting such leave is within the court's discretion and courts liberally allow amendments. *See, e.g., Valley Media, Inc. v. Borders, Inc (In re Valley Media, Inc.)* 288 B.R. 189, 192-93 (Bankr. D. Del. 2003); In *re Crucible Materials Corp.*, 2011 WL 2669113, at *4-5 (Bankr. D. Del. Jul. 6, 2011). However, "denial of leave to amend is justified if there is undue delay, bad faith, a dilatory motive, prejudice or futility." *Valley Media,* 288 B.R. at 193 (citing *In re Burlington Coat Factory Sec. Litig.,* 114F.3d at 1434).

The Trustee seeks leave to amend in a footnote. Courts have observed that where a plaintiff only requested leave to amend in a footnote in a response in opposing a motion to dismiss, doing so was not the proper method to seek leave to amend. *Malivuk v. Ameripark,* LLC, 694 Fed. Appx 705, 710-11 (11th Cir. 2017) (citing *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1222 (11th Cir. 1999) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.")). A plaintiff's request for leave to amend a complaint is improper without indicating the particular grounds on which amendment is sought. *Mackereth v. Kooma, Inc.,* 2015 WL 2337273, at *12 (E.D. Pa. May 14, 2015) (quoting *U.S. ex rel Zizic v. Q2Administrators,* LLC, 728 F3d 228, 243 (3d Cir. 2013) (denying plaintiff's footnote request for leave to amend the response in opposition to defendants' motion to dismiss).

The Court will deny the Trustee's request for leave to amend based on procedural infirmities. The Court is not making a finding of undue delay, bad faith, a dilatory motive, prejudice or futility. The Court finds that a request for leave to amend a complaint that is embedded in a footnote of an opposition to a motion to dismiss is improper.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Virgo Defendants dismissal of the Seventh and Eighth Claim without prejudice.

Dated: September 16, 2019

KEVIN GROSS, U.S.B.J.