## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| OUR ALCHEMY, LLC, *et al*.,[1] | Case No. 16-11596-JTD |
| *Debtors.* | Jointly Administered |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC, | Adv. Pro. No. 18-50633-JTD |
| *Plaintiff,* <br> v. | |
| ANCONNECT, LLC, *et al.*, | **Re: Adv. Docket No. 142** |
| *Defendants.* | |

### PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF HIS REQUEST TO ALLOW DISCOVERY PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(d) AND IN OPPOSITION TO ANCONNECT, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, III, AND V

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Andrew J. Belli, Esq.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
scoren@kcr-law.com

*Attorneys for Plaintiff*

COZEN O'CONNOR
John T. Carroll, III (DE Bar No. 4060)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
jcarroll@cozen.com

*Attorneys for Plaintiff*

Dated:  September 25, 2020

---

[1]     The Debtors are: Our Alchemy, LLC, Case No. 16-11596 and Anderson Digital, LLC, Case No. 16-11597.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

I. INTRODUCTION .................................................................................... 1

II. RELEVANT BACKGROUND ................................................................. 2

    A. The Trustee, Based On The Limited Evidence Available To Him
       At The Time, Prepared A Complaint Which Survived ANConnect's
       Motion To Dismiss ........................................................................ 2

        1. The Complaint And Supporting Evidence ................................. 2

        2. Procedural History ....................................................................... 6

            a. The Court Denies Dismissal of the Trustee's Avoidance
               Claims Relating to the ANConnect Transaction ................... 7

            b. ANConnect's Motion For Reconsideration Is Denied ......... 8

    B. ANConnect Stonewalls The Trustee's Attempts to Start Discovery ................ 9

III. LEGAL STANDARDS ........................................................................... 10

IV. ARGUMENT ........................................................................................... 12

    A. ANConnect's Motion Should Be Denied Pursuant to Rule 56(d) Because
       Summary Judgment As To Fact-Sensitive Issues Is Inappropriate Before
       The Parties Have The Opportunity For Full And Fair Discovery ................ 12

        1. Legal Standards Relevant To ANConnect's Motion For
           Summary Judgment .................................................................... 13

         2. The Trustee Satisfies the Three-Part Rule 56(d) Test ............... 16

            a. The Trustee Plans To Conduct Discovery Calculated To
               Further Support His Allegations Concerning The
               ANConnect Transaction, Which Would Preclude Summary
               Judgment ............................................................................ 16

            b. The Trustee's Efforts to Conduct Discovery Have Been
               Thwarted ............................................................................. 21

    B. Alternatively, Even Based On The Current Record, ANConnect's Motion
       Should Be Denied Because There Are Disputed Issues of Material Fact
       Concerning The Trustee's Avoidance and Unjust Enrichment Claims ........... 22

i

1. There Are Genuine Issues of Material Fact Concerning Reasonably Equivalent Value ................................................................................22

2. There Are Genuine Issues of Material Fact Concerning Actual Fraudulent Intent ..........................................................................28

IV. CONCLUSION ....................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. BI Inc.*, No. CV 16-2705, 2018 WL 2288286 (E.D. Pa. May 17, 2018) ..................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 10, 11, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 22

*Doe v. Abington Friends School*, 480 F.3d 252 (3d Cir. 2007) ....................................... 11

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...................................... 15

*In re Autobacs Strauss, Inc.*, 473 B.R. 525 (Bankr. D. Del. 2012) ................................................. 14

*In re Avandia Marketing, Sales and Prods. Liabl. Litig.*, 945 F.3d 749 (3d Cir. 2019) .............. 21

*In re Bentivegna*, 597 B.R. 261 (Bankr. E.D. Pa. 2019) ................................................. 13

*In re BMT-NW Acquisition, LLC*, 582 B.R. 846 (Bankr. D. Del. 2018) ...................................... 30

*In re Charys Holding Co., Inc.*, 2010 WL 2774852 (Bankr. D. Del. July 14, 2010) .................. 14

*In re Charys Holding Co., Inc.*, 443 B.R. 628 (Bankr. D. Del. 2010) .................................... 14, 27

*In re DBSI, Inc.*, Adv. No. 10-55963, 2011 WL 2175940 (Bankr. D. Del. May 27, 2011) ....................................................................................................... 21

*In re Deb Stores Holding LLC*, No. 14-12676 (KG), 2018 WL 1571518 (Bankr. D. Del. Mar. 28, 2018) ........................................................................................ 11, 12

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017) ........................................... 15

*In re Fedders N. Am., Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) ................................................ 20

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ........................................... 13, 26, 27

*In re GGI Props., LLC*, 588 B.R. 401 (Bankr. D.N.J. 2018) ................................................ 22

*In re Hechinger Inv. Co. of Del.*, 327 B.R. 537 (D. Del. 2005) .................................................... 22

*In re Hill*, 342 B.R. 183 (Bankr. D.N.J. 2006) ......................................................................... 14

*In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ......................................... 22

*In re Maxus Energy Corp.*, 615 B.R. 62 (Bankr. D. Del. 2020) ................................................ 10

*In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005) ............................................................. 14

*In re PennySaver USA Publ'g, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018) ................................. 28

*In re Polichuk*, 506 B.R. 405 (Bankr. E.D. Pa. 2014)................................................................. 15

*In re R.M.L., Inc.*, *Inc.*, 187 B.R. 455 (Bankr. M.D. Pa. 1995), *subsequently aff'd,* 92 F.3d 139 (3d Cir. 1996)............................................................................................................................ 22

*In re Stone & Webster, Inc.*, Adv. No. 08-51839, 2009 WL 426118 (Bankr. D. Del. Feb. 18, 2009) ......................................................................................................................................... 12

*In re Tribune Co.*, 464 B.R. 126 (Bank. D. Del. 2011) ............................................................... 14

*In re Washington Mut., Inc.*, No. 08-12229 (MFW), 2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ......................................................................................................................................... 13

*Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006)......................................................... 10

*Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834 (3d Cir. 1992) .................................................. 20

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010).......................................................................... 15

*O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458 (D.N.J. 2016)........................................... 21

*Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015) ............................................................ 12, 16, 21

*St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309 (3d Cir. 1994).................................................... 12

**Rules**

FED. R. CIV. P. 56............................................................................................................... passim

Plaintiff George L. Miller, Chapter 7 Trustee ("Plaintiff" or the "Trustee") for the jointly administered bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital" and, together with Alchemy, the "Debtors"), submits this Memorandum of Law in support of his request for discovery pursuant to FED. R. CIV. P. 56(d) and in opposition to Defendant ANConnect, LLC's ("ANConnect") Motion for Partial Summary Judgment on Counts I, II, III, and V of the Trustee's Complaint (Adv. D.I. 142).

## I.    **INTRODUCTION**

In this adversary proceeding, the Trustee seeks, *inter alia*, to avoid Alchemy's acquisition of ANConnect's physical and digital distribution business (the "ANConnect Transaction"), in connection with which Alchemy made cash payments to ANConnect totaling $29,888,124.40 and assumed ANConnect liabilities exceeding $16 million.  On September 16, 2019, this Court denied ANConnect's motion to dismiss the Trustee's avoidance claims—holding that the Trustee had sufficiently pleaded lack of reasonably equivalent value along with badges of fraud indicative of actual fraudulent intent. ANConnect's motion for reconsideration was denied on November 1, 2019.

The instant summary judgment motion is ANConnect's third bite at the apple concerning inherently fact sensitive issues. Defendant's third effort to defeat claims that the Court has held properly pleaded—before the Trustee has been afforded discovery—should be summarily rejected. Simply stated, the Trustee is entitled to full and fair discovery before having to defend a summary judgment motion like that presented by ANConnect and Rule 56(d) confirms the point.  In this regard, the Trustee submits the Coren Declaration, which sets forth the scope of relevant information the Trustee intends to seek in discovery and how it is essential to his opposition, as

well as why it has not been previously obtained (*i.e.*, because the Defendants have frustrated the Trustee's efforts to obtain discovery).

Alternatively, summary judgment should be denied based on the existing record—as there are genuine issues of material fact concerning reasonably equivalent value and badges of fraud indicative of actual fraudulent intent. The Trustee's allegations concerning these issues—which the Court twice held are sufficient to state fraudulent transfer and unjust enrichment claims—are supported by evidence contained in the Debtors' records, including, *inter alia*, contemporary communications between the Debtors' managers, executives, and other personnel, presentations prepared for the Debtors' lender, and sworn statements by Defendant Lyons (founder of Anderson Digital) from prior litigation.  As to the materials submitted by ANConnect to support its motion, they fall woefully short of establishing an entitlement to summary judgment and merely highlight issues over which the parties have material factual disputes.

## II.     RELEVANT BACKGROUND

### A.     The Trustee, Based On The Limited Evidence Available To Him At The Time, Prepared A Complaint Which Survived ANConnect's Motion To Dismiss

#### 1.  The Complaint And Supporting Evidence

In January 2015, Alchemy was considering an acquisition of ANConnect's video and digital distribution business. Compl., ¶ 55; *see also* ANConnect's Opening Brief in Support of Motion for Partial Summary Judgment (Adv. D.I. 143) ("ANConnect Br."), p. 4.  In a Term Sheet dated February 11, 2015, Millennium Entertainment, LLC (now known as Alchemy) expressed the intent to purchase ANConnect's "US video and digital distribution business" and to assume "certain specified liabilities and obligations," in exchange for "a multiple of 4 times estimated Proforma EBITDA of the Physical Business and 6 times estimated Proforma EBITDA of the

Digital Business." Compl., ¶ 57; Declaration of Steven M. Coren, Esquire ("Coren Decl."),[2] Ex. 1 (Term Sheet). Unfortunately, the rationale for the transaction was half-baked—as Alchemy and the Virgo Defendants focused on making Alchemy an "[u]nstoppable force with thick competitive barrier to entry, dominating independent film distribution worldwide," while ignoring that Alchemy was struggling financially and physical media was a rapidly dying business. *See id.*, Ex. 2, p. 25 (Board Presentation).

Ignoring "red flags" that should have torpedoed the deal, Alchemy executed an Asset Purchase Agreement with ANConnect dated May 7, 2015 (the "APA"). Compl., ¶ 59; Coren Decl., Ex. 3 (APA). The "Purchased Assets" included ANConnect's 51% membership interest in Anderson Digital.[3] *Id.*, pp. 12-13. The APA sets forth an aggregate purchase price for the Purchased Assets of $37,637,347 (subject to certain post-closing adjustments), consisting of (a) $35,893,147 allocated to the physical segment of the Business, and (b) $1,744,200 for ANConnect's 51% membership interest in Anderson Digital. *Id.*, p. 17. Alchemy also agreed to assume certain liabilities of ANConnect, including, *inter alia*: (i) liabilities related to content suppliers' contracts, inventory sales, and personnel; (ii) amounts due to content owners; and (iii) accounts payable to wholesale suppliers. *Id.*, pp. 14-15. Closing on the ANConnect Transaction occurred on July 9, 2015 (the "Closing"). Compl., ¶ 64; ANConnect, LLC's Answer to the Trustee's Complaint (Adv. D.I. 108) ("Answer"), ¶ 64. The cash payments made by Alchemy in connection with the Closing totaled $29,888,124.40, and the liabilities assumed by Alchemy

---

[2]    The Coren Declaration is submitted in support of the Trustee's opposition to ANConnect's Motion and request for discovery pursuant to Rule 56(d).

[3]    Alchemy purchased the remaining membership interests in Anderson Digital from the company's founders Stephen Lyons and Freyr Thor, who each owned a 24.5% interest. Compl., ¶¶ 61 n.6, 86, 94.

amounted to more than $16 million. Compl., ¶¶ 83, 208.c.; Declaration of Jay Maier in Support of ANConnect's Motion (Adv. D.I. 143-1) ("Maier Decl."), ¶ 32.

Bent on "world domination" at any price, Alchemy ignored numerous red flags warning that the purchase price was vastly overinflated and much higher than the actual value of what it had acquired. Compl., ¶ 69. Before closing, Alchemy knew that ANConnect and Anderson Digital had "very concerning" collection issues and that ANConnect had defaulted on payment obligations owed to Alchemy. Coren Decl., Ex. 4 (February 25, 2015 email chain between Rex Bowring and Jim Jenkins, copying John Avagliano). Alchemy also knew that the physical business (based largely on DVD sales), a major component of the transaction, was in rapid decline, with total industry revenues declining from $20.6 billion in 2006 to $9.6 billion in 2015, with declines expected to accelerate rapidly through 2021. *Id.*, Ex. 5 at p. 12 (Alchemy Lender Update and Amendment Presentation). In a May 7, 2015 email, Akin Gump (counsel to SunTrust, Alchemy's lender) raised concerns that "there are no provisions addressing ANConnect's solvency following the closing…. To add extra protection, we could take this one step further and request a solvency opinion at closing." Compl., ¶ 70; Coren Decl., Ex. 6. No solvency or fairness opinion was obtained. Compl., ¶ 71.

Additionally, before the deal closed, Alchemy and ANConnect knew that ANConnect's relationship with Group 1200 Media—ANConnect's third largest supplier of physical product to Walmart in 2014—would terminate in August 2015. Compl., ¶ 72; Coren Decl., Ex. 7. A June 23, 2015 Alchemy bank presentation to SunTrust estimated that the annual EBITD impact of losing this relationship was approximately negative $1.4 million, which should have equated to a $5.6 million reduction ($1.4 million multiplied by 4) of the purchase price but was ignored or overlooked. *Id.*, p. 3; Coren Decl., Ex. 8 (June 23, 2015 email from SunTrust, seeking an

4

explanation "why management/virgo was ok without a purchase price adjustment despite Group 1200 leaving"). Making matters worse, Alchemy assumed in excess of $3 million in obligations due from ANConnect to Group 1200 Media for a relationship about to terminate. Compl., ¶¶ 72, 80; Coren Decl., Ex. 9 (February 2016 email chain between Mark Perez, Kelly Summers, and others).

Alchemy had experienced ongoing liquidity and cash flow problems in the months leading up to the Closing, another red flag. *See* Compl., ¶¶ 43-44, 67-68; Coren Decl., Exs. 15, 16, 22-25 (emails regarding Alchemy's liquidity concerns and inability to pay obligations on time, and disputes with creditors over unpaid debts). This already insufficient cashflow significantly worsened when the ANConnect Transaction closed. Compl., ¶ 76. Almost immediately after Closing, creditors were contacting Alchemy demanding payment, and within a matter of weeks, Alchemy was in the midst of a crippling liquidity crisis—and unable to meet its obligations as they became due. *Id.* Indeed, just one day after Closing, then-CEO Bill Lee emailed a list of "Alchemy priorities," which listed "[m]anage[ment] [of] negative $5M working capital requirement through September" as his top priority, and listed "liquidity/cash management" as one of Manager Mark Perez's main concerns. Compl., ¶ 77; Coren Decl., Ex. 10.

In the words of Anderson Digital co-founder Stephen Lyons, it was immediately apparent that "Alchemy's acquisition of Anderson Digital's parent company ha[d] been an operational and financial disaster," which left Alchemy "experiencing serious trouble meeting its financial obligations as they c[a]me due, [including obligations] to vendors and suppliers which [we]re critical to company's continued existence." Compl., ¶ 79; Coren Decl., Ex. 11, p. 5 (Declaration of Stephen Lyons, dated February 16, 2016). The transaction left the already distressed Alchemy

in a state of "financial triage, picking and choosing which of its creditors it will pay," and having difficulty making timely lease and license payments. *Id.*, p. 6.

In an email dated February 12, 2016 to Alchemy Co-Presidents Scott Guthrie and Kelly Summers, Perez described his efforts to resolve Alchemy's dispute with Group 1200 Media over the unpaid "legacy liability" of over $3 million that Alchemy had assumed as part of the ANConnect Transaction by setting up a monthly payment plan. Compl., ¶¶ 80-81; Coren Decl., Ex. 9. Summers responded that "[p]ayment plans is all we can offer … [b]ut until I see what our cash flow looks like it's hard to say whether that's something we can honor." *Id.* Summers further commented that Alchemy "ha[d] many other payables affecting [its] current ability to produce near-term revenue," was "losing product flow from existing suppliers," had "effectively shut down all business development & acquisition activity," and had a "dying" pipeline. *Id.*

The Group 1200 Media liability was one of many "legacy liabilities" Alchemy was "burdened with" as a result of the ANConnect Transaction. Compl., ¶ 82; Coren Decl., Ex. 12, p. 44 (Alchemy Confidential Information Memorandum, April 2016). In April 2016, the legacy liabilities totaled $22.4 million—approximately 50% of Alchemy's total liabilities. *Id.*

The ANConnect Transaction (along with related transactions described in the Complaint) was a financial disaster from which Alchemy never recovered—as it filed for bankruptcy less than a year after the Closing. Compl., ¶¶ 2, 7.

## 2.    Procedural History

Alchemy paid $29,888,124.40 in cash to ANConnect and assumed more than $16 million in ANConnect obligations—which the Trustee seeks to avoid and recover as actual and constructive fraudulent transfers under the Bankruptcy Code and the Delaware Uniform

Fraudulent Transfer Act ("DUFTA").  *See* Compl., Counts I, II, and V. The Complaint also asserts

an alternative claim for unjust enrichment based on the same transfers. *See id.*, Count III.

ANConnect and Anderson Merchandisers, LLC (collectively, the "Anderson Defendants")

moved to dismiss the claims against them pursuant to FED. R. CIV. P. 12(b)(6) (applicable here

pursuant to FED. R. BANKR. PROC. 7012). On September 16, 2019, this Court issued its

Memorandum Opinion denying in part and granting in part the Anderson Defendants' motion to

dismiss, relevant portions of which are summarized below. *See* Memorandum Opinion Re:

Defendants ANConnect, LLC and Anderson Merchandisers, LLC, Adv. D.I. 84 (the "Anderson

Op.").

> ### a.   The Court Denies Dismissal of the Trustee's Avoidance Claims Relating to the ANConnect Transaction

This Court denied the Anderson Defendants' motion to dismiss the Trustee's avoidance

claims relating to Alchemy's payment of $29,888,124,40 and assumption of obligations in excess

of $16 million pursuant to the APA. *See* Anderson Op., pp. 16-18, 21-22, 31-32.  Holding that the

Trustee sufficiently alleged the absence of reasonably equivalent value, this Court opined:

> The Complaint alleges that Alchemy's insiders ignored information about ANConnect while negotiating the deal, which resulted in a "vastly overinflated" Anderson Purchase price and the assumption of excessive liabilities. Compl. ¶¶ 69-72. The information Alchemy allegedly failed to consider during negotiations includes: the sharp decline in ANConnect's physical media sales, as well as the rapid deterioration of the entire physical media industry; ANConnect's solvency following the closing of the deal; and the termination of ANConnect's relationship with a significant supplier, which allegedly should have reduced the Anderson Purchase Price by $5.6 million. Compl. ¶¶ 69-72. . . . After considering the alleged flaws in the negotiation process and the immediate financial distress caused by the ANConnect Transaction,[] the Court finds that the Trustee sufficiently pleaded lack of reasonably equivalent value.

*Id.*, pp. 17-18. These allegations set forth a badge of fraud (one of three which the Court held were adequately pleaded) supporting the Trustee's actual fraudulent transfer claims, and likewise support the Trustee's constructive fraudulent transfer claims. *Id.*, pp. 18, 22, 32.

This Court further opined that reasonably equivalent value is determined by a "totality of circumstances" test, which implicates factors such as market value, good faith, and whether the transaction was at arm's length and "requires a factual determination that cannot be made on a motion to dismiss." *Id.*, p. 21-22. Specifically rejecting the Anderson Defendants' argument that "the Trustee failed to allege the value it received in the ANConnect Transaction," this Court held that "such a determination is not necessary at this stage in the proceeding." *Id.*, p. 22.

With respect to actual fraudulent intent, this Court held that, "the Trustee adequately pleaded the circumstances surrounding the ANConnect Transaction to allow the Court to plausibly infer actual fraudulent transfers," given badges of fraud concerning lack of reasonably equivalent value, insolvency, and the transferring away of Alchemy's remaining liquidity in connection with the transaction. *Id.*, pp. 16-18.

Similarly, this Court held that the Trustee adequately pleaded his unjust enrichment claim, including, *inter alia*, sufficient facts showing an "enrichment" ("as the Defendants received payment and/or a reduction of liabilities" in connection with the transfers) and an "impoverishment" ("as [the Debtors] could not fund operations or pay vendors" after the transfers). *Id.*, p. 26. Finally, the Court held that the Trustee has properly asserted unjust enrichment as an alternative theory of liability. *Id.*, pp. 25-26.

### b.    ANConnect's Motion For Reconsideration Is Denied

On September 27, 2019, ANConnect filed a motion for reconsideration of the Court's decision regarding reasonably equivalent value. *See* Adv. D.I. 85. This Court denied the motion

on November 1, 2019—holding that its original decision "considered the 'totality of the circumstances' and concluded after a thorough and careful review and analysis" that the Trustee sufficiently pleaded the issue of reasonably equivalent value. Adv. D.I. 98, at pp. 2-3.

### B.    ANConnect Stonewalls The Trustee's Attempts to Start Discovery

On January 16, 2020, in the wake of the Court's denial of ANConnect's motion for reconsideration, the Trustee's counsel emailed Defendants' counsel a proposed scheduling order in an effort to commence discovery.  Coren Decl., Ex. 13.  On February 25, 2020, after discussions among counsel regarding the proposed schedule and the Debtors' electronic records in the Trustee's possession, counsel for the Anderson Defendants sent the Trustee a markup of the scheduling order which removed all definitive dates from the Trustee's proposal and put disproportionate burdens on the Trustee. Coren Decl., Ex. 17.

By email dated February 28, 2020, the Trustee, through counsel, reiterated his desire to begin discovery "as soon as possible." *Id.*, Ex. 18.  On April 3, 2020, after further talks in which defendants' stonewalled the Trustee's attempts to commence discovery, counsel for the Trustee reiterated that "there is no reason to delay the start of discovery," and served his initial disclosures on Defendants. *Id.*, Ex. 19.  Counsel for ANConnect responded on April 7, 2020, stating that ANConnect did not agree that "the parties have held/concluded their scheduling conference or [that] discovery between the parties should commence at this time" *Id.*, Ex. 20; *see also id.* at Ex. 21 (4/29/20 email from ANConnect's counsel stating that "we fundamentally disagree with . . . your view that discovery can commence now").

On May 18, 2020, counsel for the Trustee wrote the Court on behalf of all parties requesting briefing and a hearing on the issue that the Defendants were using to delay discovery—*i.e.*, the Trustee's intention to produce Debtor records in the format in which he received them—and, on

May 19, 2020, the Court held a telephone hearing at which it instructed the parties to explore cost sharing with respect to the Debtors' electronic data. *See* ECF No. 124.  Since the May 19, 2020 hearing, the Trustee has worked diligently and in good faith to provide Defendants with the information they have requested to facilitate resolution of the so-called "threshold" discovery issues, spending substantial time to collect and produce data in response to Defendants' specific "pre-discovery" requests. Despite the Trustee's efforts, his substantial document productions to date and his request that Defendants reciprocate by commencing document production, Defendants have yet to produce a single document to the Trustee. Coren Decl., ¶ 6.

## III.    <u>LEGAL STANDARDS</u>

Pursuant to Federal Rule of Civil Procedure 56, applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056, a party "may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought," and the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056. An issue is considered "genuine" if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and a factual dispute is considered "material" if it "might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *In re Maxus Energy Corp.*, 615 B.R. 62, 69 (Bankr. D. Del. 2020). "[W]here the record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* (internal quotation marks omitted).

"[B]y its very nature, the summary judgment process presupposes the existence of an adequate record." *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007); *see also* FED. R. CIV. P. 56(c) (instructing that summary judgment be decided on the basis of "materials in the record"); *Anderson*, 477 U.S. at 257 (explaining that the non-moving party's burden at summary judgment rests on the assumption that it "had a full opportunity to conduct discovery"). "[F]ederal litigation revolves around the generous and wide-ranging discovery provided by the Federal Rules of Civil Procedure. . . . Rather than endless pleadings served back and forth *ad infinitum* until the last issue of fact was tracked down and identified through the medium of declarations, bills, pleas, replications, rejoinders, surrejoinders, etc. that had characterized common law litigation, modern civil procedure instead relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Doe*, 480 F.3d at 256-57 (citations and internal quotation marks omitted).

Accordingly, "a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" *Id.* at 257 (quoted reference omitted). Indeed, "[w]hen a motion for summary judgment is filed, '[i]f discovery is incomplete in any way material to [the] motion, [the court] is justified in not granting the motion.'" *In re Deb Stores Holding LLC*, No. 14-12676 (KG), 2018 WL 1571518, at *2 (Bankr. D. Del. Mar. 28, 2018) (quoting *Doe*, 480 F.3d at 257). In this regard, Rule 56 provides, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may[, *inter alia*,] defer considering the motion or deny it." FED. R. CIV. P. 56(d).[4] Such requests, which may

---

[4]    The principles set forth in Rule 56(d) were, prior to the 2010 amendments to the Federal Rules of Civil Procedure, contained in subsection (f) of Rule 56. The Committee Notes regarding the change state that "Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)." FED. R. CIV. P. 56, Advisory Committee Notes, Subdivision (d) (2010);

be made in the form of a motion or as part of a party's response to a summary judgment motion,[5]

"are granted 'as a matter of course.'" *Alvarez v. BI Inc.*, No. CV 16-2705, 2018 WL 2288286, at

*10 (E.D. Pa. May 17, 2018) (quoting *St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309, 1314 (3d

Cir. 1994)); *see also In re Stone & Webster, Inc.*, Adv. No. 08-51839, 2009 WL 426118, at *5

(Bankr. D. Del. Feb. 18, 2009) ("[G]enerally courts are careful not to prematurely consider motions

for summary judgment, especially when little or no discovery has been conducted."). Unless the

information sought is immaterial, courts are "rarely justified" in granting summary judgment when

discovery is incomplete. *Shelton*, 775 F.3d at 568.

To properly invoke Rule 56(d), a party must submit an affidavit or declaration setting forth

"what particular information is sought; how, if disclosed, it would preclude summary judgment;

and why it has not been previously obtained." *Id.* "This three-part test is meant to offer guidance

to the court in exercising its discretion under Rule 56(d) and is not exhaustive." *Deb Stores*, 2018

WL 1571518, at *3 (citation omitted).

## IV.    ARGUMENT

### A.    ANConnect's Motion Should Be Denied Pursuant to Rule 56(d) Because Summary Judgment As To Fact-Sensitive Issues Is Inappropriate Before The Parties Have The Opportunity For Full And Fair Discovery

The first two prongs of the Rule 56(d) test—the particular information sought by the

Trustee and how such information would preclude summary judgment—must be viewed in light

of ANConnect's argument, *i.e.*, that summary judgment should be granted as to the Trustee's

fraudulent transfer and unjust enrichment claims because "the ANConnect Acquisition was a fully

diligenced, arm's length transaction whereby Debtors received reasonably equivalent value" and

---

*see also Shelton v. Bledsoe*, 775 F.3d 554,  567 (3d Cir. 2015) (noting that "Rule 56(f) . . . became Rule 56(d)").

[5]    *See Shelton*, 775 F.3d at 566-68.

because there is an "absence of actual fraud."[6] Accordingly, the Trustee first sets forth the legal standards implicated by ANConnect's summary judgment arguments, followed by discussion of the three-part Rule 56(d) test—the requirements of which are easily satisfied here.

### 1. Legal Standards Relevant To ANConnect's Motion For Summary Judgment

Issues of reasonably equivalent value and actual fraudulent intent require a fact-sensitive inquiry into the circumstances surrounding the challenged transfer, which emphasizes the importance of discovery and weighs strongly in favor of denying the premature summary judgment motion.

To determine whether a debtor received "reasonably equivalent value," one of the elements of the Trustee's constructive fraudulent transfer claims (and a badge of fraud for the Trustee's actual fraudulent transfer claims), courts look to the totality of the circumstances, including: "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (citation omitted). Whether a debtor received reasonably equivalent value for an allegedly fraudulent transfer is an inherently fact-specific inquiry and thus one which is rarely resolved before discovery. *See, e.g.*, *In re Washington Mut., Inc.*, No. 08-12229 (MFW), 2013 WL 3757330, at *5 (Bankr. D. Del. July 16, 2013) (describing reasonably equivalent value as "an issue of fact that can only be properly developed with discovery and at trial"); *In re Bentivegna*, 597 B.R. 261, 266 (Bankr. E.D. Pa. 2019) ("The Third Circuit has explained that the determination of whether reasonably equivalent value was exchanged for a transfer is a factual one."); *In re Charys Holding Co., Inc.*, 443 B.R.

---

[6]   *See* ANConnect Br., at pp. 15, 22.

628, 638 (Bankr. D. Del. 2010) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

Under the Bankruptcy Code and Delaware law, transfers are avoidable as actual fraudulent transfers if they were made "with actual intent to hinder, delay, or defraud" any of the debtor's creditors. 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1). Because parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, courts rely on "badges of fraud" as circumstantial proof of actual fraudulent intent. *In re Charys Holding Co., Inc.*, 2010 WL 2774852, at *3, *5 (Bankr. D. Del. July 14, 2010). Badges of fraud include: "(i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits, control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 565 (Bankr. D. Del. 2012); *see also In re OODC, LLC*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (badges of fraud include transferor's knowledge of creditors' claims and its inability to pay them); 6 Del. C. § 1304(b) (setting forth non-exhaustive list of badges for consideration under Delaware UFTA).

While the presence or absence of any single badge of fraud is "not conclusive," "[t]he presence of a single … badge of fraud[] may cast suspicion on the transferor's intent," and "the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (citations omitted). "A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for example, if the "natural consequence" of the transfer is that the debtor's creditors were hindered, delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bank. D. Del. 2011). Ultimately, the determination of whether a transfer was made with fraudulent intent is

a question of fact "rarely susceptible to resolution at the summary judgment stage." *In re Polichuk*, 506 B.R. 405, 418 (Bankr. E.D. Pa. 2014); *see also In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 35 n. 18 (Bankr. S.D.N.Y. 2007) ("Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." (quoted reference omitted)).

The Trustee's unjust enrichment claim likewise implicates factual issues. *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (setting forth the elements of unjust enrichment under Delaware law, the first two of which are "an enrichment" and "an impoverishment"). Unjust enrichment also requires "the absence of a remedy provided by law." *Id.* As the Court recognized in the Anderson Opinion, determination of this element depends in part on the outcome of the Trustee's fraudulent transfer claims. *See* Anderson Op., p. 26 (denying motion to dismiss unjust enrichment because, *inter alia*, it is plausible the Trustee would be left without an adequate remedy at law if his fraudulent transfer claims fail) (citing *In re FAH Liquidating Corp.*, 572 B.R. 117, 131 (Bankr. D. Del. 2017)).

ANConnect's Motion seeking summary judgment regarding the fact-intensive inquiries set forth above cannot be properly evaluated (much less granted) without affording the Trustee an opportunity to gather evidence essential to his opposition. *See Anderson*, 477 U.S. at 250 n. 5 ("[S]ummary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."). As set forth below, ANConnect's Motion should be denied pursuant to Rule 56(d) and the Trustee should be afforded the discovery to which he is entitled.

### 2.    The Trustee Satisfies the Three-Part Rule 56(d) Test

Invoking Rule 56(d), a party must submit an affidavit or declaration setting forth "what particular information is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained." *Shelton*, 775 F.3d at 568. The Trustee has satisfied these requirements and his Rule 56(d) request should be granted.

### a.    The Trustee Plans To Conduct Discovery Calculated To Further Support His Allegations Concerning The ANConnect Transaction, Which Would Preclude Summary Judgment

ANConnect filed its motion for partial summary judgment before the Trustee had an opportunity to conduct discovery in this matter—cleverly frustrating the Trustee's discovery efforts as a tactical advantage in connection with its premature motion.  *See supra* Section II.B; Coren Decl., ¶¶ 4-6. Discovery is needed for the Trustee to adequately oppose ANConnect's Motion because there are material issues of fact concerning the value Alchemy received as part of the ANConnect Transaction and the circumstances surrounding the deal, which if obtained through discovery may alter the Court's determination of ANConnect's Motion.

Specifically, as set forth in paragraph 3 of the Coren Declaration, the Trustee plans to seek discovery from ANConnect, other Defendants, and third parties which is expected to support the existence of disputed issues of material fact and thereby preclude summary judgment on the issues raised in ANConnect's Motion, as set forth in the Coren Declaration and summarized in the following chart:

| Target of Discovery | Information to Be Sought In Discovery | Relevance to ANConnect's Summary Judgment Argument |
| --- | --- | --- |
| ANConnect | Information concerning the negotiation and consummation of the ANConnect Transaction, including internal communications regarding the terms of the APA, negotiation and calculation of the purchase price, the scope of assumed | Information essential to the Trustee's allegations concerning valuation of ANConnect's business; the existence of good faith; the |

| | | |
|---|---|---|
| | liabilities (including those owed to Group 1200 Media), and post-closing adjustments under the APA; Information concerning due diligence performed in connection with the ANConnect Transaction, including information provided by ANConnect and internal communications; Information (including internal records and communications) regarding ANConnect's assets, liabilities, liquidity, cash flow, operations, and valuation; Internal ANConnect communications regarding Alchemy's financial condition; Information set forth in the Maier Declaration; Averments contained in ANConnect's Answer to the Complaint. | extent of due diligence performed; the extent of ANConnect's "collection issues" and other financial issues; the basis for Alchemy's projections and other reports prepared by Alchemy's advisors. |
| Virgo Defendants | Information concerning the negotiation and consummation of the ANConnect Transaction, including internal communications regarding the terms of the APA, negotiation and calculation of the purchase price, the scope of assumed liabilities (including those owed to Group 1200 Media), and post-closing adjustments under the APA; Information concerning due diligence performed in connection with the ANConnect Transaction, including Board presentations, communications with Alchemy's advisors, and internal communications regarding ANConnect's assets, liabilities, liquidity, cash flow, operations, and valuation; Information concerning Debtors' financial condition, including internal communications regarding solvency, cash flow, and the impact of the ANConnect Transaction on the Debtors' financial condition; Information concerning the Debtors' operations, management, financial condition, transactions, vendor relations, or bankruptcy filing; Information relating to *Nu Image, Inc. v. Calrissian LP, et al.*, JAMS Reference No. 1210033079. | Information essential to the Trustee's allegations concerning the extent of due diligence performed; Alchemy's insolvency, liquidity, and other financial issues before and after the transaction; the cause of the Debtors' financial collapse

Given Virgo's role in and control over the negotiation and acquisition process, and post-acquisition dealings with creditors, Virgo is a vital source of information essential to the Trustee's ability to oppose ANConnect's Motion. |
| BDO USA, LLP | Information concerning consulting services and/or due diligence performed by BDO in connection with the ANConnect Transaction, including internal records and communications regarding preparation of the Project Red Cloud Due Diligence Report, ANConnect's valuation, operations, and financials (including assets, liabilities, liquidity, and cash flow), Alchemy's | Information essential to the Trustee's allegations concerning the extent of due diligence performed; the basis for statements and conclusions contained in the Project Red Cloud Due Diligence Report and the |

| | financials, the terms of the APA, negotiation of the purchase price, and the scope of assumed liabilities (including those owed to Group 1200 Media); Information concerning auditing services performed by BDO for Alchemy, including internal records and communications regarding the BDO Audit Report. | BDO Audit Report, including the information relied upon in preparing the Reports. |
|---|---|---|
| SunTrust Robinson Humphrey and SunTrust Bank | Information concerning advisory services performed by SunTrust relating to the ANConnect Transaction; Information concerning the financing of the ANConnect Transaction; Information concerning negotiation of the terms of the APA, the purchase price, the scope of assumed liabilities (including those owed to Group 1200 Media); Information concerning due diligence performed in connection with the ANConnect Transaction, including regarding ANConnect's assets, liabilities, liquidity, cash flow, operations, and valuation; Information concerning analyses of the ANConnect Transaction, the valuation of ANConnect, or Alchemy's financial condition performed by SunTrust. | Information essential to the Trustee's allegations concerning the extent of due diligence performed. |
| Stephen Lyons | Information concerning the ANConnect Transaction and its effect on Alchemy, and statements made by Lyons in his Complaint against Alchemy; Information concerning the valuation and financial condition of Anderson Digital. | Information essential to the Trustee's allegations concerning the effect of the ANConnect Transaction on Alchemy. |
| Freyr Thor | Information concerning the ANConnect Transaction and its effect on Alchemy; Information concerning the valuation and financial condition of Anderson Digital. | Information essential to the Trustee's allegations concerning the effect of the ANConnect Transaction on Alchemy. |
| Expert(s) | Valuation of ANConnect's business. | Information essential to the Trustee's allegations concerning valuation of ANConnect's business, and whether reasonably equivalent value was exchanged. |

In addition to serving discovery requests concerning the topics identified above, the Trustee

intends to conduct depositions of: (i) representatives of ANConnect, including Jay Maier, Charlie

Anderson, Bill Lardie, and others identified in the Anderson Defendants' initial disclosures[7]; (ii) representatives of Virgo, including Mark Perez and Jesse Watson; (iii) Bill Lee; (iv) Stephen Lyons; (v) representative(s) of BDO; (vi) representative(s) of SunTrust; (vii) additional individuals with relevant information to be identified during the course of discovery; and (viii) expert witness(es), regarding the topics identified above—which the Trustee anticipates will reveal information that creates a disputed issue of material fact and thereby preclude summary judgment regarding reasonably equivalent value (or lack thereof) and actual fraud in connection with the ANConnect Transaction. *See* Coren Decl., ¶ 7.

Indeed, the need for discovery and depositions as is highlighted by the Maier Declaration and other materials submitted by ANConnect. The Trustee must fairly be afforded an opportunity to depose Maier on the basis for his assertions—particularly those which purport to explain the meaning of various documents prepared by other parties and which attest to various actions purportedly taken by Alchemy or its advisors (with whom Maier was not and is not affiliated). *See, e.g.*, Maier Decl., ¶¶ 15-16, 24, 26, 34; *see also id.*, ¶ 11 (identifying Bill Lee and Mark Perez, for Alchemy, and Charlie Anderson, for ANConnect, as the individuals who negotiated the ANConnect Acquisition). ANConnect relies on the supposed "arm's-length" nature of the negotiations and on services purportedly provided to Alchemy by SunTrust and BDO as the primary bases for its Motion, yet seeks to deny the Trustee an opportunity to depose or obtain

---

[7]     *See* Coren Decl., Ex. 14, Anderson Defendants' Federal Rule 26(a)(1) Disclosures, pp. 2-3, 5.   The Anderson Defendants' initial disclosures list numerous individuals and entities (including ANConnect, Alchemy, Virgo, BDO, SunTrust, and other third parties) likely to have discoverable information concerning, *inter alia*, "[t]he value of ANConnect's assets and operations." *Id.*, pp. 5-7.  They further confirm that the Anderson Defendants are in possession of "documents, correspondence and records" concerning, *inter alia*, "the assets acquired by the Debtors and other aspects of the transactions" and "the Debtor's purchase of assets." *Id.*, p. 8. None of these items has been produced to the Trustee.

relevant discovery from the individuals who actually negotiated the APA or the professionals who prepared the reports and presentations upon which ANConnect relies. *See Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 845 (3d Cir. 1992) (where none of people who participated in decisions at issue had been deposed yet, "the incomplete state of discovery alone should have precluded summary judgment on the merits").

Moreover, valuation of the assets purchased from ANConnect requires analysis of ANConnect's assets, liabilities, liquidity, cash flow, operations, and valuation prior to and at the time of the transaction, which clearly implicates information primarily within ANConnect's possession.[8] The parties' due diligence process is squarely at issue, and the Trustee has alleged that the process was deficient and failed to take all relevant information into account. *See* Compl., ¶¶ 69-72; *see also* Anderson Op., p. 18. The Trustee is thus entitled to discovery concerning these matters from all parties involved in the due diligence process—particularly given the Trustee's lack of personal involvement in the underlying transactions, as courts regularly recognize the importance of discovery to a Chapter 7 trustee's ability to gather evidentiary support for claims relating to pre-petition fraudulent transfers. *See, e.g.*, Anderson Op., p. 13 (citing *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009)). Furthermore, issues concerning business valuation are frequently the subject of expert opinion, which itself requires full and fair discovery.

Discovery concerning the issues identified above (and in the Coren Declaration) is essential to the Trustee's ability to oppose ANConnect's Motion, satisfying the first two prongs of the Rule 56(d) test. *See* Coren Decl., ¶¶ 3, 7-9.

---

[8]     Indeed, according to the Maier Declaration, during due diligence ANConnect "produced significant financial information" directly to BDO.  *See* Maier Decl., ¶ 22.

### b. The Trustee's Efforts to Conduct Discovery Have Been Thwarted

The third prong of the Rule 56(d) test requires the non-moving party to demonstrate why the discovery sought has not been previously obtained. *Shelton*, 775 F.3d at 568. The answer is simple. Ever since the pleadings closed and initial motion practice concluded, the Trustee has sought to commence discovery. The Defendants are in no hurry to do so and have yet to produce a single document. Following the Court's denial of reconsideration concerning reasonably equivalent value (*see supra* Section II.A.2.b), the Trustee sent a proposed scheduling order to the Defendants to move the case forward and commence discovery. However, these efforts have been rebuffed by the Defendants, and the parties have instead spent months engaged in a threshold dispute concerning the format of electronically-stored information in the Trustee's possession. *See supra* Section II.B; Coren Decl., ¶¶ 4-6. While the parties have exchanged initial disclosures and the Trustee has produced electronic records to the Defendants, the Defendants have resisted efforts to commence discovery and have not themselves produced any documents. A scheduling order has not been entered, and the parties have not yet exchanged formal discovery requests or taken any depositions.

ANConnect's suggestion that the Court accept its spin of the facts, without affording the Trustee an opportunity for discovery, deserves short shrift. Rule 56(d) discovery requests are granted as a matter of course when, as here, there has been no opportunity to obtain discovery. *See, e.g.*, *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 465 (D.N.J. 2016) (denying motion for summary judgment and granting Rule 56(d) request where no discovery had taken place yet); *In re Avandia Marketing, Sales and Prods. Liabl. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) (summary judgment should not have been granted where Rule 56(d) declaration demonstrated plaintiffs had never received discovery regarding their claims); *see also In re DBSI, Inc.*, Adv. No.

21

10-55963, 2011 WL 2175940, at *3 (Bankr. D. Del. May 27, 2011) ("A Rule 56(d) motion is favored when discovery is incomplete and the movant possesses pertinent facts."). The Court has already held that the Trustee's Complaint sufficiently states avoidance and unjust enrichment claims concerning the ANConnect Transaction. *See supra* Section II.A.2.a. In doing so, the Court stated that determinations concerning the value Alchemy received in the ANConnect Transaction were "not necessary at this stage of the proceeding." Anderson Op., p. 22. The stage of the proceeding has not meaningfully changed, as formal discovery has yet to commence.[9]

Accordingly, ANConnect's Motion should be denied pursuant to Rule 56(d), to afford the parties a full and fair opportunity to conduct discovery.

**B.      Alternatively, Even Based On The Current Record, ANConnect's Motion Should Be Denied Because There Are Disputed Issues of Material Fact Concerning The Trustee's Avoidance and Unjust Enrichment Claims**

**1.      There Are Genuine Issues of Material Fact Concerning Reasonably Equivalent Value**

---

[9] Notably, the cases cited by ANConnect—in which courts find a plaintiff failed to prove lack of reasonably equivalent value or other valuation issues—are overwhelmingly cases decided following the close of discovery, and in many instances following trial. *See, e.g.*, *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 541 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) (summary judgment motions "filed at the close of discovery"); *In re GGI Props., LLC*, 588 B.R. 401, 404 (Bankr. D.N.J. 2018) (post-trial opinion); *In re Iridium Operating LLC*, 373 B.R. 283, 290 (Bankr. S.D.N.Y. 2007) (opinion following a fifty-day trial, which "[f]ollow[ed] years of fact and expert discovery"); *In re R.M.L., Inc., Inc.*, 187 B.R. 455, 458 (Bankr. M.D. Pa. 1995), *subsequently aff'd*, 92 F.3d 139 (3d Cir. 1996) (post-trial).

ANConnect mistakenly relies on *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) to advance the argument based on "an absence of evidence" supporting the Trustee's case. *See* ANConnect Br., pp. 13-14. But *Celotex*, while authorizing summary judgment based on an absence of evidence in appropriate circumstances, does *not* reject the importance of discovery. On the contrary, the Supreme Court emphasized that the parties in that case "had conducted discovery" and specifically acknowledged the danger of a nonmovant being "'railroaded' by a premature motion for summary judgment" filed prior to "full discovery" – a danger which Rule 56(d) (then Rule 56(f)) is intended to prevent. *Celotex*, 477 U.S. at 326.

The limited record evidence available to the Trustee at the start of the case is itself sufficient to defeat ANConnect's Motion. ANConnect contends that the Trustee cannot prove his case. Yet, this Court has twice held that the Trustee has adequately pleaded the absence of reasonably equivalent value along with fraudulent intent—and the limited record evidence in the Trustee's possession is sufficient to create a disputed issue of material fact on the point. *See, e.g.,* ANConnect Br. at 16 (stating, without citing any evidence, that "the ANConnect Acquisition represented a fair market sale by a willing seller to a willing buyer at arms' length in an open market"). This argument was explicitly rejected by this Court at the motion to dismiss stage:

> Defendant ANConnect counters the Trustee's interpretation of the facts in the Complaint, arguing that the Complaint actually establishes that the ANConnect Transaction was the product of arm's length negotiations between sophisticated parties and an independent third-party underwriter (SunTrust); Defendant also opines that a court should not reevaluate the reasonableness of such a transaction with the benefit of hindsight. After considering the alleged flaws in the negotiation process and the immediate financial distress caused by the ANConnect Transaction, the Court finds that the Trustee sufficiently pleaded lack of reasonably equivalent value.

Anderson Op., p. 18; *see also* Adv. D.I. 98, at pp. 2-3 (denying reconsideration). In this regard, the Court referenced the Trustee's allegations regarding ANConnect's financial problems, declining industry revenues, the termination of ANConnect's relationship with Group 1200 Media (which should have reduced the purchase price by $5.6 million), and statements from Lyons regarding the "operational and financial disaster" caused by the ANConnect Transaction. *See* Anderson Op., pp. 17-18, 22 (citing Compl., ¶¶ 69-72, 79).

The allegations deemed adequate by the Court as a matter of law are supported by documentary evidence. Indeed, in support of its conclusion that the lack of reasonably equivalent value was sufficiently pleaded, the Court cited a document the contents of which were explicitly pleaded by the Trustee and which establishes that, in the words of Anderson Digital co-founder

Stephen Lyons, "Alchemy's acquisition of Anderson Digital's parent company[, i.e., ANConnect,] ha[d] been an operational and financial disaster." *See* Anderson Op., p. 18 n. 11. The document quoted by the Court is a declaration filed by Lyons in a suit he filed against Alchemy in February 2016. *See* Coren Decl., Ex. 11. Lyons explained that the ANConnect Transaction left Alchemy "experiencing serious trouble meeting its financial obligations as they come due, [including obligations] to vendors and suppliers which are critical to the company's continued existence." *Id.*, p. 5; *see also* Coren Decl., Ex. 10 (July 10, 2015 emails attaching list of "Alchemy priorities", showing Bill Lee and Mark Perez were worried about liquidity and cash management just one day after Closing, with Lee noting Alchemy's "negative $5M working capital").

With respect to information known to but ignored by Alchemy prior to consummation of the transaction, on February 25, 2015, Jim Jenkins (Alchemy VP of Business Development and Merger and Acquisitions) sent Rex Bowring (Alchemy Controller) a spreadsheet regarding ANConnect's account receivables, commenting that "It's clear that they have some collection issues that we will have BDO look at very closely (Ingram, Best Buy and Costco are all very concerning)." Coren Decl., Ex. 4. This same email chain also refers to "past due amounts" owed by Anderson to Alchemy. *Id.* In a May 7, 2015 email, Akin Gump, SunTrust's counsel, raised concerns that "there are no provisions addressing ANConnect's solvency following the closing. . . . To add extra protection, we could take this one step further and request a solvency opinion at closing," yet a solvency opinion was not obtained. *Id.*, Ex. 6.[10] Presentations to Alchemy's lender

---

[10]     Maier purports to "explain" the meaning and significance of statements in the May 7, 2015 email from Akin Gump (who was counsel to SunTrust, Alchemy's lender, not "OurAlchemy's counsel," as Maier states) recommending a solvency opinion, contending that it does not raise concerns relevant to Alchemy.  However, the email refers to concerns regarding potential "unsatisfied [ANConnect] creditor[s] assert[ing] a claim of fraudulent conveyance against the buyer [i.e., Alchemy]" and the risk of ANConnect being unable to pay indemnification obligations to Alchemy.  *See* Coren Decl., Ex. 6.  Given that no solvency opinion was obtained, the Trustee

also reference overall industry decline for ANConnect's physical business (based largely on DVD sales). *See id.*, Ex. 5, p. 12 (Alchemy Lender Update and Amendment Presentation, acknowledging physical side of home entertainment industry was in rapid decline, with total industry revenues declining from $20.6 billion in 2006 to only $9.6 billion in 2015, with declines expected to accelerate rapidly through 2021); *id.*, Ex. 12, p. 38 (Alchemy Confidential Information Memorandum, noting "10% annual market decline on physical product consistent with research estimates").

The Trustee's allegations concerning lack of reasonably equivalent value are further supported by the fact that the purchase price failed to account for the impending termination of the Group 1200 Media relationship—of which the parties knew prior to closing and which should have reduced the purchase price by $5.6 million. *See* Compl., ¶ 72. Group 1200 Media was one of ANConnect's largest suppliers, but the relationship was to terminate in August 2015, shortly after Closing. *See* Coren Decl., Ex. 7, p. 3 (Alchemy Red Cloud/Arc Update for SunTrust, dated June 23, 2015, noting that Group 1200 relationship was "terminating on August 31, 2015"). The annual EBITD impact of losing this relationship was approximately negative $1.4 million (*see id.*), which, applying the method set forth in the Term Sheet (*id.*, Ex. 1) for calculating the purchase price, should have equated to a $5.6 million reduction (*i.e.*, $1.4 million multiplied by 4) of the purchase price in the ANConnect Transaction. However, the purchase price was not renegotiated or reduced to account for this loss. *See id.*, Ex. 8 (June 23, 2015 email from SunTrust seeking an explanation "why management/virgo was ok without a purchase price adjustment despite Group 1200

_____

views this email as relevant to Alchemy's consideration (or lack thereof) of ANConnect's financial condition in connection with the transaction.  In any event, ANConnect's disagreement as to the significance of evidence cited by the Trustee merely highlights the need for discovery and the existence of material disputes surrounding the due diligence process.

leaving").[11] To make matters worse, Alchemy also assumed more than $3 million in obligations due from ANConnect to Group 1200 Media, even though the relationship was about to terminate. *See id.*, Ex. 9 (February 12, 2016 email chain between Mark Perez, Kelly Summers, and others regarding "$3mm+" "legacy liability" owed to Group 1200, and the need for a payment plan). This is a concrete example of Alchemy's overpayment in connection with the ANConnect Transaction, wherein Alchemy overpaid by at least $5.6 million and assumed more than $3 million in exchange for no value, given the lost relationship with Group 1200 Media.

ANConnect's arguments concerning supposed "hindsight" analysis should be rejected.[12] The Trustee's allegations concerning lack of reasonably equivalent value are not based simply on the fact that Alchemy later failed; rather, as set forth herein, they are based on documents showing that Alchemy failed to account for red flags known to it prior to closing and that Alchemy's already-existing liquidity problems only worsened following the transaction. *See also* Anderson Op., p. 18 (rejecting ANConnect's argument that the Trustee's allegations were based on hindsight).

The documents cited by ANConnect do not conclusively demonstrate the existence of reasonably equivalent value—which courts evaluate based on the totality of the circumstances. *Fruehauf Trailer*, 444 F.3d at 213. Here, the circumstances surrounding the ANConnect Transaction demonstrate that there are genuine issues of material fact concerning the existence of reasonably equivalent value, notwithstanding that the parties went through the motions of due

---

[11]     ANConnect asks the Court to assume that, because Alchemy received a loan from SunTrust, reasonably equivalent value must have been exchanged in the transaction. *See* ANConnect Br., p. 20.  There is no support (or evidence offered by ANConnect) for this inferential leap.  Moreover, as set forth above, SunTrust's analysis of the transaction is among the topics on which the Trustee intends to conduct discovery.

[12]     *See* ANConnect Br., pp. 20-21.

diligence. For example, the April 2015 BDO Report emphasizes the importance of the Group 1200 Media relationship for ANConnect's business, noting that "[t]he increase in adjusted revenue from FY13 to FY14 of 29% . . . was largely driven by increased sales of products sourced from Group 1200 Media and WEA Corp., which have higher average selling prices" and that "[t]he increase in vendor mix of $2,317 is primarily attributable to increased sales of products from Group 1200 Media and Team Marketing." Maier Decl., Ex. 2, BDO Report, p. 13; *see also id.*, p. 26. Yet, by the time of Closing in July 2015, the parties knew that the Group 1200 Media relationship—which had been critical to ANConnect's recent increases in adjusted revenue and vendor mix—would be terminated the following month, *see* Coren Decl., Ex. 7, p. 3 (Alchemy Red Cloud/Arc Update for SunTrust, dated June 23, 2015), and the purchase price does not reflect the $5.6 million reduction that should have resulted. This gives rise to a genuine issue of material fact concerning "whether [Alchemy] got roughly the value it gave," *Fruehauf Trailer*, 444 F.3d at 213, which must be fleshed out "through the discovery process." *Charys Holding*, 443 B.R. at 638.

Finally, ANConnect's cursory argument concerning the Trustee's unjust enrichment claim should be rejected for the same reasons as its arguments concerning reasonably equivalent value. There are genuine issues of material fact concerning whether Alchemy received reasonably equivalent value in connection with the ANConnect Transaction and these arguments apply to the question of whether the elements of unjust enrichment have been met—in particular whether there has been "an enrichment," "an impoverishment," and "the absence of justification." *Nemec*, 991 A.2d at 1130. Additionally, as the Court has recognized, the viability of the Trustee's alternative unjust enrichment claim depends on the outcome of his fraudulent transfer claims. *See* Anderson Op., p. 26 (denying motion to dismiss unjust enrichment because, *inter alia*, it is plausible the Trustee would be left without an adequate remedy at law if his fraudulent transfer claims fail).

27

**2.    There Are Genuine Issues of Material Fact Concerning Actual Fraudulent Intent**

ANConnect argues—in a conclusory fashion, without citation to any evidence, and contrary to the Court's prior holding—that "the Trustee has not alleged any facts or produced any documents that would support" the existence of actual intent to hinder, delay, or defraud creditors. ANConnect Br., p. 22. However, the Court already determined that the Trustee alleged sufficient facts supporting his actual fraudulent transfer claims, specifically finding that "[t]he Trustee sufficiently alleged three badges of fraud"—insolvency, the amount of the debtors' estate transferred, and consideration for the conveyance. Anderson Op., pp. 16-18. "The confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." *Id.*, p. 18 (quoting *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 461 (Bankr. D. Del. 2018)).

The Trustee's allegations concerning badges of fraud are supported by the evidence set forth herein. With respect to consideration for the conveyance, as discussed above, the evidence available to the Trustee indicates that the purchase price paid by Alchemy and the amount of liabilities assumed by Alchemy far exceeded the value received by Alchemy in connection with the transaction. *See supra* Section IV.B.1.

With respect to the amount of the debtors' estate transferred, evidence demonstrates that Alchemy transferred away what little liquidity it had, well in excess of what the Debtors could afford. *See* Coren Decl., Ex. 10 (email sent by Lee on July 10, 2015 referencing $5 million negative working capital one day after ANConnect Transaction closed); *id.*, Ex. 11 (declaration from Lyons stating that ANConnect Transaction was "operational and financial disaster" that left Alchemy "experiencing serious trouble meeting its financial obligations as they c[a]me due, [including obligations] to vendors and suppliers which [we]re critical to company's continued existence");

28

*see also PennySaver USA Publ'g*, 587 B.R. at 461 (transfers beyond what the debtor can afford speak to the badge of fraud regarding the amount of the estate transferred).

With respect to insolvency, ANConnect points to an audit report prepared by BDO for the year 2014 as supposed evidence of Alchemy's solvency at the time of the ANConnect Transaction (which closed July 2015). *See* ANConnect Br., p. 17 n. 5. However, as the document clearly indicates, it is consolidated financial statements "as of December 31, 2014," and the various statements contained within it pertain only to time periods during 2014. *See* Maier Decl., Ex. 9, p. 3.[13] While the report may be relevant to issues concerning the timing of Alchemy's insolvency or other financial difficulties (which are fact questions inappropriate for resolution on a premature motion for summary judgment), it is not conclusive—particularly given other evidence concerning Alchemy's significant liquidity issues before and after the ANConnect Transaction. *See* Coren Decl., Exs. 15, 16, 22-25 (emails between Alchemy managers and officers regarding liquidity concerns and inability to pay obligations on time, and disputes with creditors over unpaid debts); *id.*, Ex. 9 (February 12, 2016 email from Summers stating "[p]ayment plans is all we can offer" and that Alchemy "ha[d] many other payables affecting [its] current ability to produce near-term revenue"); *id.*, Ex. 12, p. 44 (April 2016 Confidential Information Memorandum showing that "legacy liabilities" assumed in connection with ANConnect Transaction accounted for nearly 50% of Alchemy's liabilities); *see also* 6 Del. C. § 1302(b) ("A debtor who is generally not paying debts as they become due is presumed to be insolvent.").[14] Further, ANConnect appears to acknowledge

---

[13]     ANConnect argues that this document relates to the ANConnect Transaction because it was "issued" in June 2015, but the report makes clear that it does not pertain to any time period beyond December 31, 2014.

[14]     For constructively fraudulent transfers, analysis concerning the debtor's financial condition is not limited strictly to insolvency, but also considers whether the debtor was (or was about to be) engaged in business or a transaction for which it had "unreasonably small capital" or if the debtor

that the Debtors were in "immediate financial distress" following the ANConnect Transaction, but simply disputes whether the transaction was the "cause" of that distress. *See* ANConnect Br., p. 9. This issue is not ripe for resolution on summary judgment, especially on a limited record prior to discovery. *See In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 857 (Bankr. D. Del. 2018) (noting fact-intensive nature of insolvency analysis).

Given evidence supporting the existence of at least three badges of fraud, ANConnect's Motion should be denied.

## IV.    <u>CONCLUSION</u>

In light of the foregoing facts and authorities, Plaintiff respectfully submits that his request for Rule 56(d) discovery should be granted and ANConnect's Motion denied.

Dated: September 25, 2020

Respectfully submitted,

*/s/ John T. Carroll, III*

_____
John T. Carroll, III, Esq. (DE Bar No. 4060)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
302-295-2028
jcarroll@cozen.com

-and-

Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Andrew J. Belli, Esq.
KAUFMAN, COREN & RESS, P.C.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
215-735-8700
scoren@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Ch. 7 Trustee*

_____
intended to (or believed it would) incur debts beyond its ability to pay as such debts matured. See 11 U.S.C. §548(a)(1)(B); 6 Del. C. § 1304(a)(2).