**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| EMIGRANT BANK; PACIFIC MERCANTILE BANK, | Index No. _____ |
| Plaintiffs, | |
| -against- | |
| VIRGO INVESTMENT GROUP LLC; VIRGO SOCIETAS PARTNERS, LLC; VIRGO SOCIETAS PARTNERSHIP III (ONSHORE), L.P.; VIRGO SOCIETAS PARTNERSHIP III (OFFSHORE), L.P.; VIRGO SERVICE COMPANY, LLC; JESSE WATSON; MARK PEREZ; AND DOES 1 THROUGH 10, INCLUSIVE, | **SUMMONS** |
| Defendants. | |

### TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

New York County is designated as the place of trial. Venue is appropriate in New York County pursuant to CPLR § 503, because Plaintiff Emigrant Bank has its principal place of business in New York County at 5 East 42nd Street, New York, New York 10017, and because the wrongful acts alleged herein occurred in New York County, New York.

Dated: New York, New York
         July 9, 2021

                    QUINN EMANUEL URQUHART &
                       SULLIVAN, LLP

              By:    _____
                     R. Corey Worcester
                     Leigha Empson
                     51 Madison Avenue, 22nd Floor
                     New York, New York 10010
                     (212) 849-7000

Gary E. Gans (*pro hac vice forthcoming*)
Sage R. Vanden Heuvel (*pro hac vice forthcoming*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Plaintiffs Emigrant Bank and Pacific Mercantile Bank*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

EMIGRANT BANK; PACIFIC MERCANTILE BANK,

Plaintiffs,

-against-

VIRGO INVESTMENT GROUP LLC; VIRGO
SOCIETAS PARTNERS, LLC; VIRGO SOCIETAS
PARTNERSHIP III (ONSHORE), L.P.; VIRGO
SOCIETAS PARTNERSHIP III (OFFSHORE), L.P.;
VIRGO SERVICE COMPANY, LLC; JESSE
WATSON; MARK PEREZ; AND DOES 1 THROUGH
10, INCLUSIVE,

Defendants.

Index No. _____

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Emigrant Bank and Pacific Mercantile Bank ("Plaintiffs"), by and through their

counsel Quinn Emanuel Urquhart & Sullivan, LLP, bring this complaint against the following

entities and individuals (collectively, "Virgo" or "Defendants"): (i) Virgo Investment Group

LLC; (ii) Virgo Societas Partners, LLC; (iii) Virgo Societas Partnership III (Onshore), L.P.; (iv)

Virgo Societas Partnership III (Offshore), L.P.; (v) Virgo Service Company, LLC; (vi) Jesse

Watson; (vii) Mark Perez; and (viii) Defendants Doe 1 through Doe 10 ("Doe Defendants").

Plaintiffs allege as follows:

**Nature of the Case**

1.      This action is based on a fraudulent scheme by Virgo to induce a group of lenders,

including Plaintiffs, to commit tens of millions of dollars to Virgo and to Virgo's film and DVD

distribution business based on false, misleading, and incomplete financial disclosures.  In 2014,

Virgo sought to acquire the predecessor of a company called Our Alchemy, Inc. ("Alchemy").

Virgo set up a shell company, Calrissian, LP ("Calrissian"), to purchase Alchemy on Virgo's

behalf and to guaranty repayment of the loan made to Alchemy.  To ensure that the deal went through, Virgo: (i) failed to disclose material facts to the lenders about Alchemy's finances and deceptive business practices; (ii) failed to disclose that the guarantor of the loan, Calrissian, had no ability to repay the loan if Alchemy were to default; and (iii) misled the lenders into believing that Virgo, as Calrissian's principal and alter ego, would guaranty the loan and provide additional funding to keep Alchemy afloat.  Then, when Alchemy filed for bankruptcy in 2016—due to Virgo's self-dealing and fraud which left Alchemy insolvent—Calrissian also filed for bankruptcy because it had no ability to guaranty Alchemy's debt.  As a result, the lenders lost tens of millions of dollars.

2.      Virgo purchased Alchemy (then named Millennium Entertainment, LLC) from Nu Image Holdings ("Nu Image") on August 18, 2014 in order to gain a foothold in the DVD distribution business.  Virgo contributed the entire purchase price of $41 million; however, Virgo promptly repaid itself a substantial portion of the purchase price with funds borrowed by Alchemy under the 2014 Credit Agreement as described below.

3.      On September 4, 2014, Virgo arranged a Revolving Credit and Term Loan Agreement (the "2014 Credit Agreement") by and among Alchemy as borrower, SunTrust Bank ("SunTrust") as both a lender and the Administrative Agent for all lenders, Pacific Mercantile Bank ("Pacific Mercantile") as a lender, and Preferred Bank as a lender (together with Pacific Mercantile and SunTrust, the "Original Lenders").  A copy of the 2014 Credit Agreement is annexed hereto as **Exhibit A**.

4.      Virgo induced the Original Lenders to enter into the 2014 Credit Agreement by misrepresenting Alchemy's true financial condition, including by concealing material information regarding Alchemy's earnings.  To keep the true state of Alchemy's finances hidden

2

from the Original Lenders, Virgo even had its due diligence accounting firm, Baker Tilly, change certain negative comments about Alchemy's earnings in its pre-purchase report on the company.

5.     Virgo also induced the Original Lenders to enter into the 2014 Credit Agreement by promising to guaranty Alchemy's obligations under the 2014 Credit Agreement by means of a Guaranty and Security Agreement, dated as of September 4, 2014 (as amended, supplemented or modified, the "Guaranty Agreement").  A copy of the Guaranty Agreement is annexed hereto as **Exhibit B**.  In the Guaranty Agreement, Virgo's agent and alter ego, Calrissian, agreed to unconditionally and irrevocably guarantee all of Alchemy's obligations under the 2014 Credit Agreement.

6.     Alchemy experienced substantial liquidity and cash flow problems in 2014 and 2015.  To conceal these problems, Virgo and Alchemy intentionally and falsely inflated Alchemy's reported revenues and projected financial performance.

7.     On May 7, 2015, Virgo arranged Alchemy's purchase of ANConnect, LLC's ("ANConnect") physical and digital distribution business for $42.7 million.  Virgo knew that ANConnect's physical distribution business was suffering from its own serious financial problems.  Virgo also knew that Alchemy's top executives had been fraudulently inflating Alchemy's financials and that Alchemy's borrowing base was inflated by millions of dollars. But Virgo intentionally concealed this material information the Original Lenders and from Emigrant Bank in order to induce them in July 2015 to increase the revolving credit and term loan facility to nearly $60 million.

8.     The 2014 Credit Agreement was amended, restated and superseded by the Amended and Restated Revolving Credit and Term Loan Agreement, dated as of July 9, 2015 (as

amended, supplemented or modified, the "Amended Credit Agreement"). A copy of the Amended Credit Agreement is annexed hereto as **Exhibit C**.

9. Emigrant Bank became a party to and a lender under the Amended Credit Agreement by means of a Term Loan Joinder Agreement, dated as of July 10, 2015 (as amended, the "Joinder Agreement"). A copy of the Joinder Agreement is annexed hereto as **Exhibit D**.

10. Thus, the lenders to the Amended Credit Agreement were SunTrust, Emigrant Bank, Pacific Mercantile, and Preferred Bank (collectively, the "Lenders"). As part of the transaction, the Guaranty Agreement was amended, with Virgo's agent and alter ego Calrissian promising to guarantee Alchemy's obligations under the Amended Credit Agreement. A copy of the Omnibus Amendment of Certain Collateral Documents dated July 9, 2015 is annexed hereto as **Exhibit E**.

11. Plaintiff Emigrant Bank committed to providing $14.875 million as part of the Amended Credit Agreement, and Plaintiff Pacific Mercantile committed to providing $15.87 million.

12. Rather than use the credit facility to shore up Alchemy's finances and strengthen its business, Virgo used the financing to pay itself despite being aware of Alchemy's serious financial problems. Virgo caused Alchemy to draw over $13 million from the newly established credit facility and pay that sum to Virgo through its affiliates. As a result of Virgo's withdrawal of the funds, Alchemy immediately experienced severe liquidity and cash flow problems.

13. Virgo knew that Alchemy's borrowing base, as certified to the Lenders in written borrowing base certificates, was overstated by millions of dollars, but withheld this information from the Lenders and instead offered false assurances in late 2015 and early 2016 regarding the state of Alchemy's finances.

4

14.     By early 2016, just six months after the Amended Credit Agreement was executed, Alchemy was in default under the Loan Documents due to, among other things, failing to prepay certain obligations, failing to maintain EBITDA of at least $17,400,000, and failing to maintain at least $2,000,000 of liquidity as required under the terms of the Amended Credit Agreement.

15.     As a result of these defaults, and as provided in the Amended Credit Agreement, SunTrust (on behalf the Lenders) notified Alchemy and Calrissian on June 15, 2016 that all obligations owed under the Amended Credit Agreement were accelerated and were due and payable immediately (the "Debt Acceleration Notice").  A copy of the Debt Acceleration Notice is annexed hereto as **Exhibit F**.

16.     Unable to pay its debts, and with over $46 million of the guaranteed loans still outstanding, on July 1, 2016—less than a year after Emigrant Bank joined as a Lender to the Amended Credit Agreement—Alchemy sought bankruptcy protection by filing a petition under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for District of Delaware, Case No. 16-11596-KG (the "Alchemy Bankruptcy").  The Alchemy Bankruptcy is still pending.

17.     After Calrissian failed to pay the loans pursuant to the Guaranty Agreement, SunTrust (as Administrative Agent for the Lenders) filed suit against Calrissian on August 5, 2016 for breach of the Guaranty Agreement in the Supreme Court of the State of New York, captioned *SunTrust Bank v. Calrissian LP*, Index No. 654148/2016 (the "Guaranty Action"). SunTrust sought damages of $46 million.

18.     On February 16, 2017, Calrissian filed a petition under Chapter 11 of Title 11 of the United Sates Code in the United States Bankruptcy Court for the District of Delaware, Case

5

No. 17-10356-KG (the "Calrissian Bankruptcy"). Calrissian's filings in its bankruptcy proceeding showed that it had virtually no assets. On August 10, 2018, the proceeding was converted to Chapter 7, and on January 9, 2020, the Bankruptcy Court entered an order closing the Calrissian Bankruptcy.

## Jurisdiction and Venue

19.     The Court has personal jurisdiction over Defendants under CPLR §§ 301 and 302(a) because each regularly does or solicits business within the State of New York, each has committed tortious acts within the State of New York causing injury to person(s) within the State of New York, and each expected or reasonably should have expected that its acts would have consequences within the State of New York.

20.     Venue is proper under CPLR § 503 because Emigrant Bank has its principal place of business in New York County, New York, and because the wrongful acts alleged herein occurred in New York County, New York.

21.     Although the true identities of the Doe Defendants are unknown to Plaintiffs at this time, on information and belief, each Doe Defendant may be found in this District and a substantial part of the alleged events and omissions occurred and have had a significant effect within this District.

## The Parties

22.     Plaintiff Emigrant Bank is a savings bank with its principal place of business at 5 East 42nd Street, New York, New York 10017.

23.     Plaintiff Pacific Mercantile is a business bank with its principal place of business at 949 South Coast Drive, Third Floor, Costa Mesa, California 92626.

6

24.     Defendant Virgo Investment Group, LLC ("<u>Virgo Investment Group</u>") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.

25.     Defendant Virgo Societas Partners, LLC ("<u>Virgo Societas</u>") is a Delaware limited liability company for which Jesse Watson serves as Managing Member, with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.

26.     Defendant Virgo Societas Partnership III (Onshore), L.P. ("<u>Virgo Onshore</u>") is a Delaware limited partnership with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.   Virgo Onshore's general partner is Defendant Virgo Societas Partners, LLC, of which Jesse Watson is the Managing Member. Virgo Onshore is a limited partner of Calrissian, LP.

27.     Defendant Virgo Societas Partnership III (Offshore), L.P. ("<u>Virgo Offshore</u>") is a Cayman Islands limited partnership with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.   Virgo Offshore's general partner is Defendant Virgo Societas Partners, LLC, of which Jesse Watson is the Managing Member.   Virgo Offshore is a limited partner of Calrissian, LP.

28.     Defendant Virgo Service Company LLC ("<u>Virgo Service Company</u>") is a Delaware limited liability company with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.   Virgo Service Company is an affiliate of Defendants Virgo Investment Group, Virgo Onshore, and Virgo Offshore.   Virgo Service Company is the general partner of Calrissian, which is the 100% equity owner and sole member of Alchemy.

29.     Defendant Jesse Watson ("<u>Watson</u>") is an individual with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010.   Watson is Founding Partner,

Chief Investment Officer, and Managing Member of Virgo Investment Group, and has had lead responsibility for the day-to-day operations of the company and its affiliates. Watson is also a Manager of Virgo Service Company. Watson also served on Alchemy's Board of Managers.

30. Defendant Mark Perez ("Perez") is an individual with a place of business at 1201 Howard Avenue, Suite 300, Burlingame, California 94010. Perez is a Founding Partner of Virgo Investment Group. Perez also served on Alchemy's Board of Managers, and played an active role in Alchemy's day-to-day operations.

31. The true names and capacities of the Doe Defendants are presently unknown to Plaintiffs despite Plaintiffs' efforts to identify the Doe Defendants. On information and belief, each of the fictitiously named defendants is responsible in some manner for the occurrences alleged herein. Plaintiffs therefore sue these defendants by such fictitious names and will amend this Complaint to state their true names and capacities when such names have been ascertained.

32. At all times relevant hereto, each Defendant was and is the agent of one another and, in doing the acts alleged herein, acted within the course and scope of such agency, and each authorized and/or ratified the wrongful acts of each other.

33. In particular, at all times relevant hereto, Calrissian and Alchemy were the agents of Virgo and, in doing the acts alleged herein, acted within the course and scope of such agency, and each authorized and/or ratified the wrongful acts of each other.

34. Furthermore, at all times relevant hereto, Calrissian and Alchemy acted as Virgo's alter egos. Virgo owned and exercised complete dominion and control over Calrissian and Alchemy to perpetrate fraud and other wrongdoing against Plaintiffs. Virgo's misuse of legal forms and shifting of assets from Calrissian and Alchemy to Virgo was designed to enrich Virgo and its principals while shielding Virgo from liability to Plaintiffs and others.

8

**<u>Factual Background</u>**

35.     Virgo was founded in 2009 by Jesse Watson, Mark Perez, and Barry Uphoff. Virgo is a private investment fund that purportedly seeks to capitalize on "market dislocations" and "inefficient market segments."

36.     In 2010, Nu Image formed Millennium Entertainment, LLC, now Alchemy, to engage in business as, among other things, a distributor of motion pictures and television programs, including DVD products.[1]

37.     In April 2014, Virgo agreed to purchase Alchemy from Nu Image for $41 million. Virgo agreed to pay $36 million at closing and the remaining $5 million in four non-contingent payments over the following four years.

38.     Before closing the purchase, Virgo engaged in due diligence to assess, among other things, the value of Alchemy's business and the quality of its earnings.  Virgo engaged the accounting firm, Baker Tilly, to advise it in connection with the performance of this due diligence.  Baker Tilly advised Virgo in a draft report that Alchemy had a low quality of earnings and that focusing on EBIDTA rather than cash flow provided a misleading view of Alchemy's earnings.  Virgo's CFO, Mark Perez, asked Baker Tilly to change these negative assessments in the final version of its report, and Baker Tilly complied with Perez's request.  Virgo never disclosed Baker Tilly's initial conclusions or concerns to the Lenders and did not disclose Perez's request for changes to the report.

39.     Virgo failed to disclose, and concealed, these and other material facts concerning Alchemy's finances to induce the Original Lenders to agree to the 2014 Credit Agreement, and continued to fail to disclose and conceal these and other material facts concerning Alchemy's

---

[1]  For ease of understanding, Millennium Entertainment, LLC is referred to herein as Alchemy both before and after its name was changed.

finances to induce Emigrant Bank and Pacific Mercantile to enter into the Amended Credit Agreement and the Joinder Agreement.

**Virgo, Acting Through Calrissian, Purchases Alchemy**

40.     On August 4, 2014, Virgo formed Calrissian as a Delaware limited partnership, with Virgo Service Company as its general partner, and Virgo Onshore, Virgo Offshore, and Santa Rita Entertainment, LLC as its limited partners.

41.     Virgo formed Calrissian for the purposes of purchasing Alchemy and guarantying the loan necessary to finance the acquisition and Alchemy's business.  Calrissian was managed by Watson, Virgo's Managing Member, and Perez, also a member of Virgo and Virgo's CFO. Calrissian had no offices, no employees, no IT network or office equipment, and virtually no assets—in other words, it had no ability to guaranty Alchemy's obligations under the 2014 Credit Agreement or the Amended Credit Agreement.

42.     As of August 18, 2014, Calrissian and Virgo entered into a Purchase Agreement with Nu Image and other equity holders to purchase all outstanding equity interests in Alchemy for the agreed purchase price of $41 million.

43.     After the sale, Virgo changed the name of the company from Millennium to Our Alchemy, LLC.

**Virgo Induces the Original Lenders to Agree to the 2014 Credit Agreement**

44.     As of September 4, 2014, Alchemy entered into the 2014 Credit Agreement, under which SunTrust, as Administrative Agent for the Original Lenders, established a $40 million credit facility consisting of a $20 million revolving loan and a $20 million term loan.

45.     Section 3.1(b)(xiv) of the 2014 Credit Agreement required the execution of the Guaranty Agreement before the obligation to make loans thereunder became effective.

Specifically, the provision states that "the obligations of the Lenders to make Loans hereunder shall not become effective until the date on which . . . the Guaranty and Security Agreement [is] duly executed by the Loan Parties."

46.     As of September 4, 2014, Alchemy and Calrissian entered into the Guaranty Agreement and did so, as stated in the agreement's recitals, to "induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder."   The Guaranty Agreement was executed by Calrissian in its capacity as Virgo's agent and alter ego.   In fact, the Guaranty Agreement was executed in Calrissian's name by Virgo's Managing Member, Watson, and provides that notices to Calrissian be sent to Virgo's CFO, Perez, at Virgo's offices.

**Virgo's Guaranteed Obligations to the Lenders**

47.     Section 2.1(a)(i) of the Guaranty Agreement provides that Calrissian guarantees the full payment of all loans made under the 2014 Credit Agreement when and as due, whether at maturity, by acceleration or otherwise.   *See* Ex. B, § 2.1.   Under Section 2.1(a)(ii) of the Guaranty Agreement, Calrissian further guaranteed Alchemy's timely performance of all covenants and obligations under the 2014 Credit Agreement.   *See id.*   As alleged above, Calrissian was acting as Virgo's agent and alter ego in making these guarantees.

48.     As collateral for its guarantees, Calrissian granted Lenders a security interest in "all of its personal and real property, tangible and intangible" (with certain limited exceptions). *See id.*, § 3.1.   However, Virgo failed to disclose that Calrissian had virtually no personal or real property, tangible or intangible, other than its equity interest in Alchemy, and no ability to guaranty Alchemy's obligations under the 2014 Credit Agreement.   Further, Virgo misled the Lenders into believing that Virgo would stand behind Alchemy to ensure that Alchemy's loan obligations would be repaid.

11

**Virgo Immediately Withdraws $14.5 Million from Alchemy, Causing Liquidity Problems**

49.     Upon the closing of the 2014 Credit Agreement, Virgo—acting through its CFO, Perez—caused Alchemy to draw $14,539,123.65 from the credit facility and to transfer all of that sum to Calrissian (the "Virgo Distribution").  On information and belief, Perez sent an email on September 4, 2014 confirming receipt of the funds on behalf of "Calrissian / Virgo."

50.     Then, on September 17, 2014, Calrissian transferred (i) $7,110,756.29 to Virgo Onshore and (ii) $7,411,931.38 to Virgo Offshore.  Thus, out of the $14,539,123.65 of loan proceeds to Alchemy, $14,522,687.67 was paid to Virgo and Calrissian kept only $16,435.98. Alchemy kept nothing.

51.     The Virgo Distribution had the effect of doubling Alchemy's bank debt, from approximately $15 to $30 million, leaving it with unreasonably little capital.

52.     After the Virgo Distribution, Alchemy became inundated with past due notices from creditors, threats of termination of material content supply agreements because of non-payment, and threats of legal action, and it soon defaulted on, *inter alia*, a number of film licensing agreements.

**Alchemy's Financial Performance is Inflated by Alchemy and Virgo**

53.     Alchemy's reported financial performance in 2014 and 2015 was fraudulently inflated by a "channel stuffing" scheme, of which Virgo was aware prior to the Amended Credit Agreement.  Channel stuffing is a deceptive business practice used to inflate sales and earnings figures by sending retailers more products than can reasonably be sold to the public and which are later returned to the supplier.  Alchemy engaged in approximately $2 million of channel stuffing in April and June 2014 to inflate Alchemy's financial performance in advance of the purchase by Virgo.

54.     Virgo executives, including Watson and Perez, became aware of and/or complicit in the channel stuffing, but concealed it in order to induce Emigrant Bank and Pacific Mercantile to provide loans to Alchemy and to enter into the Amended Credit Agreement.  In December 2014, for example, Alchemy shipped another approximately $2 million in DVDs with no reasonable expectation that the company would generate actual sales from the shipment. Alchemy then booked the sales from this shipment, inflating revenues for December 2014 by about 10%.  The channel stuffing scheme falsely inflated Alchemy's purported borrowing base by increasing the accounts receivable in the borrowing base certificates and other financial disclosures provided to the Lenders.  Accounts receivable constituted over fifty percent of the borrowing base which was relied upon by Emigrant Bank and Pacific Mercantile when underwriting the Amended Credit Agreement.

55.     In addition to channel stuffing, Alchemy inflated its projected financial performance in its 2015 budget.  Specifically, the financial projection models and other financial disclosures provided to the Lenders contained false and/or misleading financial data regarding Alchemy's performance in 2014 as well as its projected performance for 2015 through 2018.  For example, in a June 2015 document titled "Financial Model Projections" that was provided to the Lenders before the Amended Credit Agreement was executed, Alchemy projected assets of $227 million and borrowing base collateral of $58 million as of December 2015.  Both of these calculations were knowingly and willfully inflated by Alchemy and Virgo.  Virgo executives, including Watson and Perez, were aware of and/or complicit in the inflation of Alchemy's projected financial performance but failed to disclose and purposely concealed it in order to induce Emigrant Bank and Pacific Mercantile to enter into the Amended Credit Agreement and the Joinder Agreement.

56.    In addition to the acts alleged above, Virgo inflated Alchemy's borrowing base in 2015 through the use of a false return rate of 35% for DVDs, when Virgo knew that actual return rates were much higher as sales of physical video discs were declining.  The low return rate falsely inflated Alchemy's accounts receivable, resulting in disclosure to the Lenders of an overstated borrowing base.  Virgo also inflated Alchemy's accounts receivable in the borrowing base by including accounts that it knew were unlikely to be fully or even partially collected. Virgo misrepresented the borrowing base—and concealed Alchemy's use of false financial data—in order to induce Emigrant Bank and Pacific Mercantile to enter into the Amended Credit Agreement and the Joinder Agreement.

57.    The aforementioned misrepresentations and failures to disclose occurred in the months leading up to the execution of the Amended Credit Agreement and the Joinder Agreement, including but not limited to the lender's presentation meeting on May 29, 2015. These misrepresentations and failures to disclose were ongoing, and continued for almost a year after the Lenders entered into the Amended Credit Agreement.  Alchemy provided monthly borrowing base certificates to the Lenders into 2016.  Virgo knew that the borrowing base certificates were false but withheld this information from the Emigrant Bank and Pacific Mercantile in order to induce them to continue to extend credit.

**Virgo Causes Alchemy to Purchase Distressed ANConnect Business Units**

58.    During January 2015, Virgo considered an acquisition of the video and digital distribution business of a company named ANConnect.  On information and belief, the negotiations were directed by Virgo's Perez on behalf of Alchemy.

59.    Alchemy pursued the ANConnect transaction despite the fact that Alchemy's core business was struggling for a number of reasons, including the financial stress resulting from the

Virgo Distribution. Alchemy and ANConnect executed an Asset Purchase Agreement as of May 7, 2015. The aggregate purchase price for the assets purchased assets was $37,637,347. Alchemy also agreed to assume certain liabilities of ANConnect.

60. Virgo received numerous indications that the ANConnect purchase price was potentially much greater than the actual value of the company and that Alchemy would suffer cash flow problems as a result of the purchase. However, Virgo intentionally failed to disclose and concealed this negative information from the Lenders. For example, in a May 29, 2015 presentation by Perez, Alchemy's CEO Bill Lee and its CFO John Avagliano, the Lenders were told that the acquisition of ANConnect's business would "generat[e] significant free cash flow and enable[e] favorable working capital with 100% 'services' model." Virgo knew that this was not true.

61. Alchemy's already insufficient cash flow significantly worsened once the ANConnect transaction closed, due in large part to the liabilities assumed. Within a short time, Alchemy was in the midst of a liquidity crisis and was unable to meet its obligations as they became due.

62. Liquidity and cash flow had been ongoing concerns at Alchemy in the months leading up to the closing of the ANConnect transaction. Virgo's Watson and Perez understood that Alchemy desperately needed additional loan commitments from the Lenders in order to survive.

63. Indeed, at the time of the Amended Credit Agreement and the Joinder Agreement, Virgo was aware that Alchemy was suffering from severe liquidity issues and a lack of working capital. The concerns about Alchemy's true financial position were not disclosed to Emigrant Bank or Pacific Mercantile, but instead were actively and intentionally concealed to induce

15

Emigrant Bank and Pacific Mercantile to enter into the Amended Credit Agreement and the Joinder Agreement.

**Virgo Induces Plaintiffs to Expand the Revolving Credit Facility**

64.     In early 2015, Virgo sought to increase Alchemy's credit facility by means of the Amended Credit Agreement and the Joinder Agreement.   In doing so, Virgo made material misrepresentations and failed to disclose material facts with the intent of inducing Emigrant Bank and Pacific Mercantile to enter into the Amended Credit Agreement and the Joinder Agreement, and to lend millions of dollars to Virgo's failing venture.

65.     During meetings on February 25, 2015 and March 12, 2015, Watson pitched the transaction to Emigrant Bank.  In doing so, Watson intentionally withheld material information including: (i) Alchemy's poor earnings; (ii) Alchemy's inflated financial reports; (iii) Alchemy's channel stuffing and other irregular activities; (iv) problems with Alchemy's management; (v) ANConnect's financial condition and the impact on Alchemy of the purchase of ANConnect; (vi) the assumptions, figures, and devices used to inflate Alchemy's borrowing base; and (vii) Virgo's intent to provide additional funding as needed to ensure Alchemy and Calrissian would fulfill their obligations to the Lenders.

66.     As of July 9, 2015, the 2014 Credit Agreement was amended, restated and superseded by the Amended Credit Agreement.  As of July 10, 2015, the Joinder Agreement was executed.  The Amended Credit Agreement stated that the Guaranty Agreement was a condition precedent to making of the loans.  See Ex. C, § 3.1. Under the Guaranty Agreement, which was amended in conjunction with the execution of the Amended Credit Agreement, Calrissian as Virgo's agent and alter ego agreed to guarantee Alchemy's obligations under the Amended Credit Agreement.  *See* Exs. B, C, E.

67.     Upon the execution of the Amended Credit Agreement and the Joinder Agreement, the Lenders' commitments were as follows:

| Lender | Revolver Allocation | Term Loan Allocation | Total Allocation | Percentage |
|---|---|---|---|---|
| SunTrust | $9,533,333.34 | $12,283,333.34 | $21,816,666.68 | 36.67% |
| Pacific Mercantile | 6,933,333.33 | 8,933,333.33 | 15,866,666.66 | 26.67% |
| Emigrant Bank | 6,500,000.00 | 8,375,000.00 | 14,875,000.00 | 25.00% |
| Preferred Bank | 3,033,333.33 | 3,908,333.33 | 6,941,666.66 | 11.67% |
| **Total** | **$26,000,000.00** | **$33,500,000.00** | **$59,500,000.00** | **100%** |

68.     After the Lenders executed the Amended Credit Agreement, Virgo sought to pay itself rather than use the loans to support Alchemy's business. Virgo caused Alchemy to draw over $13 million from the newly established credit facility and pay that sum through Calrissian to Virgo. Through this transaction, Virgo sought to benefit itself at the expense of the Lenders.

**Virgo Conceals Alchemy's Continued Financial Deterioration**

69.     At the time of the execution of the Amended Credit Agreement and the Joinder Agreement, Alchemy's borrowing base was overstated by approximately $10 million. Virgo executives, including Perez knew that the borrowing base was not being calculated accurately, in part due to excessive DVD returns as well as the "channel stuffing" scheme described above, and that Alchemy was in, or headed for, a liquidity crisis. These facts were not disclosed to Emigrant Bank or Pacific Mercantile.

70.     On August 24, 2015, only weeks after the execution of the Amended Credit Agreement and the Joinder Agreement, Virgo caused Alchemy's CFO, Avagliano, to be terminated based on various allegations of breach of fiduciary duty, including preparing fraudulent financial statements and artificially inflating Alchemy's projected financial performance. Virgo had known about and was complicit in some or all of this wrongful conduct. Moreover, Virgo did not disclose to the Lenders that Avagliano had acted improperly, that any

17

financial statements were improper, or that Alchemy's projected financial performance had been artificially inflated. Virgo intentionally delayed the firing of Avagliano until after the execution of the Amended Credit Agreement and the Joinder Agreement so as to conceal material facts regarding Alchemy's management and its financial statements.

71.    Alchemy's acquisition of ANConnect created further liquidity problems for Alchemy, leaving it nearly insolvent. Although Virgo understood the financial ramifications of the ANConnect acquisition, it failed to disclose the extent of Alchemy's problems to Plaintiffs.

72.    In particular, Perez was active in managing Alchemy at this time and knew about Alchemy's financial condition, including its cash flow problems. Alchemy's Controller, Rex Bowring, advised Alchemy's management not to sign-off on the borrowing base in late 2015, but his advice was disregarded by Alchemy and Virgo. In fact, Watson and Perez knowingly authorized Alchemy to present inaccurate borrowing base certificates to the Lenders, and knowingly provided false assurances regarding Alchemy's finances in order to buy time to secure additional financing.

**The Acceleration of the Guaranteed Obligations**

73.    On January 19, 2016, SunTrust sent Alchemy a Reservation of Rights Letter, notifying Alchemy of the occurrence and continuation of certain events of default under the Amended Credit Agreement.

74.    On March 3, 2016, SunTrust sent Alchemy a second Reservation of Rights Letter, notifying Alchemy of the occurrence and continuation of certain Events of Default under the Amended Credit Agreement.

75.    Based on, *inter alia*, the events of default alleged above, and certain anticipated defaults, the Lenders and Calrissian entered into a "Forbearance Agreement" as of April 20, 2016. Pursuant to the Forbearance Agreement, the Lenders agreed not to take certain legal

18

action against Alchemy or Calrissian relating to the existing defaults and certain anticipated defaults during a specified forbearance period or until the occurrence of one of several defined events ("Termination Events") which would immediately terminate the forbearance period.

76.    On May 5, 2016, SunTrust sent Alchemy a third Reservation of Rights Letter, notifying the company of the occurrence and continuation of certain Termination Events under the Forbearance Agreement.

77.    On May 18, 2016, SunTrust sent Alchemy a fourth Reservation of Rights Letter, notifying Alchemy that the forbearance period in the Forbearance Agreement had terminated, certain existing defaults were continuing, certain anticipated events of default had become events of default, and SunTrust (as Administrative Agent) was entitled to exercise its rights and remedies under the loan documents.

78.    On June 15, 2016, SunTrust sent Alchemy and Calrissian the Debt Acceleration Notice.  *See* Ex. F.  In the Debt Acceleration Notice, SunTrust notified Alchemy and Calrissian that it was, *inter alia*, accelerating the obligations owed under the Amended Credit Agreement. As a result of the Debt Acceleration Notice, and pursuant to Section 2.1(i) of the Guaranty Agreement, the guaranteed obligations under the Guaranty Agreement also were accelerated.

**Alchemy Files for Chapter 7 Relief**

79.    On July 1, 2016, Alchemy filed the Alchemy Bankruptcy.  At that time, Alchemy was unable to pay its debts as they came due, which constitutes an event of default under Section 8.1(i) of the Amended Credit Agreement.  The filing of the Alchemy Bankruptcy constituted an additional event of default under Section 8.1(g) of the Amended Credit Agreement.

**Calrissian and Virgo Fail to Honor the Guaranty Agreement**

80.    As with the Debt Acceleration Notice, Alchemy's bankruptcy filing and inability to pay its debts as they came due accelerated the maturity of the obligations guaranteed under the

19

Guaranty Agreement. Therefore, as of June 15, 2016, all of the guaranteed obligations were due and payable.

81. On August 5, 2016, SunTrust, on behalf of the Lenders, filed the Guaranty Action. The Guaranty Action is still pending.

82. On February 16, 2017, Calrissian filed the Calrissian Bankruptcy. The Calrissian Bankruptcy was closed on January 9, 2020.

83. Neither Calrissian nor Virgo has paid any of the obligations guaranteed under the Guaranty Agreement.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Fraudulent Misrepresentation)**

84. Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-83 as if set forth fully herein.

85. To benefit itself, Virgo made material and intentional misrepresentations of present fact to the Lenders, including Plaintiffs, in order to induce Emigrant Bank and Pacific Mercantile to agree to the Amended Credit Agreement and the Joinder Agreement, thereby committing to tens of millions in loans to Virgo and its affiliates. Virgo misrepresented, *inter alia*:

      a.      Alchemy's earnings;

      b.      Alchemy's borrowing base;

      c.      Alchemy's sales data;

      d.      Alchemy's projected performance;

      e.      The rates of DVD sales and DVD returns;

      f.      The competency, honesty, and actions of Alchemy's management;

20

g.　Virgo's intent to honor the Guaranty Agreement and financially support Alchemy to ensure that Alchemy's loan obligations would be repaid;

h.　Expected liquidity and synergies from the ANConnect transaction;

i.　ANConnect's actual and expected financial performance; and

j.　Virgo's due diligence on the Alchemy and ANConnect transactions.

86.　Furthermore, the Amended Credit Agreement contains specific representations by Alchemy, made with Virgo's knowledge, complicity and authorization, that no event of default was occurring and that all "representations and warranties" were "true and correct in all material respects." *See, e.g.*, Ex. C (Amended Credit Agreement) at §§ 2.21, 3.1, 3.3, 4.4, 4.12.

87.　Virgo knew that the representations alleged above were material, false and misleading.

88.　Virgo, through Watson and Perez or at their direction, made, authorized, and/or ratified these representations with the intent and expectation that Plaintiffs would rely on them.

89.　These misrepresentations were ongoing from 2014 through 2016 and, as alleged above, were made orally and in writing to the Lenders.  In addition, many of the facts regarding Virgo's material misrepresentations to Plaintiffs, including but not limited to the misrepresentations alleged above, were and remain solely in Virgo's possession.

90.　Plaintiffs reasonably relied on Virgo's misrepresentations, without which Plaintiffs would have learned of Alchemy's true financial condition and management, including its lack of ability to pay its obligations under the Amended Credit Agreement and the lack of any real guaranty of those obligations.  Plaintiffs conducted an independent analysis of Alchemy's finances, but the material facts were withheld and concealed by Virgo.  The Amended Credit Agreement states that "[a]ll covenants, agreements, representations and warranties made by the

Borrower herein and in the certificates, reports, notices or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto." Ex. C (Amended Credit Agreement) at § 10.9.

91.     But for Virgo's misrepresentations, Plaintiffs would not have entered into the Amended Credit Agreement or the Joinder Agreement and would not have extended tens of millions in loans that have not been repaid.  In addition, but for Virgo's misrepresentations, Plaintiffs could have sought to recover the loaned funds prior to Alchemy's default and bankruptcy.

92.     Plaintiffs have suffered substantial damages as a direct result of Virgo's fraudulent misrepresentations in an amount to be determined at trial.

93.     Each of the Defendants' acts of fraudulent misrepresentation were willful, wanton, and malicious, entitling Plaintiffs to punitive damages.

## SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Fraudulent Concealment)

94.     Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-93 as if set forth fully herein.

95.     To benefit itself, Virgo failed to disclose and intentionally concealed material facts that were unknown to Plaintiffs in order to induce Emigrant Bank and Pacific Mercantile to agree to the Amended Credit Agreement and the Joinder Agreement, and to induce the Lenders to extend tens of millions of dollars in loans to Virgo and its affiliates.  Virgo failed to disclose and concealed, *inter alia*:

     a.     Virgo's awareness of fraudulent actions by Alchemy executives to inflate Alchemy's financials and its intent to terminate Avagliano;

22

b.     Virgo's awareness that Alchemy had poor quality of earnings;

c.     Alchemy's actual earnings;

d.     Alchemy's actual sales data;

e.     Alchemy's actual projected financial performance;

f.     The overstating of Alchemy's borrowing base;

g.     The channel-stuffing scheme;

h.     Alchemy's insolvency;

i.     The actual rates of declining DVD sales and increasing DVD returns;

j.     Calrissian's lack of assets and the lack of any real guaranty of Alchemy's obligations; and

k.     ANConnect's actual and expected financial performance.

96.     Virgo had a duty to disclose the material information it failed to disclose and concealed from Plaintiffs. Virgo knew that this information was material, and that its failure to disclose and its concealment of the information would mislead Plaintiffs in connection with their agreement to the Amended Credit Agreement and the Joinder Agreement. These material facts were solely within Virgo's possession, and Plaintiffs were unable to uncover these facts despite substantial due diligence into Alchemy's finances. In addition, many of the facts regarding Virgo's material misrepresentations to Plaintiffs, including but not limited to the undisclosed facts alleged above, remain solely in Virgo's possession.

97.     Virgo, through Watson and Perez or at their direction, failed to disclose and concealed these facts with the intent to deceive Emigrant Bank and Pacific Mercantile into entering into the Amended Credit Agreement and the Joinder Agreement, and providing tens of millions of dollars in loans to Alchemy.

23

98.     Virgo's failure to disclose and concealment of these material facts was ongoing from 2014 through 2016.

99.     Plaintiffs reasonably relied on the accuracy and completeness of Virgo's representations.  Without Virgo's failure to disclose and concealment of the material facts that were solely in Virgo's possession, Plaintiffs would have learned of Alchemy's true financial condition and management and its lack of ability to pay its obligations under the Amended Credit Agreement.  Plaintiffs conducted an independent analysis of Alchemy's finances, but the material facts were withheld and concealed by Virgo.  Furthermore, the Amended Credit Agreement states that "[a]ll covenants, agreements, representations and warranties made by the Borrower herein and in the certificates, reports, notices or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto."  Ex. C (Amended Credit Agreement) at § 10.9.

100.     The Amended Credit Agreement contains specific agreements by Alchemy, made with Virgo's knowledge, complicity, and authorization, that no event of default was occurring and that all "representations and warranties" were "true and correct in all material respects" and that there had been no omission to state any material fact.  *See, e.g.*, Ex. C (Amended Credit Agreement) at §§ 2.21, 3.1, 3.3, 4.4, 4.12.  Virgo failed to disclose that Alchemy's representations and warranties were not "true and correct in all material respects" and that material facts had been concealed.

101.     But for Virgo's misrepresentations and omissions, Plaintiffs could have avoided entering into the Amended Credit Agreement and the Joinder Agreement, and extending tens of millions in loans that have yet to be repaid.  In addition, but for Virgo's misrepresentations and

omissions, Plaintiffs could have sought to recover the loaned funds prior to Alchemy's default and bankruptcy.

102.    Plaintiffs have suffered substantial damages as a direct result of Virgo's fraudulent failure to disclose and concealment of material facts in an amount to be determined at trial.

103.    Each of the Defendants' acts of fraudulent concealment were willful, wanton, and malicious, entitling Plaintiffs to punitive damages.

**THIRD CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Aiding and Abetting Fraud)**

104.    Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-103 as if set forth fully herein.

105.    As alleged above, Virgo knew that Alchemy's executives including Avagliano were engaged in a fraudulent channel-stuffing scheme designed to inflate Alchemy's sales figures and that Alchemy's borrowing base and projected financial performance were overstated. Virgo aided and abetted this deception and fraud, providing substantial assistance to Alchemy and its executives, by approving, authorizing, ratifying, perpetuating and concealing these fraudulent actions.

106.    But for this substantial assistance from Virgo, Plaintiffs would not have suffered the damages they did by entering into the Amended Credit Agreement and the Joinder Agreement and by extending tens of millions in loans that have not been repaid.

107.    Plaintiffs have suffered substantial damages as a direct result of Virgo's aiding and abetting fraud in an amount to be determined at trial.

108.    Each of the Defendants' acts of aiding and abetting fraud was willful, wanton, and malicious, entitling Plaintiffs to punitive damages.

**FOURTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Tortious Interference with Contract)**

109.    Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-108 as if set forth fully herein.

110.    The Amended Credit Agreement is a valid agreement between Plaintiffs and Alchemy, among others.

111.    Virgo knew of the Amended Credit Agreement.

112.    Through its actions, Virgo intentionally induced Alchemy to breach the Amended Credit Agreement by, *inter alia*: (i) depriving Alchemy of necessary working capital after the Amended Credit Agreement was signed; (ii) allowing and/or assisting Alchemy's financial mismanagement and misstatements; and (iii) saddling Alchemy with excessive debts and liabilities through the Virgo Distribution and the ANConnect transaction.

113.    By these and other actions for which it had no justification, Virgo made it impossible for Alchemy to render performance under the Amended Credit Agreement.

114.    Plaintiffs have suffered substantial damages as a direct result of Virgo's interference with contract in an amount to be determined at trial.

115.    Each of the Defendants' acts of tortious interference were willful, wanton, and malicious, entitling Plaintiffs to punitive damages.

## FIFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Unjust Enrichment)

116.    Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-115 as if set forth fully herein.

117.    Virgo made misrepresentations to Plaintiffs to induce them to enter the Amended Credit Agreement and the Joinder Agreement, and to provide tens of millions in loans, from which Virgo benefited as alleged above.  Virgo was thus unjustly enriched at the expense of Plaintiffs.

118.    It would be inequitable and unconscionable for Virgo to retain the profits, benefits, and funds obtained by reason of the conduct alleged herein.

119.    Plaintiffs seek an order that Virgo disgorge all profits, benefits, and other compensation obtained by Virgo from its misconduct.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request:

(a)    An award in favor of the Plaintiffs and against Defendants on all of Plaintiffs' claims asserted herein;

(b)    Exemplary or punitive damages in an amount to be determined at trial for Defendants' tortious conduct;

(c)    Compensatory damages in excess of $500,000, in an amount to be proven at trial;

(d)    Pre-judgment interest on all such damages; and

(e)    Such other and further relief as the Court deems just and proper.

**<u>Demand for Jury Trial</u>**

Plaintiffs demand trial by jury of all issues so triable.


Dated:  New York, New York
        July 9, 2021

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP


By:  _____
     R. Corey Worcester
     Leigha Empson
     51 Madison Avenue, 22nd Floor
     New York, New York  10010
     (212) 849-7000

     Gary E. Gans (*pro hac vice forthcoming*)
     Sage R. Vanden Heuvel (*pro hac vice forthcoming*)
     865 S. Figueroa St., 10th Floor
     Los Angeles, CA 90017
     (213) 443-3000

     *Attorneys for Plaintiffs Emigrant Bank and Pacific Mercantile Bank*
