# **<u>EXHIBIT A</u>**

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK : CIVIL TERM : PART 53
 2   ----------------------------------------X
     EMIGRANT BANK AND PACIFIC MERCANTILE BANK,
 3
                         Plaintiffs,            INDEX NO.:
 4                                              654350/2021
                     -against-
 5
     VIRGO INVESTMENT GROUP LLC, VIRGO SOCIETAS    PROCEEDINGS
 6   PARTNERS, LLC. VIRGO SOCIETAS PARTNERSHIP III
     (ONSHORE), L.P., VIRGO SOCIETAS PARTNERSHIP III
 7   (OFFSHORE), L.P., VIRGO SERVICE COMPANY, LLC,
     JESSE WATSON, MARK PEREZ, AND DOES 1 THROUGH 10,
 8   INCLUSIVE,

 9                       Defendants.
     ----------------------------------------X
10                       MICROSOFT TEAMS
                        February 8, 2022
11
     B E F O R E:
12
                     THE HONORABLE ANDREW BORROK,
13                         J U S T I C E

14   A P P E A R A N C E S:

15   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorney for the Plaintiffs
16   51 Madison Avenue
     New York, New York  10010
17   BY:  GARY GANS, ESQ.
          LEIGHA EMPSON, ESQ.
18
     ALLEN & OVERY LLP
19   Attorneys for the Defendants
     1221 Avenue of the Americas
20   New York, New York  10020
     BY:  ANDREA KIM, ESQ.
21        EMANUEL GRILLO, ESQ.

22

23

24
                   Carrie Belmonte, CSR, RPR, NYACR
25                      Senior Court Reporter
```

Proceedings

1              THE COURT:  *Emigrant Bank versus Virgo Investment*

2      *Group LLC*, 654350 of 2021.

3              Your appearances, please, for the record.

4              MS. KIM:  Andrea Kim for the defendants, Your

5      Honor.

6              MR. GRILLO:  Co-counsel with Ms. Kim, Your Honor,

7      Emmanuel Grillo, Allen & Overy.

8              MR. GANS:  Good morning, Your Honor.  Gary Gans

9      with Quinn Emanuel for plaintiffs.

10             MS. EMPSON:  And Leigha Empson from Quinn Emmanuel

11     on behalf of plaintiffs as well.

12             THE COURT:  Okay.  Good morning to all of you.

13             So I'm prepared to discuss the motion.  I know that

14     there was some concerns over word limits -- right? -- that I

15     saw in the papers.  And also I got a letter; right?

16             MS. KIM:  Yes, Your Honor.

17             THE COURT:  Yes?  Maybe?

18             MS. KIM:  Yes.  Yes, Your Honor.  Sorry.

19             THE COURT:  So have no fear.  I'm ignoring the

20     letter because I don't take letters.  And have no fear that

21     I'm not reading the last four pages of the papers that were

22     submitted without permission.  I'm not going to consider

23     either one.

24             I'm ready to hear the motion.

25             MS. KIM:  Thank you, Your Honor.  I'll be

Proceedings

1    presenting for the defendants this morning.  I think it's

2    worth setting the table first, Your Honor, with respect to

3    the parties in this matter.

4            THE COURT:  Sure.  I've got a demonstrative.

5    Individual lenders.  So can you see that?  See the

6    consortium of lenders?

7            MS. KIM:  It's a little blurry but --

8            THE COURT:  It's a little blurry.  Okay.

9            The middle one is SunTrust in front of all the

10   individual lenders.  See the individual lenders?  There is

11   SunTrust.  I got Virgo over here.  I got Alchemy over here.

12   And I've got none other than the famous -- I like to call

13   him Lando, but I'm stuck calling him Calrissian, for the

14   purposes of our conversation.  But let's talk about --

15           MS. KIM:  If Your Honor wishes to call it Lando, no

16   one here is going to stop you.

17           THE COURT:  Okay.  That's fine.

18           MS. KIM:  Okay.

19           Well, stickies aside, I'm going to try to kind of

20   set the table, and I'm sure I won't do a better job than

21   that, the Court's chart, but there are seven defendants that

22   are listed and named in this complaint.

23           THE COURT:  Sure.

24           MS. KIM:  The first two are Virgo Investment Group

25   LLC and Virgo Societas Partners, LLC.  Other than listing

Proceedings

1    them as parties and in one paragraph saying that they're

2    agents of all the other defendants, they plead absolutely

3    nothing that either party did or what relationship they had

4    to the two loans that are the sole subject of this

5    complaint.  They are not signatories to any loan; they were

6    not signatories to a guarantee.  There is not one shred of

7    an allegation that they are alter egos or the borrowers or

8    the guaranty on the loan, and, quite frankly, they should

9    summarily be dismissed.

10            The next three defendants are two limited partners

11    of Lando and the general partner of Calrissian, the

12    guarantor on the loan and the equity owner of Alchemy.

13            The two limited partners, I'm just going to refer

14    to them in short as onshore and offshore, Virgo Societas

15    Partners III (Onshore) and Virgo Societas Partners III

16    (Offshore), are limited partners of Calrissian.  And one

17    general partner of Calrissian is Virgo Service Company.

18    Okay.  And that is -- Calrissian was, as Your Honor has

19    pointed out, the guarantor -- in a chart -- guarantor of the

20    loan and the equity owner of Alchemy.

21            THE COURT:  Right.

22            MS. KIM:  The pleadings specific to these parties

23    in which they are mentioned specifically are actually two

24    paragraphs, paragraphs 40 and 50.  40 tells you what I just

25    told you about their role, and 50 tells you about

*cb*

Proceedings

1    reimbursement by Calrissian to its limited partners, which

2    I'll address this morning and show you where in black and

3    white in Section 511 of the 2014 credit agreement, which is

4    Exhibit A to the plaintiffs' complaint, that reimbursement

5    was not only known, planned for and negotiated, but actually

6    required by the lenders under the 2014 loan agreement.  That

7    is Exhibit A.  So those are the two paragraphs specific to

8    the limited partners and the general partner of Calrissian.

9          Finally, there are two individual defendants,

10   Mr. Watson and Mr. Perez.  The individual defendants are

11   alleged to have a management responsibility for the other

12   defendants and were on the board as board members of

13   Alchemy.

14          I will address the handful of specific mentions of

15   them.  They craftily tried to implicate them by association

16   in allegations that, despite the bank's best effort to hide,

17   are actually just on information and belief, which the bank

18   stated openly when they made those same allegations in

19   federal court and in claims against Centra, the lead

20   administrative bank in the loans, in an attempt to get

21   Centra to sue these individual defendants here in this case.

22          None of these allegations against them specifically

23   attribute a specific misstatement to these two individuals,

24   and none state a claim or are based on any duty other than

25   the reporting requirements in the loan agreements.  The

Proceedings

1    suggestion of misrepresentation -- that there is no

2    suggestion of a misrepresentation extraneous to the loan

3    contract, and there is no basis for plaintiff seeking

4    damages for anything --

5              THE COURT:  Well, there is an allegation extraneous

6    to the loan contract; right?  I mean, part of the

7    allegations are the fraud and the inducement that the full

8    reason why they were entered into these transactions is

9    because of the alleged channel-stuffing and the other things

10   that they talk about.  So I don't think -- respectfully, I

11   don't think that that's a fair characterization.

12             MS. KIM:  Well, let me address that, Your Honor.

13   I'll take that --

14             THE COURT:  I didn't want to take you off your

15   script.  I just was saying that I think that some of the

16   allegations we can deal with sort of the big picture of

17   things that you've raised in your papers, which I think is

18   important to talk about and why I thought the structure

19   chart would be helpful to our conversation.  But I do think

20   it is not entirely fair to say that the allegations here are

21   solely limited to the breach of the contractual provisions

22   set forth in the loan agreement.

23             MS. KIM:  Okay.  Well, let's -- if you'll permit

24   me, let me do this.  I think that those are best dealt with

25   individually.

Proceedings

1          THE COURT:  Sure.

2          MS. KIM:  The allegations; right?  And what I'm

3     really referring to is them as a whole, but certainly I'm

4     going to address them specifically.  What I would say is

5     that the allegations at this point, is that the allegations

6     that are made against them is when you look at those 11

7     paragraphs, or 11 paragraphs that mention them specifically

8     at all, the individuals --

9          THE COURT:  I understand what you are saying.

10    Yeah.

11         MS. KIM:  Yeah.

12         THE COURT:  I understand what you are saying.

13         MS. KIM:  They relate to -- they ultimately just

14    say that they didn't tell the bank things that are financial

15    information, the financial condition of the debtor, all of

16    which is required under Section 412 of the loan agreement --

17         THE COURT:  Well, they also say that they weren't

18    told about Calrissian -- right? -- and the fact that

19    Calrissian didn't have any assets and that as such it wasn't

20    a proper guarantor.

21         I think we are going not to the place that you want

22    to start, but we can get here if we need to, but -- and I

23    definitely have questions for Mr. Gans and Ms. Empson about

24    those allegations and due diligence and all that as it

25    relates and whose obligation it is to do due diligence as it

Proceedings

1    relates to assets of a guarantor and how that -- you know.

2    But putting that aside for a minute, if you want to start,

3    that's fine.  I don't want -- I feel like I've taken you off

4    track.

5            MS. KIM:  No, not at all.  I would just say briefly

6    on that point, to your point we can return to, is that with

7    respect to the Calrissian, you know, that Calrissian doesn't

8    have assets, there is not a single representation,

9    affirmative representation, that they had other assets other

10   than the ownership of Alchemy.  And as I'll show the Court

11   in Exhibit A to their complaint, in Section 511 of that

12   complaint it explicitly says in the loan agreement, which is

13   almost a 200-page loan agreement, that had a Holdco has

14   purchased the entities.  It's purchased Alchemy.

15           So to the extent that the banks want to say that

16   they didn't understand that Calrissian was a holding company

17   for Alchemy to hold the -- to hold the equity of Alchemy,

18   that's false.

19           And, in fact, the guarantee agreement doesn't say

20   anything to the contrary either.  So the idea that they just

21   didn't know that Calrissian was a Holdco and was holding the

22   singular asset of Alchemy is just false.

23           And it's probably worth mentioning at this point

24   that lenders all the time take -- take as a precautionary

25   measure security in the equity of their borrower in case

*cb*

Proceedings

1   they decide to take over the company instead of liquidating

2   or --

3           THE COURT:  You are talking about a pledge of the

4   membership interest or the partnership interest so that

5   they --

6           MS. KIM:  Right.  Exactly.

7           THE COURT:  Well, first of all, Holdco in the loan

8   agreement, is defined as Calrissian, LP.  It's actually --

9   Holdco means Calrissian.  It's not a generic.

10          MS. KIM:  Right.  Right.  No.  No.  I'm sorry.

11  That's what I meant to say.  That's the point, is they not

12  only recognize Holdco, they call it a Holdco.  So to suggest

13  that it's something else or that they didn't know it's

14  something is belied by their own documents as --

15          THE COURT:  Again, I don't know that this is the

16  right place to start.  It's -- it may be questions, if we

17  get to this, for Mr. Gans and Ms. Empson, but it strikes me

18  as part of the due diligence that lenders do is that they

19  look at -- when they require a guarantor, they look at the

20  creditworthiness of the guarantor as part of their due

21  diligence process.

22          MS. KIM:  Yes, Your Honor.

23          THE COURT:  That's part of the process.

24          MS. KIM:  Certainly.  Certainly that's right.

25          So the banks come before this Court with claims

Proceedings

1    mostly against -- I'm going to call it the blob that they

2    call Virgo and not identifying which of these seven

3    defendants they are referring to.  And they do so because

4    they don't like the result of the normal avenues of recovery

5    for a loan.

6           The bankruptcy trustee that has a fiduciary

7    responsibility to the borrower, Alchemy, in fact, was

8    appointed by the US trustee, is a Chapter 7 trustee, has

9    pursued suing quite literally everyone and their dog, to get

10   every dollar they could for all the creditors, including the

11   banks that are plaintiffs here.

12          THE COURT:  So that would be SunTrust.  Flesh that

13   out.  So SunTrust -- talk to me about how we got to where we

14   are.  That's important, I think.

15          MS. KIM:  Yes.  Absolutely.  So I was trying to do

16   it sort of in chronological order.

17          THE COURT:  Sure.

18          MS. KIM:  So the first thing that happened was the

19   borrower, which is Alchemy, went into bankruptcy.  Okay.

20          THE COURT:  Right.

21          MS. KIM:  In July of 2016.

22          And not long after that, the United States Trustees

23   Office appointed a Chapter 7 trustee to govern over the

24   borrower, Alchemy.  Okay.

25          So that trustee has pursued claims against dozens

Proceedings

1    of parties, including the defendants here and many, many

2    others.  Those claims have been settled.  And there is, you

3    know, a result that we paid some settlement dollars, and

4    those moneys are for all creditors, including the creditors

5    that are in front of the Court today.

6         So to the extent that Mr. Watson or Mr. Perez as

7    board directors of Alchemy, or in any other capacity for

8    that matter, damaged the borrower in such a way as is

9    alleged in this complaint, as to have harmed the company's

10   ability to pay its creditors, that's a claim that the

11   bankruptcy trustee owns because it's stepped in the shoes of

12   the debtor, which in this case is Alchemy, and has made --

13   has 63 pages of allegations against not only these

14   defendants but another half-dozen other defendants,

15   including, which they haven't settled, claims against

16   ANConnect for the sale of their business to Alchemy in 2015,

17   which was the genesis or the basis of the 2015 loan

18   agreement that these plaintiffs entered into and say they

19   were induced into entering into.

20        THE COURT:  Just to be clear.  Are you suggesting

21   that the bankruptcy trustee had -- to the extent that there

22   is a fraudulent inducement claim here as it relates to the

23   loan, are you saying that that's a claim that should have

24   been brought by the bankruptcy trustee?

25        MS. KIM:  I'm saying something slightly different.

Proceedings

1          THE COURT:  That's critical; right?  That's an

2     important question.

3          MS. KIM:  No.  I understand.

4          I think what you're referring to is the allegation

5     by the bank that the trustee didn't have that claim or

6     couldn't bring a fraud inducement claim.

7          THE COURT:  Right.

8          MS. KIM:  Right.  To that I would say that's

9     incorrect because the same facts that they pled here, in

10    fact, literally identical facts, as was shown in our exhibit

11    to our motion, to the allegations that the trustee is

12    brought to say that they've harmed the company and thereby

13    harmed its ability to repay the loan, and if they had only

14    known the things that my clients allegedly have done to harm

15    the debtor, if they'd only known that the debtor was in that

16    position, they wouldn't have made those loans in the first

17    place.

18         Well, the trustee wants to avoid -- avoid the

19    same -- the same conduct.  In other words, he is saying the

20    same conduct that is at issue here is the conduct that the

21    trustee wants to pursue.  Because as I'm sure Your Honor

22    knows, the bankruptcy trustee is trying to get every asset

23    for the estate.

24         So if there is harm to the company and that harm to

25    the company just happens to be -- as all kinds of the

Proceedings

1    company would be -- a reason why the company didn't repay

2    its loan, then those are claims that belong to the estate.

3    And those are the allegations, for the most part, that are

4    made in this -- in their complaint.

5         Now, what they want to say is that it's individual

6    harm because only they made this loan.  In other words,

7    it's -- the particular debts that weren't repaid are these

8    particular debts that are the subject of the 2014 and 2015

9    loan agreement.

10        The problem with that issue, Your Honor, is that

11   both -- in both of those loan agreements, as I think you

12   Your Honor alluded to a moment ago, in Section 8.1 and 9.1

13   of those agreements, they conceded, delegated away their

14   authority, to bring any claims that arise as a result of not

15   being repaid those loans or default on those loans.  And

16   they acknowledge that in Technicolor in their allegations in

17   the federal court matter which the plaintiff did not

18   disclose.

19        THE COURT:  So that's an important point that

20   you're making.  You're saying that in the loan agreement

21   there was a designation of SunTrust to bring these claims?

22        MS. KIM:  Yes, Your Honor.

23        THE COURT:  Okay.  That's a really good place for

24   us to start in our conversation and what the effect of that

25   was, and what Akin Gump did they did when Mr. Gans wrote a

Proceedings

1    letter or when Akin Gump responded to Mr. Gans's letter on

2    January 3rd because SunTrust agreed with the position that

3    you are now taking --

4              MS. KIM:  Yes, Your Honor.

5              THE COURT:  -- although rejected the demand to

6    bring a lawsuit.  So I'm going to stop you there for a

7    minute --

8              MS. KIM:  Yes, Your Honor.

9              THE COURT:  -- because I want to talk to Mr. Gans

10   about this, what I would call a threshold issue here.

11             So, Mr. Gans; right?  It can be Ms. Empson.  You

12   wrote the letters.  I've been referring to you only because

13   your name is on the papers in terms of the actual letters

14   along the way.  It's not a slight in any way to Ms. Empson

15   or her terrific ability to argue the motion.  And if she is

16   the one doing it, it's great, I'm happy to talk to her about

17   it.  But you wrote the letters, and they responded to you.

18   So if I'm directing this the right way, great.  If not, my

19   apologies.  Am I directing it the right way for now?

20             MR. GANS:  Yes, Your Honor.

21             MS. EMPSON:  You are, Your Honor.

22             THE COURT:  Okay.  Cool.

23             So they've raised a threshold issue, and the

24   threshold issue that they raised is that the individual

25   lenders -- even if these claims have merit, the individual

Proceedings

1   lenders don't have standing to bring these claims.  That's

2   the threshold issue that Ms. Kim and Mr. Grillo have put in

3   front of the Court.

4         And you said, well, Judge -- in your papers, the

5   way I understood it -- these people aren't a party to the

6   loan agreement and that should be the beginning and the end

7   of the story as it relates to our claims; right?  Alchemy is

8   the borrower.  We're not suing Alchemy here.  We're suing

9   the other entities.  So that should be the start and the end

10  of that conversation.  That's what you said about that

11  point; right?

12        MR. GANS:  I think it's the start.  I don't think

13  it's the end.

14        THE COURT:  Okay.  Good.  Because I was going to

15  say I'm not so sure I agree, but let's keep going.

16        MR. GANS:  Okay.  Yeah.  Let's get into that.

17        THE COURT:  Yeah.  It's really the elephant in the

18  room; right?

19        MR. GANS:  Yeah.  I think it's important to

20  understand the difference in the claims against SunTrust,

21  the claims that SunTrust has asserted, and the claims that

22  we've asserted.

23        THE COURT:  Sure.

24        MR. GANS:  And Virgo -- and I can get into --

25        THE COURT:  Before you get to that, though, before

Proceedings

1    you get to that, let's just say for a minute that I accept

2    that there is a difference between the SunTrust claims and

3    your claims.  Let's say that I understand why they are

4    different.  You can flesh it out for the record.  I'm going

5    to give you the opportunity to do that.

6         But let's say that I take that as a given, that

7    their claims are contract-based claims, your claims are not.

8    You claim fraud and the inducement as it relates to the

9    loan, you wouldn't have made this loan in the first place

10   for a whole host of different reasons, some of which I kind

11   of alluded to about the Calrissian not having other assets.

12   I find that one a difficult argument.

13        I talked a little bit about why Ms. Kim raised

14   another important point as to why that's a more challenging

15   argument as it relates to Calrissian's financial

16   wherewithal.  But you say channel-stuffing the cash flow.  I

17   think Enron, you know.  So I'm old, you know.  So, you know,

18   somebody is making up cash flows, I start to think about

19   fabricated sales, you know.  We wouldn't have underwritten

20   the loan in the way we had underwritten the loan.  I

21   understand the differences, but you can make your record.

22        Let's say that I accept the fact that there is

23   differences in the claims, I'm wondering why does that

24   affect the analysis as to whether or not SunTrust is the

25   right person to sue.  Because you weren't defrauded by

Proceedings

1  SunTrust, were you?

2        MR. GANS:  No.

3        THE COURT:  So the loan agreement, even if invalid

4  as it relates -- and you're entitled to rescission or some

5  other remedy against the borrower.  And let's say I even

6  think there is veil piercing, just for our conversation

7  purposes, why aren't these SunTrust's claims to bring?  Why

8  doesn't the court of appeals decision in -- just give me one

9  second -- in the *Beal Savings* case require that result?

10        That's what I'm having a lot of trouble with.  And

11  if you are dissatisfied with SunTrust, why don't you sue

12  them?

13        MR. GANS:  Well, we did sue them.  And I think it's

14  not only that the claims are different, but the nature of

15  the difference is really critical here.

16        THE COURT:  Okay.

17        MR. GANS:  And so let me explain.

18        SunTrust filed a lawsuit against Calrissian, as

19  Your Honor knows.

20        THE COURT:  Yeah.

21        MR. GANS:  That -- that's a lawsuit based on the

22  guarantee that Calrissian issued.

23        THE COURT:  Sure.  Worthless but I get it.

24        MR. GANS:  Yeah.  But that's the route they chose

25  to take is to sue a company without assets.

Proceedings

1           But the point is that my letters and what we asked

2     SunTrust to do, because we represent a majority of the stake

3     in the loan --

4               THE COURT:  Sure.

5               MR. GANS:  -- was to bring a lawsuit against Virgo

6     as the alter ego of Calrissian under the guaranty.

7               THE COURT:  Right.

8               MR. GANS:  Not tort claims but a contract action

9     under the guaranty.  So --

10              THE COURT:  And they said no.

11              MR. GANS:  And they said no, and I would be happy

12    to discuss the reasons.  I'm not sure it's relevant here

13    but --

14              THE COURT:  Well, it may be.  I mean, see, I'm not

15    so sure it isn't relevant is I guess what I'm trying to say

16    to you and what your potential course of action is with

17    respect to SunTrust.

18              MR. GANS:  Yeah.  So the reason they said no is

19    because they wanted a full release of known and unknown

20    claims before they would provide any discovery.  So we

21    believe it seems like they are hiding something but we don't

22    know.

23              THE COURT:  Right.

24              MR. GANS:  But the lawsuit that they brought and

25    the lawsuit that we brought against SunTrust involves the

Proceedings

1          guaranty and the guaranty only, okay.  So if -- if you look

2          at the credit agreement.

3                    THE COURT:  Sure.  I can pull it up.  Actually, I

4          think I have it open to save time.  What provision of the

5          loan agreement do you want me to look at?

6                    MR. GANS:  Let's start with section 8.1.  It's on

7          page 114.

8                    THE COURT:  All right.  I'm there.  I had a feeling

9          you were going to talk about it.  We're good.

10                   MR. GANS:  Okay.  It says, the administrative agent

11         may, and upon the written request of the required lenders

12         shall, closed quote, exercise certain remedies.

13                   THE COURT:  Right.

14                   MR. GANS:  And that this is the provision that

15         Virgo relies on.  So this term gives SunTrust the ability to

16         exercise certain remedies on behalf of the lenders.  It says

17         they may.  But it doesn't give SunTrust the exclusive

18         standing to do so and doesn't say there or anywhere else

19         that plaintiffs cannot pursue tort remedies against

20         nonparties.

21                   THE COURT:  Well, it's an interesting argument, but

22         in the *Beal Savings* case, there wasn't an exclusive

23         designation provision either.

24                   MR. GANS:  Yeah.  So *Beal Savings,* that's an

25         interesting case.

Proceedings

1          THE COURT:  Judge Fried's case.

2          MR. GANS:  In that case, the borrower argued that

3    an individual lender could not file a lawsuit against it.

4          THE COURT:  Right.  Because of the broad granting

5    authority on the administrative agent conditioned on a

6    supermajority vote.  And the clear intention that, you know,

7    enforcement of the loan agreement, the loan documents, you

8    know, prohibited an individual lender from acting

9    individually.  Or I think the word he uses is

10   "unilaterally," but he really means individually.

11         MR. GANS:  Yeah.  But let me see if I can get into

12   the differences between *Beal* and here.

13         THE COURT:  Okay.  Yeah.  Help me understand that.

14         MR. GANS:  Okay.  In *Beal* there were 27

15   participants to the loan.

16         THE COURT:  So in my example I would need more --

17   I'm holding up my demonstrative.  See this circle of lenders

18   over here?  I put three stickies down.  I really need 27

19   here to make this *Beal*; right?

20         MR. GANS:  That's right.

21         THE COURT:  Okay.  Great.  So assume that I'm going

22   to multiply this by 9, so each one of these now represents

23   9.  I'm going make it 9L, 9L, 9L.  So far I made *Beal*, okay.

24         You go ahead.

25         MR. GANS:  In *Beal*, the lenders made a decision,

*cb*

Proceedings

1    are we going to sue the borrower or not?  26 of the 27

2    representing 95.5 percent elected to stand on the contract

3    and not to sue the borrower.  *Beal*, 1 of 27 -- one little

4    sticky would be several pages of stickies -- decided to --

5            THE COURT:  Maybe one-ninth.  I'm going to make it

6    one-ninth now.

7            MR. GANS:  Well, *Beal* is one-twenty-seventh.

8            THE COURT:  Okay.  Mine were three.  So each one of

9    these is nine so it's one-ninth.  It's a math thing.

10           MR. GANS:  So Beal refused to abide by the

11   supermajority decision of the lenders --

12           THE COURT:  Right.

13           MR. GANS:  -- and individually sued under the

14   contract, which is an important point.  The Court of Appeal

15   held that one lender in a syndicated loan cannot sue for

16   breach of the credit agreement, quote, contrary to the will

17   of the other 26 lenders to forbear from taking action.

18           THE COURT:  Well, wait a minute.  You say "quote."

19   I don't -- the -- where are you looking?  I have the

20   decision here.  Quote?

21           MR. GANS:  Yeah.  I'm sorry.  I don't have the page

22   handy.

23           THE COURT:  What it says is, "the required lender

24   is defined as a supermajority vote by lenders collectively

25   holding two-thirds of the borrower's outstanding debt."

*cb*

Proceedings

1          And they said, "the supermajority vote evinces a

2    clear intention that enforcement of loan documents,

3    including the keep-well agreement, be collective, and that a

4    minority lender, such as plaintiff, be prohibited from

5    acting unilaterally to recover a judgment."

6          MR. GANS:  That's right.  And that's the critical

7    point is that the majority, a supermajority, said we should

8    not sue, we're standing on the contract, we would like to

9    continue with the contract.  Beal refused to abide by the

10    supermajority and sued anyway.

11          Unlike in *Beal*, here Virgo is not even a party to

12    the credit agreement.  So it has no right to enforce it.

13    And here plaintiffs have 51 percent of the debt, a majority,

14    and nobody elected not to sue Virgo or not to sue -- yeah,

15    not to sue Virgo.  And this is not a suit on the contract.

16    This is a suit against a nonparty to the contract on a tort

17    claim.

18          So --

19          THE COURT:  Well, I don't know that I read the

20    holding of *Beal* as narrowly as you're suggesting that it

21    should be read.  Because didn't the App Div say that the

22    clear and unambiguous language in the various -- in the loan

23    docs prevented the various lenders from individually suing

24    the sponsors?  And then the reasoning is -- meaning that

25    it's the administrative agent that has the standing to sue

Proceedings

1    and that the reasoning that the court used to adopt that

2    holding was the fact that it required a supermajority in

3    interest to get a lawsuit going was evidence that the

4    designation to the administrative agent was intentional and

5    was binding on all of the individual lenders.

6         That's what I think that the holding stands for --

7    right? -- is that when you designate an administrative agent

8    to administer the loan, they are the people with the

9    standing to sue.  And in this case, how it got to its answer

10   was because in order to bring a lawsuit the supermajority

11   needed to want to bring the lawsuit, but it was still the

12   administrative agent that had the standing to sue.

13        MR. GANS:  I think -- and frankly, if I look at the

14   very first sentence of *Beal* that --

15        THE COURT:  Sure.

16        MR. GANS:  -- that frames the issue.

17        THE COURT:  Sure.  The very first sentence of *Beal*.

18   Okay.  You mean, "Ordered Supreme Court, New York County,

19   Bernard J. Fried, entered December 16, 2005, which, in an

20   action for breach of contract, granted defendants' motion to

21   dismiss the complaint on the basis of documentary evidence,

22   unanimously affirmed, with costs"?  That sentence?

23        MR. GANS:  No.  What I have of the copy in front

24   me, it says, "We are asked to determine" --

25        THE COURT:  I'm looking at the Appellate Division

Proceedings

1     decision.  I'll look at the First Department's decision.

2     Let me get the Court of Appeals' decision.  Give me a

3     minute.

4          MS. KIM:  Your Honor, he is reading from the very

5     bottom of page 320 of the opinion.

6          THE COURT:  Give me a minute.  We're going off the

7     record for a minute while I go get it.  Okay.

8          MR. GANS:  All right.  Thank you, Your Honor.

9          (Pause in proceedings.)

10          THE COURT:  All right.  Sorry.  My apologies.  All

11     right.  I have it up.

12          Okay.  You want me to go to "where asked to

13     determine whether one lender in a syndicated loan

14     arrangement has standing to sue for breach of contract

15     contrary to the will of the other 36 lenders to forbear from

16     taking any other action."

17          MR. GANS:  That was the issue for the Court of

18     Appeal.  It's contrary.

19          THE COURT:  Look at what the next sentence is in

20     the decision.  I mean, "the specific unambiguous language of

21     several provisions read in the context of these agreements

22     as a whole convinces us that in this instance the lenders

23     intended to act collectively in the event of the borrower's

24     default and to preclude an individual lender from disrupting

25     the scheme of the agreements at issue."

Proceedings

1           MR. GANS:  That's exactly right, Your Honor.  And

2    the -- you put those two together, what the Court of Appeals

3    is talking about is the collective action, is the election

4    by 26 out of 27 lenders not to sue.  That's the collective

5    action.  It doesn't refer in that paragraph to the

6    administrative agent.  It refers to collective action and

7    that's why they had a vote, and 26 out of 27 elected not to

8    sue.

9           THE COURT:  Yeah, but -- sure.  But look at page 5

10   of the decision under 8.3, "the administrative agent acts

11   upon the direction of the required lenders.  And if

12   required, the borrower must deposit the outstanding

13   principal.  In addition, it is the administrative agent that

14   upon direction of the required lenders may exercise any and

15   all rights and remedies as the lenders elect, including" --

16          MR. GANS:  That's -- sorry.

17          THE COURT:  -- "including all of the rights and

18   remedies."  So not just contract but all of the rights and

19   remedies as the lender elects, including recovering

20   judgment.

21          MR. GANS:  Yes, Your Honor.  As Your Honor read,

22   the direction of the required lenders is what the case is

23   about.

24          THE COURT:  But -- no.  What --

25          MR. GANS:  The administrative agent --

Proceedings

1          THE COURT:  No.  What the -- I don't agree.  I

2     think what the case is about is a designation in the

3     documents as to who has standing.  And the specific issue is

4     whether or not notwithstanding the supermajority requirement

5     to compel the person that's outstanding to sue, to bring

6     that suit, whether or not you can go outside of that

7     designation, and the court said no.

8          But that doesn't change the fact that the person

9     that has standing to sue is, in fact, the administrative

10    agent, which is what you're contending.  And I don't think

11    there is any authority for that.

12         MR. GANS:  I don't think -- I mean, I don't think

13    that *Beal* stands for the proposition that the lenders have

14    no individual rights and tort against nonparties to the

15    contract, which is what we have here.

16         THE COURT:  Well, then you say nonparties to the

17    contract, but the only thing that gives liability -- I mean,

18    you are sort of saying it both ways; right?  I mean, the

19    only thing that gives liabilities to the parties to the

20    contract is the fact that you allege alter ego, and their

21    liability under the circumstances stems from that alter ego;

22    right?

23         MR. GANS:  No.

24         THE COURT:  No?

25         MR. GANS:  No.  Virgo's liability stems from

Proceedings

1    misrepresentations and failures to disclose to induce the

2    plaintiffs to enter the contract, not from --

3              THE COURT:  To the loan with Alchemy.

4              MR. GANS:  Yes.  But that has nothing to do with

5    the alter ego.  That's not -- that's not the basis of our

6    claims at all.

7              THE COURT:  I'm sorry.  So let me see if I got this

8    right in your theory.  Let me see if I understand this.  So

9    you're saying that Virgo and Alchemy are not alter egos.

10             MR. GANS:  I'm not saying that.  I'm saying that I

11   believe they are --

12             THE COURT:  Are they alter egos in your theory or

13   not?

14             MR. GANS:  Yes.

15             THE COURT:  So what I just said is so they are

16   alter egos and Virgo's liability in inducing the lenders

17   to -- it's not the representations in the loan agreement

18   that you are suing on as it relates to the lenders; right?

19             MR. GANS:  Right.

20             THE COURT:  It's the fact that the alter ego of the

21   borrower made certain representations as it relates to

22   things like channel-stuffing, and had they been straight

23   with you about it you would never have done this loan;

24   right?  That's essentially in sum and substance what it is

25   that you're saying?

Proceedings

1          MR. GANS:  Yes, except that when the fraudulent

2     representations were made, they were not the alter ego

3     because they had not yet acquired Alchemy as to the original

4     loan agreement.  They were as to the second loan agreement.

5          THE COURT:  So what was their relationship with

6     Alchemy as it relates to the original loan agreement?  And

7     how would you have relied on their representations if they

8     weren't affiliates of Alchemy at that time?

9          MR. GANS:  For one, during the due diligence

10    period, before Calrissian acquired Alchemy, there was a

11    report by Baker Tilly.  Baker Tilly said there is a poor

12    quality of earnings and focusing on EBIDTA.  It gives you

13    a -- misrepresents the true earnings.  This is --

14         THE COURT:  Okay.  I was asking about Virgo, not

15    about the guarantor.  I was asking about these Virgo

16    entities; right?  Calrissian is the guarantor under the

17    loan.  So you have the loan -- as it relates to the

18    guarantor, there are due diligence items that were done.

19    And maybe the guarantor and Alchemy are the same.  I don't

20    know.  But what I was asking about is doesn't Virgo's

21    liability stem from its relationship with Alchemy?

22         MR. GANS:  No.

23         THE COURT:  It doesn't?

24         MR. GANS:  No.

25         THE COURT:  So what consideration was there for

Proceedings

1    anything that Virgo did here that supports any claim

2    whatsoever?  Did you loan money independently to Virgo?

3              MR. GANS:  No.

4              THE COURT:  So how --

5              MR. GANS:  Virgo wanted to acquire Alchemy.

6              THE COURT:  Sure.  I understand that.

7              MR. GANS:  Okay.  And as we've discussed, did it

8    through Calrissian.

9              The liability here is based on representations made

10   by Virgo, not as the alter ego of Alchemy but on its own

11   behalf.

12             THE COURT:  What are those representations?  Let me

13   just see if I understand this.

14             MR. GANS:  Sure.  The representations has to do

15   with the earnings of the company.

16             THE COURT:  Which company?

17             MR. GANS:  Of Alchemy.

18             So Virgo misrepresented --

19             THE COURT:  So Virgo, that it doesn't own at the

20   time, made misrepresentations about Alchemy's cash flow.

21   And your theory is that Virgo is responsible for those

22   representations that it -- and I'm sorry.  How -- if it's

23   not related to Alchemy at the time, how did it acquire this

24   knowledge as it relates to this cash flow?

25             I mean, I don't understand what you are saying.

Proceedings

1    It's like you're -- I feel like every time I try to get to a

2    line of thinking on one theory, we move, we shift, and I'm

3    having trouble understanding.

4         What is Alchemy -- what's the relationship -- why

5    are you -- if Virgo and Alchemy are not related and Virgo is

6    not part of Alchemy, why are you looking to Virgo for -- how

7    is there any reasonable reliance on anything that Virgo

8    tells you about Alchemy if you're not seeing them as one

9    consolidated group?

10        MR. GANS:  I think they are one consolidated group.

11   I think the distinction that I'm not articulating well is

12   that Virgo, officers of Virgo, specifically Mr. Perez and

13   Mr. Watson, made representations to, for example, Emigrant

14   Bank as to the borrowing base and the earnings of Alchemy so

15   that Emigrant Bank would join the loan and throw in 15

16   million dollars.

17        THE COURT:  Okay.  Let me ask a question.  And what

18   are those two peoples' relationship with Alchemy at the time

19   that those representations are made?

20        MR. GANS:  They were office -- I mean, we haven't

21   conducted discovery yet, obviously, but our understanding is

22   that they are principals of Alchemy.  Alchemy indirectly

23   owns -- I'm sorry.  I'm sorry.  They are principals of

24   Virgo, and Virgo indirectly owns Alchemy.

25        THE COURT:  Right.  So now I'm starting to hear the

1      stuff that I thought I was hearing before about alter ego;

2      right?  And now I'm starting to hear, like, the badges of

3      fraud, right?  Like the usual things that people talk to the

4      Court about.  You know, look, it was really one consolidated

5      group, they are owned by the same people, this was all a

6      sham from the beginning, and so I'm getting back to what I

7      was saying to you, which is that the premises for this

8      claim, as it relates to Virgo's representations and your

9      reasonable reliance under the circumstances necessarily is

10     predicated on the fact that the people that you are speaking

11     to about those representations have some basis for making

12     those representations to you; otherwise, your reliance could

13     never be reasonable.

14          It would be per se -- if I gave you a

15     representation, which I am never going to do, about -- not

16     doing this, not doing this, not doing this -- about the

17     earnings of Apple, you'd say I'm not going to rely on what

18     that judge in the commercial division says.  He doesn't know

19     the first thing about this.  And you would be right for

20     concluding that because I don't.  Okay?

21          MR. GANS:  Yeah.

22          THE COURT:  But in order for there to be (a)(7)

23     here, meaning you are stating a claim as it relates to this

24     fraud, I think you have to have some reasonable reliance as

25     it relates to that that you allege.

Proceedings

1    MR. GANS:  Yes.

2    THE COURT:  I'm pretty sure if there isn't I'm

3    going to get a pretty strong letter from the App Div telling

4    me, Borrok, you blew it.  You really blew it on this one.

5    I'm not looking for that letter.  I try to minimize

6    the number of times that I get those letters and make it a

7    real rainy day when I hear from the panel and they say,

8    Borrok, you didn't do your job right.

9    So I'm going back to what I said to you before,

10   which is, you know, on the one hand you're saying that these

11   are -- you shouldn't be bound by *Beal* and what I consider it

12   to be its holding because these claims are outside the

13   contract, but your claims as it relates to Alchemy it may

14   be -- fraudulent inducement is certainly not a contract

15   claim.  I get that.  I understand that that's an "outside of

16   the contract" claim.

17   But the delegation between the consortium of

18   lenders to SunTrust isn't affected by that fraud is what I'm

19   having trouble with.  And I don't think that there is any

20   Appellate Division or Court of Appeals authority for the

21   notion that having designated SunTrust as your agent that

22   you now have standing to bring these claims.

23   And I don't think it matters, I guess is what I'm

24   trying to say, stated differently, that in the *Beal*

25   agreement there was a supermajority requirement as to when

*cb*

Proceedings

1    the administrative agent under the syndicated loan could act

2    and whether or not the administrative agent under the

3    syndication would act without a supermajority if it thought

4    it was in the best interest.

5         And to me, the way I think about this -- and then

6    you can make your record and we're going to talk about the

7    rest of this, is -- but I think this is a critical issue --

8    is you very well may have a claim against SunTrust if they

9    didn't do something that they were supposed to, that they

10   may have breached their fiduciary duties to you as a lender

11   by failing to give -- by failing to bring this claim if you

12   ask them to do that, because they had standing to do it and

13   you didn't and you designated them as your agent pursuant to

14   this agreement.  And the Akin Gump letter may be an

15   anticipatory breach of their duties.  That's the way I think

16   about it.

17         MR. GANS:  If I may, let me address a couple of the

18   points.

19         THE COURT:  Sure.

20         MR. GANS:  First of all, all of that assumes that

21   Virgo is the alter ego of Alchemy, and I'm sure that counsel

22   would deny that they are.

23         So on a motion to dismiss, are we going to find

24   that they are the alter ego, and I don't think that we

25   can --

*cb*

Proceedings

```
 1              THE COURT:  No.  But I think I have to accept your

 2     allegations as true for the purposes of the motion to

 3     dismiss, and I think you necessarily have to be telling me

 4     that they are because, otherwise, how would any

 5     representation that Virgo made be reasonably relied on by

 6     any of the lenders?

 7              MR. GANS:  Because they can have an interest in

 8     Alchemy without being an alter ego.

 9              THE COURT:  Sure.  They could.

10              MR. GANS:  I could own 30 percent of some company

11     and have no management of the company, and I could represent

12     to you that the company has wonderful earnings and a large

13     borrowing base, and if you lend money to the company, that

14     will increase my 30 percent interest even though I'm not the

15     alter ego.

16              THE COURT:  Sure sounds like a failure of diligence

17     to me, if you were to accept that as a lender.  And let me

18     tell you why.

19              Because if you are going to rely on a 30 percent

20     interest owner in a company that has an independent board

21     and has independent decision-making and that you don't have

22     the kind of access to verify that information, then, jeez, I

23     don't know.  I represented scores of lenders in my

24     pre-judicial career, and I'll tell you, I would never, in my

25     20 years of practice, let a lender without an opinion in the
```

Proceedings

1    file from me telling them not to do this, take the reps from

2    a 30 percent holder and not additionally take the reps from

3    the actual borrower under the circumstances, and I would say

4    the reps -- and I would want to know some basis for the

5    underwriting as it relates to those reps.  The guarantor I

6    might take it from but -- and I would, you know, want to

7    understand, and I would ask the question, you know, have you

8    done your due diligence and do you understand that the

9    guarantor appears to be a shell and what you are really

10    looking to as it relates to your loan of value here.

11            MR. GANS:  I understand that, Your Honor, and I am

12    sure that will be an affirmative defense.

13            THE COURT:  Yeah, of course it will.

14            MR. GANS:  Yeah.  But I don't think that's a basis

15    of motion to dismiss.  In fact, they haven't even raised

16    that as a basis for the motion.

17            THE COURT:  No, I don't think they have to.  I

18    think they have a standing issue.

19            MR. GANS:  Well, let me, if I can --

20            THE COURT:  Go right ahead.

21            MR. GANS:  Okay.  Let's look at the credit

22    agreement here, because it's not the same as the credit

23    agreement in *Beal*.

24            As we looked at before, 8.1 says that SunTrust may

25    exercise certain remedies.  Let me just find my notes here.

Proceedings

1    One second, please.

2              THE COURT:  Sure.  Take your time.

3              MR. GANS:  Nothing --

4              THE COURT:  For purposes of the record, 8.11

5    subsection?  Just for the record.

6              MR. GANS:  Yeah.  It's at the very end of 8.1.

7    It's sort of separated out.  It's not very clear what

8    subsection it is, but it follows from subsection Q.  It's

9    sort of a separate paragraph at the very end after

10   subsection Q.

11             THE COURT:  P?  You mean after subsection P?

12             MR. GANS:  Well, I think it's Q.  It's the

13   paragraph before Section 8.2 if that helps.

14             THE COURT:  It helps.  Is the lead-in, "then in any

15   such event"?

16             MR. GANS:  Yes.

17             THE COURT:  Yeah.  It's right after P.  P is, "any

18   lien purported to be created under any collateral."

19             MR. GANS:  Yes.  But there is a Q also.  And,

20   Your Honor, maybe you are looking at the original credit

21   agreement rather than the amended.

22             THE COURT:  Oh.  I think you're right.  Let me look

23   at the amended credit agreement.

24             MR. GANS:  It's Exhibit C to our complaint if that

25   helps.

Proceedings

1     THE COURT:  It helps.  Okay.  Yeah.  Okay.  "The

2     administrative agent may, and upon the written request of

3     the required lenders, shall" --

4     MR. GANS:  Yes.  And then if you go to (iii),

5     "exercise all remedies contained in any other loan

6     document."

7     And (iv) is, "exercise any remedies available at

8     law or in equity."

9     THE COURT:  Sure.

10     MR. GANS:  So SunTrust may do that.  And if --

11     THE COURT:  To require lender to send them a love

12     letter, they have to do it.

13     MR. GANS:  Right.  But nothing says anywhere in the

14     agreement that they have exclusive standing to do that, and

15     nothing says that plaintiffs may not pursue tort remedies

16     against nonparties.

17     And let me ask you to take a look at Section 10.2

18     of the credit agreement.  That's on page --

19     THE COURT:  Sure.  Give me one second though, okay.

20     MR. GANS:  Sure.

21     THE COURT:  All right.  So in this agreement, just

22     for purposes of our conversation, "required lenders" is

23     defined as lenders holding more than 50 percent whereas the

24     *Beal* lenders it was two-thirds.  Here it's 50 percent.  But

25     I understand what you are saying.

Proceedings

1           MR. GANS:  Right.  And here the majority are the

2      plaintiffs.  My clients are the majority here.

3           THE COURT:  Sure.  There is no dispute about that.

4      We agree.

5           So now you want me to go to 10.2?

6           MR. GANS:  Yeah.  10.2, please.

7           THE COURT:  Can I just ask a simple question as it

8      relates to this argument?  If you're right, wouldn't the

9      *Beal* court have just simply said hey, look, you can sue?

10          MR. GANS:  No.  No.

11          THE COURT:  Why not?

12          MR. GANS:  Because the supermajority in *Beal* said

13     no.  And the Court of Appeals said --

14          THE COURT:  But if it's not an exclusive provision

15     as you argue here, why would it matter?  In other words, in

16     *Beal*, they say, hey, look, there was a clear designation, as

17     you say, to the orderly administration of the loan and that

18     in order to get the administrative agent to bring a lawsuit

19     you needed a supermajority.

20          In that case there wasn't a supermajority and it

21     wasn't the individual lender -- it wasn't the administrative

22     agent that was bringing the lawsuit, in any event.  It was

23     an individual under.  The court said no, no, no, there is a

24     clear designation as it relates to administrative agent.

25     And what's evidence of that is that it requires a

Proceedings

1    supermajority.

2            I'm saying to you then, while you may meet the

3    threshold requirement under this loan document, it doesn't

4    change the fact that -- I guess I'm saying the same thing as

5    I said before -- that there is a clear designation that the

6    administrative agent is the one to bring suit.

7            And if you're right that it's not an exclusive

8    provision, then why -- and it doesn't -- and the *Beal*

9    agreement didn't have exclusive language either.  Why

10   wouldn't the individual -- why do you need this -- what is

11   the provision doing if it's not setting a threshold

12   requirement to bring a lawsuit?

13           MR. GANS:  I'm sorry.  I didn't understand the

14   question.

15           THE COURT:  Withdrawn.  It's okay.  10.2 waiver and

16   amendments.

17           MR. GANS:  Yeah.  So 10.2, if you look on page 124,

18   the fourth line down, it says, "the rights and remedies of

19   the administrative agent and the lenders hereunder and under

20   the other loan documents are cumulative and are not

21   exclusive of any rights or remedies provided by law."

22           So assume for a moment that my clients have a right

23   to sue for fraud in the inducement against a nonparty to

24   this agreement.  Nothing in this agreement precludes them

25   from doing so.

Proceedings

1          And if we go back to *Beal* for one second, and then

2     I want to show you one other section of this credit

3     agreement, in *Beal* it wasn't just that a majority did not

4     decide to sue, it's a supermajority decided not to sue.  And

5     what Beal did was in contradiction of the supermajority.

6          THE COURT:  I understand the argument.  I don't

7     think that -- your argument is essentially that if Beal had

8     owned 80 percent of the loan, then Beal could have walked

9     into court and brought a lawsuit.

10         MR. GANS:  If -- yeah.  If a supermajority --

11         THE COURT:  So if Beal held 80 percent of the loan

12    and the rest of the syndicate owned 20 percent, under your

13    reading of *Beal*, Beal could have brought that lawsuit.

14         MR. GANS:  Could have -- well, I'm trying to be

15    clear and not quibble with the Court's question.  Beal could

16    have brought a lawsuit for fraud against a nonparty, yes.

17         THE COURT:  No.  That -- the fraud against a

18    nonparty, again, is predicated on the relationship and the

19    reasonable reliance.

20         Okay.  So what I'm saying is Beal, under your

21    theory, if it owned 80 percent, should have been allowed to

22    proceed against the party to the loan agreement.

23         MR. GANS:  Yes.  If under *Beal* there was no

24    election not to sue, then Beal, as an 80 percent owner,

25    could have filed a lawsuit for --

Proceedings

 1           THE COURT:  And would not have had to look to the

 2     administrative agent that was designated under the agreement

 3     to bring that lawsuit by virtue of the designation because

 4     it's not an exclusive provision as set forth in the

 5     decision.  It's very clear in the decision of *Beal* that it

 6     didn't say this is the exclusive -- notwithstanding the

 7     holding, that it was exclusive.  If Beal owned 80 percent,

 8     he himself could have brought a lawsuit.

 9           MR. GANS:  Your Honor, I think that there is a

10     critical distinction about filing a lawsuit and tort against

11     a nonparty.  And I'm happy -- I would like to show you one

12     other provision.

13           THE COURT:  Before you do, I just want an answer to

14     my question, though.

15           MR. GANS:  Could Beal --

16           THE COURT:  If Beal owned 80 percent of the loan,

17     could Beal have brought a lawsuit under your reading or

18     would Beal have had to have sent a notice, as indicated in

19     the loan agreement, to the administrative agent to bring the

20     claim?

21           MR. GANS:  The claim --

22           THE COURT:  That's all I'm asking you.

23           MR. GANS:  Yes, Your Honor.  And I'm trying to be

24     clear that the answer is -- depends on the claim.  A claim

25     under the contract has to be brought by the administrative

Proceedings

1    agent just like it does here.  And I would like to show you

2    another provision that says that here.

3             But I -- I don't know how to answer other than to

4    distinguish between a contract claim against a party to the

5    contract, which I think the administrative agent has to

6    file, and the tort claim against a nonparty.

7             And if Your Honor would take a look at the credit

8    agreement here in Section 9.13, I think that really makes

9    it -- makes it clear.  We're on page 121 of Exhibit C to our

10   complaint.

11            THE COURT:  You mean "anything contained in any of

12   the loan documents to the contrary notwithstanding, the

13   borrower, the administrative agent and each lender hereby

14   agree that no lender shall have any right individually to

15   realize upon any of the collateral or to enforce the

16   collateral documents, it being understood and agreed that

17   all powers, rights and remedies hereunder and under the

18   collateral documents may be exercised solely by the

19   administrative agent"?

20            MR. GANS:  That's right, Your Honor.  So a lawsuit

21   under the credit agreement or the collateral documents must

22   be brought solely by the administrative agent.  And that's

23   the distinction I've been trying to make.  Because --

24            THE COURT:  It doesn't say that.  I mean, you're

25   asking me to read in language that isn't here.

Proceedings

1          MR. GANS:  I think it's -- the language here is it

2     may be exercised solely by the administrative agent, rights

3     and remedies under the credit agreement and under the

4     collateral documents.

5          If --

6          THE COURT:  I mean, respectfully, I -- I think you

7     are missing the whole point of why there is a designation as

8     to an administrative agent.  The whole point of this is so

9     that the administrative agent administers the loan.  That's

10    the whole point of this arrangement is that the lender -- I

11    mean --

12         MR. GANS:  Your Honor, I agree with that but --

13         THE COURT:  Yeah.  So but you understand that when

14    people write loans at banks, that the loan officer isn't the

15    person that services the loan after the loan is written,

16    whether it's on the balance sheet of the loan or whether

17    it's securitized; right?  You understand that.

18         MR. GANS:  Yes.

19         THE COURT:  They typically hire a service company

20    to do all of this because they are not in the business of

21    doing all of this.  So you turn to the servicer and you say

22    to the servicer or the trustee, as it relates to a

23    securitized set of loans, and you say, go bring this

24    lawsuit.  And they're bound to do it.  And if they don't do

25    it, they are exposed.  And this whole argument that you are

Proceedings

1       making flies in the face -- not only the loan documents, not

2       only the Court of Appeals decision, but in the way that

3       these relationships are set up and what the purpose of these

4       relationships are for, and the way that the business model

5       of the banks is bifurcated.  People that do origination

6       don't do servicing.

7            MR. GANS:  I do understand that.  But I think the

8       distinction is that they service the loan.  And that is not

9       the same as filing a tort claim -- an individual filing a

10      tort claim, against a nonparty.  And that's why --

11           THE COURT:  I think it's a distinction without a

12      difference under the circumstances.  I really do.

13           I mean, you're realizing what you really want is

14      either rescission or damages relating from the fraudulent

15      representations that were made in connection with the

16      underwriting of this loan.  That's really what you want.

17           And essentially this is SunTrust's claim to make as

18      your agent.  That's what they're there for.  And if they

19      don't do it, they better really have a really good reason

20      why they're not doing it.  Like, you're just wrong.

21           MR. GANS:  I --

22           THE COURT:  And if not, you know, I can assure you

23      that, you know, whether it's me or one of my -- God, I --

24      one of my colleagues will understand that that's what they

25      are there for and that's what they are supposed to do.

Proceedings

1              My problem, I -- I just -- you know, look.  I want

2       to be very clear about something for the purposes of the

3       record.  Okay.  Because I don't have any questions about

4       your claim.  I don't have any questions about whether or not

5       you can satisfy, because we are going to run out of time.

6              I think you've -- that there is a claim.  I just

7       don't think you're the right person to be making the claim.

8       And if I get one of those notes that we were talking about,

9       from 25th Street, just a few minutes ago, well, we'll have a

10      very different conversation about the case.  But I think

11      that the dispositive issue at this stage of the proceeding

12      is the standing issue.  It's not whether or not you've

13      adequately alleged fabricated cash flows and things that if

14      you knew -- so we don't need to spend time on the rest of

15      this is what I'm trying to say to you.

16              So if there's something else you want me to

17      consider, I'm all ears.  But I -- we respectfully don't come

18      to the same answer about what the arrangement is intended to

19      accomplish, who has standing to sue.  We don't have a

20      disagreement about whether allegations -- specific

21      allegations of fabricated cash flows is sufficient to

22      support a fraudulent inducement claim.

23              Is there anything else you want me to look at as it

24      relates to the issue that I'm stuck on?

25              MR. GANS:  No.  I would just like to reiterate

Proceedings

1    briefly and, Your Honor, I'm sorry if it's not really new,

2    but as Your Honor is describing what an administrative agent

3    does is to administrate the loan, it is not to sue third

4    parties on behalf of individual lenders, and I don't think

5    there is anything in the agreement that precludes that.

6         But I understand what Your Honor is saying and

7    we're happy to -- we would like an opportunity to amend to

8    clarify the standing and the alter ego issue.

9         THE COURT:  Well, let me ask a question about *Beal*.

10   What were the underlying claims in *Beal* that were being

11   asserted?  If you remember.

12        MR. GANS:  Unfortunately, I don't remember,

13   Your Honor.

14        THE COURT:  Okay.  I commend the underlying case to

15   you in Judge Fried's opinion.

16        MR. GANS:  All right.  I mean, the other thing

17   about *Beal*, which I would like Your Honor to consider, is

18   that *Beal* has a party to the contract enforcing the term

19   that's in issue.  Virgo --

20        THE COURT:  I understand that.  I get that.  But

21   that's not my problem.  Standing is a threshold issue that

22   the Court looks at.  It's not an issue -- I understand that

23   your claims are -- that the loan agreement between --

24   ultimately somebody may find that the loan agreement is

25   invalid.  I understand that.  And that your claims are

Proceedings

1    outside the agreement for those reasons.

2           But the agreement that's codified in the loan

3    document between SunTrust and the consortium of lenders as

4    administrative agent is in no way affected by the

5    allegations that you make against the borrower or the

6    borrower's affiliate or the borrower's alter ego, or as

7    against the guarantor.

8           SunTrust didn't do anything here that invalidates

9    that designation is what I'm trying to say to you.  So

10   it's -- if I draw a line in the middle of my demonstrative.

11   Okay.  See the line in the middle of -- I don't know --

12   coming through?  And I've got the lender group over here,

13   which I would include the administrative agent and on behalf

14   of the lender group, okay, because this is the agent on

15   behalf of these people, the principals here.  And then on

16   the other side of this -- and I don't mean this negatively.

17   I'm just taking the allegations as true.  Okay.

18           I got all the people that you're angry at over

19   here.  Okay.  What you call the bad people.  Is "bad"

20   generic enough?  The bad people over here.  And this

21   agreement on this side of the equation, even taking your

22   allegations as true, is unaffected is what I'm trying to say

23   to you.

24           This designation, this principal-agent

25   relationship, is unaffected.  And if this loan needs to be

Proceedings

1    undone because it was fraudulently induced, what I'm saying

2    to you is that SunTrust is the person to bring that claim.

3    Whether it's a default under the loan documents, whether

4    there were fraud in the inducement, whether there was fraud

5    during the course of the loan documents, it's their claim as

6    your agent as it relates to this loan.  That's what I'm

7    saying to you.

8         MR. GANS:  I understand that, Your Honor.  SunTrust

9    is saying that no, they don't have to bring this.

10        THE COURT:  And then so where is that lawsuit?

11        MR. GANS:  That lawsuit is -- there was a motion to

12   dismiss filed and fully briefed in October of 2020, which

13   the court has not yet ruled on.

14        THE COURT:  In which court?

15        MR. GANS:  Southern District.

16        THE COURT:  I'm quite certain that you are going to

17   take this transcript and bring it to Foley Square, and

18   you'll show it to Judge Rakoff, or any of my colleagues next

19   door, and I'm quite certain -- I'm not 100 percent sure --

20   that -- so I'm going to dismiss your case without prejudice.

21   And I'm going to give you leave to replead if the Southern

22   District finds that SunTrust is successful in their lawsuit

23   because you can't be kept without remedy.

24        MR. GANS:  Well, that is the issue.

25        Your Honor, respectfully, I request the week that

Proceedings

1   we have one chance to amend --

2          THE COURT:  I'm going to do this based on what

3   happens in the federal action.  And I'm going to -- I'm

4   going to give you, in my order, 45 days to replead in the

5   event that the Southern District grants the SunTrust motion

6   to dismiss so that I'm going to address any statute of lims

7   issues that way.  So you'll have plenty of time to come back

8   to me, if they come to a different conclusion in a way that

9   is much harder to address.

10          All right.  I appreciate our conversation.

11          What's wrong, Ms. Kim?  You win.  When you win, you

12   are supposed to sit down.

13          MS. KIM:  Yeah.  I know, Your Honor, and this might

14   be foolish, but I have a question.

15          THE COURT:  Yeah.  Go on.

16          MS. KIM:  So if I understand your ruling --

17          THE COURT:  I'm ruling on the standing issue,

18   solely on the standing.

19          MS. KIM:  Okay.  My question is -- maybe I

20   misunderstood what the Court said -- that is the motion to

21   dismiss granted today or it is granted 45 days after?

22          THE COURT:  I'm granting the motion to dismiss

23   right now without prejudice, I'm giving them leave to

24   replead solely in the event that the Southern District

25   dismisses the federal action filed against SunTrust.  They

Proceedings

1    will get 45 days to come back and replead if SunTrust is

2    successful in that action.  They can't be left without

3    remedy.

4              And if the Southern District thinks that they don't

5    have to bring this lawsuit, SunTrust, then they can bring it

6    back here, and I'll look at why the Southern District said

7    they don't have to bring that lawsuit.

8              Doesn't mean they can't bring the lawsuit.  It

9    means I'm going to look at why the Southern District said

10   that SunTrust didn't have to bring the lawsuit.

11             MS. KIM:  Okay.  I understand.  Thank you,

12   Your Honor.

13             THE COURT:  All right.

14             MR. GANS:  Your Honor, if I can just take one more

15   shot at amending now --

16             THE COURT:  I'm not doing that.  I just said I'm

17   not doing that.  No.  I really -- I'm sorry.  It's not -- to

18   me this isn't a -- I really think that the *Beal* decision

19   answers this question.  I really -- I do.  Period.  So there

20   is nothing that you can fix for me on the standing point

21   that's going to make this work for me.

22             I really think that there is a designation by the

23   lenders of SunTrust as the agent to bring this suit, and

24   they are required to bring the suit pursuant to the

25   agreement.

Proceedings

1    And they would be required to bring it, in any

2    event, because they have fiduciary duties to the consortium

3    of lenders that they represent.  And the failure to do that

4    would be an absolute breach of fiduciary duty under the

5    circumstances.  And you'll see what happens in the federal

6    district.

7    MR. GANS:  Your Honor, I have to point out one

8    thing, because the credit agreement specifically disclaims

9    any fiduciary duty on behalf of SunTrust.  They have no

10    fiduciary duty.

11    THE COURT:  Show me where it says that.

12    MR. GANS:  Let me find that.  I don't know.

13    Ms. Empson, if you can help me.

14    THE COURT:  Are you looking at 9.1 -- 9.12?

15    MR. GANS:  Let me see.

16    THE COURT:  I think you are looking at 9.12.

17    MR. GANS:  That's one of them.  I believe there is

18    another place where it says specifically that they have no

19    fiduciary duty.

20    MS. EMPSON:  It may be section 10.15.  That may be

21    incorrect.  Let me see if I can find the right section.  I'm

22    being advised it's Section 9.2.

23    THE COURT:  9.12 or 9.2?

24    MS. EMPSON:  2.

25    THE COURT:  Okay.  So 9.2 doesn't help you.  "The

*cb*

Proceedings

1    administrative agent shall not have any duties or

2    obligations except those expressly set forth in this

3    agreement and the other loan documents.  Without limiting

4    the generality of the foregoing the administrative agent

5    shall not be subject any fiduciary or other implied duties

6    regardless of whether default or event of default has

7    occurred and is continuing, the administrative agent shall

8    not have any duty to take any discretionary action or

9    exercise any discretionary powers except those discretionary

10   rights and powers expressly contemplated by the loan

11   documents that the administrative agent is required to

12   exercise in writing by the required lenders."

13          And that would mean bring the lawsuit.  Because it

14   specifically tells you -- them that they have to do it.  So

15   that's the point of this is that without the designation in

16   writing, they don't have to do anything.  You have to tell

17   them to do something, and then they have to do it.

18          And if they don't do it, then they're in breach.

19   That's the point.  It's the "except."  "Except those powers

20   expressly contemplated" -- "is required to exercise."

21   That's why the section that I was talking to Mr. Gans about

22   says "shall" and not "may."  Once they get the notice.  It's

23   because of that writing.  They have to.  They have to act.

24   They can't not.  Unless they think it will expose them to

25   personal liability and all the other things that are a

1    carveout; otherwise, the arrangement would never work.  Why

2    would you ever designate them administrative agent for the

3    loan if they didn't have to do anything; right?

4              All right.  Good chat.  Nice to see you.

5                        **********

6    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL

7    STENOGRAPHIC MINUTES TAKEN OF THIS VIRTUAL PROCEEDING.

8                              CARRIE BELMONTE, CSR, RPR

9                              Senior Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*cb*