# Exhibit 2

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                        .   Chapter 7
 3    IN RE:                            .
                                        .   Case No. 16-11596 (JTD)
 4    OUR ALCHEMY, LLC, et al.,         .
                                        .   Jointly Administered
 5                Debtors.              .
      . . . . . . . . . . . . . . . . . .
 6    GEORGE L. MILLER, in his          .   Adv. Pro. No. 18-50633
 7    Capacity as Chapter 7 Trustee,    .
                                        .
 8                Plaintiff.            .   Re: Adv. D.I. 214
                                        .
 9       v.                             .   Courtroom No. 5
                                        .   824 North King Street
10    ANCONNECT LLC, et al.,            .   Wilmington, Delaware 19801
                                        .
11                Defendant.            .   September 21, 2022
12    . . . . . . . . . . . . . . . . .     1:00 p.m.

13                       TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
14                 UNITED STATES BANKRUPTCY JUDGE

15    APPEARANCES:

16    For the Chapter 7
      Trustee:               John Carroll, III, Esquire
17                           COZEN O'CONNOR
                             1201 North Market Street
18                           Suite 1001
                             Wilmington, Delaware 19801
19

20    Audio Operator:        Jermaine Cooper

21    Transcription Company: Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email: gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording,
25    transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Chapter 7
Trustee:                        Andrew Belli, Esquire
                                KAUFMAN COREN & RESS, P.C.
                                2001 Market Street
                                Philadelphia, Pennsylvania 19103

For Virgo Investment
Group:                          Andrea Kim, Esquire
                                DANIELS & TREDENNICK LLP
                                6363 Woodway, Suite 700
                                Houston, Texas 77057

For Emigrant Bank,
Pacific Mercantile
Bank:                           L. Katherine Good, Esquire
                                POTTER ANDERSON & CORROON LLP
                                Hercules Plaza
                                1313 North Market Street, 6th Floor
                                P.O. Box 951
                                Wilmington, Delaware 19801

                                Victor Noskov, Esquire
                                QUINN EMANUEL URQUHART & SULLIVAN
                                51 Madison Avenue, 22nd Floor
                                New York, New York 10010

1                                INDEX

2  MOTION GOING FORWARD:                                  PAGE

3  Agenda
4  Item 1: Oral Argument Regarding Trustee's Motion        5
              for Entry of Bar Order and Sanctions for
5              Violating the Automatic Stay Against the
              Usurping Banks filed by George L. Miller,
6              Trustee [Filed 12/17/2021; Docket No. 957]
              [Adv. Docket No. 214] (Adv. No. 18-50633)
7
              Court's Ruling:                             82
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 1:00 p.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good afternoon, everyone.  Thank you.

4  Please be seated.

5               Yes?

6               MR. CARROLL:  Good afternoon, Your Honor.  John

7  Carroll of the law firm of Cozen O'Connor appearing on behalf

8  of the Trustee.

9               This is the matter of Our Alchemy, LLC.  We are

10  here today for a singular matter which is the oral argument

11  on the Trustee's motion for an entry of the bar order and

12  sanctions for violating the automatic stay against certain

13  usurping banks which was filed by the Trustee.

14               Your Honor, I just have two housekeeping matters

15  that I wanted to address.

16               In terms of the Trustee making argument today will

17  be Andrew Belli and also, perhaps, Steven Coren, both of whom

18  have been admitted previously on a *pro hac vice* basis.

19               I would ask for the Court's permission to be

20  excused at or about 1:30.  I have another hearing which

21  starts at 2 o'clock.  So with the Court's permission I would

22  like to leave the courtroom at that point.

23               THE COURT:  That's fine.  Thank you.

24               MR. CARROLL:  Your Honor, with that I think we're

25  ready to proceed.

1           THE COURT:  Okay.  I will hear from Trustee's

2 counsel.

3           MR. BELLI:  Good afternoon, Your Honor.  Andrew

4 Belli of Kaufman Coren & Ress here on behalf of George

5 Miller, Chapter 7 Trustee of the estates of Our Alchemy, LLC

6 and Anderson Digital, LLC.

7           As Mr. Carroll noted, we're here today to address

8 the Trustee's motion for entry of a board order and for

9 sanctions for violation of the automatic stay against

10 Emigrant Bank and Pacific Mercantile Bank which are referred

11 to in the Trustee's papers, and which I will refer to today

12 as the usurping banks.

13           THE COURT:  Why don't we just refer to them as the

14 lenders?

15           MR. BELLI:  As the lenders?  Well, there's also

16 other lenders, Your Honor, who are similarly situated.

17           THE COURT:  Well, the lenders who are in front of

18 me.

19           MR. BELLI:  Okay, Your Honor, I can do that.

20           THE COURT:  So we can refer to them as lenders,

21 and that is who you are referring to.

22           MR. BELLI:  Thank you, Your Honor.

23           I also want to introduce Virgo.  Virgo is a

24 private equity company which, through various affiliates,

25 owned a company called Calrissian which owned all the equity

1  of the debtor.  Our papers detailed the specific Virgo

2  affiliates and individuals at issue here, and I am going to

3  refer to them all today for the sake of convenience as Virgo

4  or the Virgo parties.

5           The Virgo parties have joined in the Trustee's

6  motion to the extent it seeks a bar order.  Andrew Kim, who I

7  am sharing my table, and I have agreed to, if it's okay with

8  Your Honor, cede part of my time to Ms. Kim so she can make

9  Virgo's joinder arguments.

10          THE COURT:  Okay.

11          MR. BELLI:  By way of background, the lenders, who

12 the Trustee seeks a bar order against, were prepetition

13 lenders to debtor Alchemy pursuant to credit agreements which

14 designated SunTrust Bank as the administrative agent with

15 sole authority to enforce the credit agreement on behalf of

16 all the lenders.

17          After Alchemy filed for Chapter 7 SunTrust entered

18 into a sharing and reimbursement agreement with the Trustee

19 that granted the lender group, including the usurping banks,

20 an allowed claim in the amount of the outstanding loans owed

21 by Alchemy under the credit agreements.  That agreement was

22 approved by Judge Gross in October of 2016.

23          The Trustee brought an adversary proceeding which

24 asserted claims against a number of defendants, some of which

25 were entities and individuals affiliated with Virgo.  As

1  against Virgo the Trustee's adversary proceeding asserted

2  claims for unjust enrichment, breach of fiduciary duty and

3  avoidance of various fraudulent transfers, many of which

4  implicate funds loaned to Alchemy under the credit

5  agreements.

6         The Court approved a voluntary mediation in June

7  of 2021.  As set forth in the certificate of counsel that

8  proceeded the Court's order, mediation consisted of a two-

9  step process.  First, there will be preliminary calls with

10 the mediator where he would attempt to resolve the matter

11 prior to an in-person mediation at the end of September 2021.

12        While that preliminary mediation was in process

13 the lenders at issue here today filed litigation in the New

14 York Supreme Court; that was filed on July 9th, 2021.  The

15 litigation was filed against the same Virgo entities and

16 individuals sued by the Trustee.  And the complaint in that

17 litigation is liberally from the allegations made by the

18 Trustee and uses those allegations to set forth reported

19 claims for unjust enrichment, fraud and tortious interference

20 with contract, but the damages at issue in that complaint are

21 quantified solely by the money loaned by the bank group to

22 Alchemy.

23        The Trustee -- sorry, Your Honor, the complaint in

24 that New York litigation makes a number of allegations which

25 cut to the heart of the matter I'm here to discuss today.

1  Those are detailed in our papers.  It would take more time

2  than I have to go through each and every one of them, but I

3  want to direct the Court to two notable paragraphs from that

4  New York complaint.

5           The first is Paragraph 33, and I'm quoting here

6  that that paragraph states:

7           "At all times relevant hereto, Calrissian and

8  Alchemy were the agents of Virgo.  And in doing the acts

9  alleged herein acted within the course and scope of such

10 agency, and authorized and/or ratified the wrongful acts of

11 each other."

12          I would also want to point the Court to Paragraph

13 34 which similarly states that:

14          "At all times relevant hereto, Calrissian and

15 Alchemy, which is the debtor, acted as Virgo's alter-egos.

16 Virgo owned and exercised complete dominion and control over

17 Calrissian and Alchemy to perpetrate fraud and other

18 wrongdoing against plaintiffs.  Virgo's misuse of legal

19 forums and shifting of assets from Calrissian and Alchemy to

20 Virgo was designed to enrich Virgo and its principals while

21 shielding Virgo from liability to plaintiffs and others."

22          So these allegations, when read along with the

23 rest of the State Court complaint justify entry of the bar

24 order that I am seeking today.

25          As Your Honor knows, the automatic stay operates

1 | broadly and prohibits any act to obtain or exercise control

2 | over property of the estate.  And the language I just quoted

3 | to this Court makes it clear that the State Court complaint

4 | is an attempt by the lenders we're discussing here today to

5 | exercise control over property of the estate.

6 | Now in the Third Circuit the test for whether a

7 | cause of action is property of the estate is governed by a

8 | two part test set forth in In Re Emerald and the first part

9 | of that test is that the claim existed at the time of the

10 | bankruptcy filing and could have been asserted by the debtor

11 | under state law.  Our briefing cites many cases establishing

12 | as a general matter that Alchemy had the ability under

13 | Delaware law, through the Trustee, to attempt to pierce its

14 | own veil at the commencement of the bankruptcy, thus

15 | satisfying the first element.

16 | More specifically here the Trustee actually did

17 | bring claims based on the same conduct challenged by the

18 | lenders in the State Court complaint.  As the State Court

19 | complaint notes or alleges, Virgo's shifting of assets from

20 | Alchemy to Virgo was designed to enrich Virgo and its

21 | principals.  That, in a nutshell, Your Honor, is what the

22 | Trustee was alleging in the adversary proceeding.

23 | The second part of the In Re Emerald test is that

24 | the claim is a general claim with no particularized injury

25 | arriving from it.  Courts have repeatedly found that alter-

1    ego and similar claims are general claims which inure to the

2    benefit of all creditors.  Again, if Your Honor looks at the

3    State Court complaint, the usurping banks specifically

4    alleged that Virgo was misusing the legal forum and usurping

5    the debtor's assets to the detriment of not only the lenders

6    we're discussing here today, but also unspecified others.

7    That is language the New York State Court complaint uses.

8         Who are the "others?"  I submit to Your Honor that

9    they could only be other creditors of the debtor because the

10    usurping banks were making allegations of generalized harm

11    that impact all of Alchemy's creditors and not just Pacific

12    Mercantile Bank and Emigrant Bank.

13         So, Your Honor, you have -- we have established

14    that the claims are property of the estate under Emerald, and

15    then there is a second main reason why the State Court claims

16    they're an attempt to exercise control over property of the

17    estate and that is that a subset of those claims,

18    essentially, seek to repackage and replead claims that the

19    Trustee actually brought in the adversary proceeding.

20         They attempt to give the claims different labels,

21    but the usurping banks are bringing disguised fraudulent

22    transfer claims that are in the exclusive province of the

23    Trustee.  They repeat the Trustee's allegations concerning

24    transfers made by the debtors to Virgo.  They allege that

25    Virgo caused Alchemy to transfer loan proceeds to benefit

1  itself at the expense of the lenders and other creditors.

2  And they treat Alchemy and Virgo as interchangeable by

3  pleading that the bank group loaned money to Virgo.

4           Accordingly, Your Honor, when you look at the

5  substance of those claims it's identical to the fraudulent

6  transfer claims being made by the Trustee.  They allege that

7  Virgo caused Alchemy to transfer loan proceeds for its own

8  benefit at the expense of Alchemy's creditors and seek to

9  recover damages from Virgo that are measured on account of

10 those transfers.  That is the same exact wrongdoing that the

11 Trustee alleges in the adversary.

12          THE COURT:  Let me ask you a question: what if,

13 instead of Virgo, Our Alchemy had hired a broker to find

14 lenders to contribute to Our Alchemy?  So the broker goes out

15 and gets the banks to give money.  And the broker knows in

16 doing so that Our Alchemy is misrepresenting its income, its

17 ability to stay in business, whatever it might be, it's

18 EBITDA.  So the broker knows that.  The broker knows that

19 they are misrepresenting information publicly, but the broker

20 goes along with it, goes out, and gets the lenders to give

21 money by making those same misrepresentations.

22          Would Our Alchemy have the ability to sue the

23 broker for that?

24          MR. BELLI:  I believe so, Your Honor, because they

25 would ultimately result in Alchemy taking on a debt that it

1  doesn't really have the bonafides to maintain.

2          THE COURT:  Aren't there two different things

3  here?  There is a question of whether the fraudulent transfer

4  claims have to do with money that went from Our Alchemy to

5  Virgo, but the question here is, and what they're saying that

6  they're pursuing in New York, is the misrepresentations made

7  directly by Virgo to them which is in an independent claim

8  and they can pursue damages against them.

9          Now their damages are going to be measured by

10 whatever amounts they loaned to Our Alchemy, but that doesn't

11 mean they're trying to recover the transfers from Our Alchemy

12 to Virgo.  There's two separate issues there.

13         MR. BELLI:  I recognize that, Your Honor, but I

14 think you're relying on their characterization of what the

15 New York State Court complaint says rather then what that

16 complaint actually says.  If Your Honor takes a look at that

17 complaint and strips away all the allegations that aren't

18 based on either things the debtor said to the banks or that

19 to directors of Alchemy, Jessie Watson and Mark Perez, said

20 to the banks that in their capacity as directors of Alchemy

21 once you strip all that away the State Court complaint

22 doesn't make allegations that Virgo is making all these

23 extraneous representations.

24         The State Court complaint is attempting to take

25 the actions and representations of Alchemy and impute them to

1  Virgo so that the banks can avoid the bankruptcy process and

2  recover against Virgo.  If Your Honor looks at each of the

3  counts in the New York State complaint I think it's

4  instructive that each of the counts has an allegation that

5  references the reps and warranties made by the debtor in the

6  credit agreement.

7       I don't -- I mean Virgo wasn't a party to the

8  credit agreement.  Virgo wasn't making the reps and

9  warranties under the credit agreement.  Why are the

10 allegations made in the credit agreement an essential part of

11 the bank's claims against Virgo if Virgo is not the alter-ego

12 of Alchemy?  If alter-ego isn't, you know, the crux of their

13 claims in New York.  I submit to Your Honor that it is.

14      THE COURT:  So who do they allege made the

15 misrepresentations in their complaint?

16      MR. BELLI:  If you go through the complaint the

17 complaint parrots the allegations of the adversary complaint

18 and they say that, you know, officers and debtors made

19 certain representations -- officers and directors of the

20 debtor made certain representations and they try to impute

21 those representations to Virgo.

22      THE COURT:  Okay.  Go ahead.

23      MR. BELLI:  So under the rubric I have just

24 described, you know, without disregarding the corporate forum

25 the State Court complaint makes little sense. It seeks to

1   recover as damages funds loaned to Alchemy.  But for very few

2   allegations it challenges the actions of the debtors and its

3   officers and directors.

4          So one of two things has to be true, either the

5   banks' claims are challenging the actions of the debtor

6   directly and their claims should have been brought in this

7   Court or their claims treat the actions of Alchemy and Virgo

8   as interchangeable under an alter-ego or agency theory in

9   which case their claims are property of the estate and also

10  need to be dealt with in this Court.

11         Stepping back to look at things more broadly I

12  want to talk about, you know, the underlying purpose of the

13  automatic stay and that is to avoid interference with the

14  orderly liquidation of the debtor.  With that concept in mind

15  let's take a look at what these banks did here.

16         Knowing that the Trustee and Virgo were in the

17  middle of a Court approved mediation process they crib the

18  allegations that were the basis for the mediation, they threw

19  together a complaint seeking to recover funds loaned to the

20  debtor and passed onto Virgo based on the allegation that the

21  debtor was acting as Virgo's alter-ego and agent.  And when

22  they did so they also knew that they had designated SunTrust

23  as their administrative agent with sole authority to bring

24  claims under the credit agreements.  And SunTrust and the

25  Trustee entered into a sharing agreement approved by Judge

1  Gross that dictated how they were to be repaid by the

2  debtors.

3          So, Your Honor, I submit that these facts make it

4  clear that the usurping banks have interfered with and

5  continue to interfere with the orderly liquidation of the

6  debtors by working end-run around the claims administration

7  process.

8          These banks may be dissatisfied that they were

9  unable to recover funds loaned to Alchemy before it filed for

10  bankruptcy, but this doesn't permit them to recast their

11  contract claims against Alchemy as alter-ego claims which

12  entitle them to recover ahead of other creditors.

13          I see I'm halfway through my time.  Does Your

14  Honor have any questions before I cede my time to Virgo?

15          THE COURT:  No.  Thank you.

16          MR. BELLI:  Thank you, Your Honor.

17          MS. KIM:  Good afternoon, Your Honor.  My name is

18  Andrea Kim, I represent the Virgo parties.

19          I think I'd like to spend some time on the

20  complaint specifically, but I would like to come out of the

21  gate answering Your Honor's question that you posed to the

22  estate's counsel; what if there was a broker that defrauded

23  banks, I think was the question. I may have misstated that,

24  but I think that is the general idea.

25          The allegations in the complaint are not that

1  Virgo went out and solicited funds for the company.  The

2  allegations in the complaint, as I'm going to show to Your

3  Honor, which is Exhibit 19 of their complaint, New York

4  complaint, are that the debtor, Alchemy gave them

5  misrepresented financials and that the directors and officers

6  of the company, which are two of my clients, knew that and,

7  therefore, were malfeasant in allowing Alchemy to give those

8  representations.

9          If that happened I assume that in the fact pattern

10 Your Honor gave that the allegations were not that the broker

11 is the alter-ego and should be treated interchangeably as the

12 borrower.  If that were the case then I think my co-counsel

13 here, counsel for the estate has properly answered that

14 question because the point is that the broker is

15 interchangeable and should be treated as interchangeable with

16 the debtor then the debtor made misrepresentations.

17          Then the claim, the issue is the debtors made

18 misrepresentations to the lender.  To the extent that is the

19 claim then that is the claim that ought to be analyzed as

20 whether or not its property of the estate, right.  That is,

21 in fact, not what happened here and it's not what they

22 allege.

23          I want to step back, I want to be responsive to

24 that question, Your Honor, if you had follow-up questions I'm

25 happy to answer them.

1              THE COURT:  Go ahead.

2              MS. KIM:  I want to step back a little bit so it's

3    not lost on the fact that the Virgo parties lost more money

4    than any party, including the banks here any other banks

5    involved.  As the complaint demonstrates here, as both

6    complaints demonstrate, since they're almost identical, the

7    investment into Alchemy to buy Alchemy was diligenced side by

8    side to Virgo investment funds and a group of banks.  None of

9    those banks that did that diligence of the debtor are here

10   today.

11             Instead, the banks that are here today are

12   Emigrant Bank who did not invest, did not put money in until

13   later, a year later, and PMB Bank.  PMB Bank had been, as

14   Exhibit 1 before the Court, Section 5.11 of the original

15   agreement states PMB was the lender to Alchemy at that time.

16   I call on Millennium, those are inter-changeable.  PMB had

17   been the lender, according to that subsection for over a year

18   and a half.

19             In that same subsection and also in the definition

20   section on who the prior lender is, what the prior lender is,

21   defining it as PMB, it made clear that the primary purpose,

22   not the only purpose, but the primary purpose of that

23   original debt was to pay out PMB.  In other words they were

24   being refinanced.

25             So there is a reason why their complaint does not

1  actually allege anywhere that these two banks were in,

2  supposedly the crux of their complaint being inducement were

3  induced into the original loan agreement.  That is Exhibit 1.

4  Because they weren't, because one was the longtime lender of

5  the debtor.  In fact, knew it was there well before any Virgo

6  party showed up which, by the way, their pleadings admit.

7  The other wasn't there at all.

8         Now there is a second loan agreement involved here

9  and that is the amended loan agreement.  The amended loan

10 agreement, which is Exhibit 2 in the evidence before the

11 Court, was entered into in July of 2015 for the purchase of

12 ANConnect.  ANConnect was another distributor.  The idea

13 behind the purchase of ANConnect was to get scale for the

14 company and ANConnect had a different business model; not

15 that that is the subject of the matter, but for the Court's

16 interest.  It was the subject of the -- it had a different

17 business model that had more cash up front and was supposed

18 to help cash flow.  That was the idea.

19         That second matter, that second loan was entered

20 into by both PMB and Emigrant Bank to purchase ANConnect.

21 First, I think it's worth noting that the sale by ANConnect,

22 of course, made representations to the company as to what we

23 were buying like as in any commercial purchase when you

24 purchase a company they're going to tell you, hey, this is

25 what our financials say.

1          Not surprisingly, those loan agreements, including

2   the amended loan agreement, has a specific provision in

3   section 9 that says that each bank did their individual

4   independent diligence, not surprising because, of course,

5   they did.  And, of course, the board of the debtor, the board

6   of Alchemy, which included two of my clients, they weren't

7   the whole board, but two of the defendants were on the board

8   also did their own diligence and they had professionals for

9   that diligence including the buy side bankers which were

10  SunTrust, which was the primary bank in the banking group

11  that lent under that amended loan agreement.

12         Notably, SunTrust bank and the other bank, the

13  four banks that loaned, are not here today and they are not

14  filing in New York. The Court may have noted in all of the

15  exhibits that have been provided that the reason they're not

16  here is because in Exhibit 29 and Exhibit BB to Exhibit 29

17  specifically the SunTrust lawyers, when propositioned by

18  Emigrant and PMB, to file these claims, to treat Virgo as the

19  alter-ego, all the parties as a matter of fact, both

20  investment funds, their managers and the two gentlemen that

21  sat on the board of the debtor, all of them as alter-egos of

22  the debtor they declined.

23         They said in that letter, which is now a matter of

24  public record because they filed it both in the federal

25  action in which these two banks sued them for not suing my

1  clients, and also we provided that for the Court in New York.

2  What it says, which is, again, in evidence, it says that

3  SunTrust refused to file such claims as the administrative

4  bank, that is the bank who has the right to file them,

5  because they don't -- they can't be forced to file claims

6  that lack merit.  They were very specific about that.

7         So as a result the two banks that are before this

8  Court filed suit in New York and what they have done in their

9  pleadings, remarkably, is to run from their pleadings.  They

10  have relegated the actual pleadings to a footnote in their

11  reply.  So I wanted to take a moment, I think it's worthwhile

12  taking a moment to address whether the crux of their

13  complaint is really inducement or the crux of their complaint

14  is identical to the claims that we have already settled in

15  this estate and paid good money to settle, and had been

16  released by this estate.

17         In the complaint, in Paragraph 1, it starts off

18  by saying this action is based on a fraudulent scheme by

19  Virgo to induce a group of lenders, including plaintiffs, to

20  commit tens of millions of dollars to Virgo and Virgo's film

21  and DVD distribution business based on false, misleading and

22  incomplete financial disclosures.

23         The rest of the complaint goes on to admit, what

24  is, obviously, true and what everyone knows which is that

25  Virgo never got a loan from these lenders, ever, and it

1  wasn't Virgo's film and DVD business, right, its Alchemy's,

2  it's the debtors.  As a matter of fact it's not even -- if

3  you were going to talk about the owner, the owner is

4  Calrissian which is a HoldCo, which is also the guarantor and

5  SunTrust had sued Calrissian and its general partner, which

6  is a Virgo partner.  So we also have been sued there and we

7  have defended that suit, and the suit is where it is.

8          Right out of the gate the complaint, basically,

9  treats Virgo parties as if we were the debtor and it doesn't

10 change from there.  In the paragraphs that counsel for the

11 estate read they specifically say that all times, at all

12 times the Virgo parties were agents of the debtor and were

13 the alter-ego of the debtor at Paragraphs 34 and 35.  Those

14 paragraphs are incorporated in every cause of action.

15         You might say, well, they say that their cause of

16 action or really the crux of them is inducement, it's not

17 really these fraudulent transfers, okay.  So let's look at

18 the headings of this complaint and the causes of action.

19         So the headings in the complaint, right, the

20 factual headings starting on page 10 of the complaint: Virgo,

21 acting through Calrissian, purchases Alchemy.  Okay.  We did

22 purchase Alchemy, that's true.  Virgo induces the original

23 lenders to agree to the 2014 credit agreement. Okay.  Now

24 what does that have to do with us, right.  I just dictated

25 for you out of the complaint, out of Exhibit 1 before the

1   Court, we did not induce them into the original loan

2   agreement.  These two banks could not have been adduced.

3   Number one, one wasn't there.  Number two, the other was a

4   current lender.  They're certainly not alleging that the

5   current lender was defrauded into being refinanced.  So that

6   is clearly not the case; although, that portion of the

7   complaint goes on to talk about how my clients took out $14

8   and a half million out of the financing that is under Exhibit

9   1, the first financing.

10          If the Court looks at Exhibit 1 and specifically

11  the loan agreement, and specifically goes to the purposes or

12  the uses of the agreement which, again, is in Section 511 the

13  uses very specifically say under Section 4 of that one of the

14  uses, the fourth use of it is to finance the partial

15  reimbursement to HoldCo, Calrissian, of an amount not to

16  exceed $20 million of its equity payment to sellers in

17  connection with the Millennium acquisition.

18          So in other words, there was no defrauding.  We

19  didn't steal $14 and a half million.  It was an LBO. It was

20  always intended to be financed and the financing was intended

21  to repay a portion of the amount that we had paid for the

22  purchase of the company.  But yet, that $14 and a half

23  million claim was a fraudulent transfer claim brought by the

24  estate and that we have settled.  So it's not about

25  inducement, it's about fraudulent transfer.

1          Second he said -- that is the second heading,

2   Virgo immediately withdrawals $14 and a half million from

3   Alchemy.  Again, that is a fraudulent transfer claim.

4   Alchemy's financial performance is inflated by Alchemy and

5   Virgo.  The financial performance of the company was reported

6   under the contractual required loan agreement provisions to

7   the borrowers.

8          So, yes, the debtor had to give them financial

9   information and their required to under the loan agreement,

10  but that is the debtor's representations, not Virgo's

11  representations.

12         Next heading, Virgo causes Alchemy to purchase

13  distressed ANConnect business units.  Virgo did not purchase

14  ANConnect business units, the debtor purchased the business

15  units with the same diligence that any other purchase would

16  go under and the banks did their own diligence.  We know that

17  why, because Exhibit 2 the loan agreement specifically says

18  they did.  It says that they did their own independent

19  diligence and they didn't rely on each other, and they

20  decided which documents to rely upon not surprisingly.

21  Again, that is the debtor's action and, again, that purchase

22  of that company for those dollars was a fraudulent transfer

23  claim brought by the estate which we have already settled.

24         The next is Virgo induces plaintiffs to expand the

25  revolving credit facility.  Again, credit facility we got

1  nothing of the credit facility.  The debtor asked for more

2  money and got more money along the way, right, and to the

3  extent that there was money paid back, right, which is what

4  that section talks about, it talks about two sections which I

5  am going to show Your Honor if I can share a screen in a

6  moment, two amounts that they say that Virgo took out, a $10

7  million amount and a $3 million amount.  They squash it

8  together to say its $13 million.  Both of those amounts

9  fraudulent transfers that we defended against the estate and

10  that we settled.

11         The causes of action, there's not a single cause

12  of action in this complaint that is fraud in the inducement

13  for starters.  So if the crux of their complaint is that we

14  induce them fraudulently to enter into a loan agreement one

15  would expect that to be there, but it's not there.

16         The first cause of action is fraudulent

17  misrepresentation and what are the fraudulent

18  misrepresentations; Alchemy's earnings, Alchemy's borrowings,

19  Alchemy's sales, Alchemy's projected performance, right,

20  Alchemy's rates of DVD sales and DVD returns, the honesty of

21  Alchemy's management, right, Virgo's intent to honor the

22  gaurantee.  It's not our gaurantee to honor, its

23  Calrissian's.  Expected liquidity and synergies from the

24  ANConnect transaction which, again, we don't own.

25  ANConnect's actual expected financial performance and Virgo's

1  due diligence on the Alchemy and ANConnect transactions. In

2  other words, what the company undertook to determine whether

3  the company, whether the debtor was going to purchase this

4  entity.

5        Very tellingly, perhaps most tellingly in

6  Paragraph 90, in that same cause of action which, by the way,

7  incorporates all the alter-ego claims so that -- and they're

8  not doing that as a throw-away, and they're not doing that to

9  convince the Court that we had good access to the

10 information.  They're doing that because they know that

11 unless they treat our clients as an alter-ego we had no duty

12 to them.  We weren't making representations to them.  We

13 didn't have a contractual duty and we weren't making separate

14 representations from what the company did.  So they have to

15 plead alter-ego and now they want to run from it.

16       When the Court in New York asked them if they were

17 going to treat us as the alter-ego they said yes.  They are

18 going to argue to you all day that they had a big long

19 conversation with the New York judge about that and they sure

20 did, but he pinned them down and they were not willing to let

21 go of that.

22       A few months later I got an email from counsel for

23 the banks in which he said, hey, can we enter into a

24 stipulation about those alter-ego allegations. I said we're

25 happy to listen, tell me what you have in mind.  The

1  stipulation they wanted to offer is we won't bring a cause of

2  action for alter-ego.  In the same breath that they

3  recognize, as we do, that there aren't -- there is no such

4  thing under New York law as a cause of action for alter-ego.

5  Those pleadings are there because they want to hold us to the

6  responsibilities, both the tort and contractual

7  responsibilities that could -- duties and responsibilities

8  that are for the debtor to fulfill; all of which claims we

9  answered and settled with the estate.

10         In Paragraph 90 it says plaintiffs reasonably

11  relied on Virgo's misrepresentations without which they

12  wouldn't have learned of Alchemy's true financial condition

13  and management.  Then it goes onto cite Section 10.9 of what;

14  of the actual amended credit agreement.  It says plaintiffs

15  conducted independent analysis of Alchemy's finances, but the

16  material facts were withheld and concealed the amended credit

17  agreement states, and he's quoting from the amended credit

18  agreement all covenants, agreements, representations and

19  warranties may buy the Borrower, capital B Borrower, made by

20  Alchemy. Herein, and in the certificates, reports, notices or

21  other instruments delivered in connection with or pursuit to

22  this agreement shall be considered to have been relied upon

23  by the other parties hereto.

24         In other words in their complaint they're saying

25  to the Court in New York Alchemy had to make representations.

1  Alchemy made representations.  Alchemy made representations

2  about Alchemy and we relied on them.  By the way, these guys,

3  these Virgo guys they're the alter-ego so you should tap them

4  for those allegations.  That is not inducement, that is

5  trying to treat my clients as the debtor and if they were

6  going to do that this is the Court in which they needed to do

7  that and they didn't do that.

8          They didn't do that because we knew that we don't

9  have separate duties to them.  We did not go out and solicit

10 and there is not a word in here that says in the loan

11 application, you know, it wasn't by -- Alchemy didn't make a

12 loan application, Virgo made a loan application because we

13 didn't.  It's just not true.

14         The second cause of action fraudulent concealment,

15 same thing.  In Paragraph 99 they cite 10.9 of the loan

16 agreement which can only mean the representations made to

17 them in the loan application that are required to be made by

18 the debtor, not by my clients.

19         Now in the aiding and abetting, aiding and

20 abetting they have us aiding and abetting ourselves.  We are

21 the alter-ego of the debtor and Alchemy is the one that made

22 misrepresentations and that is exactly what it says.

23 Alchemy's executives, including Avagliano, were engaged in a

24 fraudulent channeling stepping scheme designed to inflate

25 Alchemy sales.  So, again, what is the misrepresentation?

1  It's about the debtor.

2          All of this conduct -- and I am going to show Your

3  Honor, if I can share a screen.  My technology skills aren't

4  as poor as I expect them to be.

5          THE COURT:  Are you doing this through the zoom

6  call or are you doing this --

7          MS. KIM:  I am, yes.

8          THE COURT:  There's a way to connect through the

9  system.

10         MS. KIM:  It says its working.  So just as a

11 matter of demonstrative we put together just a really simply

12 demonstrative to show that actually the banks claims are

13 really about the fraudulent transfers.  The crux of it is not

14 inducement because, again, it's all about loan applications

15 made by the debtor.  The crux of it are the fraudulent

16 transfers that we have already answered for and already

17 settled, and they have already been dismissed in full.

18         If Your Honor looks to the demonstrative it simply

19 lays out on the left hand side the banks allegations which

20 are identical to what is on the right hand side which is the

21 Trustee's allegations.  And specifically related to, in this

22 first slide, the $14 and a half million transfer.  That is

23 the first part.

24                              In the second slide is

25 related to the ANConnect acquisition in which the trust

1 alleged that my clients were grossly negligent and fraudulent

2 in their decision on behalf of the board, on behalf of the

3 debtor to enter into this acquisition.  And to take on

4 additional debt, they even made a point in their complaint

5 say that, you know, we caused the company, at a time when

6 company was otherwise insolvent, to take on additional debt,

7 and that that additional debt harmed the estate.  The same

8 debt that's at issue in the New York suit and in the same

9 transaction that's at issue in the New York suit.

10        And if they were successful, which, you know,

11 we've settled these claims, but if they had been successful,

12 then one would say that they had gotten proceeds that related

13 to the transaction failing and, therefore, the company not

14 being able to pay its debts.  Not just its assets to these

15 banks, but its debts to any of its creditors, right.

16        So, that's why it is a generalized harm claim.

17 It's not a specific claim, unless the specific claim was

18 against the debtor, which is what they're trying to do.

19 They're really trying to get their bite at the debtor by

20 calling us the "alter ego" and saying, Hey, in the loan

21 applications, we think you lied.

22        And then, finally, the bank's claims, these are a

23 little more difficult to ferret out because they melded them

24 together in their complaint.  They say Virgo caused Alchemy

25 to draw over 13 million from the newly established credit

1  facility and pay that sum to Virgo, which is also not true.

2  But nonetheless, we face those allegations, the same

3  allegations in fraudulent transfer claims with the estate, as

4  I've provided on this demonstrative for the Court.

5           So, in closing, every claim that they are actually

6  bringing -- not what they say they're bringing -- but if you

7  actually read the complaint and what it actually says is

8  Alchemy didn't pay the debt and Alchemy told us things about

9  Alchemy that weren't true, and so we kept loaning.  And

10  Alchemy told us things about the acquisition they wanted to

11  undertake and we relied on them.  And, by the way, we're

12  contractually allowed to rely on them.

13           And oh, by the way, those Virgo guys, they are

14  alter egos of the debtor.  In every one of those claims,

15  every one of those allegations in every one of those claims,

16  my clients have already faced and spent millions of dollars

17  in defending and settling and being released from.

18           And, again, of all the parties here, no one has

19  lost more money than the Virgo Plaintiffs.  And they've spent

20  tens of millions of dollars on the ANConnect transaction.

21  They spent tens of millions of dollars buying the debtor.

22           So, what this is, is, frankly, sour grapes, that

23  the banks, had their diligence failure failed, frankly, my

24  client's diligence failure failed.  But we're not here

25  saying, Well, gosh, we have a claim against the debtor and,

1  you know, we lost all our equity, right.  So -- and they

2  can't do that, and they know they can't do that.

3         And SunTrust, the administrative bank, knows they

4  can do that.  And if neither the trustee has said that we're

5  the alter egos, or there's any evidence of that, and

6  SunTrust, the administrative bank said, And we don't agree

7  that you're the alter egos and that there's any theory, and

8  we think those claims are specious.

9         So, you'll -- I realize when we talk about, you

10  know, the sort of rogue banks or, you know, it maybe sounds

11  pejorative.  It's not intended to, I don't believe, but it is

12  true that we're only facing these claims because two banks

13  broke off and decided that they were going to do something

14  that the estate had already sought to do and had already

15  settled.  And they did it 30 days before the mediation.

16         One of the things that Estate's counsel didn't

17  address, and I will just address it for what it's worth,

18  there is no doubt, and it probably bears common sense that

19  when my clients realized they were being sued, again, for the

20  very same conduct and the very same claims and the very same

21  issues that were all part of the estate, it caused no small

22  amount of problems in the mediation, not to mention, frankly,

23  threatening whether we could settle at all, because we were

24  going to have to deal with this matter, as well.

25         The Estate very wisely agreed not to go into a lot

1    of discovery over that because, frankly, the obviously matter

2    is that in order to prove what havoc it wreaked on our

3    mediation process and the process of settling the Estate's

4    claims, you would have to get into privilege.  You would have

5    to get in what happened in mediation and you'd have to get

6    into how my client had to consider things and how the Estate

7    had to consider things.  And, of course, we're not going to

8    do that because it's a breach of our duty and it's not

9    reasonable to do.

10            But, I just beg the Court not to take lightly that

11   this was absolutely done to get their seat at the table, and

12   we didn't give it to them, we didn't bring them into the

13   mediation, and that's why we're here and that's the only

14   reason we're here.

15            Thank you, Your Honor.

16            THE COURT:  Thank you.

17            MS. GOOD:  Good afternoon, Your Honor.  Katie Good

18   of Potter Anderson & Corroon, on behalf of Emigrant Bank and

19   Pacific Mercantile Bank.  I'd like to introduce my co-counsel

20   from Quinn Emmanuel u Hart & Sullivan, Gary Ganz and Victor

21   Noskov.

22            Before I turn the podium over to -- Mr. Noskov

23   will be handling the argument today -- I just want to note

24   that my colleague Andrew Brown, I believe, has been granted

25   screen share and access through a Zoom, and we will be

1   posting a few exhibits, including a demonstrative that we

2   also sent to the parties and to chambers before the hearing

3   today.

4            THE COURT:  Okay.  Thank you.

5            MS. GOOD:  All right.  With that, I'll turn the

6   podium over to Mr. Noskov.

7            MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

8   Emmanuel.

9            We have a presentation -- may I approach and hand

10  you a copy, please?

11           THE COURT:  I can look at it electronically.

12           MR. NOSKOV:  Okay.  Great.

13           Your Honor, I would like to start with just some

14  context before we get into the merits of the discussion and

15  then the arguments that have been made here by Virgo's

16  counsel and by the trustee.

17           The real context, this goes back to about 2017,

18  when we first started representing our clients in connection

19  with this bankruptcy.  And from then on, my colleagues were

20  in touch with the trustee and coordinating with this trustee

21  on strategy, on the types of claims that the trustee may

22  bring in this bankruptcy against various parties on what

23  types of claims belong to the lenders, what types of claims

24  belong tots trustee.

25           At no point in those discussions did the types of

1  claims that we brought, the inducement claims, the fraud and

2  misrepresentation claims against Virgo, were those considered

3  as claims that the trustee would bring.  And the reason is

4  simple, because those claims were not the trustee's claims to

5  bring, and we'll get into the substance of that before, but

6  just as a matter of history, it was never that the trustee

7  claimed that we should bring these claims and there was some

8  arguments.  It was never that.

9          And, ultimately, the adversary proceeding did not

10 include the fraudulent inducement claims and/or any

11 allegations about Virgo, misrepresenting various facts to our

12 clients directly.  That complaint does not include those

13 claims.

14          THE COURT:  Does your complaint include a count

15 for fraudulent inducement?

16          MR. NOSKOV:  Our -- the -- our apologies -- my

17 apologies, Your Honor.  Our complaint does not call it that;

18 it is called "fraudulent misrepresentation," "fraudulent

19 concealment," but it all goes to the same.  To the facts that

20 are alleged in connection with those counts, all have to do

21 with Virgo's misrepresentation that were made directly to our

22 client, not through Our Alchemy somehow, but directly, and

23 the damages that arose as a result of those

24 misrepresentations, namely, as Your Honor pointed out, the

25 amounts that were transferred as a result of those fraudulent

1  misrepresentations.

2          THE COURT:  Well, who as Virgo do you allege made

3  direct misrepresentations to your clients?

4          MR. NOSKOV:  We could skip to Slide 3 of our

5  presentation.  Slide 3 is the number at the bottom.

6          The next one, Andy.  There we go.

7          Right there, we have allegations that Mark Perez,

8  who is Virgo's CFO, he was made aware of the low quality of

9  the Alchemy's earnings by the accounting firm, Baker Tilly.

10  Baker Tilly advised Virgo that the way that the financials

11  were prepared, namely, focusing on the EBITDA, rather than

12  the cash flow, provide a misleading view of Alchemy's

13  earnings.  And despite this advice, Perez asked Baker Tilly

14  to change the report and to continue to misrepresent those

15  financials.

16          Now, Virgo, and I believe the trustee a little

17  bit, but mostly Virgo's counsel, undisputed these allegations

18  just earlier today.  They're saying that they know Mark Perez

19  was really acting on account of Alchemy and not on Virgo.

20  That is a factual dispute.

21          What we've alleged is that he was acting on behalf

22  of Virgo.  That Virgo failed to disclose that Calrissian,

23  Virgo's direct subsidiary, had no assets or ability to

24  guarantee the loan under the creditor agreement.  That Virgo

25  executives, Jesse Watson and Mark Perez, were aware of the

1  channel-stuffing scheme.  That --

2           THE COURT:  I'm assuming that Mark Perez is also

3  an officer and/or director of Our Alchemy?

4           MR. NOSKOV:  I do not know that.  The allegations

5  of our complaint are that Mark Perez was acting on behalf of

6  Virgo in these communications and interactions.  But I can

7  confirm shortly whether that is also true to Your Honor.

8           I think the point is that --

9           THE COURT:  I think that's a very important point.

10          MR. NOSKOV:  Sure.  Sure.

11          But I think it all goes to the merits of the State

12 Court action.  If, in the State Court action, there is

13 discovery and that action goes forward and Virgo says, We

14 were not acting on our behalf; we were acting on behalf of

15 Alchemy, and so we shouldn't have any liability for these.

16 These executives are really acting on behalf of Alchemy.

17 This is a lawsuit against Alchemy, and you should have

18 brought that in the Bankruptcy Court.  And if they prevail,

19 then that case should be dismissed.

20          And that goes to the point about alter ego, too,

21 which I'll get into later.  We are not pursuing alter ego

22 liability.  They were alleging directly that Virgo acted in a

23 certain way, misrepresented facts to us, and that induced us

24 to provide the loans to Alchemy.

25          If it were Alchemy that substance abused us,

1   then -- and then we would -- then, the alter ego allegation

2   would be relevant.  But we're not pursuing that.  We're not

3   pursuing allegations against Alchemy, and then saying, Well,

4   you're also on the hook because you're the alter ego.

5           That's not in our complaint.  That's not what we

6   were pursuing.  We've been clear in the State Court.  We've

7   been clear here that that's not what we're doing.  And I can

8   get into a little bit of that, more specifically, but,

9   certainly, our allegations in the complaint are that Virgo

10  did X and Virgo is liable.  Those are the allegations.

11          And even the paragraphs of the complaint that

12  Virgo's counsel read out, those headings, right.  She went

13  through them heading-by-heading, and I can -- we can pull

14  it -- and she read:

15          "Virgo induces the original lenders to agree to

16  the 2014 agreement."

17          She says, No, no, Virgo didn't do that.  It was

18  really Alchemy that did it.

19          Okay.  That's a factual statement that goes

20  against the allegations here, but the allegations are that

21  Virgo did that, that Virgo was the one that made false

22  representations to us.  And that's what we're alleging there,

23  we're not alleging that somehow Virgo is responsible for

24  Alchemy's actions as an alter ego.

25          The next one is Alchemy's financial performance is

1    inflated by Alchemy and Virgo, right.  So, yes, Alchemy did

2    inflate its financials; that's true, that's a factual

3    statement in our complaint, but so did Virgo.  And we're

4    suing in that complaint -- the State Court complaint is only

5    against Virgo, seeking liability against Virgo for its own

6    actions.

7              And we can go on in our presentation.  On this

8    Slide 3, we have cites to the complaint with specific

9    allegations of Virgo's representatives making these various

10   misrepresentations.

11             If we go back one slide to Slide 2, Andy, if you

12   could, there we have the actual counts, the fraudulent

13   misrepresentation count, fraudulent concealment, aiding and

14   abetting fraud, tortious interference with contract unjust

15   enrichment.  All of those are, and we have cites to the

16   complaint, all of those are against Virgo for things that

17   Virgo did.

18             Virgo misrepresented directly to the defrauded

19   lenders the various facts during the negotiation process of

20   the credit agreement.  Virgo concealed facts, knew about the

21   fraudulent candle-stuffing scheme and didn't review it to the

22   lenders, and induced Alchemy's breach of the credit

23   agreement.  This is the period after our -- the original

24   lenders entered into the 2014 agreement.  The 2015 agreement

25   hadn't been entered into.  In between that theory that Virgo

1  continued to represent things directly to the lenders, and

2  continued to, and also induced Alchemy to breach the credit

3  agreement.

4          That allegation is about what Virgo did, not what

5  Alchemy did.  Whether that's meritorious on the facts or

6  succeeds in State Court, that's a separate question and not

7  for us today.  It's what -- but we're alleging is Virgo did

8  something, did X, the damage does and the damages were that

9  we sent the money, which we otherwise wouldn't have sent.

10          Now, what's interesting is we -- Virgo's counsel

11  pulled their -- the demonstrative earlier, and if he got

12  columns, right, on the one side, you have the trustee's

13  allegations and the complaint.  And on the other side it has

14  allegations that look -- that are similar in our complaint.

15          What that doesn't have are these various -- oh,

16  these various allegations that I have here -- here, in front

17  of you.  They just ignored them.  But these are the heart of

18  the claims.  This is what really harmed us directly, the

19  other factual allegations that money was ultimately sent up

20  to Virgo, those are true, and, of course, they're included in

21  our complaint to paint the full story of what happened there.

22          Well, we're not seeking to claw that back to the

23  debtor.  That's a trustee claim.  That's an estate claim.

24          What we're trying to do is get damages for the

25  actions that Virgo took that were directly -- that were

 1  directed at our clients, and made us transfer funds to the

 2  debtors.

 3          I believe Your Honor must have seen in our

 4  pleadings, I think if we go two slides forward, we've got an

 5  illustration of this, the difference between the claims,

 6  right.

 7          The trustee's claims are fraudulent transfer

 8  claims for amounts that the debtor had and transferred out to

 9  Virgo, right.  These are quintessential bankruptcy claims as

10  we all know them.  And the idea there is that it was a

11  constructive or intentional fraudulent transfer.  The fraud

12  belongs to Alchemy.  The fraud is -- the debtors defrauded

13  whether, constructively or intentionally, all of its

14  creditors, and now we want to make the pie bigger by clawing

15  that money back, and we have to distributed it to all

16  creditors.

17          Absolutely an Estate claim.  On the left side, the

18  Virgo fraud claims, the fraud comes from Defendant Virgo to

19  our clients.  That's where the fraud is.

20          It's not from Alchemy.  I'm not trying to skip

21  over Alchemy.  It's a direct interaction based on the

22  allegations we've made in the complaint.  And the real -- the

23  transfer or the action was the transfer into the estate; it's

24  not a diminution of value of the Estate that occurred here.

25          In fact, the Estate benefited from Virgo's fraud

1   and, ultimately, benefited from Virgo, of course.  But the

2   Estate benefited from the infusion of money from our clients

3   that Virgo induced.  So, the structure or the type of claim

4   that this is, is completely different.  And the allegations

5   that really go to the heart of it are just -- are ignored in

6   the demonstrative that was presented by Virgo's counsel, and

7   for good reason, because it goes against their theory that

8   these are just duplicative things -- duplicative claims,

9   seeking the same damages.  It's just not true.

10          Now, I do just want to go back for a second to the

11  sort of how this came about and the timeline of when we filed

12  our complaint and the allegations that somehow the complaint

13  was designed to interfere with the bankruptcy process, or

14  that it was done somehow to undermine the settlement or the

15  mediation.  When we filed the complaint, it was file in July;

16  a month later, on August 22nd --

17          And if we could, pull up Exhibit 42 from the Joint

18  Exhibits.

19          After filing the complaint, Quinn Emanuel emailed

20  the trustee's counsel, letting them know that we filed the

21  complaint.

22          If you could scroll down, please, to the bottom.

23          If you look here, the email sent Monday,

24  August 23rd, 12:49 p.m., an email was sent from Quinn Emanuel

25  to the Cozen firm and the trustee's counsel -- other counsel.

1             We represent Emigrant Bank and Pacific Mercantile

2   Bank, two of the lenders under the amended and restated

3   revolving credit interim loan agreement, an email was sent

4   from Quinn Emmanuel to the Cozen firm and the trustee's

5   counsel -- other counsel.  We represented Emigrant Bank and

6   Pacific Mercantile Bank, two of the lenders under the amended

7   and restated revolving credit interim loan agreement.  We

8   recently filed a lawsuit against certain Virgo entities and

9   individuals and New York State Court, relating to the amended

10  credit agreement.

11            We understand that fact discovery has been ongoing

12  for some time in the above-captioned adversary proceeding.

13  We except there will be substantial overlap in the discovery

14  we take in our lawsuit.  Of course, as I said, there are

15  overlapping facts here.

16            Therefore, we would like to discuss with you

17  whether we can informally share our discovery in these two

18  actions.  Please let us know your thoughts.

19            A month goes by.  If you could scroll up?

20            So, that was August 23rd.  A month goes by.  We've

21  got September 21st, follow-up email from Quinn Emmanuel:

22            "Counsel, I am reaching out, again, regarding your

23  prior request to informally obtain the discovery above -- in

24  the above cash and adversary proceeding.  Please let us know

25  if this is something you're willing to do.  If you would

1  prefer, we can issue a subpoena as the documents are highly

2  likely or relevant to the lawsuit that we have filed against

3  Virgo.  That's after a month of waiting for a response and

4  not getting one.

5          If you scroll up, Response From Trustee's Counsel,

6  one day later:

7          "In response to your email, please be advised that

8  the trustee will not participate in or provide informal

9  discovery."

10          Okay.  The request for informal discovery was

11  rejected.  What was not in that email was, Oh my God, what

12  are you doing; you're violating the automatic stay.  Why are

13  you prosecuting claims that should be prosecuted by the

14  trustee?  Why are you interfering with the mediation process

15  and the settlement?  Nothing.  No, you know, saying this is

16  problematic.  Nothing at all.  Not asking us to pause that

17  proceeding while we figure it out, not asking us to dismiss

18  it.  Nothing at all until three months later, and again, four

19  months after initial notice, when the bar motion was finally

20  filed.

21          And, to be fair, we did know before that, that

22  this was going to happen, because the settlement agreement

23  was filed and the settlement agreement included in it, a

24  provision that the trustee was obligated to bring a bar

25  motion to bar our claims.  So, we saw it then and that's when

1  we engaged in discussions with the trustee to try to

2  understand.

3           Why -- why is the trustee now taking this position

4  after all this time?  What is the benefit to the Estate?

5           And we asked for discovery.  We asked for

6  discovery to substantiate these various allegations that

7  those, somehow, are intent to interfere with the bankruptcy,

8  or even if there was a detrimental effect to the bankruptcy.

9  We did.

10          And to avoid a motion to compel on all of those

11 various documents, we entered into a stipulation with the

12 trustee.  And that stipulations did two things; one, it

13 withdrew the sanctions request that included allegations

14 about the effect of our litigation on the bankruptcy

15 proceedings and on the settlement, and we agreed on a closed

16 universe of exhibits that may be used in connection with

17 these motions.

18          Now, Virgo's counsel admitted he was not part of

19 those discussions and today, without any real -- without any

20 evidence, she talked about the obvious effect of our claims

21 on the mediation, but, of course, that's not in the record,

22 Your Honor.  None of that is in the record, and we wanted to

23 probe it.  We had discovery into it and we wanted to

24 understand exactly why the trustee was saying what it was

25 saying and, especially, given that the trustee never reached

1    out to us during those discussions to say, Hey, guys, stop

2    it.  You're interfering with this date.  That didn't happen.

3          What we think happened is, as part of the

4    settlement agreement, Virgo demanded that the trustee pursue

5    this motion to try to bar us from our claims against them in

6    the State Court.  I don't believe Virgo for that maneuver,

7    but that's not really what the trustee or how the Bankruptcy

8    Court should work.

9          What, essentially, they're trying to get here is a

10   third-party release, right.  They're trying to get a release

11   against a third party for participating in the settlement.

12   But it's not a plan.  There's no justification for a third-

13   party release under the circumstances.  So, that's the oh

14   context of the back-and-forth here and where we're coming

15   from, in terms of trying to understand, exactly, why the

16   trustee is taking this position.

17         And we get it, that's -- it's part of the

18   settlement the trustee has put us in this position now, and

19   so I'm happy to discuss the merits of what we've been talking

20   about, but I think it was important for you to know, for Your

21   Honor to have that background.

22         On the merits, we've already touched on this a

23   little bit, about the argument about duplication, right.

24   That's one of their arguments; the other being the alter ego.

25         The duplication argument just doesn't pass the

1  smell test.  We have the table that was presented by Virgo's

2  counsel here, but it just doesn't include the very heart of

3  our allegations about the direct actions taken on -- taken by

4  Virgo.  Those allegations are not in there and I don't think

5  I've heard an explanation of why they're not in there and how

6  those are not independent, direct claims against Virgo, as

7  opposed to against Alchemy.

8          The -- and if you look at -- if you just look at

9  our presentation on Slide 5 --

10          Andy, if you could flip to that.

11          -- we just got some case law there that's also in

12  our pleadings that, of course, that some facts, that just the

13  existence of some facts being re-pleaded in various different

14  complaints doesn't mean that the claims are the same.  So,

15  the fact that they could pluck out the exact same fact and

16  the transfer being described in your complaint, and in the

17  trustee's compliant, doesn't mean that we're seeking the

18  same -- the same claims.  It doesn't mean it's against the

19  same party.  It doesn't mean, really, anything, other than

20  that those facts occurred and both, the trustee and we agree

21  that they occurred.

22          In the next slide, we also have some case law that

23  fraudulent inducement claims are claims against -- are claims

24  that belong to the creditors and not to the debtors.  I know

25  that Your Honor pointed out that we don't call them

1  "fraudulent inducement" claims; they're "fraudulent,

2  misrepresentation, and concealment" claims, but, in

3  substance, they're the same thing, and substance is what this

4  Court should look at under the Third Circuit's jurisprudence.

5         Now, that's the duplication argument.  The other

6  argument I think is clever, also, is the alter ego argument.

7  The alter oh go argument is based on the allegation --

8  there's one allegation in paragraph 34 of our State Court

9  complaint that says that Alchemy is the alter ego of Virgo --

10 that is true -- and we don't run away from that.  We believe

11 that Virgo was the alter ego of Alchemy.

12        But our allegations or the liability we seek are

13 not about that relationship.  Those allegations are against

14 Virgo for what Virgo did.

15        We are not, for example, pursuing Alchemy and

16 saying, Alchemy, you did this:  You hurt us, you owe us X

17 amount of money.  But your parent is also on the hook,

18 because it's the alter ego.

19        We're not doing that.  We're alleging facts that

20 say Virgo was in direct contact with our clients, directly

21 misrepresented certain things to us, directly concealed

22 certain things from us, which made us transfer money.

23        The fact that they're also the alter ego doesn't

24 protect them from the direct liability.

25             THE COURT:  How about the reverse of that?  What

1   if -- are you makes allegations that Virgo compelled Our

2   Alchemy to do certain things that resulted in harm?

3          MR. NOSKOV:  We -- those are allegations, those

4   are factual allegations in our complaint, sure.  But they're

5   not -- because we believe that that's right, they're not the

6   basis of any liability to us.  We're not suing on behalf of

7   the trustee or the Estate saying, Virgo, you hurt the Estate.

8   It's in there, because we think that that happened, they did

9   induce.

10          But the point is that Virgo induced us to provide

11  money to the Estate.  That's what the damages are for.

12  That's what those claims are for.  That's the nature of those

13  claims.

14          THE COURT:  And you're asserting that those were

15  direct misrepresentations made to your client by Virgo?

16          MR. NOSKOV:  That is correct, Your Honor.

17          THE COURT:  All right.  So, what about -- you

18  had -- I saw some allegations are you say Virgo withheld

19  information.

20          Well, what obligation did Virgo have to disclose

21  anything to you, if they weren't the alter ego of Our

22  Alchemy?

23          MR. NOSKOV:  Virgo was involved in those

24  negotiations, as the parent.  It's not -- Virgo, them --

25  itself, was involved in the discussions when our clients were

1   considering entering into the credit agreement and entering

2   into the amended credit agreement.

3            Virgo, itself, was making those representations to

4   us.  So, the fact that they were, at the negotiating table,

5   and making those representations to us, that's the allegation

6   that they are liable for our ultimate transfer of the money,

7   because the representations they were making were fraudulent.

8            Now, is it -- was it reasonable for us to rely on

9   Virgo's misrepresentations at that time?  Should we have only

10  relied on Alchemy's misrepresentations?  Were -- is Virgo

11  somehow otherwise protected?  Those are all questions that go

12  to the merits of the State Court lawsuit and they should be

13  litigated there.

14           Is Virgo really singularly, independently,

15  uniquely liable to us?

16           They can say, We're not.  We were there as

17  representatives of Alchemy.  That has to be litigated.

18  There's no evidence here today that shows that.  They didn't

19  introduce any evidence of that, as part of this proceeding,

20  nor would it really be appropriate.  It really is appropriate

21  for the State Court proceedings to she would themselves from

22  that liability.

23           That's the crux of it I -- and you may have read

24  the transcript with the State Court judge, and in the State

25  Court proceeding, the State Court asks this:  Are you

1  alleging alter ego?  Are you saying that they're the alter

2  ego?

3            And my colleague, Mr. Gans, said, Yes, we do say

4  that.  That's paragraph 34.  It says that.

5            But then -- and that's, of course, what Virgo's

6  counsel and trustee's counsel points out in their papers --

7  but if you go to Slide 10, on the left, you have what they

8  cite, Virgo's counsel and trustee's cite.  They say -- the

9  Court says:

10           "I'm sorry, so, let me see if I have this right in

11  your theory.  Let me see if I understand.  You're saying that

12  Virgo and Alchemy are not alter egos?

13           "Mr. Gans:  I am not saying that.  I am saying

14  that I believe they are.

15           "Are they alter egos in your theory or not?

16           "Yes, they are alter egos."

17           But then if you just Zoom out to the previous

18  page, the Court asks:

19           "Well, when you're saying non-parties to the

20  contract, but the only thing that that gives is liability, I

21  mean, you're saying it both ways.  I mean, the only thing

22  that gives liabilities to the parties to the contract is the

23  fact that you allege alter ego and their liabilities under

24  the circumstances, stems from that alter ego, right?

25           "Mr. Gans:  No.

1      "The Court:  No?

2      "Mr. Gans:  No.  Virgo's liability stems from

3  misrepresentations and failures to disclose to induce the

4  Plaintiffs to enter the contract, not from."

5      And then it goes on.  It couldn't be clearer.

6  Ignored by opposing counsel here.

7      And there's a passage later in that transcript

8  exchange, also, that discusses -- that continues to discuss

9  this dynamic.  And, again, Mr. Gans reiterates that we are

10  not pursuing an alter-ego theory here.

11      Virgo's counsel, unfortunately, I think, raised

12  our discussions about a stipulation that we've reached out to

13  them after we saw the Virgo joinder, to discuss their joinder

14  and why it is that they were joining.  Because a large part

15  of their joinder talked about this alter ego liability, and

16  for us to say to them, Look, we just want to make sure

17  there's no disagreement here.  We are not alleging -- we're

18  not seeking alter ego liability here.

19      What we're doing, and we're saying your clients

20  directly defrauded us.

21      And if it makes -- if it makes you happy to make

22  this go away, we can agree to that.  We can agree to that in

23  State Court.  We would not pursue damages based on an alter-

24  ego theory.  That was all F. R. E. 408; it was disclosed

25  here, at the hearing.

1      Unfortunately -- I don't want to get into it
2  more -- there were discussions after that.  We ended up not
3  entering into the allegation because I think it's -- it makes
4  sense for them to pursue this line of argument here to try to
5  knock out the lawsuit.  Regardless, there is -- there is no
6  doubt that the State Court lawsuit, the way that it's
7  structured, the allegations that are really the operating
8  allegations, that they go to direct action of Virgo.  And if
9  we fail on those, if, factually, they're incorrect, if they
10 have other defenses, then that lawsuit fails.  It doesn't --
11 we don't resurrect it by bringing, now, an alter ego claim
12 based on Alchemy's actions.

13      And just to point out the detail here, because
14 there is a slight detail that is maybe lost in the new lines.
15 The allegations about the Baker Tilly report and the
16 Calrissian misrepresentations, all of that, in terms of the
17 timeline, came before Virgo acquired Alchemy.

18      So, at that point, even we would not make the
19 allegation that they were the alter ego; it's completely
20 separate.  But they were still involved in those discussions
21 and we were still talking to them and they were -- they
22 concealed certain things from us and made representations.

23      And so, as far as the alter ego, you know,
24 plausibility of that alter ego argument goes, for those
25 allegations, it's impossible, it's actually impossible that

1  they were the alter ego at that point.

2          But we're not running away from the fact that

3  after they acquired them, we think that they were the alter

4  ego; it's just not the basis for our liability, and that

5  being the alter ego doesn't shield them from liability of

6  what they did directly to our clients.

7          The -- just to underline this, that's kind of the

8  point about the direct and non-direct allegations, I want to

9  go straight to Emerald and Emerald is on Slide 8.  And

10  counsel referred to this, we agree Emerald is a seminal case

11  on this issue of whether their alter ego claims are property

12  of the estate.

13          And here's a key passage -- the red in there is

14  mine and the blue is emphasis added.  So, I'll read the whole

15  thing:

16          "To determine whether the Plaintiffs' cause of

17  action against Aroma (phonetic) constitutes property of

18  Emerald's bankruptcy estate, we must examine the nature of

19  the causes of action itself.

20          While the Plaintiffs focused on the individualized

21  nature of their personal injury claims against Emerald,"

22  that's the debtor, "we cannot ignore the fact that, and fact

23  it be, that their only theory of liability is against Aroma,

24  the alleged-dealt alter ego, a third-party that is not

25  alleged to have caused any direct injury to the Plaintiffs is

1  that, as a matter of law, aroma constitutes a mere

2  continuation of Emerald."

3        The only theory of liability and that's why the

4  Emeril case says your only theory is you think the debtor did

5  something, but you're going after the parent.  That's

6  something that all creditors should get the benefit of

7  because, if that is pierced, then the assets of the parent

8  should go to all the different creditors.

9        Well, we're saying we have a situation where we do

10 have independent allegations.  This is not a case like

11 Emeril, but this is a case Emeril considered and would have

12 gone the other way.  That's the distinction.

13       And there are other cases that they cite in their

14 -- you know, on the next slide, slide 9, and it's in our

15 brief too, just don't have the same situation where there are

16 direct allegations against something -- about something that

17 the parent did directly to a client and the lawsuit is for

18 those direct allegations that involve alter ego allegations.

19 It just doesn't -- we can go through it closely, but it

20 doesn't -- just none of those cases touch on it.

21       I'll come back just at the end to the stipulation

22 and sort of the effect of the stipulation, and I think what

23 it has -- what it does to the claims here because it does

24 more than just -- more than just withdraw certain allegations

25 about the effect of the -- of our lawsuit on the settlement

1  agreement, it certainly does that.  So there's no evidence in

2  front of you, no evidence of harm to the debtor.  And I would

3  say even, you know, no evidence of any benefit to the debtor

4  for bringing this action other than the 300,000 that Virgo

5  agreed to pay the trustee to bring this motion.

6          But what it also does is, by controlling the

7  universe and having an agreement on the universe of exhibits

8  that are included in the record here and not going down the

9  path of actually probing the various allegations that we

10  would have wanted to probe, what it does is it undermines the

11  theory of this whole case and especially as it pertains to

12  the sanctions request because there is no support in the

13  record that we've agreed to for any allegations regarding our

14  intent to interfere with the litigation here, with the

15  adversary proceeding litigation.  There is no -- there is no

16  evidence that we willfully violated the automatic stay, there

17  is no explanation that the trustee -- why the trustee did not

18  tell us that the claims belong to the estate or claim a

19  violation of the automatic stay.  It does not -- the evidence

20  does not indicate how the claims are prejudicial to

21  settlement negotiations, it just doesn't, despite the fact

22  that Virgo's counsel may say that in court today without any

23  support from evidence.

24          It -- there is also no explanation of why, if as

25  the representative of all creditors in this proceeding, why

1   the trustee did not include the Virgo fraud claims; if they

2   belong to the trustee, why they did not include the Virgo

3   fraud claims in the -- in any analysis of potential claims to

4   bring or in the adversary proceeding itself, those claims are

5   not there, those allegations are not there.

6           And nothing in the exhibits or evidentiary record

7   explains how borrowing the defrauding lenders -- our lenders,

8   not -- I'll use the neutral terminology, our clients from

9   pursuing fraud claims against Virgo in New York Supreme

10  Court, how that would provide any benefit to the estate here.

11          And the harm, again, the time that it's taken to

12  go through this process, I think, and the fact that there

13  really is no harm to the estate, we're not seeking to get

14  funds from the estate as part of the Virgo litigation in

15  state court, there really is no effect on Virgo -- on the

16  Alchemy estate, there is no evidence that shows why we should

17  be sanctioned, and certainly why we should be sanctioned in

18  light of the fact that the trustee never reached out to us,

19  never tried to tell -- never told us their position, never

20  tried to interfere with the state court proceeding other than

21  after settling with Virgo.

22          So just all that to say is, just I think this is

23  obvious to everybody here, the trustee is doing Virgo's

24  bidding and Virgo should, you know, raise their actual

25  arguments on the merit in the state court litigation, but it

1    does not mean that our claims here are not direct against

2    Virgo or somehow overlap with the trustee's or are somehow

3    based on alter ego liability, which they just are not.

4         I think I want to end with Your Honor's question

5    about, well, if there's a broker that went out and solicited

6    parties, solicited lenders, could the debtor sue that broker

7    for damages resulting from those misrepresentations when the

8    debtor itself also was complicit, right?  It was the debtor's

9    faulty projections that are continuing to be misrepresented

10   by the broker.  The answer is no.  At the petition date,

11   there is cause of action that the debtor could bring.  In

12   fact, those misrepresentations benefitted the estate

13   perversely.  They benefitted the estate by inducing certain

14   parties to give money to the estate that then it could

15   transfer as it wished, right?  The fact that it then later

16   transferred it, which created a cause of action, transferred

17   those funds that created a cause of action that a trustee

18   could bring is one thing, but the infusion of funds is a

19   completely different matter.  And that infusion of funds is

20   not a claim that the debtor had at the petition date, which

21   is the standard in this -- in the Third Circuit and certainly

22   should be applied here as the standard to decide whether the

23   claims belong to the estate.

24        So, at bottom, we respectfully disagree with the

25   trustee and Virgo and believe that the claims are

1  independent, unique, and should not be barred for any of the

2  reasons we've discussed today.

3           THE COURT:  Okay.  The complaint has been

4  dismissed; right?  It's not currently pending in New York;

5  right?

6           MR. NOSKOV:  The complaint has been dismissed, but

7  that's on appeal.  It's been dismissed without prejudice --

8           THE COURT:  Okay.

9           MR. NOSKOV:  -- Your Honor, and --

10          THE COURT:  What's the status of the appeal?

11          MR. NOSKOV:  The appeal is pending; I believe

12 argument is going to be scheduled in November.  But to be

13 completely clear about that dismissal, it was without

14 prejudice and, as part of that dismissal -- and we talk about

15 this in our reply brief -- as part of that decision, what the

16 court said was I'm dismissing this complaint because I think

17 that SunTrust, the administrative agent, is the right party

18 to bring the complaint.  And I think that SunTrust is the

19 right party to bring the complaint because only it can bring

20 claims on behalf of the lenders.

21          And so there's another proceeding in the Southern

22 District of New York, we're also -- we're seeking to compel

23 SunTrust to bring a claim against the guarantor, so it's a

24 separate type of claim against the guarantor entity.  And,

25 you know, there's a dispute about whether that lawsuit also

1  requires -- is the same type of lawsuit where we should -- if

2  that's allowed, if we compel SunTrust to ultimately bring

3  that complaint, but that would subsume the state court

4  litigation.  We don't think it does, actually, just to be

5  completely clear, but the state court said you should win in

6  that -- in the SDNY action, essentially, take this transcript

7  to the SDNY, show them, and I'm sure that those judges will

8  -- because you should have a remedy and SunTrust should bring

9  this complaint on your behalf and, if you don't come back to

10 me, if you don't come back to me and you can re-plead.

11           And what that does, what that decision really says

12 is that the claims are the lenders', they're the lenders'.

13 It's not a decision that said, well, it's really the trustee

14 that should bring or it belongs to the bankruptcy, none of

15 that, even though in the litigation Virgo also made those

16 allegations -- or made those arguments, it doesn't say that.

17 What it does is it necessarily rules that it's actually

18 SunTrust on behalf of the lenders that should be bringing

19 that complaint.

20           So, in that sense, it's also -- that would be

21 inconsistent with Virgo's and the trustee's position in this

22 case.  Now, we're not saying it's preclusive, Your Honor.  We

23 think this Court is the right court to decide the issue, but

24 it would be inconsistent if the decision were that the claims

25 are barred because they belong the estate, the state court

1  judge held that they really should be brought by SunTrust on

2  behalf of the lenders.

3         But that's the long answer to your procedural

4  question, I think, where the appeal stands, which is --

5  arguments are in November?  That's correct.

6         THE COURT:  Okay.  Thank you.

7         MR. NOSKOV:  Thank you, Your Honor.

8         THE COURT:  Rebuttal?

9         MR. BELLI:  Thank you, Your Honor.

10        Mr. Noskov led today and there's a focus on his

11  briefing on some coordination that happened between the

12  trustee and the bank group concerning strategy before the

13  adversary proceeding was filed and I'll submit to Your Honor

14  that that really doesn't have any bearing on the bar order

15  we're requesting today.

16        First of all, these discussions preceded the

17  adversary proceeding filed by the complaint.  That adversary

18  proceeding made a number of factual allegations that mirror

19  the factual allegations made in New York and that the trustee

20  framed the claims as fraudulent transfers or breaches of

21  fiduciary duty, as opposed to alter ego or fraudulent

22  misrepresentation, you know, is really of no moment.

23        Second of all and more importantly, the issue is a

24  red herring because the trustee doesn't have the authority to

25  determine what claims are property of the estate, that

1   authority rests exclusively with Your Honor.  And I think In
2   re Emeril is instructive on this point because that's a case
3   where the trustee was saying that the claims at issue were
4   not property of the estate, but the Third Circuit came in
5   over the top and says, well, trustee, what you say doesn't
6   really determine what is and what is not property of the
7   estate, it's the two-part test and it's for the Court to
8   decide.

9           In the same vein, you know, that the trustee may
10  have had -- you know, may have responded or not responded to
11  an email that Mr. Noskov's colleagues sent on the eve of
12  mediation, I think Your Honor can read between the lines as
13  to what that email was really saying.  If you send an email
14  on the eve of mediation asking, you know, for assistance in
15  discovery, I think Your Honor can read between the lines and,
16  you know, infer that counsel is not going to write an email
17  that says, oh, we're trying to throw a bomb into your
18  mediation.

19          I think Your Honor hit the nail on the head when
20  you asked, you know, who made these representations?  Who --
21  you know, because the complaint says, oh, Virgo made all
22  these representations, but if you read the entirety of the
23  New York State Court complaint, it's clear that when these
24  banks use the term "Virgo," they're lumping together a huge
25  number of entities and individuals, which include the debtor

1  by virtue of the alter ego and agency allegations, which are

2  incorporated into every claim in that complaint, and they

3  also include Mark Perez and Jesse Watson, both of whom were

4  on the debtor's board.

5         So they're saying Virgo made all these

6  representations, but in terms of the actual human being doing

7  the speaking, if you look at allegations to that effect, it's

8  always Mr. Watson or Mr. Perez, and they were both

9  participating in the process as directors of Alchemy.

10        THE COURT:  Well, aren't you asking me then to

11 make findings about whether or not their complaint is

12 accurate or not?  You're asking me to make rulings on whether

13 or not it was in fact Virgo that made misrepresentations.

14 They've alleged it in their complaint, but that complaint is

15 not in front of me.  The only question in front of me today

16 is whether that complaint alleges direct claims that belong

17 to the banks or does it allege derivative claims that belong

18 to the trustee.  And if the complaint says Virgo made

19 misrepresentations to us, the banks, that's dispositive at

20 this point; isn't it?

21        I can't make rulings on whether or not their

22 complaint is accurate or not.

23        MR. BELLI:  I think Your Honor can take parts of

24 the complaint that may be cherry-picked to say Virgo did or

25 did not do certain things and look at them in the context of

1  the totality of the complaint, and see that that complaint

2  also says that these banks loaned money to Virgo.  Well, Your

3  Honor knows from the other evidence before the Court that the

4  banks didn't loan any money to Virgo, all the money got

5  loaned to Alchemy.

6          The complaint also says that all these reps and

7  warranties were made by Virgo to these banks.  Well, Your

8  Honor knows that the only reps and warranties made to the

9  bank are spelled out in the loan agreement as coming from

10 Alchemy.

11         So I think that they have to have plausible claims

12 and I think that Your Honor can, you know, look at the

13 complaint and see what it really means when it says that

14 Virgo did certain things.

15         THE COURT:  Well, isn't that for the court in New

16 York to figure out?  I mean, they've said they're not seeking

17 anything under an alter ego theory and the complaint, they

18 pointed to me sections where they say Virgo made these

19 representations, false representations, Virgo withheld

20 information that they were involved in the negotiation of the

21 loan, and how do I, sitting here, make a determination as to

22 whether or not those allegations are correct?

23         There are things that can be done in New York to

24 address that issue if it turns out that they're not correct.

25         MR. BELLI:  Well, Your Honor, they can say they're

1  not relying on alter ego all they want, but if you refer to

2  the underlying complaint, it's clear that alter ego permeates

3  and infuses that complaint.  And when they say that funds

4  were loaned to Virgo, I think Your Honor can make a factual

5  determination on that point because Your Honor has the credit

6  agreements in front of them.  So --

7          THE COURT:  Well, the credit agreements don't --

8  doesn't resolve that question because, yeah, okay, Our

9  Alchemy made representations and warranties in the credit

10 agreement, but the complaint says Virgo made representations

11 and warranties separate from that agreement, and it's those

12 that they're relying on.  I mean, sure, they included the

13 factual assertions in the complaint, but it doesn't form a

14 basis for their claim that Virgo itself -- and let's assume

15 for a moment that Virgo did make direct representations to

16 the banks and it turns out that those representations were

17 false, isn't that a direct claim that they have against

18 Virgo?

19         MR. BELLI:  In the context here, Your Honor, I

20 don't think so just because the credit agreement set up the

21 administrative agent as SunTrust and these banks should be

22 going through SunTrust.  They tried to go through SunTrust --

23         THE COURT:  Well, that's a New York issue, that's

24 not my issue; that's a New York issue, that's already being

25 addressed in New York.

1            MR. BELLI:  Well, I think it -- by virtue of this

2    sharing and reimbursement agreement the trustee entered into

3    with the administrative agent, I think it might be within

4    Your Honor's purview.  But I do think that --

5            THE COURT:  I don't agree with that.  I mean,

6    whether or not SunTrust is the only party that could bring

7    these claims, that's for the New York court to decide.

8            But my question to you is that I'd like an answer

9    to, if in fact there are allegations in the complaint that

10   Virgo made direct misrepresentations to the banks that

11   induced them to enter into these loans with Our Alchemy,

12   those are direct claims belonging to the bank; are they not?

13           MR. BELLI:  I don't believe so in a situation

14   where Virgo is controlling the board of Alchemy.

15           THE COURT:  Well, now you're trying to raise alter

16   ego as a defense; aren't you?  You're saying, well, you can't

17   -- they couldn't have made direct misrepresentations because

18   Virgo is just the alter ego of Our Alchemy, but Virgo is a

19   separate entity, it can still act independently even if it

20   was the alter ego of Our Alchemy.

21           MR. BELLI:  And I submit to Your Honor that that's

22   not -- you know, I apologize for not more directly answering

23   the question, but I don't think that's the case before Your

24   Honor here today.  The allegations of alter ego in the New

25   York complaint that we're discussing today permeate and

1   infuse the whole complaint and it's clear that they're

2   attempting to use those allegations to make representations

3   made by the debtor to turn them into representations made by

4   Virgo.

5         THE COURT:  And if that turns out to be incorrect,

6   the complaint gets dismissed, as they said.

7         MR. BELLI:  But if it turns out to be correct,

8   then it's a violation of the automatic stay and within Your

9   Honor's jurisdiction.

10        THE COURT:  Well, then you can come back to me and

11  ask for sanctions because they violated the automatic stay,

12  because the court in New York decided that all of these

13  claims are really alter ego claims and there was no direct

14  misrepresentations by Virgo, despite what they alleged in the

15  complaint.

16        MR. BELLI:  I understand your point, Your Honor.

17  I respectfully disagree, especially under the, you know,

18  specific complaint we're discussing here.

19        THE COURT:  See, it just puts me in a difficult

20  position where, sure, there are -- and I've done it in the

21  past, I have made rulings where a party clearly is seeking to

22  assert derivative claims outside of the Bankruptcy Court that

23  belong to the estate and I've enjoined those, but if they're

24  making allegations of direct misrepresentation, those belong

25  to whoever received those direct misrepresentations by a

1  third party.  Virgo is not a debtor, they're a third party;

2  if they made direct misrepresentations to the banks -- and

3  that's a factual issue that has to be decided in New York --

4  I can't stop them from bringing those claims.

5          MR. BELLI:  I understand Your Honor's point and,

6  you know, to the extent you're not inclined to grant the full

7  relief asked for in the trustee's papers, could, you know, a

8  pared-down order bar Virgo from -- or bar these banks from

9  making any claim against Virgo based on conduct of the

10 debtor.  So all these allegations in the New York complaint

11 about alter ego, all these allegations in the New York

12 complaint about the debtor did this and the debtor did that,

13 can Your Honor bar them from proceeding based on those

14 allegations.

15         THE COURT:  Well, those aren't allegations, those

16 are factual assertions that they've made in their complaint,

17 and you can have -- the debtor may have made

18 misrepresentations too and those certainly belong to the

19 estate, those are estate causes of action, but that doesn't

20 mean that Virgo couldn't also make the same

21 misrepresentations.

22         The hypothetical I asked at the beginning where

23 you hire a broker to go out and find lenders to loan to the

24 company, the broker knows that the person trying to get the

25 loan is misrepresenting their financials, but they still go

1  out and do it anyway, they're directly liable to the parties

2  that they went to to get that loan -- to get those loans

3  from; right?  So how is that different here?

4         So I don't know how I could fashion an order.

5  They certainly cannot pursue claims based on an alter ego

6  theory.  Alter ego is not a cause of action; it's a theory of

7  recovery.

8         So, to the extent they're trying to argue that the

9  debtor made misrepresentations and Virgo is somehow

10  responsible for those misrepresentations because they were

11  the alter ego of the debtor, they can't bring those claims.

12  But they're arguing, they're saying Virgo, independently,

13  made misrepresentations to us, and those I don't see how I

14  could bar.

15         MR. BELLI:  And that's what they're saying to Your

16  Honor here today, but, again, I think if Your Honor delves

17  into the substance of that New York complaint, you know,

18  you'll see that the -- in terms of allegations actually made

19  by Virgo, they're few and far between.  And, in reality,

20  those claims are entirely premised on the alter ego

21  allegations, trying to make the actions of the debtor the

22  actions of Virgo.

23         THE COURT:  Well, I could -- you could fashion an

24  order that says that they're barred from bringing any claims

25  that are based on an alter ego theory of liability, I can do

1  that, but I'm not going to bar them from pursuing the

2  complaint.

3          MR. BELLI:  I mean, that's an order we would

4  appreciate, Your Honor.

5          THE COURT:  Okay.  All right, anything else?

6          MR. BELLI:  Your Honor says that, you know, the

7  trustee would have nothing to gain from such an order, but

8  the trustee, along with the Court, are responsible for the

9  orderly administration of the claims process under the Code

10  and, as I addressed in my principal argument, the actions

11  they've taken have sought to undermine that process.

12          And that's all I have, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          MS. KIM:  May I be heard?

15          THE COURT:  Go ahead.  And I'm going to come back

16  to you -- because I raised this issue about the form of

17  order, I'm going to come back and five you an opportunity.

18          MR. NOSKOV:  Thank you.

19          MS. KIM:  Your Honor, I think -- with respect, I

20  think opposing Counsel is, to some degree, speaking out of

21  both sides of his mouth because, on one hand, he's telling

22  you that he's not pursuing an alter ego theory of liability,

23  he's telling you that, but it's in their complaint and it's

24  incorporated in every cause of action.

25          And it's worse than that.  If we look at those

1  particular paragraphs, it says -- and Your Honor asked this

2  question, are you suing them -- is the point that they were

3  controlling -- they were, you know, directors and officers,

4  they were -- they know that.  They were defendants in

5  director and officer actions by the trustee and, as Counsel

6  represented, they've discussed at length what those claims

7  are.  So they're very well aware that Mr. Perez and Mr.

8  Watson were on the board and that that's the basis of these

9  claims.  But it says, "Virgo owned and exercised complete

10  dominion and control over Calrissian and Alchemy to

11  perpetrate fraud or wrongdoings over plaintiffs.  Virgo's

12  misuse of legal forms and shifting of assets from Calrissian

13  and Alchemy to Virgo was designed to enrich Virgo and its

14  principals while shielding Virgo from liability to plaintiffs

15  and others."

16         So it's in their complaint.  And what's happening

17  here is they're telling you on one hand, don't worry, okay,

18  we're not really pursuing alter ego, that's just background

19  facts, just take our word for it.  You saw the New York judge

20  said -- and, actually, if you want to read the whole

21  transcript, I would commend to the Court -- he went on to say

22  well -- essentially, well, you guys, you have to have alter

23  ego, right?  Because, otherwise, what are their duties to

24  you?  Why do they have any duties to you?  Which of course is

25  why they didn't give up on their alter ego and why they

1  wouldn't give up -- they still won't give up on it, right?

2              So they're telling you one thing, but their

3  complaint says something different.

4              And there was an exchange with opposing counsel

5  where they said, oh, you know, we're not actually seeking to

6  recover on those fraudulent transfers, I heard that.  Okay?

7              So, paragraph 112, in their own complaint, fourth

8  cause of action for tortious interference, reads this way:

9  "Through its actions, Virgo intentionally induced Alchemy to

10 breach the amended credit agreement by, *inter alia*; one,

11 depriving Alchemy of necessary working capital after the

12 amended credit agreement was signed" -- in other words, they

13 can't pay it back because you didn't give them money to pay

14 it back -- "two, allowing and/or assisting Alchemy's

15 financial mismanagement and misstatements" -- in what

16 capacity could they possibly do that other than as officers

17 or directors?  They were directors -- "and, three" -- and

18 this is the key -- "saddling Alchemy with excessive debts and

19 liabilities through the Virgo distribution and the ANConnect

20 transaction."

21             I submit to you, Your Honor, that right there was

22 the subject of pages of the trustee -- and trustee's claims,

23 the director and officer claims, that we spent hundreds of

24 thousands of dollars responding to and in fact getting most

25 of them dismissed by this Court in the very beginning.

1          So the idea, they're telling you, verbally, here

2    before this Court, that, oh, don't worry, they're not seeking

3    -- they're not actually seeking the same fraudulent

4    transfers, but they are.  They're telling this Court, oh,

5    we're not pursuing an alter ego theory, but they are.  The

6    last cause of action in their complaint, paragraph 117, the

7    cause of action is unjust enrichment, okay?  So what's the

8    unjust enrichment?  Let's find out.

9          Paragraph 117:  "Virgo made misrepresentations to

10   plaintiffs to induce them to enter into the amended credit

11   agreement and the joinder agreement, and to provide tens of

12   millions in loans, from which Virgo benefitted, as alleged

13   above."

14         Where is it -- what is alleged above?  The only

15   thing alleged above, if we look at the substance of their

16   complaint, which both case law and counsel have recommended,

17   it says you've benefitted by, guess what, the same fraudulent

18   transfer, this exact fraudulent transfer, word for work,

19   paragraph for paragraph, amounts that they say came out of

20   the debtor and came to us that we just defended with the

21   estate.

22         So, while they're telling you one thing, Your

23   Honor, it's just not true.

24         And on page 3 of their -- they said, oh, we're not

25   bringing -- we're not saying anything -- sorry, I'm

1  stuttering, I'm so upset, I'm sorry -- they haven't said

2  anything.  Well, let's say something about that.  And we

3  have, actually, in our briefings.

4            There are five bullet points on that page.  The

5  first two bullet points, on the face of their complaint --

6  the Court doesn't have to decide whether it's right or not,

7  just take it for what it is, take it on the face of the

8  complaint -- the first two bullets, as they've said

9  themselves, are where they say, we didn't disclose something

10 and we didn't -- or we didn't disclose certain information to

11 them, okay, at a time when we had no obligation to disclose

12 anything.  And, more importantly --

13           THE COURT:  Well, that's a fact issue that --

14           MS. KIM:  I understand.

15           THE COURT:  -- I'm not -- I'm not going to decide

16 that.

17           MS. KIM:  I understand, I understand.  And I'm not

18 asking you to, to be clear, and I don't believe that the

19 trustee is either.  Okay?  But here's what's important.

20       `    On the face of the complaint, taking it as true,

21 on the face of Exhibit 1, which is attached to the complaint

22 and is also before this Court, these two plaintiffs that are

23 in front of you did not rely on any of these representations.

24 One of them wasn't even there and they say that in their own

25 complaint.

1           THE COURT:  Again, that goes to the merits of the

2    complaint itself --

3           MS. KIM:  I understand, Your Honor.

4           THE COURT:  -- not -- and that's not my job,

5    that's the New York court's job.

6           MS. KIM:  I understand.

7           The last three bullet points, each and every one

8    of them, are on their face -- you don't have to decide one

9    way or -- you don't have to decide anything about them other

10   than just to read them in the context of the same complaint,

11   in the context of paragraph 1, 2, 34, 35, 85, 95, and all the

12   paragraphs that bring those into the cause of action, all you

13   have to do is read them, and they say we made these

14   representations for Alchemy, in the context of an Alchemy

15   loan application.  And then their cause of action brings in

16   the reliance on those -- of those representations under the

17   agreement that's not with Virgo, Virgo is not a party to it,

18   but the representations that the debtor made.

19          So they're telling you one thing, they're telling

20   you, oh, don't worry, it will be separate, but that's not

21   what their complaint says, their complaint doesn't say that.

22          THE COURT:  Well, isn't that the -- I mean, we're

23   going back to the same thing.  This is -- if Virgo made the

24   same misrepresentations that the debtor did, Virgo, as a

25   separate entity, is liable for those misrepresentations; are

1  they not?

2          MS. KIM:  If they were sitting on the board of

3  directors and made representations on behalf of the debtor,

4  and if you have a complaint in front of the Court that says

5  that they were the alter ego of the debtor, no.

6          THE COURT:  Well, that is, again, a factual

7  question pursuant to the complaint, right?  I mean, they can

8  -- how do I sit here and make a determination as to whether

9  representations made by someone who sat on -- was an officer

10 and director of Virgo and was also an officer and director of

11 the debtors, how do I make a determination as to whether they

12 were acting on behalf of Virgo independently or were they

13 acting on behalf of Our Alchemy as the alter ego?

14         MS. KIM:  Because they say -- the answer to that

15 question, Your Honor, is because their complaint tells you so

16 and you have to take it on the face of it.

17         I appreciate that we're not asking this Court to

18 make factual determinations, we're just asking this Court to

19 bar the very claims that they've actually filed; not the

20 claims they're telling you about, not the claims they're

21 describing, but the actual claims and what they say in their

22 actual complaint.  They say that we -- the way all this

23 happened was we had control over the debtor and then that's

24 how we made all these representations.  I mean, it truly is

25 the face of the complaint.  That's all we ask, Your Honor.

And, to join Counsel for the estate, we would very much appreciate the order that the Court posited. And I'm sure that my learned Counsel for the banks are not going to like that because -- I can't wait for the transcript of this to come out because, in the exact same argument, Mr. Noskov said two things. He said, don't worry about it, Your Honor, because they can argue to the New York court that it's property of the estate and that it's all based on alter ego, because, of course, it's in their complaint, so of course they're going to argue that, so of course we're going to say that. And they can tell the court -- and then that court, that New York court can say, well, that's property of the estate.

And then in the same argument, at the end of the argument, in response to Your Honor's questions they said, oh, but of course this Court is the only court with jurisdiction to say that, and that's the problem, Your Honor. That's what's going to happen, it's already happening.

If we go back to New York, if these claims come back, which we don't know if they will or not, but at this moment we have to proceed as if they will -- if they go back, they are going to argue what's in their complaint, they've already told that judge they're going to. And what's in their complaint is they're arguing that we are the alter ego of the debtor and what's in their complaint is the very

1  fraudulent transfer claims, the exact fraudulent transfer

2  allegations, literally, word-for-word, and unjust enrichment

3  on that basis.  That's what they're going to argue.

4          And then when we say, well, gosh, that's property

5  of the estate, they're going to say, sorry, the New York

6  court doesn't have jurisdiction to argue that, that's for the

7  Bankruptcy Court to argue.  That's what we're concerned

8  about.  We're going to be played pinball with you, Your

9  Honor.

10          So I beg of the Court to please issue an order at

11  least to that effect, so that at least they can't play that

12  brinkmanship game when we get back to New York, if we get

13  there.  Thank you.

14          THE COURT:  All right.  Mr. Noskov?

15          MR. NOSKOV:  Your Honor, Victor Noskov here.  I'm

16  not going to get into the factual back-and-forth.  We agree

17  with Your Honor that a lot of these arguments are for the

18  merits in the state court.

19          As to -- I do want to address -- I think it's

20  been, I would say, not given enough nuance or distinction

21  here today -- what an alter ego claim really is, what an

22  alter ego theory of liability is, and what --

23          THE COURT:  It's not a claim, it's a theory of

24  liability.

25          MR. NOSKOV:  It's not a claim, we agree with you,

1  Your Honor, it's not a claim; it's a theory of liability,

2  it's a theory of liability that some third party is liable,

3  even though we didn't on the face of the actions do anything,

4  but it's the alter ego of a party that did do something to

5  you, right?  That's the theory of liability, that's how you

6  get damages from a third party.

7          The fact that somebody is an alter ego is a fact,

8  they have a close relationship, they abuse the corporate

9  forum, et cetera.  That exists.  We've alleged -- we allege

10 that they are the alter ego in our complaint, that's true.

11 What we did not do is we did not pursue liability based on

12 that alter ego relationship.

13         So when they say, well, they shouldn't be allowed

14 to say in the court that they -- that -- we should strike it

15 from their complaint, the alter ego allegation, I don't think

16 that's right.  I don't think that that's -- the relationship

17 between the parties is what the relationship between the

18 parties is.  What we shouldn't be doing and we are not doing

19 is pursuing liability based on that relationship.  If the New

20 York State Court finds that the representatives of Virgo

21 really were representatives of Alchemy, and it's really

22 Alchemy who was at fault for all these actions that we

23 allege, then we can't turn around and say, oh, great, now

24 let's get Virgo because they're the alter ego.

25         The reason for the alter ego allegation and

1   various other allegations about the close relationship is our

2   reliance.  You got at this, Your Honor got at this, you know,

3   why would you rely on them, why is it reasonable for you to

4   rely on them, it's the reliance.  We knew that there was --

5   there's a relationship between them, that they have

6   knowledge.  And the state court, likewise, is interested in

7   was your reliance reasonable, but that's for the state court

8   to decide whether our reliance was reasonable.

9           And we can agree that we're not bringing and we

10  will not bring any alter ego theory of liability, but it

11  doesn't make sense to handcuff us or put one hand behind our

12  back and say, well, you can't talk about that relationship,

13  that's off-limits, those facts are off-limits.

14          THE COURT:  Well, I think -- well, what's your

15  position on the form of order?

16          I mean, as I view this or what I'm thinking at

17  this point is and I haven't made a final decision, but a form

18  of order that says you cannot pursue causes of action in the

19  New York litigation that are based on an alter ego theory of

20  liability.  You go back to New York and you say, Judge, New

21  York Judge, we're not pursuing alter ego theories of

22  liability; we're pursuing direct claims against Virgo.

23          The New York court disagrees with you and says

24  those aren't direct claims, those are alter ego claims.  Now

25  you've got an order that I've already ruled that you can't

1  bring those claims and, therefore, your case gets dismissed.

2  No harm, no foul to you because you're saying you're not

3  pursuing alter ego claims, right?

4          So why can't we fashion a form of order that says

5  something along those lines?

6          MR. NOSKOV:  That's correct, Your Honor.  The

7  reason -- well, I'm not disagreeing in principle that that is

8  something that we could get behind.  The nuance that I'm

9  trying to bring to the forefront that we need to address, I

10  think -- and I'm not sure I have the perfect answer right now

11  -- is that they can't then go to the state court and say,

12  well, now you can't talk about the relationship between Virgo

13  and Alchemy, now you can't -- now you have to withdraw just

14  the factual statement that they were the alter ego, you have

15  to withdraw allegations that substantiate your reliance.

16          THE COURT:  Well, if I give them this order, I

17  don't think they're going to say that because they're going

18  to go up to New York and say, go ahead and say it all you

19  want, because that's only going to induce the New York judge

20  to say, yeah, these are alter ego claims.

21          So I don't think they're going to -- I don't think

22  they would want me to take it out and I wouldn't take it -- I

23  wouldn't make you take it out.

24          MR. NOSKOV:  Right.  And the alter ego, just so I

25  understand Your Honor correctly and for the record, the alter

1   ego liability that you're talking about is the type of claim

2   where really the New York State Court determines that all of

3   our allegations about Virgo's independent actions were really

4   allegations of something that Alchemy did itself, and that

5   the only reason -- the only way to reach Virgo for liability

6   for those actions is the alter ego relationship.  Is that

7   correct?

8          THE COURT:  That's generally my view at this

9   point, but I'm not going to hold anybody to this at this

10  point.  I'm going to ask you to go back and talk about this

11  and see if you can come up with a form of order that both

12  sides can agree with.  If you can, I'll order it; if you

13  can't, come back and I'll have to rule on the pending motions

14  on that.

15         MR. NOSKOV:  Thank you, Your Honor.  And just to

16  be clear on the remainder of their requests to bar the order,

17  the order you're proposing would be no bar of our litigation

18  other than this carveout that we would negotiate?

19         THE COURT:  Right.  And I'm assuming the sanctions

20  was withdrawn, right, or not?  Are you still seeking

21  sanctions?

22         MR. NOSKOV:  I don't believe they were withdrawn,

23  but I won't speak for Counsel.

24         MR. BELLI:  Your Honor, the stipulation we entered

25  withdrew only the sanctions for the impact on the mediation.

1  The trustee still maintains that Your Honor can enter

2  sanctions for their knowing interference with the automatic

3  stay.  And the knowing and intentional aspect that has to be

4  established for Your Honor to be able to enter sanctions

5  isn't that they intended to have some kind of deleterious

6  effect, it's that they acted knowing that a bankruptcy had

7  been filed and Your Honor can, you know, find the evidence

8  for that right in their New York complaint where they plead

9  that a bankruptcy had been filed.

10          THE COURT:  Well, I think they took the view that

11  what they were filing in New York didn't violate the

12  automatic stay because they thought were bringing independent

13  claims against Virgo.

14          So I'm not going to impose sanctions, I'll deny

15  that part of the motion.

16          MR. BELLI:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          MR. NOSKOV:  Thank you, Your Honor.

19          THE COURT:  All right.  Anything else then?

20      (No verbal response)

21          THE COURT:  Okay.  How much -- I'll give you guys

22  whatever amount of time you think you need, just let me know,

23  let chambers know if you either come to an agreement or if

24  you can't and maybe, if you can't, I'll come back and we'll

25  have a short status conference, and then I'll have to figure

1    out how I'm going to decide the motion.  Okay?

2              So -- and we can at least -- well, we can wait

3    until whatever final order gets entered on the sanctions

4    issue, we'll just include that as all together.

5              Okay.  All right, anything else?

6         (No verbal response)

7              THE COURT:  Thank you all very much.  We're

8    adjourned.

9              COUNSEL:  Thank you, Your Honor.

10        (Proceedings concluded at 2:51 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                September 13, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                September 13, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 September 13, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25