## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| OUR ALCHEMY, LLC, et al., | ) | Case No. 16-11596-JTD |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| GEORGE L. MILLER, in his capacity as | ) | |
| Chapter 7 Trustee for the jointly administered | ) | |
| bankruptcy estates of Our Alchemy, LLC and | ) | Adv. Pro. No. 18-50633-JTD |
| Anderson Digital, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ANCONNECT, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DECLARATION OF JAY MAIER

I, Jay Maier, hereby declare under oath as follows:

1. I am the Chief Financial Officer of Anderson Media Corporation and I am responsible for the treasury, financial reporting, and administrative areas of Anderson Media.

2. I am Vice President of Anderson Management Services, Inc. ("Anderson Management"). Anderson Management is a 100% subsidiary of Anderson Media. Anderson Management provides senior management and financial advisory services to ANConnect, LLC ("ANConnect").

3. I am Secretary of Anderson Merchandisers, LLC.

4. In connection with my role with Anderson Management, I personally serve as a representative of ANConnect, am authorized to speak on its behalf, and am familiar with the facts

1

and circumstances set forth herein. I am also a representative of Anderson Merchandisers and am authorized to speak on its behalf, and am familiar with the facts and circumstances set forth herein.

5.    This Declaration is submitted in support of the Anderson Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment.

6.    I make this declaration based upon my personal knowledge and, where appropriate, a review of the relevant case files including documents produced by the parties in this adversary proceeding.

7.    In early 2015, Our Alchemy, LLC ("Alchemy"), approached ANConnect about its interest in purchasing certain of ANConnect's video and digital business in an asset purchase transaction.

8.    ANConnect and Alchemy executed the APA, which set forth an aggregate purchase price Alchemy of $37,637,347 ("Anderson Purchase Price"). A true and correct copy of the APA is attached to this declaration at Exhibit 1.

9.    The amount Alchemy paid to ANConnect at closing totaled $29,888,124.40.

10.    Alchemy was obligated to remit or otherwise make significant post-closing payments to ANConnect, which it did not do. Ultimately, Alchemy never paid ANConnect the full Anderson Purchase Price as required under the APA.

11.    In connection with the ANConnect Acquisition: (a) ANConnect and Alchemy entered into the Transition Services Agreement ("TSA"), and (b) Anderson Merchandisers and Alchemy entered into the Merchandising Agreement ("MA"). True and correct copies of the TSA and MA are attached to this declaration at Exhibits 2 and 3, respectively.

12.    Under the TSA and MA, Alchemy was also obligated to pay for services performed by ANConnect and Anderson Merchandisers, which Alchemy failed to do.

13.    For several months following the Closing, the parties attempted to agree on the post-closing adjustments and exchanged emails and spreadsheets with numerous categories of adjustments. Attached at Exhibit 4 to this declaration is a copy of an Email the Trustee produced in discovery dated 11/10/15 from Jim Jenkins with an attached Excel spreadsheet evidencing the parties' effort to calculate the post-closing adjustments. Although the parties did not reach agreement on the ultimate Purchase Price adjustment, the attachment to this email shows that Alchemy *did* agree that "***Alchemy owes more to ANConnect than vice versa.***" (***emphasis added***).

14.    The spreadsheets passed between Alchemy and the Anderson Defendants included the APA-related balance sheet adjustments *and* all other amounts that were owed to or from Alchemy, ANConnect, and Anderson Merchandisers under the APA, TSA and MA. The parties always netted all of the various debts and credits arising from the related agreements. Every iteration of the spreadsheet I have reviewed shows that Alchemy owed more to ANConnect and Anderson Merchandisers than they ever owed to Alchemy.

15.    Attached at Exhibit 7 to this declaration is a copy of an Email the Trustee produced in discovery dated 11/11/15 from Jim Jenkins in which he stated "ANConnect knows that we owe them more then they owe us [ . . . . ]" At the time of this email, Mr. Jenkins acknowledged that Alchemy owed ANConnect "approximately $4.9M compared with the ~$5M they owe us in A/R." He also noted that amounts Alchemy owed could be "offset" by the A/R that ANConnect had collected.

16.    Because Alchemy failed to comply with its obligations under APA Sections 2.05 and 2.06, and its payment obligations under the APA, TSA and MA, the Anderson Defendants filed suit against Alchemy on February 23, 2016 in the Superior Court of Delaware in the matter styled, *ANConnect, LLC and Anderson Merchandisers, LLC v. Our Alchemy, LLC,* Superior Court

of Delaware, New Castle County, Case No.: N16C-02-152. A true and correct copy of the State Court Complaint is attached to this declaration at Exhibit 6. At the time of that filing, Alchemy owed the Anderson Defendants the net amount of more than $9 million under the three agreements.

17.    As set forth in Paragraph 43 of the State Court Complaint, before February 16, 2016, ANConnect had reduced the amounts owing it by Alchemy through a setoff of the "$3,208,314 ANConnect owes Alchemy in post-closing adjustments per Section 2.06(a)(iv) of the Purchase Agreement."

18.    Attached at Exhibit 9 of this declaration is a demonstrative exhibit calculating the damages sought in the State Court Complaint—$10,840,010.99—which was net of the $3,208,314 Credit.

19.    Further, ANConnect's Proof of Claim No. 158 further confirms that the amounts sought by ANConnect from Alchemy was net of the $3,208,314 Credit. A true and correct copy of the Proof of Claim is attached to this declaration at Exhibit 8.

20.    Alchemy's counsel, James Sammataro, with the law firm Stroock, sent Anderson Merchandisers a letter, dated April 12, 2016 ("Stroock Letter"). A true and correct copy of the Stroock Letter is attached to this declaration at Exhibit 10.

21.    In the Stroock Letter, Alchemy—not ANConnect—purported to "offset the $3,208,314.00 that ANConnect admittedly owes to Alchemy under the APA against the $2,281,556.13 Anderson demands as payment in full satisfaction of the amounts owed under the Merchandising Agreement."

22.    The Anderson Defendants never agreed to this process and never confirmed the application.

23.    Rather, ANConnect indemnified Anderson Merchandisers in the amount of $3,228,731.14, which reflected the total of outstanding and unpaid invoices for services Anderson Merchandisers had performed under the MA.

24.    The fact that ANConnect's payment to Anderson Merchandisers was pursuant to an indemnity agreement is confirmed by internal emails between Anderson employees. Attached at Exhibit 11 to this declaration is a true and correct copy of an Email dated 6/23/16 from Bill Lardie confirming that this payment was made to indemnify Anderson Merchandisers.

25.    Ultimately, ANConnect sent a wire to Anderson Merchandisers in the total amount of $3,228,731.14 on June 27, 2016. Attached at Exhibit 12 to this declaration is a Bank of America Wire Transaction Detail confirming the payment.

26.    Attached at Exhibit 13 to this declaration is a true and correct copy of a Demand Letter dated 6/27/16 to Alchemy providing a default notice and demanding payment of $3,228,731.14.

27.    ANConnect did not transfer the Credit to Anderson Merchandisers as an offset against amounts ANConnect owed to Alchemy.

28.    Alchemy breached the APA *long before* the alleged transfer of the Credit occurred.

29.    Because Alchemy was in breach, on October 18, 2015, Bill Lardie sent a demand for payment to Alchemy identifying several breaches of the APA, TSA and MA. A true and correct copy of that letter is attached to this declaration at Exhibit 14.

30.    ANConnect's right to use the A/R it collected under the TSA to offset amounts owed by Alchemy was acknowledged by Alchemy's own lawyer, Schuyler Moore. Attached at Exhibit 15 to this declaration is a copy of an email dated 10/20/15 that the Trustee produced in from Alchemy's lawyer, Schuyler Moore.

5

31.     Alchemy's agreement/acquiescence to ANConnect withholding the collected A/R as an offset to amounts Alchemy owed ANConnect is further evidenced by a letter ANConnect sent to Alchemy dated 10/18/15 ("Lardie Letter"). A true and correct copy of the Lardie Letter is attached to this declaration at Exhibit 14.

32.     Alchemy did not object to ANConnect using the collected A/R to satisfy amounts Alchemy owed. Nor did Alchemy demand that ANConnect pay Alchemy the collected A/R. If Alchemy had objected or demanded payment, Anderson Merchandisers would have terminated the TSA and MA and ceased performing the valuable services it provided to Alchemy.

33.     Rather than demand that ANConnect remit the collected A/R, the parties continued discussing the post-closing adjustments and updating the spreadsheet. For example, a version of the spreadsheet dated 9/17/2015 shows that Alchemy believed it owed the Anderson Defendants $12,553,081 even after applying the Credit *and* the Collected Amount. This spreadsheet was originally produced in its native format (*i.e.*, Excel) and was Bates labeled VIG0006281. The metadata for this spreadsheet shows that it was created on September 17, 2015. A true and correct copy of that spreadsheet is attached to this declaration at Exhibit 16.

34.     In December of 2015, Alchemy prepared a document it called "Red Cloud Settlement Memo" in which it discussed its position regarding the post-closing adjustments and "Additional Reconciling Items." Notably, the memo concludes that "Alchemy's position that the total net balance that should be owed by Alchemy to ANConnect is **$3,043,898."** (**emphasis in original**). A true and correct copy of an email the Trustee produced in this case from Mark Perez dated 1/13/16 attaching the Red Cloud Settlement Memo is attached to this declaration at Exhibit 17. A true and correct copy of the Red Cloud Settlement Memo is attached to this declaration at Exhibit 18.

35.     Alchemy shared the spreadsheet with its lender, SunTrust Bank, just weeks before it filed its bankruptcy petition. Exhibit 19 to this declaration is a copy of an email dated 06/11/16 that the Trustee produced in discovery in which it told SunTrust "the true reconciliation maybe closer to $2 million" owed by Alchemy.

36.     In the latest known version of the spreadsheet that I have seen—from June 2016— Alchemy still admits to owing the Anderson Defendants approximately one million dollars *after* applying the Credit and Collected Amount to Alchemy's debts. This spreadsheet was originally produced in its native format (*i.e.,* Excel) and was Bates labeled VIG0006863. Exhibit 20 to this declaration is a copy of the June 2016 spreadsheet produced in discovery in this matter.

37.     Ultimately, ANConnect withheld the Collected Amount—$6,047,325—to reduce amounts Alchemy owed to ANConnect.

38.     Attached at Exhibit 5 to this declaration are true and correct copies of portions of my deposition taking in this adversary proceeding on September 29, 2022, which are cited in the Anderson Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment.

39.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this this declaration was executed in Knoxville, Tennessee.

Executed this 23 day of February, 2023.

_____

Jay Maier, Chief Financial Officer

**EXHIBIT 1**

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

between

**ANCONNECT, LLC**

and

**OUR ALCHEMY, LLC**

dated as of

May 7, 2015

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................... 1

ARTICLE II PURCHASE AND SALE ........................................................................ 12

Section 2.01 Purchase and Sale of Assets........................................................... 12

Section 2.02 Excluded Assets. ........................................................................... 13

Section 2.03 Assumed Liabilities.......................................................................... 14

Section 2.04 Excluded Liabilities. ........................................................................ 15

Section 2.05 Purchase Price................................................................................ 17

Section 2.06 Purchase Price Adjustments............................................................ 19

Section 2.07 Allocation of Purchase Price............................................................ 24

Section 2.08 Withholding Tax. ............................................................................. 24

Section 2.09 Third Party Consents. ..................................................................... 24

ARTICLE III CLOSING ............................................................................................. 25

Section 3.01 Closing. .......................................................................................... 25

Section 3.02 Closing Deliverables. ...................................................................... 25

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER.................. 27

Section 4.01 Organization and Qualification of Seller........................................... 27

Section 4.02 Authority of Seller. .......................................................................... 28

Section 4.03 No Conflicts; Consents. ................................................................... 28

Section 4.04 Financials......................................................................................... 29

Section 4.05 Intentionally Deleted........................................................................ 29

Section 4.06 Absence of Certain Changes, Events and Conditions. ...................... 29

Section 4.07 Material Contracts. .......................................................................... 31

Section 4.08 Title to Purchased Assets................................................................. 32

Section 4.09 Sufficiency of Assets. ...................................................................... 33

Section 4.10 Intellectual Property. ....................................................................... 33

i

Section 4.11 Inventory. ................................................................................33

Section 4.12 Material Retailers and Material Content Suppliers. .................33

Section 4.13 Insurance. ...............................................................................34

Section 4.14 Legal Proceedings; Governmental Orders. .............................34

Section 4.15 Compliance With Laws; Permits................................................35

Section 4.16 Environmental Matters. ...........................................................35

Section 4.17 Employee Benefit Matters. ......................................................35

Section 4.18 Employment Matters. ..............................................................35

Section 4.19 Taxes. .....................................................................................36

Section 4.20 Brokers. ..................................................................................37

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER .................37

Section 5.01 Organization of Buyer. ............................................................37

Section 5.02 Authority of Buyer. ..................................................................37

Section 5.03 No Conflicts; Consents. ..........................................................38

Section 5.04 Legal Proceedings; Governmental Orders. .............................38

Section 5.05 Financial Capability. ................................................................38

Section 5.06 Brokers. ..................................................................................39

Section 5.07 Condition of the Business........................................................39

ARTICLE VI COVENANTS.................................................................................40

Section 6.01 Conduct of Business Prior to the Closing. ..............................40

Section 6.02 Access to Information. .............................................................41

Section 6.03 No Solicitation of Other Bids. ..................................................41

Section 6.04 Notice of Certain Events. ........................................................42

Section 6.05 Employees and Employee Benefits. ........................................42

Section 6.06 Confidentiality..........................................................................43

Section 6.07 Non-competition ......................................................................43

Section 6.08 Governmental Approvals and Consents ..................................45

Section 6.09 Books and Records. ................................................................46

ii

519605 000004 14648212.21

LA 51840284

Section 6.10 Closing Conditions.................................................................47

Section 6.11 Public Announcements.............................................................47

Section 6.12 Bulk Sales Laws. ...................................................................47

Section 6.13 Transfer Taxes......................................................................47

Section 6.14 Continued Business Relationships. .............................................48

Section 6.15 Intentionally Deleted..............................................................48

Section 6.16 Product Returns.....................................................................48

Section 6.17 Further Assurances. ...............................................................48

Section 6.18 Disclosure Schedules. .............................................................48

Section 6.19 Payment Obligations...............................................................49

Section 6.20 Tag-Along Rights....................................................................49

Section 6.21 Pizza Man.............................................................................49

ARTICLE VII CONDITIONS TO CLOSING........................................................49

Section 7.01 Conditions to Obligations of All Parties. .....................................49

Section 7.02 Conditions to Obligations of Buyer.............................................50

Section 7.03 Conditions to Obligations of Seller.............................................52

ARTICLE VIII INDEMNIFICATION .................................................................53

Section 8.01 Survival. ..............................................................................53

Section 8.02 Indemnification By Seller.........................................................53

Section 8.03 Indemnification By Buyer.........................................................54

Section 8.04 Certain Limitations.................................................................55

Section 8.05 Indemnification Procedures. .....................................................56

Section 8.06 Payments.............................................................................59

Section 8.07 Tax Treatment of Indemnification Payments.................................59

ARTICLE IX TERMINATION .........................................................................59

Section 9.01 Termination..........................................................................59

Section 9.02 Effect of Termination..............................................................60

ARTICLE X MISCELLANEOUS......................................................................61

iii

Section 10.01 Expenses.............................................................................................61

Section 10.02 Notices. ..............................................................................................61

Section 10.03 Interpretation.......................................................................................63

Section 10.04 Headings..............................................................................................63

Section 10.05 Severability..........................................................................................63

Section 10.06 Entire Agreement. ...............................................................................63

Section 10.07 Successors and Assigns. .....................................................................64

Section 10.08 No Third-party Beneficiaries. ..............................................................64

Section 10.09 Amendment and Modification; Waiver. ...............................................64

Section 10.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ............................64

Section 10.11 Specific Performance...........................................................................66

Section 10.12 Counterparts. .......................................................................................66

Disclosure Schedules

Exhibit A – 3PL Business Estimated Balance Sheet
Exhibit B – Wholesale Business Estimated Balance Sheet
Exhibit C – [Intentionally deleted]
Exhibit D – Form of Merchandising Agreement
Exhibit E – [Intentionally deleted]
Exhibit F – Purchased Magnolia Pictures Inventory and Amount
Exhibit G – Anderson Digital Estimated Balance Sheet
Exhibit H – MMS Payment Schedule
Exhibit I – Computation of Transitional Return Reserves

519605 000004 14648212.21

LA 51840284

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of May 7, 2015, is entered into between ANConnect, LLC (f/k/a Anderson Merchandisers, LLC f/k/a Anderson Merchandisers, L.P.), a Texas limited liability company ("**Seller**"), and Our Alchemy, LLC (f/k/a Millennium Entertainment, LLC), a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged in, among other businesses, the Business (as defined below); and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**3PL Business**" shall mean the third party logistics segment of the Business.

"**3PL Product Return A/R**" has the meaning set forth in **Section 2.05(a)(i)(B)**.

"**AAA**" has the meaning set forth in **Section 10.10(d)**.

"**Accounts Receivable**" has the meaning set forth in **Section 2.02(c)**.

1

"**Active SKU**" means a product related to the Business that is currently included on a Retailer planogram, that the Seller reasonably believes will be included on a Retailer planogram within six months after Closing Date, or that may be returned to its supplier for full credit of its cost.

"**Acquisition Proposal**" has the meaning set forth in **Section 6.03(a)**.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in **Section 2.07**.

"**Anderson Affiliates**" has the meaning set forth in **Section 6.07(a)**.

"**Anderson Digital**" means Anderson Digital, LLC, a Delaware limited liability company.

"**Anderson Digital Current Assets**" means the current assets of Anderson Digital as determined in accordance with GAAP.

"**Anderson Digital Current Liabilities**" means the current liabilities of Anderson Digital as determined in accordance with GAAP.

"**Anderson Digital Closing Working Capital**" means: (a) Anderson Digital Current Assets, less (b) Anderson Digital Current Liabilities, determined as of 11:59 p.m., Los Angeles, California time, on the day before Closing.

"**Appellate Rules**" has the meaning set forth in **Section 10.10(d)**.

"**ARC**" means ARC Entertainment, LLC and its Affiliates.

2

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(c)**.

"**Assignment and Assumption Agreements**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Bagdasarian**" means Bagdasarian Productions, LLC and its Affiliates.

"**Basket**" has the meaning set forth in **Section 8.04(a)**.

"**Best Buy**" means Best Buy Co., Inc. and its Affiliates.

"**Bills of Sale**" has the meaning set forth in **Section 3.02(a)(i)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(i)**.

"**Business**" means home video and digital distribution for motion pictures and other audiovisual media in and throughout the United States of America and its territories and protectorates, excluding, for clarity, music, including music videos, and any in-store merchandising services performed by Anderson Merchandisers, LLC.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Los Angeles, California are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 7.03(f)**.

"**Buyer Indemnitees**" has the meaning set forth in **Section 8.02**.

"**Canadian Distribution Agreement**" has the meaning set forth in **Section 3.02(a)(vii)**.

"**Cap**" has the meaning set forth in **Section 8.04(a)**.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Balance Sheets**" has the meaning set forth in **Section 2.05(a)**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

3

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" has the meaning set forth in **Section 6.06**.

"**Content Supplier**" means a licensor or seller of any physical or digital video product or other supplier of video content in connection with the Business

"**Content Supplier Contracts**" means all Contracts entered into by Seller with Content Suppliers.

"**Content Owner**" means a Content Supplier in connection with the 3PL Business.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Current ARC Agreement**" means that certain Distribution Agreement, effective as of November 11, 2010, by and between Seller and ARC.

"**Current Best Buy Agreement**" means that certain Business Services Agreement, dated as of October 1, 2014, by and between Seller and Best Buy Stores, L.P.

"**Direct Claim**" has the meaning set forth in **Section 8.05(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**DreamWorks Classics**" means DreamWorks Classics and its Affiliates.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Enforceability Exceptions**" has the meaning set forth in **Section 4.02**.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any

4

Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

519605 000004 14648212.21

LA 51840284

"**Estimated Balance Sheets**" has the meaning set forth in **Section 2.05(a)**.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 2.02(f)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Extended ARC Agreement**" has the meaning set forth in **Section 3.02(a)(vi)**.

"**Extended Best Buy Agreement**" has the meaning set forth in **Section 3.02(a)(v)**.

"**GAAP**" means United States generally accepted accounting principles as promulgated by the Financial Accounting Standards Board, as in effect on the date on which they are to be applied.

"**Government Contracts**" has the meaning set forth in **Section 4.07(a)(ix)**

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Gross Due Content Owner**" has the definition set forth in **Section 2.05(a)(i)(A)**.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnified Party**" has the meaning set forth in **Section 8.05**.

"**Indemnifying Party**" has the meaning set forth in **Section 8.05**.

519605 000004 14648212.21

LA 51840284

"**Independent Accountant**" has the meaning set forth in **Section 2.06(b)(iii)**.

"**Independents**" has the meaning set forth in **Section 6.07(a)**.

"**Ingram**" means Ingram Industries Inc. and its Affiliates.

"**Insurance Policies**" has the meaning set forth in **Section 4.13**.

"**Intellectual Property**" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (g) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (h) all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages; provided, however, that Intellectual Property shall not include the rights granted to Seller under or with respect to the Content Supplier Contracts.

7

"**Inventory**" has the meaning set forth in **Section 2.01(a)**.

"**Ketchup**" means Ketchup Entertainment, Inc. and its Affiliates.

"**Knowledge of Buyer**" or "**Buyer's Knowledge**" or any other similar knowledge qualification, means if Bill Lee is actually aware of such fact or matter.

"**Knowledge of Seller**" or "**Seller's Knowledge**" or any other similar knowledge qualification, means if Bill Lardie, Chuck Taylor, Matthew Smith, and Steve McClanahan, and (solely with respect to matters involving Anderson Digital) Freyr Thor or Stephen Lyons is actually aware of such fact or matter.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include consequential, incidental, indirect, special or punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

"**Magnolia Inventory Statement**" has the meaning set forth in **Section 2.06(a)(vii)**.

"**Magnolia Pictures**" means Magnolia Pictures LLC and its Affiliates.

"**Major Movie Studio**" has the meaning set forth in **Section 6.07(a)**.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise), operations, capitalization or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis, other than in each case changes in general economic conditions, changes in interest rates, financial markets or securities markets, changes in applicable law, the effects of force majeure,

8

earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby; any effect resulting from the announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; and other matters which impact businesses generally or the industry in which the Business operates.

"**Material Contracts**" has the meaning set forth in **Section 4.07(a)**.

"**Material Content Suppliers**" means ARC, DreamWorks Classics, Vertical, Microsoft, Bagdasarian, Ketchup and XIrator.

"**Material Retailers**" means Best Buy, Sam's Club and Walmart.

"**Merchandising Agreement**" has the meaning set forth in **Section 3.02(a)(iv)**.

"**Microsoft**" means Microsoft Corporation and its Affiliates.

"**Overall Cap**" has the meaning set forth in **Section 8.04(c)**.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in **Section 4.08(a)**.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Platinum Disc**" means Platinum Disc, LLC and its Affiliates.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Product Return A/R Statement**" has the meaning set forth in **Section 2.06(a)(ii)**.

9

"**Purchase Price**" has the meaning set forth in **Section 2.05**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Resolution Period**" has the meaning set forth in **Section 2.06(b)(ii)**.

"**Restricted Period**" has the meaning set forth in **Section 6.07(a)**.

"**Retailer**" means Best Buy, Walmart, Sam's Club, Ingram, and any other retailers who have purchased products from the Business.

"**Retailer Contracts**" means all Contracts entered into by Seller with Retailers and other customers in connection with the Business.

"**Review Period**" has the meaning set forth in **Section 2.06(b)(i)**.

"**Sam's Club**" means Sam's West, Inc., and Sam's East, Inc. and their Affiliates.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in **Section 7.02(h)**.

"**Seller Indemnitees**" has the meaning set forth in **Section 8.03**.

"**Statement of Objections**" has the meaning set forth in **Section 2.06(b)(ii)**.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest,

10

additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third Party Claim**" has the meaning set forth in **Section 8.05(a)**.

"**Transaction Documents**" means this Agreement, the Bills of Sale, the Assignment and Assumption Agreements, the Transition Services Agreement, the Merchandising Agreement, the Canadian Distribution Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transition Services Agreement**" has the meaning set forth in **Section 3.02(a)(iii)**.

"**Union**" has the meaning set forth in **Section 4.18(b)**.

"**Vendor Condition Precedent Date**" means the date that a vendor number has been activated for Buyer by Walmart, Sam's Club and Best Buy.

"**Vendor Effective Date**" means the date on which Buyer has become the vendor of record with a vendor number with respect to such Retailer and such vendor number becoming effective (as opposed to such vendor number just being activated).

"**Vendor Reconciliation Statement**" has the meaning set forth in **Section 3.02(a)(xv)**.

"**Walmart**" means Wal-Mart Stores, Inc. and its Affiliates.

"**Wholesale Business**" shall mean the wholesale segment of the Business.

"**Wholesale Product Return A/R**" has the meaning set forth in **Section 2.05(a)(ii)(B)**.

"**Wholesale Supplier Working Capital**" has the meaning set forth in Section **2.05(a)(ii)(A)**.

"**Xlrator**" means Xlrator Media, LLC and its Affiliates.

11

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01 Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of Seller's right, title and interest in, to and under the following assets (including goodwill associated therewith), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which are used or held for use in connection with the Business (collectively, the "**Purchased Assets**"):

(a)    all inventory of finished goods of Active SKU's related to the Wholesale Business ("**Inventory**") (excluding any such Inventory from or related to Magnolia Pictures and/or Platinum Disc, other than the Inventory set forth on Exhibit F);

(b)    all raw materials, works in progress, packaging, supplies (excluding shipping supplies), parts and other inventories related thereto, in each case wherever located (including in shipment or transit) and whether owned by Seller or held by Seller on consignment or other basis;

(c)    all Content Supplier Contracts listed on **Section 2.01(c)** of the Disclosure Schedules; all Retailer Contracts listed on **Section 2.01(c)** of the Disclosure Schedules; and all Contracts for those employees of the Business listed on **Section 6.05** of the Disclosure Schedules (collectively, the "**Assigned Contracts**");

(d)    Seller's 51% membership interest in Anderson Digital;

(e)    all transferrable Permits which are held by Seller and required solely for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets listed on **Section 4.15(b)** of the Disclosure Schedules;

(f)    all rights to any Actions of any nature available to or being pursued by Seller to the extent related solely to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(g)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) to the extent related solely to the Business, the Purchased Assets or the Assumed Liabilities;

(h)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related solely to any Purchased Assets;

519605 000004 14648212.21

LA 51840284

(i)    originals, or where not available, copies, of all customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices) and marketing and promotional surveys, in each case for the two years preceding the Closing Date and related solely to the Business, as well as all files relating to the employees listed on **Section 6.05** of the Disclosure Schedules (collectively, "**Books and Records**"); and

(j)    all goodwill and the going concern value of the Business.

**Section 2.02  Excluded Assets.** Notwithstanding the foregoing, Seller shall retain all right, title and interest to in and under the Excluded Assets.  "**Excluded Assets**" shall mean all assets, properties, interests and rights of Seller other than the Purchased Assets, including without limitation:

(a)    any Inventory from or related to Magnolia Pictures and/or Platinum Disc not set forth on Exhibit F;

(b)    cash or cash equivalents, bank deposits, or similar cash items;

(c)    all accounts or notes receivable held by Seller in connection with the Business, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

(d)    any furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones or, other than as specified in **Section 2.01**, other tangible personal property;

(e)    any real property, whether owned or leased by Seller;

(f)    Contracts that are not Assigned Contracts (the "**Excluded Contracts**");

(g)    any asset of Seller not related solely to the Business;

(h)    any asset required for Seller to perform under the Transition Services Agreement, including, without limitation, Seller's pick, pack and ship operations and administrative activities;

(i)    any personnel or files relating to employees or former employees of Seller other than the employees listed on **Section 6.05** of the Disclosure Schedules, the employees of Anderson Digital, and any files relating thereto;

(j)    all Intellectual Property of Seller;

519605 000004 14648212.21

LA 51840284

(k)   any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(l)   all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller;

(m)  any claims or causes of action of against third parties relating to assets, properties, business or operations of Seller arising out of events occurring on or prior to the Closing Date;

(n)   all Tax returns and financial statements of Seller and the Business and all records (including working papers) related thereto;

(o)   all ownership interests of Seller in any Person other than Anderson Digital;

(p)   all of Seller's causes of action, claims, credits, demands or rights of set-off against third parties, to the extent related to any Excluded Asset or Excluded Liability;

(q)   the assets, properties and rights specifically set forth on **Section 2.02(q)** of the Disclosure Schedules; and

(r)   the rights which accrue or will accrue to Seller under the Transaction Documents.

**Section 2.03   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)   all Liabilities in respect of the Content Supplier Contracts that are attributable to periods after the Closing Date or that are set forth on **Section 2.03(a)** of the Disclosure Schedules, but solely to the extent such Liabilities are attributable to periods after the Closing Date;

(b)   all Liabilities in respect of the Contracts set forth on **Section 2.03(b)** of the Disclosure Schedules, but solely to the extent such Liabilities are attributable to periods after the Closing Date;

(c)   all Liabilities arising from the sale of Inventory pursuant to product warranties, product returns or rebates in respect of the Retailers that are set forth on **Section 2.03(c)** of the Disclosure Schedules;

(d)   all Liabilities constituting, or arising in connection with, accounts payable and Gross Due Content Owner relating to the Business to any of the parties set forth on Exhibit A or Exhibit B;

14

(e)  50% of all sales, use, stamp, transfer and other similar Taxes, if any, applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)  other Liabilities with respect to the Business and the Purchased Assets attributable to events occurring and/or obligations incurred after the Closing;

(g)  Liabilities for Taxes relating to the Purchased Assets for all taxable periods (or portions thereof) beginning after the Closing Date;

(h)  all Liabilities relating to the obligation to credit unsold product from Retailers against Retailers' future purchases from the Buyer, including product that the Seller sold to Retailers on or prior to the Closing Date;

(i)  all Liabilities for bonus, vacation or other payroll accruals set forth on **Section 2.03(i)** of the Disclosure Schedules.

(j)  those Liabilities of Seller set forth on **Section 2.03(j)** of the Disclosure Schedules.

**Section 2.04  Excluded Liabilities.** Notwithstanding the provisions of **Section 2.03** or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall, and shall cause each of its Affiliates, as applicable, to, pay and satisfy in due course all Excluded Liabilities which it is, or they are, as applicable, obligated to pay and satisfy; provided, however, that nothing herein is intended to expand the obligations of any Affiliate of Seller with respect to Liabilities beyond the obligations such Affiliate had prior to the Closing or to cause such Affiliate to guarantee any obligation of Seller. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)  any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)  any Liability for (i) Taxes of Seller (or any owner, member or Affiliate of Seller) or relating to the Business or the Purchased Assets for any Pre-Closing Tax Period, except to the extent such Taxes are taken into account in any adjustments to the Purchase Price hereunder; (ii) except as set forth in **Section 2.03(e)**, Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to **Section 6.13**; or (iii) other Taxes of Seller (or any owner, member or Affiliate of Seller) relating to the Excluded Assets;

15

(c)  any Liabilities relating to or arising out of the Excluded Assets;

(d)  except as set forth in **Section 2.03**, any Liabilities relating to, arising out of or incurred in connection with Business that have accrued, or are attributable to periods, prior to the Closing;

(e)  any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(f)  any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(g)  any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(h)  any Liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(i)  any Liabilities of Seller for any present or former employees, officers, directors, managers, retirees, independent contractors or consultants of Seller, including any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments, except for Liabilities relating to Buyer's employment of any employees set forth on **Section 6.05** of the Disclosure Schedules;

(j)  any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(k)  any trade accounts payable of Seller (i) relating to the Excluded Assets; or (ii) which constitute intercompany payables owing to Affiliates of Seller;

(l)  any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing;

(m)  any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, manager, employee or agent of Seller (including with respect to

16

any breach of fiduciary obligations by same), except for indemnification of same pursuant to **Section 8.03** as Seller Indemnitees;

(n)   any Liabilities under the Excluded Contracts or any other Contracts to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(o)   any Liabilities associated with debt, loans or credit facilities of Seller or any of its Affiliates and/or the Business owing to financial institutions or any other Person;

(p)   any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order; and

(q)   any Liabilities relating to or arising out of the matters set forth on **Section 4.10(b)** or **Section 4.14(a)** of the Disclosure Schedules.

**Section 2.05   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be Thirty-Seven Million, Six Hundred Thirty-Seven Thousand, Three Hundred Forty-Seven Dollars ($37,637,347.00) ((a) $35,893,147.00 of which shall be allocated to the physical segment of the Business and (b) $1,744,200.00 of which shall be allocated to Anderson Digital), subject to adjustment pursuant to this **Section 2.05** and **Section 2.06** hereof (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. Any Purchase Price adjustments set forth herein shall be allocated to the physical segment of the Business, other than those Purchase Price adjustments set forth in **Section 2.05(b)** and **Section 2.06(a)(v)**, which shall be allocated to Anderson Digital. The Purchase Price shall be paid at the Closing by wire transfer of immediately available funds to an account designated in writing by Seller.

(a)   Balance Sheets. On or prior to the date hereof, Seller has prepared and delivered to Buyer balance sheets ("**Estimated Balance Sheets**") as of May 1, 2015 for each of the 3PL Business (set forth as Exhibit A), the Wholesale Business (Exhibit B), and Anderson Digital (Exhibit G). Within thirty (30) days after the Closing, Seller will prepare and deliver to Buyer the closing balance sheets ("**Closing Balance Sheets**") for each of the 3PL Business, the Wholesale Business, and Anderson Digital reflecting each's accounts and operations as of the Closing Date.

(i)      3PL Business.

(A)      The Estimated Balance Sheet and Closing Balance Sheet for the 3PL Business shall summarize the computation of each Gross Due Content Owner (as defined below) and shall be in the form set forth as Exhibit A.  The Gross Due Content Owner (as defined below) shall reflect inception-to-date activity of Seller with the applicable Content Owners.  The "**Gross Due Content Owner**" is defined as net billings, inclusive of digital royalties, owed to each Content Owner *less* the sum of recoupable

17

expenses, distribution fees, recoupable advances and payments previously made by Seller to such Content Owner.  At the Closing, the Purchase Price will be reduced by the sum of the Gross Due Content Owner balances set forth on the Estimated Balance Sheet for the 3PL Business; provided, however, that the following Gross Due Content Owner balances shall be excluded from such calculation and Purchase Price adjustment: Maddox Entertainment; Big Air Studios, LLC; Grand Entertainment, LLC; Nasser Group, Inc.; Anderson Digital; SP Sales and Distribution, LLC; and each of their Affiliates.

(B)    At the Closing, the Purchase Price shall be increased by $3,201,982.00, $102,429.00 and $500,000.00, representing the respective estimated values of Walmart/Sam's Club, Best Buy, and Ingram product returns (valued based on "dealer cost" charged to the applicable Retailer), computed as set forth in Exhibit I, credited against Seller's Accounts Receivable from Walmart/Sam's Club, Best Buy, and Ingram, respectively, for the 3PL Business as of the Closing Date (each such amount, the "**3PL Product Return A/R**" with respect to the applicable Retailer). The Purchase Price adjustments contemplated by this **Section 2.05(a)(i)(B)** shall be subject to further adjustment after the Closing as set forth in **Section 2.06**.

(ii)    Wholesale Business.

(A)    The Estimated Balance Sheet and Closing Balance Sheet for the Wholesale Business shall summarize the computation of Wholesale Supplier Working Capital (as defined below) and shall be presented in the form set forth as Exhibit B.  "**Wholesale Supplier Working Capital**" is defined as Inventory of the Wholesale Business (valued based on "last order cost" charged by the applicable Content Supplier) less accounts payable (determined in accordance with GAAP, subject to the modifications set forth in this **Section 2.05(a)(ii)(A)**) owed by Seller to the Content Suppliers of such Inventory of the Wholesale Business. Computation of such accounts payable shall include recognition of amounts labeled on the Estimated Balance Sheet and Closing Balance Sheet for the Wholesale Business as "received not billed" (Inventory received by Seller from Content Suppliers but not yet invoiced by Content Suppliers) and "returns not shipped" (Inventory returned to Seller from Retailers but not yet sent back to Content Suppliers), in each case valued at "invoice cost."   At the Closing, the Purchase Price will be reduced by the negative amount of the aggregate Wholesale Supplier Working Capital balances set forth on the Estimated Balance Sheet for the Wholesale Business; provided, however, that the Wholesale Supplier Working Capital balances with respect to Magnolia Pictures, Platinum Disc, and each of their Affiliates, other than those set forth on Exhibit F, shall be excluded from such calculation and Purchase Price adjustment.

18

(B)     At the Closing, the Purchase Price shall be increased by $4,033,429.00 and $1,058,479.00, representing the respective estimated values of Walmart/Sam's Club and Best Buy product returns (valued based on "dealer cost" charged to the applicable Retailer), computed as set forth in Exhibit I, credited against Seller's Accounts Receivable from Walmart/Sam's Club and Best Buy, respectively, as of the Closing Date for the Wholesale Business (each such amount, the "**Wholesale Product Return A/R**" with respect to the applicable Retailer). The Purchase Price adjustments contemplated by this **Section 2.05(a)(ii)(B)** shall be subject to further adjustment after the Closing as set forth in **Section 2.06**.

(C)     At the Closing, the Purchase Price shall be increased by $361,299.00, representing the estimated invoiced cost of the Inventory of Magnolia Pictures set forth on Exhibit F. The Purchase Price adjustments contemplated by this **Section 2.05(a)(ii)(C)** shall be subject to further adjustment after the Closing as set forth in **Section 2.06**.

(D)     At the Closing, the Purchase Price shall be reduced by $100,000.00, representing the parties agreed cost to Buyer to assume responsibility for product returns for non-Inventory products or from inactive Content Suppliers. The Purchase Price adjustment contemplated by this **Section 2.05(a)(ii)(D)** shall not be subject to further adjustment.

(b) Anderson Digital.  The Estimated Balance Sheet for Anderson Digital shall set forth Seller's calculation of Anderson Digital Closing Working Capital. At the Closing, the Purchase Price will be reduced by the amount by which the Anderson Digital Closing Working Capital is less than $0. There shall be no adjustment to the Purchase Price for any amount by which the Anderson Digital Closing Working Capital exceeds $0. The Purchase Price adjustments contemplated by this section shall be subject to further adjustment after the Closing as set forth in **Section 2.06**.

(c) Salary Reimbursement. At the Closing, the Purchase Price shall be reduced by $125,000.00, representing a reimbursement of certain salary expenses to be incurred by Buyer with respect to the employment of Matthew Smith, subject to Matthew Smith accepting an offer of employment from Buyer prior to Closing.

### Section 2.06  Purchase Price Adjustments.

(a) **Post-Closing Adjustments.** Subject in all cases to **Section 2.06(b)**:

(i)     To the extent that the sum of the Content Owners Gross Due balances set forth on the Closing Balance Sheet for the 3PL Business exceeds such amount as set forth on the Estimated Balance Sheet for the 3PL Business, Seller shall pay the amount of such excess to Buyer in accordance with **Section 2.06(b)(iv)**. *Solely*

19

*by way of illustration, if the Estimated Balance Sheet reflected a Content Owners Gross Due Balance of $1,000,000 and the Closing Balance Sheet reflected a Content Owners Gross Due Balance of $1,200,000, then Seller shall owe Buyer $200,000.* To the extent that the sum of the Content Owners Gross Due balances set forth on the Closing Balance Sheet for the 3PL Business is less than such amount as set forth on the Estimated Balance Sheet for the 3PL Business, Buyer shall pay the amount of such shortfall to Seller in accordance with **Section 2.06(b)(iv)**. For "overpaid" Gross Due Content Owner balances excluded from the computations set forth in **Section 2.05(a)(i)(A)** pursuant to the terms thereof, after the Closing, Buyer shall make reasonable efforts to recoup such the "overpaid" portion of each such balance as set forth on the Closing Balance Sheet; if and when such "overpaid" balance is recouped (after Buyer's deduction of any and all applicable distribution fees and expenses), Buyer shall remit such amount to Seller before paying the applicable Gross Due Content Owner to the applicable Content Owner. Seller acknowledges and agrees that Buyer shall have no liability to Seller for any failure by Buyer or any other Person to fully recoup any "overpaid" Gross Due Content Owner balances. Any recouped balances due to Seller pursuant to this **Section 2.06(a)(i)** shall be paid to Seller by Buyer on a monthly basis on the first day of each month.

(ii)    Within thirty (30) days following the Vendor Effective Date for a given Retailer, Seller shall prepare and deliver to Buyer a statement setting forth its calculation of the actual amount of 3PL Product Return A/R and Wholesale Product Return A/R from each such Retailer for the period between the Closing Date and the applicable Vendor Effective Date (each such statement, the "**Product Return A/R Statement**" with respect to the applicable Retailer). Should the actual combined 3PL Product Return A/R and Wholesale Product Return A/R from such Retailer set forth on the Product Return A/R Statement for such Retailer exceed the aggregate of the estimated amounts set forth in **Section 2.05(a)(i)(B)** and **Section 2.05(a)(ii)(B)**, respectively, for such Retailer, Buyer shall pay the amount of such excess to Seller in accordance with **Section 2.06(b)(iv)**. Should the actual combined 3PL Product Return A/R and Wholesale Product Return A/R from such Retailer set forth on the Product Return A/R Statement for such Retailer be less than the aggregate of the estimated amounts set forth in **Section 2.05(a)(i)(B)** and **Section 2.05(a)(ii)(B)**, respectively, for such Retailer, Seller shall pay the amount of such shortfall to Buyer in accordance with **Section 2.06(b)(iv)**.

(iii)    For six (6) months following the Closing Date, Buyer shall have a "put" option to sell product relating to the following Content Suppliers for the Wholesale Business to Seller at the applicable product "last order cost" of such product (subject in each case to the aggregate cap for the applicable vendor account set forth on **Section 2.06(a)(iii)** of the Disclosure Schedules):  WEA, Capitol Christian, Sony, UMGD, and

20

IMT Records.  If such "put" option is exercised by Buyer, Buyer agrees, at Seller's election, to return the product to the applicable Content Supplier for Seller's benefit, in which event Seller shall pay any and all shipping costs in connection therewith.

(iv)     To the extent that the negative amount of the aggregate Wholesale Supplier Working Capital balances set forth on the Closing Balance Sheet for the Wholesale Business exceeds such amount as set forth on the Estimated Balance Sheet for the Wholesale Business, Seller shall pay the amount of such excess to Buyer in accordance with **Section 2.06(b)(iv)**. To the extent that the negative amount of the aggregate Wholesale Supplier Working Capital balances set forth on the Closing Balance Sheet for the Wholesale Business is less than such amount as set forth on the Estimated Balance Sheet for the Wholesale Business, Buyer shall pay the amount of such shortfall to Seller in accordance with **Section 2.06(b)(iv)**.  *Solely by way of illustration, if the Estimated Balance Sheet reflected a negative amount of aggregate Wholesale Supplier Working Capital balance of $3,000,000 and the Closing Balance Sheet reflected a negative amount of aggregate Wholesale Supplier Working Capital balance of $1,500,000, then Buyer shall owe Seller $1,500,000.*

(v)     To the extent that the Anderson Digital Closing Working Capital balance set forth on the Closing Balance Sheet for Anderson Digital is negative and is larger than any negative amount of the Anderson Digital Closing Working Capital balance set forth on the Estimated Balance Sheet for Anderson Digital**,** Seller shall pay the amount of such excess to Buyer in accordance with **Section 2.06(b)(iv)**.

(vi)     Within 180 days following the Closing Date, the parties shall jointly agree on any Purchase Price adjustments on a Dollar-for-Dollar basis relating to the following:

(A)     With respect to accounts payable of the Wholesale Business, increases or decreases in Purchase Price for errors in valuing such accounts payable in accordance with Financial Accounting Standard No. 5 of the Financial Accounting Standards Board consistent with the Company's historic accounting procedures, including any errors in the accounting cutoff as of the Closing; and

(B)     With respect to Gross Due Content Owner for the 3PL Business, increases or decreases in Purchase Price for pre-Closing errors by Seller in the computation of inception-to-date revenues, distribution fees, recoupable costs, recoupable advances, and/or payments to applicable Content Owners.

Any Purchase Price adjustments resulting from clauses (A) or (B) above shall be paid by the party owing such adjusted amounts within five (5) Business Days following such determination by wire transfer of immediately available funds.

21

(vii)     Within thirty (30) days after the Closing, Seller will prepare and deliver to Buyer a statement setting forth the actual invoiced cost of the Inventory of Magnolia Pictures as of the Closing Date (the "**Magnolia Inventory Statement**"). To the extent that the amount set forth on the Magnolia Inventory Statement is less than the estimated invoiced cost of the Inventory of Magnolia Pictures set forth on Exhibit F, Seller shall pay the amount of such shortfall to Buyer in accordance with **Section 2.06(b)(iv)**.

(b)     **Examination and Review; Disputes; Adjustment Payments.**

(i)     After receipt of (A) the Closing Balance Sheets, (B) the Product Return A/R Statement for each of Walmart, Sam's Club, and Best Buy,  and (C) the Magnolia Inventory Statement, Buyer shall have thirty (30) days (each such period, a "**Review Period**") to review such Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable. During the applicable Review Period, Buyer shall have access to the relevant books and records of Seller, the personnel of, and work papers prepared by, Seller to the extent that they relate to the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, and to such historical financial information (to the extent in Seller's possession) relating to the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, as Buyer may reasonably request for the purpose of reviewing the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, and to prepare a Statement of Objections (defined below) with respect thereto; provided, however, that such access shall be in a manner that does not interfere with the normal business operations of Seller.

(ii)     On or prior to the last day of the applicable Review Period, Buyer may object to the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, by delivering to Seller a written statement setting forth Buyer's objections in reasonable detail, indicating each disputed item or amount and the basis for Buyer's disagreement therewith (each such statement, a "**Statement of Objections**"). If Buyer fails to deliver the applicable Statement of Objections before the expiration of the applicable Review Period, the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, and the Purchase Price adjustments determined pursuant to **Section 2.06(a)** based on the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, shall be deemed to have been accepted by Buyer. If Buyer delivers the applicable Statement of Objections before the expiration of the applicable Review Period, Seller and Buyer shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (each such period, a "**Resolution Period**"), and, if the same are so resolved within the

22

applicable Resolution Period, the Purchase Price adjustments determined pursuant to **Section 2.06(a)** based on the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, with such changes as may have been previously agreed in writing by Seller and Buyer, shall be final and binding

(iii)     Notwithstanding anything to the contrary contained in this Agreement (including **Section 10.10**), in the event of any dispute regarding the Closing Balance Sheets, any Product Return A/R Statement, the Magnolia Inventory Statement, and/or any of the Purchase Price adjustments determined pursuant to **Section 2.06(a)**, such dispute shall be submitted for resolution to the Dallas, Texas office of Ernst & Young LLP (or if Ernst & Young declines to so accept such assignment, by an independent accounting firm in Dallas, Texas to be mutually agreed by Buyer and Seller) (the "**Independent Accountant**"). Such Independent Accountant shall only decide the specific items under dispute by the parties and shall select either the Buyer's or Seller's position on the disputed matter. The fees and expenses of the arbitrator shall be paid by the non-prevailing party or proportionately split by the Independent Accountant in the case of multiple determinations. The Independent Accountant's resolution of the specific items under dispute and their adjustments to the Closing Balance Sheets, the applicable Product Return A/R Statement(s), the Magnolia Inventory Statement, and/or the applicable the Purchase Price adjustments determined pursuant to **Section 2.06(a)**, as applicable, shall be conclusive and binding upon the parties hereto.

(iv)     Except as otherwise explicitly provided in **Section 2.06(a)**, any payment of the Purchase Price adjustments determined pursuant to **Section 2.06(a)** shall (A) be due (x) within five (5) Business Days of acceptance of the Closing Balance Sheets, applicable Product Return A/R Statement(s), and/or Magnolia Inventory Statement, as applicable, or (y) if there is any dispute regarding the Closing Balance Sheets, applicable Product Return A/R Statement(s), and/or Magnolia Inventory Statement, as applicable, then within five (5) Business Days of the resolution described in **Sections 2.06(b)(ii)** through **2.06(b)(iii)** above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be.  Except as specifically provided herein, neither party may offset amounts owed from the other party; provided, however, that Buyer may offset any amounts owed to it by Seller hereunder that have been agreed by Seller to be owed, determined to be owed by the Independent Accountant in accordance with **Section 2.06(b)**, or determined to be owed pursuant to the dispute resolution mechanisms set forth in **Section 10.10** against any amounts that Buyer may owe to Seller, Anderson Merchandisers, LLC, or their respective Affiliates pursuant to the Merchandising Agreement.

(c)     [Intentionally deleted.]

23

(d)     **Millennium Receivable.**  Buyer shall pay the gross amount owed by it, as successor to Millennium Media Services, Inc., on the Closing Date to Seller without regard to deferrals for collection of accounts receivable or future product returns.  Such amount shall be offset by amounts owed by Seller to Buyer.  At the Closing, the parties shall estimate the amount of such payment, with such estimate to be trued up in the Closing Balance Sheet for the Wholesale Business.  Buyer's payment shall be made in accordance with the payment schedule set forth on Exhibit H.

(e)     **Adjustments for Tax Purposes.** Any payments made pursuant to **Section 2.06** shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

Section 2.07     **Allocation of Purchase Price.** Seller and Buyer agree that the Purchase Price shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) in accordance with **Section 2.07** of the Disclosure Schedules (the "**Allocation Schedule**"). Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule. Any adjustments to the Purchase Price pursuant to **Section 2.05** or **Section 2.06** herein shall be allocated in a manner consistent with the Allocation Schedule.

Section 2.08  **Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.  Notwithstanding the foregoing, Buyer is not aware of any required withholding.  If Buyer becomes aware of any withholding, Buyer will promptly notify Seller and the parties will work in good faith to obtain any available exemption from withholding.

Section 2.09     **Third Party Consents.**  To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. Seller shall use its best efforts to obtain any such required consent(s) from the Material Content Suppliers as promptly as possible and Seller and Buyer shall share equally in any costs or fees imposed by any such Material Content Supplier as a condition to consenting to such assignment; provided that such costs and fees (as well as any amendments, modifications, or other changes to the terms of any Contracts entered into with the

24

Material Content Suppliers required by such Material Content Suppliers as a condition to consenting to such assignment) shall be subject to Buyer's approval. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this **Section 2.09** to the contrary, Buyer shall not be deemed to have waived its rights under **Section 7.02(d)** hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.  As for any Content Supplier Contracts other than Contracts with the Material Content Suppliers, Seller shall have no liability to Buyer for failing to obtain or provide to Buyer a consent to assignment of any such Contract; provided, however, that upon Buyer's payment to Seller of an amount equal to the downward adjustments to the Purchase Price made at the Closing pursuant to **Section 2.05(a)** in respect of any Gross Due Content Owner balances or Wholesale Supplier Working Capital balances associated with the applicable Content Supplier for such Contract, Buyer shall assign, and Seller shall assume, such Contract and associated Liabilities (in which event such Liabilities shall be deemed to be Excluded Liabilities for the purposes of this Agreement).

## ARTICLE III
### CLOSING

Section 3.01     Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Stroock & Stroock & Lavan LLP, 2029 Century Park E, Suite 1600, Los Angeles, California 90067, at 11:59 p.m., Los Angeles, California time, on the first Friday which is a Business Day after all of the conditions to Closing set forth in **Article VII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

Section 3.02     **Closing Deliverables.**

(a)     At the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following:

25

(i)        such bills of sale in form and substance reasonably satisfactory to Buyer (the "**Bills of Sale**") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii)        such assignment and assumption agreements in form and substance reasonably satisfactory to Seller and Buyer (the "**Assignment and Assumption Agreements**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)        a Transition Services Agreement in form and substance reasonably satisfactory to Seller and Buyer (the "**Transition Services Agreement**") duly executed by Seller;

(iv)        the Merchandising Agreement in the form set forth as Exhibit D attached hereto (the "**Merchandising Agreement**") duly executed by Anderson Merchandisers, LLC;

(v)        an Assignment and Assumption Agreement in form reasonably acceptable to Seller and Buyer and duly executed by Seller with respect to the Current Best Buy Agreement which, prior to the Closing, will be extended on terms satisfactory to Buyer (the "**Extended Best Buy Agreement**");

(vi)        an Assignment and Assumption Agreement in form reasonably acceptable to Seller and Buyer and duly executed by Seller with respect to the Current ARC Agreement which, prior to the Closing, will be extended on terms satisfactory to Buyer (the "**Extended ARC Agreement**");

(vii)        a Canadian Distribution Agreement in form and substance reasonably satisfactory to Seller and Buyer (the "**Canadian Distribution Agreement**") duly executed by Seller;

(viii)        activated vendor numbers for use by Buyer with each of Walmart, Sam's Club, and Best Buy;

(ix)        consents to the assignments of Contracts and other transactions contemplated by this Agreement in form and substance reasonably satisfactory to Buyer and duly executed by the Material Content Suppliers;

(x)        duly executed releases and, if applicable, related Uniform Commercial Code termination statements from all Persons holding any Encumbrances against or relating to any of the Purchased Assets (including Bank of America, N.A.) in form and substance reasonably satisfactory to Buyer in its sole discretion;

(xi)        possession of the Purchased Assets;

(xii)        the Seller Closing Certificate;

26

(xiii)     the certificates of the Secretary of Seller required by **Section 7.02(i)** and **Section 7.02(j)**;

(xiv)     the certificate signed by Bill Lardie, Chuck Taylor, Matthew Smith and Steve McClanahan required by **Section 7.02(k)**;

(xv)     a statement setting forth any and all amounts disputed by Content Suppliers of the Wholesale Business as of the Closing Date as compared to such amounts as set forth on the Closing Balance Sheet for the Wholesale Business (the "**Vendor Reconciliation Statement**"); and

(xvi)     such other customary instruments of transfer, assumption, conveyance, certificates of title, filings or documents, in form and substance reasonably satisfactory to Seller and Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Purchase Price, as adjusted pursuant to **Section 2.05**;

(ii)     the Assignment and Assumption Agreements duly executed by Buyer;

(iii)     the Transition Services Agreement duly executed by Buyer;

(iv)     the Merchandising Agreement duly executed by Buyer;

(v)     the Buyer Closing Certificate;

(vi)     the certificates of an officer of Buyer required by **Section 7.03(f)** and **Section 7.03(g)**; and

(vii)     such other customary instruments of assumption or other certificates, affidavits or documents, in form and substance reasonably satisfactory to Seller and Buyer, as may be required to give effect to this Agreement.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01     Organization and Qualification of Seller.** Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Texas and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business

27

as currently conducted. **Section 4.01** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except as would not have a Material Adverse Effect on the Business.

**Section 4.02     Authority of Seller.** Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Documents to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "**Enforceability Exceptions**"). When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

**Section 4.03     No Conflicts; Consents.** The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, limited liability company agreement or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in **Section 4.03** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the

28

acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04     Financials.**   The Estimated Balance Sheets are based on the books and records of the Business, and fairly present an estimate of the accounts of the Business as of the Closing Date. The Books and Records (including all participation statements) are complete with respect to the period to which they relate, and accurately and fairly present the accounts of the Business as of the Closing Date. The Estimated Balance Sheet for Anderson Digital, including the calculation of Anderson Digital Closing Working Capital set forth thereon, is based on the books and records of Anderson Digital, and accurately and fairly presents the accounts and operations of Anderson Digital as of the Closing Date. Anderson Digital has no Liabilities other than those taken into account in the calculation of the Anderson Digital Closing Working Capital. Anderson Digital's estimated commitments are set forth on **Section 4.04** of the Disclosure Schedules. The Vendor Reconciliation Statement will be complete and correct in all material respects as of the Closing Date.

**Section 4.05**     [Intentionally deleted.]

**Section 4.06     Absence of Certain Changes, Events and Conditions.** Since March 27, 2015, and other than in the ordinary course of business consistent with past practice, there has not been any:

(a)     event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business;

(b)     material change in any method of accounting or accounting practice for the Business;

(c)     material change in policies, practices and procedures of the Business with respect to inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

29

(d)     entry into any Contract that would constitute a Material Contract with respect to the Business;

(e)     incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(f)     transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Estimated Balance Sheet, except for the sale of Inventory in the ordinary course of business;

(g)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(h)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Content Supplier Contracts;

(i)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(j)     acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

(k)     material capital expenditures which would constitute an Assumed Liability;

(l)     imposition of any Encumbrance upon any of the Purchased Assets;

(m)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any employee listed on **Section 6.05** of the Disclosure Schedules, other than as provided for in any written agreements or required by applicable Law, (ii) change in the terms of employment for any employee listed on **Section 6.05** of the Disclosure Schedules, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any employee listed on **Section 6.05** of the Disclosure Schedules;

(n)     adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any employee listed on **Section 6.05** of the Disclosure Schedules, (ii) benefit plan, or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(o)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any employees of the Business listed on **Section 6.05** of the Disclosure Schedules;

(p)     adoption by Seller of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

519605 000004 14648212.21

LA 51840284

(q)      purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with the Business, except for purchases of Inventory or supplies in the ordinary course of business consistent with past practice;

(r)      any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 4.07      Material Contracts.**

(a)      **Section 4.07(a)** of the Disclosure Schedules lists each of the following Contracts (x) by which any of the Purchased Assets are bound or affected or (y) to which Seller is a party or by which it is bound solely in connection with the Business or the Purchased Assets (such Contracts set forth in **Section 4.07(a)** of the Disclosure Schedules, being "**Material Contracts**"):

(i)      all Content Supplier Contracts;

(ii)      all Retailer Contracts;

(iii)      all Contracts that require Seller to purchase or sell a stated portion of the requirements or outputs of the Business or that contain "take or pay" provisions;

(iv)      all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(v)      all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(vi)      all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(vii)      all Contracts with employees set forth on **Section 6.05** of the Disclosure Schedules and independent contractors or consultants (or similar arrangements) and which are not cancellable without material penalty or without more than 90 days' notice;

(viii)      except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including guarantees);

(ix)      all Contracts with any Governmental Authority ("**Government Contracts**");

(x)      all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

31

(xi)     all joint venture, partnership or similar Contracts;

(xii)     all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(xiii)     all powers of attorney with respect to the Business or any Purchased Asset;

(xiv)     all other Contracts that are material to the Purchased Assets or the operation of the Business and not previously disclosed pursuant to this **Section 4.07**.

(b)     Each Material Contract is valid and binding on Seller and, to Seller's Knowledge, the other parties thereto in accordance with its terms and is in full force and effect, in each such case subject to the Enforceability Exceptions. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been provided to Buyer by Seller. To Seller's Knowledge, there are no material disputes pending or, to Seller's Knowledge, threatened under any Retailer Contract or Content Supplier Contract included in the Purchased Assets.

**Section 4.08     Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(a)     those items set forth in **Section 4.08** of the Disclosure Schedules;

(b)     liens for Taxes not yet due and payable; or

(c)     mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business or the Purchased Assets.

32

**Section 4.09    Sufficiency of Assets.** Except for assets and employees used by Seller for performance under the Transition Services Agreement, the Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.

**Section 4.10    Intellectual Property.**

(a)    The conduct of the Business as currently conducted, and the rights granted to Seller pursuant to the Content Supplier Contracts, have not infringed, misappropriated, diluted or otherwise violated the Intellectual Property or other rights of any Person. To the Knowledge of Seller, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any rights granted to Seller under or with respect to the Content Supplier Contracts.

(b)    Except for Actions set forth on **Section 4.10(b)** of the Disclosure Schedules there are no Actions (including any oppositions, interferences or re-examinations) settled, pending or to Seller's Knowledge, threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business; (ii) challenging the validity or enforceability of any rights granted to Seller under or with respect to the Content Supplier Contracts; or (iii) by Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any rights granted to Seller under or with respect to the Content Supplier Contracts. Seller is not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or would restrict or impair the use of any rights granted to Seller under or with respect to the Content Supplier Contracts.

**Section 4.11    Inventory.** All Inventory consists of a quality usable and salable in the ordinary course of business. Except as set forth on **Section 4.11** of the Disclosure Schedules, all Inventory is owned by Seller free and clear of all Encumbrances. Except as otherwise provided for in this Agreement, Inventory has been valued based on the "last order cost" charged by the applicable Content Supplier.

**Section 4.12    Material Retailers and Material Content Suppliers.**

(a)    **Section 4.12(a)** of the Disclosure Schedules sets forth with respect to the Business the net sales (sales less returns) for each Material Retailer for goods or services rendered for the 12-month period prior to the date hereof. Seller has not received any notice that any of the Material Retailers has ceased, or intends to cease

33

after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business, and to Seller's Knowledge, no Material Retailer currently has plans to terminate its relationship with the Business in the next 12 months.

(b)      **Section 4.12(b)** of the Disclosure Schedules sets forth the Dollar amount of purchases from each Material Content Supplier during such periods. Except as set forth on **Section 4.12(b)** of the Disclosure Schedules, Seller has not received any notice, and has no reason to believe, that any of the Material Content Suppliers has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

**Section 4.13      Insurance.** Seller maintains and has maintained since January 1, 2013, commercially adequate policies of liability insurance covering the Business and the Purchased Assets (the "**Insurance Policies**").   There are no claims related to the Business, the Purchased Assets or the Assumed Liabilities pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Seller nor any of its Affiliates has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of Seller's current Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if not yet due, accrued. All such Insurance Policies (a) are in full force and effect and enforceable in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. None of Seller or any of its Affiliates is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are sufficient for compliance with all applicable Laws and Contracts to which Seller is a party or by which it is bound.

**Section 4.14      Legal Proceedings; Governmental Orders.**

(a)      Except as set forth on **Section 4.14** of the Disclosure Schedules there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)      There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business.

519605 000004 14648212.21

LA 51840284

**Section 4.15    Compliance With Laws; Permits.**

(a)    Seller is in material compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

(b)    Except as would not have a Material Adverse Effect on the Business, all Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect, and all fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 4.15(b)** of the Disclosure Schedules lists all current material Permits issued to Seller which are related solely to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration. To Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 4.15(b)** of the Disclosure Schedules.

**Section 4.16    Environmental Matters.**

(a)    The operations of Seller with respect to the Business and the Purchased Assets are currently and have been in material compliance with all Environmental Laws. Seller has not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)    The Business as currently conducted by Seller requires no Environmental Permits.

**Section 4.17    Employee Benefit Matters.**    Seller is not a party to any Multiemployer Plan within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

**Section 4.18    Employment Matters.**

(a)    **Section 4.18(a)** of the Disclosure Schedules sets forth for each individual listed on **Section 6.05** of the Disclosure Schedules the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. As of the date hereof, all compensation, including wages, commissions and

35

bonuses payable to such employees for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)    Seller is not, and has not been for the past three years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been for the past three years, any Union representing or purporting to represent any employee of Seller, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. There has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business. Seller has no duty to bargain with any Union.

**Section 4.19  Taxes.**   The following representations (a) – (e) and (h) shall apply only to Taxes which could affect the Buyer's ownership and operation of the Purchased Assets or for which  Buyer could become liable.

(a)    All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all material respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)    All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority have been fully paid.

(e)    Seller is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority relating to the Purchased Assets.

(f)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)    Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

519605 000004 14648212.21

LA 51840284

(h)      Seller is not, and has not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

(i)      None of the Purchased Assets is (i) required to be treated as being owned by another Person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, or (ii) subject to Section 168(g)(1)(A) of the Code.

(j)      None of the Purchased Assets is tax-exempt use property within the meaning of Section 168(h) of the Code.

**Section 4.20      Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof.

**Section 5.01      Organization of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.

**Section 5.02      Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms,

519605 000004 14648212.21

LA 51840284

subject to the Enforceability Exceptions. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

**Section 5.03    No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, limited liability company agreement or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in **Section 5.03** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Legal Proceedings; Governmental Orders.** There are no Actions pending or, to Buyer's Knowledge, threatened against or by Buyer (a) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement, or (b) which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or to consummate the transactions hereby. To Buyer's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 5.05    Financial Capability.** Buyer (i) has binding equity or debt commitments for, and at the Closing will have, sufficient funds available to pay the Purchase Price, as adjusted hereby, and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement, (ii) at the Closing will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would materially impair or materially and adversely affect such resources and capabilities.

38

**Section 5.06      Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.07      Condition of the Business.** NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, BUYER ACKNOWLEDGES AND AGREES THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN BY SELLER IN <u>ARTICLE IV</u> HEREOF (AS MODIFIED BY THE DISCLOSURE SCHEDULES ATTACHED HERETO AS SUPPLEMENTED OR AMENDED), AND BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED THEREIN, THE PURCHASED ASSETS AND THE BUSINESS ARE BEING TRANSFERRED ON A "<u>WHERE IS</u>" AND, AS TO CONDITION, "<u>AS IS</u>" BASIS.  ANY CLAIMS BUYER MAY HAVE FOR BREACH OF REPRESENTATION OR WARRANTY SHALL BE BASED SOLELY ON THE REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH IN <u>ARTICLE IV</u> HEREOF (AS MODIFIED BY THE DISCLOSURE SCHEDULES ATTACHED HERETO AS SUPPLEMENTED OR AMENDED).  BUYER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS AFFILIATES NOR ANY OTHER PERSON HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING SELLER, THE BUSINESS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT NOT EXPRESSLY SET FORTH IN THIS AGREEMENT, AND NONE OF SELLER, ANY OF ITS AFFILIATES OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO BUYER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO BUYER OR ITS REPRESENTATIVES OR BUYER'S USE OF, ANY SUCH INFORMATION, INCLUDING ANY DOCUMENT OR INFORMATION IN ANY FORM PROVIDED TO BUYER OR ITS REPRESENTATIVES IN CONNECTION WITH THE SALE OF THE BUSINESS AND THE TRANSACTIONS CONTEMPLATED HEREBY.  BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED TO ITS SATISFACTION, ITS OWN INDEPENDENT INVESTIGATION OF THE BUSINESS AND, IN MAKING THE DETERMINATION TO PROCEED WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, BUYER HAS RELIED ON THE RESULTS OF ITS OWN INDEPENDENT INVESTIGATION.  AS OF THE DATE HEREOF, BUYER HAS NO KNOWLEDGE OF ANY FACTS, EVENTS OR CIRCUMSTANCES THAT WOULD CAUSE ANY OF THE REPRESENTATIONS OR WARRANTIES OF SELLER SET FORTH IN <u>ARTICLE IV</u> HEREOF TO BE UNTRUE OR INCORRECT IN ANY RESPECT.

519605 000004 14648212.21

LA 51840284

# ARTICLE VI
## COVENANTS

**Section 6.01      Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business; provided, however, that Seller and Buyer will undertake to obtain the consents of the Material Content Suppliers to the assignment of the Content Supplier Contracts entered into by them, and such efforts may result in changes in the relationship between such Material Content Suppliers and the Business for which Seller shall have no liability to Purchaser. Nothing herein shall prohibit the Company from (i) causing Anderson Digital to make cash distributions to its members prior to Closing; provided that such distributions shall not cause Anderson Digital to have Anderson Digital Closing Working Capital of less than $0 as of the Closing Date; and (ii) making product returns to Content Suppliers or resolving disputed items with Content Suppliers regarding payables. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

(a)      preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)      pay the debts, Taxes and other obligations of the Business when due;

(c)      maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d)      continue in full force and effect without modification all Insurance Policies relating to the Business, except as required by applicable Law;

(e)      defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(f)      perform all of its obligations under all Assigned Contracts;

(g)      maintain the Books and Records in accordance with past practice;

(h)      comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

40

(i)    not take or permit any action that would cause any of the changes, events or conditions described in **Section 4.06** to occur.

**Section 6.02    Access to Information.** From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business. Any investigation pursuant to this **Section 6.02** shall be conducted during normal business hours, upon reasonable advance notice in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

**Section 6.03    No Solicitation of Other Bids.**

(a)    Seller shall not, and shall not authorize or permit any of its Affiliates or any of its or their Representatives to, directly or indirectly, (i) knowingly encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Seller shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the Business or the Purchased Assets.

(b)    In addition to the other obligations under this **Section 6.03**, Seller shall promptly (and in any event within three Business Days after receipt thereof by Seller or its Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

41

(c)     Seller agrees that the rights and remedies for noncompliance with this **Section 6.03** shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

### Section 6.04     Notice of Certain Events.

(a)     From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 7.02** to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 4.14** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this **Section 6.04** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including **Section 8.02** and **Section 9.01(b)**) and shall not be deemed to amend or supplement the Disclosure Schedules.

### Section 6.05     Employees and Employee Benefits. Buyer will offer employment to each of the employees listed on **Section 6.05** of the Disclosure Schedules on terms and conditions no less favorable to the employees than the current terms and conditions of such employees' employment with Seller.  Buyer agrees to guarantee a  term of employment to Matthew Smith of at least one year following the Closing Date on terms and conditions no less favorable to him than his current terms and conditions of employment with Seller.

42

**Section 6.06   Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed;  provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.  Buyer acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of that certain letter agreement between Buyer and Seller dated November 26, 2014, as supplemented by that certain side letter dated February 26, 2015 and updated April 1, 2015 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Buyer acknowledges that any and all other Evaluation Material (as defined in the Confidentiality Agreement) provided to it by Seller or their Representatives (as defined in the Confidentiality Agreement) concerning Seller and its Affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

**Section 6.07   Non-competition**

(a)   For a period of four years commencing on the Closing Date (the "**Restricted Period**"), Seller shall not, and shall not permit Anderson Media Corporation or any entity directly controlled by Anderson Media Corporation (collectively, "**Anderson Affiliates**") to, directly or indirectly, engage in, or assist others in engaging in, or provide, or assist others in providing, (i) any video distribution services for any Independents to any Retailers or other distributors or (ii) any scan-based trading services for any Major Movie Studios to any Retailers other than Walmart and Sam's Club. Notwithstanding the foregoing, nothing herein shall restrict Seller or any Anderson Affiliates from fulfilling direct-to-consumer orders for Walmart.com, providing in-store merchandising services or soliciting Major Movie Studios for their video distribution business. For the avoidance of

43

519605 000004 14648212.21

LA 51840284

doubt, if a Major Movie Studio controls the video distribution business for any Independent, the video distribution services rendered by such Major Movie Studio for such Independent will be considered a part of the video distribution business of such Major Movie Studio (and not for such Independent) for the purposes of this **Section 6.07** so long as Seller and the Anderson Affiliates do not, directly or indirectly, solicit, engage or provide services to such Independent's video distribution business separate from, and in lieu of, the video distribution business of such Major Movie Studio. For purposes hereof, "**Major Movie Studio**" means each of the following: The Walt Disney Studios, Universal Studios Inc., Warner Bros. Entertainment Inc., Twentieth Century Fox Film Corporation, Sony Pictures Entertainment Inc., Paramount Pictures Corporation, and Lions Gate Entertainment Corporation. For purposes hereof, "**Independents**" means, collectively any entity not wholly owned by a Major Movie Studio.  Additionally, nothing herein shall prohibit Seller from liquidating products from Magnolia Pictures, Platinum Disc or those certain Content Owners with respect to which any applicable Gross Due Content Owner balances are excluded from the Purchase Price adjustment set forth in **Section 2.05(a)(i)(A)**.

(b)     Seller acknowledges that a breach or threatened breach of this **Section 6.07** would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(c)     Seller acknowledges that the restrictions contained in this **Section 6.07** are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 6.07** should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this **Section 6.07** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

519605 000004 14648212.21

LA 51840284

**Section 6.08     Governmental Approvals and Consents**

(a)     Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals from Governmental Authorities. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders or approvals from Governmental Authorities.

(b)     Seller and Buyer shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 4.03** and **Section 5.03** of the Disclosure Schedules. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents. In the event that obtaining any such consent requires any payments, incentives or additional costs or measures be paid or undertaken by Seller or Buyer, such amounts and any costs therefor shall be paid equally by Seller and Buyer. Seller shall not intentionally or knowingly take any action that might cause any such payments, incentives or additional costs or measures to be required for the parties to obtain any such consent.

(c)     Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use all reasonable best efforts to:

(i)     respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any other Transaction Document;

(ii)     avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any other Transaction Document; and

(iii)     in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any other Transaction Document has been issued, to have such Governmental Order vacated or lifted.

(d)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental

45

Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Seller or Buyer with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(e)     Notwithstanding the foregoing, nothing in this **Section 6.08** shall require, or be construed to require, Buyer or any of its Affiliates to agree to (i) sell, hold, divest, discontinue or limit, before or after the Closing Date, any assets, businesses or interests of Buyer or any of its Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests which, in either case, could reasonably be expected to result in a Material Adverse Effect or materially and adversely impact the economic or business benefits to Buyer of the transactions contemplated by this Agreement and the other Transaction Documents; or (iii) any material modification or waiver of the terms and conditions of this Agreement.

### Section 6.09     Books and Records.

(a)     In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of three years after the Closing, Buyer shall:

(i)     retain the Books and Records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii)     upon reasonable notice, afford the Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.

(b)     In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing, or for any other reasonable purpose, for a period of three years following the Closing, Seller shall:

519605 000004 14648212.21

LA 51840284

(i)        retain the books and records (including personnel files) of Seller which relate to the Business and its operations for periods prior to the Closing which are not delivered to Buyer as part of the Books and Records; and

(ii)        upon reasonable notice, afford the Buyer's Representatives reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

(c)        Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 6.09** where such access would violate any Law.

**Section 6.10        Closing Conditions.** From the date hereof until the Closing, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VII** hereof.

**Section 6.11        Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.12        Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that, except as otherwise set forth herein, any Liabilities arising out of the failure to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

**Section 6.13        Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest), if any, incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be split equally by Buyer and Seller and collected by the Seller as required by law and remitted by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

47

**Section 6.14    Continued Business Relationships.** Seller shall not take any action that is designed or intended to have the effect of discouraging any Retailer (including any Material Retailer), supplier (including any Material Content Supplier), Content Owner, licensor, licensee, lessor or other business associate of Seller in connection with the Business from maintaining the same business relationships with Buyer in connection with the Business after the Closing as it maintained with Seller in connection with the Business prior to the Closing. Seller's reasonable efforts to obtain a consent to the assignment of a Contract from any Material Content Supplier or to obtain a consent from any Material Retailer to the transactions contemplated herein shall not be deemed a breach of this provision.

**Section 6.15**        [Intentionally deleted.]

**Section 6.16    Product Returns**. From and after the Closing Date, Buyer shall be responsible for all product returns (regardless of when sold) with respect to the Inventory relating to Walmart, Sam's Club, Best Buy and other Retailers; provided that the Seller has recognized sales from such Retailer in the six months preceding Closing. Additionally, Buyer shall be responsible for all product returns for non-Inventory products and inactive Content Suppliers. The Purchase Price reflects the parties' agreement with respect to Buyer's cost of such obligations.

**Section 6.17    Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 6.18 Disclosure Schedules.** Seller may, at its option, include in the Disclosure Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to Dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in one section of the Disclosure Schedules shall constitute a disclosure for all purposes under this Agreement and on each other section of the Disclosure Schedules, in such case where it is reasonably apparent on its face from the text of such disclosure that it should apply to such other section(s) of the Disclosure Schedules. From time to time prior to the Closing, Seller shall have the right

48

to supplement or amend the Disclosure Schedules with respect to any matter hereafter arising or discovered after the delivery of the Disclosure Schedules pursuant to this Agreement.   No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in **Section 7.02(a)** or termination rights under **Section 9.01(b)**; however, if Buyer does not elect to terminate the Agreement in accordance with **Section 9.01(b)**, it shall have irrevocably waived its right to indemnification under **Article VIII** with respect to such matter.

**Section 6.19    Payment Obligations.** Buyer agrees that it shall not create, incur, guarantee or secure any indebtedness owed to any of Buyer's equityholders or their Affiliates in connection with its financing of the Purchase Price that would be senior to any payment obligations to Seller hereunder.

**Section 6.20    Tag-Along Rights.**   Buyer acknowledges that Seller will provide a notice to the other members of Anderson Digital pursuant to Section 9.1 of the First Amended and Restated Limited Liability Company Agreement of Anderson Digital, LLC, dated as of October 1, 2012, informing such members of tag-along rights triggered by Buyer's offer to acquire Seller's interest in Anderson Digital.  Buyer agrees to purchase the membership units of any member exercising its rights under Section 9.1 of such agreement at the same price per membership unit set forth herein.

**Section 6.21    Pizza Man.**    Buyer agrees from and after the Closing Date to cause Anderson Digital not to distribute the picture Pizza Man.

## ARTICLE VII
### CONDITIONS TO CLOSING

**Section 7.01    Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities, if any, referred to in **Section 4.03** and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental

49

Authorities, if any, referred to in **Section 5.03**, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

**Section 7.02        Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)        Other than the representations and warranties of Seller contained in **Section 4.01**, **Section 4.02**, and **Section 4.20**, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in **Section 4.01**, **Section 4.02**, and **Section 4.20** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)        Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; provided that, with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)        No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)        All approvals, consents and waivers that are listed on **Section 4.03** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer, at or prior to the Closing; provided that all such approvals, consents and waivers from Material Content Suppliers shall have been received, and

50

executed counterparts thereof shall have been delivered to Buyer, within 14 days from the date of this Agreement.

(e)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect.

(f)    Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

(g)    All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(h)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in **Section 7.02(a)** and **Section 7.02(b)** have been satisfied (the "**Seller Closing Certificate**").

(i)    Buyer shall have received a certificate of the Secretary of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of managers of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(j)    Buyer shall have received a certificate of the Secretary of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(k)    Buyer shall have received a certificate signed by each of Bill Lardie, Chuck Taylor, Matthew Smith and Steve McClanahan certifying that any and all representations and warranties contained herein made with reference to their awareness of any fact or matter are true;

(l)    Seller shall have complied with the terms of the First Amended and Restated Limited Liability Company Agreement of Anderson Digital, LLC, dated as of October 1, 2012 (including Sections 8.1 and 9.1 thereof) that apply to Seller's assignment of its interest in Anderson Digital.

519605 000004 14648212.21

LA 51840284

(m)    Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(n)    The occurrence of the Vendor Condition Precedent Date.

(o)    Seller shall have delivered to Buyer the Extended Best Buy Agreement.

(p)    Seller shall have delivered to Buyer the Extended ARC Agreement.

**Section 7.03    Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in **Section 5.01**, **Section 5.02** and **Section 5.06**, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in **Section 5.01**, **Section 5.02** and **Section 5.06** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; provided that, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    No Action shall have been commenced against Buyer or Seller, which would prevent the Closing.  No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)    All approvals, consents and waivers that are listed on **Section 5.03** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Seller, at or prior to the Closing.

52

(e)    Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(f)    Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied (the "**Buyer Closing Certificate**").

(g)    Seller shall have received a certificate of an officer of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of managers of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(h)    Seller shall have received a certificate of an officer of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

## ARTICLE VIII
### INDEMNIFICATION

**Section 8.01    Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is two (2) years following the Closing Date; provided that the representations and warranties in (i) **Section 4.01**, **Section 4.02**, **Section 4.08**, **Section 5.01** and **Section 5.02** shall survive indefinitely and (ii) **Section 4.16** and **Section 4.19** shall survive for a period of seven years after the Closing Date. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

**Section 8.02    Indemnification By Seller.** Subject to the other terms and conditions of this **Article VIII**, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**")

53

against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them  for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement;

(c)    any Excluded Asset or any Excluded Liability;

(d)    any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates (including the Business and the Purchased Assets) conducted, existing or arising prior to the Closing Date except to the extent included in the Assumed Liabilities; or

(e)    any Third Party Claim from a Content Owner with respect to a dispute over its Gross Due Content Owner for time periods prior to the Closing Date, to the extent that such Third Party Claim has not and may not be included in the calculation of a Purchase Price adjustment pursuant to **Section 2.05** or **Section 2.06**; provided that such Third Party Claim arises and Seller has been provided notice of such Third Party Claim within two (2) years following the Closing Date.

**Section 8.03    Indemnification By Buyer.** Subject to the other terms and conditions of this **Article VIII**, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them  for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

54

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement;

(c)      any Assumed Liability; or

(d)      Buyer's operation of the Business or use of the Purchased Assets from and after the Closing Date, including any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Buyer or any of its Affiliates (including the Business and the Purchased Assets) conducted, existing or arising from and after the Closing Date except to the extent included in or related to the Excluded Liabilities or due to a breach of any representation, warranty, or covenant under this Agreement by Seller.

**Section 8.04      Certain Limitations.** The indemnification provided for in **Section 8.02** and **Section 8.03** shall be subject to the following limitations:

(a)      Seller shall not be liable to the Buyer Indemnitees for indemnification under **Section 8.02(a)** until the aggregate amount of all Losses in respect of indemnification under **Section 8.02(a)** exceeds $250,000 (the "**Basket**"), after which Seller shall be obligated to indemnify Buyer Indemnitees for Losses in excess of the Basket. The aggregate amount of all Losses for which Seller shall be liable pursuant to **Section 8.02(a)** shall not exceed $6,000,000 (the "**Cap**").

(b)      Buyer shall not be liable to the Seller Indemnitees for indemnification under **Section 8.03(a)** until the aggregate amount of all Losses in respect of indemnification under **Section 8.03(a)** exceeds the Basket, after which Buyer shall be obligated to indemnify Seller Indemnitees for Losses in excess of the Basket. The aggregate amount of all Losses for which Buyer shall be liable pursuant to **Section 8.03(a)** shall not exceed the Cap.

(c)      Notwithstanding the foregoing, the limitations set forth in **Section 8.04(a)** and **Section 8.04(b)** shall not apply to Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty in **Section 4.01**, **Section 4.02**, **Section 4.08**, **Section 4.16**, **Section 4.20**, **Section 5.01**, **Section 5.02** and **Section 5.06**; provided that except as otherwise set forth below, in no event shall either party be liable for Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty to the extent such Losses are in excess of the Purchase Price (the "**Overall Cap**").

(d)      Notwithstanding the foregoing, none of the Basket, Cap or Overall Cap shall apply to indemnification of one party for Losses resulting from, arising out of, relating to, in the nature of, or caused by intentional fraud or intentional misrepresentation of the other party, which shall be fully indemnified by such other party from the first Dollar.

55

(e)      Neither party shall make any claim for indemnification under this **Article VIII** or otherwise in respect of any matter that is taken into account in the calculation of any adjustment to the Purchase Price pursuant to **Section 2.05** or **Section 2.06**.

(f)      The amount of any Losses for which indemnification is provided under this **Article VIII** shall be net of any amounts actually recovered or recoverable by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).  Seller and Buyer each shall use commercially reasonable efforts to recover under insurance policies for any Losses prior to seeking indemnification under this Agreement.

(g)      Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

(h)      From and after the Closing Date, the sole and exclusive remedy for any breach or failure to be true and correct, or alleged breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement, shall be indemnification in accordance with this **Article VIII**.  In furtherance of the foregoing, each of the parties hereby waive, to the fullest extent permitted by applicable law, any and all other rights, claims and causes of action (including rights of contributions, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, as the case may be, arising under or based upon any federal, state or local law (including any such law relating to environmental matters or arising under or based upon any securities law, common law or otherwise).  Notwithstanding the foregoing, this **Section 8.04(h)** shall not operate to (i) interfere with or impede the operation of the provisions of **Section 2.06(b)** providing for the resolution of certain disputes relating to the Purchase Price between the parties and/or by an Independent Accountant or (ii) limit the rights of the parties to seek specific performance or injunctive relief.

**Section 8.05      Indemnification Procedures.** The party making a claim under this **Article VIII** is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this **Article VIII** is referred to as the "**Indemnifying Party**".

(a)      **Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which

56

the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than ten (10) calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel reasonably satisfactory to the Indemnified Party, and the Indemnified Party shall cooperate in good faith in such defense; provided  that such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim (i) that seeks an injunction or other equitable relief against the Indemnified Party; and (ii) if such Indemnifying Party fails to conduct the defense of the Third Party Claim actively and diligently. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.05(b)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party; provided that if in the reasonable opinion of counsel to the Indemnified Party, (there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.05(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of **Section 6.06**) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party,

57

management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)    **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.05(b)**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all Liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within  fifteen (15) Business Days of such notice and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 8.05(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)    **Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty  (30) days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30 day period announcing its intent to contest the Direct Claim, such Direct Claim shall be deemed accepted and the amount of Losses with respect to such Direct Claim shall be deemed a valid indemnifiable claim. If the Indemnifying Party contests the assertion of a Direct Claim by giving such written notice

58

to the Indemnified Party within such 30-day period, then the parties shall endeavor in good faith to resolve the Direct Claim. If the parties are unable to resolve such Direct Claim within sixty (60) days after the Indemnifying Party deliver such notice contesting the Direct Claim, then the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 8.06     Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VIII**, the Indemnifying Party shall satisfy its obligations within fifteen  (15) Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such 15 Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to but excluding the date such payment has been made at a rate per annum equal to the United States Dollar prime rate as quoted by Bloomberg on the Closing Date. Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

**Section 8.07     Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

## ARTICLE IX
### TERMINATION

**Section 9.01     Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Buyer;

59

(ii)      any of the conditions set forth in **Section 7.01** or **Section 7.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 29, 2015 (except for those conditions that include a specified date, the fulfillment of which shall be determined as of that specified date in all respects), unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)      The forms of Transition Services Agreement and Canadian Distribution Agreement have not been agreed by Buyer and Seller by May 13, 2015;

(c)      by Seller by written notice to Buyer if:

(i)      Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller;

(ii)      any of the conditions set forth in **Section 7.01** or **Section 7.03** shall not have been fulfilled by May 29, 2015, or sooner, if it becomes apparent that any of such conditions will not be fulfilled by May 29, 2015 (except, in each case, for those conditions that include a specified date, the fulfillment of which shall be determined as of that specified date in all respects), unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)      The forms of Transition Services Agreement and Canadian Distribution Agreement have not been agreed by Buyer and Seller by May 13, 2015;

(d)      by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02      Effect of Termination.** In the event of the termination of this Agreement in accordance with this **Article IX** or **Section 6.18**, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in this **Article IX** and **Section 6.06** and **Article X** hereof; and

519605 000004 14648212.21

LA 51840284

(b)      that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof, fraud or intentional misrepresentation.

## ARTICLE X
### MISCELLANEOUS

**Section 10.01    Expenses.** Except as otherwise expressly provided in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.02**):

If to Seller:                        ANConnect, LLC

                                     265 Brookview Town Centre Way, Suite 501

                                     Knoxville, TN  37919

                                     Facsimile:      865-475-8507

                                     E-mail: jmaier@andersonmediacorp.com

                                     Attention:      Jay R. Maier

61

with a copy to:                    Timothy K. Corley

2815 Darby Drive

Florence, AL 35630

Facsimile:      256-760-0083

E-mail: tim@timothycorley.com

and

Thompson & Knight LLP

1722 Routh Street, Suite 1500

Dallas, Texas 75201

Attn: Amy R. Curtis

Facsimile:  214-999-1564

Email:  amy.curtis@tklaw.com


If to Buyer:                       Alchemy

5900 Wilshire Boulevard, Floor 18

Los Angeles, CA 90036

Facsimile:      310-893-6289

E-mail: bill.lee@ouralchemy.com

Attention:      Bill Lee, CEO


with a copy to:                    Stroock & Stroock & Lavan LLP

2029 Century Park E, Suite 1600

Los Angeles, CA 90067

Facsimile:      310-556-5959

E-mail: smoore@stroock.com

62

Attention:        Schuyler M. Moore, Esq.

**Section 10.03 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation" unless otherwise specified; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 6.07(c)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Each party to this Agreement acknowledges that it is not relying on any statement, representation or warranty made by any Person other than as

519605 000004 14648212.21

LA 51840284

set forth in this Agreement and the other Transaction Documents. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08 No Third-party Beneficiaries.** Except as provided in **Article VIII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)   This Agreement and any claim arising hereunder (whether based in contract or tort) shall be governed by, construed, interpreted and enforced in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law

64

provision or rule (whether of the State of Delaware or any other jurisdiction) that would require or permit the application of the laws of another jurisdiction.

(b)  EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MUST BE INSTITUTED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR THE COURTS OF THE STATE OF DELAWARE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE (COLLECTIVELY, THE "DELAWARE COURTS"), AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN THE DELAWARE COURTS. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN THE DELAWARE COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN THE DELAWARE COURTS HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  THE PARTIES AGREE NOT TO FILE ANY SUIT, ACTION OR PROCEEDING IN ANY FORUM OTHER THAN THE DELAWARE COURTS.

(c)  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION, CLAIM OR DEFENSE ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **Section 10.10(c)**.

519605 000004 14648212.21

LA 51840284

(d)      Notwithstanding anything to the contrary contained in this Agreement, any dispute with regard to any claim for indemnification under **Section 8.02(a)** resulting from a Third Party Claim (and no other type of dispute under this Agreement) shall be resolved as expeditiously as possible by binding arbitration to be conducted before a single arbitrator in the state of Delaware in accordance with the then-current rules of the American Arbitration Association (the "**AAA**"); provided, however, that no depositions or motions shall be permitted in connection with such arbitration; provided further that the underlying award in such arbitration may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules ("**Appellate Rules**"); provided further that the underlying award rendered by the arbitrator shall, at a minimum, be a reasoned award; provided further that the underlying award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired. Any appeals in accordance with the terms of this **Section 10.10(d)** must be initiated within thirty (30) days of receipt of an underlying award, as defined by Rule A-3 of the Appellate Rules, by filing a Notice of Appeal with any AAA office. The parties consent to the exclusive jurisdiction and venue of the federal and state courts located in Delaware for purposes of enforcing this arbitration provision and/or confirming, modifying, or vacating any arbitration award hereunder.

**Section 10.11 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

519605 000004 14648212.21

LA 51840284

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ANCONNECT, LLC

By _Bill Lardie_
Name: BILL LARDIE
Title: CEO

OUR ALCHEMY, LLC

By_____
Name:
Title:

(Signature Page to Asset Purchase Agreement)

519605 000004 14648212.21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ANCONNECT, LLC

By_____
Name:
Title:

OUR ALCHEMY, LLC

By_____
Name: BILL LEE
Title: CEO

(Signature Page to Asset Purchase Agreement)

EXHIBIT A

**3PL SUPPLIERS**
**As of April 2015**

| Content Owner | Net Revenue | Royalties | Total Net Revenue | Deduction for Recoupable Expenses | Distribution Fees | Advances | Forgiveness of Advances | Less Payments to Date | Gross Due Content Owner |
|---|---|---|---|---|---|---|---|---|---|
| Classic | 110,627,502 | 8,702 | 110,636,204 | (24,663,544) | (20,947,733) | - | | (57,068,150) | 7,956,777 |
| Vertical | 12,390,449 | 593,048 | 12,983,497 | (3,850,826) | (3,702,909) | (1,000,000) | | (2,966,375) | 1,463,387 |
| Mill Creek | 2,708,825 | - | 2,708,825 | (88,500) | (768,272) | - | | (1,630,106) | 221,946 |
| Freestyle | 2,503,098 | 42,079 | 2,545,176 | (708,733) | (608,283) | - | | (263,911) | 954,248 |
| Hornet's Nest | 1,613,871 | 221,203 | 1,835,073 | (373,060) | (281,850) | - | | (713,706) | 466,456 |
| Inception Media | 3,438,190 | - | 3,438,190 | (88,942) | (1,373,814) | - | | (1,605,927) | 369,508 |
| Xirator | 10,340,491 | 551,517 | 10,892,008 | (4,508,315) | (3,045,960) | (1,375,000) | | (1,980,873) | (18,139) |
| Microsoft | 10,541,286 | 991,712 | 11,532,998 | (3,452,369) | (1,789,058) | - | | (3,475,594) | 2,815,977 |
| Cohen | 569,179 | 51,382 | 620,560 | (273,323) | (113,357) | - | | (82,021) | 151,860 |
| Genesis | 115,162 | 916 | 116,078 | (66,870) | (56,222) | - | | (18,561) | (25,575) |
| Bagdasarian | 10,957,989 | (23,912) | 10,934,077 | (3,486,906) | (2,497,683) | (995,000) | | (4,003,985) | (49,496) |
| Bagdasarian TV series | - | - | - | - | - | (1,125,000) | | - | (1,125,000) |
| Ketchup & K II | 2,006,613 | 378,548 | 2,385,161 | (1,925,247) | (468,429) | - | 3,600,000 | - | (8,514) |
| ARC | 79,307,171 | 3,099,174 | 82,406,345 | (32,332,061) | (25,207,405) | (15,800,000) | | (12,969,534) | (292,655) |
| | 247,119,826 | 5,914,367 | 253,034,192 | (75,808,696) | (60,860,973) | (20,295,000) | 3,600,000 | (86,778,744) | 12,890,779 |

**WHOLESALE SUPPLIERS**

*Month End Balance Sheet - April 2015*

**Exhibit B**

| Supplier | Supplier Number | WHOLESALE INVENTORY | ACCOUNTS PAYABLE | RETURNS NOT SHIPPED | RECEIVED NOT BILLED | WHOLESALE SUPPLIER WORKING CAPITAL |
|---|---|---|---|---|---|---|
| Sony Music Entertainment | 2016 | $541,134 | ($535,875) | $0 | $0 | $5,259 |
| UMGD | 2033 | $16,796 | ($38,940) | $0 | ($2,228) | ($24,372) |
| LAGUNA FILMS | 2041 | $194,887 | ($224,999) | $0 | ($11,316) | ($41,428) |
| WEA Corp. | 2076 | $923,182 | ($286,054) | $0 | ($690) | $636,438 |
| E1 Entertainment | 2391 | $592,252 | ($814,686) | $0 | $0 | ($222,435) |
| MPI HOME VIDEO | 2466 | $932,962 | ($1,173,394) | $0 | $0 | ($240,432) |
| IMT RECORDS | 21537 | $151,655 | ($290,787) | $0 | ($25) | ($139,157) |
| Millennium Media Services MMS | 23585 | $851,809 | ($1,016,910) | $0 | $0 | ($165,101) |
| COVENANT COMMUNICATIONS | 25064 | $33,069 | ($3,489) | $0 | $0 | $29,580 |
| CEDAR FORT | 25739 | $23,209 | ($132,241) | $0 | $0 | ($109,032) |
| Group 1200 Media | 27822 | $1,594,101 | ($2,392,555) | $0 | ($396,877) | ($1,195,332) |
| MAVERICK ENTERTAINMENT | 28709 | $511,842 | ($697,074) | $0 | ($78,089) | ($263,321) |
| Excel Entertainment | 29481 | $198,850 | ($603,194) | $0 | ($2,147) | ($406,491) |
| TEAM MARKETING | 30168 | $3,038,380 | ($3,346,493) | $0 | ($28,651) | ($336,765) |
| MULTIMUSIC INC. | 34873 | $60,510 | ($35,308) | $0 | $0 | $25,202 |
| INDICAN PICTURES | 35340 | $12,414 | ($35,238) | $0 | ($3,962) | ($26,787) |
| WELL GO USA, INC | 36299 | $961,490 | ($1,929,044) | $0 | ($2,925) | ($970,479) |
| PLUS ENTERTAINMENT | 36696 | $307,241 | ($370,011) | $0 | ($12,675) | ($75,444) |
| N CIRCLE ENTERTAINMENT | 37481 | $891,137 | ($1,003,743) | $0 | ($14,688) | ($127,295) |
| DISCO POWER | 37737 | $23,096 | $11,921 | $0 | $0 | $35,017 |
| CANDLELIGHT MEDIA GROUP | 37893 | $83,657 | ($100,527) | $0 | ($4,481) | ($21,352) |
| DISTRIMAX INC | 37966 | $105,365 | $62,744 | $0 | $0 | $168,109 |
| PHASE 4 FILMS | 38943 | $336,254 | ($533,326) | $0 | ($25,425) | ($222,497) |
| Xenon Pictures | 39637 | $47,765 | ($39,607) | $0 | $0 | $8,158 |
| Softland International | 41006 | $107,721 | ($68,059) | $0 | ($109) | $39,553 |
| CAPITAL CHRISTIAN DIST | 41318 | $595,650 | $232,041 | $0 | $0 | $827,691 |
| Gaiam Fitness | 42501 | $130,106 | $35,399 | $0 | $0 | $165,505 |
| AMAZON VIDEO | 42752 | $57,144 | $0 | $0 | $0 | $57,144 |
| **Total** | | **$13,323,675** | **($15,329,451)** | **$0** | **($584,288)** | **($2,590,063)** |

**Exhibit D**

**Form of Merchandising Agreement**

[*See attached*]

# MERCHANDISING AGREEMENT

**THIS AGREEMENT** (the "**Agreement**"), entered into and effective this _____ ___, 2015 (the "**Effective Date**") is by and between Our Alchemy, LLC ("**Company**"), with offices at 5900 Wilshire Boulevard, Floor 18, Los Angeles, California 90036, and Anderson Merchandisers, LLC with offices at 5601 Granite Parkway, Suite 1400, Plano, Texas 75024 ("**Contractor**").

## W I T N E S S E T H :

**Background.** Company wishes to engage Contractor to perform certain services with respect to Walmart stores as more particularly described in Exhibit A, attached to and made a part of this Agreement, as well as such other additional and/or modified Services on projects that may, from time to time be agreed to by both Company and Contractor pursuant to the procedures provided herein (the "**Services**"). Contractor desires perform the Services as specified in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein above and hereinafter set forth, the parties hereby agree as follows:

## 1. SERVICES

**1.1. Services**. Company hereby engages Contractor to perform the Services as described in Exhibit A or as from time to time agreed to by the parties. Contractor agrees to perform the Services in a good and workmanlike manner, consistent with applicable industry standards.

**1.2. Reports.** Company may periodically request reasonable written reports concerning Contractor's progress, project status, billing data, and other matters pertaining to the Services in which Company typically supplies in rendering the same or similar services as those performed hereunder, and Contractor shall provide such reports to Company at no additional charge.

**1.3. Personnel**. Contractor represents that all individuals performing the Services (the "**Personnel**") are qualified to perform the Services and have been assigned by Contractor to work with Company pursuant to this Agreement. Contractor may use its employees or subcontractors to perform the Services, provided that if Contractor uses subcontractors (a) Contractor shall remain solely responsible for the proper performance of the Services and this Agreement and (b) Contractor shall be solely responsible for engaging and paying such subcontractors. Contractor hereby agrees to pay its subcontractors, laborers and suppliers in full on a timely basis.

**1.4. Exclusive Service Provider.** Unless terminated or modified by the parties pursuant to this Agreement, Company agrees to use Contractor solely and exclusively to perform merchandising services in Wal-Mart stores and Sam's Clubs during the term of this Agreement.

## 2. COMPENSATION / EXPENSES

**2.1. Fees**. As full and complete consideration for the Services to be performed by Contractor, Company agrees to pay Contractor total fees (hereinafter called the "**Fees**") in accordance with this Section 2. Taxes, if any, shall be separately itemized by Contractor. For the Services to be provided under Exhibit A, the Fees shall be as set forth in Exhibit A. For any additional services, the Fees shall be agreed upon prior to the initiation of such additional services and set forth in as additional work authorization, and all Services performed under the additional work authorization will be governed by the terms of this Agreement and the additional work authorization. Payment of the Fees shall be subject to completion of the Services as provided herein. Company may offset amounts owed by ANConnect, LLC to it under that certain Asset Purchase Agreement (the "APA") dated as of May 7, 2015 by and between Company and ANConnect, LLC, but only to the extent that such offset is specifically permitted by the APA.

**2.2 Fee Adjustments.** If requested by Contractor, the parties may mutually agree to adjust the Fees as provided in this Section 2.2 (other than the portion of the fee related to the "Reimbursement Fees" as defined on

Exhibit A). Any adjustments to the Fees will be based upon market fluctuations and/or changes in the actual direct costs to Contractor for the Services. The parties will review such direct costs every six (6) months during the Term and, if needed, adjust the Fees based upon such review. If, in accordance with this Section 2.2, the parties can not mutually agree upon a fee adjustment, Contractor may terminate this Agreement upon thirty (30) days prior written notice to Company.

**2.3. Expenses.** The Fees shall include all sums due and owing of every kind and description solely with regard to performing the Services including but not limited to telephone calls, mileage, duplicating costs and mailing expenses, but shall specifically exclude without limitation, any materials such as Company's product (e.g., videograms), fixtures, signage and any such similar materials . Separate reimbursable expense items shall be specified on Exhibit A or in an additional work authorization.

**2.4. Excess Payment Amount.** If by the first anniversary of the Effective Date (the "Excess Payment Date"), Contractor shall not have received Reimbursement Fees totaling the "Excess Payment Amount" as defined on Exhibit A, then within five (5) days of the Excess Payment Date, Company shall pay to Contractor by wire transfer of immediately available funds an amount equal to the amount by which the Excess Payment Amount exceeds the aggregate Reimbursement Fees paid to Contractor hereunder as of the Excess Payment Date.

**2.5. Invoices.** Unless otherwise specified herein and in Exhibit A, Contractor shall submit invoices monthly and, subject to the terms of this Agreement, invoices are payable within thirty (30) days of receipt by Company.

**2.6. Books and Records; Audits.**

(i) Contractor shall maintain complete and accurate accounting records, and shall retain such records for a period of three (3) years following the date of the invoice to which they relate.

(ii) Company (and its duly authorized representatives) shall have the right at its sole expense, upon reasonable notice, to audit at any time up to one (1) year after payment of an invoice and only one time per statement, Contractor's records relating to the Fees that are due Contractor hereunder, the number of units invoiced and delivered in accordance with the terms hereof, and the expenses billed to Company in connection with the Services rendered under this Agreement. The examination shall take place at Contractor's principal office during Contractor's normal business hours. Company hereby confirms that the

examination, and any negotiations or matters related to the examination, are of a confidential nature and may only be disclosed or discussed between Company and its professional advisors (i.e., accountants and/or attorneys), but no one else, and Company will ensure that any confidentiality document Contractor may require prior to the commencement of any examination shall be signed and delivered to Contractor. If any payments are due Company as a consequence of an examination under this Agreement, such payments will be credited to Company's account after the execution of a letter of release acknowledging that all controversies between Company and Contractor with respect to the accountings examined by Company and/or its authorized representatives are finally compromised, settled and are deemed conclusive, accepted and binding upon Company.

## 3. PROPRIETARY RIGHTS CONFIDENTIALITY

**3.1. No Violation of Proprietary Rights**. Company hereby represents and warrants to Contractor that any and all materials supplied to Contractor in connection with Contractor performing its Services hereunder will not violate rights of third parties, including, without limitation, patents, copyrights, or trade secrets, and that such materials will not violate any contractual obligations or confidential relationships which Company may have to/with any third party. Contractor hereby represents and warrants to Company that its activities in connection with the performance of the Services hereunder will not violate any proprietary rights of third parties, including, without limitation, patents, copyrights, or trade secrets, and that such activities will not violate any contractual obligations or confidential relationships which Contractor may have to/with any third party.

**3.2. Confidential Information**.

(i) Each party hereto agrees to hold in trust and confidence, without limitation of time, all of the information and materials (including but not limited to all documents, reports, papers, programs, cards, tapes, disks, disk-racks, plans, designs, drawings, specifications, formulae, instructions, processes, systems, theories and any other information or materials) regarding the other company's business, the Services performed hereunder and the results thereof (a) disclosed by a party hereto, its agents or employees ("**Disclosing Party**") to the other party ("**Receiving Party**") hereunder; (b) obtained from the Disclosing Party or otherwise learned as a result of the Services performed hereunder; and/or (c) used as a basis for and/or contained in any reports prepared by a Disclosing Party for the Receiving Party hereunder (all of which shall be called the "**Confidential Information**"). The material and financial terms of this Agreement shall be included as

Confidential Information. The Receiving Party will not (1) use or allow to be used for its own benefit, (2) disclose or reveal or allow to be disclosed or revealed to any third party, or (3) make any commercial or other use of, all or any part of the Confidential Information nor make any press release regarding the existence of this Agreement without the prior written consent of the Disclosing Party.

(ii) It is understood, however, that the restrictions in this Paragraph 3.2, shall not apply to any portion of the Confidential Information which falls within any of the following categories: (a) Confidential Information that as of the time of disclosure to the Receiving Party, was already known to the Receiving Party without obligation of confidentiality; or (b) Confidential Information obtained after the date hereof by the Receiving Party from a third party; or (c) Confidential Information which is or becomes part of the public domain through no fault of the Receiving Party or its employees.

(iii) Each party agrees to restrict access to all of the Confidential Information within its company to only such limited group of authorized employees or independent contractors who (a) require such information in connection with their activities as contemplated by this Agreement, and (b) have agreed to maintain the confidential nature of all proprietary information - including that of third parties - received by them in the course of their employment or engagement. Neither party's name or insignia, photographs of any project part of the Services, or any other publicity pertaining to the Services shall not be used in any magazine, trade paper, newspaper or other medium without the prior written consent (email shall be acceptable) of the other party. Notwithstanding the above, Contractor may list Company as current or former (as applicable) client of Contractor.

(iv) All written materials relating to or containing the Confidential Information shall be maintained in a restricted access area to prevent unauthorized use or reproduction thereof.

(v) Disclosure of Confidential Information to the Receiving Party hereunder shall not constitute any option, grant or license to the Receiving Party under any patent or other rights now or hereinafter held by the Disclosing Party, its subsidiaries, or any of its affiliated companies.

(vi) Upon termination of this Agreement, or earlier upon a Disclosing Party's request, the Receiving Party shall deliver all items containing any Confidential Information to the Disclosing Party or make such other

disposition thereof as the Disclosing Party may reasonably direct.

**3.3. Survival**. This Section 3 shall survive termination or expiration of this Agreement.

**4. Intentionally Omitted.**

**5. OWNERSHIP OF WORK PRODUCT**

**5.1. Company and Contractor's Property**. All Confidential Information, data, business plans and information, specifications, drawings, or other property furnished by either party ("**Furnishing Party**") or obtained by a party to this Agreement in connection with the performance of the Services hereunder shall remain the exclusive property of the Furnishing Party. Each party agrees that such property will be used for no purpose other than in connection with and to fulfill the purposes of this Agreement. Each party shall be responsible for the safekeeping of all such property.

**6. COMPETING SERVICES**

Company acknowledges and agrees that Contractor is engaged in the business of providing merchandising services and will, accordingly, provide similar services to other entities including, without limitation, competitors of Company.

**7. INDEMNIFICATION**

**7.1. General**.

7.1.1 Contractor shall use reasonable care and judgment in rendering the Services to be performed hereunder. Contractor will defend, indemnify and hold harmless Company and each of its direct and indirect parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents, representatives, successors and assigns (collectively, the "**Company Indemnitees**"), from and against any and all third party claims, demands, liabilities, losses, damages, expenses (including without limitation, penalties and interest, reasonable fees and disbursements of counsel, and court costs), proceedings, judgments, settlements, actions or causes of action or government inquiries of any kind (including, without limitation, emotional distress, sickness, personal injury or death to any person (including employees of Contractor or its contractors), or damage or destruction to, or loss of use of, tangible property) ("**Claims**") arising out of, relating to or in connection with this Agreement, the performance of the Services under this Agreement or any of the representations, warranties, covenants, duties or

obligations of Contractor ; provided, however, that Contractor shall not be obligated to indemnify Company with respect to Claims due to the negligence or willful misconduct of Company.

7.1.2    Company will defend, indemnify and hold harmless Contractor and each of its direct and indirect parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents, representatives, successors and assigns (collectively, the "**Contractor Indemnitees**"), from and against any and all Claims arising out of, relating to or in connection with this Agreement, any materials provided by Company to Contractor in performing Services under this Agreement or any of the representations, warranties, covenants, duties or obligations of Company under this Agreement; provided, however, that Company shall not be obligated to indemnify Contractor with respect to Claims due to the negligence or willful misconduct of Contractor.

**7.2.  Indemnification Procedures**.  The indemnified party will notify the indemnifying party promptly in writing of any Claim of which it becomes aware.  The indemnified party may designate its counsel of choice to defend such Claim at the sole expense of the indemnifying party and/or its insurer(s).  The indemnifying party may, at its own expense participate in the defense.  In any event, (a) the indemnifying party shall keep the indemnified party informed of, and shall consult with the indemnified party in connection with, the progress of any investigation, defense or settlement, and (b) the indemnifying party shall not have any right to, and shall not without the indemnified party's prior written consent (which consent will be in its sole and absolute discretion), settle or compromise any claim if such settlement or compromise (i) would require any admission or acknowledgment of wrongdoing or culpability by the indemnified party or any Indemnitee, or (ii) provide for any non-monetary relief to any person or entity to be performed by the indemnifying party or any Indemnitee.

**7.3.  Survival**.  The obligations described in this Section 7 shall survive the termination/expiration of this Agreement.

# 8.  INSURANCE

**8.1.**  Upon execution of this Agreement, Contractor shall at its own expense procure the following insurance coverage for the benefit and protection of Company and Contractor, which insurance coverage shall be maintained in full force and effect until all of the Services are completed and accepted for final payment:

8.1.1    A Commercial General Liability Insurance Policy with a limit of not less than $3 million per occurrence and $3 million in the aggregate and a Business Automobile Liability Policy (including owned, non-owned, and hired vehicles) with a combined single limit of not less than $1 million, both policies providing coverage for bodily injury, personal injury and property damage for the mutual interest of both Company and Contractor with respect to all operations;

8.1.2    An Umbrella or Following Form Excess Liability Insurance policy will be acceptable to achieve the above required liability limits; and

8.1.3    Workers' Compensation Insurance with statutory limits to include Employer's Liability with a limit of not less than $1 million.

**8.2.**  The policies referenced in the foregoing clauses 8.1.1 and 8.1.2 shall name Company as an additional insured by endorsement with respect to the Services provided hereunder.  The policies referenced in the foregoing clauses 8.1.1, 8.1.2 and 8.1.3 shall contain a severability of interest clause, provide a Waiver of Subrogation on behalf of the Affiliated Companies, and shall be primary insurance in place and stead of any insurance maintained by Company unless Company is found to be at fault.  Contractor shall maintain such insurance in effect until all of the Services hereunder are completed and accepted for final payment.

**8.3.**  Contractor agrees to deliver to Company upon request after execution of this Agreement original Certificates of Insurance and endorsements evidencing the insurance coverage herein required.

# 9.  TERM,        TERMINATION        AND CANCELLATION

**9.1.  Term**.  This Agreement shall commence on the Effective Date and thereafter shall remain in effect (unless and until terminated as set forth in this Section 9) until June 1, 2019 (the "**Term**").

**9.2.  Termination**.  This Agreement may be terminated forthwith by either party upon the occurrence of any of the following, by the terminating party giving written notice to the other party by registered or certified mail, return receipt requested, in which event this Agreement shall terminate on the date set forth in such notice.  The date of mailing said written notice shall be deemed the date on which notice of termination of this Agreement shall have been given.

(i)    The other party commits any act of fraud, gross negligence or willful misconduct in connection with their performance of this Agreement;

(ii) If any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceedings under any law for the relief of debtors shall be instituted by the other party, or if such a proceeding is brought involuntarily against the other party and is not dismissed within a period of 30 days from the date filed, or if the other party shall make an assignment for the benefit of creditors;

(iii) A material breach by the other party of any of the terms of this Agreement, including (without limitation) non-payment by Company, which breach is not remedied by the other party to the terminating party's reasonable satisfaction within fifteen (15) business days of the other party's receipt of notice of such breach from the terminating party by registered or certified mail, return receipt requested, or by Federal Express or other nationally recognized private overnight package/letter delivery service.

**9.3. Force Majeure.** In the event delay is caused by circumstances beyond either party's control, including but not limited to fire, strike, war, riots, acts of God, and/or acts of civil or military authority, the Term shall be extended to provide for such delay. Immediately upon such an occurrence, the parties shall begin discussions as to mutually acceptable adjustments to or alternate methods of proceeding with the affected Services, and the impact, if any, on project schedules. If any such delay continues for a period beyond thirty (30) days, and the parties are unable to agree to acceptable adjustments to or alternate methods of proceeding with the affected Services, then either party may request that the other party participate in discussions to establish mutually acceptable terms for the termination of any or all of the affected Services and/or this Agreement.

## 10. INDEPENDENT CONTRACTOR

It is understood and agreed that in performing the Services for Company hereunder, Contractor shall act in the capacity of an independent contractor and not as an employee, partner, joint venture or agent of Company. Contractor shall be solely responsible for the remuneration of and the payment of any and all taxes with respect to its employees and contractors and any claims with respect thereto and shall be solely responsible for the withholding and payment of all federal, state and local income taxes as well as all FICA and FUTA taxes applicable to it, its employees, and its contractors. Contractor acknowledges that as an independent contractor, neither it nor any of its employees or contractors shall be eligible for any Company employee benefits, including, but not limited to, vacation, medical, dental or pension benefits.

## 11. LIMITATION OF LIABILITY

Under no circumstances shall either party be liable to the other for any special, indirect or consequential loss or damage whether or not such loss or damage is caused by the fault or negligence of such party, its employees, agents or contractors and whether or not the parties have been apprised of the possibility of such losses or damages. This exclusion of liability for special, indirect or consequential loss or damage is intended to apply to damage or loss of a "commercial" nature such as, but not limited to, loss of profits or revenue, cost of capital, loss of use of equipment or facilities, or claims of customers due to loss of service.

## 12. NOTICES

To be effective, all notices relating to this Agreement are to be sent by certified or registered mail, postage prepaid and return receipt requested (effective three (3) business days after postmark date), or delivered personally (effective upon receipt), or sent by nationally recognized overnight delivery service (effective one (1) business day after delivery to such delivery service), or by confirmed telecopy/facsimile (effective upon receipt), to the respective addresses set forth in the opening paragraph hereof or to such other addresses as either party shall designate by notice given as aforesaid.

## 13. Intentionally Omitted.

## 14. GENERAL

**14.1. Observance of Company Policies.** In the event that Contractor's employees are working on the premises of Company, said Contractor's employees shall observe the working hours, working rules, safety and security procedures established by Company and for which Contractor's employees are informed of such.

**14.2. Assignment.** This Agreement, each attachment and each and every portion thereof, shall be binding upon the successors and assigns of the parties hereto; provided that no right or interest in this Agreement shall be assigned by either party without the prior written permission of the other party, and no delegation of the obligations owed by either party shall be made without the prior written consent of the other party.

**14.3. Waiver.** Either party's waiver of any breach or failure to enforce any of the terms and conditions of this Agreement at any time shall not in any way affect, limit or waive such party's right thereafter to enforce and compel strict compliance with every term and condition thereof.

**14.4. Governing Law; Arbitration.**

THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS MADE AND PERFORMED ENTIRELY IN TEXAS SHALL GOVERN (i) THE VALIDITY AND INTERPRETATION OF THIS AGREEMENT, (ii) THE PERFORMANCE BY THE PARTIES OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER, AND (iii) ALL OTHER CAUSES OF ACTION (WHETHER SOUNDING IN CONTRACT OR IN TORT) ARISING OUT OF OR RELATING TO THIS AGREEMENT (OR CONTRACTOR'S ENGAGEMENT AND/OR SERVICES HEREUNDER) OR THE TERMINATION OF THIS AGREEMENT (OR OF CONTRACTOR'S ENGAGEMENT AND/OR SERVICES).

**14.5.   Severability**.   In case any term of this Agreement shall be held invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other term shall be in any way affected thereby.

**14.6. Remedies Cumulative**. All remedies provided herein are cumulative and not exclusive of any remedies provided by law or equity.

**14.7.   Survival**.   Except as otherwise provided herein, the rights and obligations of the parties hereto shall survive any termination of this Agreement.

**14.8.   Compliance with Law**.   Contractor will comply with all statutes, ordinances, and regulations of all federal, state, county and municipal or local governments within the United States, and of any and all of the departments and bureaus thereof, applicable to the carrying on of its business and performance of the Services.

**14.9.   Complete Agreement; Amendment.**   This Agreement and the Exhibit constitute the complete agreement between the parties hereto and supersedes all prior communications and agreements between the parties with respect to the subject matter hereof and may not be modified or otherwise amended except by a further writing executed by both parties hereto, which writing makes specific reference to this Agreement.

**14.10.   Headings.**   The paragraph headings in this Agreement are solely for convenience of reference and shall not affect the interpretation of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto by their duly authorized representatives have executed this Agreement upon the date first set forth above.

.

**ANDERSON MERCHANDISERS, LLC**          **OUR ALCHEMY, LLC**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

(Signature Page to Merchandising Agreement)

## EXHIBIT A
## SERVICES AND FEES

POS pricing per unit: $0.25 (base rate) plus "Reimbursement Fees" of $__ per Unit, but the Reimbursement Fees shall be payable from the Effective Date only until the earlier of (a) the Excess Payment Date or (b) the date that the Reimbursement Fees total $_____ (the "Excess Payment Amount"). [ NOTE: to equal 50% of any amount imposed by Material Content Suppliers (as defined in the APA) as a condition to consenting to the assignment of any Contract (as defined in the APA) with such Material Content Supplier by Seller to Company in connection with the consummation of the transactions contemplated by the APA.]

The services shall include the following:

The Anderson Merchandisers field team, in partnership with Walmart stores, is responsible for the stocking, zoning, and setting of the Movie department at Walmart.

Sales field execution is measured through the services provided by Anderson that include, but are not limited to:

- **FOS Fixture sets** – weekly set and service of product and promotions on the FOS fixture(s)
- **Corrugation sets** – negotiate and verify placement of all new and promotional studio distributed corrugation
- **Pricing placement-** ensure all pricing has been set and is correct and current
- **Inline and Outpost fixture sets** – weekly involvement and verification for all titles, signing, and tags are correctly set for outpost fixtures
- **New Store sets/reporting** – coordinate set times with store planning and management to ensure all product and signing get placed in new stores.  Reporting helps open new stores 100% in stock by identifying missing titles
- **Stocking and title change outs** - assist store with daily stocking activities and verification that weekly modular title changes have been performed
- **Inventory Management** – help to identify/resolve inventory management opportunities that include efficient boxing of over overstock product, effective deletion returns, and sales/inventory opportunities by store
- **Movie returns-** assist the store with coordination and execution of all Walmart movie return initiatives
- **Signing and POP-** execution of studio and overall department signing and POP materials
- **Department 5 Manager/Associate Training -** work with and train the electronics associates to better serve customers and maintain modular integrity
- **Out of stock scanning** – Scan all true out of stocks (pocket at zero on hand); this enables the field team to help manage inventory by measuring scanned outs against the Walmart Physical Inventory
- **On-Hand Adjustment Review -** walk the department with D5 mgr to identify true out of stock titles.  The Walmart physical inventory and on-hand adjustments are keys to store replenishment
- **Tuesday Service -** Visit all large format stores every Tuesday(or on such day as required by the retailer) to ensure all New Release product is on the sales floor and available to the customer.  Prioritize corrugation and FOS Fixtures on these visits
- **New Release Placement -** help verify that the titles have been placed into the New Release modular each week and month (depending on the section of New Releases).  New Release sections are updated every week/month and set to a new modular
- **Value Bin Clean outs-** assist store with value bin clean outs as necessary
- **Modular Sets -** three times a year: Anderson Merchandisers assists in a complete change-out of most DVD modular titles
- **Reporting -** survey questions will be provided along with reporting - DASH Project Tracking allows studios access to survey results via their account liaison.  These reports enable Anderson to track weekly execution KPIs such things as: Front of Store placement, corrugate placement, other promotions, etc.
- **Excluded (but not limited to)**
  - one off signing,
  - stickers

  o   non Tuesday street dates
  o   overnight Blitzs,

**Non Video specific tasks include:**

  ♦   **Sign in and out of vendor log**
  ♦   **Communicate with all levels of store management**

AN Connect                    **EXHIBIT F**
Magnolia Active Titles
DC Inventory on Hand as of 5-1-2015

| Title | UPC | Quantity | Dollar Value at Invoice cost |
|---|---|---|---|
| BLACK DEATH WM W/ VUDU | 87696400668 | 37 | 138.75 |
| CENTURION | 87696400341 | 8045 | 24,135.00 |
| CENTURION(BD) | 87696400342 | 70 | 535.50 |
| DEADFALL/HUNTER 2 PK | 87696400841 | 845 | 8,407.75 |
| EUROPA REPORT | 87696400600 | 246 | 1,328.40 |
| HAMMER OF THE GODS W/VUDU | 87696400598 | 5243 | 18,350.50 |
| JOURNEY TO THE WEST VUDU | 87696400676 | 919 | 4,962.60 |
| LAST DAYS ON MARS W/VUDU | 87696400641 | 180 | 990.00 |
| LIFE PARTNERS DVD | 87696400813 | 3948 | 39,282.60 |
| MARLEY W/VUDU WM | 87696400547 | 2149 | 12,034.40 |
| ONG BAK 2 THE BEGINNING | 87696400265 | 996 | 5,378.40 |
| ONG BAK 3 SE | 87696400364 | 884 | 4,773.60 |
| ONG BAK TRILOGY BD (VUDU) | 87696400702 | 632 | 6,288.40 |
| PIONEER | 87696400709 | 4356 | 48,787.20 |
| PROTECTOR 2, THE VUDU EXC | 87696400697 | 9929 | 50,836.48 |
| RAGNAROK (W/VUDU) | 87696400849 | 1428 | 10,424.40 |
| SORCERER/WHITE SNAKE COMB | 87696400588 | 3188 | 16,322.56 |
| SORCERER/WHITE SNAKE+VUDU | 87696400587 | 9291 | 32,518.50 |
| TUCKER & DALE VS EVIL | 87696400431 | 4877 | 14,631.00 |
| V/H/S: VIRAL DVD | 87696400809 | 6148 | 61,172.60 |
| Grand Total | | 63411 | 361,298.64 |

# Anderson Digital, LLC
530 South Hewitt Street #535
Los Angeles CA 90013

Exhibit G

## Balance Sheet

### As of May 2015

5/6/15
3:01:24 PM

| Assets | | | |
|---|---|---|---|
| Current Assets | | | |
| Cash On Hand | | | |
| Checking Account | $1,874,996.96 | | |
| Payroll Checking Account | ($100,288.23) | | |
| Savings Account | $4,602.65 | | |
| Payroll Savings | $4,302.36 | | |
| Operating Checking Account | ($957.04) | | |
| Operating Savings Account | $0.00 | | |
| Undeposited Funds | $0.00 | | |
| Electronic Clearing Account | $0.01 | | |
| Total Cash On Hand | | $1,782,656.71 | |
| Accounts Receivable | | $4,132,848.38 | |
| MG's | | $21,055.56 | |
| Prepaid Insurance | | $0.00 | |
| Prepaid Interest | | $0.00 | |
| Prepaid Taxes | | $0.00 | |
| Other Prepaid Expenses | | $0.00 | |
| Merchandise Inventory | | $0.00 | |
| Total Current Assets | | | $5,936,560.65 |
| Fixed Assets | | | |
| Inventory | | $132,262.89 | |
| Leasehold Improvements | | | |
| Improvements Original Cost | $0.00 | | |
| Improvements Amortization | $0.00 | | |
| Total Leasehold Improvements | | $0.00 | |
| Buildings & Improvements | | | |
| Bldgs & Imprv Orig Cost | $0.00 | | |
| Bldgs & Imprv Accum Dep | $0.00 | | |
| Total Buildings & Improvements | | $0.00 | |
| Furniture and Fixtures | | | |
| Furniture & Fixtures Orig Co | $54,928.27 | | |
| Furniture & Fixtures Accum Dep | ($17,594.34) | | |
| Total Furniture and Fixtures | | $37,333.93 | |
| Office Equipment | | | |
| Office Equip Orig Cost | $45,758.58 | | |
| Office Equip Accum Dep | ($12,880.43) | | |
| Lab Equipment Original Cost | $720,386.45 | | |
| Lab Equipment Accum Dep | ($360,183.14) | | |
| Software | $45,855.00 | | |
| Software AD | ($33,569.98) | | |
| Total Office Equipment | | $405,366.48 | |
| Warehouse Equipment | | | |
| Warehouse Equip Orig Cost | $0.00 | | |
| Warehouse Equip Accum Dep | $0.00 | | |
| Total Warehouse Equipment | | $0.00 | |
| Transportation Equipment | | | |
| Transportn Equip Orig Cost | $0.00 | | |
| Transportn Equip Accum Dep | $0.00 | | |
| Total Transportation Equipment | | $0.00 | |
| Total Fixed Assets | | | $574,963.30 |
| Goodwill | | | $3,641,139.91 |
| Total Assets | | | $10,152,663.86 |

# Anderson Digital, LLC

## Balance Sheet          Exhibit G

### As of May 2015

5/6/15
3:01:24 PM

| Liabilities | | | |
|---|---|---|---|
| Current Liabilities | | | |
| Credit Cards | | | |
| American Express | $0.00 | | |
| MasterCard | $0.00 | | |
| Visa | $0.00 | | |
| Total Credit Cards | | $0.00 | |
| Accounts Payable | | $5,000,186.96 | |
| Sales Tax Payable | | $0.00 | |
| Import Duty Payable | | $0.00 | |
| Payroll Withholding | | | |
| Default Payroll Withholding | $0.00 | | |
| Federal Income Tax Payable | $0.00 | | |
| FMed / FSoc Payable | $0.00 | | |
| FUTA Payable | $0.00 | | |
| State Income Tax Payable | $0.00 | | |
| SUI / SDI Payable | $0.00 | | |
| Total Payroll Withholding | | $0.00 | |
| Accrued Expenses | | $0.00 | |
| Customer Deposits | | $0.00 | |
| Other Liability | | $0.00 | |
| Total Current Liabilities | | $5,000,186.96 | |
| Long Term Liabilities | | | |
| Bank Loans | | $0.00 | |
| AM Loan Note | | $0.00 | |
| Total Long Term Liabilities | | $0.00 | |
| Total Liabilities | | | $5,000,186.96 |
| | | | |
| Equity | | | |
| Owner's / Shareholder's Equity | | | |
| Owner's / Sharehldr Investment | | $0.00 | |
| Owner's / Sharehldr Withdrawal | | $0.00 | |
| Total Owner's / Shareholder's Equit | | $0.00 | |
| Retained Earnings | | $4,383,480.78 | |
| Current Year Earnings | | $636,285.72 | |
| Historical Balancing | | $132,710.40 | |
| Total Equity | | | $5,152,476.90 |
| | | | |
| Total Liability & Equity | | | $10,152,663.86 |

**EXHIBIT H**
**Payment Schedule for Alchemy Statement Settlement with ANConnect**

| | |
|---|---|
| **Closing Date:** | TBD |
| **Estimated Settlement Amount:** | $4,176,717 |

Assuming the closing settlement amount of $4,176,717, the timing and amount of installment payments would be:

| Days After Close | % of Balance to be Paid | Amount to be Paid |
|---|---|---|
| 30 | 15% | $626,507.55 |
| 45 | 15% | $626,507.55 |
| 60 | 15% | $626,507.55 |
| 75 | 15% | $626,507.55 |
| 90 | 15% | $626,507.55 |
| 105 | 15% | $626,507.55 |
| 120 | 10% | $417,671.70 |

Actual Settlement amount will be determined and finalized based on the closing balance sheets as of the closing date of the transaction.

**EXHIBIT I**

AN Connect
Reserve for Returns 3PL
As of 05-01-2015

| Vendor | Vendor Number | WM Sam's | Best Buy | Other | TOTAL |
|---|---|---|---|---|---|
| Anderson Digital | 42235 | 3,215.67 | 0 | 1,078.00 | 4,293.67 |
| ARC ENT 3PL | 40996 | 676,832.90 | 12,803.94 | 112,783.17 | 802,420.01 |
| Bagdasarian Productions | 41484 | 368,171.74 | 1,839.64 | - | 370,011.38 |
| Big Air Studios | 41540 | 15.31 | - | 1.87 | 17.18 |
| Classic Media LLC-3PL | 41800 | 791,646.21 | 11,341.50 | 170,703.75 | 973,691.46 |
| Cohen Media Group | 42744 | 2,261.56 | 0 | 799.52 | 3,061.08 |
| Freestyle Digital Media LLC | 42115 | 214,770.79 | 0 | 2,786.99 | 217,557.78 |
| Genesis Distribution LLC | 42729 | 9,767.48 | 0 | 1,317.35 | 11,084.83 |
| Grand Entertainment | 42027 | 3,424.19 | 0 | 1,077.68 | 4,501.87 |
| Inception Media Group LLC | 41777 | 173,244.98 | 2,001.12 | 22,227.15 | 197,473.25 |
| Ketchup Entertainment Inc | 42737 | 82,338.74 | 6,346.47 | 18,911.13 | 107,596.34 |
| Maddox Entertainment | 42272 | 117.92 | 0 | 23.69 | 141.61 |
| Microsoft | 41990 | 408,351.95 | 28,666.50 | 66,269.79 | 503,288.24 |
| Mill Creek 3PL | 42196 | 42,415.72 | 36,346.21 | - | 78,761.93 |
| Nasser Entertainment Group | 42308 | 773.78 | 0 | 252.13 | 1,025.91 |
| SP SALES AND DIST. LLC | 42722 | 56,692.97 | 0 | 13,500.01 | 70,192.98 |
| THN Movie, LLC | 42754 | 17,602.70 | 0 | 4,791.68 | 22,394.38 |
| Vertical Entertainment LLC | 42209 | 289,072.47 | 0 | 71,337.45 | 360,409.92 |
| Xlrator Media,LLC-3PL | 41738 | 61,265.09 | 3,084.03 | 12,138.64 | 76,487.75 |
| TOTAL | | 3,201,982.16 | 102,429.40 | 500,000.00 | 3,804,411.56 |

**EXHIBIT I**

AN Connect
Summary
As of 05-01-2015
Reserve for Returns WHOLESALE

| Vendor | Vendor Number | WM Sam's | Best Buy | TOTAL |
|---|---|---|---|---|
| CANDLELIGHT MEDIA GROUP | 37893 | 8,530.03 | 94.25 | 8,624.28 |
| Capitol Christian Disbt. | 41318 | 250,942.71 | | 250,942.71 |
| CEDAR FORT, INC. | 25739 | 9,534.49 | | 9,534.49 |
| COVENANT COMMUNICATIONS | 25064 | 3,460.52 | | 3,460.52 |
| Disco Power | 37737 | 4,096.65 | | 4,096.65 |
| DISTRIMAX INC | 37966 | 28,081.35 | | 28,081.35 |
| E-1 Entertainment | 2391 | 106,181.72 | 63,945.41 | 170,127.13 |
| Excel Entertainment | 29481 | 136,034.51 | | 136,034.51 |
| Galam Fitness | 42501 | 1.92 | 34,499.08 | 34,501.00 |
| Group 1200 Media | 27822 | 201,750.12 | 268,902.65 | 470,652.77 |
| IMT RECORDS | 21537 | 144,742.00 | | 144,742.00 |
| INDICAN PICTURES | 35340 | 11,133.06 | | 11,133.06 |
| LAGUNA FILMS | 2041 | 227,522.07 | | 227,522.07 |
| MAGNOLIA PICTURES LLC. | 35569 | 403,187.73 | 87,784.30 | 490,972.03 |
| MAVERICK ENTERTAINMENT | 28709 | 150,461.34 | 94.25 | 150,555.59 |
| Millennium Media Services | 23585 | 75,370.45 | 51,177.34 | 126,547.79 |
| MPI HOME VIDEO | 2466 | 451,259.76 | 52,269.06 | 503,528.82 |
| MULTIMUSIC INC. | 34873 | 40,993.48 | | 40,993.48 |
| N CIRCLE ENTERTAINMENT | 37481 | 177,093.35 | 9,878.45 | 186,971.80 |
| Phase 4 Films | 38943 | 91,538.51 | 57,916.11 | 149,454.62 |
| Platinum Disc | 12537 | | 23,741.71 | 23,741.71 |
| PLUS ENTERTAINMENT | 36696 | 253,586.49 | | 253,586.49 |
| Softland International | 41006 | 13,632.06 | 366.88 | 13,998.94 |
| Sony Music Entertainment | 2016 | 63,013.39 | | 63,013.39 |
| TEAM MARKETING | 30168 | 468,521.83 | 275,069.06 | 743,590.89 |
| UMGD | 2033 | 757.56 | | 757.56 |
| WEA Corp. | 2076 | 453,774.40 | 53,769.91 | 507,544.31 |
| WELL GO USA, INC | 36299 | 234,017.80 | 78,971.01 | 312,988.81 |
| Xenon Pictures | 39637 | 24,210.11 | | 24,210.11 |
| TOTAL | | 4,033,429.37 | 1,058,479.47 | 5,091,908.84 |

Margin Return Allowance

| Vendor | Vendor Number | Margin Return Allowance |
|---|---|---|
| Sony Music Entertainment | 2016 | (108,447.00) |
| UMGD | 2033 | (626.00) |
| LAGUNA FILMS | 2041 | (69,112.00) |
| WEA Corp. | 2076 | (261,753.00) |
| E1 Entertainment | 2391 | (105,837.00) |
| MPI HOME VIDEO | 2466 | (189,428.00) |
| IMT RECORDS | 21537 | (43,467.00) |
| Millennium Media Services N | 23585 | (105,771.00) |
| COVENANT COMMUNICATIC | 25064 | (1,521.00) |
| CEDAR FORT | 25739 | (2,268.00) |
| Group 1200 Media | 27822 | (285,889.00) |
| MAVERICK ENTERTAINMENT | 28709 | (47,192.00) |
| Excel Entertainment | 29481 | (25,783.00) |
| TEAM MARKETING | 30168 | (345,552.00) |
| MULTIMUSIC INC. | 34873 | (13,764.00) |
| INDICAN PICTURES | 35340 | (4,448.00) |
| WELL GO USA, INC | 36299 | (265,836.00) |
| PLUS ENTERTAINMENT | 36696 | (56,763.00) |
| N CIRCLE ENTERTAINMENT | 37481 | (131,967.00) |
| DISCO POWER | 37737 | (4,950.00) |
| CANDLELIGHT MEDIA GROUI | 37893 | (27,230.00) |
| DISTRIMAX INC | 37966 | (14,286.00) |
| PHASE 4 FILMS | 38943 | (44,706.00) |
| Xenon Pictures | 39637 | (11,002.00) |
| Softland International | 41006 | (11,444.00) |
| CAPITAL CHRISTIAN DIST | 41318 | (143,177.00) |
| Galam Fitness | 42501 | (40,434.00) |
| AMAZON VIDEO | 42752 | . |
| TOTAL | | (2,362,653.00) |

# DISCLOSURE SCHEDULES

(Attached)

## INTRODUCTION

These Disclosure Schedules (the "<u>Schedules</u>") are delivered by ANConnect, LLC, a Texas limited liability company ("**Seller**"), and Our Alchemy, LLC (f/k/a Millennium Entertainment, LLC), a Delaware limited liability company ("**Buyer**") concurrently, in connection with the execution and delivery of that certain Asset Purchase Agreement, dated as of May __, 2015 (the "<u>Purchase Agreement</u>"), by and between Buyer and Seller.

In accordance with the Purchase Agreement, these Schedules are incorporated and made a part of the Purchase Agreement as if set forth in full therein. Any capitalized terms used in these Schedules but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. Headings contained in these Schedules are provided for convenience only and shall not have the effect of amending or changing the express description of the items in these Schedules in the corresponding Sections of the Purchase Agreement.

The information set forth in these Schedules, which relates to the representations, warranties, covenants and agreements of Seller and Buyer, is subject to the following qualifications:

a. Inclusion of any item in these Schedules (i) does not represent an admission or determination by Buyer or Seller that such item is material or would constitute or would be reasonably likely to have a Material Adverse Effect or is required to be disclosed in order for the representations and warranties of Buyer or Seller to be true and correct, nor shall it be deemed to establish a standard for materiality or a Material Adverse Effect, (ii) does not represent an admission or determination by Buyer or Seller that such item did not arise in the ordinary course of business or in a manner consistent with past practice and (iii) shall not constitute, or be deemed to be, an admission by any party to any third party of any matter whatsoever (including any violation of applicable Law or breach of Contract). In cases where a representation or warranty is qualified by a reference to materiality or a Material Adverse Effect, the disclosure of any matter in this Disclosure Schedule shall not imply that any other undisclosed matter that has a greater value or could otherwise be deemed to be more significant (x) is or is reasonably likely to be material or (y) has had or would be reasonably likely to have a Material Adverse Effect. These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties, covenants and agreements of Seller contained in the Purchase Agreement and shall not be deemed to expand in any way the scope or effect of any such representations, warranties, covenants and agreements. The items in these Schedules may include brief descriptions of certain aspects of the Purchased Assets, and such descriptions are necessarily not complete;

b. The information disclosed in these Schedules may not be limited to matters required by the Purchase Agreement to be disclosed in these Schedules, and any such additional matter is disclosed for informational purposes only and does not necessarily include other matters of a similar nature.

c. The information set forth on one section or subsection of these Schedules shall constitute a disclosure for all purposes under the Purchase Agreement and on each other section of

these Schedules, in such case where it is reasonably apparent on its face from the text of such disclosure that it should apply to such other section(s) of these Schedules.

d. Inclusion of any item in these Schedules is not deemed to broaden or narrow Buyer's or Seller's representations and warranties, obligations, covenants, conditions or agreements contained in the Purchase Agreement.

e. Inclusion of any item in these Schedules with respect to the enforceability of agreements with third-parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third-parties, or similar matters or statements, is intended only to allocate rights and risks among the parties to the Purchase Agreement and is not intended to be an admission against interests, give rise to any interference or proof of accuracy, be admissible against any party by any entity or person who is not a party, or give rise to any claim or benefit to any entity or person who is not a party.

f. No disclosure in these Schedules, including disclosures relating to possible breaches or violations of any Contract, applicable Law, judgment, writ or injunction, shall be deemed by any person as an admission or indication that any breach or violation of any Contract, applicable Law, judgment, writ or injunction exists, has occurred or is reasonably likely to occur. Nothing in this Disclosure Schedule shall be deemed by any person as an admission of liability or obligation of any person, including Buyer and Seller, to any other person or an admission against the interests of any person, including Buyer and Seller.

g. Inclusion of any item in these Schedules does not waive any attorney-client privilege associated with such item or information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

h. The rules of interpretation specified in Section 10.03 of the Purchase Agreement shall also apply to these Schedules.

Section 2.01(c)
Assigned Content Supplier Contracts; Assigned Retailer Contracts

The Distribution Agreements for the 3PL Business to be assigned are identified below by the date of the contract, and dates of any amendments thereto, and name of the counterparty(ies) to each contract:

| | |
|---|---|
| Amazon Content Services, LLC | 7/1/2014 |
| Animagic Media Group, Inc. | 11/1/2014 |
| ARC Entertainment, LLC | 11/11/2010 |
| Bagdasarian Productions, LLC | 8/28/2013<br><br>11/11/13 - Amendment #1 |
| Bagdasarian Productions, LLC for Classic TV | 8/5/2011<br><br>12/19/1014 - Amendment #6<br><br>11/11/2013 - Amendment #5<br><br>8/14/2013 - Amendment #4<br><br>8/1/2013 - Amendment #3<br><br>12/21/2012 - Amendment #2<br><br>3/23/2012 - Amendment #1 |
| Big Air Studios, LLC | 9/12/2011 |
| Charlie Mike, LLC | 4/2/2015 |
| Charlie Mike Productions, LLC | 5/1/2015 |
| Cohen Media Group, LLC | 5/6/2014 |
| Freestyle Digital Media, LLC | 11/14/2012 |
| Genesis Distribution, LLC | 7/30/2013 |
| Gold Key Home Video, LLC (a/k/a Classic) /Big Idea Entertainment, LLC (Physical Agreement) | 5/1/2012<br><br>6/30/2014 - Amendment to |

| | Distribution Agreements & Binding Term Sheet<br><br>6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party) |
|---|---|
| Gold Key Home Video, LLC (a/k/a Classic)/Big Idea Entertainment, LLC (Digital Agreement) | 7/1/2012<br><br>6/30/2014 - Amendment to Distribution Agreements & Binding Term Sheet<br><br>6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party)<br><br>7/1/2012 – Email letter agreement. |
| Industry Releasing, Inc. | 3/23/2015 |
| Ketchup Entertainment, Inc. | 4/16/2014<br><br>4/1/2015 – First Amendment |
| Maddox Entertainment | 4/12/2013 |
| Microsoft Corporation | 9/19/2012<br><br>10/17/2014 – Amendment to Video Distribution Agreement |
| Nasser Group, Inc d/b/a Nasser Entertainment Group | 3/8/2013 |
| SP Sales & Distribution (a/k/a Crystal Sky)* | 6/1/2014<br><br>8/20/2014 Letter of Direction |

| | |
|---|---|
| | 8/18/2014 – Second Amendment<br><br>N/A – First Amendment; not executed. |
| Vertical Entertainment, LLC | 5/5/2013 |
| Xlrator Media, LLC | 3/5/2012<br><br>8/29/2013 – Settlement Agreement, Release & 2nd Amendment<br><br>1/25/2013 – First Amendment |

The Content Supplier Agreements to be assigned are identified below by the date of the contract, and dates of any amendments thereto, and name of the counterparty(ies) to each contract:

| | |
|---|---|
| Gaiam Americas, Inc. | 4/27/2012 |
| Grand Entertainment, LLC | 9/20/2012 |
| Inception Media Group, LLC | 3/1/2012 |

*This contract has a pending or unexecuted amendment.*

The Sub-Distribution Agreements to be assigned are identified below by the date of the contract, and dates of any amendments thereto, and name of the counterparty(ies) to each contract:

| | |
|---|---|
| Alliance Films, Inc. | 7/12/2011 - Email adding titles to agreement<br><br>5/17/2011 |
| Anderson Digital, LLC | 10/1/2012 |
| Millennium Media Services, Inc. | 4/12/2013 - Revised & Restated Exclusive Distribution Agreement<br><br>5/11/2011 |
| New Video Group, Inc. | Various amendments adding titles to the agreement.<br><br>5/11/2011 (Agreement was terminated but picture term is still in effect for Pictures). |

| | |
|---|---|
| Provident Films, LLC (a unit of Sony Music Entertainment) | 10/1/2013 - Letter extending term until 10/31/2015<br><br>11/1/2011 – Amendment |
| Rentrak Corporation | 5/6/13 - Amendment<br><br>May 17, 2011 |

Section 2.02(q)
<u>Excluded Assets, Properties and Rights</u>

NONE

Section 2.03(a)
<u>Assumed Liabilities – Content Supplier Contracts</u>

See the contracts listed on 2.01(c)

Section 2.03(b)
<u>Assumed Liabilities – Other Contracts</u>

See the contracts listed on 2.01(c)

Section 2.03(c)
Assumed Liabilities – Sale of Inventory

| Customer List | Agreement or PO | Date |
|---|---|---|
| Sams | Agreement | 6/4/2008 |
| Walmart | Agreement | 10/1/2010 |
| Kmart | Agreement | 6/7/2012 |
| Baker and Taylor | Term Sheet | 4/11/2011 |
| Wax Works | Agreement | 4/11/2011 |
| Softland International | PO Only | 4/11/2011 |
| Netflix | PO Only | 5/1/2011 |
| Blockbuster | Purchase Agreement | 4/11/2011 |
| Midwest Tape | Agreement | 4/14/2011 |
| VPD | Term Sheet | 4/8/2011 |
| Super D | Vendor Agreement | 4/8/2011 |
| Alliance | On Line only | 5/17/2011 |
| Ingram | Agreement | 4/14/2011 |
| Flash Distributors | PO Only | 4/11/2011 |
| Alchemy for shipment to Target | PO Only | 5/1/2011 |
| Vobile (ne Rentrak) | Agreement | 4/11/2011 |
| Amazon | Term Sheet | 2/4/2011 |
| Provident | Agreement | 11/1/2011 |
| Ignatius Press | PO Only | 1/25/2012 |
| Best Buy | Agreement | 10/1/2014 |
| Costco | Agreement | 7/31/2012 |
| Redbox | PO Only | 11/8/2012 |
| Anderson Digital | Agreement | 10/1/2012 |
| New Video* | Agreement | 5/11/2011 |

*This agreement was terminated but the picture term is still in effect for Pictures.

Section 2.03(i)
Assumed Liabilities – Employee Bonus, Vacation or Other Payroll Accruals

The accrued Liabilities set forth below as of May 6, 2015, as well as additional Liabilities that accrue between such date and the Closing Date:

| Name | Title/Position | EMPL | Hire Date | Base Pay | Bonus Potential | Total Pay | Vac/Sick Accrual Balance Hours | Benefits | 401(k) Match |
|------|----------------|------|-----------|----------|-----------------|-----------|-------------------------------|----------|--------------|
| Erin L. Hill | Director of 3PL Sales (Outside Walmart and Best Buy) | 32244 | 4/22/2013 | 102,000 | 15,300 | 117,300 | 120.77 | Savings, LTD | $1,532.16 |
| Matthew Smith | Executive VP of Purchasing and Marketing | 23116 | 2/28/2011 | 470,015 | - | 470,015 | 188.16 | Medical, HSA, Dental, Vision | $7,800.00 |
| Donna Edwards | Marketing - Dreamworks | 36350 | 11/10/2014 | 110,000 | - | 110,000 | 90.46 | N/A | N/A |
| Steve Pechter | Best Buy Buyer | 29540 | 6/4/2012 | 165,000 | 33,000 | 198,000 | 124.15 | LTD | $541.44 |
| Tammy Tate | Legal | 22183 | 1/21/2010 | 91,555 | - | 91,555 | 229.53 | Medical, HSA, Dental, Vision, LTD | $1,921.73 |
| Mitch Budin | Consultant - Marketing Dreamworks | | | 180,000 | | 180,000 | N/A | N/A | N/A |
| Craig Bergstein | Consultant - Analytics Dreamworks | | | 120,000 | | 120,000 | N/A | N/A | N/A |

Section 2.03(j)
Other Assumed Liabilities

NONE

Section 2.06(a)(iii)
Aggregate Caps per Vendor Account

**AN Connect Schedule of Returns to AN Connect CAP**

| Vendor | Return Cap Amount |
|---|---|
| WEA | 415,000.00 |
| Capitol Christian | 500,000.00 |
| Sony | 146,500.00 |
| UMGD | 1,500.00 |
| IMT Records | 276,000.00 |
| | |
| TOTAL | 1,339,000.00 |

Section 2.07
Allocation of Purchase Price

TO BE AGREED AT CLOSING

Section 4.01
Seller Business Qualifications


CALIFORNIA

DELAWARE

GEORGIA

TEXAS

Section 4.03
Seller – Necessary Consents

**ANConnect Distribution Agreements:**

| | |
|---|---|
| ARC Entertainment, LLC | 11/11/2010 |
| Bagdasarian Productions, LLC | 8/28/2013<br><br>11/11/13 - Amendment #1 |
| Bagdasarian Productions, LLC for Classic TV | 8/5/2011<br><br>12/19/1014 - Amendment #6<br><br>11/11/2013 - Amendment #5<br><br>8/14/2013 - Amendment #4<br><br>8/1/2013 - Amendment #3<br><br>12/21/2012 - Amendment #2<br><br>3/23/2012 - Amendment #1 |
| Big Air Studios, LLC | 9/12/2011 |
| Cohen Media Group, LLC | 5/6/2014 |
| Gold Key Home Video, LLC (a/k/a Classic)/Big Idea Entertainment, LLC (Physical Agreement) | 5/1/2012<br><br>6/30/2014 - Amendment to Distribution Agreements & Binding Term Sheet<br><br>6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party) |
| Gold Key Home Video, LLC (a/k/a Classic)/Big Idea Entertainment, LLC (Digital Agreement) | 7/1/2012<br><br>6/30/2014 - Amendment to Distribution Agreements & Binding Term Sheet |

|  | 6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party)<br><br>7/1/2012 – Email letter agreement. |
|---|---|
| Ketchup Entertainment, Inc. | 4/16/2014<br><br>4/1/2015 – First Amendment |
| Microsoft Corporation | 9/19/2012<br><br>10/17/2014 – Amendment to Video Distribution Agreement |
| SP Sales & Distribution (a/k/a Crystal Sky) | 6/1/2014<br><br>8/20/2014 Letter of Direction<br><br>8/18/2014 – Second Amendment<br><br>N/A – First Amendment; not executed. |
| Vertical Entertainment, LLC | 5/5/2013 |
| Xlrator Media, LLC | 3/5/2012<br><br>8/29/2013 – Settlement Agreement, Release & 2nd Amendment<br><br>1/25/2013 – First Amendment |

## ANConnect Supplier Agreements:

| Gaiam Americas, Inc. | 4/27/2012 |
|---|---|

## ANConnect Sub-Distribution Agreements:

| Alliance Films, Inc. |  |
|---|---|

|  | 7/12/2011 - Email adding titles to agreement |
|  | 5/17/2011 |
| Anderson Digital, LLC | 10/1/2012 |
| Millennium Media Services, Inc. | 4/12/2013 - Revised & Restated Exclusive Distribution Agreement<br>5/11/2011 |
| New Video Group, Inc. | Various amendments adding titles to the agreement.<br><br>5/11/2011 (Agreement was terminated but picture term is still in effect for Pictures). |
| Provident Films, LLC (a unit of Sony Music Entertainment) | 10/1/2013 - Letter extending term until 10/31/2015<br><br>11/1/2011 - Amendment<br><br>11/1/2011 |
| Rentrak Corporation | 5/6/13 - Amendment<br><br>May 17, 2011 |

## Anderson Digital Platform Contracts:

| Amaon – AIV | 11/1/2012 |
| Amazon - Create Space | 3/3/2004 |
| Amazon Prime AVOD | 3/20/2014 |
| Amazon Prime | Various |
| Bell Canada* | 3/23/2015 |
| Bell Canada* | 3/20/2015 |
| Bloom Media | 8/13/2014 |
| Cinedigm Ent. | 12/1/2014 |
| ConTV | 1/12/2015 |
| Dove Channel* | 2/24/2015 |
| CinePlay HD* | 11/1/2013 |
| Fuhu Inc. | 11/25/2013 |
| Gaiam, Inc. | 2/25/2013 |
| GooglePlay | 3/4/2015 |
| HCCP Dist.* | 4/15/2015 |
| Hoopla/Midwest Tape | 1/17/2013 |
| Hulu (Classic & Plus) | 6/30/2013 |

| | |
|---|---|
| Hulu Kids | 6/30/2013 |
| iTunes | 7/31/2012 |
| iTunes | 7/18/2012 |
| iTunes | 7/31/2012 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| JellyTelly | 5/15/1941 |
| M-Go | 11/21/2013 |
| Nabi - Fuhu | 12/1/2014 |
| Nabi-Pass | 9/22/2014 |
| Netflix | Various |
| NetMedia | 9/24/2013 |
| NetMedia | 9/30/2013 |
| Overdrive | 5/15/2012 |
| Popcornflix | 2/3/2014 |
| Right Now Media | 5/22/2014 |
| Showtime | Various |
| Sony Network Entertainment | 1/1/2013 |
| Sonifi | Various |
| Feel'N/SpiritClips/Hallmark | 12/1/2013 |
| Starz | Various |
| Univision Network* | 1/13/2015 |
| Xbox Video / Microsoft* | 9/1/2012 |
| Vimeo | 2/24/2015 |
| Youtube | 4/17/2014 |
| Vudu | 8/13/2013 |

*This contract is pending or has a pending amendment.*

**Anderson Digital Content Suppliers:**

| | |
|---|---|
| Action Flicks | 1/27/2015 |
| Action Slate Releasing | 3/30/2015 |

| | |
|---|---|
| Air Buds Entertainment (Key Pics Ent.) | 4/16/2014 |
| ANC/ 343 industries | 9/19/2012 |
| ANC/Arc Entertainment | 11/11/2010 |
| ANC/Bagdasarian Productions | 8/15/2011 |
| ANC/Big Idea | 4/23/2013 |
| ANC/Cohen Media | 4/1/2014 |
| ANC/Crystal Sky SP Distribution | 3/13/2014 |
| ANC/DreamWorks Classics | 4/23/2013 |
| ANC/DWC-Big Idea | 7/21/2014 |
| ANC/Genesis Distribution | 9/1/2013 |
| ANC/Ketchup Entertainment | 4/1/2014 |
| ANC/Maddox Entertainment | 10/1/2013 |
| ANC/SP Sales, Crystal Sky | 6/1/2014 |
| ANC/THN Movie, LLC | 5/6/2014 |
| ANC/Vertical Ent. | 5/5/2013 |
| ANC/XLRator Media | 5/5/2012 |
| M4E Telescreen | 10/1/2012 |
| MHZ Networks | 9/8/2011 |
| Paws Inc. | 11/1/2011 |
| PGS Entertainment | 3/21/2014 |
| Vanguard Library | varies |

| | |
|---|---|
| Warner Music Group | 8/1/2014 |

**Anderson Digital Other Licensors:**

| | |
|---|---|
| Mount Parnassus Pictures | 09/28/10 |
| RAI International | 8/10/2012 |

Section 4.04
Anderson Digital Estimated Commitments

Anderson Digital is discussion with "Peanuts" regarding Digital Delivery services.

Section 4.07(a)
Material Contracts

Loan and Security Agreement with Bank of America, N.A. dated July 1, 2013.

## Wholesale Contracts

| Customer List | Agreement or PO | Date |
|---|---|---|
| Sams | Agreement | 6/4/2008 |
| Walmart | Agreement | 10/1/2010 |
| Kmart | Agreement | 6/7/2012 |
| Baker and Taylor | Term Sheet | 4/11/2011 |
| Wax Works | Agreement | 4/11/2011 |
| Softland International | PO Only | 4/11/2011 |
| Netflix | PO Only | 5/1/2011 |
| Blockbuster | Purchase Agreement | 4/11/2011 |
| Midwest Tape | Agreement | 4/14/2011 |
| VPD | Term Sheet | 4/8/2011 |
| Super D | Vendor Agreement | 4/8/2011 |
| Alliance | On Line only | 5/17/2011 |
| Ingram | Agreement | 4/14/2011 |
| Flash Distributors | PO Only | 4/11/2011 |
| Alchemy for shipment to Target | PO Only | 5/1/2011 |
| Vobile (ne Rentrak) | Agreement | 4/11/2011 |
| Amazon | Term Sheet | 2/4/2011 |
| Provident | Agreement | 11/1/2011 |
| Ignatius Press | PO Only | 1/25/2012 |
| Best Buy | Agreement | 10/1/2014 |
| Costco | Agreement | 7/31/2012 |
| Redbox | PO Only | 11/8/2012 |
| Anderson Digital | Agreement | 10/1/2012 |
| New Video* | Agreement | 5/11/2011 |

*This agreement was terminated but the picture term is still in effect for Pictures.*

Additionally, the Company enters into P.O.s with the additional parties set forth on Exhibit B.

## ANConnect 3PL Distribution Agreements

| | |
|---|---|
| 28 Entertainment, LLC (to be terminated by ANConnect) | 4/30/2013 |
| Amazon Content Services, LLC | 7/1/2014 |
| Animagic Media Group, Inc. | 11/1/2014 |

| | |
|---|---|
| ARC Entertainment, LLC | 11/11/2010 |
| Bagdasarian Productions, LLC | 8/28/2013<br><br>11/11/13 - Amendment #1 |
| Bagdasarian Productions, LLC for Classic TV | 8/5/2011<br><br>12/19/1014 - Amendment #6<br><br>11/11/2013 - Amendment #5<br><br>8/14/2013 - Amendment #4<br><br>8/1/2013 - Amendment #3<br><br>12/21/2012 - Amendment #2<br><br>3/23/2012 - Amendment #1 |
| Big Air Studios, LLC | 9/12/2011 |
| Charlie Mike, LLC | 4/2/2015 |
| Charlie Mike Productions, LLC | 5/1/2015 |
| Cohen Media Group, LLC | 5/6/2014 |
| Freestyle Digital Media, LLC | 11/14/2012 |
| Genesis Distribution, LLC | 7/30/2013 |
| Green Card 2010, LLC (to be terminated by ANConnect) | 3/1/2012 |
| Gold Key Home Video, LLC (a/k/a Classic) /Big Idea Entertainment, LLC (Physical Agreement) | 5/1/2012<br><br>6/30/2014 - Amendment to Distribution Agreements & Binding Term Sheet<br><br>6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party) |

| | |
|---|---|
| Gold Key Home Video, LLC (a/k/a Classic)/Big Idea Entertainment, LLC (Digital Agreement) | 7/1/2012<br><br>6/30/2014 - Amendment to Distribution Agreements & Binding Term Sheet<br><br>6/28/2013 – First Amendment to Binding Term Sheet<br><br>4/23/2013 - Binding Term Sheet (adds DreamWorks Animation Home Entertainment, Inc. as contract party)<br><br>7/1/2012 – Email letter agreement. |
| Industry Releasing, Inc. | 3/23/2015 |
| Ketchup Entertainment, Inc. | 4/16/2014<br><br>4/1/2015 – First Amendment |
| Maddox Entertainment | 4/12/2013 |
| Mandalay Television, LLC/SGP Entertainment, LLC (to be terminated by ANConnect) | 9/13/2011 |
| Microsoft Corporation | 9/19/2012<br><br>10/17/2014 – Amendment to Video Distribution Agreement |
| Nasser Group, Inc d/b/a Nasser Entertainment Group | 3/8/2013 |
| Radical Studios, Inc. (to be terminated by ANConnect) | 1/10/2012 |
| Red, White & Brown, LLC (to be terminated by ANConnect) | 3/1/2012 |
| SP Sales & Distribution (a/k/a Crystal Sky)* | 6/1/2014<br><br>8/20/2014 Letter of Direction<br><br>8/18/2014 – Second Amendment<br><br>N/A – First Amendment; not executed. |

| | |
|---|---|
| THN Movie, LLC (to be terminated by ANConnect) | 5/6/2014<br><br>9/10/2014 First Amendment |
| Vertical Entertainment, LLC | 5/5/2013 |
| Xlrator Media, LLC | 3/5/2012<br><br>8/29/2013 – Settlement Agreement, Release & 2nd Amendment<br><br>1/25/2013 – First Amendment |

*This contract has a pending or unexecuted amendment.*

## ANConnect Content Supplier Agreements

| | |
|---|---|
| E-T Pictures, LLC (to be terminated by ANConnect) | 11/1/2012<br><br>4/4/2013 First Amendment<br><br>5/22/2014 Letter Agreement |
| Gaiam Americas, Inc. | 4/27/2012 |
| Grand Entertainment, LLC | 9/20/2012 |
| Inception Media Group, LLC | 3/1/2012 |
| LT Lakosky, LLC (to be terminated by ANConnect) | 5/28/2013<br><br>5/22/2014 – Letter Agreement |
| TGG Direct, LLC | 1/16/2012<br><br>1/1/2014 – Second Amendment<br><br>8/27/2012 – First Amendment |

## ANConnect Sub-Distribution Agreements

| | |
|---|---|
| Alliance Films, Inc. | 7/12/2011 - Email adding titles to agreement<br><br>5/17/2011 |

| Anderson Digital, LLC | 10/1/2012 |
|---|---|
| Millennium Media Services, Inc. | 4/12/2013 - Revised & Restated Exclusive Distribution Agreement<br><br>5/11/2011 |
| New Video Group, Inc. | Various amendments adding titles to the agreement.<br><br>5/11/2011 (Agreement was terminated but picture term is still in effect for Pictures). |
| Provident Films, LLC (a unit of Sony Music Entertainment) | 10/1/2013 - Letter extending term until 10/31/2015<br><br>11/1/2011 - Amendment<br><br>11/1/2011 |
| Rentrak Corporation | 5/6/13 - Amendment<br><br>May 17, 2011 |

## Anderson Digital Platform Supplier Contracts

| Amazon – AIV* | Under Negotiation |
|---|---|
| Amaon - AIV | 11/1/2012 |
| Amazon - Create Space | 3/3/2004 |
| Amazon Prime AVOD | 3/20/2014 |
| Amazon Prime | Various |
| Bell Canada* | 3/23/2015 |
| Bell Canada* | 3/20/2015 |
| Bloom Media | 8/13/2014 |
| Cupcake Digital* | pending |
| Cinedigm Ent. | 12/1/2014 |
| ConTV | 1/12/2015 |
| Dove Channel* | 2/24/2015 |
| CinePlay HD* | 11/1/2013 |
| Dish Network* | Pending |
| Dish Network* | Pending |
| Fuhu Inc. | 11/25/2013 |
| Gaiam, Inc. | 2/25/2013 |
| GooglePlay | 3/4/2015 |

| | |
|---|---|
| HCCP Dist.* | 4/15/2015 |
| Hoopla/Midwest Tape | 1/17/2013 |
| Hulu (Classic & Plus) | 6/30/2013 |
| Hulu Kids | 6/30/2013 |
| iNDemand* | Pending |
| iTunes | 7/31/2012 |
| iTunes | 7/18/2012 |
| iTunes | 7/31/2012 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| iTunes | 3/21/2015 |
| JellyTelly | 5/15/1941 |
| M-Go | 11/21/2013 |
| Nabi - Fuhu | 12/1/2014 |
| Nabi-Pass | 9/22/2014 |
| Netflix | Various |
| NetMedia | 9/24/2013 |
| NetMedia | 9/30/2013 |
| Overdrive | 5/15/2012 |
| Popcornflix | 2/3/2014 |
| Right Now Media | 5/22/2014 |
| Showtime | Various |
| Sony Network Entertainment | 1/1/2013 |
| Sonifi | Various |
| Feel'N/SpiritClips/Hallmark | 12/1/2013 |
| Starz | Various |
| Univision Network* | 1/13/2015 |
| Xbox Video / Microsoft | 9/1/2012 |
| Vimeo | 2/24/2015 |
| Youtube | 4/17/2014 |
| Vudu | 8/13/2013 |

*This denotes a contract that has a pending signature, is not confirmed or is still under
   negotiation.

**Anderson Digital Content Suppliers**

| | |
|---|---|
| Action Flicks | 1/27/2015 |
| Action Slate Releasing | 3/30/2015 |
| Air Buds Entertainment (Key Pics Ent.) | 4/16/2014 |
| ANC/ 343 industries | 9/19/2012 |
| ANC/Arc Entertainment | 11/11/2010 |
| ANC/Bagdasarian Productions | 8/15/2011 |
| ANC/Big Idea | 4/23/2013 |
| ANC/Cohen Media | 4/1/2014 |
| ANC/Crystal Sky SP Distribution | 3/13/2014 |
| ANC/DreamWorks Classics | 4/23/2013 |
| ANC/DWC-Big Idea | 7/21/2014 |
| ANC/Genesis Distribution | 9/1/2013 |
| ANC/Ketchup Entertainment | 4/1/2014 |
| ANC/Maddox Entertainment | 10/1/2013 |
| ANC/SP Sales, Crystal Sky | 6/1/2014 |
| ANC/THN Movie, LLC | 5/6/2014 |
| ANC/Vertical Ent. | 5/5/2013 |
| ANC/XLRator Media | 5/5/2012 |
| Barking Cow | 2/1/2014 |
| Bidou Films | 6/5/2015 |
| Blue Socks Entertainment | April 2015 |

| | |
|---|---|
| BRB Spain | 2/1/2012 |
| Cake Entertainment | 5/1/2014 |
| Capitol Christian (Universal Music) | 4/30/2015 |
| Circus Road | 6/27/2013 |
| Digital Immigrants, LLC | 8/28/2014 |
| Fairway Film Alliance | 1/1/2014 |
| Fairway Film Alliance | 1/1/2014 |
| George Bush Presidential Library Foundation | 5/1/2015 |
| Hennepin Studios | 1/16/2014 |
| Ironhouse/Vladar Entertainment | 1/1/2015 |
| ITN | 11/19/2013 |
| Kindle Entertainment | 7/1/2014 |
| M4E Telescreen | 10/1/2012 |
| Markwood Films | 1/21/2014 |
| MHZ Networks | 9/8/2011 |
| New Yolk Times | 5/28/2013 |
| Nikki Black Films LTD | 1/21/2014 |
| Paws Inc. | 11/1/2011 |
| PGS Entertainment | 3/21/2014 |
| Portfolio Entertainment | 7/3/2014 |
| Princ Films | 7/23/2013 |

| | |
|---|---|
| Provident Entertainment | 7/9/2014 |
| Rogue Arts | 7/5/2013 |
| Rogue Arts | 6/5/2013 |
| Rogue Arts | 5/28/2013 |
| Rogue Arts | 6/25/2013 |
| Silent Partners/Footage Films | 10/21/2014 |
| Trajectory Films | 6/25/2013 |
| Vanguard Library | varies |
| Warner Music Group | 8/1/2014 |
| Wilder Films (Laid Off) Limited | 1/9/2014 |
| Working Title | 2/3/2014 |
| Wrekin Hill Ent. | 8/19/2014 |

## **Anderson Digital Other Contracts**

| | | |
|---|---|---|
| ACC Business | month to month | 100mbps Dedicated Fiber Optic Cable Wiring to Suite |
| Deluxe Media | 1 year renewable | colocation services agreement for content storage, hardware and software usage |
| Dinimsoft | 1 year renewable | Software Lease |
| Freyr Thor | month to month | Commercial Office Lease Agreement |
| Freyr Thor | month to month | parking space rental |
| GPL Technologies | 6 months renewable | IT technical maintenance services |
| Willis | 1 year renewable | E&O Liability Insurance Policy |
| Willis | 1 year renewable | WorkComp Liability Insurance Policy |

| | | |
|---|---|---|
| Amazon AWS | month to month | Server Storage (being faced out) |
| Adobe | month to month | Creative Suite Licensing fee |
| Constant Contact | month to month | web marketing licensing fee |
| Stamps | pay as you go | stamps |
| Temperature Alert | month to month | server room temperature monitoring |
| Yahoo | month to month | web hosting |
| Meldium | month to month | credential management |
| Github | month to month | code respository |
| Office 365 | month to month | software licensing |
| Carbonite | 1 year renewable | file backup facility |
| Hostmonster | 1 year renewable | website hosting |
| Hostmonster | 1 year renewable | domains and privacy controls |
| IMDBPro | 1 year renewable | online motion picture data service |

## Anderson Digital Licenses

| Licensor | Effective Date | Expiration Date |
|---|---|---|
| 4th Grade Films | 08/24/10 | 08/24/17 |
| 59 Films LLC & Hog Butcher LLC | 02/16/12 | 12/25/19 |
| A Chip and A Chair Films | 11/23/10 | 11/23/17 |
| A Guy named Rick | | 2018 |
| A Winter's Tale | 03/19/02 | 11/18/18 |
| Against The Wind Films | 01/19/12 | 01/19/19 |
| Aitor Gaizka Sempere Y Llona | 04/26/11 | 04/26/18 |
| Al Miller Production | 09/22/09 | 09/22/16 |
| Albino Fawn Productions | 02/21/12 | 02/21/19 |
| Anacost Films | 11/30/10 | 11/30/20 |
| Anne Wairimu Mathenge | | 2019 |
| Armless Movie Productions LLC | 02/22/11 | 02/22/18 |
| Artis Entertainment | 02/21/12 | 02/21/17 |
| Artis Entertainment | 07/27/11 | 07/27/16 |
| Artmedia LTD | 02/21/12 | 02/21/19 |
| Avra Productions | | 2017 |

| | | |
|---|---|---|
| Badland Corporation | 02/24/09 | 02/24/16 |
| Becoming Eduardo | 03/29/11 | 03/29/18 |
| Blue Egg Picture Protudion | 04/20/10 | 04/20/17 |
| Boll AG | 10/26/10 | 10/26/17 |
| Boll AG | 06/29/10 | 06/29/17 |
| Broken Beat and Scarred | 11/28/12 | 11/28/19 |
| Broken Table Productions | | 2017 |
| Broken Windows LLC | 02/24/09 | 02/24/16 |
| Burwasser Films | 11/11/99 | 11/11/18 |
| Butterfly Dreaming LLC | 05/25/10 | 05/25/17 |
| Canada Inc | 03/24/09 | 03/24/16 |
| Capella International | 02/08/11 | 02/08/18 |
| Capella International | 09/09/11 | 09/09/18 |
| Cardinal Studio | 04/20/10 | 04/20/17 |
| Carried Away LLC | 06/26/12 | 06/26/19 |
| CB Films | 04/26/12 | 10/23/20 |
| Charles Koppelman | | 2016 |
| Christopher Julian Digitalworks | 05/31/11 | 05/31/18 |
| Christopher M. Harris | 10/15/07 | 12/31/16 |
| Cine International Filmvertrieb GmbH & Co. KG, | 12/05/06 | 10/14/18 |
| Cinema Five Films, Inc. | 05/26/09 | 05/26/16 |
| Cineworks | 09/03/09 | 02/23/17 |
| Circus Road Films | | 2018 |
| Class Production | 01/26/09 | 01/26/16 |
| Cold Play Movie, LLC | 04/21/09 | 04/21/16 |
| Colin Hearts Kay LLC | 09/08/11 | 09/08/18 |
| Condne Films | 05/01/08 | 10/28/15 |
| Conned LLC | 04/05/12 | 10/23/20 |
| Conscious Light | 11/04/97 | 11/04/16 |
| Cordish Media Inc | 05/09/08 | 7/15/13 |
| CORGAN PICTURES INC. | 03/17/11 | 03/17/18 |
| Cut Entertainment | | 2016 |
| Dale Stelly | 01/15/08 | 07/22/15 |
| Dead Artist Films LLC | 03/29/11 | 03/29/18 |
| Diablo Productions | 01/27/09 | 01/27/16 |
| Doc & Film International | 11/16/11 | 11/16/16 |
| DOC & FILMS | 02/23/11 | 02/23/16 |
| DOUGLAS H. CHANG | 10/11/10 | 10/11/17 |
| Dr. Khairy Malek | 05/25/10 | 05/25/17 |
| Dragon Horse Limited | 02/27/12 | 02/27/19 |
| Dreamscape Cinema | 04/16/11 | 04/16/18 |
| East West Film Distribution | 12/17/11 | 12/17/18 |
| East West Film Distribution GmbH | 02/22/11 | 02/22/18 |
| Echelon Studios | 11/20/07 | 05/27/15 |

| | | |
|---|---|---|
| Echelon Studios | 07/21/09 | 07/21/16 |
| Echelon Studios | 11/20/07 | 09/23/15 |
| Echelon Studios | 08/25/09 | 08/25/16 |
| Echelon Studios | 11/20/07 | 07/22/15 |
| Edward R. Miller | 01/20/10 | 01/20/17 |
| Edwin Oyarce | 08/15/11 | 08/15/18 |
| EME FILMS LLC | 03/10/11 | 03/10/18 |
| Emphatic Films, LLC | 01/06/12 | 01/06/19 |
| Euroobscura | | 2016 |
| Falcon | 05/14/08 | 12/23/15 |
| Film Marketing Services | 05/24/11 | 05/24/16 |
| Floodgate Features | 05/25/10 | 05/25/17 |
| Forward Motion Entertainment | 03/10/09 | 10/20/16 |
| Freezer Burn | 05/26/09 | 05/26/16 |
| Gitano Films | 08/15/11 | 08/15/18 |
| Gray Eminence Films | 04/21/09 | 04/21/16 |
| Greenway Entertainment | | 2018 |
| Handyman Productions | 01/15/08 | 09/23/15 |
| Hobbies Odd | 02/24/09 | 12/31/16 |
| INDIE MARKETING | 07/07/11 | 07/07/18 |
| INJURY SLIGHT LLC | 11/21/10 | 11/21/15 |
| Insomnia World Sales | 09/12/11 | 09/12/16 |
| INSOMNIA WORLD SALES | 06/29/11 | 06/29/18 |
| Insurgent Films | 03/03/09 | 10/20/16 |
| insurgent Pictures | 06/17/11 | 06/17/18 |
| INTERFILM | 01/10/11 | 01/10/18 |
| International Film Fund, LLC | 01/19/10 | 01/19/17 |
| International Film Fund, LLC | 11/23/10 | 11/23/17 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| International Producers Group | 08/01/08 | 12/31/16 |
| ITN distribution | 12/10/07 | 05/27/15 |
| ITN Distribution | 01/27/09 | 01/27/16 |
| ITN Distribution | 12/10/07 | 08/26/15 |
| ITN Distribution | 12/10/07 | 08/26/15 |
| ITN Distribution | 01/08/04 | 06/24/15 |
| ITN Distribution | 12/10/07 | 06/24/15 |
| Jam Media | 03/23/10 | 03/23/17 |
| Jamin Griffiths | 06/23/09 | 06/23/16 |

| | | |
|---|---|---|
| Janis DeLucia Allen | 06/18/09 | 02/23/17 |
| JEFF PICKETT | 02/03/11 | 02/03/18 |
| Jinga Films Limited | 04/19/12 | 04/19/19 |
| Joint Ent. | 11/23/09 | 11/23/16 |
| Joint Entertainment International, Inc | 05/24/11 | 05/24/18 |
| Joint Entertainment International, Inc | 05/24/11 | 05/24/18 |
| Jon Cohen | 02/22/11 | 02/22/18 |
| Joseph Gold | 03/27/08 | 08/26/15 |
| JS Editorial & Projects | 12/22/09 | 12/22/16 |
| Kamal Ahmed | 01/21/08 | 05/27/15 |
| Kangoo Films LLC | 05/26/09 | 05/26/16 |
| Keep Movieng | 06/17/11 | 06/17/18 |
| KINDLE ENTERTAINMENT | 01/19/11 | 01/19/18 |
| Ko Studios, Inc | 04/26/11 | 04/26/18 |
| KR7 Productions | 03/29/11 | 03/29/18 |
| Kutir Films | 06/11/12 | 12/25/19 |
| Kutir Films | 06/11/12 | 12/25/19 |
| LACIVERT FILM LTD. | 08/24/10 | 08/24/17 |
| LEFT FILMS | 02/08/11 | 02/08/18 |
| LEFT FILMS | 02/08/11 | 02/08/18 |
| Lifesize Entertainment | 05/16/08 | 05/16/15 |
| Lifesize Inc | 02/18/11 | 02/18/18 |
| Lifesize Inc | 05/16/08 | 05/16/15 |
| Locomotive Distribution | 10/10/12 | 12/18/20 |
| LOST RIVER PRODUCTIONS | 06/01/11 | 06/01/18 |
| M.M. GERTZ ENTERTAINMENT | 02/07/11 | 02/07/18 |
| M.M. GERTZ ENTERTAINMENT | 02/07/11 | 02/07/18 |
| M.M. Gertz Entertainment | 06/17/11 | 06/17/18 |
| M.M. Gertz Entertainment | 02/07/11 | 02/07/18 |
| Markwood Films | | 2018 |
| Mayon Film, Inc | 03/24/09 | 03/24/16 |
| MDUX Pictures, LLC | 06/17/11 | 06/17/21 |
| Media Luna New Films UG | 03/09/12 | 11/27/20 |
| Melissa Verhuis | | |
| Michael Vaidini Productions | | 2018 |
| ML Banks | | 2016 |
| M.M. Gertz Entertainment | 01/20/11 | 01/20/18 |
| Molake Pictures | 06/23/09 | 06/23/16 |
| Montague Films LLC | 04/26/11 | 04/26/18 |
| Morning Films, LLC | 02/20/12 | 12/25/19 |
| Mosquito Flixks LLC | 12/21/10 | 12/21/17 |
| Mount Parnassus Pictures | 09/28/10 | 09/28/18 |
| Mystery Island | | 2018 |
| Mythmaker | 06/29/11 | 01/29/21 |
| Neon Buddha Multimedia | 06/29/10 | 06/29/17 |

| | | |
|---|---|---|
| Nicole Blaine | 02/11/11 | 02/11/18 |
| Nikki Black Films Limited | | 2019 |
| NOM DE PLUME FILMS, LLC | 09/28/10 | 09/28/17 |
| Norman Gerard | 02/16/10 | 09/16/17 |
| Norman Gerard | 02/16/10 | 09/16/17 |
| North Poplar Pictures | 11/23/15 | 12/31/16 |
| Olliewood Films, Inc. | 03/06/08 | 09/23/15 |
| ONE NIGHT LLC | 08/24/10 | 08/24/17 |
| Over The GW LLC | 01/25/11 | 01/01/18 |
| Padded Room Pictures | 08/10/12 | 01/29/21 |
| Panorama Entertainment | 01/27/09 | 01/27/16 |
| Panorama Entertainment | 05/26/09 | 05/26/16 |
| Plateado Films | 07/01/06 | 01/01/20 |
| Plateado Films | 07/01/06 | 01/01/20 |
| PRIME OF YOUR LIFE PICTURES, LLC | 02/09/11 | 02/09/18 |
| Primer Plano Film Group S.A. | 08/01/11 | 08/01/18 |
| Primer Plano Film Group S.A. | 10/14/11 | 10/14/18 |
| Primer Plano Film Group S.A. | 12/16/11 | 12/16/18 |
| Primer Plano Film Group S.A. | 04/26/11 | 04/26/18 |
| Proactive Pictures | 03/29/11 | 03/29/18 |
| Racing Daylight, llc | 05/30/08 | 12/23/22 |
| RAI International | 8/10/2012 | 8/9/2020 |
| RAI International | 8/10/2012 | 8/9/2020 |
| Razor Sharp Productions, llc | 05/01/08 | 11/25/15 |
| Read You Like A Book LLC | 06/24/08 | 06/24/15 |
| Rendez-Vous Pictures | 03/20/12 | 03/20/19 |
| RESEARCH FILMS | 02/09/09 | 06/23/16 |
| Rinky Dink Inc. | 02/22/11 | 02/22/18 |
| Rogue Arts | 11/12/02 | 09/30/16 |
| Rogue Arts | 03/09/12 | 03/09/19 |
| ROGUE ARTS | 06/23/09 | 06/23/16 |
| Rogue Arts | 06/18/10 | 06/18/17 |
| Rogue Arts | 03/12/12 | 11/01/20 |
| Rogue Arts | 05/21/08 | 05/21/15 |
| Rogue Arts | 10/26/10 | 10/26/17 |
| Rogue Arts | 05/21/08 | 05/21/16 |
| Rogue Arts | 10/31/07 | 05/27/15 |
| Rogue Arts | 03/09/12 | 03/09/19 |
| Rogue Arts | 11/28/11 | 11/28/18 |
| Rogue Arts | 05/21/08 | 05/21/17 |
| Ron Gilbert | 03/23/10 | 03/23/17 |
| Room 314, LLC | 02/21/08 | 07/22/15 |
| Roundtable Media | 04/20/10 | 04/20/17 |
| RTV Pictures | 09/22/09 | 09/22/16 |
| Sakkara Productions | 03/29/11 | 03/29/18 |

| | | |
|---|---|---|
| SECRET GARDEN FILMS, LLC | 03/24/11 | 03/24/16 |
| Skoorbyland | 10/26/10 | 10/26/17 |
| Starlight & Superfish LLC | 05/11/11 | 05/11/18 |
| Static Room Media | 04/30/08 | 10/28/15 |
| Stlla Films | 12/21/10 | 12/21/17 |
| Studio Interzona Productions | 06/22/09 | 02/23/17 |
| Stuffed Olive | 07/21/09 | 07/21/16 |
| Suarez Corporation Industries | 11/29/11 | 11/29/18 |
| SUNWORLD PRODUCTIONS | 02/24/11 | 02/24/18 |
| Sydney Film School | 04/20/10 | 04/20/17 |
| Tangent Films | | 2016 |
| Tapioca LLC | 03/24/09 | 03/24/16 |
| Tate LLC | 02/21/07 | 10/24/15 |
| The Dreaming Tree | 01/26/09 | 01/26/16 |
| The Johnson Group | 03/23/10 | 03/23/17 |
| The Last Big Thing Corp. | 06/29/10 | 06/29/17 |
| The Last Bigh Thing Corp. | 08/24/10 | 08/24/17 |
| Then What Films | 12/23/11 | 12/23/16 |
| Think Dreamer Productions | 03/29/11 | 03/29/18 |
| Those Guys and That Girl Films, LLC | 05/24/11 | 05/24/18 |
| Tiny Sumo | 04/09/08 | 12/23/15 |
| Tom Wilton | 03/29/11 | 03/29/22 |
| Top Movie, LLC | 11/06/11 | 11/06/18 |
| Travis Eliot | 02/22/10 | 02/22/17 |
| Tropical Storm Ent. | 05/26/09 | 02/23/17 |
| Tropical Storm Ent. | 06/30/09 | 03/23/17 |
| Troy McGatlin | 01/20/08 | 09/23/15 |
| USB Productions | 12/08/05 | 01/07/18 |
| VIEWSTER | 04/26/11 | 04/26/18 |
| Visit Films | 09/28/10 | 09/28/17 |
| Visit Films | 09/28/10 | 09/28/17 |
| Visit Films | | 2017 |
| Visit Films | 01/26/09 | 01/26/16 |
| Visit Films | 03/20/12 | 03/20/19 |
| VLA PRODUCTIONS | 05/11/11 | 05/11/18 |
| Waters Of March Films | 03/20/12 | 03/20/19 |
| Weird Chief Pictures | 02/10/11 | 02/10/21 |
| What We Did On Our Holidays, LLC | 01/27/09 | 01/27/16 |
| Wild Wimming Films LLC | 01/26/09 | 01/26/16 |
| WILDART FILM | 01/14/11 | 01/14/18 |
| WILL KLIPSTINE AND AMY MILLS | 06/07/11 | 06/07/16 |
| Wonderphil Productions | 11/23/10 | 11/23/17 |
| YMI, LLC | 01/15/08 | 08/26/15 |
| Young Man Kang Films | 07/21/09 | 07/21/16 |
| Zach Parker dba Along the Tracks | 05/12/08 | 10/28/15 |

Section 4.08
Permitted Encumbrances

As of the date hereof Inventory and Accounts Receivable are encumbered according to that certain Loan and Security Agreement with Bank of America, N.A. dated July 1, 2013.  Simultaneous with Closing Bank of America will release its lien.

Section 4.10(b)
Intellectual Property Infringement

- *JNK Entertainment, LLC, a Delaware limited liability company vs. SP SALES AND DISTRIBUTION, LLC, a California limited liability company; SP SALES WORLDWIDE, LLC, a California limited liability company; SP's CRYSTAL EDGE, LLC, a California limited liability company; SP DISTRIBUTION, LLC, a California limited liability company; STEVEN PAUL, an individual, and ANDERSON DIGITAL, LLC, a Delaware limited liability company.*

- The Company has received notice from Cohen Media Group, LLC of its intent to seek indemnification pursuant to its distribution agreement with the Company with respect to a patent infringement claim against Cohen Media Group relating to "authoring" the menu on certain DVDs.  The Company contends that such claim may not subject to indemnification pursuant to the distribution agreement because the Company only manufacturers the DVD and does not "author" it.

Section 4.11
<u>Inventory Encumbrances</u>

As of the date hereof Inventory and Accounts Receivable are encumbered according to that certain Loan and Security Agreement with Bank of America, N.A. dated July 1, 2013.  Simultaneous with Closing Bank of America will release its lien.

Section 4.12(a)
Material Retailer Net Sales

**Sales less Returns for May 2014 through April 2015**

| Material Retailer | Sales | Returns | Net Sales |
|---|---|---|---|
| Wal-Mart | 143,945,167 | 80,030,171 | 63,914,996 |
| Sam's Club | 13,843,690 | 7,592,073 | 6,251,617 |
| Best Buy | 29,737,118 | 13,939,698 | 15,797,420 |
| **TOTAL** | **187,525,974** | **101,561,941** | **85,964,033** |

Section 4.12(b)
Material Content Supplier Purchases

**Sales less Returns for May 2014 through April 2015**

| Material Content Supplier | Sales | Returns | Net Sales |
|---|---|---|---|
| ARC | 24,856,196 | 14,715,687 | 10,140,508 |
| Dreamworks Classic | 41,577,441 | 20,879,013 | 20,698,428 |
| Vertical | 13,343,628 | 6,561,850 | 6,781,778 |
| Microsoft | 5,199,619 | 416,207 | 4,783,412 |
| Bagsadarian | 2,591,088 | 2,994,717 | (403,630) |
| Ketchup | 3,245,739 | 1,189,379 | 2,056,360 |
| Xlrator | 4,160,068 | 2,432,176 | 1,727,892 |
| **TOTAL** | **94,973,778** | **49,189,029** | **45,784,749** |

Section 4.14(a)
Legal Proceedings

- *JNK Entertainment, LLC, a Delaware limited liability company vs. SP SALES AND DISTRIBUTION, LLC, a California limited liability company; SP SALES WORLDWIDE, LLC, a California limited liability company; SP's CRYSTAL EDGE, LLC, a California limited liability company; SP DISTRIBUTION, LLC, a California limited liability company; STEVEN PAUL, an individual, and ANDERSON DIGITAL, LLC, a Delaware limited liability company.*

- The Company has received notice from Cohen Media Group, LLC of its intent to seek indemnification pursuant to its distribution agreement with the Company with respect to a patent infringement claim against Cohen Media Group relating to "authoring" the menu on certain DVDs. The Company contends that such claim may not subject to indemnification pursuant to the distribution agreement because the Company only manufacturers the DVD and does not "author" it.

Section 4.15(b)
<u>Material Permits</u>

NONE

Section 4.18(a)
Employee Information

| Name | Title/Position | EMPL | Hire Date | Base Pay | Bonus Potential | Total Pay | Vac/Sick Accrual Balance Hours | Benefits | 401(k) Match |
|------|---------------|------|-----------|----------|-----------------|-----------|-------------------------------|----------|--------------|
| Erin L. Hill | Director of 3PL Sales (Outside Walmart and Best Buy) | 32244 | 4/22/2013 | 102,000 | 15,300 | 117,300 | 120.77 | Savings, LTD | $1,532.16 |
| Matthew Smith | Executive VP of Purchasing and Marketing | 23116 | 2/28/2011 | 470,015 | - | 470,015 | 188.16 | Medical, HSA, Dental, Vision | $7,800.00 |
| Donna Edwards | Marketing - Dreamworks | 36350 | 11/10/2014 | 110,000 | - | 110,000 | 90.46 | N/A | N/A |
| Steve Pechter | Best Buy Buyer | 29540 | 6/4/2012 | 165,000 | 33,000 | 198,000 | 124.15 | LTD | $541.44 |
| Tammy Tate | Legal | 22183 | 1/21/2010 | 91,555 | - | 91,555 | 229.53 | Medical, HSA, Dental, Vision, LTD | $1,921.73 |
| Mitch Budin | Consultant - Marketing Dreamworks | | | 180,000 | | 180,000 | N/A | N/A | N/A |
| Craig Bergstein | Consultant - Analytics Dreamworks | | | 120,000 | | 120,000 | N/A | N/A | N/A |

**All of these employees are full time.**

Section 5.03
<u>Buyer – Necessary Consents</u>

NONE

Section 6.05
Employees of the Business

## Name

Employees:
Erin L. Hill
Matthew Smith
Donna Edwards
Steve Pechter
Tammy Tate

Consultants:
Mitch Budin
Craig Bergstein

**EXHIBIT 2**

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT**, dated as of July 9, 2015 (this "Agreement"), is entered into by and between ANCONNECT, LLC, a Texas limited liability company ("Seller") and OUR ALCHEMY, LLC, a Delaware limited liability company ("Buyer") (each a "Party" and, collectively, the "Parties").

## RECITALS

**WHEREAS**, Buyer and Seller are parties to that certain Asset Purchase Agreement, dated as of May 7, 2015 (the "Purchase Agreement"), pursuant to which Buyer has agreed to purchase and assume from Seller certain assets, and certain specified liabilities, of Seller's Business (as defined in the Purchase Agreement) consisting of home video and digital distribution for motion pictures and other audiovisual media in and throughout the United States of America and its territories and protectorates.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

2. <u>Transition Services</u>. During the Term (as defined in Section 13 below), Seller shall provide to Buyer the distribution and returns transition services described in detail in <u>Exhibit A</u> attached hereto (the "Distribution and Returns Transition Services") and the administrative services described in detail in <u>Exhibit B</u> attached hereto (the "Administrative Services", and together with the Distribution and Returns Transition Services, the "Transition Services") in accordance with implementation milestones set forth thereon. In the event Buyer requires any additional Transition Services not otherwise specifically identified in this <u>Exhibit A</u> or <u>Exhibit B</u>, Seller shall use commercially reasonable efforts to provide such additional Transitional Services on mutually agreeable terms and conditions.

3. <u>Compensation for Transition Services</u>.

    (a)    For Distribution and Returns Transition Services, Buyer shall pay Seller weekly fees and charges according to Seller's Rate Card as set forth on <u>Exhibit A</u>.

    (b)    For Administrative Services, Buyer shall pre-pay Seller on a weekly basis the fees as set forth on <u>Exhibit B.</u>

    (c)    The total costs and reimbursements set forth in Sections 3(a) and (b) hereof shall be referred to as the "Transition Service Fees."

4.    Scope of Transition Services.

(a)    In the event that Seller believes that it will be required to use overtime hours to provide any required Distribution and Returns Transition Services, Seller shall obtain the Buyer's prior written consent, which shall not be unreasonably withheld or delayed.  Buyer shall reasonably consent to an appropriate amount of overtime.

(b)    Buyer shall have the right to inspect the Seller's books and records related to its performance under this Agreement, including, without limitation all items set forth on Exhibit A as well as any applicable cost components.  Such audits shall be performed with reasonable advance written notice, during normal business hours.

5.    Administrative and Distribution Transition Services.  Seller's Administrative Services and Distribution and Return Transition Services shall be conducted as they were immediately prior to the sale of the Business, and there shall be no materially detrimental changes to such practices and procedures during the Transition Period without the prior written approval of the Buyer.

6.    Payment Terms.  Seller shall invoice the Buyer on a weekly basis for Distribution and Returns Transition Service Fees incurred in connection with such Transition Services on each Wednesday for the previous week's Distribution and Returns Transition Services.  For Administrative Services, Seller shall invoice the Buyer one week in advance, on each Wednesday for the following week's Administrative Services.   With each such invoice, the Seller shall provide back-up information in reasonable detail to support such invoice as well as an appropriate breakdown of permitted overtime costs for the Distribution and Returns Transition Services.  Invoices for Transition Services shall be sent to the Buyer at the following address: 5900 Wilshire Boulevard, Floor 18, Los Angeles, CA  90036, Attention: Bill Lee, CEO, via facsimile or e-mail in the manner set forth in Section 10.02 of the Purchase Agreement.  Buyer shall pay each such invoice by wire transfer of immediately available funds within (a) 14 Days of its receipt of such invoice relating to Administrative Services and (b) 30 days of its receipt of such invoice relating to Distribution and Returns Transition Services.  If Seller does not receive payment in full within the time periods stated above following the Buyer's receipt of any invoice, the Seller shall have the right to immediately cease providing any or all Transition Services under this Agreement until such payment is received.

7.    Relationship of Parties.   Seller and Buyer shall each act as an independent contractor with respect to the provision of the Transition Services hereunder.  Nothing contained in this Agreement shall be construed as creating an agency, employee, servant, joint venture, partnership or similar legal relationship between or among Buyer and Seller.

8.    Staffing for Services.  Seller shall provide the Transition Services through its own employees or current Seller temporary agency contractors.

9.    Compliance with Laws.  Each Party shall comply, at its own expense, with the provisions of all Laws applicable to the performance of its obligations under this Agreement.

10.    Permits, Licenses and Consents.  Each Party shall, at its sole expense, obtain any licenses, permits or consents required by any governmental entity or other third party with

respect to the type of activity to be conducted by such Party or its employees pursuant to this Agreement.

11.   <u>Standards of Performance</u>.  Except as expressly set forth in this Agreement, Seller represents and warrants that the Transition Services shall be performed by it in a manner consistent with Seller's historical business practices. Buyer acknowledges that Seller is not in the business of providing the Transition Services and that Seller is performing these services as an accommodation to the Buyer, helping to ensure continuity of activities.  Seller assumes no obligation to do more for the Buyer than it does for itself or its affiliated businesses.

12.   <u>Disclaimer of Warranties</u>.   SELLER MAKES NO WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE TRANSITION SERVICES PROVIDED BY SELLER HEREUNDER.

13.   <u>Term</u>.

(a)   The term of this Agreement with respect to each Transition Service shall continue until the earlier of (i) one year from the date hereof and (ii) the date of notice from Buyer that it desires to terminate any particular Transition Service, which may be a subset of any service included within the Distribution and Returns Transition Services or Administrative Services (the "<u>Term</u>"). In particular, the Administrative Services shall terminate with respect to each Retailer upon the Vendor Effective Date with respect to such Retailer.  Any such termination of the Administrative Services with respect to Walmart, Sam's Club, or Best Buy shall reduce the Administrative Services Fee by one third of the original amount on a prospective basis. For all other terminated Transition Services, Seller and Buyer shall use commercially reasonable efforts to mutually agree to an appropriate reduction in the applicable Transition Services Fees. The termination by Buyer of any one of the Transition Services shall not reduce or otherwise affect Seller's obligation to continue to provide the remaining Transition Services.

(b)   Seller may terminate its obligations with respect to any or all of the Transition Services upon written notice to Buyer if Buyer fails to pay any invoice within 8 days of the Buyer's receipt of such invoice.  Seller may also terminate its obligations with respect to any or all of the  Transition Services upon written notice to Buyer if Buyer fails to pay any amount set forth in Section 2.06(d) of the Purchase Agreement.

14.   <u>Indemnification</u>. Each Party shall indemnify, hold harmless and defend the other Party and its Affiliates, their respective directors, officers, employees, representatives and agents (each an "<u>Indemnified Party</u>") from and against any and all liabilities, claims, suits, demands, causes of action, costs, damages, fines, penalties and expenses fully and finally awarded against any Indemnified Party (including, without limitation, reasonable attorneys' fees and experts' fees and disbursements) ("<u>Losses</u>") arising out of or resulting from (i) any act, omission, negligence or breach on the part of Seller or the Buyer, as the case may be, related to its obligations under this Agreement or any damage to property and (ii) injury or death of any person arising out of or

resulting from any act, omission or negligence of Seller or Buyer, as the case may be, and their respective officers, agents and employees in connection with their respective performance under this Agreement.    Notwithstanding the foregoing, the maximum aggregate amount of indemnifiable Losses which may be recovered by Buyer or Seller pursuant to this Agreement shall be an amount equal to the greater of:    (1) 50% of the aggregate Fees paid under this Agreement; and (2) $1,000,000; provided, however, indemnifiable Losses under Section 14(ii) above or Losses resulting from any breach of any payment obligation of Buyer hereunder shall not be subject to such aggregate cap.

15.    Transition Cooperation.  Each Party will, and will cause their respective Affiliates to, give full cooperation and support to the other Party and its Affiliates to enable the Seller to perform the Transition Services as set forth in this Agreement.

16.    Notices.  Any notice to be given under this Agreement shall be in writing and shall be given pursuant to the notice provisions in the Purchase Agreement.

17.    Dispute Resolution.  If a dispute arises between the Parties under this Agreement, the Parties will use reasonable efforts to settle such dispute at an operational level.  If such dispute cannot be resolved at the operational level within a period of 10 days, then it will be referred to Bill Lardie of Seller and Bill Lee of Buyer (together, the "Dispute Resolution Parties") for resolution within a further period of 10 days.  If any dispute shall not be resolved in accordance with the above, the Parties may resort to such other dispute resolution remedies as may be available under applicable law.

18.    Confidentiality.

(a)    Confidential Information.  In connection with the transactions contemplated herein, a Party (the "Disclosing Party") may provide another Party (the "Receiving Party") with, or a Party may become aware of, certain Confidential Information (as defined below) about the business and affairs of another Party.  The Receiving Party shall use the Confidential Information solely in connection with fulfilling its obligations under this Agreement.  For purposes of this Agreement, "Confidential Information" means any and all information directly or indirectly disclosed to or otherwise obtained by the Receiving Party or any of its officers, directors, employees or agents (whether before or after the date of this Agreement and whether orally, in writing, in machine-readable form or by any other means) relating in any way directly or indirectly to the transactions contemplated under this Agreement, the business and affairs of the Disclosing Party and its Affiliates, including, without limitation, any information relating to the Disclosing Party's or its Affiliates' products, services, operations, processes, plans or intentions, product information, know-how, design rights, patents, trade secrets, market opportunities and business affairs, together with all notes, analyses, compilations or studies prepared by the Receiving Party that contain or otherwise reflect such information.

(b)    Receiving Party Obligations.  The Receiving Party shall keep all Confidential Information confidential and, in particular, shall exercise in relation to the Confidential Information no lesser security measures and degree of care than those that a

reasonable person would apply to its own confidential information and those that are applied to the Receiving Party's confidential information.

(c)  Permitted Use of Confidential Information.  The Receiving Party shall not disclose the Confidential Information to another person without the prior written consent of the Disclosing Party, except that the Receiving Party may disclose Confidential Information:

(i)  to those of its employees to whom such disclosure is properly required to be made for the purpose of fulfilling its obligations under this Agreement; and

(ii)  if disclosure is required by Law, by a court of competent jurisdiction or by another appropriate regulatory body, provided that the Receiving Party gives the Disclosing Party prompt, and in any case not less than two Business Days, prior notice in writing of that disclosure and uses all reasonable efforts to limit or prevent any further disclosure or dissemination of Confidential Information so disclosed.

(d)  Prevent Disclosure.  The Receiving Party shall use its best efforts to prevent the disclosure of Confidential Information except as provided in Section 18(b) and shall procure that each person to whom Confidential Information is disclosed pursuant to Section 18(a) complies with the terms of this Agreement as if that person were a party to this Agreement.

(e)  Confidentiality Not Applicable.  The provisions of this Section 18 shall not apply to any Confidential Information:

(i)  to the extent that it is or becomes publicly known other than by breach of this Agreement by the Receiving Party or its officers, directors, employees or agents;

(ii)  is independently developed by or known to the Receiving Party or any third party on the Receiving Party's behalf without reference to the Confidential Information of the Disclosing Party, as evidenced by your contemporaneous written records; or

(iii)  that the Receiving Party can show by its written records was in its possession prior to the Receiving Party receiving it from the Disclosing Party and that Receiving Party had not previously obtained from the Disclosing Party or from another person on the Disclosing Party's behalf under an obligation of confidence.

(f)  Obligations Survive.  The obligations contained in this Section 18 shall survive the expiration or earlier termination of this Agreement for a period of two (2) years.

19.   <u>Remedies</u>.  The Parties hereto acknowledge and agree that in the event of any breach of Section 18 of this Agreement, the Parties would be irreparably harmed and could not be made whole by monetary damages.  Each Party hereto accordingly agrees to the extent permitted by law (i) not to assert by way of defense or otherwise that a remedy at law would be adequate, and (ii) in addition to any other remedy, the remedy of specific performance of this Agreement is appropriate in any action in court.

20.   <u>Exhibits</u>.  The Exhibits to this Agreement is hereby incorporated herein and made a part hereof.

21.   <u>Entire Agreement</u>.  This Agreement and Sections 2.06(d) and 3.02(a)(iii) of the Purchase Agreement constitute the entire understanding and agreement between Buyer and Seller with respect to the provision of the Transition Services and supersedes any and all prior agreements, whether written or oral, that may exist between the Parties solely with respect to such subject matters.

22.   <u>Survival</u>.  The provisions of this Agreement which by their nature survive termination of this Agreement shall so survive and remain in effect following the termination of this Agreement for any reason whatsoever.

23.   <u>Controlling Law</u>.  The provisions of Section 10.10(a) of the Purchase Agreement are hereby incorporated by reference.

24.   <u>Force Majeure</u>.  Notwithstanding any provision herein to the contrary, Seller shall not be liable to the Buyer for any damages due to delays or failures in performance of its obligations under this Agreement due to a Force Majeure Event, and such delays or failures shall not be deemed a breach of this Agreement.  Immediately upon becoming aware of a Force Majeure Event, the Seller will (a) use commercially reasonable efforts to end or circumvent the Force Majeure Event; (b) keep the Buyer apprised of those efforts on a timely basis; and (c) communicate with, coordinate with and assist the Buyer in resolving any impact resulting from the Force Majeure Event.  "<u>Force Majeure Event</u>" means fire, flood, storm, earthquake, landslide, volcanic activity or other acts of God; acts of terrorism or vandalism; riot, war, civil disturbance or insurrection; strikes, lockout or other labor unrest; power, transportation, Internet or other utility or carrier delays or outages, interference by any governmental authority, or any other event(s) beyond the reasonable control of the Seller.

25.   <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

26.   <u>Changes and Amendments</u>.  Modifications and amendments to this Agreement shall be made only by a written instrument signed by each Party.

27.   <u>Counterparts</u>.  This Agreement may be executed in counterparts, all of which will be considered one and the same agreement and each of which will be deemed an original.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

OUR ALCHEMY, LLC

By: _____
Name: __Bill Lee_____
Title: __CEO_____


ANCONNECT, LLC

By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**OUR ALCHEMY, LLC**

By: _____
Name: _____
Title: _____

**ANCONNECT, LLC**

By: _Bill Fardie_____
Name: _Bill Cardie_____
Title: _CEO_____

## EXHIBIT A: DISTRIBUTION AND RETURNS SERVICES

### Services provided

➢ Physical logistics services including warehousing, order fulfillment (pick, pack and shipping), freight management to customers, price stickering, and returns processing.

➢ ANConnect will provide the above services at present level of accuracy and timeliness as is being performed for all content suppliers prior to the conversion

|  | cents per unit |  |
|---|---|---|
| Outbound - Loose Pick | 19.0 | Per Loose pick unit |
| Outbound - Bulk Pick | 7.0 | Per Bulk pick unit |
| Cross Dock Fee | 1.0 | Per Cross Docked Unit |
| Price Stickering | 2.0 | Per Stickered Unit |
| Walmart's Return Center Fees | 4.4 | Per WM Returned Unit |
| Returns Freight | 3.3 | Per Returned Unit |
| Returns Processing | 16.5 | Per Returned Unit |

| Outbound freight |  |
|---|---|
| WALMART | 12.0 |
| BEST BUY | 34.0 |
| MMS-MILLENNIUM MEDIA SERVICES/Target | 5.0 |
| SAM'S CLUBS | 33.0 |
| INGRAM ENTERTAINMENT INC | 5.0 |
| ONE-TIME CUSTOMER | 3.0 |
| AMAZON | 10.0 |
| REDBOX | 0.0 |
| AEC - ALLIANCE ENT CORP | 5.0 |
| COSTCO | 5.0 |
| VIDEO PRODUCTS DISTRIBUTORS | 5.0 |
| KMART | 40.0 |
| RENTRAK CORPORATION | 5.0 |
| MID WEST TAPE | 5.0 |
| WAX WORKS | 5.0 |
| NETFLIX | 5.0 |
| BAKER AND TAYLOR | 5.0 |
| EURPAC | 5.0 |
| IGNATIUS PRESS | 5.0 |
| CROY AND ASSOCIATES | 5.0 |
| SOFT LAND INTERNATIONAL | 5.0 |
| PROVIDENT MUSIC GROUP | 5.0 |
| AMAZON STUDIOS | 5.0 |
| FLASH DISTRIBUTORS | 5.0 |

## EXHIBIT B: ADMINISTRATIVE SERVICES

- ➤ Administrative Services
  - o Complete order to cash processing and accounting with customers (processing of orders received from customers or generation of replenishment orders for "VMI" customers as applicable, invoicing, cash collection, deduction management and return authorization processing);
  - o Customer service functions (communicating status of order with customers, providing new item setup and pricing information as appropriate);
  - o Supplier inventory management (placement of PO's with Wholesale Suppliers or requests for product from 3PL Suppliers, coordination of returns with Suppliers including obtaining RA's and processing returns shipments to Suppliers);
  - o Financial record keeping (maintaining all transactional data required to generate Participation statements for 3PL suppliers and accurate balance sheets for Wholesale Suppliers
- ➤ Provide, upon request, to Buyer:
  - o Complete list of active "planogram" SKUs for all retailers (including Walmart, Best Buy, Kmart, Costco and Sam's Club) including UPC code, description, SRP, dealer cost, and specific planogram information;
  - o Release schedule for all known upcoming new releases and special promotions for all suppliers (including street dates, item number, UPC codes, supplier, pricing and unit forecasts);
  - o Complete warehouse inventory list for all Active SKUs (including unit count and "Last Order Cost" for all owned inventory.

**Collection and Transfer of Accounts Receivable**

- ➤ Maintenance of accurate records of Accounts Receivable created post closing for the benefit of Buyer (including gross amounts from new invoices added to new A/R balance, payments made by customers against new invoices, any deductions taken by customer against new invoices)
- ➤ Remittance of any cash collected on behalf of Buyer to be made by wire transfer every Monday for any cash collected in the prior week
- ➤ At vendor of record change, Buyer will begin invoicing customers and customers will begin deducting returns against Buyer's account.  Remaining invoices originated by Seller will continue to be remitted as payment is received as per above.

**Allocation of Administrative Services.  Amount to be charged per Calendar Day until Customer or Customer group is transitioned to Alchemy**

|  | Walmart | Best Buy | Other | TOTAL |
|---|---|---|---|---|
| Per Calendar Day | $ 2,243 | $ 1,120 | $ 3,645 | $ 7,008 |

**EXHIBIT 3**

# MERCHANDISING AGREEMENT

**THIS AGREEMENT** (the "**Agreement**"), entered into and effective this July 9, 2015 (the "**Effective Date**") is by and between Our Alchemy, LLC ("**Company**"), with offices at 5900 Wilshire Boulevard, Floor 18, Los Angeles, California 90036, and Anderson Merchandisers, LLC with offices at 5601 Granite Parkway, Suite 1400, Plano, Texas 75024 ("**Contractor**").

## WITNESSETH:

**Background.** Company wishes to engage Contractor to perform certain services with respect to Walmart stores as more particularly described in Exhibit A, attached to and made a part of this Agreement, as well as such other additional and/or modified Services on projects that may, from time to time be agreed to by both Company and Contractor pursuant to the procedures provided herein (the "**Services**"). Contractor desires perform the Services as specified in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and premises herein above and hereinafter set forth, the parties hereby agree as follows:

## 1. SERVICES

**1.1. Services.** Company hereby engages Contractor to perform the Services as described in Exhibit A or as from time to time agreed to by the parties. Contractor agrees to perform the Services in a good and workmanlike manner, consistent with applicable industry standards.

**1.2. Reports.** Company may periodically request reasonable written reports concerning Contractor's progress, project status, billing data, and other matters pertaining to the Services in which Company typically supplies in rendering the same or similar services as those performed hereunder, and Contractor shall provide such reports to Company at no additional charge.

**1.3. Personnel.** Contractor represents that all individuals performing the Services (the "**Personnel**") are qualified to perform the Services and have been assigned by Contractor to work with Company pursuant to this Agreement. Contractor may use its employees or subcontractors to perform the Services, provided that if Contractor uses subcontractors (a) Contractor shall remain solely responsible for the proper performance of the Services and this Agreement and (b) Contractor shall be solely responsible for engaging and paying such subcontractors. Contractor hereby agrees to pay its subcontractors, laborers and suppliers in full on a timely basis.

**1.4. Exclusive Service Provider.** Unless terminated or modified by the parties pursuant to this Agreement, Company agrees to use Contractor solely and exclusively to perform merchandising services in Wal-Mart stores and Sam's Clubs during the term of this Agreement.

## 2. COMPENSATION / EXPENSES

**2.1. Fees.** As full and complete consideration for the Services to be performed by Contractor, Company agrees to pay Contractor total fees (hereinafter called the "**Fees**") in accordance with this Section 2. Taxes, if any, shall be separately itemized by Contractor. For the Services to be provided under Exhibit A, the Fees shall be as set forth in Exhibit A. For any additional services, the Fees shall be agreed upon prior to the initiation of such additional services and set forth in as additional work authorization, and all Services performed under the additional work authorization will be governed by the terms of this Agreement and the additional work authorization. Payment of the Fees shall be subject to completion of the Services as provided herein. Company may offset amounts owed by ANConnect, LLC to it under that certain Asset Purchase Agreement (the "APA") dated as of May 7, 2015 by and between Company and ANConnect, LLC, but only to the extent that such offset is specifically permitted by the APA.

**2.2 Fee Adjustments.** If requested by Contractor, the parties may mutually agree to adjust the Fees as provided in this Section 2.2 (other than the portion of the fee related to the "Reimbursement Fees" as defined on Exhibit A). Any adjustments to the Fees will be based upon market fluctuations and/or changes in the actual direct costs to Contractor for the Services. The parties will review such direct costs every six (6) months during the Term and, if needed, adjust the Fees based upon such review. If, in accordance with this Section 2.2, the parties can not mutually agree upon a fee adjustment, Contractor may terminate this Agreement upon thirty (30) days prior written notice to Company.

**TRUSTEE-4**

**2.3. Expenses.** The Fees shall include all sums due and owing of every kind and description solely with regard to performing the Services including but not limited to telephone calls, mileage, duplicating costs and mailing expenses, but shall specifically exclude without limitation, any materials such as Company's product (e.g., videograms), fixtures, signage and any such similar materials . Separate reimbursable expense items shall be specified on Exhibit A or in an additional work authorization.

**2.4. Excess Payment Amount.** If by the first anniversary of the Effective Date (the "Excess Payment Date"), Contractor shall not have received Reimbursement Fees totaling the "Excess Payment Amount" as defined on Exhibit A, then within five (5) days of the Excess Payment Date, Company shall pay to Contractor by wire transfer of immediately available funds an amount equal to the amount by which the Excess Payment Amount exceeds the aggregate Reimbursement Fees paid to Contractor hereunder as of the Excess Payment Date.

**2.5. Invoices.** Unless otherwise specified herein and in Exhibit A, Contractor shall submit invoices monthly and, subject to the terms of this Agreement, invoices are payable within thirty (30) days of receipt by Company.

**2.6. Books and Records; Audits.**

(i) Contractor shall maintain complete and accurate accounting records, and shall retain such records for a period of three (3) years following the date of the invoice to which they relate.

(ii) Company (and its duly authorized representatives) shall have the right at its sole expense, upon reasonable notice, to audit at any time up to one (1) year after payment of an invoice and only one time per statement, Contractor's records relating to the Fees that are due Contractor hereunder, the number of units invoiced and delivered in accordance with the terms hereof, and the expenses billed to Company in connection with the Services rendered under this Agreement. The examination shall take place at Contractor's principal office during Contractor's normal business hours. Company hereby confirms that the examination, and any negotiations or matters related to the examination, are of a confidential nature and may only be disclosed or discussed between Company and its professional advisors (i.e., accountants and/or attorneys), but no one else, and Company will ensure that any confidentiality document Contractor may require prior to the commencement of any examination shall be signed and delivered to Contractor. If any payments are due Company as a consequence of an examination under this Agreement, such payments will be credited to

Company's account after the execution of a letter of release acknowledging that all controversies between Company and Contractor with respect to the accountings examined by Company and/or its authorized representatives are finally compromised, settled and are deemed conclusive, accepted and binding upon Company.

## 3. PROPRIETARY RIGHTS CONFIDENTIALITY

**3.1. No Violation of Proprietary Rights.** Company hereby represents and warrants to Contractor that any and all materials supplied to Contractor in connection with Contractor performing its Services hereunder will not violate rights of third parties, including, without limitation, patents, copyrights, or trade secrets, and that such materials will not violate any contractual obligations or confidential relationships which Company may have to/with any third party. Contractor hereby represents and warrants to Company that its activities in connection with the performance of the Services hereunder will not violate any proprietary rights of third parties, including, without limitation, patents, copyrights, or trade secrets, and that such activities will not violate any contractual obligations or confidential relationships which Contractor may have to/with any third party.

**3.2. Confidential Information.**

(i) Each party hereto agrees to hold in trust and confidence, without limitation of time, all of the information and materials (including but not limited to all documents, reports, papers, programs, cards, tapes, disks, disk-racks, plans, designs, drawings, specifications, formulae, instructions, processes, systems, theories and any other information or materials) regarding the other company's business, the Services performed hereunder and the results thereof (a) disclosed by a party hereto, its agents or employees ("**Disclosing Party**") to the other party ("**Receiving Party**") hereunder; (b) obtained from the Disclosing Party or otherwise learned as a result of the Services performed hereunder; and/or (c) used as a basis for and/or contained in any reports prepared by a Disclosing Party for the Receiving Party hereunder (all of which shall be called the "**Confidential Information**"). The material and financial terms of this Agreement shall be included as Confidential Information. The Receiving Party will not (1) use or allow to be used for its own benefit, (2) disclose or reveal or allow to be disclosed or revealed to any third party, or (3) make any commercial or other use of, all or any part of the Confidential Information nor make any press release regarding the existence of this Agreement without the prior written consent of the Disclosing Party.

2

(ii) It is understood, however, that the restrictions in this Paragraph 3.2, shall not apply to any portion of the Confidential Information which falls within any of the following categories: (a) Confidential Information that as of the time of disclosure to the Receiving Party, was already known to the Receiving Party without obligation of confidentiality; or (b) Confidential Information obtained after the date hereof by the Receiving Party from a third party; or (c) Confidential Information which is or becomes part of the public domain through no fault of the Receiving Party or its employees.

(iii) Each party agrees to restrict access to all of the Confidential Information within its company to only such limited group of authorized employees or independent contractors who (a) require such information in connection with their activities as contemplated by this Agreement, and (b) have agreed to maintain the confidential nature of all proprietary information - including that of third parties - received by them in the course of their employment or engagement. Neither party's name or insignia, photographs of any project part of the Services, or any other publicity pertaining to the Services shall not be used in any magazine, trade paper, newspaper or other medium without the prior written consent (email shall be acceptable) of the other party. Notwithstanding the above, Contractor may list Company as current or former (as applicable) client of Contractor.

(iv) All written materials relating to or containing the Confidential Information shall be maintained in a restricted access area to prevent unauthorized use or reproduction thereof.

(v) Disclosure of Confidential Information to the Receiving Party hereunder shall not constitute any option, grant or license to the Receiving Party under any patent or other rights now or hereinafter held by the Disclosing Party, its subsidiaries, or any of its affiliated companies.

(vi) Upon termination of this Agreement, or earlier upon a Disclosing Party's request, the Receiving Party shall deliver all items containing any Confidential Information to the Disclosing Party or make such other disposition thereof as the Disclosing Party may reasonably direct.

**3.3. Survival.** This Section 3 shall survive termination or expiration of this Agreement.

**4. Intentionally Omitted.**

## 5. OWNERSHIP OF WORK PRODUCT

**5.1. Company and Contractor's Property.** All Confidential Information, data, business plans and information, specifications, drawings, or other property furnished by either party ("**Furnishing Party**") or obtained by a party to this Agreement in connection with the performance of the Services hereunder shall remain the exclusive property of the Furnishing Party. Each party agrees that such property will be used for no purpose other than in connection with and to fulfill the purposes of this Agreement. Each party shall be responsible for the safekeeping of all such property.

## 6. COMPETING SERVICES

Company acknowledges and agrees that Contractor is engaged in the business of providing merchandising services and will, accordingly, provide similar services to other entities including, without limitation, competitors of Company.

## 7. INDEMNIFICATION

**7.1. General.**

7.1.1    Contractor shall use reasonable care and judgment in rendering the Services to be performed hereunder. Contractor will defend, indemnify and hold harmless Company and each of its direct and indirect parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents, representatives, successors and assigns (collectively, the "**Company Indemnitees**"), from and against any and all third party claims, demands, liabilities, losses, damages, expenses (including without limitation, penalties and interest, reasonable fees and disbursements of counsel, and court costs), proceedings, judgments, settlements, actions or causes of action or government inquiries of any kind (including, without limitation, emotional distress, sickness, personal injury or death to any person (including employees of Contractor or its contractors), or damage or destruction to, or loss of use of, tangible property) ("**Claims**") arising out of, relating to or in connection with this Agreement, the performance of the Services under this Agreement or any of the representations, warranties, covenants, duties or obligations of Contractor ; provided, however, that Contractor shall not be obligated to indemnify Company with respect to Claims due to the negligence or willful misconduct of Company.

7.1.2    Company will defend, indemnify and hold harmless Contractor and each of its direct and indirect parents, subsidiaries and affiliates, and their respective officers, directors, employees, agents, representatives, successors and assigns (collectively, the

3

"**Contractor Indemnitees**"), from and against any and all Claims arising out of, relating to or in connection with this Agreement, any materials provided by Company to Contractor in performing Services under this Agreement or any of the representations, warranties, covenants, duties or obligations of Company under this Agreement; provided, however, that Company shall not be obligated to indemnify Contractor with respect to Claims due to the negligence or willful misconduct of Contractor.

**7.2. Indemnification Procedures.** The indemnified party will notify the indemnifying party promptly in writing of any Claim of which it becomes aware. The indemnified party may designate its counsel of choice to defend such Claim at the sole expense of the indemnifying party and/or its insurer(s). The indemnifying party may, at its own expense participate in the defense. In any event, (a) the indemnifying party shall keep the indemnified party informed of, and shall consult with the indemnified party in connection with, the progress of any investigation, defense or settlement, and (b) the indemnifying party shall not have any right to, and shall not without the indemnified party's prior written consent (which consent will be in its sole and absolute discretion), settle or compromise any claim if such settlement or compromise (i) would require any admission or acknowledgment of wrongdoing or culpability by the indemnified party or any Indemnitee, or (ii) provide for any non-monetary relief to any person or entity to be performed by the indemnified party or any Indemnitee.

**7.3. Survival.** The obligations described in this Section 7 shall survive the termination/expiration of this Agreement.

**8. INSURANCE**

**8.1.** Upon execution of this Agreement, Contractor shall at its own expense procure the following insurance coverage for the benefit and protection of Company and Contractor, which insurance coverage shall be maintained in full force and effect until all of the Services are completed and accepted for final payment:

8.1.1    A Commercial General Liability Insurance Policy with a limit of not less than $3 million per occurrence and $3 million in the aggregate and a Business Automobile Liability Policy (including owned, non-owned, and hired vehicles) with a combined single limit of not less than $1 million, both policies providing coverage for bodily injury, personal injury and property damage for the mutual interest of both Company and Contractor with respect to all operations;

8.1.2    An Umbrella or Following Form Excess Liability Insurance policy will be acceptable to achieve the above required liability limits; and

8.1.3    Workers' Compensation Insurance with statutory limits to include Employer's Liability with a limit of not less than $1 million.

**8.2.** The policies referenced in the foregoing clauses 8.1.1 and 8.1.2 shall name Company as an additional insured by endorsement with respect to the Services provided hereunder. The policies referenced in the foregoing clauses 8.1.1, 8.1.2 and 8.1.3 shall contain a severability of interest clause, provide a Waiver of Subrogation on behalf of the Affiliated Companies, and shall be primary insurance in place and stead of any insurance maintained by Company unless Company is found to be at fault. Contractor shall maintain such insurance in effect until all of the Services hereunder are completed and accepted for final payment.

**8.3.** Contractor agrees to deliver to Company upon request after execution of this Agreement original Certificates of Insurance and endorsements evidencing the insurance coverage herein required.

**9. TERM,    TERMINATION    AND CANCELLATION**

**9.1. Term.** This Agreement shall commence on the Effective Date and thereafter shall remain in effect (unless and until terminated as set forth in this Section 9) until June 1, 2019 (the "**Term**").

**9.2. Termination.** This Agreement may be terminated forthwith by either party upon the occurrence of any of the following, by the terminating party giving written notice to the other party by registered or certified mail, return receipt requested, in which event this Agreement shall terminate on the date set forth in such notice. The date of mailing said written notice shall be deemed the date on which notice of termination of this Agreement shall have been given.

(i)    The other party commits any act of fraud, gross negligence or willful misconduct in connection with their performance of this Agreement;

(ii)    If any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceedings under any law for the relief of debtors shall be instituted by the other party, or if such a proceeding is brought involuntarily against the other party and is not dismissed within a period of 30 days from the date filed, or if the other party shall make an assignment for the benefit of creditors;

(iii)    A material breach by the other party of any of the terms of this Agreement, including (without

4

limitation) non-payment by Company, which breach is not remedied by the other party to the terminating party's reasonable satisfaction within fifteen (15) business days of the other party's receipt of notice of such breach from the terminating party by registered or certified mail, return receipt requested, or by Federal Express or other nationally recognized private overnight package/letter delivery service.

**9.3. Force Majeure.** In the event delay is caused by circumstances beyond either party's control, including but not limited to fire, strike, war, riots, acts of God, and/or acts of civil or military authority, the Term shall be extended to provide for such delay. Immediately upon such an occurrence, the parties shall begin discussions as to mutually acceptable adjustments to or alternate methods of proceeding with the affected Services, and the impact, if any, on project schedules. If any such delay continues for a period beyond thirty (30) days, and the parties are unable to agree to acceptable adjustments to or alternate methods of proceeding with the affected Services, then either party may request that the other party participate in discussions to establish mutually acceptable terms for the termination of any or all of the affected Services and/or this Agreement.

## 10. INDEPENDENT CONTRACTOR

It is understood and agreed that in performing the Services for Company hereunder, Contractor shall act in the capacity of an independent contractor and not as an employee, partner, joint venture or agent of Company. Contractor shall be solely responsible for the remuneration of and the payment of any and all taxes with respect to its employees and contractors and any claims with respect thereto and shall be solely responsible for the withholding and payment of all federal, state and local income taxes as well as all FICA and FUTA taxes applicable to it, its employees, and its contractors. Contractor acknowledges that as an independent contractor, neither it nor any of its employees or contractors shall be eligible for any Company employee benefits, including, but not limited to, vacation, medical, dental or pension benefits.

## 11. LIMITATION OF LIABILITY

Under no circumstances shall either party be liable to the other for any special, indirect or consequential loss or damage whether or not such loss or damage is caused by the fault or negligence of such party, its employees, agents or contractors and whether or not the parties have been apprised of the possibility of such losses or damages. This exclusion of liability for special, indirect or consequential loss or damage is intended to apply to damage or loss of a "commercial" nature such as, but not limited to, loss of profits or revenue, cost of capital, loss

of use of equipment or facilities, or claims of customers due to loss of service.

## 12. NOTICES

To be effective, all notices relating to this Agreement are to be sent by certified or registered mail, postage prepaid and return receipt requested (effective three (3) business days after postmark date), or delivered personally (effective upon receipt), or sent by nationally recognized overnight delivery service (effective one (1) business day after delivery to such delivery service), or by confirmed telecopy/facsimile (effective upon receipt), to the respective addresses set forth in the opening paragraph hereof or to such other addresses as either party shall designate by notice given as aforesaid.

## 13. Intentionally Omitted.

## 14. GENERAL

**14.1.  Observance of Company Policies.**  In the event that Contractor's employees are working on the premises of Company, said Contractor's employees shall observe the working hours, working rules, safety and security procedures established by Company and for which Contractor's employees are informed of such.

**14.2.    Assignment.**    This Agreement, each attachment and each and every portion thereof, shall be binding upon the successors and assigns of the parties hereto; provided that no right or interest in this Agreement shall be assigned by either party without the prior written permission of the other party, and no delegation of the obligations owed by either party shall be made without the prior written consent of the other party.

**14.3. Waiver.**  Either party's waiver of any breach or failure to enforce any of the terms and conditions of this Agreement at any time shall not in any way affect, limit or waive such party's right thereafter to enforce and compel strict compliance with every term and condition thereof.

**14.4.  Governing Law; Arbitration.**
THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS MADE AND PERFORMED ENTIRELY IN TEXAS SHALL GOVERN (i) THE VALIDITY AND INTERPRETATION OF THIS AGREEMENT, (ii) THE PERFORMANCE BY THE PARTIES OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER, AND (iii) ALL OTHER CAUSES OF ACTION (WHETHER SOUNDING IN CONTRACT OR IN

TORT) ARISING OUT OF OR RELATING TO THIS AGREEMENT (OR CONTRACTOR'S ENGAGEMENT AND/OR SERVICES HEREUNDER) OR THE TERMINATION OF THIS AGREEMENT (OR OF CONTRACTOR'S ENGAGEMENT AND/OR SERVICES).

**14.5.    Severability**.    In case any term of this Agreement shall be held invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other term shall be in any way affected thereby.

**14.6. Remedies Cumulative**. All remedies provided herein are cumulative and not exclusive of any remedies provided by law or equity.

**14.7.    Survival**.    Except as otherwise provided herein, the rights and obligations of the parties hereto shall survive any termination of this Agreement.

**14.8.    Compliance with Law**.    Contractor will comply with all statutes, ordinances, and regulations of all federal, state, county and municipal or local governments within the United States, and of any and all of the departments and bureaus thereof, applicable to the carrying on of its business and performance of the Services.

**14.9.    Complete Agreement; Amendment.**    This Agreement and the Exhibit constitute the complete agreement between the parties hereto and supersedes all prior communications and agreements between the parties with respect to the subject matter hereof and may not be modified or otherwise amended except by a further writing executed by both parties hereto, which writing makes specific reference to this Agreement.

**14.10.    Headings.**    The paragraph headings in this Agreement are solely for convenience of reference and shall not affect the interpretation of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto by their duly authorized representatives have executed this Agreement upon the date first set forth above.

**ANDERSON MERCHANDISERS, LLC**

By: _Bill Landis_

Print Name: _BILL LANDIS_

Title: _C.E.O._

**OUR ALCHEMY, LLC**

By: _____

Print Name: _____

Title: _____

(Signature Page to Merchandising Agreement)

LA 51871689

IN WITNESS WHEREOF, the parties hereto by their duly authorized representatives have executed this Agreement upon the date first set forth above.

ANDERSON MERCHANDISERS, LLC

By: _____

Print Name: _____

Title: _____

OUR ALCHEMY, LLC

By: _____

Print Name: ___Bill Lee_____

Title: ___CEO_____

(Signature Page to Merchandising Agreement)

LA 51871689

**EXHIBIT A**
**SERVICES AND FEES**

POS pricing per unit: $0.25 (base rate) plus "Reimbursement Fees" of $0.35 per Unit, but the Reimbursement Fees shall be payable from the Effective Date only until the earlier of (a) the Excess Payment Date or (b) the date that the Reimbursement Fees total $4,351,000.00 (the "Excess Payment Amount").

The services shall include the following:

The Anderson Merchandisers field team, in partnership with Walmart stores, is responsible for the stocking, zoning, and setting of the Movie department at Walmart.

Sales field execution is measured through the services provided by Anderson that include, but are not limited to:

- **FOS Fixture sets** – weekly set and service of product and promotions on the FOS fixture(s)
- **Corrugation sets** – negotiate and verify placement of all new and promotional studio distributed corrugation
- **Pricing placement**- ensure all pricing has been set and is correct and current
- **Inline and Outpost fixture sets** – weekly involvement and verification for all titles, signing, and tags are correctly set for outpost fixtures
- **New Store sets/reporting** – coordinate set times with store planning and management to ensure all product and signing get placed in new stores. Reporting helps open new stores 100% in stock by identifying missing titles
- **Stocking and title change outs** - assist store with daily stocking activities and verification that weekly modular title changes have been performed
- **Inventory Management** – help to identify/resolve inventory management opportunities that include efficient boxing of over overstock product, effective deletion returns, and sales/inventory opportunities by store
- **Movie returns**- assist the store with coordination and execution of all Walmart movie return initiatives
- **Signing and POP**- execution of studio and overall department signing and POP materials
- **Department 5 Manager/Associate Training** - work with and train the electronics associates to better serve customers and maintain modular integrity
- **Out of stock scanning** – Scan all true out of stocks (pocket at zero on hand); this enables the field team to help manage inventory by measuring scanned outs against the Walmart Physical Inventory
- **On-Hand Adjustment Review** - walk the department with D5 mgr to identify true out of stock titles. The Walmart physical inventory and on-hand adjustments are keys to store replenishment
- **Tuesday Service** - Visit all large format stores every Tuesday(or on such day as required by the retailer) to ensure all New Release product is on the sales floor and available to the customer. Prioritize corrugation and FOS Fixtures on these visits
- **New Release Placement** - help verify that the titles have been placed into the New Release modular each week and month (depending on the section of New Releases). New Release sections are updated every week/month and set to a new modular
- **Value Bin Clean outs**- assist store with value bin clean outs as necessary
- **Modular Sets** - three times a year: Anderson Merchandisers assists in a complete change-out of most DVD modular titles
- **Reporting** - survey questions will be provided along with reporting - DASH Project Tracking allows studios access to survey results via their account liaison. These reports enable Anderson to track weekly execution KPIs such things as: Front of Store placement, corrugate placement, other promotions, etc.
- **Excluded (but not limited to)**
  - one off signing,
  - stickers
  - non Tuesday street dates
  - overnight Blitzs,

**Non Video specific tasks include:**

- **Sign in and out of vendor log**
- **Communicate with all levels of store management**

**EXHIBIT 4**

| From: | Jim Jenkins |
|---|---|
| Sent: | Tuesday, November 10, 2015 6:07 PM CST |
| To: | Bill Lee; Mark A. Perez; Jesse C. Watson; Scott Guthrie |
| CC: | Olivia Lerner; Kelly Summers; Rex Bowring |
| Subject: | ANConnect legal approach / overview |
| Attachments: | Overview of Issues and Potential Actions regarding the ANconnect Agreements v2.docx |

Hello all,

Please see the attached summary of issues and recommendations.  Should we schedule a time tomorrow to discuss in more detail?

Thanks,

Jim

VIG0005636

## Overview of Issues and Potential Actions regarding the ANConnect Agreements

**Specific breaches by ANConnect**

There have been no material breaches of the APA itself, as all of the data issues we are experiencing relate to post close transactions which are only covered by the Transition Services Agreement.

The following breaches by ANConnect have occurred under the Transition Services Agreement:

From Exhibit A (Distribution & Returns Services):
- *"ANConnect will provide [physical logistics] services at present level of accuracy and timeliness as is being performed for all content suppliers prior to the conversion"*

From Exhibit B (Administrative Services)
- *"Financial record keeping (maintaining all transactional data required to generate Participation statements for 3PL suppliers and accurate balance sheets for Wholesale Suppliers)"*


**Real and Potential damages to Alchemy**

- Expedited freight incurred by Alchemy resulting from issues caused by ANConnect (in process of being quantified)

- Lost sales from missed shipments of certain titles by ANConnect (Difficult to estimate; can discuss a methodology)

- Potential loss of Content Suppliers

    o Vertical's threat to find another supplier resulting from the breaches noted above (We can estimate lost margin over the course of remaining term of agreement)


**Cap on damages in the Transition Services Agreement**

- Alchemy's ability to collect damages from ANConnect under the TSA is limited to:

    o Amounts fully and finally awarded (i.e., by a court of law or arbitrator) and

    o Capped at the greater of  "50% of the aggregate Fees paid under this Agreement; and (2) $1,000,000"

        ▪ Note: Total fees generated under Transition Services Agreement are ~$1.7M, however several components of that figure are under dispute.

        ▪ Note: the cap would include any recovery of attorneys' fees

**Thus, the cap on damages to be sought under the Transitions Services Agreement would be $1M.**

VIG0005743

**Key Points of Leverage**

**Positive points of leverage for Alchemy**
- Alchemy owes more to ANConnect than vice versa
  - ANConnect currently holds ~$5M in A/R that is ultimately due to Alchemy
  - Alchemy owes ANConnect in excess of $10M including the following items:
    - Working Capital Adjustment
    - Return Reserve Reconciliation
    - Amounts invoiced under Transition Services Agreement
    - Net balance of Alchemy Statement to ANConnect vs. ANConnect's A/P balance with Alchemy
    - Remaining SVOD receivable balance owed at close from Anderson Digital back to ANConnect
  - The resulting net balance is a large amount that Alchemy owes to ANConnect
- Alchemy no longer requires any of the Distribution and Returns Services under the Transition Services Agreement

**Negative points of leverage for Alchemy**
- Legal damages under Transition Services Agreement are capped at $1M
- Alchemy does not yet have complete and accurate data necessary to complete all Participations Statements and Wholesale Accounts Payable

**Potential Courses of Action & Priorities**

- The top priority remains getting the financial data Alchemy still requires
- With that data in house, all leverage points will be in our favor moving forward (save for the cap on damages)

Specific legal action around the loss of Content Suppliers or specific breaches in the TSA, will require Alchemy to spend legal fees in pursuit of a cap of $1M. There will be a significant cost to Alchemy to go through this as the indemnification clause specifically requires a legal ruling in Alchemy's favor in order to force a payment from ANConnect.

Taking any official legal position prior to receiving the data Alchemy requires could result in ANConnect *slowing down* the process of providing that data and refocusing their efforts on a legal response (and as stated above, this path has a very specific cap on financial upside to Alchemy)

Based on all of the above information as well as review with Sky and Olivia, my recommendation is as follows:

- Continue to work with ANConnect to get the financial data required
- Continue to prepare Alchemy's position of deductions (including damages) it believes to be appropriate based on the various breaches and performance issues
- Work within the timelines defined in the APA for resolution of the Working Capital and Returns Reserve reconciliations
- After receipt of all financial data needed for supplier statements, create a letter asserting the various deductions and damages that are not specifically accounted for in either the APA or TSA and propose a net settlement of all amounts owed between the parties (and negotiate a settlement from a position of leverage)

VIG0005744

**EXHIBIT 5**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
CASE NO. 16-11596-JTD


IN RE:  OUR ALCHEMY, LLC, et al.,
                    Debtors.


GEORGE L. MILLER, in his capacity as
Chapter 7 Trustee for the jointly
administered bankruptcy estates of
Our Alchemy, LLC and Anderson Digital, LLC,
                    Plaintiff,

            v.              ADV. PRO. NO. 18-50633-JTD
                            Related Doc. Nos. 171, 201
ANCONNECT, LLC, et al.,
                    Defendants.


                ------------
        Thursday, September 29, 2022
                ------------


            Oral sworn videotape deposition of JAY
R. MAIER, taken remotely via Zoom, on the above
date, commencing at 9:52 a.m., there being present:


            KAUFMAN, COREN & RESS, P.C.
            2001 Market Street, Suite 3900
            Philadelphia, PA  19103
            BY:  STEVEN M. COREN, ESQ.
                 ANDREW BELLI, ESQ.
            Attorneys for Plaintiff


                    - - - - - -


                TATE & TATE
            Certified Court Reporters
            520 Stokes Road - Suite C-1
            Medford, New Jersey 08055
        (856) 983-8484 - (800) 636-8283
                www.tate-tate.com

USBC, District of Delaware          In Re:  Our Alchemy, LLC, et al., Debtors                    Thursday
No. 16-11596-JTD                    Videotape Deposition of Jay R. Maier                 September 29, 2022

Page 16

1    the true-up?

2    **A.         Yes, sir.**

3    Q.         And what do you recall about that?

4    **A.         I mean, I've seen several different**

5    **documents that summarize the parties' calculation of**

6    **those true-up amounts.**

7    Q.         And do you recall what the ultimate true-up

8    amount was?  It's not a memory test.  We're going to

9    look at the documents.  I'm just wondering if you

10   happen to know off the --

11   **A.         Well, no, there's, I mean, like I said,**

12   **there's three or four major balance sheet**

13   **adjustments and there's several other adjustments**

14   **relating to that true-up.**

15   Q.         Fair enough.  We'll look at some papers on

16   that and hopefully we can answer that question.

17              So, that's -- this is Trustee Exhibit 3.

18   Let's turn to Trustee Exhibit 4 entitled

19   Merchandising Agreement.

20                   (Exhibit Trustee-4, Merchandising

21   agreement, July 9, 2015, was marked for

22   identification.)

23   Q.         And this is an agreement between Our

24   Alchemy, LLC, and Anderson Merchandisers, LLC; is

25   that correct?

USBC, District of Delaware
No. 16-11596-JTD

In Re:  Our Alchemy, LLC, et al., Debtors
Videotape Deposition of Jay R. Maier

Thursday
September 29, 2022

Page 22

1   Do you see that reference?

2   **A.       I do.**

3   Q.       And is that $3.2 million figure in fact the

4   true-up that we talked about earlier?

5   **A.       Well, as we talked about earlier, that's**

6   **one of several items that went into the calculation**

7   **referenced in paragraph 43 where there's a net**

8   **amount due of $10,840,011.**

9   Q.       Well, is it fair to say the amount would

10  have been -- the amount, but for that true-up, would

11  have been another $3.2 million and change; is that

12  right?

13              **MR. HUNGELING:**  Objection to form.

14  **A.       Again, if one didn't have that offset, the**

15  **amount would be, of paragraph 43, would be, to your**

16  **point, $14 million, yeah.**

17  Q.       Okay.  So, when focusing just on the

18  true-up under that particular paragraph and no other

19  obligations under the agreement, the true-up amount

20  was the $3.2 million figure referred to in footnote

21  2; is that correct?

22              **MR. HUNGELING:**  Objection to form.

23  **A.       No, as we talked about, the true-up would**

24  **be the $14 million.**

25  Q.       Well, the 3.2 is the post-closing

Page 23

1  adjustment under section 2.06(a)(iv) that ANConnect

2  owed to Alchemy; is that correct?

3  **A.        That is one of several different**

4  **adjustments going back to section 2.06 of the APA.**

5  Q.        Let's turn to paragraph 67 of that

6  complaint.  Now, paragraph 67 provides that "under

7  the transition services agreement, ANConnect has

8  collected receivables from Walmart/Sam's Club, Best

9  Buy and Ingram on behalf of Alchemy and has remitted

10  a portion of those amounts to Alchemy by wire

11  transfer."  Do you see that reference?

12  **A.        Yes, sir.**

13  Q.        Now, it indicates that Alchemy -- that

14  ANConnect has withheld $6,047,325 and it provides

15  here as an equitable setoff for amounts due and

16  owing to ANConnect under its various agreements with

17  Alchemy.  Did I get that, I get that right?

18  **A.        Well, I mean, I can read it.  The point is**

19  **is that Alchemy has already gotten benefit, I think**

20  **it was over $4 million of physical products that**

21  **were returned post-closing that it could then take**

22  **against its (audio lost).**

23  Q.        We lost you there.  Sound went -- say that

24  again.  We couldn't hear you.

25              **MR. HUNGELING:**  How about you re-ask

USBC, District of Delaware
No. 16-11596-JTD

In Re: Our Alchemy, LLC, et al., Debtors
Videotape Deposition of Jay R. Maier

Thursday
September 29, 2022

Page 36

1   Q.       And what was John Campbell's position?

2   **A.       John was the chief financial officer for**

3   **Anderson Merchandisers at that time.**

4   Q.       And you wrote, "John, please invoice

5   ANConnect $3.2 million regarding merchandising

6   services rendered to Alchemy."  What did you

7   understand that direction to be?

8   **A.       Well, that Anderson Merchandisers had not**

9   **been paid for the merchandising services it had**

10  **rendered to Alchemy post-closing.  We were not going**

11  **to permit Anderson Merchandisers to take a loss.  It**

12  **had been indemnified for that loss by ANConnect**

13  **because those merchandising services were part of a**

14  **transaction that ANConnect had entered into with Our**

15  **Alchemy.**

16  Q.       All right.  So, then you continue on,

17  "Chuck, please have ANConnect pay Amerch," that's

18  Anderson Merchandisers, "this invoice."  Is that

19  right?

20  **A.       Yes, that's what it says.**

21  Q.       And then you wrote, "This relates to the

22  offset that Alchemy took via an element to the

23  post-closing adjustments with ANConnect."  What were

24  you saying there?

25  **A.       Just that, that Our Alchemy did not pay**

USBC, District of Delaware          In Re:  Our Alchemy, LLC, et al., Debtors                    Thursday
No. 16-11596-JTD                      Videotape Deposition of Jay R. Maier                    September 29, 2022

Page 40

1    Q.        Okay.  Can you tell me what the terms of --

2    so, strike that.

3              Is there an oral indemnification agreement

4    of which you're aware?

5    **A.        Yes, sir.**

6    Q.        And can you tell me when that agreement was

7    reached?

8    **A.        Generally after Alchemy didn't pay Anderson**

9    **Merchandisers, it was understood that Anderson**

10   **Merchandisers would still perform those services**

11   **while ANConnect and Alchemy worked through some of**

12   **these post-closing issues.**

13   Q.        Okay.  Who, who was it on behalf of

14   ANConnect that entered into this agreement and when?

15   **A.        It would be with Scott McDaniel, Bill**

16   **Lardie, Charlie Anderson and myself.**

17   Q.        All right.  Were you -- was this agreement

18   entered into in person?  I mean, were people sitting

19   around and saying I agree to this and I agree to

20   that on behalf of these companies?

21   **A.        There's really not -- there's not a bunch**

22   **of people sitting around making that decision.  I**

23   **think the decision was reached with Scott**

24   **complaining that he wasn't getting paid; Charlie and**

25   **I would speak about that and say, okay, this is, you**

USBC, District of Delaware          In Re:  Our Alchemy, LLC, et al., Debtors                    Thursday
No. 16-11596-JTD                    Videotape Deposition of Jay R. Maier            September 29, 2022

Page 41

1    **know, this isn't right.  Amerch never tried to**

2    **curtail those services going back to Walmart because**

3    **it knew it was going to get paid through its sister**

4    **company.**

5    Q.       I see.  You say it knew.  Were you present

6    in any meeting or conversation where an

7    indemnification agreement was reached between

8    ANConnect and Merchandisers, were you there when

9    that agreement was formed?

10   **A.       I was there with the discussion with**

11   **Charlie that that's how it would happen.  I mean, so**

12   **there's, there's really not Bill Lardie and Scott**

13   **negotiating.  This was just a decision that was**

14   **reached by Charlie Anderson and communicated to him.**

15   **How it was communicated, again, everyone understood**

16   **that was -- that's how we're going to do it.**

17   Q.       Right.  Were you there when the agreement

18   was reached?

19   **A.       I was with Charlie when we talked about it,**

20   **you know, because I had knowledge of it, but like I**

21   **said, it wasn't formally written and so I can't go**

22   **back and tell you the date, the time that it was**

23   **entered into.**

24   Q.       Can you tell me the terms of the agreement,

25   the oral agreement?

Page 42

1    A.        Just that, you know, we had launched

2    Anderson Merchandisers basically as a new business,

3    as a greenfield startup, and we weren't going to let

4    that business be adversely affected by a transaction

5    its sister company created.

6    Q.        And when you say Charlie, that's Charlie

7    Anderson?

8    A.        Yes, sir.

9    Q.        And he is at the top of the pyramid of all

10   the Anderson companies?

11   A.        His last name is Anderson.  He's at the

12   top.

13   Q.        All right.  Can you tell me anything --

14   A.        David --

15   Q.        I'm sorry.

16   A.        I'm sorry.  When we get off this topic, I

17   want to go back to something we talked about

18   earlier, but let's finish this.  I'm sorry.

19   Q.        Can you tell me anything more about this

20   indemnification agreement?

21   A.        Not offhand, no.

22   Q.        I'm sorry.  You had something else you

23   wanted to talk about.

24   A.        Well, earlier we spoke about whether $8

25   million or $6 million plus was withheld in cash, and

**EXHIBIT 6**

EFiled: Feb 23 2016 04:16PM EST
Transaction ID 58617244
Case No. N16C-02-152 WCC CCLD

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| ANCONNECT, LLC, and ANDERSON MERCHANDISERS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> OUR ALCHEMY, LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. _____-\_\_\_\_ [CCLD] <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

**YOU ARE IN POSSESSION OF A DOCUMENT FILED IN THE SUPERIOR COURT OF DELAWARE THAT IS CONFIDENTIAL AND FILED UNDER SEAL.**

**If you are not authorized by Court order to view or retrieve this document read no further than this page. You should contact the following person:**

Douglas D. Herrmann (Del. Bar No. 4872)
Christopher B. Chuff (Del. Bar No. 5729)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street, PO Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
*herrmand@pepperlaw.com*
*chuffc@pepperlaw.com*

*Attorneys for Plaintiffs ANconnect, LLC and
Anderson Merchandisers, LLC*

Dated: February 17, 2016

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

|  |  |  |
|---|---|---|
| ANCONNECT, LLC, and ANDERSON MERCHANDISERS, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. _____-\_\_\_\_  [CCLD] |
| v. | ) ) | |
| OUR ALCHEMY, LLC, | ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

ANconnect, LLC ("ANconnect"), and Anderson Merchandisers, LLC ("Anderson") (collectively, "Plaintiffs"), by and through their undersigned counsel, file Plaintiffs' Complaint (the "Complaint") against Defendant, Our Alchemy, LLC ("Alchemy").  Plaintiffs allege, upon information and belief, as follows:

### INTRODUCTION

1.    ANconnect is the physical distribution arm of Anderson Media Corporation.   On May 7, 2015, ANconnect entered into an Asset Purchase Agreement ("Purchase Agreement") with Alchemy, an independent film and television distributor, whereby Alchemy agreed to purchase and assume from ANconnect certain assets and liabilities of ANconnect's business consisting of home video and digital distribution of motion pictures and other audiovisual media

1

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

in and throughout the United States.  The parties agreed on an aggregate purchase price subject to certain closing and post-closing adjustments pursuant to sections 2.05 and 2.06 of the Purchase Agreement, and the assumption by Alchemy of specified liabilities.

2.     The parties later executed two amendments to the Purchase Agreement: Amendment No. 1, dated May 29, 2015, and Amendment No. 2, dated July 9, 2015.

3.     In connection with the Purchase Agreement, ANconnect and Alchemy entered into a Transition Services Agreement, dated July 9, 2015, whereby ANconnect agreed to provide Alchemy with specified distribution and returns transition services, including warehousing, order fulfillment, freight management to customers, price stickering, and returns processing, as well as other administrative services.  Alchemy agreed to pay weekly fees and charges for ANconnect's transition services.

4.     In connection with the Purchase Agreement, Alchemy also entered into a Merchandising Agreement with Anderson, dated July 9, 2015, whereby Alchemy engaged Anderson to perform certain merchandising services, including but not limited to, stocking, zoning, and setting of the movie department at Walmart stores. The parties agreed that Anderson would submit monthly invoices to Alchemy, which would be payable within thirty (30) days of receipt.

2

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

5.      The ANconnect-Alchemy transaction was finalized and closed on July 9, 2015.

6.      Since that time, Alchemy has failed to perform numerous obligations under the Purchase Agreement, the Transition Services Agreement, and the Merchandising Agreement.  Alchemy has also failed to compensate ANconnect for various other services rendered in connection with the ANconnect-Alchemy transaction.  As a result, Alchemy currently owes Plaintiffs a net amount of not less than **$9,023,611.00**.[1]  Plaintiffs bring this action to recover the amounts rightfully due to them under the parties' agreements.

## PARTIES

7.      Plaintiff ANconnect, LLC is a Texas limited liability company with its principal place of business at 421 SE 34th Street, Amarillo, Texas 79103.

8.      Plaintiff Anderson Merchandisers, LLC is a Delaware limited liability company with its principal place of business at 5601 Granite Parkway, Suite 1400, Plano, Texas 75024.

9.      Defendant Our Alchemy, LLC is a Delaware limited liability company with its principal place of business at 5900 Wilshire Boulevard, Floor 18, Los Angeles, California 90036.

---

[1] This net amount reflects an equitable setoff of $6,047,325.00 owed to Alchemy under the Transition Services Agreement.  In total, Alchemy owes Plaintiffs an aggregate amount of  $15,070,936.00 under the parties' various agreements.

3

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

## JURISDICTION, VENUE & GOVERNING LAW

10.    Jurisdiction and venue in this Court are proper because the Purchase Agreement contains a forum-selection clause whereby the parties expressly agree that the state and federal courts located in Delaware shall have exclusive jurisdiction over any legal suit, action, or proceeding arising out of or based upon the Purchase Agreement or other transaction documents, including the Transition Services Agreement and the Merchandising Agreement. *See* Ex. A, Purchase Agreement § 10.10(b). Further, the amount in controversy exceeds $1 million.

11.    According to the Purchase Agreement and the Transition Services Agreement, the Purchase Agreement, the Transition Services Agreement, and any claims arising thereunder, shall be governed, construed, interpreted and enforced in accordance with the substantive laws of the State of Delaware. *See* Ex. A, Purchase Agreement § 10.10(a); Ex. B, Transition Services Agreement § 23 (incorporating the provisions of Section 10.10(a) of the Purchase Agreement).

12.    According to the Merchandising Agreement, the validity and interpretation of the Merchandising Agreement, the performance of the parties and their respective obligations, and any claims arising thereunder, shall be governed and construed in accordance with the substantive laws of the State of Texas. *See* Ex. C, Merchandising Agreement § 14.4.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

## FACTUAL ALLEGATIONS

13.    Alchemy has breached the Purchase Agreement, Transition Services Agreement, and Merchandising Agreement, and has failed to pay for other services provided by ANconnect.  As set forth herein, Alchemy has caused and continues to cause Plaintiffs to suffer direct and consequential damages.

**FIRST, ALCHEMY HAS FAILED TO PERFORM OBLIGATIONS UNDER THE PURCHASE AGREEMENT AND AMENDMENTS THERETO.**

14.    Under the Purchase Agreement, ANconnect and Alchemy agreed that the original purchase price would be adjusted pursuant to Sections 2.05 and 2.06. Ex. A, Purchase Agreement § 2.05.  However, as detailed below, Alchemy has failed to pay certain post-closing adjustments.

15.    Section 2.06(a)(i) provides (in part):

> To the extent that the sum of the Content Owners Gross Due balances set forth on the Closing Balance Sheet for the 3PL Business exceeds such amount as set forth on the Estimated Balance Sheet for the 3PL Business, Seller shall pay the amount of such excess to Buyer in accordance with Section 2.06(b)(iv).  Solely by way of illustration, if the Estimated Balance Sheet reflected a Content Owners Gross Due Balance of $1,000,000 and the Closing Balance Sheet reflected a Content Owners Gross Due Balance of $1,200,000, then Seller shall owe Buyer $200,000. **To the extent that the sum of the Content Owners Gross Due balances set forth on the Closing Balance Sheet for the 3PL Business is less than such amount as set forth on the Estimated Balance Sheet for the 3PL Business, Buyer [Alchemy] shall pay the amount of such shortfall to Seller [ANconnect] in accordance with Section 2.06(b)(iv)** . . . .

(emphasis added).

5

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

16.     Sections 2.06(b)(i)-(ii) provide (in part):

**(b) Examination and Review; Disputes; Adjustment Payments.**

> (i) After receipt of (A) the Closing Balance Sheets, (B) the Product Return A/R Statement for each of Walmart, Sam's Club, and Best Buy, and (C) the Magnolia Inventory Statement, Buyer shall have thirty (30) days (each such period, a "**Review Period**") to review such Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable. . . .

> (ii) On or prior to the last day of the applicable Review Period, Buyer may object to the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, by delivering to Seller a written statement setting forth Buyer's objections in reasonable detail, indicating each disputed item or amount and the basis for Buyer's disagreement therewith (each such statement, a "Statement of Objections"). **If Buyer [Alchemy] fails to deliver the applicable Statement of Objections before the expiration of the applicable Review Period, the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, and the Purchase Price adjustments determined pursuant to Section 2.06(a) based on the Closing Balance Sheets, Product Return A/R Statement, and/or Magnolia Inventory Statement, as applicable, *shall be deemed to have been accepted by Buyer*. . . .**

(emphasis added).

17.     Alchemy never objected to the sum of the Content Owners Gross Due balances as set forth on the Closing Balance Sheet for the 3PL Business, which was **$4,685,941.00** *less* than such amount as set forth on the Estimated Balance Sheet for the 3PL Business. *Compare* Ex. A, Purchase Agreement, Ex. A, *with* Ex. D, Closing Balance Sheet for the 3PL Business. However, Alchemy never paid

6

this amount to ANconnect, as required under Section 2.06(a)(i).

18.    Section 2.05(a)(i)(B) provides:

At the Closing, the Purchase Price shall be increased by $3,201,982.00, $102,429.00 and $500,000.00, representing the respective estimated values of Walmart/Sam's Club, Best Buy, and Ingram product returns (valued based on "dealer cost" charged to the applicable Retailer), computed as set forth in Exhibit I, credited against Seller's Accounts Receivable from Walmart/Sam's Club, Best Buy, and Ingram, respectively, for the 3PL Business as of the Closing Date (each such amount, the "**3PL Product Return A/R**" with respect to the applicable Retailer). ***The Purchase Price adjustments contemplated by this Section 2.05(a)(i)(B) shall be subject to further adjustment after the Closing as set forth in Section 2.06.***

(emphasis added).

19.    Section 2.05(a)(ii)(B) provides:

At the Closing, the Purchase Price shall be increased by $4,033,429.00 and $1,058,479.00, representing the respective estimated values of Walmart/Sam's Club and Best Buy product returns (valued based on "dealer cost" charged to the applicable Retailer), computed as set forth in Exhibit I, credited against Seller's Accounts Receivable from Walmart/Sam's Club and Best Buy, respectively, as of the Closing Date for the Wholesale Business (each such amount, the "**Wholesale Product Return A/R**" with respect to the applicable Retailer). ***The Purchase Price adjustments contemplated by this Section 2.05(a)(ii)(B) shall be subject to further adjustment after the Closing as set forth in Section 2.06.***

(emphasis added).

20.    Section 2.06(a)(ii) provides (in part):

Within thirty (30) days following the Vendor Effective Date for a given Retailer, Seller shall prepare and deliver to Buyer a statement setting forth its calculation of the actual amount of 3PL Product Return A/R and Wholesale Product Return A/R from each such Retailer for the period between the Closing Date and the applicable

7

Vendor Effective Date (each such statement, the "**Product Return A/R Statement**" with respect to the applicable Retailer). **Should the actual combined 3PL Product Return A/R and Wholesale Product Return A/R from such Retailer set forth on the Product Return A/R Statement for such Retailer exceed the aggregate of the estimated amounts set forth in Section 2.05(a)(i)(B) and Section 2.05(a)(ii)(B), respectively, for such Retailer, Buyer [Alchemy] shall pay the amount of such excess to Seller [ANconnect] in accordance with Section 2.06(b)(iv).** . . .

(emphasis added).

21.    Although Alchemy representatives raised questions during an e-mail exchange with ANconnect, Alchemy never formally objected to the actual combined 3PL Product Return A/R and Wholesale Product Return A/R as set forth on the Combined Product Return A/R Statement in accordance with Sections 2.06(b)(i)-(ii), which *exceeded* the aggregate estimated amounts set forth in Sections 2.05(a)(i)(B) and 2.05(a)(ii)(B) by **$4,422,675.00**.  *Compare* Ex. A, Purchase Agreement §§ 2.05(a)(i)(B), 2.05(a)(ii)(B), *with* Ex. E, Combined Product Return A/R Statement.   But, Alchemy never paid this amount to ANconnect, as required under Sections 2.05(a)(i)(B), 2.05(a)(ii)(B), and 2.06(a)(ii).

22.    Section 2.06(d) provides:

**(d) Millennium Receivable**. Buyer shall pay the gross amount owed by it, as successor to Millennium Media Services, Inc., on the Closing Date to Seller without regard to deferrals for collection of accounts receivable or future product returns. Such amount shall be offset by amounts owed by Seller to Buyer. At the Closing, the parties shall estimate the amount of such payment, with such estimate to be trued

8

up in the Closing Balance Sheet for the Wholesale Business. Buyer's payment shall be made in accordance with the payment schedule set forth on Exhibit H.

23.     After closing, Alchemy delivered to ANconnect a final statement summary, which reflects a balance payable to ANconnect of $4,850,622.50 for the gross amount owed by it, as successor to Millennium Media Services, Inc. *See* Ex. F, Alchemy Statement Summary. Pursuant to Section 2.06(d), ANconnect offset this amount by $1,691,337.00 owed by ANconnect to Alchemy, as reflected on the Closing Balance Sheet for the Wholesale Business, resulting in a net amount of **$3,159,285.50** due to ANconnect. *See* Ex. F, Alchemy Statement Summary; Ex. G, Closing Balance Sheet for the Wholesale Business. Pursuant to the payment schedule set forth in Exhibit H, Alchemy was required to pay this amount within 120 days after closing. But, as of the date of this Complaint, Alchemy has made no payments to satisfy its obligation.

24.     On July 9, 2015, ANconnect and Alchemy executed Amendment No. 2, which added a new Section 2.06(f) to the Purchase Agreement. *See* Ex. H, Amendment No. 2 § 1(c). Section 2.06(f) provides:

> **Anderson Digital Receivable**. Buyer [Alchemy] shall cause Anderson Digital to pay the receivable in the amount of $1,450,924.92 owed by Anderson Digital, on the Closing Date to Seller [ANconnect] in twelve equal monthly installments beginning on the first day of the month following the Closing Date.

25.     Alchemy's first monthly installment was due on August 1, 2015.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

However, Alchemy has made no monthly payments, and, as of the date of this Complaint, is currently six months past due.  The amount currently outstanding is **$725,462.46**.

26.    Under Section 2.03(d), Alchemy assumed and agreed to pay, perform, and discharge certain liabilities of ANconnect, including "all liabilities constituting, or arising in connection with, accounts payable and Gross Due Content Owner relating to the Business" of certain parties set forth in Exhibits A and B.  *See* Ex. A, Purchase Agreement § 2.03(d).

27.    Despite the fact that Alchemy assumed the obligation to pay, ANconnect has paid a total of **$1,054,961.03** in wholesale amounts to the following vendors:

| | |
|---|---|
| Sony Music Entertainment | $415,245.00 |
| WEA Corp. | $264,424.00 |
| E1 Entertainment | $79,374.00 |
| IMT Records | $955.00 |
| Capital Christian Distribution | $294,657.00 |
| Covenant Communications | $306.03 |

Ex. I, Receipts of Wholesale Amounts Paid by ANconnect.  Alchemy was obligated to pay these amounts under Section 2.03(d), but never did.

**SECOND, ALCHEMY HAS FAILED TO PAY FOR SERVICES UNDER THE TRANSITION SERVICES AGREEMENT.**

28.    Under the Transition Services Agreement, ANconnect agreed to

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

provide Alchemy with specified distribution and returns transition services and other administrative services.  *See* Ex. B, Transition Services Agreement § 2. Alchemy agreed to pay for these services in accordance with Section 3 of the Transition Services Agreement, which provides:

Compensation for Transition Services.

(a) For Distribution and Returns Transition Services, Buyer shall pay Seller weekly fees and charges according to Seller's Rate Card as set forth on Exhibit A.

(b) For Administrative Services, Buyer shall pre-pay Seller on a weekly basis the fees as set forth on Exhibit B.

(c) The total costs and reimbursements set forth in Sections 3(a) and (b) hereof shall be referred to as the "Transition Service Fees."

29.    Alchemy has failed to compensate ANconnect for its transition services.  Specifically, Alchemy has failed to pay weekly fees for distribution and returns transition services in accordance with Section 3(a) and Exhibit A, and currently owes ANconnect **$844,815.55**.    *See*  Ex.  B,  Transition  Services Agreement, Ex. A; Ex. J, Summary and Invoices for Distribution and Returns Services.

30.    Alchemy has also failed to pre-pay weekly administrative fees in accordance with Section 3(a) and Exhibit B; thus, Alchemy currently owes ANconnect **$376,768.00**. *See* Ex. K, Invoices for Administrative Fees.

31.    Section 17 provides:

11

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

Dispute Resolution. If a dispute arises between the Parties under this Agreement, the Parties will use reasonable efforts to settle such dispute at an operational level. If such dispute cannot be resolved at the operational level within a period of 10 days, then it will be referred to Bill Lardie of Seller and Bill Lee of Buyer (together, the "Dispute Resolution Parties") for resolution within a further period of 10 days. If any dispute shall not be resolved in accordance with the above, the Parties may resort to such other dispute resolution remedies as may be available under applicable law.

32.    The parties have used reasonable efforts to settle their disputes at the operational level.    Since October, 2015, representatives of ANconnect and Alchemy, including Bill Lardie of ANconnect and Bill Lee of Alchemy (later replaced by Scott Guthrie), have engaged in on-going communications regarding past-due amounts and disputes under the Transition Services Agreement. However, as of the date of this Complaint, the parties have been unable to resolve their disputes.

**THIRD, ALCHEMY HAS FAILED TO PAY FOR SERVICES UNDER THE MERCHANDISING AGREEMENT.**

33.    Under the Merchandising Agreement, Alchemy engaged Anderson to perform certain merchandising services.    *See* Ex. C, Merchandising Agreement § 1.1, Ex. A.    The parties agreed that Anderson would submit monthly invoices to Alchemy, which would be payable within thirty (30) days of receipt.    *See* Ex. C, Merchandising Agreement § 2.5.

34.    Alchemy has failed to make monthly payments as required by Section 2.5.    As of the date of this Complaint, ten (10) monthly invoices are past due,

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

totaling an amount not less than **$2,267,327.13**.   *See* Ex. L, Invoices for Merchandising Services.   Additionally, Alchemy has yet to pay the most recent invoice for **$236,815.20**, which is due on February 28, 2016.   *See* Ex. L, Invoices for Merchandising Services.

**FOURTH, ALCHEMY HAS FAILED TO REIMBURSE ANCONNECT AND PAY FOR OTHER SERVICES RENDERED BY ANCONNECT.**

35.    In February, 2015, Jim Jenkins of Alchemy and Chuck Taylor of ANconnect agreed that the parties would engage Ansarada Pty Limited ("Ansarada"), a third-party vendor, to set up a data room for Alchemy, and that Alchemy would reimburse ANconnect for any fees it incurred in the process. ANconnect ultimately paid Ansarada **$18,107.00** in data room fees, expecting to be reimbursed by Alchemy per the parties' agreement.   *See* Ex. M, Invoices for Data Room Usage.   Although ANconnect invoiced Alchemy for the data room fees, Alchemy has neither disputed the charges nor reimbursed ANconnect for the charges.

36.    In late December, 2015 and early January, Alchemy engaged ANconnect to perform services in Denton, Texas to oversticker existing Universal Product Codes on certain Dreamworks titles prior to shipping a liquidation order. ANconnect overstickered 131,742 units at its standard rate of $0.08 per unit.   *See* Ex. N, Invoice for Classic-Dreamworks Oversticker Service.   However, Alchemy has failed to compensate ANconnect for its services, and currently owes

13

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

**$10,539.36** in outstanding fees—an amount which Alchemy has not disputed. *See* Ex. N, Invoice for Classic-Dreamworks Oversticker Service.

37.    In May 2015, per an agreement between Jim Jenkins and Chuck Taylor, Alchemy engaged ANconnect to perform inventory transfer services at a transfer rate of $0.04 per unit.   ANconnect transferred 11,913,819 units, resulting in an outstanding balance of **$476,552.76**.   *See* Ex. O, Invoice for Inventory Transfer Services.   Although ANconnect invoiced Alchemy for its inventory transfer services, Alchemy has not disputed the charges and, as of the date of this Complaint, has failed to make any payments.

## CAUSES OF ACTION

### COUNT 1: BREACH OF CONTRACT (PURCHASE AGREEMENT)

38.    Plaintiffs repeat and re-allege each allegation set forth herein.

39.    Under the Purchase Agreement, Alchemy was required to pay ANconnect certain post-closing adjustments in accordance with Sections 2.05(a)(i)(B), 2.05(a)(ii)(B), 2.06(a)(i), and 2.06(a)(ii).   Alchemy breached the Purchase Agreement by failing to pay these post-closing adjustments.

40.    Under the Purchase Agreement, Alchemy was required to pay to ANconnect the Millennium Receivable in accordance with Section 2.06(d) and the payment schedule set forth on Exhibit H.   Alchemy breached the Purchase Agreement by failing to make any payments to satisfy its obligation.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

41.    Under Amendment No. 2 to the Purchase Agreement, Alchemy was required to cause Anderson Digital to pay an amount of $1,450,924.92 to ANconnect in twelve equal monthly installments, in accordance with Section 2.06(f).    Alchemy breached the Purchase Agreement by failing to make any monthly payments.

42.    Under the Purchase Agreement, Alchemy was required to pay, perform, and discharge certain liabilities of ANconnect, in accordance with Section 2.03(d), including "all liabilities constituting, or arising in connection with, accounts payable and Gross Due Content Owner relating to the Business" of certain parties set forth in Exhibits A and B.    Alchemy breached the Purchase Agreement by failing to make required payments to the following vendors: Sony Music Entertainment, WEA Corp., E1 Entertainment, IMT Records, and Capital Christian Distribution, and Covenant Communications.    ANconnect made these payments instead.

43.    As a direct and proximate result of Alchemy's breaches of the Purchase Agreement, ANconnect has suffered damages in a net amount not less than **$10,840,011.00**.[2]

44.    All conditions precedent to ANconnect's claims for relief under the

---

[2] This net amount accounts for the $3,208,314 ANconnect owes Alchemy in post-closing adjustments per Section 2.06(a)(iv) of the Purchase Agreement. *See* Ex. A, Purchase Agreement, Ex. B; Ex. G, Closing Balance Sheet for the Wholesale Business.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

Purchase Agreement have been performed or have occurred.

## COUNT 2: BREACH OF CONTRACT (TRANSITION SERVICES AGREEMENT)

45.    Plaintiffs repeat and re-allege each allegation set forth herein.

46.    Under the Transition Services Agreement, Alchemy was required to compensate ANconnect for its transition services in accordance with Section 3 and Exhibits A and B.  Alchemy has breached the Transition Services Agreement by failing to pay weekly fees for ANconnect's distribution and returns transition services and administrative services.

47.    As a direct and proximate result of Alchemy's breaches of the Transition Services Agreement, ANconnect has suffered damages in an amount not less than **$1,221,583.55**.

48.    All conditions precedent to ANconnect's claims for relief under the Transition Services Agreement have been performed or have occurred.

## COUNT 3: BREACH OF CONTRACT (MERCHANDISING AGREEMENT)

49.    Plaintiffs repeat and re-allege each allegation set forth herein.

50.    Under the Merchandising Agreement, Alchemy was required to compensate Anderson for its merchandising services by making monthly payments in accordance with Section 2.5 and Exhibit A.  Alchemy breached the Merchandising Agreement by failing to make any monthly payments.

51.    As a direct and proximate result of Alchemy's breach of the

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

Merchandising Agreement, Anderson has suffered damages in an amount not less than **$2,504,142.33**.

52.    All conditions precedent to Anderson's claims for relief under the Merchandising Agreement have been performed or have occurred.

### COUNT 4: BREACH OF CONTRACT (FAILURE TO REIMBURSE DATA ROOM FEES)

53.    Plaintiffs repeat and re-allege each allegation set forth herein.

54.    Per an agreement between representatives of Alchemy and ANconnect, Alchemy agreed to reimburse ANconnect for any fees and costs incurred during the set-up and use of a data room.  ANconnect paid Ansarada—a third party vendor—for Alchemy's data room usage.   Alchemy breached the parties' agreement by failing to reimburse ANconnect for amounts paid to Ansarada.

55.    As a direct and proximate result of Alchemy's breach of the parties' agreement, ANconnect has suffered damages in an amount not less than **$18,107.00**.

56.    All conditions precedent to ANconnect's claim for relief under this agreement have been performed or have occurred.

### COUNT 5: BREACH OF CONTRACT (FAILURE TO PAY FOR OVERSTICKER SERVICES)

57.    Plaintiffs repeat and re-allege each allegation set forth herein.

58.    Alchemy engaged ANconnect to oversticker existing Universal

17

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

Product Codes on certain Dreamworks titles prior to shipping a liquidation order. ANconnect overstickered 131,742 units at its standard rate of $0.08 per unit. Alchemy breached the parties' agreement by failing to compensate ANconnect for its services.

59.   As a direct and proximate result of Alchemy's breach of the parties' agreement, ANconnect has suffered damages in an amount not less than **$10,539.36**.

60.   All conditions precedent to ANconnect's claim for relief under this agreement have been performed or have occurred.

## COUNT 6: BREACH OF CONTRACT (FAILURE TO PAY FOR INVENTORY TRANSFER SERVICES)

61.   Plaintiffs repeat and re-allege each allegation set forth herein.

62.   Per an agreement between representatives of Alchemy and ANconnect, Alchemy engaged ANconnect to perform inventory transfer services at a transfer rate of $0.04 per unit. ANconnect transferred 11,913,819 units, but Alchemy breached the parties' agreement by failing to compensate ANconnect for its services.

63.   As a direct and proximate result of Alchemy's breach of the parties' agreement, ANconnect has suffered damages in an amount not less than **$476,552.76**.

64.   All conditions precedent to ANconnect's claim for relief under this

18

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

agreement have been performed or have occurred.

## COUNT 7: EQUITABLE SETOFF

65.     Plaintiffs repeat and re-allege each allegation set forth herein.

66.     As reflected in Sections 2.05(a)(i)(B) and 2.05(a)(ii)(B) of the Purchase Agreement, the parties factored the respective estimated values of Walmart/Sam's Club, Best Buy, and Ingram product returns as an increase in the purchase price, subject to post-closing adjustments because such retailers would deduct amounts for product returns from amounts otherwise owed to ANconnect following the closing.   The actual product return deductions exceeded the aggregate estimated amounts by $4,422,675, which is due and owing to ANconnect as a post-closing adjustment under the Purchase Agreement.  *See* Ex. A, Purchase Agreement §§ 2.05(a)(i)(B), 2.05(a)(ii)(B); Ex. E, Combined Product Return A/R Statement.  While deductions for product returns were charged by the retailers to ANconnect, the physical product being returned was delivered to Alchemy.  Although Alchemy received a substantial amount of physical product returns in excess of the parties' estimates, Alchemy has neither paid post-closing adjustments, nor performed its other obligations under the Purchase Agreement, Transition Services Agreement, Merchandising Agreement, or other agreements with ANconnect.

19

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.**
**REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.**

67.    Under the Transition Services Agreement, ANconnect has collected receivables from Walmart/Sam's Club, Best Buy, and Ingram on behalf of Alchemy (which receivables were not charged with deductions made for product returns) and has remitted a portion of those amounts to Alchemy by wire transfer. However, given Alchemy's refusal to honor its various contractual obligations, ANconnect has withheld $6,047,325.00 as an equitable setoff for amounts due and owing to ANconnect under its various agreements with Alchemy.    Allowing Alchemy to both receive the gross amount of receivables (without reduction for product return deductions) and to hold the physical product returned while ANconnect suffers the economic impact of product return deductions due to Alchemy's continued shirking of its obligations to pay post-closing adjustments would be inequitable, and would allow Alchemy to financially benefit from its wrongful conduct.

68.    Accordingly, ANconnect seeks to retain the **$6,047,325.00** otherwise due to Alchemy under the Transition Services Agreement as an equitable setoff for amounts due and owing to Plaintiffs under their various agreements with Alchemy.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

## PRAYER FOR RELIEF

69.    For the foregoing reasons, Plaintiffs seek judgment against Alchemy,

including the following:

(a)    Award Plaintiffs damages in the amount that will be proved at trial representing the actual loss caused by Alchemy's wrongful conduct in breach of the Purchase Agreement, the Transition Services Agreement, the Merchandising Agreement, as well as the parties' other agreements relating to reimbursement of data room fees, oversticker services, and inventory transfer services;

(b)    Award Plaintiffs their costs and expenses incurred in this action;

(c)    Award Plaintiffs pre-judgment and post-judgment interest as allowed by law; and

(d)    Award Plaintiffs any such other relief that this Court deems proper and just.

/s/ Douglas D. Herrmann

Douglas D. Herrmann (Del. Bar No. 4872)
Christopher B. Chuff (Del. Bar No. 5729)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street, PO Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
herrmand@pepperlaw.com
chuffc@pepperlaw.com

OF COUNSEL:

Stephen C. Rasch
Anna Kalinina
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Stephen.Rasch@tklaw.com
Anna.Kalinina@tklaw.com

*Attorneys for Plaintiffs ANconnect, LLC and Anderson Merchandisers, LLC*

Dated:  February 17, 2016

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

**EXHIBIT 7**

| | |
|---|---|
| **From:** | Jim Jenkins |
| **Sent:** | Wednesday, November 11, 2015 3:29 PM CST |
| **To:** | Olivia Lerner; Mark A. Perez |
| **Subject:** | RE: ANConnect legal approach / overview |

Hi Mark,

There are different timelines defined for the various components of the Post Close Adjustments.

Working Capital adjustments – They had 30 days to provide the final balance sheet. They were late on this (I'd have to go back in my emails to see by how much). We had 30 days to respond / dispute. We were also late on that and only responded via my email last week with our view of what the working capital adjustments should be. They have not responded to that email yet. Based on the terms of the APA, if they agree to the amounts, we would then have 5 days to pay the amount owed. However, that amount owed is approximately $4.9M compared with the ~$5M they owe us in A/R. If they demand payment, we would suggest a settlement of offset of those amounts.

Return Reserve reconciliation – This item has the same 30 day period for us to dispute. We received an updated Return file last Friday (Nov 6), so we have 30 days to respond / dispute. I'm am trying to get some validation / justification for questioning the returns data, but the initial response from Walmart is that the data is consistent.

Transition Services Fees – Last week I sent an email confirming my dispute of all of the invoicing for the various Transition fees which they have not yet responded to.

At this stage, I think our best course is to let the current data crisis play out. I think we want to have clean data before we try to finalize the validation of the returns data, which will extend the timeline further.

ANConnect knows that we owe them more than they owe us, and they know that this data issue is all on them, so I don't think they will get too aggressive over this settlement in the next few weeks, and if they do, the only settlement they have a clear path to demand payment for is the working capital adjustment listed above which would be offset by the A/R owed to us. Everything else is within a normal dispute process awaiting more accurate data.

Let me know if that addresses your concerns.

Thanks,

Jim

**From:** Olivia Lerner
**Sent:** Wednesday, November 11, 2015 8:13 AM
**To:** Mark A. Perez <mperez@virgo-llc.com>; Jim Jenkins <Jim.Jenkins@ouralchemy.com>
**Subject:** RE: ANConnect legal approach / overview

VIG0005643

Good morning, Mark,

I will always favor documenting Alchemy's position to secure timelines, but it seems there may be benefits in this instance to intentionally not triggering firm timelines.  Maybe the three of us can sit down for a few minutes this morning to discuss?

Kindly,
Olivia

---

**From:** Mark A. Perez [mailto:mperez@virgo-llc.com]
**Sent:** Tuesday, November 10, 2015 11:07 PM
**To:** Jim Jenkins <Jim.Jenkins@ouralchemy.com>
**Cc:** Olivia Lerner <Olivia.Lerner@ouralchemy.com>
**Subject:** RE: ANConnect legal approach / overview

Jim / Olivia – what is your current perspective on our need to submit a Statement of Objection for any of the working capital items to protect our resolution timeline?

MP

---

**From:** Jim Jenkins [mailto:Jim.Jenkins@ouralchemy.com]
**Sent:** Tuesday, November 10, 2015 4:07 PM
**To:** Bill Lee <Bill.Lee@ouralchemy.com>; Mark A. Perez <mperez@virgo-llc.com>; Jesse C. Watson <jwatson@virgo-llc.com>; Scott Guthrie <Scott.Guthrie@ouralchemy.com>
**Cc:** Olivia Lerner <Olivia.Lerner@ouralchemy.com>; Kelly Summers <Kelly.Summers@ouralchemy.com>; Rex Bowring <Rex.Bowring@ouralchemy.com>
**Subject:** ANConnect legal approach / overview

Hello all,

Please see the attached summary of issues and recommendations.  Should we schedule a time tomorrow to discuss in more detail?

Thanks,

Jim

VIG0005644

**EXHIBIT 8**

---

**Fill in this information to identify the case:**

Debtor 1    Our Alchemy, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   District of Delaware

Case number    16-11596

---

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

ANconnect LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Evelyn J. Meltzer, Pepper Hamilton LLP**
Name

1313 N. Market Street, Suite 5100
Number        Street

Wilmington            DE          19801
City                State        ZIP Code

Contact phone  302.777.6532

Contact email  meltzere@pepperlaw.com

**WITH A COPY TO: ANconnect, LLC, Attn:  Chuck Taylor
421 SE 34th Avenue, Amarillo, TX  79103

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Where should payments to the creditor be sent? (if different)

ANconnect LLC, Attn: Chuck Taylor
Name

421 SE 34th Avenue
Number        Street

Amarillo              TX          79103
City                State        ZIP Code

Contact phone  806-379-0551

Contact email  Chuck.Taylor@anconnect.net

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____      Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**    $_____17,957,939.26 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Amounts due pursuant to Sale Documents- See attached rider

9. **Is all or part of the claim secured?**

☐ No

☑ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:    Right of recoupment and/or setoff

**Basis for perfection:**    Right of recoupment and/or setoff

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $__548,546.94__   17,957,939.26

**Amount of the claim that is secured:**    $____6,144,630.00

**Amount of the claim that is unsecured:**    $____11,813,309.26 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

11. **Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property:    See attached rider

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

*  Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/12/2016
                 MM / DD / YYYY

Signature  *Chuck Taylor*

**Print the name of the person who is completing and signing this claim:**

| | | |
|---|---|---|
| Name | Chuck | Taylor |
| | First name    Middle name | Last name |
| Title | CFO/COO | |
| Company | ANconnect LLC | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 421 SE 34th Avenue | |
| | Number    Street | |
| | Amarillo | TX    79103 |
| | City | State    ZIP Code |
| Contact phone | 806-379-0551 | Email  Chuck.Taylor@anconnect.net |

# Rider to Proof of Claim

ANconnect, LLC ("ANconnect") hereby supplements the attached proof of claim (the "Proof of Claim") as follows:

## General Background

1.    On July 1, 2016 (the "Petition Date"), Our Alchemy, LLC ("Alchemy") and Anderson Digital LLC ("Anderson Digital" and together with Alchemy, the "Debtors") filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  George L. Miller is the chapter 7 trustee (the "Chapter 7 Trustee") for the Debtors' estates.

2.    Alchemy was in the business of distributing DVDs to retailers.

3.    ANconnect is a wholly owned subsidiary of Anderson Media Corporation ("Anderson Media").  Additionally, Anderson Merchandisers, LLC ("Anderson Merchandisers") and Anderson Merchandisers Canada, Inc. ("AM Canada") are also each wholly owned subsidiaries of Anderson Media.

4.    On May 7, 2015, ANconnect entered into an Asset Purchase Agreement (the "Purchase Agreement") with Alchemy, whereby Alchemy agreed to purchase and assume from ANconnect certain assets and liabilities of ANconnect's business consisting of home video and digital distribution of motion pictures and other audiovisual media in and throughout the United States.  Among the purchased assets was the sale of ANconnect's 51% membership interest in Anderson Digital.  The parties agreed on an aggregate purchase price subject to certain closing and post-closing adjustments pursuant to sections 2.05 and 2.06 of the Purchase Agreement.

5.    Alchemy and ANconnect executed two amendments to the Purchase Agreement: Amendment No. 1, dated May 29, 2015 and Amendment No. 2, dated July 9, 2015.

6.    In connection with the Purchase Agreement, Alchemy and ANconnect entered into a Transition Services Agreement, dated July 9, 2015, whereby ANconnect agreed to provide Alchemy with specified distribution and return transition services, including warehousing, order fulfillment, freight management to customers, price stickering and return processing, as well as other administrative services.

7.    In connection with the Purchase Agreement, Alchemy also entered into a Merchandising Agreement with Anderson Merchandisers,[1] dated July 9, 2015, whereby Alchemy engaged Anderson Merchandisers to perform certain merchandising services, including but not limited to, stocking, zoning and setting of the movie department at Walmart stores.

---

[1]    Contemporarily herewith, Anderson Merchandisers is filing a proof of claim for amounts owed to it under the Merchandising Agreement.

8.    In connection with the Purchase Agreement, Alchemy also entered into a Wholesale Service Agreement with AM Canada, dated July 9, 2015, whereby Alchemy engaged AM Canada to perform certain wholesale services in Canada.

9.    The sale closed on July 9, 2015.

10.    On February 23, 2016, ANconnect and Anderson Merchandisers (collectively, the "Plaintiffs") filed a complaint (the "Complaint")[2] against Alchemy in the Superior Court of the State of Delaware in and for New Castle County, Case No. N16C-02-152 WCC-CCLD.  By the Complaint, the Plaintiffs sought $15,070,936.00 on account of (i) Alchemy's failure to perform numerous obligations under the Purchase Agreement, Transition Services Agreement and Merchandising Agreement (and together with the Wholesale Service Agreement, the "Sale Documents") and (ii) Alchemy's failure to compensate ANconnect for various other services rendered in connection with the sale transaction.

### Pre-Petition Claim

11.    ANconnect asserts a pre-Petition Date claim against Alchemy in the amount of **$11,813,309.26** (the "Pre-Petition Claim") for amounts owed under the Sale Documents consisting of (i) a general unsecured claim in the amount of $17,957,939.26 and (ii) a claim secured by right of recoupment and/or right of setoff in the amount of $6,144,630.  The Pre-Petition Claim is net of ANconnect's right of recoup and/or setoff.

12.    ANconnect's general unsecured claim in the amount of $17,957,939.26 is calculated as follows:

a.    $13,619,357.33 on account of the claims set forth in the Complaint.  This amount reflects that (i) the amount due and owing ANconnect with respect the allegations contained in paragraph 25 of the Complaint increased to $1,450,924.92 due to the failure of Alchemy to make additional monthly payments after the filing of the Complaint and (ii) the amount due and owing ANconnect with respect the allegations contained in paragraph 27 of the Complaint increased to $1,382,062.24 because of additional wholesale amounts paid by ANconnect to vendors since the filing of the Complaint that Alchemy was obligated to pay under the Sale Documents.

b.    $4,338,581.93 (the "Additional Amounts") on account of amounts paid by ANconnect to third parties that Alchemy was obligated to pay under the Sale Documents.  The terms governing payment of the Additional Amounts are confidential and therefore documentation supporting the Additional Amounts is not attached to this proof of claim.  Documentation in support of the Additional Amounts will be provided to the Chapter 7 Trustee upon request.

---

[2]    As the Complaint was filed under seal, a copy of the Complaint is not attached to this proof of claim.  ANconnect will provide the Chapter 7 Trustee with a copy of the Complaint upon request.

#40687886 v2

13.    ANconnect's secured claim by right of recoupment as a defense and/or right of setoff pursuant to section 506(a)(1) of the Bankruptcy Code in the amount of $6,144,630 is calculated as follows:

a.    $6,047,325 by a right of recoupment or, in the alternative, a right of setoff representing sums collected by ANconnect on behalf of Alchemy pursuant to the Sale Documents which ANconnect has withheld paying to Alchemy because of amounts due and owing ANconnect by Alchemy pursuant the Sale Documents. *See* Complaint, paragraphs 65-68.

b.    $126,094.69 CAD (which using the exchange rate as of the Petition Date equals $97,305)[3] by a right of recoupment representing sums collected by AM Canada on behalf of the Debtors pursuant to the Sale Documents that AM Canada has withheld paying to the Debtors because of amounts due and owing ANconnect by Alchemy pursuant to the Sale Documents.

## Reservation of Rights

14.    ANconnect reserves the right to amend, update, or supplement this Proof of Claim at any time and in any respect and file additional proofs of claim.

15.    ANconnect reserves the right to file one or more requests for payment of administrative expenses in accordance with Bankruptcy Code section 503.

16.    ANconnect does not waive any claims against the Debtors that may arise post-petition, post-confirmation or after the conversion of this case to a case under any other chapter of the Bankruptcy Code.

17.    ANconnect reserves all rights of setoff and recoupment against the Debtors.

## No Consent To Jurisdiction

18.    By filing this Proof of Claim, ANconnect does not submit to the jurisdiction of the Bankruptcy Court for any purpose other than with respect to the claims asserted in this Proof of Claim, and ANconnect does not waive, and specifically preserves, all of its procedural and substantive defenses to, any claim that may be asserted against ANconnect by the Debtors, the Chapter 7 Trustee or any other party.

---

[3]    *See* https://www.oanda.com/currency/converter/

-3-

#40687886 v2

**EXHIBIT 9**

*Damages Calculation*

**ANCONNECT**

| APA Damages (Gross) | Count 1 APA Damages (net) | Count 2 TSA Damages | Count 4 Data Room Fees | Count 5 Overtime Services | Count 6 Investor Transfer | Count 7 Equitable Stroff |
|---|---|---|---|---|---|---|
| $ 4,685,941.00 | $ 4,685,941.00 | $ 844,815.55 | | | | |
| $ 4,422,675.00 | $ 4,422,675.00 | $ 376,768.00 | $ 18,107.00 | $ 10,559.36 | $ 476,552.76 | $ 4,422,675.00 |
| $ 4,850,632.50 | $ 4,850,632.50 | | | | | $ 6,047,325.00 |
| $ 3,199,288.50 | $ 3,199,288.50 | | | | | |
| $ 725,462.46 | $ 725,462.46 | | | | | |
| $ 1,054,961.03 | $ 1,054,961.03 | | | | | |
| $ 15,739,461.99 | $ 15,664,326.99 | 1,221,583.55 | 18,107.00 | 10,539.36 | 476,552.76 | 10,470,000.00 |

FoC 18
Complaint
Increase to par. 25
Increase to par. 27

| | |
|---|---|
| $ | 10,840,010.99 |
| $ | 725,462.46 |
| | 327,109.21 |
| | 121,138.55 |
| | 18,107.00 |
| | 10,539.36 |
| | 476,552.76 |
| | 476,552.76 |
| | 13,616,957.33 |

**ANDERSON MEDIA**

| Count 3 |
|---|
| $ 2,504,142.33 |

| | Net | Net of (if any) | gross |
|---|---|---|---|
| Complaint - 43 ANConnect-APA | $ 10,840,011.00 | $ 3,208,314.00 | $ 14,048,325.00 |
| Complaint 47 ANConnect TSA | $ 1,221,583.55 | $ - | $ 1,221,583.55 |
| Complaint 51 - Merch | $ 2,504,142.33 | $ - | $ 2,504,142.33 |
| Complaint 55 - ANConnect Fee | $ 18,107.00 | $ - | $ 18,107.00 |
| Complaint 59 - ANConnect Sticker Fee | $ 10,539.36 | $ - | $ 10,539.36 |
| Complaint 63 - ANConnect Invent Trans | $ 476,552.76 | $ - | $ 476,552.76 |
| **Complaint Total to ANConnect** | **$ 12,566,793.67** | | |
| POC 158 Notes additional accruals of | | | |
| Proof of Claim - Amount Owing to ANConnect | $ 1,052,563.67 | | |
| | **$13,619,357.33** | | |

**EXHIBIT 10**

# STROOCK

April 12, 2016

James G. Sammataro
Direct Dial  305-789-9388
Direct Fax  305-416-2888
jsammataro@stroock.com

**Via Scanned Email & U.S. Mail**
Scott McDaniel
Anderson Merchandisers
5601 Granite Parkway, Suite 1400
Plano, Texas 75024
Email: mcdaniels@amerch.com

Re:    Merchandising Agreement between Anderson Merchandisers, LLC and Our Alchemy, LLC

Dear Mr. McDaniel:

We are legal counsel for Our Alchemy, LLC ("Alchemy"). We write in response to your March 23, 2016 correspondence in which Anderson Merchandisers ("Anderson") asserts that Alchemy is in material breach of the July 9, 2015 Merchandising Agreement ("Merchandising Agreement") for alleged non-payment. Specifically, your letter: (i) claims that Alchemy owes Anderson $2,281,556.13 under the Merchandising Agreement, and (ii) threatens to terminate the Merchandising Agreement if payment is not received in full within fifteen (15) business days.

In the Complaint filed by Anderson and ANconnect, LLC ("ANconnect") in the New Castle County, Delaware Superior Court, Case No. N16C-02-152 WCC [CCLD] ("Lawsuit"), ANconnect expressly concedes that *it* owes Alchemy $3,208,314.00 in post-closing adjustments pursuant to Section 2.06(a)(iv) of the Asset Purchase Agreement ("APA") between ANconnect and Alchemy. (See Complaint ¶ 42 n. 2.). Section 2.06(b)(iv) of the APA expressly permits Alchemy to offset any amounts agreed to be owed by ANconnect under the APA against any amounts Alchemy may owe to ANconnect, Anderson or their respective affiliates pursuant to the Merchandising Agreement.

Pursuant to its express contractual rights, Alchemy hereby exercises its option to offset the $3,208,314.00 that ANconnect admittedly owes to Alchemy under the APA against the $2,281,556.13 Anderson demands as payment in full satisfaction of the amounts owed under the Merchandising Agreement.[1]

---

[1] As articulated in greater detail in the Counterclaim that Alchemy filed yesterday evening, Alchemy maintains that it is owed substantially more than $3,208,314.00 in post-closing adjustments. Alchemy reserves all rights to recover the full amount of the post-closing adjustments, as well as all rights into the remaining $926,757.87 that ANconnect admittedly owes to Alchemy.

LA 51983938    STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES • WASHINGTON, DC
SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.789.9300 FAX 305.789.9302 WWW.STROOCK.COM

ANConnect-OurAlch0000044

Scott McDaniel
April 12, 2016
Page 2

Anderson is unquestionably aware that its cessation of performance under the Merchandising Agreement will cause irreparable and irreversible harm to Alchemy's business. Should Anderson terminate performance of any its duties under the Merchandising Agreement, it will be in breach of the parties' agreements and Alchemy will seek all available remedies.[2]

This letter does not constitute a complete or exhaustive statement of Alchemy's rights, claims, defenses, contentions or legal theories.  Nothing stated herein is intended as, nor should it be deemed to constitute a waiver or relinquishment of any of Alchemy's claims or defenses, all of which are hereby expressly reserved.

To the extent that you have any questions or concerns or wish to discuss the matter further, please let me know.  Otherwise, please immediately confirm that the $2,281,556.13 owed by ANconnect to Alchemy will be applied to the outstanding balance under the Merchandising Agreement, and that Anderson will continue its honor its contractual obligations.

Sincerely,

James G. Sammataro, Esq.

---

[2] Anderson's threat to terminate the Merchandising Agreement contravenes the spirit of the parties' dialogue and course of conduct.  As evidenced by a litany of communications spanning several months, the parties have sought a global reconciliation of all amounts respectively owed by the parties under the various agreements including the APA, the Transition Services Agreement, the Merchandising Agreement and attendant oral agreements.  Further, since the filing of the Complaint, Alchemy has made two good faith payments totaling $471,471.00, on a no-waiver basis.  Consequently, Anderson's new found attempt to divorce payment under the Merchandising Agreement from the global resolution is improper and viewed for what is: a transparent attempt to gain leverage by threatening immense harm to Alchemy's business.

ANConnect-OurAlch0000045

**EXHIBIT 11**

Message

| | |
|---|---|
| **From:** | Bill Lardie [lardieb@amerch.com] |
| on behalf of | Bill Lardie <lardieb@amerch.com> [lardieb@amerch.com] |
| **Sent:** | 6/23/2016 1:51:34 PM |
| **To:** | Chuck Taylor [Chuck.Taylor@anconnect.net] |
| **CC:** | Rick Thamer [thamerr@amerch.com] |
| **Subject:** | Alchemy / AMerch |

Chuck,

Charlie / Jay asked that ANconnect, before June 30th, transfer $3.2M to indemnify AMerch for merchandising the Alchemy product.

Thank you,
Bill

--
This email, including any attachments, is confidential and for the sole use of the intended recipient(s). If you are not the intended recipient, please notify me by reply email and delete all copies of this message. Thank you.

ANConnect-OurAlch0113898

**EXHIBIT 12**

Transaction Detail

# Bank of America
# Merrill Lynch

### Transaction Details

| | |
|---|---|
| Date: | 27-Jun-2016 |
| Account Number: | 4451054588 |
| Bank ID: | 111000012 |
| Transaction: | Incoming Internl Money Trnsfr (191) |
| Currency: | USD |
| Amount: | 3,228,731.14 |
| Credit/Debit: | CREDIT |
| Customer Ref #: | 0627337284 |
| Bank Reference: | 160627337284 |
| Value Date: | |
| | |
| Immediate Avail: | 3,228,731.14 |
| 1 Day Float: | 0.00 |
| 2 Day Float: | 0.00 |
| Text: | WIRE TYPE:BOOK IN DATE:062716 TIME:1453 ET TRN:2016062700337284 SNDR REF:166RD5228O312N27 SERVICE REF; RELATED REF; ORIG:ANCONNECT LLC OPERATING ACCOUNT 421 SE 34TH AVE AMARILLO TX 79103 ID:003359874081 ORG BK: ID: INS BK:CASHPRO-ONLINE ID:CPOP SND BK: ID: BNF:ANDERSON MERCHANDISERS LLC FBO BANK OF AMERICA N.A. DEP ACCT 5601 GRANITE PARKWAY SUITE 1400 PLANO TX 75024 ID:004451054588 BNF BK: ID: PAYMENT DETAILS: |

*To pay for Alchemy Invoices*

Confidential

ANConnect-OurAlch0115033



View Customer Payment for Invoices



| | |
|---|---|
| Customer Payment: | Anderson Merchandisers LLC - Alchemy - 06/27/2016 - 3,228,731.14 - USD |
| Status: | Complete |
| Application Status: | Fully Applied |
| Transaction Information: | Payment and Deposit Combined |
| Origin: | Manual Entry |

**Customer Payment Information**

| | |
|---|---|
| Company: | Anderson Merchandisers LLC |
| Currency: | USD |
| Payment Date: | 06/27/2016 |
| Payment Type: | EFT |
| Transaction Amount: | 3,228,731.14 |

**Additional Information**

| | |
|---|---|
| Remit-From Customer: | Alchemy |
| Payment Reference: | wire from ANconnect 160627337284 |
| Memo: | |
| Ready to Auto-Apply: | Yes |

**Deposit Detail**

| Deposit | Deposit Reference | Bank Account | Payment Deposit Date | Deposit Status | Reconciliation Status | Payments Deposited |
|---|---|---|---|---|---|---|
| Customer Deposit: Bank of America-Depository - 06/27/2016 - 3,228,731.14 | | Bank of America-Depository | 06/27/2016 | Approved | Unreconciled | |

**Payment Application**

| Customer Transaction | Transaction Date | Payment Applications | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Status | Payable Document | Customer | Payment Amount | Discount Given | Writeoff | On Account |
| Customer Transaction: Alchemy - 06/27/2016 | 06/27/2016 | Approved | Customer Invoice: 2002196 | Alchemy | 352,587.00 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002245 | Alchemy | 3,929.50 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002449 | Alchemy | 232,329.60 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002650 | Alchemy | 10,914.00 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002670 | Alchemy | 110,700.91 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002760 | Alchemy | 469,493.40 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002930 | Alchemy | 29,151.52 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2002953 | Alchemy | 599,140.20 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003079 | Alchemy | 236,815.20 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003133 | Alchemy | 16,911.87 | 0.00 | 0.00 | |



| Customer Transaction | Transaction Date | Payment Applications | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Status | Payable Document | Customer | Payment Amount | Discount Given | Writeoff | On Account |
| | | Approved | Customer Invoice: 2003267 | Alchemy | 17,697.35 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003379 | Alchemy | 331,257.60 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003409 | Alchemy | 29,451.84 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003571 | Alchemy | 352,960.20 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003691 | Alchemy | 60,642.60 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003724 | Alchemy | 193,122.00 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2003908 | Alchemy | 10,283.75 | 0.00 | 0.00 | |
| | | Approved | Customer Invoice: 2004050 | Alchemy | 171,342.60 | 0.00 | 0.00 | |

## Remittance Advice

| Invoice | Bill-To Customer | Amount to Pay | Other Remittance Information | |
|---|---|---|---|---|
| | | | Remittance Advice Type | Details |
| 2002196 - 10/02/2015 - 0.00 - USD | Alchemy | 0.00 | | |
| 2002245 - 10/02/2015 - 0.00 - USD | | | | |
| 2002449 - 11/09/2015 - 0.00 - USD | | | | |
| 2002650 - 12/14/2015 - 0.00 - USD | | | | |
| 2002670 - 12/11/2015 - 0.00 - USD | | | | |
| 2002760 - 12/17/2015 - 0.00 - USD | | | | |
| 2002930 - 01/08/2016 - 0.00 - USD | | | | |
| 2002953 - 12/31/2015 - 0.00 - USD | | | | |
| 2003079 - 01/29/2016 - 0.00 - USD | | | | |
| 2003133 - 02/12/2016 - 0.00 - USD | | | | |
| 2003267 - 02/29/2016 - 0.00 - USD | | | | |
| 2003379 - 03/09/2016 - 0.00 - USD | | | | |
| 2003409 - 03/25/2016 - 0.00 - USD | | | | |
| 2003571 - 04/11/2016 - 0.00 - USD | | | | |
| 2003691 - 04/29/2016 - 0.00 - USD | | | | |
| 2003724 - 04/29/2016 - 0.00 - USD | | | | |
| 2003908 - 05/25/2016 - 0.00 - USD | | | | |
| 2004050 - 05/27/2016 - 0.00 - USD | | | | |

## Payment History

| Transaction | Customer Transaction Type | Transaction Date |
|---|---|---|
| Customer Transaction: Alchemy - 06/27/2016 | Apply | 06/27/2016 |

## Process History

| Process | Step | Status | Completed On | Due Date | Person | Comment |
|---|---|---|---|---|---|---|
| Customer Payment Application Event | Customer Payment Application Event | Step Completed | 06/27/2016 03:06:25 PM | 06/29/2016 | Rose Wheeler (36226) | |
| Customer Payment Application Event | Review Bad Debt Writeoff | Not Required | | 06/29/2016 | | |

**EXHIBIT 13**

# ANDERSON
## MERCHANDISERS

<u>**Via Email and Certified Mail, Return Receipt Requested**</u>

June 27, 2016

Our Alchemy, LLC
5900 Wilshire Boulevard, Floor 18
Los Angeles, CA  90036
Attn: Mr. Scott Guthrie

Re: Merchandising Agreement with Anderson Merchandisers, LLC.

Dear Mr. Guthrie,

Notice is hereby given pursuant of Section 9.2(iii) under the Merchandising Agreement ("Agreement") dated July 9, 2015 by and between Our Alchemy, LLC ("Company") and Anderson Merchandisers, LLC ("Contractor") that you are in material breach for non-payment under the Agreement.  As of the date hereof, Company owes Contractor $3,228,731.14 under the Agreement, which amount remains unpaid. Demand is hereby made for this payment in full.

In the event this breach is not remedied by Company within the time periods set forth in the Agreement, Contractor reserves the right to terminate this Agreement pursuant to Section 9.2 (iii) of the Agreement.

Sincerely,

Scott McDaniel
President

CC:

Ms. Olivia Lerner
General Counsel, Our Alchemy, LLC
Olivia.Lerner@ouralchemy.com

**5601 Granite Parkway, Suite 1400 • Plano, Texas  75024 • (972) 987-5516**

ANConnect-OurAlch0000043

**EXHIBIT 14**



PO Box 32270 (79120) • 421 E 34ᵗʰ Street • Amarillo, TX 79103 • (806) 376-6251

October 18, 2015

<u>Via Email (bill.lee@ouralchemy.com) and Overnight Delivery</u>
Our Alchemy LLC
OA Investment Holdings LLC
5900 Wilshire Boulevard, Floor 18
Los Angeles, CA 90036
Attention:    Bill Lee, CEO

> **RE:  Past due payments**

Dear Bill,

After discussing with Jim Jenkins, on October 9, 2015, ANconnect deducted $612,731.25 from cash due Alchemy under the Transition Services Agreement (TSA) A/R collections provisions.  This represented:

1. $250,000 of principal payment due on the Promissory Note of OA Investments Holdings, LLC.
2. $362,731.23 on Anderson Digital receivable – August, September, and October payments due ($1,450,924.92/12 = $120,910.41 x 3 months = $362,731.23 as called for in Amendment No. 2 to the APA, which amended 2.06(f) of the APA).

In addition, we request to deduct the following payments due ANconnect and Anderson Merchandisers:

1. Transition service fees – outbound fee of $579,941.00, returns processing fee of $347,682.00, administrative service fee of $376,768.00, and transfer fee of units to Sony DADC of $476,552.76 for a total of $1,780,943.76.
2. Merchandising services provided by AMerch including the 35¢ reimbursement fee of $459,081 (three weeks past due).
3. Payments due on net Millennium receivables (2.06(d) of the APA).  We calculate $4,850,623 due to ANconnect.  ANconnect owes Alchemy / MMS $1,520,885.85.  The net balance due ANconnect is $3,329,737.15 (see Exhibit H. 75% is now due $2,497,302.86.  An additional 15% or $499,460.57 is due on October 22, 2015 and a final payment of 10% or is $332,973.72 due on November 6, 2015).
4. The total past due balance is $4,737,327.  Also, prior to November 6, 2015 $832,434.29 will become due.

519605 000004 16150154.1

**Amarillo  ~  Atlanta  ~  Denton**



Pursuant to the Merchandising Agreement, ANconnect has the right to terminate such agreement for Alchemy's failure to make a timely payment of invoiced amounts, and pursuant to the Transition Services Agreement by and between ANconnect and Alchemy, ANconnect has the right to terminate such agreement by virtue of Alchemy's failure to make timely payments of the Millennium Receivable.  Further, pursuant to the Loan and Security Agreement, ANconnect, through the agent, has all of the rights and remedies pursuant to such agreement upon an Event of Default.

In order to avoid ANconnect and Anderson Merchandisers exercising the aforementioned remedies, please advise us no later than October 21, 2015 that you consent to ANconnect deducting $4,737,327 from amounts due Alchemy under the TSA A/R provisions.  This deduction will bring the accounts current.

We look forward to your prompt response.

Very truly,

Bill Lardie

ANConnect-OurAlch0000217

**EXHIBIT 15**

om:                m Jenkins
ent:               /ednesday, October 21, 2015 11:13 AM CDT
o:                 loore, Schuyler M.; Mark A. Perez; Bill Lee; Tony Polito; Olivia Lerner
ubject:            E: ANConnect

On October 9, Anderson sent the wire from which they made the offset deductions. Chuck sent an email (I'll forward to all) that detailed out those deductions. On the phone with Chuck, I acknowledged what they had done, but I did not agree to it.

**From:** Moore, Schuyler M. [mailto:smoore@stroock.com]
**Sent:** Tuesday, October 20, 2015 11:33 PM
**To:** 'Mark A. Perez' <mperez@virgo-llc.com>; Bill Lee <Bill.Lee@ouralchemy.com>; Tony Polito <Tony.Polito@ouralchemy.com>; Olivia Lerner <Olivia.Lerner@ouralchemy.com>; Jim Jenkins <Jim.Jenkins@ouralchemy.com>
**Subject:** RE: ANConnect

It seemed from their letter that Alchemy had agreed on October 9th to offset of the first two items listed in their letter (the Note and the Anderson Digital installment). Please advise if that is not correct.

**From:** Mark A. Perez [mailto:mperez@virgo-llc.com]
**Sent:** Tuesday, October 20, 2015 10:17 PM
**To:** Moore, Schuyler M.; 'Bill Lee'; Tony Polito; Olivia Lerner; Jim Jenkins
**Subject:** RE: ANConnect

Thanks, Sky. We should think about whether we want to offer a legal response as this letter and their behavior certainly doesn't follow the mechanism (nor spirit) of the agreement. Keying in on the key points below:

-    The $250k payment offset for the principal payment due by OA Investments Holdings, LLC is inappropriate. That is not a liability of Alchemy.

-    Not sure if we received actual invoices for the amounts claimed under the Transition Services Agreement, but I'm pretty sure we have not otherwise agreed to the amounts. Then, there is the question of whether Alchemy received the right service levels from ANconnect and whether there is a dispute that needs to be resolved based on the mechanism described below. Until that is all resolved through the proper channels, hard to confirm that is a real liability for Alchemy ... the main argument being that the right procedures have not taken place.

-    On the Merchandising services, agree with Sky that ANconnect and Anderson Merchandisers are separate entities and so the offset on the ANconnect side is not appropriate. Notwithstanding, I think that this is an actual agreement that we do want to keep current so we would likely want to settle the amount (assuming that we have been invoiced properly and we agree with the amount).

VIG0005622

- On 2.06(d) of the APA, we have not reached agreement on the Closing Balance Sheet of the wholesale business.  We are still awaiting data from Anderson.  As such, we don't owe them anything at this point.  The fact that they use the language "We calculate ..." implies that they recognize that we have not agreed to any payment at this point.

Would appreciate Bill and Jim's perspective on next steps on our side.  No need to get into a game of legal optics if it won't produce the right outcome, but we do have the right to respond to their letter.

MP

**From:** Moore, Schuyler M. [mailto:smoore@stroock.com]
**Sent:** Tuesday, October 20, 2015 5:37 PM
**To:** 'Bill Lee' <Bill.Lee@ouralchemy.com>; Mark A. Perez <mperez@virgo-llc.com>; Tony Polito <Tony.Polito@ouralchemy.com>; Olivia Lerner <Olivia.Lerner@ouralchemy.com>; Jim Jenkins <Jim.Jenkins@ouralchemy.com>
**Subject:** ANConnect

1. ANConnect has setoff rights under state law for any amounts owed to ANConnect by Alchemy, so they technically do not have the right to offset the $459k claimed as owed by Alchemy to Anderson Merchandisers under the Merchandising Agreement (but possession is 9/10ths of the law, so they will obviously offset anyway).
2. Section 2.06(d) of the APA references the additional net amount owed by Alchemy (as successor to Millennium Media Services) to ANConnect based on the Closing Balance Sheet of the wholesale business.  Did you receive the Closing Balance Sheet for the wholesale business pursuant to Section 2.06(b) and (d) of the APA?  If Alchemy disputed this item within thirty days of delivery of the final Closing Balance Sheet, the dispute is resolved by E&Y in Texas.
3. Did you receive the invoices for the amounts claimed owed by Alchemy under the Transition Services Agreement and Merchandising Agreement?  Do you agree with the calculations in their letter?
4. Disputes under Transition Services Agreement (such as to the level of services or amounts owed) are to be resolved by (a) Bill Lardie and Bill Lee within ten days or (ii) court action thereafter anywhere that has jurisdiction over the matter.  You have the right to terminate any of ANConnect's services under this agreement if you are prepared to handle the service directly.
5. Disputes under the Merchandising Agreement are to be resolved by court action anywhere that has jurisdiction over the matter.
   Sky

VIG0005623

**EXHIBIT 16**

| | ANconnect | Alchemy | Notes |
|---|---|---|---|
| Exhibit A Gross Due Content Owners | (4,685,941.48) | (4,685,941.48) | Final verification with Alchemy team -- assumed to be confirmed |
| Exhibit I 3PL & Wholesale Product Returns | (4,422,673.63) | | **Final reconciliation pending** |
| Exhibit B Wholesale Working Capital | 3,208,314.00 | 3,208,314.00 | Final verification with Alchemy team -- assumed to be confirmed |
| | | | |
| Alchemy Payable to ANConnect | (4,850,622.50) | (4,850,622.50) | Confirmed |
| Alchemy Receivable from ANConnect | 1,691,337.00 | 1,691,337.00 | Confirmed |
| Wholesale AP from Exhibit B paid by ANC | (1,195,817.00) | | **Final reconciliation pending** |
| Salary Reimbursement | 125,000.00 | 125,000.00 | Confirmed |
| Bagdasarian Participation forgiveness July 9 | 460,869.00 | 460,869.00 | Confirmed |
| Anderson Digital Excess Tag Along | 68,314.00 | 68,314.00 | Confirmed |
| Data Room Fees paid by ANC | (18,107.30) | (18,107.30) | Confirmed |
| DWA overstickering invoice | | | |
| | | | |
| Distribution & Returns Fees | (844,816.00) | (844,816.00) | Confirmed |
| Admin Fees | (376,768.00) | | **Disputed based on transition period service levels** |
| Inventory Transfer | (476,552.76) | (476,552.76) | Confirmed |
| | | | |
| A/R due to Alchemy | 7,027,687.00 | 7,027,687.00 | **Pending A/R review with Alchemy and ANconnect team** |
| 3PL co-op/marketing paid by ANC | (204,374.66) | (204,374.66) | Final verification with Alchemy team -- assumed to be confirmed |
| 3PL revenue share received by ANC | 18,129.42 | 18,129.42 | Final verification with Alchemy team -- assumed to be confirmed |
| **Subtotal** | **(4,476,022.91)** | **1,519,235.72** | |
| | | | |
| Anderson Digital Receivable | (604,552.05) | (604,552.05) | Confirmed |
| Anderson Merchandisers | (1,043,997.60) | (1,043,997.60) | Confirmed |
| Expedited Freight Chargeback | 0.00 | 578,102.65 | Previously presented |
| | | | |
| **Total (pre-final reconciliation)** | **(6,124,572.56)** | **448,788.72** | |

*Excludes any additional claims under the Transition Service Agreement.*

**ANconnect/Anderson Digital Working Capital Reconciliation**

| | APA Section | Increase/(Decrease) to Purch Price | | Gross Exposure Due From/(To) Anderson | Status | |
|---|---|---|---|---|---|---|
| | | Initial Amount | Closing Balance | | | |
| **Post-Closing Adjustments per APA** | | | | | | |
| Exhibit A Gross Due Content Owners | 2.06(a)(i) | (12,890,779) | (8,204,838) | (4,685,941) | Closed | A |
| Exhibit I 3PL & Wholesale Product Returns | 2.06(a)(ii) | 8,896,320 | 13,318,994 | (4,422,674) | Open | B |
| Exhibit B Wholesale Working Capital | 2.06(a)(iv) | (2,590,063) | (5,798,377) | 3,208,314 | Closed | C |
| Anderson Digital Working Capital | 2.06(a)(v) | 936,374 | 158,139 | - | Closed | D |
| **Total Post-Closing Adjustments per APA** | | **(5,648,148)** | **(526,081)** | **(5,900,301)** | | |
| | | | | | | |
| **Other Adjustments** | | | | | | |
| Alchemy Payable to ANConnect | N/A | N/A | (4,850,623) | (4,850,623) | Closed | E |
| Alchemy Receivable from ANConnect | N/A | N/A | 1,691,337 | 1,691,337 | Closed | F |
| Wholesale AP from Exhibit B paid by ANC | | | (1,195,817) | (1,195,817) | Open | J |
| Salary Reimbursement | 2.05(c) | - | 125,000 | 125,000 | Closed | G |
| Bagdasarian Participation forgiveness July 9 | | - | 460,869 | 460,869 | Closed | |
| Anderson Digital Excess Tag Along | N/A | 1,426,000 | 1,494,314 | 68,314 | Closed | H |
| Data Room Fees paid by ANC | | | (18,107) | (18,107) | Closed | I |
| **Total Other Adjustments** | | **1,426,000** | **(2,293,027)** | **(3,719,027)** | | |
| | | | | | | |
| **TOTAL POST CLOSING ADJUSTMENT PER APA & OTHER ADJ** | | **(4,222,148)** | **(2,819,108)** | **(9,619,328)** | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | Gross Exposure Due From/(To) Anderson | Status |
|---|---|---|
| **Transition Services Fees** | | |
| Distribution & Returns Fees | (844,816) | Closed |
| Admin Fees | (376,768) | Open |
| Inventory Transfer | (476,553) | Closed |
| **Total Transition Fees** | **(1,698,137)** | |

**Additional Reconciling Items**

| | | | |
|---|---:|---:|---|
| A/R due to Alchemy - post 7-9-2015 ships ($15,727,686 net of $8,700,000 payment) | | 7,027,687 | Open |
| 3PL co-op/marketing paid by ANC | (204,375) | (204,375) | Closed |
| 3PL revenue share received by ANC | 18,129 | 18,129 | Closed |
| Expedited Freight incurred by Alchemy due to transition issues | | | Open |
| Lost Sales due to missed shipments | | | |
| **Total Additional Reconciling items** | **-** | **(186,245)** | **6,841,442** |
| **Total Due From/(To) Anderson** | **($4,222,148)** | **($3,005,353)** | **($4,476,023)** |

**Merchandising Premium Adjustments**

| | Increase/(Decrease) to Purch Price | | Adjustment Due |
|---|---|---|---|
| | **Initial Amount** | **Closing Balance** | **From/(To) Anderson** |
| Dreamworks Consent Fee | (500,000) | | (500,000) |
| Xlrator Inventory buyback and liquidation | (150,000) | (1,384) | (151,384) |
| ARC | (2,000,000) | | (2,000,000) |
| Ketchup | (250,000) | | (250,000) |
| Bagdasarian | (25,000) | (205,435) | (230,435) |
| Excess Tag a Long | (1,426,000) | (68,314) | (1,494,314) |
| Total Merchandising Premium Adjustments | **(4,351,000)** | **(275,133)** | **(4,626,133)** |

$608,998.60 past due premium and $434,999 base amount past due

**Remaining AN Connect Receivable**
**Gross Due From/(To) Anderson**

| | |
|---|---:|
| Anderson Digital SVOD receivable due to ANConnect (12 monthly payments $120,910.41) | **(1,450,925)** |
| 5 months past due of $604,552.05 | |
| OA Investments Holding LLC (payable 8 quarterly payments of $250,000 Sept 2015 - June 2017) | **(2,000,000)** |
| $250,000 past due | |
| Total Due AN Connect over 24 months | **(8,077,058)** |

Summary

TOTAL PAST DUE $1,898,549.65

TOTAL due AN Connect                                                                                    **(12,553,081)**

**A** See tabs Exhibit A per APA and Exhibit A Jul 9 for detail. Exhibit A is a detail of amounts due to 3PL/Consignment content suppliers after fees, royalties, advances and deductions.  Updated for additional Kmart returns for Classic.

**B** See tabs *Exhibit I per APA*  and *Exhibit I Jul 9*  for detail. Exhibit I represents returns from retailers (Walmart/Sams, Best Buy and Ingram) from the closing date (Jul 9) through the date Alchemy became the official vendor of record. These returns are additional assets received by Alchemy not included on Exhibit A or Exhibit B.

**C** See tabs *Exhibit B per APA*  and *Exhibit B Jul 9*  for detail. Exhibit B is a detail of net amounts due to Wholesale content suppliers (Amounts payable to suppliers less inventory on hand). Audit of inventory records provided by Anderson pending.

**D** To the extent that the Anderson Digital closing working capital balance is negative and is larger than any negative amount on the estimated balance sheet in the purchase agreement, Anderson pays Alchemy.

**E** The Closing Balance is the 7/9 payable balance per participation statement provided to Anderson

**F** The Closing Balance is the 7/9 receivable balance as reconciled with Anderson

**G** APA §2.05(c) specifies that the purchase price will be reduced by $125,000, representing a reimbursement of certain salary expenses to be incurred by Alchemy with respect to the employment of Matthew Smith, subject to Matthew Smith accepting an offer of employment from Alchemy. This $125,000 was not reflected in the purchase price paid, and as such we are including this amount in the post-closing adjustments.

**H** The valuation of Anderson Digital reflected in the Asset Purchase Agreement is (6 x estimated 2014 EBITDA of $570,000), or $3,420,000. The implied value of the 49% minority interest is $3,420,000 x 49%, or $1,675,800. The actual amount paid for the 49% minority interest in Anderson Digital was $3,170,114, including $2,300,000 cash and notes payable of $870,114. The purpose of the Excess Tag Along was to reduce the purchase price for the 49% minority interest to the implied value per the APA of $1,675,800, which would require a reduction of $1,494,314. The actual reduction was $1,426,000, leaving a further reduction of $68,314.

**I** AN Connect paid data room fees that are to be reimbursed by Alchemy.

**J** Exhibit B accounts payable includes balances for vendors from which AN Connect purchases non video product. Rather than transfer the invoices to Alchemy and have them pay, AN Connect has paid the vendor. Alchemy owes AN Connect.

**K** After the July 9th effective date AN Connect paid to supply vendors and honored deductions from retailers for co-op and marketing charges that are a pass through to the 3PL vendors. They were charged to the 3PL statement dated July 31, 2015. Alchemy owes AN Connect

**L** AN connect received payments from Rentrak for revenue sharing on the digital contracts for the 3PL vendors. This amount was passed through to the 3PL vendor on the July 31, 2015 statement. This amount is due Alchemy.

Summary

**3PL SUPPLIERS**                                                                                                    EXHIBIT A
## As of April 2015

| Content Owner | Net Revenue | Royalties | Total Net Revenue | Deduction for Recoupable Expenses | Distribution Fees | Advances | Forgiveness of Advances | Less Payments to Date | Gross Due Content Owner |
|---|---|---|---|---|---|---|---|---|---|
| Classic | 110,627,502 | 8,702 | 110,636,204 | (24,663,544) | (20,947,733) | - | | (57,068,150) | 7,956,777 |
| Vertical | 12,390,449 | 593,048 | 12,983,497 | (3,850,826) | (3,702,909) | (1,000,000) | | (2,966,375) | 1,463,387 |
| Mill Creek | 2,708,825 | - | 2,708,825 | (88,500) | (768,272) | - | | (1,630,106) | 221,946 |
| Freestyle | 2,503,098 | 42,079 | 2,545,176 | (708,733) | (608,283) | - | | (263,911) | 964,248 |
| Hornet's Nest | 1,613,871 | 221,203 | 1,835,073 | (373,060) | (281,850) | - | | (713,706) | 466,456 |
| Inception Media | 3,438,190 | - | 3,438,190 | (88,942) | (1,373,814) | - | | (1,605,927) | 369,508 |
| XIrator | 10,340,491 | 551,517 | 10,892,008 | (4,508,315) | (3,045,960) | (1,375,000) | | (1,980,873) | (18,139) |
| Microsoft | 10,541,286 | 991,712 | 11,532,998 | (3,452,369) | (1,789,058) | - | | (3,475,594) | 2,815,977 |
| Cohen | 569,179 | 51,382 | 620,560 | (273,323) | (113,357) | - | | (82,021) | 151,860 |
| Genesis | 115,162 | 916 | 116,078 | (66,870) | (56,222) | - | | (18,561) | (25,575) |
| Bagdasarian | 10,957,989 | (23,912) | 10,934,077 | (3,486,906) | (2,497,683) | (995,000) | | (4,003,985) | (49,496) |
| Bagdasarian TV series | - | - | - | - | - | (1,125,000) | | - | (1,125,000) |
| Ketchup & K II | 2,006,613 | 378,548 | 2,385,161 | (1,925,247) | (468,429) | - | | - | (8,514) |
| ARC | 79,307,171 | 3,099,174 | 82,406,345 | (32,322,061) | (25,207,405) | (15,800,000) | 3,600,000 | (12,969,534) | (292,655) |
| | 247,119,826 | 5,914,367 | 253,034,192 | (75,808,696) | (60,860,973) | (20,295,000) | 3,600,000 | (86,778,744) | 12,890,779 |

Exhibit A per APA

**EXHIBIT A**

**3PL SUPPLIERS**
## As of July 9

| Content Owner | Net Revenue | Royalties | Total Net Revenue | Deduction for Recoupable Expenses | Distribution Fees | Advances | Forgiveness of Advances | Less Payments to Date | Gross Due Content Owner |
|---|---|---|---|---|---|---|---|---|---|
| Classic | 109,303,197 | 8,702 | 109,311,899 | (24,255,495) | (20,889,097) | - | | (62,975,005) | 1,192,301 |
| Vertical | 14,351,117 | 670,016 | 15,021,133 | (3,931,297) | (4,095,504) | (1,000,000) | | (2,989,177) | 3,005,154 |
| Mill Creek | 2,825,136 | - | 2,825,136 | (93,915) | (842,783) | - | | (1,630,106) | 258,331 |
| Freestyle | 2,315,963 | 51,374 | 2,367,337 | (759,761) | (679,248) | - | | (541,753) | 386,575 |
| Hornet's Nest | 1,718,598 | 268,957 | 1,987,556 | (378,359) | (301,952) | - | | (870,976) | 436,269 |
| Inception Media | 3,397,142 | - | 3,397,142 | (91,409) | (1,432,915) | - | | (1,605,927) | 266,892 |
| Xlrator | 10,560,582 | 570,491 | 11,131,073 | (4,564,127) | (3,098,449) | (1,375,000) | | (1,980,873) | 112,625 |
| Microsoft | 10,027,761 | 1,023,836 | 11,051,597 | (3,548,897) | (1,841,789) | - | | (3,475,594) | 2,185,317 |
| Cohen | 704,663 | 62,207 | 766,871 | (272,687) | (134,747) | - | | (82,021) | 277,416 |
| Genesis | 107,704 | 1,121 | 108,825 | (68,066) | (57,770) | - | | (18,561) | (35,572) |
| Bagdasarian | 10,540,184 | 29,964 | 10,570,149 | (3,473,927) | (2,510,565) | (995,000) | | (4,051,525) | (460,869) |
| Bagdasarian TV series | - | - | - | - | - | (1,125,000) | | - | (1,125,000) |
| Ketchup & K II | 2,350,326 | 539,269 | 2,889,595 | (2,054,540) | (543,467) | - | | - | 291,588 |
| ARC | 81,407,585 | 3,141,503 | 84,549,088 | (32,599,835) | (25,765,906) | (15,800,000) | 4,000,000 | (12,969,534) | 1,413,812 |
| | **249,609,958** | **6,313,565** | **255,923,523** | **(76,289,527)** | **(62,371,504)** | **(20,295,000)** | **4,000,000** | **(93,120,710)** | **8,204,838** |

Pending possible updates to 3PL statements provided by Anderson, including confirmation of corrected balance for Classic.

AN Connect
Reserve for Returns 3PL
As of 05-01-2015

**EXHIBIT I**

| Vendor | Vendor Number | WM Sam's | Best Buy | Other | TOTAL |
|---|---|---|---|---|---|
| Anderson Digital | 42235 | 3,215.67 | 0 | 1,078.00 | 4,293.67 |
| ARC ENT 3PL | 40996 | 676,832.90 | 12,803.94 | 112,783.17 | 802,420.01 |
| Bagdasarian Productions | 41484 | 368,171.74 | 1,839.64 | - | 370,011.38 |
| Big Air Studios | 41540 | 15.31 | - | 1.87 | 17.18 |
| Classic Media LLC-3PL | 41800 | 791,646.21 | 11,341.50 | 170,703.75 | 973,691.46 |
| Cohen Media Group | 42744 | 2,261.56 | 0 | 799.52 | 3,061.08 |
| Freestyle Digital Media LLC | 42115 | 214,770.79 | 0 | 2,786.99 | 217,557.78 |
| Genesis Distribution LLC | 42729 | 9,767.48 | 0 | 1,317.35 | 11,084.83 |
| Grand Entertainment | 42027 | 3,424.19 | 0 | 1,077.68 | 4,501.87 |
| Inception Media Group LLC | 41777 | 173,244.98 | 2,001.12 | 22,227.15 | 197,473.25 |
| Ketchup Entertainment Inc | 42737 | 82,338.74 | 6,346.47 | 18,911.13 | 107,596.34 |
| Maddox Entertainment | 42272 | 117.92 | 0 | 23.69 | 141.61 |
| Microsoft | 41990 | 408,351.95 | 28,666.50 | 66,269.79 | 503,288.24 |
| Mill Creek 3PL | 42196 | 42,415.72 | 36,346.21 | - | 78,761.93 |
| Nasser Entertainment Group | 42308 | 773.78 | 0 | 252.13 | 1,025.91 |
| SP SALES AND DIST. LLC | 42722 | 56,692.97 | 0 | 13,500.01 | 70,192.98 |
| THN Movie, LLC | 42754 | 17,602.70 | 0 | 4,791.68 | 22,394.38 |
| Vertical Entertainment LLC | 42209 | 289,072.47 | 0 | 71,337.45 | 360,409.92 |
| Xlrator Media,LLC-3PL | 41738 | 61,265.09 | 3,084.03 | 12,138.64 | 76,487.75 |
| | | | | | |
| TOTAL | | 3,201,982.16 | 102,429.40 | 500,000.00 | 3,804,411.56 |

| | |
|---|---|
| Reserve for Returns 3PL | 3,804,411.56 |
| Reserve for Returns Wholesale | 5,091,908.84 |
| Total Exhibit I per APA | 8,896,320.40 |

AN Connect
Summary
As of 05-01-2015
Reserve for Returns WHOLESALE

**EXHIBIT I**

| Vendor | Vendor Number | WM Sam's | Best Buy | TOTAL |
|---|---|---|---|---|
| CANDLELIGHT MEDIA GROUP | 37893 | 8,530.03 | 94.25 | 8,624.28 |
| Capitol Christian Disbt. | 41318 | 250,942.71 | | 250,942.71 |
| CEDAR FORT, INC. | 25739 | 9,534.49 | | 9,534.49 |
| COVENANT COMMUNICATIONS | 25064 | 3,460.52 | | 3,460.52 |
| Disco Power | 37737 | 4,096.65 | | 4,096.65 |
| DISTRIMAX INC | 37966 | 28,081.35 | | 28,081.35 |
| E-1 Entertainment | 2391 | 106,181.72 | 63,945.41 | 170,127.13 |
| Excel Entertainment | 29481 | 136,034.51 | | 136,034.51 |
| Gaiam Fitness | 42501 | 1.92 | 34,499.08 | 34,501.00 |
| Group 1200 Media | 27822 | 201,750.12 | 268,902.65 | 470,652.77 |
| IMT RECORDS | 21537 | 144,742.00 | | 144,742.00 |
| INDICAN PICTURES | 35340 | 11,133.06 | | 11,133.06 |
| LAGUNA FILMS | 2041 | 227,522.07 | | 227,522.07 |
| MAGNOLIA PICTURES LLC. | 35569 | 403,187.73 | 87,784.30 | 490,972.03 |
| MAVERICK ENTERTAINMENT | 28709 | 150,461.34 | 94.25 | 150,555.59 |
| Millennium Media Services | 23585 | 75,370.45 | 51,177.34 | 126,547.79 |
| MPI HOME VIDEO | 2466 | 451,259.76 | 52,269.06 | 503,528.82 |
| MULTIMUSIC INC. | 34873 | 40,993.48 | | 40,993.48 |
| N CIRCLE ENTERTAINMENT | 37481 | 177,093.35 | 9,878.45 | 186,971.80 |
| Phase 4 Films | 38943 | 91,538.51 | 57,916.11 | 149,454.62 |
| Platinum Disc | 12537 | | 23,741.71 | 23,741.71 |
| PLUS ENTERTAINMENT | 36696 | 253,586.49 | | 253,586.49 |
| Softland International | 41006 | 13,632.06 | 366.88 | 13,998.94 |
| Sony Music Entertainment | 2016 | 63,013.39 | | 63,013.39 |
| TEAM MARKETING | 30168 | 468,521.83 | 275,069.06 | 743,590.89 |
| UMGD | 2033 | 757.56 | | 757.56 |
| WEA Corp. | 2076 | 453,774.40 | 53,769.91 | 507,544.31 |
| WELL GO USA, INC | 36299 | 234,017.80 | 78,971.01 | 312,988.81 |
| Xenon Pictures | 39637 | 24,210.11 | | 24,210.11 |
| | | | | |
| TOTAL | | 4,033,429.37 | 1,058,479.47 | 5,091,908.84 |

Exhibit I per APA



**Our Alchemy Transition Vendors**

## Retailer Returns Processed in ANC

| Retailer | Effective Date | Returns (Jul 9 - Effective Date) |
|---|---|---|
| Walmart/Sam's Club | Sep 10 | 7,612,477.09 |
| Best Buy | Aug 21 | 1,060,577.98 |
| Ingram | Aug 28 | 22,676.77 |
| | | 8,695,731.84 |

For returns from retailers between 7/9 and the Effective Date, Anderson will process the returns, and related inventory will be shipped to Alchemy. The values above are the returns at Anderson's cost, and represent inventory acquired by Alchemy in addition to inventory shown on Exhibit B.

A $2,362,653 reserve for returns was deducted from $40M initial purchase price in order to cover the profit component on returns processed by Alchemy after the Effective Date, but related to Anderson sales prior to 7/9. The reason for this is that the credit given to the retailer will be at the price paid by the retailer to Anderson, which includes Anderson's profit, whereas the inventory will be recorded on Alchemy's books at cost, so the difference, which would otherwise be a reduction of sales revenue, will go against this reserve. This is an estimate, and there will be no true-up. For accounting purposes, if specific identification of these sales is difficult, we could amortize the reserve over the expected return period.

Exhibit I Jul 9

**WHOLESALE SUPPLIERS**

*Month End Balance Sheet - April 2015*

**Exhibit B**

| Supplier | Supplier Number | WHOLESALE INVENTORY | ACCOUNTS PAYABLE | RETURNS NOT SHIPPED | RECEIVED NOT BILLED | WHOLESALE SUPPLIER WORKING CAPITAL |
|---|---|---|---|---|---|---|
| Sony Music Entertainment | 2016 | $541,134 | ($535,875) | $0 | $0 | $5,259 |
| UMGD | 2033 | $16,796 | ($38,940) | $0 | ($2,228) | ($24,372) |
| LAGUNA FILMS | 2041 | $194,887 | ($224,999) | $0 | ($11,316) | ($41,428) |
| WEA Corp. | 2076 | $923,182 | ($286,054) | $0 | ($690) | $636,438 |
| E1 Entertainment | 2391 | $592,252 | ($814,686) | $0 | $0 | ($222,435) |
| MPI HOME VIDEO | 2466 | $932,962 | ($1,173,394) | $0 | $0 | ($240,432) |
| IMT RECORDS | 21537 | $151,655 | ($290,787) | $0 | ($25) | ($139,157) |
| Millennium Media Services MMS | 23585 | $851,809 | ($1,016,910) | $0 | $0 | ($165,101) |
| COVENANT COMMUNICATIONS | 25064 | $33,069 | ($3,489) | $0 | $0 | $29,580 |
| CEDAR FORT | 25739 | $23,209 | ($132,241) | $0 | $0 | ($109,032) |
| Group 1200 Media | 27822 | $1,594,101 | ($2,392,555) | $0 | ($396,877) | ($1,195,332) |
| MAVERICK ENTERTAINMENT | 28709 | $511,842 | ($697,074) | $0 | ($78,089) | ($263,321) |
| Excel Entertainment | 29481 | $198,850 | ($603,194) | $0 | ($2,147) | ($406,491) |
| TEAM MARKETING | 30168 | $3,038,380 | ($3,346,493) | $0 | ($28,651) | ($336,765) |
| MULTIMUSIC INC. | 34873 | $60,510 | ($35,308) | $0 | $0 | $25,202 |
| INDICAN PICTURES | 35340 | $12,414 | ($35,238) | $0 | ($3,962) | ($26,787) |
| WELL GO USA, INC | 36299 | $961,490 | ($1,929,044) | $0 | ($2,925) | ($970,479) |
| PLUS ENTERTAINMENT | 36696 | $307,241 | ($370,011) | $0 | ($12,675) | ($75,444) |
| N CIRCLE ENTERTAINMENT | 37481 | $891,137 | ($1,003,743) | $0 | ($14,688) | ($127,295) |
| DISCO POWER | 37737 | $23,096 | $11,921 | $0 | $0 | $35,017 |
| CANDLELIGHT MEDIA GROUP | 37893 | $83,657 | ($100,527) | $0 | ($4,481) | ($21,352) |
| DISTRIMAX INC | 37966 | $105,365 | $62,744 | $0 | $0 | $168,109 |
| PHASE 4 FILMS | 38943 | $336,254 | ($533,326) | $0 | ($25,425) | ($222,497) |
| Xenon Pictures | 39637 | $47,765 | ($39,607) | $0 | $0 | $8,158 |
| Softland International | 41006 | $107,721 | ($68,059) | $0 | ($109) | $39,553 |
| CAPITAL CHRISTIAN DIST | 41318 | $595,650 | $232,041 | $0 | $0 | $827,691 |
| Gaiam Fitness | 42501 | $130,106 | $35,399 | $0 | $0 | $165,505 |
| AMAZON VIDEO | 42752 | $57,144 | $0 | $0 | $0 | $57,144 |
| **Total** | | $13,323,675 | ($15,329,451) | $0 | ($584,288) | ($2,590,063) |

**WHOLESALE SUPPLIERS**

**EXHIBIT B**

*Month End Balance Sheet - July 2015*

| Supplier | Supplier Number | WHOLESALE INVENTORY | ACCOUNTS PAYABLE | RETURNS NOT SHIPPED | RECEIVED NOT BILLED | WHOLESALE SUPPLIER WORKING CAPITAL |
|---|---|---|---|---|---|---|
| Sony Music Entertainment | 2016 | $476,847 | ($415,245) | $0 | $0 | $61,602 |
| UMGD | 2033 | $23,570 | $0 | $0 | ($2,228) | $21,343 |
| LAGUNA FILMS | 2041 | $147,765 | ($228,246) | $0 | ($29,295) | ($109,776) |
| WEA Corp. | 2076 | $719,307 | ($264,424) | $0 | $0 | $454,884 |
| E1 Entertainment | 2391 | $292,981 | ($79,374) | $0 | $0 | $213,607 |
| MPI HOME VIDEO | 2466 | $816,753 | ($1,181,296) | $0 | ($113,400) | ($477,943) |
| IMT RECORDS | 21537 | $99,406 | ($875) | $0 | ($80) | $98,452 |
| Millennium Media Services MMS | 23585 | $740,067 | ($1,614,009) | $0 | ($77,328) | ($951,270) |
| COVENANT COMMUNICATIONS | 25064 | $35,357 | ($918) | $0 | $0 | $34,439 |
| CEDAR FORT | 25739 | $26,082 | ($138,016) | $0 | $0 | ($111,934) |
| Group 1200 Media | 27822 | $1,418,309 | ($5,227,989) | $0 | ($124,575) | ($3,934,255) |
| MAVERICK ENTERTAINMENT | 28709 | $262,807 | ($402,970) | $0 | $0 | ($140,163) |
| Excel Entertainment | 29481 | $197,697 | ($211,225) | $0 | ($109) | ($13,637) |
| TEAM MARKETING | 30168 | $1,588,133 | ($1,048,282) | $0 | ($61,840) | $478,012 |
| MULTIMUSIC INC. | 34873 | $39,978 | $0 | $0 | $0 | $39,978 |
| INDICAN PICTURES | 35340 | $9,740 | ($2,605) | $0 | ($3,955) | $3,181 |
| WELL GO USA, INC | 36299 | $1,024,154 | ($2,522,686) | $0 | $0 | ($1,498,532) |
| PLUS ENTERTAINMENT | 36696 | $226,919 | ($252,810) | $0 | ($10,663) | ($36,555) |
| N CIRCLE ENTERTAINMENT | 37481 | $768,103 | ($1,137,865) | $0 | ($49,649) | ($419,410) |
| DISCO POWER | 37737 | $17,299 | $0 | $0 | $0 | $17,299 |
| CANDLELIGHT MEDIA GROUP | 37893 | $46,359 | ($40,732) | $0 | ($4,481) | $1,146 |
| DISTRIMAX INC | 37966 | $66,324 | $92,055 | $0 | $0 | $158,379 |
| PHASE 4 FILMS | 38943 | $469,696 | ($586,228) | $0 | $0 | ($116,532) |
| Xenon Pictures | 39637 | $19,573 | ($12,559) | $0 | $0 | $7,014 |
| Softland International | 41006 | $132,968 | ($386,568) | $0 | $0 | ($253,600) |
| CAPITAL CHRISTIAN DIST | 41318 | $623,366 | ($294,657) | $0 | $0 | $328,709 |
| Gaiam Fitness | 42501 | $64,640 | $224,715 | $0 | $0 | $289,355 |
| AMAZON VIDEO | 42752 | $57,832 | $0 | $0 | $0 | $57,832 |
| Total | | $10,412,032 | ($15,732,809) | $0 | ($477,601) | ($5,798,377) |

| | Purchase Agreement | July 9, 2015 | |
|---|---|---|---|
| Total Cash on Hand | 1,782,656.71 | 828,735.30 | A |
| A/R | 4,132,848.38 | 3,598,988.86 | |
| MG's | 21,055.56 | 21,055.56 | |
| Total Current Assets | 5,936,560.65 | 4,448,779.72 | |
| | | | |
| A/P | (5,000,186.96) | (4,290,640.57) | |
| Total Current Liabilities | (5,000,186.96) | (4,290,640.57) | |
| | | | |
| Total Working Capital | 936,373.69 | 158,139.15 | |

**A** Refelcts reduction of $1,001,864.01 in clearing account on Jul 9
related to outgoing payment to former Anderson Digital partners.

**Only negative amount is adjusted, not the entire change**

AD Work Cap Adj

# ALCHEMY

**ALCHEMY STATEMENT SUMMARY**

**Anderson Merchandisers**
**07/01/15 - 07/09/15**
**FINAL STATEMENT**

| | Current Month | Inception* To Date |
|---|---|---|
| **Sales Invoiced:** | | |
| Units | 6,765 | 3,252,126 |
| Value | $58,693.10 | $27,026,436.25 |
| Less: | | |
| Open A/R | $0.00 | $0.00 |
| Returns | ($187,639.94) | ($7,588,024.93) |
| Marketing Rebates | ($39,490.58) | ($5,551,248.94) |
| Shipping Variances | ($1,822.43) | ($54,048.32) |
| Chargebacks/Other | $0.00 | ($0.02) |
| Appr Co-Op Marketing | $0.00 | ($569,579.20) |
| Merchandising Fees | $0.00 | $0.00 |
| Price Protection | $0.00 | ($127,798.25) |
| Reserves | $0.00 | $0.00 |
| **Gross Receipts** | **($170,259.85)** | **$13,135,736.59** |
| Deductions: | | |
| Distribution Fee | $7,737.16 | ($1,250,450.33) |
| VMI Service Fee | $0.00 | $0.00 |
| Marketing Costs | $0.00 | ($5,437.76) |
| Production Costs | $0.00 | ($117,505.39) |
| Retn Process Fee | $0.00 | ($148,254.24) |
| Freight | $0.00 | ($311,157.22) |
| Price Stickering | $0.00 | $0.00 |
| Returns To Supplier | $0.00 | ($48,998.19) |
| Pick&Pack Fees | $0.00 | ($289,405.83) |
| **Net Receipts** | **($162,522.69)** | **$10,964,527.63** |
| Less: Prior Payments | $0.00 | ($6,113,905.13) |
| **Balance Payable (Deficit)** | **($162,522.69)** | **$4,850,622.50** |

* Inception starts at July 1, 2011

|  | BALANCE AS OF JULY 9TH | |
|---|---|---|
|  | ANCONNECT | ALCHEMY |
|  | $  1,333,300.45 | $  1,985,438.28 |
| RETURN CREDITS NEEDED - 1872662 | $  (6,936.99) | |
| CREDIT COPIES NEEDED - MISC. CREDIT? | $  (89,112.00) | |
| **CREDIT KEYED AFTER 7-9-15** | **$  (18,927.79)** | |
| INVOICES IN EDI - PROD. REC. PRIOR 7-9 | $  202,093.50 | |
| **INVOICES IN EDI - PROD REC. AFTER 7-9** | **$  60,589.50** | |
| RETURN PAYBACK - LINE 3 - 1872662 | $  17,346.19 | |
| **PAYBACK KEYED AFTER 7-9-2015 - SEE LINE 5** | **$  20,679.64** | |
| PAYBACK KEYED WRONG - NEED ADDITIONAL $ PAID | $  1,853.35 | |
| ADV. CLAIM - NEED CREDIT | | $  (5,535.60) |
| OPEN CREDITS NOT ON VENDOR STMNT | | $  (49,783.75) |
| OPEN SHORTAGE CLAIM DEDUCTIONS | | $  (429.40) |
| RETURN DEDUCTIONS - PRIOR TO JULY 9TH | | $  (435,319.47) |
| **RETURN DEDUCTIONS - AFTER JULY 9TH** | | **$  (26,724.94)** |
| OPEN ADV. DEDUCTIONS | | $  (20,211.96) |
| OPEN INV. NOT ON VENDOR STMNT | | $  15,795.00 |
| OPEN RETURN PAYBACKS | | $  79,250.62 |
| OPEN ADV. PAYBACKS | | $  23.40 |
| ADJUSTMENT FOR LINE 10 - FULL PAYBACK INCLUDED IN VENDOR BALANCE | | $  (21,616.33) |
|  | **$  1,520,885.85** | **$  1,520,885.85** |

8/22/2022                                                                 MYOB / Excel                                                                          2:49 PM

**Anderson Digital, LLC**
*530 South Hewitt Street #535*
*Los Angeles CA 90013*

## Receivables Reconciliation [Summary]
7/9/15

$34,223.25  Bad Debt identified by Heather
$22,000.00  Additional Bad Debt – Microsoft
$56,223.25

| Name | Total Due | 0 - 30 | 31 - 60 | 61 - 90 | 90+ | |
|------|-----------|--------|---------|---------|-----|--|
| 7640960 Canada Inc. | $31,000.00 | $0.00 | $0.00 | $0.00 | $31,000.00 | Bad Debt |
| adRise | $13,526.98 | $0.00 | $0.00 | $24.72 | $13,502.26 | AVOD, collectible. Payments received monthly |
| AEC One Stop Group | ($4,533.31) | $0.00 | $0.00 | $0.00 | ($4,533.31) | credits for physical returns |
| Amazon.com | $726,252.40 | $261.70 | $279.74 | $185,000.00 | $540,710.96 | EST/License agreements.  Payments for License reviewed Quarterly. EST monthly |
| ANconnect | $49,048.77 | $0.00 | $0.00 | $0.00 | $49,048.77 | Anconnect Physical revenue Q414. |
| ANConnect/Arc Entertainment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| And You Films | $450.00 | $450.00 | $0.00 | $0.00 | $0.00 | |
| Baker & Taylor Ent. | $263.34 | $0.00 | $0.00 | $0.00 | $263.34 | Bad Debt |
| Bell Canada | $286,875.00 | $0.00 | $0.00 | $0.00 | $286,875.00 | SVOD license agreement. Payments based on agreement |
| Bigstar Tv, Inc. | $1,349.84 | $1,349.84 | $0.00 | $0.00 | $0.00 | |
| Bloom Media | $35,000.00 | $0.00 | $0.00 | $0.00 | $35,000.00 | Balance due now |
| Cake Distribution LTD | $30,094.00 | $0.00 | $0.00 | $17,506.00 | $12,588.00 | Cross collertation account. |
| Cinedigm Co. | $92,678.17 | $0.00 | $0.00 | $0.00 | $92,678.17 | Partial payment received in Oct. Balance to remitted beginning of November |
| Conexion Media Ltd | $2,433.10 | $0.00 | $0.00 | $0.00 | $2,433.10 | Collectible |
| Coutts Information Services | $19.95 | $0.00 | $0.00 | $0.00 | $19.95 | Bad Debt. Physical DVD sale |
| Crystal Sky Pictures | $1,750.00 | $0.00 | $0.00 | $0.00 | $1,750.00 | Cross collertation account. |
| EmE Films, LLC | $215.00 | $0.00 | $0.00 | $0.00 | $215.00 | Bad Debt. Physical DVD sale |
| Fine Arts Theatre | $350.00 | $0.00 | $0.00 | $0.00 | $350.00 | Bad Debt. Physical DVD sale |
| Fuhu, Inc. | $2,549.06 | $402.85 | $0.00 | $0.00 | $2,146.21 | As of 10/22/15 no balance |
| Google, Inc. | ($152.99) | $0.00 | $0.00 | ($152.99) | $0.00 | |
| Gravitas Ventures | $58,430.29 | $0.00 | $0.00 | $0.00 | $58,430.29 | SVOD license agreement. Payments based on agreement |
| Health Ed Learning Center | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Hulu, LLC | $147,521.13 | $67,708.07 | $79,813.06 | $0.00 | $0.00 | |
| IndieRix | $689.34 | $0.00 | $0.00 | $0.00 | $689.34 | |
| IndieReign | $2,068.00 | $0.00 | $0.00 | $0.00 | $2,068.00 | |
| Injury Slight Please Advice LLC | $850.00 | $0.00 | $0.00 | $0.00 | $850.00 | Bad Debt. Physical DVD sale |
| Intercommedia International | $41,915.00 | $1,865.00 | $0.00 | $0.00 | $40,050.00 | International License Agreement Client pays quarterly |
| Keystone Entertainment | $3,168.00 | $0.00 | $0.00 | $0.00 | $3,168.00 | Cross collertation account. |
| Leon Lozano | $110.00 | $0.00 | $0.00 | $0.00 | $110.00 | Bad Debt. Physical DVD sale |
| Midwest Tape (HOOPLA) | $8,462.82 | $4,779.00 | $3,683.82 | $0.00 | $0.00 | |
| Mircosoft/Xbox | $69,885.03 | $46,970.04 | $0.00 | $0.00 | $22,914.99 | EST/Payments  reviewed Quarterly. Monthly will check in about 22k o/s payment is due |
| Music Video Distributors | $87.34 | $0.00 | $0.00 | $0.00 | $87.34 | Bad Debt. Physical DVD sale |
| Netflix DC | $1,661,084.18 | $0.00 | $240,000.00 | $450,625.00 | $970,459.18 | SVOD license agreement. Payments based on agrement |
| Overdrive, Inc. | $1,071.50 | $0.00 | $0.00 | $0.00 | $1,071.50 | Bad Debt |
| Paul Perry | $100.00 | $0.00 | $0.00 | $0.00 | $100.00 | Bad Debt |
| Princ Films | $4,830.00 | $0.00 | $0.00 | $0.00 | $4,830.00 | Collectible |
| Rogue Arts | $1,335.00 | $0.00 | $0.00 | $0.00 | $1,335.00 | Cross collertation account. |
| Showtime Networks | $50,000.00 | $0.00 | $0.00 | $0.00 | $50,000.00 | Cable, payments based agreement |
| Snag Films | $1,652.68 | $0.00 | $0.00 | $0.00 | $1,652.68 | Collectible |
| SONIFI | $15,090.52 | $11,962.63 | $0.00 | $23.98 | $3,103.91 | Hospitality/Payments received monthly |
| Sony Network Entertainment | $59,972.54 | $18,752.19 | $41,167.82 | $52.53 | $0.00 | |
| Space Race, LLC | $1,850.00 | $0.00 | $0.00 | $0.00 | $1,850.00 | Cross collertation account. |
| Starz Entertainment | $195,000.00 | $0.00 | $20,000.00 | $0.00 | $175,000.00 | Cable, payments based agreement |
| Viewster AG | $5,774.58 | $0.00 | $0.00 | $3,711.65 | $2,062.93 | Collectible |
| Vimeo | $25.42 | $25.42 | $0.00 | $0.00 | $0.00 | |
| Walmart/Vudu | $60,698.89 | $60,698.89 | $0.00 | $0.00 | $0.00 | |
| William Scott Peake | $50.00 | $0.00 | $0.00 | $0.00 | $50.00 | Bad Debt |
| Ximon | $106.12 | $0.00 | $0.00 | $0.00 | $106.12 | Bad Debt |
| | | | | | | |
| Total: | $3,660,997.69 | $215,225.63 | $384,944.44 | $656,790.89 | $2,404,036.73 | |
| Aging Percent: | | 5.90% | 10.50% | 17.90% | 65.70% | |
| | | | | | | |
| Receivables Account: | $3,655,212.11 | | | | | |
| Out of Balance Amount: | $5,785.58 | | | | | |

| | |
|---|---|
| Initial Purchase Price | 40,000,000.00 |
| Return Reserve | (2,362,653.00) |
| **Purchase Price Per Purchase Agreement §2.05** | **37,637,347.00** |

**Initial Purchase Price Adjustments**

| | |
|---|---|
| 3PL Gross Due Content Owner *§2.05(a)(i)(A)* | (12,890,779.00) |
| 3PL Returns *§2.05(a)(i)(B)* | 3,804,411.56 |
| Wholesale Working Capital *§2.05(a)(ii)(A)* | (2,590,063.00) |
| Wholesale Returns *§2.05(a)(ii)(B)* | 5,091,908.84 |
| Magnolia *§2.05(a)(ii)(C)* | 361,299.00 |
| Salary Reimbursement §2.05(a)(ii)(D)(b) | (125,000.00) |
| Product Returns *§2.05(a)(ii)(D)* | (100,000.00) |
| **Total Initial Purchase Price Adjustments** | **(6,448,222.60)** |
| | |
| Anderson Funding of Excess Minority Interest | (1,426,000.00) |
| | |
| **Total Initial Purchase Price Paid** | **29,763,124.40**  A |

***Detail of Actual Cash Payments***

| | |
|---|---|
| Final Escrow payment - Best Buy, wire dated 7/9/2015 | 5,355,812.00 |
| ANConnect Buyout, wire dated 7/9/2015 | 24,532,312.40 |
| **Total Investment in ANConnect per Funds Flow** | **29,888,124.40**  B |
| | |
| ***B*  -  *A*  = Excess Paid** | *125,000.00* |

AN Connect

Alchemy Contract Post Close Adjustments

Wholesale accounts payable from Exhibit B paid by ANC after closing date of 7-9-2015.

| Vendor | Amount |
|---|---|
| Sony Music Entertainment | 415,245.00 |
| UMGD | 2,228.00 |
| WEA Corp. | 264,424.00 |
| E1 Entertainment | 79,374.00 |
| IMT Records | 955.00 |
| Covenant Communications | 918.00 |
| Cedar Fort | 138,016.00 |
| Capital Christian  Distribution | 294,657.00 |
| TOTAL | 1,195,817.00 |

3PL Vendor co-op and marketing paid after 7-9-2015 by ANC that needs to be paid back by Alchemy.

| | |
|---|---|
| Vertical | 32,829.21 |
| Freestyle | 2,932.31 |
| Hornet's Nest | 4,504.20 |
| Xlrator | 20,547.15 |
| Microsoft | 970.00 |
| Cohen Media Group | 1,353.83 |
| Genesis | 5,510.41 |
| Bagdasarian | 4,710.79 |
| Ketchup II | 47,205.78 |
| Ketchup | 6,335.33 |
| ARC | 77,475.65 |
| TOTAL | 204,374.66 |

3PL Vendor Revenue Sharing checks deposited by ANC belonging to Alchemy

| | |
|---|---|
| Vertical | (3,891.92) |
| Freestyle | (2,301.67) |
| Hornet's Nest | (5.23) |
| Xlrator | (3,625.63) |
| Microsoft | (1,411.98) |
| Cohen Media Group | (1,843.76) |
| Genesis | (5.82) |
| Ketchup II | (1,047.94) |
| Ketchup | (693.56) |
| ARC | (3,301.91) |
| TOTAL | (18,129.42) |







**EXHIBIT 17**

| | |
|---|---|
| **From:** | Mark A. Perez |
| **Sent:** | Wednesday, January 13, 2016 6:22 PM CST |
| **To:** | Jeff Ivers (Jeff.Ivers@ouralchemy.com) |
| **CC:** | Scott Guthrie (Scott.Guthrie@ouralchemy.com) |
| **Subject:** | FW: Anderson settlement update |
| **Attachments:** | RE: Document sent to Bill Lee on November 16, Red Cloud settlement memo 12-3-15.docx, Overview of Red Cloud settlement amounts 12-15-15 MP.xlsx |

Jeff – attached are various documents related to the Anderson true-up.  Quick summary:

- **E-mail entitled "RE: Document sent to Bill Lee on November 16"** contains two attachments:
  o 2015 11 16 Alchemy Update for Bill Lee – a file produced by Anderson in mid-November outlining their view of amounts owed (with internal comments from Jim Jenkins added afterwards, not circulated back to Anderson)
  o Overview of Issues and Potential Actions regarding the ANconnect Agreement – a document authored by Jim Jenkins (Alchemy) that outlines his view on the issues and actions at hand

- **Red Cloud settlement memo 12-3-15** – a file authored by Jim Jenkins (Alchemy) that outlines the issues at hand in narrative form

- **Overview of Red Cloud settlement amounts 12-15-15 MP** – a file that has been going back and forth between Alchemy and ANconnect that itemizes each of the true-up items

To get to the current state, please refer to the "January 2016 Review" tab in the last file.  We can discuss live. Thanks.

MP

---

**From:** Jim Jenkins [mailto:Jim.Jenkins@ouralchemy.com]
**Sent:** Tuesday, December 15, 2015 9:57 AM
**To:** Mark A. Perez <mperez@virgo-llc.com>; Scott Guthrie <Scott.Guthrie@ouralchemy.com>
**Subject:** Anderson settlement update

Mark / Scott,

Attached is the latest overview of settlement items with Anderson.  Chuck and Dan Hetrick called me yesterday to follow up with a few updates.  I'll update you in detail on our call this afternoon.

Mark – they have now responded to my open questions.  The issues are still not closed, but the ball is in Alchemy's court at the moment.  Speak with you later.

Jim

VIG0006232

**EXHIBIT 18**

# ALCHEMY

**Background:** There are several components to settle out with ANConnect which fall into 4 categories:

- Balance sheet adjustments per APA
- Other adjustments/settlements from APA
- Transition Services Fees
- Additional reconciling items and disputed amounts

The APA between Alchemy and ANConnect defines various post close adjustments and settlements that must be reconciled. In addition, all costs related to the Transition Services agreement with ANConnect remain outstanding with several amounts in dispute. Given the performance of ANConnect in providing distribution services through the transition, there has been a significant impact on the financial performance of the business which was acquired by Alchemy.

## Balance Sheet adjustments per APA

The APA defines 4 specific post-closing settlement true-ups for which the amounts are summarized on the attached spreadsheet, including any amounts Alchemy is disputing.

**Exhibit A Gross Due Suppliers**: This represents the total gross amounts due to suppliers in the 3PL model (calculated based on the participation statements with the A/R holdback and returns reserve removed from the calculation). The closing purchase price was reduced by this amount as it was an obligation that Alchemy was taking over which related to pre-closing activity. The amount used at closing for this adjustment was taken from the April month end participation statements and therefore had to be "trued up" to the actual balances for each supplier as of July 9. The spreadsheet reflects this adjustment. The adjustment goes in ANConnect's favor as the gross due amount went down significantly based on a large payment made to Dreamworks prior to close.

**Exhibit B Gross Due Suppliers**: This represents the total gross amounts due to suppliers in the Wholesale model (Accounts Payable less On Hand Inventory balance). The closing purchase price was reduced by this amount as it was an obligation that Alchemy was taking over which related to pre-closing activity. The amount used at closing for this adjustment was taken from the April month end balance sheet and therefore had to be "trued up" to the actual balances for each supplier as of July 9. The spreadsheet reflects this adjustment. The adjustment goes in Alchemy's favor mainly due to a significant increase in the payable amount due to Group 1200.

**Exhibit I Product Returns**: This represents the projected amount of returns that would be hitting against ANConnect's vendor number during the transition. As these returns amounts would be passed through to Suppliers, this amount was added back to the closing purchase price to keep the financial impact neutral for the transaction. The initial estimate was based on inventory on hand at Walmart, Best Buy and Sam's Club as of the end of April, with the assumption that Walmart and Sam's Club would be flipped over to Alchemy's vendor number in 1 month while Best Buy would be converted in 2 months. Actual returns were much higher than estimated for a few reasons. 1) The estimate was based on retail on hands in April but the deal did not close until July, so the estimate was not based on what was actually on hand in stores at the actual "starting point". 2) The actual timeline for converting over to Alchemy vendor numbers was actually reversed where Walmart and Sam's took 2 months and Best Buy took 1 month (and Walmart represented 80% of the returns). 3) In the data for Walmart's returns deductions, ANConnect included several pricing discrepancies which they have not reconciled with Walmart as well as several deductions which Walmart indicates to Alchemy are not actual returns deductions (possibly additional pricing discrepancies or other types of chargebacks, this has not been

# ALCHEMY

verified).  Therefore, as indicated on the spreadsheet, we are disputing $927K of the total returns true up amount.

**Anderson Digital Working Capital**: The APA called for the Anderson Digital balance sheet to reflect positive working capital at close (any negative balance amount would be a purchase price adjustment in Alchemy's favor).  As the AD final balance sheet had positive working capital, there is no purchase price adjustment.

Based on all of the above, Alchemy believes the Balance Sheet adjustments per the APA should total to **$5,297,129 in favor of ANConnect**.

# Other Adjustments/Settlements per APA

There are a handful of other post-closing adjustments to be made based on items called out in the APA.

**Intercompany statement reconciliation**:  Because Alchemy and ANConnect acted as suppliers to one another prior to the transaction, there were statements from each company to the other which had to be reconciled and settled.  As there was much greater volume flowing from ANConnect through Alchemy into Target, there is a much larger statement from Alchemy to ANConnect.  The two statements netted together result in $3,329,737 owed to ANConnect which was supposed to be paid over the course of 4 months following close.

**Items missed in closing cash settlement**: There were two items called out in the APA which were missed/inaccurately settled in the closing.  These included the sharing of 6 months of Matthew Smith's salary as well the inaccurate settlement of the sharing of the tag along price premium paid to the Anderson Digital partners.

**Bagdasarian statement credit**:  As part of the assignment agreement whereby Bagdasarian agreed to the assignment of the distribution agreement from ANConnect to Alchemy, ANConnect and Alchemy agreed that the gross credit balance on the Bagdasarian participation statement would be reset to $0 as of close.  The calculation for the gross amount was defined as the net balance of the statement with the A/R holdback and reserves removed.  The initial calculation used in the closing was based on the April month end statement resulting in a total credit of $50K to be split 50/50 between ANConnect and Alchemy.  However, actual returns from May through July 9 were much higher than the reserve calculated on the statement and the actual credit owed to Bagdasarian as of July 9 is $460,868.  Based on this, there is will be an additional credit due back to Alchemy from ANConnect of **$205,434.**

# Transition Services Fees

There are 3 categories of Fees defined in the Transition Services agreement:

**Distribution and Returns Fees**: These are fees paid to ANConnect for handling the physical logistics on behalf of Alchemy through the transition until vendor of record could be flipped for all retailers and the supply chain moved to Alchemy's service provider (DADC).  The rate card used was the same rate card used with DADC.  Alchemy has disputed $73K of these charges based on pricing discrepancies and units shipped by ANConnect to "MMS/Alchemy" who was no longer a customer to ANConnect after July 9.  Alchemy believes the total amount owed for these fees is $844,816.

# ALCHEMY

**Administrative fees**: These are fees to cover the overhead costs of providing back office services on Alchemy's behalf (billing & collections, order processing, etc).  The fees were broken down by retailer and set at a weekly rate for each week that ANConnect was servicing each retailer.  Given the performance through the transaction and the negative impact on Alchemy's business.  Alchemy is taking the position that all Administrative Fees should be waived.

**Inventory Transfer Fees**: These fees are for the pick, pack and ship process for moving the inventory from ANConnect's warehouses to DADC.  A special rate of $0.04 per unit shipped was negotiated for this process.  The total invoice is not disputed by Alchemy (**$476,553**).

## Additional Reconciling items

**Remaining A/R balance due to Alchemy**:  Through the transition period, ANConnect was invoicing the retailer under their vendor number on Alchemy's behalf and remitting payment to Alchemy as invoices were cleared.  George has prepared a reconciliation of these A/R balances also attached as backup.  Alchemy's reconciliation of data provided by ANConnect reflects that ANConnect invoiced $15.7M on Alchemy's behalf and has thus far remitted $8.7M back to Alchemy.  Therefore, Alchemy asserts that $7M is still owing from ANConnect in regard to these invoices.

**Anderson Digital SVOD receivable due to ANConnect**: This amount reflects remaining balances on SVOD sales made prior to closing.  As of closing, the Anderson Digital balance sheet reflected a payable to ANConnect of $1,450,925**.**  This amount was due to be paid by Alchemy to ANConnect in equal monthly installments of $120,910.  Of this amount, $362,731 was deducted by ANConnect in their final remittance made to Alchemy on the A/R being collected on Alchemy's behalf.  This leaves a balance of **$1,088,194** owed by Alchemy (still in monthly installments through June 2016).

**Expedited Freight incurred by Alchemy due to transition issues**: As a result of the supply chain issues experienced by ANConnect in the wake of their SAP transition, Alchemy was forced to expedite freight on several orders through its supply chain.   A chain reaction began when ANConnect could not ship major Halloween orders to retail and sent all the product to DADC, forcing Alchemy to react and push those orders out through DADC.  This created capacity constraints through the entire month of September whereby Alchemy was forced to repeatedly expedite new release and promo orders to attempt to make street date and avoid the wrath of retailers.  Alchemy estimates the impact of these expedited orders to be **$578,103** and should be deducted from any settlement amounts owed to ANConnect.

## Summary

Certain transactions have been purposefully excluded from the above review.  Specifically, the Note Payable from Alchemy to Charlie Anderson is considered entirely separate from this analysis.  Additionally, premium to be paid on the merchandising fees paid to Anderson Merchandisers has also been excluded from this review.

With all items above considered, the attached spreadsheet reflects Alchemy's position that the total net balance that should be owed by Alchemy to ANConnect is **$3,043,898.**

VIG0001217

**EXHIBIT 19**

| From: | Mark A. Perez |
|---|---|
| Sent: | Saturday, June 11, 2016 4:10 PM CDT |
| To: | Sammataro, James G. |
| CC: | Olivia.Lerner@ouralchemy.com |
| Subject: | RE: Alchemy / Sun Trust |
| Attachments: | Overview of Red Cloud settlement amounts 03 30 16 Adjusted.xlsx |

James -- please send across the following.  Please note that this file is highly confidential and should not be shared outside of Akin or the lender group.  Thanks.

MP


-----Original Message-----
From: Sammataro, James G. [mailto:jsammataro@stroock.com]
Sent: Saturday, June 11, 2016 12:50 PM
To: Mark A. Perez <mperez@virgo-llc.com>
Cc: Olivia.Lerner@ouralchemy.com; Sammataro, James G. <jsammataro@stroock.com>
Subject: RE: Alchemy / Sun Trust

Can you (re)send me the most favorable Excel, and I'll pass it along.  (I just want to make sure that I send the proper version).   Also, I don't read too much into SunTrust's letter, aside from a cover-its-backside preservation demand. A prudent demand given its view of the landscape.

-----Original Message-----
From: Mark A. Perez [mailto:mperez@virgo-llc.com]
Sent: Saturday, June 11, 2016 3:38 PM
To: Sammataro, James G.
Cc: Olivia.Lerner@ouralchemy.com
Subject: Re: Alchemy / Sun Trust

James -- thanks for the update. I have no problem with the Excel file that shows the reconciliation to $2mm.

Since the request was attorney to attorney, probably makes sense for you to deliver.

Happy to discuss further as needed. Thanks.

MP

> On Jun 11, 2016, at 7:55 AM, Sammataro, James G. <jsammataro@stroock.com> wrote:
>
> Mark -
>
> We had a productive call with Sun Trust yesterday. (They asked questions for the better part of an hour). They asked if we would be willing to share the last of the Excel reconciliation spreadsheets. Akin was keenly interested in learning more about the perceived delta between Anderson's $9 million dollar claim and our view that the true reconciliation maybe closer to $2 million.
>
> Please let me know if we're so inclined to share and, if so, if you wish for me to the vehicle of delivery.
>
> Sincerely,

> 
> 
> James
> 
> Sent from my Android phone using Symantec TouchDown (www.symantec.com)
> 
> -----Original Message-----
> From: Mark A. Perez (mperez@virgo-llc.com)
> Received: Saturday, 11 Jun 2016, 1:22AM
> To: Joe D'Angelo (jdangelo@carlmarks.com) [jdangelo@carlmarks.com]; Luke Goetz (lgoetz@carlmarks.com) [lgoetz@carlmarks.com]; Scott Guthrie (Scott.Guthrie@ouralchemy.com) [Scott.Guthrie@ouralchemy.com]; Kelly Summers (Kelly.Summers@ouralchemy.com) [Kelly.Summers@ouralchemy.com]; Chris MacDonald [Chris@virgo-llc.com]; Brian Wade [brian@virgo-llc.com]; Jesse C. Watson [jwatson@virgo-llc.com]; Emanuel Manny Grillo (emanuel.grillo@bakerbotts.com) [emanuel.grillo@bakerbotts.com]
> CC: Robert Racusin [rracusin@virgo-llc.com]; Sammataro, James G. [jsammataro@stroock.com]; Loftus, Jake [jloftus@stroock.com]; Moore, Schuyler M. [smoore@stroock.com]
> Subject: FW: Alchemy
> 
> Not sure what the angle here is, but sharing the attached from SunTrust's counsel.
> 
> MP
> 
> 
> From: Miller, Alissa [mailto:almiller@akingump.com]
> Sent: Friday, June 10, 2016 9:25 PM
> To: Mark A. Perez <mperez@virgo-llc.com>
> Cc: Simonds, David <dsimonds@AkinGump.com>; Stolyar, Alex <astolyar@AKINGUMP.com>; Woods, Edward <ewoods@AKINGUMP.com>; Biro, Warren <wjbiro@akingump.com>; 'McCormack.Frank' <Frank.McCormack@SunTrust.com>; DeJesus-Caballero.Juan <Juan.Dejesus-caballero@SunTrust.com>; Sharpe.David.J <David.J.Sharpe@SunTrust.com>; smoore@stroock.com
> Subject: Alchemy
> 
> 
> Please see the attached letter.
> 
> Alissa Miller
> AKIN GUMP STRAUSS HAUER & FELD LLP
> 2029 Century Park East | Suite 2400 | Los Angeles, CA 90067-3010 | USA | Direct: +1 310.728.3364<tel:1310.728.3364> | Internal: 43364<tel:43364>
> Fax: +1 310.229.1001 | almiller@akingump.com<mailto:almiller@akingump.com> | akingump.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.akingump.com&d=DQMGaQ&c=gAzS7Z2sPuIVLgfP0R9Uzw&r=IFV2npjcLsVf-Ru484AJ0eG_-VCpqIZuevE-aUz2oWA&m=HPMrR3hcQrNUnwj_y732xs9gvY8AKV4sA667KcqE4u4&s=aWacraoaA9DxasaBmWUp_LMo7CVA00CC25zD7qnhJec&e=> | Bio<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.akingump.com_almiller&d=DQMGaQ&c=gAzS7Z2sPuIVLgfP0R9Uzw&r=IFV2npjcLsVf-Ru484AJ0eG_-VCpqIZuevE-aUz2oWA&m=HPMrR3hcQrNUnwj_y732xs9gvY8AKV4sA667KcqE4u4&s=UxdiDuURxVR-Xc67EzGCKIIbQ2w7R4RPG2Oow_MrfRQ&e=>
> 
> _____
> 
> The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

VIG0006862

**EXHIBIT 20**

WORKING DRAFT -- SUBJECT TO FURTHER REVISION                    HIGHLY CONFIDENTIAL

| Item | Anderson | Alchemy | Notes |
|---|---|---|---|
| **1 - Working Capital Reconciliation** | | | |
| 3PL Supplier A/P Closing Adjustment | (4,686) | (4,686) | Agreed |
| Buy/Sell Supplier A/P Closing Adjustment | 3,208 | 6,146 | IN DISPUTE -- Alchemy data provided to Anderson for reconciliation |
| Product Returns Adjustment | (4,423) | (3,495) | IN DISPUTE -- pending third-party audit or other reconciliation |
| Buy/Sell Invoices Paid by ANconnect Post-Closing | (1,055) | (1,055) | IN DISPUTE -- Alchemy still reconciling data from suppliers |
| **2 - Deferred Purchase Price** | | | |
| Anderson Digital | (725) | (725) | Agreed |
| **3 - Other** | | | |
| ANconnect Participations | (3,159) | (3,159) | Agreed |
| Other Miscellaneous Adjustments | (29) | (29) | Agreed |
| Anderson Canada Receipts | 0 | 766 | Excluded in filing / number agreed by Alchemy and Anderson |
| Additional Agreed Upon Items (per previous schedule) | 0 | 468 | Excluded in filing / number agreed by Alchemy and Anderson |
| **4 - Anderson Merchansiders** | | | |
| Base Fee and Premiums Due | (2,504) | (2,054) | Net of payments made since filing / payment plan in process |
| **5 - Transition Service Agreement** | | | |
| Distribution & Returns Fees | (845) | (845) | Agreed |
| Admin Fees | (377) | 0 | TSA indemnity claim (non-payment) (Anderson has not contested) |
| Inventory Transfer Fees | (477) | (477) | Agreed |
| Net Receipts Collected on behalf of Alchemy | 6,047 | 7,649 | Higher number based on previous schedule received by Anderson |
| Indemnity Claim for Expedited Freight | 0 | 578 | TSA indemnity claim (non-payment) (Anderson has not contested) |
| **Total** | **(9,024)** | **(918)** | |