## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| OUR ALCHEMY, LLC, *et al.*,[1] | Case No. 16-11596-JTD |
| *Debtors.* | Jointly Administered |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC, | Adv. Pro. No. 18-50633-JTD |
| *Plaintiff,* | |
| v. | |
| ANCONNECT, LLC, *et al.*, | **Re: Adv. D.I. 310, 311** |
| *Defendants.* | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO ANCONNECT, LLC'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, III, AND V

COREN & RESS, P.C.
Steven M. Coren (pro hac vice)
Andrew J. Belli (pro hac vice)
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
scoren@kcr-law.com

COZEN O'CONNOR
John T. Carroll, III (DE Bar No. 4060)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
jcarroll@cozen.com

*Attorneys for Plaintiff*

Dated: September 22, 2023

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596 and Anderson Digital, LLC, Case No. 16-11597.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.   INTRODUCTION ......................................................................................................... 1

II.  COUNTERSTATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY ....... 1

    A.  Calrissian Purchases A Financially Troubled Alchemy And Exacerbates Its Issues
        By Extracting a $14.5 Million Equity Distribution ............................................. 1

    B.  Anderson Media Offloads ANConnect's Failing Video Assets to the Failing Alchemy
        For A Price Far In Excess of Their Fair Value ................................................... 3

        1.  The Term Sheet Reflects An Inherently Overinflated Value For A Failing Business
            In a Dying Industry ............................................................................. 4

        2.  ANConnect's Video Business Was On The Verge Of Collapse ...................... 4

        3.  ANConnect Misrepresents Material Facts to Alchemy During Due Diligence ........... 6

        4.  The Parties Signed An APA In The Face Of These Numerous Red Flags ................. 6

        5.  The Parties Fail To Adjust the Purchase Price Despite Due Diligence Revealing
            That The Underlying EBITDA Figures Were A Fiction ............................... 7

            a.  Group 1200.................................................................................. 7

            b.  ARC ........................................................................................... 8

            c.  DreamWorks/Classic ................................................................. 10

    C.  The Anderson Transaction Had A Devastating Impact On the Debtors' Already
        Unsound Business ............................................................................................ 12

    D.  Procedural History ......................................................................................... 16

III.  ANCONNECT'S MOTION SHOULD BE DENIED BECAUSE THERE ARE
     DISPUTED ISSUES OF MATERIAL FACT CONCERNING THE TRUSTEE'S
     AVOIDANCE AND  UNJUST ENRICHMENT CLAIMS ................................................. 17

    A.  Ample Evidence Demonstrates A Lack of Reasonably Equivalent Value ..................... 17

    B.  Ample Record Evidence Demonstrates that Alchemy Was Insolvent, Inadequately
        Capitalized, and Unable to Pay Its Debts When It Entered Into the Anderson
        Transaction...................................................................................................... 25

    C.  There Are Genuine Issues of Material Fact Concerning Fraudulent Intent .................... 28

    D.  Genuine Disputes of Material Fact Exist As To Unjust Enrichment .............................. 30

IV.  CONCLUSION.............................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*In re Autobacs Strauss, Inc.*, 473 B.R. 525 (Bankr. D. Del. 2012)...............................................28

*In re Bentivegna*, 597 B.R. 261 (Bankr. E.D. Pa. 2019) .............................................................18

*In re BMT-NW Acquisition, LLC*, 582 B.R. 846 (Bankr. D. Del. 2018).............................25, 30

*In re Calrissian LP*, 2018 WL 3854004 (Bankr. D. Del. Aug. 10, 2018) ......................................2

*In re Charys Holding Co., Inc.*, 2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ..................28

*In re Charys Holding Co., Inc.*, 443 B.R. 628 (Bankr. D. Del. 2010)....................................18, 20

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017).............................................30

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ...................................................18, 20

*In re Halpert & Co., Inc.*, 254 B.R. 104 (Bankr. D.N.J. 1999) ....................................................18

*In re Kendall*, 491 B.R. 191 (Table) (10th Cir. B.A.P. 2013),
   *aff'd*, 565 F. App'x 714 (10th Cir. 2014).................................................................................25

*In re Maxus Energy Corp.*, 615 B.R. 62 (Bankr. D. Del. 2020) ...................................................17

*In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005).............................................................28

*In re PennySaver USA Publ'g, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018) .................................30

*In re Plassein Int'l Corp.*, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ...........................18

*In re Tribune Co.*, 464 B.R. 126 (Bank. D. Del. 2011) ...............................................................28

*In re Washington Mut., Inc.*, No. 08-12229 (MFW), 2013 WL 3757330
   (Bankr. D. Del. July 16, 2013).................................................................................................18

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010)............................................................................30

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ...................................................22

**Statutes**

11 U.S.C. § 548..............................................................................................................25, 28

6 Del. C. § 1302 .....................................................................................................................25

6 Del. C. § 1304 ...............................................................................................................25, 28

6 Del. C. § 1305 .....................................................................................................................25

**Other Authorities**

5 Collier on Bankruptcy ¶ 548.05[1][b] (15th ed. 1998) .............................................................18

Plaintiff George L. Miller, Chapter 7 Trustee ("Plaintiff" or the "Trustee") for the jointly administered bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital" and, together with Alchemy, the "Debtors"), submits this Memorandum of Law in opposition to Defendant ANConnect, LLC's ("ANConnect") Renewed Motion for Partial Summary Judgment on Counts I, II, III, and V of the Trustee's Complaint (Adv. D.I. 310, 311).

## I.    INTRODUCTION

The Trustee seeks, *inter alia*, to avoid Alchemy's acquisition of ANConnect's physical and digital distribution business (the "ANConnect Transaction"), in connection with which Alchemy made cash payments to ANConnect totaling $29,888,124.40 and assumed ANConnect liabilities exceeding $16 million. Summary judgment should be denied based on the evidentiary record—as there are genuine issues of material fact concerning reasonably equivalent value, insolvency, and badges of fraud indicative of actual fraudulent intent. The Trustee's allegations concerning these issues—which this Court has twice held are sufficient to state fraudulent transfer and unjust enrichment claims—are supported by copious record evidence, including, inter alia, contemporary communications between the Debtors' managers, executives, and other personnel, presentations prepared for the Debtors' lender, and internal ANConnect communications. As to the materials submitted by ANConnect to support its motion, they fall woefully short of establishing an entitlement to summary judgment and merely highlight issues over which the parties have material factual disputes.

## II.    COUNTERSTATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY

### A.    Calrissian Purchases A Financially Troubled Alchemy And Exacerbates Its Issues By Extracting a $14.5 Million Equity Distribution

Millennium Entertainment, LLC, later renamed Alchemy, was formed in 2010 as a film

distribution and catalog company. On August 18, 2014, a holding company named Calrissian, L.P purchased Millennium Entertainment from Nu Image Holdings. *See In re Calrissian LP*, 2018 WL 3854004, at *1 (Bankr. D. Del. Aug. 10, 2018). Prior to the purchase, Alchemy was on the verge of insolvency and faced potentially crippling working capital issues, as summarized in an award issued by a JAMS arbitrator after six days of arbitration concerning a dispute over the acquisition:

> Baker Tilly, an accounting firm . . . assess[ed] the quality of [Millennium's] earnings. On July 22, 2014, Baker Tilly issued a draft report [concluding] that Millennium had a low quality of earnings and that focusing on EBITDA instead of cash flow could lead one to believe that Millennium's earnings were better than they were. In fact, from 2012 through the first half of 2014, . . . Millennium did not generate any positive cash flow.

Ex. 3[2] at p. 5. Tellingly—and rendering suspect the financial analyses and projections cited by ANConnect—the arbitrator concluded that Baker Tilly was pressured by Alchemy's eventual owner to alter its report to remove unfavorable information about Alchemy's finances. *Id.*

Just weeks later, Alchemy entered a $40 million credit facility with SunTrust Bank, N.A. (the "SunTrust Loan"). Ex. 1 (9/4/14 Loan Agreement). Alchemy immediately borrowed $14,539,123.65, which it transferred to Calrissian as an equity distribution (the "Calrissian Distribution"). Ex. 2. The Calrissian Distribution left Alchemy insufficiently capitalized and unable to pay its debts as they came due. *See, e.g.,* Ex. 3 at p. 6 ("From [the Calrissian Distribution] on, the evidence demonstrates that Millennium struggled to operate without sufficient cash flow to acquire product in the marketplace."); Ex. 4. (8/31/14 email stating that, after the distribution, "we are pretty tight in terms of liquidity"). The Calrissian Distribution doubled Alchemy's bank debt, from approximately $15 million, to over $31 million. *See* Ex. 5 (Funds Flow Summary indicating that, of the $31.2 million in indebtedness incurred by Alchemy on 9/4/14, over $14.3

---

[2]    Citations herein to "Ex. __" refer to exhibits attached to the Declaration of Andrew J. Belli, submitted contemporaneously herewith.

million went towards refinancing existing debt, over $14.5 million went towards the Calrissian Distribution, and over $1.1 million went toward bank fees and expenses).

As a result of the Calrissian Distribution, Alchemy was inundated with past due notices and threats of termination of content supply agreements for non-payment, was forced to micromanage which creditors to pay (if at all), and soon defaulted on, *inter alia*, key licensing agreements with Nu Image for failing to make participation payments thereunder. *See, e.g.,* Exs. 6-10 (Alchemy was in default with Nu Image as early as 9/19/14 and set up a payment plan with which it failed to comply). The point is further established by, *inter alia*:

- a September/October 2014 email chain discussing Alchemy's past due obligations to DCIP, LLC and Alchemy's decision to withhold $373,575 given its liquidity issues, and in which DCIP threatened to stop extending credit and change terms to payment in advance, Ex. 11;

- October & December 2014 emails from Sony DADC which requested Alchemy's "intentions regarding bringing your account current" and noted that, out of a total of $6.1 million owed by Alchemy, over $4 million was past due, Exs. 12 and 12A;

- an internal email dated January 20, 2015 in which an Alchemy employee stated: "Management requested non-vital vendors be extended out," Ex. 13;

- a letter dated January 21, 2015 from Reyes Consulting to Alchemy which identified a breach of an Acquisition Agreement for failure to timely pay $487,500, Ex. 14;

- a January 30, 2015 email from UMGD's Senior Director of Credit to Alchemy personnel stated that "[i]t's going to be pretty difficult for us to advance credit terms on your next sale, given [Alchemy's] lack of payment and unresponsiveness," Ex. 15; and

- a February 2015 email exchange among Alchemy personnel which indicates that, in the fourth quarter of 2014, Alchemy began intentionally withholding monthly participation statements from vendors in an effort to delay payments, Ex. 16.

### B.   Anderson Media Offloads ANConnect's Failing Video Assets to the Failing Alchemy For A Price Far In Excess of Their Fair Value

In 2015, despite its unprofitable business model and challenges caused by the Calrissian Distribution, Alchemy chose to buy ANConnect's film distribution assets. The JAMS arbitrator found that there was no rational reason for the already struggling Alchemy do so, as "Anderson was a distressed company in its own right" and Alchemy's financial executives opposed the deal

based on ANConnect's troubled finances, an unfairly high purchase price, and an unfavorable deal structure, "which entitled Anderson to keep its accounts receivables while Millennium assumed its liabilities." Ex. 3 at p. 6. Alchemy decided to proceed regardless because of its naive focus on becoming an "[u]nstoppable force with thick competitive barrier to entry, dominating independent film distribution worldwide," Ex. 17 at p. 19, consciously disregarding the poor performance of both companies and the fact that physical media was a rapidly dying business.

### 1.    The Term Sheet Reflects An Inherently Overinflated Value For A Failing Business In a Dying Industry

In a February 11, 2015 Term Sheet, Alchemy proposed to buy ANConnect's "US video and digital distribution business" in exchange for "a multiple of 4 times estimated Proforma EBITDA of the Physical Business and 6 times estimated Proforma EBITDA of the Digital Business" and the assumption of "certain specified liabilities and obligations" of ANConnect. Ex. 18. Although it concealed this fact from Alchemy, just over four years earlier, ANConnect had considered purchasing Alchemy's video distribution business, but declined because, "in this environment, it is most difficult to rationalize [a purchase price] beyond two times EBITDA." Ex. 31 at ¶ 2. The "environment" was the physical video industry (based largely on DVD sales), a major component of the ANConnect Transaction which was in rapid decline, with total industry revenues declining from $20.6 billion in 2006, to $17.3 billion in 2009, to only $9.6 billion in 2015, with declines expected to accelerate rapidly through 2021. Ex. 19 at p. 12; *see also* Ex. 20 at p. 1 (2/9/16 email in which, shortly after the ANConnect transaction, Alchemy's owner states that "[t]he physical business is not a great business" and that it is "ultimately going away").

### 2.    ANConnect's Video Business Was On The Verge Of Collapse

Before execution of a formal agreement, Alchemy personnel knew that ANConnect had "very concerning" collection issues, Ex. 21, and had defaulted on various payments due Alchemy.

This is evidenced by February 2015 emails between Debtor employees Rex Bowring and Jim Jenkins, in which Bowring expressed distress at ANConnect's large amounts of past due AR and stated that "[a]ny influence you can provide to motivate Anderson to pay past due amounts would be helpful. . . . [Anderson's] senior management has a hold on all payments." *Id.* Jenkins responded by forwarding an ANConnect AR aging report showing tens of millions overdue. *Id.* On numerous occasions, Alchemy shared outstanding statements and past due invoices that highlighted the millions due from ANConnect to Alchemy alone. *See, e.g.,* Ex. 22 (1/18/15 email from Alchemy CFO Avagliano to Anderson CFO Taylor: "our latest statements . . . showed a balance owed of close to 1.7 million with 700k past due by more than 60 days"). These issues were highlighted in a March 2015 presentation shown at a Red Cloud (code name for ANConnect) meeting describing "concerns" surrounding the Alchemy transaction which included, inter alia, ANConnect's balance sheets of suppliers with negative net balances and/or negative payables balances. Ex. 26 at p. 5.

ANConnect's leaders knew that their video distribution business was failing due to an inherently untenable business model, but did not let this stop them from reaping a windfall. Senior personnel acknowledged in January 2015 that the general gains in the digital media business were not accounting for losses on the physical side of the industry. Ex. 27. This had a devastating impact on ANConnect's video business, with executives acknowledging in an internal May 2015 email that the "Video [business] showed very small profit compared to our core products of music, books and children's books and created costs and absorbed working capital that prevented it from actually generating cash flow." Ex. 28 at 0003290. In his May 12, 2014 notes, Anderson CEO Bill Lardie wrote that it "appears the only profitable account for ANConnect is Walmart," that he estimated it would take at least three years to recoup ANConnect's losses from DreamWorks' contract shortfall, and that ANConnect should "stop chasing movie content" because this aspect of its

business causes "time and resources [to be] wasted." Ex. 29 at ¶¶ 7-8. Additionally, in a December 22, 2014 "to do" list, Lardie highlighted the need to "cut ANConnect expenses ASAP [b]ecause of soft sales trends and higher expenses than expected" by terminating employees and making corporate office cuts, which were implemented in the following months. Ex. 30 at ¶ 2.

### 3.    ANConnect Misrepresents Material Facts to Alchemy During Due Diligence

In direct contradiction to its representations during due diligence that "bad debt write-offs were infrequent and insignificant," Ex. 32 at p.16, ANConnect's principals knew that their video business was a ticking time bomb facing significant bad debt write-offs. The point is established by a May 2014 email in which Anderson CFO Chuck Taylor described ANConnect's precarious AR situation: "I'm trying to avoid being immediately and forever upside down. . . . Much of the reason for my doubtfulness of getting our money is the fact that so many of [ANConnect's] accounts are upside down already worst[] being ARC, but also TGG, Xlrator, Nasser, Primos, Big Air, Drury, Twenty8, Grand Entertainment. After adding back or excluding the Dreamworks Classic amounts the 3PL is currently upside down $7.4m." Ex. 33; *see also* Ex. 34 (ANConnect writes off $12 million in bad debt immediately after closing).

### 4.    The Parties Signed An APA In The Face Of These Numerous Red Flags

In the face of these numerous red flags that should have torpedoed the deal as lacking any semblance of reasonably equivalent value, ANConnect and Alchemy executed an Asset Purchase Agreement dated May 7, 2015 (the "APA"). Ex. 35. Consistent with the EBITDA multipliers set forth in the term sheet, the APA sets forth an aggregate purchase price for the Purchased Assets of $37,637,347, consisting of (a) $35,893,147 allocated to the physical segment of the Business, and

(b) $1,744,200 for ANConnect's 51% membership interest in Anderson Digital.[3] *Id.* at p. 17.

Alchemy also agreed to assume certain liabilities of ANConnect, including, *inter alia*: (i) liabilities

related to content suppliers' contracts, inventory sales, and personnel; (ii) amounts due to content

owners; and (iii) accounts payable to wholesale suppliers. *Id.* at pp. 14-15. Closing on the

ANConnect Transaction (the "Closing") occurred on July 9, 2015 (the "Closing Date"). The cash

payments made by Alchemy in connection with the Closing totaled $29,888,124.40, and the

liabilities assumed by Alchemy exceeded $16 million. Ex. 36.

<b>5.    The Parties Fail To Adjust the Purchase Price Despite Due Diligence<br>Revealing That The Underlying EBITDA Figures Were A Fiction</b>

<b>a.    Group 1200</b>

Before closing, Alchemy knew that ANConnect's relationship with Group 1200 Media –

ANConnect's third largest supplier of physical product to Walmart in 2014 – would terminate in

August 2015. Ex. 37 at p. 3. A June 2015 Alchemy presentation to SunTrust estimated that the

annual EBITD impact of losing this relationship was approximately negative $1.4 million, which

should have equated to a $5.6 million reduction ($1.4 million multiplied by 4) of the purchase

price, but instead of renegotiating the price to account for this significant loss of business, Alchemy

simply plowed ahead with the transaction. *Id.* To make matters worse, Alchemy assumed more

than $3 million in obligations due from ANConnect to Group 1200 Media, for a relationship that

was about to terminate. Ex. 38 at p. 4 (February 2016 email chain in which Alchemy's owner states

that it has "been coordinating with the new CFO at Group 1200 to solve the rather large payable

($3mm+) that came over with the Red Cloud transaction. Group 1200 is no longer a supplier for

---

[3]       The purchase price was subject to certain post-closing adjustments, as set forth in Sections
2.05 and 2.06 of the APA. A number of disputes arose between Alchemy and ANConnect
regarding the adjustments, which were unresolved when Debtors filed for bankruptcy.

us so this is really just a legacy liability"); *see also* Ex. 39 at p. 2 (3/12/16 internal ANConnect memo noting concern that Alchemy would "not pay . . . liabilities to vendors such as Group 1200/Funimation which were handed off to them as part of the [APA]").

### b.   ARC

Prior to closing, Alchemy identified a film acquisition company named ARC Entertainment, LLC ("ARC") as a "critical component of [the ANConnect] deal value." Ex. 40 at p. 3. ANConnect executives recognized in March 2015 that Alchemy "need[ed] comfort about the ARC relationship since it represents 25% of EBITDA and valuation" and noted that "[i]t's extremely important to maintain and extend the ARC relationship because of the huge proportion of EBITDA." Ex. 41. Due diligence revealed that ARC was dead in the water. In a May 27, 2015 internal email, Anderson CFO Taylor summarized a discussion that he had with Alchemy CEO Bill Lee about ARC Entertainment and its potential impact on the ANConnect Transaction:

> From [Lee's] diligence and review of ARC financials and pro forma's he believes:
>
> 1.   ARC is not a business that's a going concern.
>
> 2.   Even though they've bought 36 films Bill thinks they'll only generate half the revenue of last year.
>
> 3.   This makes our purchase price allocation incorrect – way too high.
>
> 4.   BUT, He's not asking to adjust the purchase price if he can come to the proper arrangement with ARC – Arden.
>
> 5.   Giving them advances doesn't help them because it's short term debt used to buy long term paying out assets that may not pay out.
>
> 6.   ARC needs significant infusion of permanent capital or long term debt – he referred to it as potential mezzanine debt.
>
> 7.   Trevor is a great marketing buy but no one there can run the [ARC] business and Arden is too far away and doesn't understand it either.

Ex. 42; *see also* Ex. 43 (6/6/15 email stating that Lee believes ARC is "not a going concern"); *see also* Ex. 44 at VIG0007773 (Alchemy's owner recognized in May 2015 that "Arc is a distressed, low value business with an uncertain future").

Inexplicably, Alchemy proceeded with the transaction without any purchase price adjustment even after discovering that 25% of ANConnect's EBITDA was attributable to an entity which was not a going concern. All involved parties were fully aware of ARC's disastrous financial position, yet proceeded because of Alchemy's desire to consummate the deal – in particular, to put together a sweetheart deal for the benefit of ARC's owner (Ardon Moore) in the naïve hope of gaining access to Moore's "manage[ment] of the primary Bass Family fund…Billions!!!." Ex. 45; *see also* Ex. 46 (10/14/14 email among Alchemy's owner and Alchemy CEO Bill Lee: "[we] also talked briefly around the Bass Family/Ardon Moore angle with regards to ARC.  We would certainly be able to reach out to them at the right time."); Ex. 37 at pp. 6-7 (6/23/15 Alchemy presentation to SunTrust: "Simultaneous with the Alchemy purchase of Red Cloud[, codename for the ANConnect transaction,] Calrissian will purchase selected assets of Arc Entertainment.  In addition, the owner of Arc Entertainment (the 'Bass Brothers') will make a $10 million equity investment into Calrissian. . . . The Bass Brothers will also insure minimum working capital levels are maintained in the new entity for future product acquisitions and expansion of film festival [activities.]"); Ex. 48 (11/19/15 email from Alchemy's owner describing ARC owner Ardon Moore as its "partner in the alchemy deal"). Indeed, in response to June 7, 2015 emails from Alchemy CFO Avagliano emphasizing "how much more we need to negotiate" given that ARC was "in denial" regarding its financial status, Lee stated that those concerns should be ignored because "Ardon and [Alchemy's owner]'s conversation was positive and there is a way forward on the transaction." Ex. 49.

Even ANConnect was shocked that Alchemy did not request a purchase price adjustment given that the EBITDA attributable to ARC was essentially fictitious. S*ee* Ex. 50 (6/5/15 email in which an ANConnect executive reports that "[t]he Alchemy due diligence team defined ARC as insolvent approximately $18M . . . negative working capital. . . . Alchemy would like to merge the two businesses together and take advantage of the synergies and receive a 'pay out' investment from Arden. At this point, Arden said, 'Why would I want to put more money into ARC? I could close it down and keep [Bentonville Film Festival].' Also, Bill Lee quoted Arden saying that he would not sign ANConnect's consent until ARC and Alchemy have a deal. Alchemy's board is supportive and Virgo Alchemy equity investors are working on this deal this weekend. At this point, Bill Lee has not said anything about a purchase price adjustment to us.").

### c.    DreamWorks/Classic

DreamWorks Classic ("DreamWorks" or "Classic") was the second largest customer of ANConnect's video 3PL division, accounting for approximately $4 million in revenue in 2014. Ex. 32 at p. 7. DreamWorks' Distribution Agreement with ANConnect provided for an annual Minimum Guarantee, meaning that regardless of performance ANConnect was obligated to pay DreamWorks a minimum amount, and, in the two years before the ANConnect Transaction, ANConnect failed to meet the Minimum Guarantee and was obligated to fund a substantial shortfall. *See, e.g.,* Ex. 51 at 0029990 (3/10/14 notes from an ANConnect executive discussing a meeting with a DreamWorks representative and stating that when ANConnect told DreamWorks that it "cannot pay the MG shortfall," DreamWorks responded that "a deal is a deal" and ANConnect's internal strategy was to be "pay what we think we owe or actually a little less, then not pay anything" and noted that "DreamWorks agree[s] the MGs should go away in the future"); *see also* Ex. 29 at ¶ 7 (5/12/14 internal ANConnect notes estimating that it would take at least three

10

years to recoup ANConnect's losses from a contract shortfall with DreamWorks). ANConnect's inability to meet the minimum guarantee reflects a significant weakness in its relationship with DreamWorks and the physical distribution business generally at the time of the transaction[4], yet the EBITDA basis for the purchase price was not reduced accordingly.

ANConnect eventually negotiated an increase to the DreamWorks distribution fee beginning in June 2014 from 18.5% to 26%. *See* Ex. 53. However, as part of the ANConnect Transaction, the DreamWorks Consent and Consignment to Alchemy reset the distribution fee back to the lower 18.5% and charged a one-time fee of $1 million, half of which was Alchemy's obligation, effectively increasing the purchase price. *See* Ex. 54 at ¶¶ 10-11. Additionally, the digital distribution rights were scaled back, and the term of the agreement was only extended to December 31, 2015, a mere six months, at which point DreamWorks was free to terminate the relationship. *See id.* at ¶¶ 6, 12. All of these concessions served to reduce the value of the DreamWorks distribution rights, yet were not accounted for in the final purchase price.

Although the DreamWorks relationship was unprofitable for ANConnect, the April 2015 BDO Report assigned an increased revenue adjustment to the relationship in the amount of $3.9 million. Ex. 32 at p. 9. Because the distribution fee to Alchemy was reset to the original reduced rate of 18.5% (down from 26%), the revenue adjustment should have been decreased, not increased, thereby inflating the EBITDA calculation used as the basis for the Purchase Price.

---

[4] *Cf., e.g.,* Ex. 52, DreamWorks SEC Form 10-K for fiscal year 12/31/15 at pp. 33-34: "In recent years, the distribution of content through physical formats has contributed less to the overall revenue for our films than in the past due to changes in consumer behavior, increased competition and lower pricing by retailers. . . . Over the last several years, we have experienced a significant decrease in the traditional home entertainment market (e.g., physical DVDs). Although we have been able to increase the amount of our content delivered through digital distribution methods, this has not fully offset the decline in physical home entertainment revenues."

Moreover, the BDO report fails to reflect the actual negative results that ANConnect experienced prior to the ANConnect Transaction and that Alchemy experienced subsequent to the ANConnect Transaction.   Ultimately, Alchemy failed to meet the Minimum Guarantee obligations and DreamWorks terminated the relationship in early 2016. *See, e.g.,* Ex. 55; Ex. 82 at ¶ 11.

### C. The Anderson Transaction Had A Devastating Impact On the Debtors' Already Unsound Business

Immediately after the Closing Date, ANConnect internally acknowledged that the business they just sold for over $45 million in cash and assumption of debt was a massive liability that was destined to fail: "the most glaring issue with [ANConnect's business] was and is the fragile finances of the suppliers who are often in advanced positions in order to provide product. Note that post video sale we will make entries known and estimated that total almost $12m dealing with the write off or reserve of 'assets' in this business. To have continued on without selling would have seen these writeoff's eventually occur without much profit return to cover them." Ex. 34.

Alchemy's already inadequate cash flow significantly worsened after closing, exacerbating a crippling liquidity crisis. Just one day after closing, Lee emailed "Alchemy priorities," which named "liquidity/cash management" as one of the main concerns at Alchemy and listed "[m]anage[ment] [of] negative $5M working capital requirement through September" as his top priority. Ex. 56. Contemporaneous communications further establish the point, including:

- a 7/13/15 email in which Alchemy's CFO considers paying Steve Lyon's severance [another legacy liability acquired as part of the transaction] "over a period of time" because Alchemy is "looking for short term liquidity improvement options," Ex. 58;

- Distributor emails in August 2015 "begging for payment": "Why are we not getting answers from anyone? Anderson has nothing to offer and Alchemy is not responding. We want and need the funds that are due," Ex. 57;

- An 8/4/15 email in which Maverick Entertainment complains about the lack of communication from Alchemy, seeks redress for past due payment, and states: "Our not being paid is a very significant issue," leading Alchemy EVP Jenkins to inform Bill Lee that, "[e]ven if we are stretching payables, we need a process around understanding what we are

dealing with." Ex. 83. Due to Alchemy's lack of communication, Maverick then approached ANConnect directly, stating: "Alchemy rarely answers or calls and when they do it's usually an email full of stall tactics pointing the finger," Ex. 83A;

- an 8/17/15 email in which an Alchemy consultant and Alchemy's HR Director discuss a conversation regarding the consultant's past due invoices and the consultant states that Alchemy's general counsel Olivia Lerner told her as a personal favor that, unless she received pre-payment for services rendered to Alchemy, she should refuse to perform them, Ex. 47;

- A 9/2/15 email in which Maverick Entertainment notifies Bowring that payments are past due: "I have not heard back from you and am very concerned. We have absolutely no understanding of how you can justify collecting money from Walmart on our invoiced product but will not pay us for our portion of the collected sales. . . . Please do not ignore our request. Alchemy is inflicting serious pain on our business," Ex. 59;

- A 9/30/15 email with "a plea for mercy" from Hot Rod Creative to Alchemy seeking payment for past-due invoices: "It is getting impossible to stay afloat. We . . . have not yet received any payments from Alchemy . . .," Ex. 60; and

- 11/16/15 minutes from an ANConnect Manager meeting which state: "Chuck [Taylor] reviewed the outstanding items related to the Alchemy closing. There are several balance that are due from Alchemy. We estimate the aggregate amount due from Alchemy over the next 24 months is $18.5 million. There are ongoing discussions with Alchemy over their cash flow issues. Alchemy has requested funding from ANConnect," Ex. 61.

    In the words of Anderson Digital co-founder Lyons, it was immediately apparent that "Alchemy's acquisition of Anderson Digital's parent company[, i.e., ANConnect,] has been an operational and financial disaster" which left Alchemy "experiencing serious trouble meeting its financial obligations as they come due, [including obligations] to vendors and suppliers which are critical to company's continued existence." Ex. 62 at ¶¶ 30-32. The transaction left the already distressed Alchemy in a state of "financial triage, picking and choosing which of its creditors it will pay," and having difficulty making timely lease and license payments. *Id.* Lyons was also informed on at least two occasions – including in November 2015 by then-CEO Bill Lee and in February 2016 by Alchemy's owner – about the Debtors' cash flow problems. *Id.* at ¶¶ 10, 23.

    By December 2015, Alchemy's owner forced Lee to resign, purged individuals involved with the Anderson deal, and installed Scott Guthrie and Kelly Summers to serve as co-Presidents. Ex. 63. In a January 2016 SunTrust meeting, Alchemy reported that it continued to struggle with

13

liquidity, could not collect AR from key customers, was laden with unfavorable contracts from the ANConnect Transaction, and had no concrete plan to fix these issues. *See* Adv. D.I. 315-3 at pp. 2-3 ("Meeting Overview: Alchemy/Virgo 1/12/16"). Tellingly, Alchemy also reported that the process by which it "greenlighted" the content it would purchase and distribute was "focused almost entirely on financials that were not grounded in reality" and that it was moving to a new process which would involve a "realistic ROI." *Id.* at p. 3. This revelation, along with the fact that Alchemy's "accounting function [was] completely broken," Ex. 64, necessarily means that every financial statement and analysis of the debt-laden company was materially overstated.

In a February 3, 2016 email Alchemy Co-President Kelly Summers complained that Alchemy was missing "a forward-looking view and plan," noting that "[t]he situation with unpaid vendors, suppliers, and creators is reaching deep into the organization." Ex. 65. Summers was of the view that Alchemy needed to "face the music[,] be honest and stop pretending everything is fine." *Id.* In a February 10, 2016 email chain which acknowledged that Alchemy was "in the midst of a severe liquidity crunch" and would be unable to pay contractually required minimum guarantees on several films, Alchemy's owner stated that it was at the point where it "[p]rayed to St Jude." Ex. 66. By at least February 16, 2016, Alchemy's financial issues were well known throughout the industry, with *Deadline* publishing an article entitled "Alchemy Faces Financial Woes, Slashes Staff & Uncovers Discrepancies Within Parts Of Its Business." Ex. 67. Summers described the article as "not nearly as bad as it could have been," and noted that negative sources would be easy to find "[b]ecause we have left so many unpaid for so long." Ex. 68.

In an email dated February 12, 2016 to Guthrie and Summers, Alchemy's owner described its efforts to resolve Alchemy's dispute with Group 1200 Media over the unpaid "legacy liability":

have been coordinating with . . . Group 1200 to solve the rather large payable ($3mm+) that came over with the Red Cloud transaction. Group 1200 is no longer a supplier for us so this is really just a legacy liability.

The goal here is to stretch out the payment timeline, so I proposed monthly payments of $150k for the first six months . . . . The CFO didn't shut down the proposal but suggested a larger initial payment.

Summers responded that same day:

I had no idea we'd acquired a $3M liability in that transaction. Hits keep coming.

Payment plans is all we can offer so I'm with you there. But until I see what our cash flow looks like it's hard to say whether that's something we can honor. Buys us time, keeps us out of court so it's the right thing to do. But at what cost?

We have many other payables affecting our current ability to produce near-term revenue.

As you know we are losing product flow from existing suppliers, we have effectively shut down all business development & acquisition activity, and planned titles are in trouble of meeting street date due to unpaid vendors and work stoppage. Our pipeline is dying.

Ex. 38.

The Group 1200 liability was one of many "legacy liabilities" Alchemy was "burdened with" as a result of the ANConnect Transaction. Per an April 2015 CIM prepared in connection with an unsuccessful attempt at recapitalization, Alchemy was "burdened with an estimated $22.4 million of legacy liabilities related to the ANConnect transaction and transition plus payables 'overhang' from the historical acquisitions business." Ex. 69 at p. 44. Those "legacy liabilities" accounted for approximately 50% of Alchemy's total liabilities at that time. *Id.*

In a presentation dated March 14, 2016, financial and management consultant Carl Marks Advisors provided a partial summary of the disastrous state of Alchemy in the wake of the ANConnect transaction, Ex. 70, noting that,

- On 2/2/16, Alchemy terminated 60 employees, an elimination of 38% of its workforce, leaving it with only 84 employees, *id.* at p. 7.;

15

- As of 3/1/16, Alchemy owed $17.4 million in outstanding payables, $8 million of which were over 120 days past due, *id.* at p. 11; and

- "Approximately $750K in ARC purchase obligations are being reconciled and may need to be added to Alchemy's Balance Sheet," *id.*

The Debtors entered into a forbearance agreement with SunTrust on April 20, 2016, thereby acknowledging various defaults, Ex. 71, and, in a letter dated June 15, 2016, SunTrust provided notice of acceleration of Alchemy's secured debt. Ex. 72.

### D. Procedural History

On July 1, 2016 (the "Petition Date"), Debtors filed voluntary Chapter 7 petitions. The Trustee commenced the instant adversary proceeding on June 29, 2018, seeking to avoid and recover as actual and constructive fraudulent transfers under the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act ("DUFTA") the Anderson Purchase Price, i.e., the $29,888,124.40 in cash paid to ANConnect and the assumption of more than $16 million in ANConnect obligations. *See* Adv. D.I. 1, Counts I, II, and V.[5] The Complaint also asserts an alternative claim for unjust enrichment based on the same transfers. *See id.*, Count III.

ANConnect and Anderson Merchandisers, LLC (collectively, the "Anderson Defendants") moved to dismiss certain claims and, on September 16, 2019, this Court issued its Memorandum Opinion denying in part and granting in part the motion. *See* Adv. D.I. 84 (the "Anderson Op."). The Court held that the Trustee sufficiently alleged the lack of reasonably equivalent value:

> The Complaint alleges that Alchemy's insiders ignored information about ANConnect while negotiating the deal, which resulted in a "vastly overinflated" Anderson Purchase price and the assumption of excessive liabilities. Compl. ¶¶ 69-72. The information Alchemy allegedly failed to consider during negotiations includes: the sharp decline in ANConnect's physical media sales, as well as the

---

[5] Anderson's brief makes clear that they are only moving on the Trustee's claims for actual and constructive fraudulent transfer and unjust enrichment insofar as they seek to avoid transfers pursuant to the Anderson Transaction. *See* ANConnect Br. at p. 5. The Trustee's other counts, and other extant avoidance/unjust enrichment claims under Counts I, II, III, and V, will proceed to trial.

rapid deterioration of the entire physical media industry; ANConnect's solvency following the closing of the deal; and the termination of ANConnect's relationship with a significant supplier, which allegedly should have reduced the Anderson Purchase Price by $5.6 million. Compl. ¶¶ 69-72. . . . After considering the alleged flaws in the negotiation process and the immediate financial distress caused by the ANConnect Transaction,[] the Court finds that the Trustee sufficiently pleaded lack of reasonably equivalent value.

*Id.*, pp. 17-18. These allegations set forth a badge of fraud (one of three which the Court held were adequately pleaded) supporting the Trustee's actual fraudulent transfer claims, and likewise support the Trustee's constructive fraudulent transfer claims. *Id.*, pp. 18, 22, 32. This Court also held that, "the Trustee adequately pleaded the circumstances surrounding the ANConnect Transaction to allow the Court to plausibly infer actual fraudulent transfers," given badges of fraud concerning lack of reasonably equivalent value, insolvency, and the transferring away of Alchemy's remaining liquidity in connection with the transaction. *Id.*, pp. 16-18.

## III. ANCONNECT'S MOTION SHOULD BE DENIED BECAUSE THERE ARE DISPUTED ISSUES OF MATERIAL FACT CONCERNING THE TRUSTEE'S AVOIDANCE AND UNJUST ENRICHMENT CLAIMS

In deciding a motion for summary judgment, a court must view all facts and draw all reasonable inferences in favor of the non-moving party. *In re Maxus Energy Corp.*, 615 B.R. 62, 69 (Bankr. D. Del. 2020). "[W]here the record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* (internal quotation marks omitted). Issues of reasonably equivalent value, the insolvency/inadequate capitalization element of a constructive fraudulent transfer, and actual fraudulent intent require an inherently fact-sensitive inquiry into the circumstances surrounding the challenged transfer and dictate that ANConnect's motion be denied as a matter of law in light of the evidence.

### A. Ample Evidence Demonstrates A Lack of Reasonably Equivalent Value

To determine whether a debtor received "reasonably equivalent value," one of the elements of the Trustee's constructive fraudulent transfer claims, and a badge of fraud relevant to the Trustee's actual fraudulent transfer claims, courts look to the totality of the circumstances, including, non-exclusively: "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (citation omitted). Courts generally find that a party receives reasonably equivalent value when it "got roughly the value it gave." *Id.* at 212-13; *see also In re Plassein Int'l Corp.*, 2008 WL 1990315, at *6 (Bankr. D. Del. May 5, 2008). Whether a debtor received reasonably equivalent value for an allegedly fraudulent transfer is an inherently fact-specific inquiry. *See, e.g.*, *In re Washington Mut., Inc.*, 2013 WL 3757330, at *5 (Bankr. D. Del. July 16, 2013) (describing reasonably equivalent value as "an issue of fact that can only be properly developed with discovery and at trial"); *In re Bentivegna*, 597 B.R. 261, 266 (Bankr. E.D. Pa. 2019) ("The Third Circuit has explained that the determination of whether reasonably equivalent value was exchanged for a transfer is a factual one."); *In re Charys Holding Co., Inc.*, 443 B.R. 628, 637-388 (Bankr. D. Del. 2010) (holding that the analysis of reasonably equivalent value is "inherently fact driven" and requires a "fact intensive determination"); *In re Halpert & Co., Inc.*, 254 B.R. 104, 115 (Bankr. D.N.J. 1999) (citing 5 Collier on Bankruptcy ¶ 548.05[1][b] (15th ed. 1998) -- "Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of facts")).

As described in Section II.B above, there is ample evidence demonstrating that Alchemy received less than reasonably equivalent value when it vastly overpaid for the package of rights and liabilities it received from ANConnect, notwithstanding that the parties went through the

motions of due diligence. Irrationally intent on worldwide domination at any price, Ex. 17 at p. 19,

Alchemy ignored numerous red flags that would have informed any reasonable purchaser that the

purchase price was much higher than the fair market value of what it had acquired, including:

- The fact that all parties knew that the physical media business (based largely on DVD sales) was in rapid decline that was only projected to accelerate in the future, with total industry revenues declining from $20.6 billion in 2006 to only $9.6 billion in 2015, with declines expected to accelerate rapidly through 2021. Ex. 19, p. 12; *see also* Ex. 20 (Alchemy owner states just half a year after the ANConnect transaction that "[t]he physical business is not a great business" and that it is "ultimately going away"); Ex. 27 (ANConnect insider states that he "would be surprised if [Alchemy] is budgeting growth on the physical business . . . the category has not seen the digital gain make up for the physical loss.); Ex. 69, p. 38 (Alchemy Confidential Information Memorandum, noting "10% annual market decline on physical product consistent with research estimates");

- Before closing the deal, Alchemy was aware that ANConnect and Anderson Digital had "very concerning" collection issues and that ANConnect had defaulted on various payment obligations owed to Alchemy. *See* pp. 4-6, *supra*; and

- The purchase price failed to account for, *inter alia*, the impending termination of the Group 1200 Media relationship, the fact that ARC was not a going concern, and the obviously untenable DreamWorks relationship. *See* pp. 7-12, *supra*.

*See also* Adv. D.I. 312-1, Homony Dep. at 29:4-17.[6]

The Group 1200 issue is in and of itself sufficient to establish a disputed fact as to lack of

reasonably equivalent value. The April 2015 BDO Report emphasizes the importance of the Group

1200 relationship for ANConnect's business, noting that "[t]he increase in adjusted revenue from

FY13 to FY14 of 29% . . . was largely driven by increased sales of products sourced from Group

1200 Media and WEA Corp., which have higher average selling prices" and that "[t]he increase in

---

[6] The Trustee's bankruptcy and accounting advisor William Homony testified that "Alchemy's purchase price of ANConnect was completely inflated, because it relied heavily on an industry that was . . . on the significant decline and was eventually going to be extinct in the next few years. So why you would pay such a large purchase price for that business . . . still baffles me to this day, and nobody could really explain it to me. The rationale doesn't make sense to me that they wanted to be the single largest acquirer of independent film in order to distribute to Walmart. . . . [I]t's a dying industry."

vendor mix . . . is primarily attributable to increased sales of products from Group 1200 Media and Team Marketing." Ex. 32, p. 13; *see also id.*, p. 26. By the Closing Date, the parties knew that the Group 1200 relationship—which had been critical to ANConnect's recent increases in adjusted revenue and vendor mix—would be terminated the following month, *see* Ex. 37, p. 3, yet the purchase price does not reflect the $5.6 million reduction that should have resulted. *See* p. 7, *supra*.

The purchase price should have been further reduced by over $3 million to account for the liabilities assumed in connection with the defunct Group 1200 relationship, *see id.*, and by a flat 25% (i.e., over $7 million of the cash component of the purchase price) to account for the 25% of ANConnect's EBITDA attributable to ARC, which all parties acknowledged to be not a going concern. *See* pp. 8-10, *supra*. These three reductions to the purchase price total in excess of $15 million, or over half the cash component of the purchase price, which is more than sufficient to establish a genuine issue of material fact concerning "whether [Alchemy] got roughly the value it gave." *Fruehauf Trailer*, 444 F.3d at 213; *see also supra* at pp. 10-12 (discussing further purchase price reductions which should have been made due to the disastrous DreamWorks relationship).

In addition to those issues known to Alchemy (but ignored), the evidence shows that ANConnect misrepresented material facts to Alchemy during due diligence. *See* p. 6, *supra*. In direct contradiction to their statements during due diligence that "instances of bad debt write-offs were infrequent and insignificant," Ex. 32 at p.16, ANConnect's principals knew that their video business was a ticking time bomb and faced significant bad debt write-offs that made it untenable for Anderson to continue operating the business. *See, e.g.,* Ex. 33 (5/28/14 email in which Anderson CFO Taylor describes ANConnect's precarious situation regarding accounts receivable: "I'm trying to avoid being immediately and forever upside down. . . . the 3PL is currently upside down $7.4m."). Indeed, immediately after the close of the deal, ANConnect internally

acknowledged that the business which they just sold for a total purchase price of over $40 million was in fact destined to fail and required $12 million in write offs. *See* Ex. 34.[7]

In light of the foregoing evidence, which establishes ANConnect's deception as well as the fundamentally flawed basis for the EBITDA used to calculate the purchase price, ANConnect's argument that the Trustee cannot prove a lack of reasonably equivalent value is completely without merit. Furthermore, ANConnect's own statements establish that the 4x EBITDA multiplier was itself far greater than justified by the rapidly declining market conditions. *See* Ex. 31 at 0059281 (ANConnect states that "it is most difficult to rationalize beyond two times EBITDA"). ANConnect's educated statement that a business identical to the one sold to Alchemy was not worth more than 2x EBITDA in a more favorable environment for physical distribution is strong evidence that a purchase price based on a 4x EBITDA is far above fair market value.

While ANConnect cites evidence which it spins as supporting the opposite conclusion, this only highlights the extent of the parties' factual disputes. Moreover, ANConnect's spin lacks merit. ANConnect's arguments concerning supposed "hindsight" analysis should be rejected. The Trustee's allegations concerning lack of reasonably equivalent value are not based simply on the fact that Alchemy later failed; rather, as set forth herein, they are based on evidence establishing, *inter alia*, that Alchemy failed to account for ANConnect red flags prior to closing, that Alchemy's already-existing liquidity problems only worsened following the transaction, and that Alchemy's

---

[7] Additionally, while ANConnect disingenuously represents the opposite, when asked whether ANConnect provided Alchemy with inaccurate information during the sale process, Mr. Homony testified that, while he could not on the spot "point to a specific document or number[,] I know there are concerns again through communications in real time that product returns were significantly higher post-acquisition than was expected.  I do know that[.] . . . I believe there are indications that potentially Dream Works was not intending to stay with Alchemy for very long post-acquisition, that they were going to transition to an entity named Fox as their new distributor . . . . Those are the two main things."  Adv. D.I. 312-1, Homony Dep. at 23:20-24:17.

failure after the transaction was immediate and a *fait accompli*. *See* Anderson Op., p. 18 (rejecting ANConnect's argument that the Trustee's allegations were based on hindsight). ANConnect's argument that the purchase price represented fair market value because it was negotiated at arm's length (a supposed fact for which ANConnect cites no evidence) is similarly misplaced given the material information misrepresented by ANConnect and the numerous aforecited reasons to distrust the purchase price. *Cf. VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (holding that a market price can be a reliable measure of fair market value only "[a]bsent some reason to distrust it").

ANConnect asks the Court to assume that, because Alchemy received a loan from SunTrust and advisory services from SunTrust's investment banking affiliate SunTrust Robinson Humphery ("STRH"), there can be no dispute that reasonably equivalent was exchanged. *See* ANConnect Br., p. 13. There is no support for this inferential leap. To the contrary, when viewed in the light most favorable to the Trustee, the evidence supports the inference that SunTrust was conflicted in its dual roles as lender and Alchemy's M&A adviser and approved the deal based on inaccurate information (e.g., the aforecited misrepresentations made by ANConnect) and with the bankers' short term desire to reap lucrative fees. *See, e.g.,* Adv. D.I. 314-1 at p. 225 (discussing SunTrust's "Relationship Profitability"); *see also* Adv. D.I. 312-1, Homony Dep. at 27:25-28:7 ("it strikes me a little odd that [SunTrust and STRH representative Matt Rowand] would wear two hats that seem to be in conflict with each other. . . . [I]f I'm the bank, I don't want an officer of the bank trying to sell the bank on a deal . . . and banks really don't want to admit when they make bad deals."); *id.* at 26:3-13 ("I viewed [STRH], . . . as a broker, [that] tried to help [Alchemy] present the best case they could to the banks, in order for them to lend the additional money required to fund the ANConnect purchase."). Moreover, as discussed in detail above, the underlying information

provided to SunTrust was inaccurate, *see supra* at p. 6, and Mr. Rowand testified that such inaccuracies "could have changed [SunTrust's] view [because] [w]e were going on the information we were provided." Adv. D.I. 315-1, Rowand Dep. at 108:10-17. Rowand also testified that SunTrust did not have access to ANConnect's internal emails, many of which, as discussed herein at pp. 5-6, fundamentally undermine the financial data it was providing to Alchemy. *Id.* at 108:18-24. Finally, Rowand testified that STRH failed to even prepare a quality of earnings report or other written analysis of the deal. *Id.* at 116:11-13. Even the most cursory of such an analysis would have identified the glaring supplier issues set forth above, which accounted for nearly half of the cash component of the purchase price. *See supra* at pp. 7-12.

The BDO Report is similarly unpersuasive and contains numerous explicit disclaimers establishing that it was simply a regurgitation of information provided by management and cannot be relied upon as an indicator of the value of the purchased assets. *See* Ex. 32 at p. 1 ("we make no representations regarding the sufficiency of the procedures described herein . . . for any . . . purpose," "accept as accurate the accounting records of [ANConnect]," "did not perform an audit" and "do not express" "an opinion on the specific elements, accounts, or items"); *id.* at p. 2 ("We have not compiled or examined any prospective financial information which may be contained in this report . . . . We have not independently verified the information gathered or contained in this report and, accordingly express no opinion and make no representations concerning its accuracy or completeness."); *see also* Adv. D.I. 312-1, Homony Dep. at 42:2-4, 43:7-11, 44:2-21.[8]

---

[8] "I'm not sure any of this information actually originated from BDO . . . . I don't think they are opining that this is what their calculation of the estimated EBITDA is. I think they took largely what management gave them, put it in a nice package to present it to the bank. . . . [T]hey could not have evaluated the quality of the underlying major suppliers. . . . If they had done any diligence on ARC, there should have been red flags. . . . But this report doesn't say they did that. . . . I mean, there's so many disclaimers, I don't know how anybody would rely on it. . . . Dream Works . . . [was] only around for six months and left to go to another distributor. We didn't get any

Finally, while ANConnect argues that a self-serving presentation Alchemy used in a desperate and unsuccessful attempt to obtain additional financing establishes that the ANConnect assets performed as expected, ANConnect Br. at pp. 7, 16, that argument is more than outweighed by the significant evidence cited herein that the assets performed poorly and that the numbers in the presentation were fictitious, as succinctly summarized by Mr. Homony:

> There is no way in which they segregated their costs between the legacy business and the new business, especially on an administrative-overhead kind of level. They were, as I mentioned, overwhelmed. And the last thing they were doing was accounting for anything. . . . I'm not sure where ANConnect's EBITDA comes from. ANConnect operated three separate divisions as one entity, and my understanding was there was some pro forma calculation done of EBITDA, which I find hard to believe was accurate to begin with, which reflected . . . ultimately the multiple used to come up with the purchase price. Honestly, I don't think most of the numbers on these charts that segregate and split the legacy business before ANConnect and post ANConnect on a stand-alone basis are anywhere close to accurate. . . . As I mentioned, there are real time communications in which people internally at Alchemy, who are discussing it internally at Alchemy, and not with the bank or with anybody else [that] may not want to know the true condition of what was going on, are expressing huge concern about this acquisition; people that were kind of left in the dark and left to deal with it after the fact, once the deal closed . . . .

> I don't think you could . . . determine what the right number was. . . . I have gone through way more pages of documents in this case than I would have wanted to. And it's clear to me that Alchemy was incapable of segregating the two, to report it in some fashion, where they knew exactly what the stand-alone old ANConnect business was they acquired – which didn't exist anymore – versus the old legacy business that existed prior to the acquisition. . . . I think they wanted to tell a story. I think they are trying to tell the marketplace the ANConnect deal, which they had just done – I mean, at this point it was less than a year – was positive, and they could utilize that to try and get financing from a . . . new partner. . . . I noticed there are no 2016 numbers in here, and I think this is from April of 2016. . . . And that $8 million EBITDA number comes from the financing they did with the bank. . . . But for the AnyConnect piece, they used an EBITDA number for one year until they could figure out what the assets were worth and how to lend against those assets. And the EBITDA number was 8 million and change. That's why I think the number stays the way it does, because if you reduce that number . . . they can't

---

consideration for that. . . . And there were other parties like that.  There are items in these [historic ANConnect EBITDA] numbers that were not really evaluated on a contract-by-contract basis to determine whether or not this revenue could be relied upon in the future[.]".

borrow as much as they otherwise could. And Alchemy was already in an over-advanced position on a borrowing-base facility.

Adv. D.I. 312-1, Homony Dep. at 37:20-38:25, 55:20-57:25; *see also* p. 14, *supra*.

### B. Ample Record Evidence Demonstrates that Alchemy Was Insolvent, Inadequately Capitalized, and Unable to Pay Its Debts When It Entered Into the Anderson Transaction

The debtor's insolvency, or otherwise poor financial condition, is relevant to all of the Trustee's fraudulent transfer claims, as an element of constructive fraud and as a badge of actual fraud. A transfer is avoidable as a constructive fraudulent transfer if, in addition to being made for less than reasonably equivalent value, the transfer was made when the debtor was insolvent or caused the debtor to become insolvent. *See* 6 Del. C. § 1305(a); 11 U.S.C. § 548(a)(1)(B)(ii)(I); *see also* 6 Del. C. § 1302(b) ("A debtor who is generally not paying debts as they become due is presumed to be insolvent.").  As an alternative to alleging insolvency, a Plaintiff may allege that at the time of the transfer the debtor was (i) engaged or about to be engaged in business or a transaction for which the debtor's remaining property was an unreasonably small capital, *or* (ii) intended to (or believed that it would) incur debts beyond its ability to pay as they became due. *See* 6 Del. C. § 1304(a)(2); 11 U.S.C. § 548(a)(1)B)(ii)(II)-(III).[9]

In addition to the aforecited examples which create a material issue of disputed fact as to insolvency, unreasonably small capital, and inability to pay debts as they became due at Alchemy

---

[9]    Because the conditions specified in DUFTA and the Bankruptcy Code's constructive fraud provisions are written in the disjunctive, the Trustee states a claim by sufficiently pleading the requirements of any one of the conditions.  *See In re Kendall*, 491 B.R. 191 (Table), at *6 (10th Cir. B.A.P. 2013), *aff'd*, 565 F. App'x 714 (10th Cir. 2014). "[U]nreasonably small capital denotes a financial condition short of equitable insolvency," and "refer[s] to the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  "Much like the insolvency inquiry, unreasonably small capital often turns on questions of fact, thus being inappropriate to decide on a motion to dismiss." *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 859 (Bankr. D. Del. 2018).

in the wake of the Calrissian Distribution, *see supra* at pp. 1-3, the following documents and facts make clear that Alchemy's liquidity and cash flow were inadequate in the months leading up to the Closing Date such that numerous debts were not being paid as they came due:

    a.  A May 15, 2015 email from Jim Jenkins stating that Alchemy was desperately maneuvering towards "keeping out of debtor's prison," Ex. 73;

    b.  A March 25, 2015 email among Alchemy's owners acknowledging its grim financial situation and stating that "liquidity is an important area to get right and probably easiest to discuss in person," Ex. 74;

    c.  A May 27, 2015 email among Alchemy's owners acknowledging the need to resort to "back up plans" for liquidity and questioning whether they were "cutting it too close," a reference to the operation of Alchemy on a shoestring following the Calrissian Distribution, Ex. 75;

    d.  A June 5, 2015 email from Alchemy's general counsel stating that, due to ongoing issues with paying its vendors on time, Alchemy was "trying to urgently get positive trade references to a company called D&B," and that to do so certain favored vendors would have to be "called and buttered up," Ex. 76;

    e.  On June 22, 2015, Alchemy defaulted on a $1,000,000 payment due to Toiion, Inc., Ex. 77 at pp. 2-3; and

    f.  A June 23, 2015 email from the co-President of PBSS Distribution to Bill Lee describing "continued problems with getting paid" by Alchemy dating back to March 2015, Ex. 78.

       The Anderson transaction further crippled the working capital situation at the Debtor, as described in detail *supra* at pp. 12-16. As grimly summarized by Anderson Digital co-founder Stephen Lyons, it was immediately apparent that "Alchemy's acquisition of Anderson Digital's parent company has been an operational and financial disaster," which left Alchemy "experiencing serious trouble meeting its financial obligations as they come due, [including obligations] to vendors and suppliers which are critical to the company's continued existence." Ex. 62 at ¶¶ 30-21. The transaction left the already distressed Alchemy in a state of "financial triage, picking and choosing which of its creditors it will pay," and having difficulty making timely lease and license payments. *Id.* Mr. Homony further described the impact of the ANConnect Transaction on

Alchemy's working capital and ability to timely pay debts, including even the full purchase price

for ANConnect, as follows:

> it was total chaos at Alchemy . . . as soon as the ANConnect transaction closed. They didn't know which way to look. They were getting bombarded with calls from license [holders] about, When am I getting paid? When am I getting reports? We need cash for this. We don't have enough cash for that. We can't pay anybody on time. Can't pay anybody in full, we'll have to stretch that out. . . . And then you had the issue with the transition, which was whether or not they were getting information timely, in order to . . . remit that information to their contract counterparties . . . whose content they distributed. It was clear. . . . I mean, just in the communications, even in the pre-communications before the deal closed, which is why I said I don't know why Alchemy ever did this. They knew doing the diligence there were major flaws in this deal, and for some reason they did it anyway. And I know that Bill Lee was the head of that and so was John Avagliano, who were both fired in November of 2015, which was three or four months after the closing. And again, I was not there at the time, but I can tell you from the documents I reviewed and email communications that it was total chaos, and, you know, we could not even pay Anderson the full purchase price.

Adv. D.I. 312-1, Homony Dep. at 30:6-31:16.

Simply put, Alchemy foolishly pursued the Anderson Transaction when Alchemy's core

business was mortally wounded by the Calrissian Distribution and fundamental mismanagement.

As later summarized in a document prepared for an anticipated Chapter 11 filing,

> Apart from the challenges arising in the ANConnect Transaction, Alchemy's core business experienced substantial declines in revenue in 2014 and 2015. These declines resulted primarily from lower than expected performance on acquired film content. In 2014, the Debtors experienced material losses relating to the underperformance of a high investment, single title theatrical release that ultimately required approximately $6 million in minimum guarantee payments and advertising spend. Other released titles also underperformed expectations, resulting in lower earnings for the year. In 2015, increases in retailer returns of DVDs caused an overhang in the first two quarters of 2015 from underperforming 2014 releases.

Ex. 79 at ¶ 24. All the foregoing establishes material disputes of material fact as to Alchemy's

insolvency, insufficient capitalization, and the fact that any reasonable person could not have

believed anything other than that the ANConnect transaction necessitated indebtedness which

Alchemy could not (and indeed did not) pay.

27

**C.      There Are Genuine Issues of Material Fact Concerning Fraudulent Intent**

Under the Bankruptcy Code and Delaware law, transfers are avoidable as actual fraudulent transfers if they were made "with actual intent to hinder, delay, or defraud" any of the debtor's creditors. 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1). Because parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, courts rely on "badges of fraud" as circumstantial proof of actual fraudulent intent. *In re Charys Holding Co., Inc.*, 2010 WL 2774852, at *3, *5 (Bankr. D. Del. July 14, 2010). Badges of fraud include: "(i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits, control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 565 (Bankr. D. Del. 2012); *see also In re OODC, LLC*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (badges of fraud include transferor's knowledge of creditors' claims and its inability to pay them); 6 Del. C. § 1304(b) (setting forth non-exhaustive list of badges for consideration under Delaware UFTA). "A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for example, if the "natural consequence" of the transfer is that the debtor's creditors were hindered, delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bank. D. Del. 2011). Ultimately, the determination of whether a transfer was made with fraudulent intent is a question of fact "rarely susceptible to resolution at the summary judgment stage." *In re Polichuk*, 506 B.R. 405, 418 (Bankr. E.D. Pa. 2014).

ANConnect argues in a conclusory fashion that "there is no evidence to support the Trustee's claim that the ANC Acquisition was undertaken by Alchemy with the actual intent to hinder, delay, or defraud its own creditors." ANConnect Br., p. 19. The actual record, however,

demonstrates the existence of numerous badges of fraud. With respect to consideration for the conveyance, as discussed above, the evidence indicates that the cash purchase price and the amount of liabilities assumed by Alchemy far exceeded the value received in connection with the transaction. *See supra* at pp. 17-25. With respect to the amount of the debtors' estate transferred, evidence that Alchemy's working capital was insufficient both before and after the ANConnect transaction demonstrates that Alchemy transferred away what little liquidity it had, well more than what the Debtors could afford. *See* Ex. 56 (email sent by Lee on July 10, 2015 referencing $5 million negative working capital one day after ANConnect Transaction closed); *id.*, Ex. 62 at ¶ 30 (declaration from Lyons stating that ANConnect Transaction was "operational and financial disaster" that left Alchemy "experiencing serious trouble meeting its financial obligations as they c[a]me due, [including obligations] to vendors and suppliers which [we]re critical to company's continued existence"); *see also PennySaver USA Publ'g*, 587 B.R. at 461 (transfers beyond what the debtor can afford speak to the badge of fraud regarding the amount of the estate transferred).

ANConnect points to an audit report prepared for the year 2014 as supposed evidence of Alchemy's solvency at the time of the ANConnect Transaction (which closed July 2015). *See* ANConnect Br., p. 3 and p. 3 nn. 7-8. However, as the document clearly indicates, it is consolidated financial statements "as of December 31, 2014." *See* Ex. 81, p. 3. While the report may be relevant to issues concerning the timing of Alchemy's insolvency or other financial difficulties (which are fact questions inappropriate for resolution at summary judgment), it is not conclusive— particularly given other evidence concerning Alchemy's significant liquidity issues before and after the ANConnect Transaction. *See supra* at pp. 1-3, 12-16.

Further, ANConnect appears to acknowledge that the Debtors were in "financial distress" following the ANConnect Transaction, but simply disputes whether the transaction was the cause

of that distress. *See* ANConnect Br., p. 6 (ANConnect's contention that "the undisputed evidence establishes that . . . the Debtors' financial distress was not the result of the operations of the ANC Assets"). This issue is accordingly inappropriate for resolution on summary judgment, *see In re BMT*, 582 B.R. at 857 (noting fact-intensive nature of insolvency analysis), and, given evidence supporting the confluence of at least three badges of fraud, ANConnect's Motion should be denied. *See In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 461 (Bankr. D. Del. 2018) ("The confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." (quotation marks omitted)).

### D. Genuine Disputes of Material Fact Exist As To Unjust Enrichment

ANConnect's cursory argument concerning the Trustee's unjust enrichment claim should be rejected because, as set forth in detail in Section III.A above, there are genuine issues of material fact concerning whether Alchemy received reasonably equivalent value in connection with the ANConnect Transaction and these arguments apply to the question of whether the elements of unjust enrichment have been met—in particular whether there has been "an enrichment," "an impoverishment," and "the absence of justification." *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Additionally, as this Court has recognized, the viability of the Trustee's alternative unjust enrichment claim depends on the outcome of his fraudulent transfer claims. *See* Anderson Op., p. 26 (denying motion to dismiss unjust enrichment claim because, *inter alia*, it is plausible the Trustee would be left without an adequate remedy at law if his fraudulent transfer claims fail) (citing *In re FAH Liquidating Corp.*, 572 B.R. 117, 131 (Bankr. D. Del. 2017)).

## IV. <u>CONCLUSION</u>

Considering the foregoing facts and authorities, Plaintiff respectfully submits that ANConnect's Motion should be denied.

Dated:  September 22, 2023

Respectfully submitted,

/s/ John T. Carroll, III

John T. Carroll, III (DE Bar No. 4060)
COZEN O'CONNOR


-and-

Steven M. Coren, Esq. (pro hac vice)
Andrew J. Belli, Esq. (pro hac vice)
COREN & RESS, P.C.

*Counsel for Plaintiff*
*George L. Miller, Ch. 7 Trustee*